IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT L. VAZZO, LMFT, individually
and on behalf of his patients, DAVID H.
PICKUP, LMFT, individually and on
behalf of his patients,

        CASE NO.8:17-cv-02896-CEH-AAS

        Plaintiffs,

v.

CITY OF TAMPA, FLORIDA,

        Defendant.

---

### DEFENDANT, CITY OF TAMPA'S, RESPONSE AND MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Defendant, City of Tampa, Florida ("City"), by and through its undersigned counsel, files this Response and Memorandum of Law in Opposition to Plaintiffs' Motion for Preliminary Injunction, and states as follows:

### FACTUAL BACKGROUND

On April 6, 2017, the Tampa City Council passed Ordinance No. 2017-47, relating to conversion therapy on patients who are minors ("the Ordinance") and, on April 10, 2017, Mayor Buckhorn approved the Ordinance. The intent of the Ordinance is expressly set forth in § 14-310 and provides as follows:

> The Intent of this Ordinance is to protect the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and/or questioning youth from exposure to the serious harms and risks caused by conversion therapy or reparative therapy by licensed providers, including but not limited to licensed therapists. These provisions are exercise of police power of the City for the public safety, health, and welfare; and its provisions shall be liberally construed to accomplish that purpose.

The Ordinance cites to numerous medical and mental health organizations which have found that sexual orientation change efforts ("SOCE") therapy, including conversion therapy and reparative therapy, may pose a serious threat to the health and well-being of the affected persons. Moreover, according to the Ordinance, many such organizations have also concluded that there is a lack of credible evidence that SOCE therapy is effective. Specifically, the Ordinance cites to articles, reports, position statements, policy statements, a resolution and other publications, from such prominent medical and mental health organizations as the American Academy of Pediatrics, the American Psychiatric Association, the American Psychological Association's Task Force on Appropriate Therapeutic Responses to Sexual Orientation,[1] the American Psychological Association, the American Psychoanalytic Association, the American Academy of Child & Adolescent Psychiatry, the Pan American Health Organization, the American School Counselor Association, the Substance Abuse and Mental Health Services Administration (a division of the U.S. Department of Health and Human Services), the American College of

---

[1] Although Plaintiffs' Complaint and Motion cite to select portions of the 2009 Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation ("APA Report") in support of their position, there are other portions of the APA Report that support the City's concerns that SOCE therapy can pose serious health risks. For example, and without limitation, in the summary of the APA Report, in chapter 4, it states that "studies ... indicate that attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including depression and suicidal thoughts." (Page 42 of APA Report, Doc.1, Ex. B) In the conclusion of the APA Report, in chapter 4, it further provides that "We found that there was some evidence to indicate that individuals experienced harm from SOCE" (Page 43 of APA Report, Doc. 1, Ex. B) The APA Report also provides that: "the peer-refereed empirical research on the outcome of efforts to alter sexual orientation provides little evidence of efficacy and some evidence of harm." (Page 35 of APA Report, Doc. 1, Ex. B.) The City further notes that to the extent that there is a lack of absolute certainty as to the adverse impact of conversion therapy, it would be imprudent to require the City to conduct studies on children, subjecting them to conversion therapy, to prove with certainty that conversion therapy poses serious harms. *See FCC v. Fox Television Stations, Inc.*, 129 S. Ct. 1800, 1813 (2009) (Supreme Court refused to require Congress to present studies where minors were intentionally exposed to indecent television broadcasts, isolated from all other indecency, to establish the harmful effects of the broadcasts.)

Physicians, the American Medical Association, the World Psychiatric Association, the National Association of Social Workers, and the Agency for Healthcare Research and Quality.[2] The Ordinance also cites to two federal decisions upholding the validity of a statute prohibiting licensed professionals from engaging in SOCE therapy with minors.[3]

The Ordinance further provides that:

> City Council hereby finds the overwhelming research demonstrating that sexual orientation and gender identity change efforts can pose critical health risks to lesbian, gay, bisexual, transgender or questioning persons, and that being lesbian, gay, bisexual, transgender or questioning is not a mental disease, mental disorder, mental illness, deficiency, or shortcoming ...."

(Page 4 of Ordinance.) The Ordinance also goes on to state that the City has a "compelling interest in in protecting the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and questioning youth, and in protecting its minors against exposure to serious harm caused by sexual orientation and gender identity change efforts ...." [4] Further, the Ordinance provides:

> ... the City does not intend to prevent mental health providers from speaking to the public about SOCE; expressing their views to patients; recommending SOCE to patients; administering SOCE to any person who is 18 years of age or older; or referring minors to unlicensed counselors, such as religious leaders. This ordinance does not prevent unlicensed providers, such as religious leaders, from administering SOCE to children or adults; nor does it prevent minors from seeking SOCE from mental health providers in other political subdivisions or states outside of the City ....

---

[2] See the "Whereas Clauses" on pages 1-4 of the Ordinance which, pursuant to section 1 of the Ordinance, are incorporated therein by reference. The articles, reports, position statements, policy statements, resolution, and other publications, which are cited in the Ordinance, are attached to the certified copy of the Ordinance being filed of record by the City. The City, under separate cover, is requesting that the Court take judicial notice of the certified copy of the Ordinance.

[3] See page 4 of Ordinance, citing to *King v. Governor of the State of New Jersey*, 767 F.3d 216 (3d Cir. 2014) and *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2013).

[4] Page 5 of Ordinance.

(Page 4 of Ordinance.) The Ordinance further states that:

> the City Council finds minors receiving treatment from licensed therapists in the City of Tampa, Florida, who may be subject to conversion or reparative therapy are not effectively protected by other means, including, but not limited to, other state statutes, local ordinances, or federal legislation ....

(Page 4 of Ordinance.) Turning to the definitions in the Ordinance, the term "Conversion therapy or reparative therapy" is defined as follows:

> *Conversion therapy or reparative therapy* means, interchangeably, any counseling, practice, or treatment performed with *the goal of changing an individual's sexual orientation or gender identity*, including, but not limited to, efforts to change behaviors, gender identity, or gender expression, or to eliminate, or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex. *Conversion therapy does not include counseling that provides support and assistance to a person undergoing gender transition or counseling that provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as such counseling does not seek to change sexual orientation or gender identity.*

(Section 14-311(a) of Ordinance.) (Emphasis supplied.) The term "Minor" is defined, in the Ordinance, "to mean any person less than 18 years of age." (Section 14-311(b) of the Ordinance.) The term "Provider" is defined in the Ordinance as follows:

> Provider means any person who is licensed by the State of Florida to provide professional counseling, or who performs counseling as part of his or her professional training under chapters 456, 458, 459, 490 or 491 of the Florida Statutes, as such chapters may be amended, including but not limited to, medical practitioners, osteopathic practitioners, psychologists, psychotherapists, social workers, marriage and family therapists, and licensed counselors. *A Provider does not include members of the clergy who are acting in their roles as clergy or pastoral counselors and providing religious counseling to congregants, as long as they do not hold themselves out as operating pursuant to any of the aforementioned Florida Statutes licenses.*

(Section 14-311(c) of Ordinance.) (Emphasis supplied.)

4

Finally, with respect to the "conversion therapy prohibited," the Ordinance states: "It shall be unlawful for any Provider to practice conversion therapy efforts on *any individual who is a minor* regardless of whether the Provider receives monetary compensation in exchange for such services." (Section 14-311(c) of Ordinance.) (Emphasis supplied.)

STANDARD FOR PRELIMINARY INJUNCTIVE RELIEF

The law is well established that "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equites tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 21 (2008); *see also AMP Enterprises Inc. et al v. City of Tampa*, 1998 WL 1969504 (M.D. Fla. 1998).[5] In the case *sub judice*, Plaintiffs cannot carry their burden in establishing any, let alone all, of the elements necessary for a preliminary injunction.

ARGUMENT

I. PLAINTIFFS CANNOT PROVE LIKELIHOOD OF SUCCESS ON THE MERITS

In the case at bar, Plaintiffs cannot prove a likelihood of success on the merits. Plaintiffs lack standing to assert claims on behalf of their minor patients, and Plaintiff

---

[5] *In AMP Enterprises*, where plaintiffs sought the issuance of a preliminary injunction to enjoin enforcement of a City ordinance which regulated dance halls, and which was enacted to protect the physical and psychological well-being of minors, the Court stated: "The City of Tampa maintains an interest unique to elected officials in preserving the quality of life in the community and the health, welfare and morals of the citizens." 1998 WL at 1969504*1. The Court further stated that: "Conversely, the federal courts hold no power to impose upon the States [the courts'] view of what constitutes wise economic or social policy.' " *Id.* (quoting *City of Dallas v. Staglin*, 109 S. Ct. 1591, 1596 (1989).) In applying these words of wisdom to the matter at hand, where the Ordinance was enacted to protect the physical and psychological well-being of minors, and City Council finds the overwhelming research demonstrating that sexual orientation and gender identity change efforts can pose critical health risks, this Court should also deny Plaintiffs' Motion.

Pickup lacks standing to assert claims on his own behalf. In addition, Plaintiffs fail to state a claim a claim upon which relief can be granted. Indeed, Plaintiffs have failed to cite to a single judicial decision where any court has found unconstitutional or invalid a statute or ordinance which prohibits licensed professionals from engaging in SOCE therapy with minors. To the contrary, the only judicial decisions that the City is aware of that have addressed the validity of these laws have found them to pass constitutional muster.[6]

### Plaintiffs Lack Standing to Assert Claims on Behalf of Their Purported Minor Patients

Plaintiffs lack standing to assert claims on behalf of their purported minor patients in the City. In *King*, where the plaintiffs argued that the District Court erred by concluding that they lacked standing to bring claims on behalf of their minor clients, the Third Circuit rejected that argument and concluded that "Plaintiffs lack standing to pursue claims on behalf of their minor clients." 767 F.3d at 244. In reaching that conclusion, the Third Circuit first addressed the limited circumstances in which one can obtain third-party standing and stated in relevant part:

> "It is a well-established tenet of standing that 'a litigant must assert his or her own legal rights and interests, and cannot rest a claim to relief on the legal rights or interests of third parties.'" *Pennsylvania Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 288 (3d Cir. 2002) (quoting *Powers v. Ohio*, 499 U.S. 400, 410, 111 S. Ct. 1364, 113 L. Ed.2d 411 (1991)). Yet the prohibition is not invariable and our jurisprudence recognizes third-party standing under certain circumstances.' *Id.* (citations omitted.) To establish third-party standing, a litigant must demonstrate that (1) she has suffered an 'injury in fact' that provides her with a sufficiently concrete interest in the outcome of the issue in dispute'; (2) she has a 'close relation to the third party'; and (3) there

---

[6] *See King v. Governor of the State of New Jersey*, 767 F.3d 216 (3d Cir. 2014) *cert. den.* 135 S. Ct. 2048 (2015); *Doe v. Governor of the State of New Jersey*, 783 F.3d 150 (3d Cir. 2015) cert. den. 138 S. Ct. 1155 (2016*); Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014) cert. den. 134 S. Ct. 2871 (2014); *Welch v. Brown*, 834 F.3d 1041 (9th Cir. *2017) cert. den.* 137 S. Ct. 2093 (2017).

exists 'some hindrance to the third party's ability to protect his or her own interests.' *Powers,* 499 U.S. at 411, . . .

767 F.3d at 243. The court went on to state: "Plaintiffs have failed to establish that their clients are 'hindered' in their ability to bring suit themselves ... Further, we note that minor clients have been able to file suit pseudonymously in both *Pickup* and *Doe v. Christie,* - F. Supp.3d -, 2014 WL 3765310 (D.N.J. July 31, 2014)...." 767 F.3d at 244.

In the case at bar, Plaintiffs have failed to allege each of the elements necessary to obtain third-party standing. Moreover, pursuant to the analysis in *King,* the fact that minor clients could file suit pseudonymously, supports the conclusion that Plaintiffs' minor patients are not hindered in their ability to protect their own interests. Accordingly, Plaintiffs lack standing to assert claims on behalf of their minor patients.

<u>Plaintiff Pickup lacks standing</u>

According to the Complaint, although Plaintiff Vazzo is a licensed marriage and family therapist in the State of Florida (Doc. 1, ¶14), Plaintiff Pickup is "currently undergoing the necessary requirements to obtain his license in Florida." (Doc. 1, ¶15.) Thus, Plaintiff Pickup's claims are premature at best, and he currently lacks standing to challenge the validity of the Ordinance in a jurisdiction where he is not licensed to practice.

The United States Supreme Court, in *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013), in addressing the requirements for standing, held that:

> To establish Article III standing, an injury must be 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling.' ... Although imminence is a concededly somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes – that the injury is *certainly impending.*'... Thus, we have repeatedly reiterated that 'threatened injury must be *certainly impending to*

constitute injury in fact,' and that [a]llegations of possible future injury' are not sufficient.

(emphasis in original) (citations omitted).

In the matter at hand, it is unknown from the Complaint what "necessary requirements" Plaintiff Pickup is undertaking to obtain his license, the length of time those "necessary requirements" will take, whether Plaintiff Pickup will successfully complete these "necessary requirements" and when, if at all, the State of Florida may provide him with a license. Accordingly, Plaintiff Pickup fails to satisfy the requirements for standing as articulated by the Supreme Court in *Clapper*.

## Count I Fails to State a Claim Upon which Relief Can be granted

Count I of the Complaint, which alleges that the Ordinance violates Plaintiffs' right to freedom of speech under the First Amendment, fails to state a claim upon which relief can be granted. In *King,* the Third Circuit held that the enactment of a statute, prohibiting licensed counselors from engaging in SOCE therapy with clients under age eighteen, did not violate the counselors' First Amendment free speech rights. In reaching that conclusion, the court applied an intermediate scrutiny standard of review and found that that the statute advanced the government's interest of protecting minors from ineffective and/or harmful professional services and was not more extensive than necessary to serve that interest. The Third Circuit stated in relevant part:

... The legislative record demonstrates that over the last few decades a number of well-known, reputable professional and scientific organizations have publicly condemned the practice of SOCE, expressing serious concerns about its potential to inflict harm .... Many such organizations have also concluded that there is no credible evidence that SOCE counseling is effective....

8

We conclude that this evidence is substantial. Legislatures are entitled to rely on the empirical judgments of independent professional organizations that possess specialized knowledge and experience concerning the professional practice under review ....

....

... a state legislature is not constitutionally required to wait for conclusive scientific evidence before acting to protect its citizens from serious threats of harm. *See United States v. Playboy Entm't Grp, Inc.,* 529 U.S. 803, 822 (2000) .... It is not too far a leap in logic to conclude that a minor client might suffer psychological harm if repeatedly told by an authority figure that her sexual orientation – a fundamental aspect of her identity – is an undesirable condition. Further if SOCE counseling is ineffective – which, as we have explained, is supported by substantial evidence – it would not be unreasonable for a legislative body to conclude that a minor would blame herself if the counselor's efforts failed.... We therefore conclude that [the statute] 'directly advances' New Jersey's stated interest in protecting minor citizens from harmful professional practices.

Lastly, we must determine whether [the statute] is more extensive than necessary to protect this interest. To survive this prong of intermediate scrutiny, New Jersey 'is not required to employ the least restrictive means conceivable, but it must demonstrate narrow tailoring of the challenged regulation to the asserted interest.' *Greater New Orleans Broad Ass'n, Inc. v. United States*, 527 U.S. 173, 188, 119 S. Ct. 1923, 144 L. Ed.2d 161 (1999) (citing *Board of Tr. Of State Univ. of New York v. Fox*, 492 U.S. 469, 480, 109 S. Ct.. 3028, 106 L. Ed.2d 388 (1989). Thus, New Jersey must establish a fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is in proportion to the interest served.' *Id.* (quoting *Fox*, 492 U.S. at 480, 109 S. Ct. 3028); *See also Heffner v. Murphy*, 745 F.3d 56, 92-93 (3d Cir. 2014) (upholding regulation of commercial speech while acknowledging that the fit between the statute and its interest was 'imperfect').

Plaintiffs argue that [the statute's] ban is overly burdensome, and that New Jersey's objectives could be accomplished in a less restrictive manner via a requirement that minor clients give their informed consent before undergoing SOCE counseling. We are not convinced, however, that an informed consent requirement would adequately serve New Jersey's interests. Minors constitute an 'especially vulnerable population,' ... and may feel pressured to receive SOCE counseling by their families and their communities despite their fear of being harmed....

767 F.3d at 238-240 (footnote omitted). The decision in *King* is extremely apposite to the case at bar where: (1) the legislative findings of City Council reflect that a number of medical and mental health organizations have found that SOCE therapy may pose a serious threat to the health and well-being of the affected persons, and that many such organizations have also concluded there is a lack of credible evidence that such therapy is effective; (2) the Ordinance expressly articulates a compelling interest in protecting the physical and psychological well-being of minors against exposure to serious harms caused by SOCE therapy; and (3) the Ordinance is narrowly tailored and constitutes the least restrictive means of advancing the compelling governmental interest.

The assertion by Plaintiffs, that "informed consent" would be a less restrictive means to achieve the City's interest, is an argument that was rejected in *King*. 767 F.3d at 240. Moreover, in a number of other cases, federal and state courts have recognized that minors, because of their young age, cannot consent to - or make informed decisions on – a variety of matters; that parents do not have unfettered rights concerning their children; and that the government has a compelling interest in protecting the physical and psychological well-being of minors.[7]  Accordingly, the Ordinance should clearly pass constitutional

---

[7] *See Hodgson v. Minnesota*, 497 U.S. 417, 444 (1990) ("The State has a strong and legitimate interest in the welfare of its young citizens, whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely."); *Sable Commc'ns of Cal., Inc v. FCC,* 492 U.S. 115, 126 (1989) (the state has a "compelling interest in protecting the physical and psychological well-being of minors," which "extends to shielding minors from the influence of literature that is not obscene by adult standards."); *City of Dallas v. Stanglin*, 109 S. Ct. 1591 (1989) (city ordinance did not infringe on First Amendment rights in restricting admission to certain dance halls to persons between ages of 14 and 18, and a rational relationship existed between age restrictions for dance halls and city's interest in promoting the welfare of teenagers); *Parham v. J.R.*, 442 U.S. 584, 603 (1979) ("state is not without constitutional control over parental discretion in dealing with children when their physical or mental health is jeopardized."); *McKeiver v. Pennsylvania*, 403 U.S. 528, 550 (1971) (plurality opinion) ("State is entitled to adjust its legal system to account for children's vulnerability and their need for 'concern, ... and paternal attention"); *Prince v. Massachusetts*, 321 U.S. 158, 168-169 (1944) (Supreme Court upheld statute prohibiting boys under age 12

muster under the intermediate scrutiny standard of review that was applied by the Third

Circuit in *King*, and should also pass muster under any standard of review.[8]

Plaintiffs' Motion, which essentially repackages the allegations in the Complaint

albeit in a different format, argues that the Ordinance unconstitutionally discriminates on

the basis of viewpoint and against content, and is unconstitutionally vague and overbroad,

---

and girls under age 18 from selling magazines, etc., on the street and held that state's authority over children's activities is broader than that over like actions of adults. In reaching that conclusion, the Court stated that:

> ... the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. *Reynolds v. United States*, 98 U.S. 145, 25 L.Ed. 244; *Davis v. Beason*, 133 U.S. 333, 10 S. Ct. 299, 33 L.Ed. 637. And neither rights of religion nor rights of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as parens patriae may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor, and in many other ways. Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience. Thus, he cannot claim freedom from compulsory vaccination for the child more than for himself on religious grounds. The right to practice religion freely does not include liberty to expose the community or the child to communicable disease or the latter to ill health or death.

321 U.S. at 166-167 (footnotes omitted); *Parker v. Hurley*, 514 F.3d 87 (1st Cir. 2008) (where parents. individually and on behalf of their children, brought a §1983 and state law action against school district officials and employees, alleging curriculum materials intended to encourage respect for gay persons and couples violated both their free exercise right and their right to raise their children as they wished, the First Circuit affirmed the district court's granting defendant's motion to dismiss the federal claims for failure to state a claim upon which relief could be granted, and dismissed the state claims without prejudice); *American Booksellers v. Webb*, 919 F.2d 1493 (11th Cir. 1990) (Eleventh Circuit held state may, absent impermissible burden on adults, deny minors all access in any form to materials obscene as to them, but acceptable for adults; that minors have no right to view or in any way consume such material, even if they do not purchase or otherwise take control of it; and that state's interest in protecting its youth justifies limited burden on free expression); *Schmitt v. State*, 590 So.2d 404, 410-411 (Fla. 1991) (Florida Supreme Court held "it is evident beyond all doubt that any type of sexual conduct involving a child constitutes an intrusion upon the rights of that child, whether or not the child consents and whether or not that conduct originates from a parent.").

---

[8] Although the court applied an intermediate scrutiny test to the challenge under the First Amendment right to free speech, 767 F.3d at 237, the court noted: "We recognize that our sister circuits have concluded that regulations of professional speech are subject to a more deferential standard of review or, possibly no review at all. *See Pickup*, 740 F.3d at 1231; *Wollschlager*, 760 F.3d at 1217-18, 2014 WL 3695296, at *13-*14; *Moore-King*, 708 F.3d at 567-70. *Pickup*, for example, cited *Casey*, 505 U.S. at 884, 967-68, 112 S. Ct. 279 (plurality opinion), as support for its decision to apply rational basis review to a similar statute. *Pickup*, 740 F.3d at 1231." 767 F.3d at 235 (footnote omitted). Moreover, even assuming arguendo that a strict scrutiny standard were applied in this case, and the City does not believe that such a standard should be applied based upon the analysis in *King*, the Ordinance should still pass muster insofar as the Ordinance articulates a compelling governmental interest of protecting minors from serious harms and the Ordinance is narrowly tailored and constitutes the least restrictive means of advancing the compelling governmental interest.

that the City improperly relied on a certain study and judicial decisions in *King* and *Pickup*, that there is no compelling government interest for the Ordinance, that the Ordinance is not narrowly tailored, that the Ordinance is an unconstitutional prior restraint, and that the adoption of the Ordinance was *ultra vires* and void *ab initio*. Each of these arguments is without merit.

With respect to the assertion that the Ordinance unconstitutionally discriminates on the basis of viewpoint, this argument was rejected by the court in *King* where the Court stated, in relevant part:

> Arguably, any time a professional engages in a particular professional practice she is implicitly communicating the viewpoint that such practice is effective and beneficial. The prohibition of this method of communicating a particular viewpoint, however, is not the type of viewpoint discrimination with which the First Amendment is concerned.

767 F.3d at 237. In further opposition to the argument of viewpoint discrimination, the City notes that the Ordinance is intended to protect the physical and psychological well-being of all minors, §14-310, and the Ordinance prohibits providers from engaging in SOCE therapy with *all* minors, irrespective of the sexual orientation of the minors. Indeed, § 14-312 of the Ordinance expressly provides that "It shall be unlawful for any Provider to practice conversion *on any individual who is a minor ....*" (Emphasis supplied.) In addition, far from censoring any viewpoint, the Ordinance states, at page 4, that:

> ... the City does not intend to prevent mental health providers from speaking to the public about SOCE; expressing their views to patients; recommending SOCE to patients; administering SOCE to any person who is 18 years of age or older; or referring minors to unlicensed counselors, such as religious leaders.

With respect to the assertion of discrimination on the basis of content, this argument was also rejected in *King* where the court stated in relevant part:

The New Jersey legislature has targeted SOCE counseling for prohibition because it was presented with evidence that this particular form of counseling is ineffective and potentially harmful to clients. Thus, the reason professional speech receives diminished protection under the First Amendment – i.e., because of the State's longstanding authority to protect its citizens from ineffective or harmful professional practices – is precisely the reason New Jersey targeted SOCE counseling with [the statute]. Therefore, we conclude that [the statute] does not trigger strict scrutiny by discriminating on the basis of content in an impermissible manner.

767 F.3d at 237. Similarly, in the case at bar, the reason that the City has enacted the Ordinance is because of the City's interest in protecting all minors from exposure to serious harms caused by a provider practicing conversion therapy on a minor.

Turning to the issues of vagueness and overbreadth, these arguments were also rejected in King. 767 F.3d at 240-241. As it pertains to vagueness, the court, quoting the Supreme Court in Hill v. Colorado, 530 U.S. 703, 733 (2000), stated that "speculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications." 767 F.3d at 240. As it pertains to overbreadth, the Third Circuit stated that: "a statute that impinges upon First Amendment freedoms is impermissibly overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep.'" 767 F.3d 241 (quotation omitted). In applying that standard, the court held that the statute was not unconstitutionally overbroad. Id. Similarly, in the case bar, in applying the aforesaid litmus test, the Ordinance is not unconstitutionally overbroad.

With respect to Plaintiffs' argument, that the City improperly relied on a 2009 American Psychological Association Task Force Report ("APA Report"), this argument is also without merit. Preliminarily, it should be noted that in King the court pointed out that a

legislative body is entitled to rely on empirical judgments of independent professional organizations that possess specialized knowledge and experience concerning the professional practice under review...." In *King*, moreover, one of the studies relied upon was the APA Report. As set forth in *King*: "According to the legislature, for example, a 2009 report issued by the American Psychological Association ('APA Report') concluded '[S]exual orientation change efforts can pose critical health risks....'" 767 F.3d at 222. It should also be noted that the APA Report was also favorably cited to by the courts in *Doe*, 783 F.3d at 152; *Welch*, 834 F.3d at 1046; and *Pickup*, 740 F.3d at 1232. Finally, it should be noted that the APA Report states, at page 42, that "studies ... indicate that attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals including depression and suicidal thoughts."

Plaintiffs' argument, that the City's reliance on *King* and *Pickup* is misplaced, is also without merit. Although the City candidly acknowledges that the Eleventh Circuit, in *Wollschaeger v. Governor of State of Florida*, 848 F.3d 1293, 1309 (11th Cir. 2017), has stated that "there are serious doubts about whether *Pickup* was correctly decided", the Eleventh Circuit nonetheless proceeded to state that "In any event, *Pickup is distinguishable on its face and does not speak to the issues before us.*" *Id.* (Emphasis supplied.)[9] The City

---

[9] *In Wollschaeger,* the Eleventh Circuit noted: "Importantly ...the law in *Pickup* ... did not restrict what the practitioner could say or recommend to a patient or client. *See* [740 F.3d] at 1223 (explaining that the California law did not prevent mental health providers 'from expressing their views to patients, whether children or adults, about SOCE, homosexuality, or any other topic' or from 'recommending SOCE to patients, whether children or adults'). The *Pickup* panel, therefore, concluded that the law 'regulated conduct' even though it covered the verbal aspects of SOCE therapy. *See id.* at 1229." 848 F.3d at 1309. Similarly, in the case *sub judice*, the Ordinance provides that "the City does not intend to prevent mental health providers from speaking to the public about SOCE; expressing their views to patients; recommending SOCE to patients; administering SOCE to any person who is 18 years of age or older; or referring minors to unlicensed counselors, such as religious leaders...." (Page 4 of Ordinance.)

is unaware, moreover, of any criticism by the Eleventh Circuit of the Third Circuit decisions in *King* and *Doe* upholding the constitutionality of a statute prohibiting licensed professionals from engaging in SOCE therapy with minors.

With respect to Plaintiffs' assertion that there is no compelling governmental interest, the City has addressed this issue earlier, and it bears repeating that the Ordinance states that there is a "compelling interest in protecting the physical and psychological well-being of minors ... and in protecting its minors against exposure to serious harm caused by sexual orientation and gender identity change efforts ...." (Page 4 of Ordinance.)

As it pertains to whether the Ordinance is narrowly tailored, this issue has also been discussed at length earlier. The Ordinance has been crafted in a manner that it employs the least restrictive means of advancing a compelling governmental interest. Moreover, as discussed earlier, the assertion by Plaintiffs that informed consent would be a less restrictive means to achieve the City's interest has been rejected in *King* and in other cases cited *supra*.

With respect to Plaintiffs' assertion that the Ordinance is an unconstitutional prior restraint, this argument is also without merit. The authorities cited by Plaintiffs are inapposite to this case, and the Ordinance does not represent a total prohibition on speech.

Finally, with respect to the assertion that the City's adoption of the Ordinance was *ultra vires* and void *ab initio* because the Legislature has preempted the field of regulation of mental health professionals and the field of disciplinary actions for licensed mental health professionals, this argument also lacks merit. This City addresses this argument at length, *infra*, wherein the City discusses the dismissal of count VI of the Complaint.

## Count II of the Complaint should be dismissed with prejudice

Count II of the Complaint, which alleges that the Ordinance violates Plaintiffs' clients' First Amendment Right to receive information, fails to state a claim upon which relief can be granted. In *Doe*, where a minor child and his parents had brought an action against the Governor of New Jersey, challenging the constitutionality of a New Jersey statute that prohibited state licensed counselors from engaging in SOCE therapy with minors, and plaintiffs alleged that the statute violated their First Amendment right to receive information, the Third Circuit rejected that argument. 783 F.3d at 155-156. In reaching that conclusion, the court stated in relevant part:

> ...the First Amendment protects both the speaker and the recipient of information. *See Va. State Bd. Of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756-57, 96 S. Ct. 1817, 48 L. Ed.2d 346 (1976). However, the cases interpreting the First Amendment do not contemplate that some speech may be restricted as to the speaker but not to the listener. The listener's right to receive information is reciprocal to the speaker's right to speak. *See id.; Bd. Of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867, 102 S. Ct. 2799, 73 L. Ed.2d 435 (1982) ([T]he right to receive ideas follows ineluctably from the sender's First Amendment right to send them.') As we concluded in *King*, [the statute] does not violate the counselor's right to speak, *see* 767 F.3d at 240, and, as a result, it does not violate Appellants' right to receive information.

783 F.3d at 155. In applying this holding to the case at hand, insofar as count I of the Complaint fails to state a claim upon which relief can be granted, Plaintiffs' claim under count II must also be dismissed.

## Count III of the Complaint should be dismissed with prejudice

Count III of the Complaint, which alleges that the Ordinance violates Plaintiffs' right to free exercise of religion, fails to state a claim upon which relief can be granted. In *King*, where plaintiffs' second constitutional claim was that the statute violated their First

Amendment right to free exercise of religion, the Third Circuit concluded that this claim also lacked merit. In reaching that conclusion, the court stated in relevant part:

> Under the Religion Clauses of the First Amendment, 'Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof.' The right to freely exercise one's religion, however, is not absolute. *McTernan v. City of York,* 577 F.3d 521, 532 (3d Cir. 2009). If a law is 'neutral' and 'generally applicable,' it will withstand a free exercise challenge so long as it is 'rationally related to a legitimate government objective.' *Brown v. City of Pittsburgh,* 586 F.3d 263, 284 (3d Cir. 2009) (citation omitted). This is so even if the law 'has the incidental effect of burdening a particular religious practice or group.' Id. at 284 (*quoting Church of the Lukumi Babalu Aye, Inc. v. City of Hialea*h, 508 U.S. 520, 531, 113 S. Ct. 2217, 124 L. Ed.2d 472 (1993)).
>
> The issue before us, then, is whether [the statute] is 'neutral' and 'generally applicable.' A law is 'neutral' if it does not target religiously motivated conduct either on its face or as applied in practice.' ... 'A law fails the general applicability requirement if it burdens a category of religiously motivated conduct but exempts or does not reach a substantial category of conduct that is not religiously motivated and that undermines the purposes of the law to at least the same degree as the covered conduct that is religiously motivated....'
>
> As a preliminary matter, [the statute] makes no explicit reference to any religion or religious beliefs, and is therefore neutral on its face. *See Lukumi,* 508 U.S. at 533-34, 113 S. Ct. 2217. Nevertheless, Plaintiffs argue that [the statute] covertly targets their religion .....
>
> None of [the] 'exemptions,' however, demonstrate that [the statute] covertly targets religiously motivated conduct....
>
> Accordingly, we conclude that [the statute] is neutral and generally applicable, and therefore triggers only rational basis review....

767 F.3d 216, 241-243. *See also Welch,* 834 F.3d at 1044-1047 (statute prohibiting licensed mental health providers from engaging in SOCE with minors did not excessively entangle the state with religion in violation of First Amendment's Establishment Clause).

In applying the aforesaid law to the matter at hand, the Ordinance must also pass muster under First Amendment right to the free exercise of religion where the Ordinance (1) is neutral and generally applicable, and does not target religiously motivated conduct either on its face or as applied in practice,[10] and (2) at a minimum, is rationally related to a legitimate governmental objective. Indeed, as discussed earlier, the Ordinance serves a compelling governmental interest and is narrowly tailored and constitutes the least restrictive means of advancing the compelling governmental interest.

<u>Counts IV and V of the Complaint should be dismissed with prejudice</u>

Count IV and V of the Complaint, which are constitutional challenges under the Florida Constitution, fail to state a claim for which relief can be granted for the same reasons that the federal constitutional challenges lack merit and must be dismissed. *See Warner v. City of Boca Raton*, 64 F. Supp. 2d 1272, 1295 (S.D. Fla. 1999) *aff'd* 420 F.3d 1308 (11th Cir. 2005) ("Florida Courts have generally construed their state constitutional guarantees to be coextensive with their federal counterparts)."; *Allen v. Allen*, 622 So.2d 1369 (Fla. 1st DCA 1993) (summarily finding concurrent violations of the Free Exercise Clause of both Art. I, § 3 and the First Amendment*); Florida Canners Association v. State of Florida*, 371 So.2d 503, 517 (Fla. 2d DCA 1979) (the scope of guarantees of freedom

---

[10] The Ordinance does not make any explicit reference to any religion or religious beliefs. Moreover, none of the exemptions to the Ordinance demonstrates that it covertly targets religiously motivated conduct. To the contrary, the Ordinance expressly states: "A Provider does not include members of the clergy who are acting in their roles as clergy or pastoral counselors and providing religious counseling to congregants, as long as they do not hold themselves out as operating pursuant to any of the aforementioned Florida Statutes licenses." Section 14-311(c) of the Ordinance. The Ordinance also states, on page 4, that "the City does not intend to prevent mental health providers from ... referring minors to unlicensed counselors, such as religious leaders. This ordinance does not prevent unlicensed providers, such as religious leaders, from administering SOCE to children or adults ...." Finally, the City notes that the prohibition in the Ordinance against SOCE therapy with minors by a provider is neutral and expressly applies to *"any individual* who is a minor." Section 14-312 of the Ordinance. (Emphasis supplied.)

of speech under the Florida Constitution and the First Amendment to the United States Constitution are the same and, accordingly, the court would not treat them separately).

<u>Count VI of the Complaint should be dismissed with prejudice</u>

Florida acknowledges two types of preemption: express and implied. *See D'Agastino v. City of Miami*, 220 So. 3d 410, 421 (Fla. 2017); *Sarasota Alliance for Fair Elections, Inc. v. Browning*, 28 So. 3d 880, 886 (Fla. 2010). Express preemption requires a specific legislative statement that cannot be implied or inferred, and must be accomplished by clear language stating an intended preemption. *Browning*, 28 So. 3d at 886; *City of Hollywood v. Mulligan*, 934 So. 2d 1238, 1243 (Fla. 2006). Implied preemption occurs when "the legislative scheme is so pervasive as to virtually evidence an intent to preempt the particular area, and where strong public policy reasons exist for finding such an area to be preempted by the Legislature." *D'Agastino*, 220 So. 3d at 421; *Browning*, 28 So. 3d at 886. "In determining if implied preemption applies, the court must look 'to the provisions of the whole law, and to its object and policy.'" *Browning*, 28 So. 3d at 886 (quoting *State v. Harden*, 938 So.2d 489, 486 (Fla. 2006)). However, courts "must be careful and mindful in attempting to impute intent to the Legislature to preclude a local elected governing body from exercising its home rule powers," and findings of implied preemption are generally "disfavored." *D'Agastino*, 220 So. 3d at 421, 423; *see also Exile v. Miami-Dade County*, 35 So. 3d 118, 119 (Fla. 3d DCA 2010) (noting the "severely restricted and strongly disfavored doctrine of implied preemption"); *Randolph v. Family Network on Disabilities of Fla. Inc.*, 2012 WL 71719 (M.D. Fla. 2012) (Court, in granting defendant's motion to dismiss, upheld enforcement of ordinance prohibiting

discrimination on basis of sexual orientation despite argument that it was impliedly preempted by the Florida's Civil Rights Act. In reaching that conclusion, the court stated "Because the ordinance and statute can coexist, there is no preemption." *Id.* at 71719*3).

Irrespective of whether one applies an express preemption analysis or an implied preemption analysis, Plaintiffs cannot state a claim upon which relief can be granted. Plaintiffs fail to allege any actual legislative statement expressly prohibiting local governments in the state from enacting ordinances prohibiting conversion therapy. In addition, an examination of the provisions cited by Plaintiffs - Chapter 491 of the Florida Statutes and Section 64B4 of the Florida Administrative Code[11] - reflect that they are completely silent as to any pervasive scheme evidencing a legislative attempt to preempt the City from prohibiting conversion therapy within its jurisdiction. An examination of the intent of Chapter 491 reflects, moreover, that it is completely bereft of any reference to prohibiting conversion therapy, and the intent is directed to "establishing minimum qualifications for entering into and remaining in the respective professions". Section 491.002, Fla. Stat.[12] Simply put, the Ordinance can coexist with Chapter 491, and the regulations promulgated thereunder. Accordingly, there is no preemption under state law.

---

[11] Plaintiffs also make a passing reference to proposed SOCE legislation that died in the Florida House and Florida Senate during the 2016 legislative session. (Doc. No. 1 ¶ 195.) Plaintiffs have not, however, cited to any authority for the proposition that a municipality is prohibited from adopting a provision simply because the state legislature declined to adopt the provision. Put otherwise, the failure to adopt a provision by the state legislature is not synonymous with the state legislature prohibiting the enactment of such a provision.
[12] The City notes § 491.002 and § 491.009, entitled "Discipline," were enacted in the same Act. See Laws of Fla., ch. 87-252, § 15.

<u>Count VII of the Complaint should be dismissed with prejudice</u>

Count VII of the Complaint should be dismissed as Plaintiffs fail to state a claim upon which relief can be granted, and Plaintiffs lack standing. Plaintiffs' reliance on, and application of, § 456.41 is misplaced because Plaintiffs are not "health care providers" under § 381.026, they are not "patients" to whom the Florida Patient's Bill of Rights and Responsibilities Act applies, and § 456.41 does not provide them with any cognizable action pursuant to the well-articulated restrictions of § 381.026(3). Rather, § 381.026(2) states that, "[a]s used in this section," the term ¶"'[h]ealth care provider' means a physician licensed under chapter 458, an osteopathic physician licensed under chapter 459, or a podiatric physician licensed under chapter 461." Section 381.026(2)(c), Fla. Stat. While the Legislature could have added "marriage and family therapists" under Chapter 491 as defined "health care providers," it chose not to despite fifteen revisions to § 381.026 following its enactment in 1991,[13] and the same definition of "marriage and family therapist" existing under § 491.003(5) since 1987.[14]

An examination of the purpose of Florida Patient's Bill of Rights and Responsibilities Act is instructive. Section 381.026(3) provides as follows: The statutory purpose of § 381.026(3), Fla. Stat., is to "promote the interests and well-being of the patients of health care providers and health care facilities and to promote better communication between the patient and the health care provider." Plaintiffs are not, and cannot be

---

[13] *See* Laws of Fla., ch. 91-127, § 1 (enactment); Laws of Fla., ch. 92-289, § 65; Laws of Fla., ch. 95-148, § 656; Laws of Fla., ch. 98-89, § 21; Laws of Fla., ch. 98-166, § 178; Laws of Fla., ch. 99-397, § 64; Laws of Fla., ch. 2001-53, § 7; Laws of Fla., ch. 2001-116, § 2; Laws of Fla., Ch. 2004-297, § 3; Laws of Fla., ch. 2006-261, § 12; Laws of Fla., ch. 2008-47, § 3; Laws of Fla., ch 2011-112, § 2; Laws of Fla., ch. 2011-122, sec 1; Laws of Fla., ch. 2012-5, § 48; Laws of Fla., ,ch. 2016-234, § 11; Laws of Fla., ch. 2017-152, § 1.

[14] *See* Laws of Fla., ch. 87-252, § 15 (enactment).

considered, "health care providers" under the plain definition of the statute. *See Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949) ("Statutory definitions control the meaning of statutory words[.]"); *Baker v. State,* 636 So. 2d 1342, 1343–44 (Fla. 1994) ("Where the legislature has used particular words to define a term, the courts do not have the authority to redefine it."); *see also Biddle v. Prison Health Services, Inc.,* 2010 WL 11553188, at *2 (S.D. Fla. 2010) (rejecting challenge under § 381.026 where defendant was not a "health care facility" or "health care provider" under statutory definition).

The City recognizes that subsection (4)(d)(3) of § 381.026 cite to § 456.41 and the term "health care practitioner." However, the mere mention of "health care practitioner" in this subsection - and only this subsection - through the Legislature's addition of subsection (4)(d)(3) in 2001, Laws of Fla., ch. 2001-116, §2, does not mean the statutory definition of "health care practitioner" under § 456.41(2)(b) and 456.001(4) are somehow inserted into the definition of "health care provider" or that "marriage and family therapists" can be considered "health care providers" under § 381.026. *Kasischke v. State*, 991 So. 2d 803, 810 (Fla. 2008) ("The Legislature did not include such language, and we cannot add it on our own."). Such interpretation overlooks the basic statutory premise that there is no occasion to resort to the rules of statutory construction when the "the language of the statute is clear and unambiguous and conveys a clear and definite meaning," *Holly v. Auld*, 450 So.2d 217, 219 (Fla. 1984). It also ignores the plain language of § 456.41, which limits its definitions "as used in" that particular section, and sections 456.001 and 491.003 which limit their definitions "as used in" Chapter 456 and Chapter 491,

respectively. Accordingly, Plaintiffs are not "health care providers" under § 381.026 even when subsection (4)(d)(3) is considered.

Further, the clear language of subsections (4)(d)(1), (2), and (3) apply to rights of *patients*; not Plaintiffs. Plaintiffs do not have standing to raise patient-specific claims of subsections (4)(d)(1), (2), and (3) under a statute that is clearly delineated as a patient bill of rights with the purpose "to promote the interests and *well-being of the patients* of health care providers and health care facilities."§ 381.026(3), Fla. Stat. (emphasis added).

Finally, it should be noted that § 381.026(3), expressly states that "[t]his section shall not be used for any purpose in any civil or administrative action...."

## II. PLAINTIFFS FAIL TO MEET THEIR BURDEN TO DEMONSTRATE IRREPARABLE HARM

In addition to failing to carry their burden in demonstrating a likelihood of success on the merits, Plaintiffs cannot carry their burden in establishing that they are likely to suffer irreparable harm in the absence of preliminary relief. As set forth above, Plaintiffs fail to state a claim upon which any relief can be granted, and certainly not one that is irreparable. Moreover, any claim for monetary damages cannot constitute irreparable harm. *See Ferrero v. Associated Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991).

Plaintiffs are further incapable of establishing irreparable harm for the reasons that the Ordinance (1) does not prevent Plaintiffs from administering conversion therapy to minors outside of the City; (2) does not prohibit minors from seeking to avail themselves of conversion therapy outside the City; (3) does not prevent unlicensed providers, such as religious leaders, from administering conversion therapy to minors or adults in the City; and (4) "does not intend to prevent mental health providers from speaking to the public

23

about SOCE; expressing their views to patients; recommending SOCE to patients; administering SOCE to any person who is 18 years of age or older; or referring minors to unlicensed counselors such as religious leaders."[15] Plaintiffs have not cited to any case where a preliminary injunction was issued under the facts of this case.

## III. THE BALANCE OF HARDSHIPS AND THE PUBLIC INTEREST WEIGH AGAINST GRANTING PRELIMINARY INJUNCTIVE RELIEF

The balance of hardships, and consideration of public interest, clearly outweigh any threatened injury to Plaintiffs if the injunction is not issued. First and foremost, the Ordinance identifies numerous medical and mental health organizations which have found that SOCE therapy may pose a serious threat to the health and well-being of the affected persons, and many such organizations have also concluded that that there is a lack of credible evidence that such therapy is effective. In that regard, the Ordinance expressly articulates the following legislative findings:

> **WHEREAS**, as recognized by major professional associations of mental health practitioners and researchers in the United States and elsewhere for nearly 40 years, being lesbian, gay, bisexual, transgender or gender nonconforming, or questioning (LGBT or LGBTQ) is not a mental disease, disorder or illness, deficiency or shortcoming; and

> **WHEREAS**, the American Academy of Pediatrics in 1993 published an article in its Journal, stating: "Therapy directed at specifically changing sexual orientation is contraindicated, since it can provoke guilt and anxiety while having little or no potential for achieving changes in orientation;"[[16]] and

> **WHEREAS**, the American Psychiatric Association in December 1998 published its opposition to any psychiatric treatment, including reparative or conversion therapy, which therapy regime is based upon the assumption that homosexuality is a mental disorder *per se* or that a patient should change his

---

[15] See page 4 of the Ordinance.
[[16]] http://pediatrics.aappublications.org/content/pediatrics/92/4/631.full.pdf

or her homosexual orientation;[17] and

**WHEREAS**, the American Psychological Association's Task Force on Appropriate Therapeutic Responses to Sexual Orientation ("APA Task Force") conducted a *systematic* review of peer-reviewed journal literature on Sexual Orientation Change Efforts ("SOCE"), and issued its report in 2009, citing research that sexual orientation change efforts can pose critical health risks to lesbian, gay, and bisexual people, including confusion, depression, guilt, helplessness, hopelessness, shame, social withdrawal, suicidality, substance abuse, stress, disappointment, self-blame, decreased self-esteem and authenticity to others, increased self-hatred, hostility and blame toward parents, feelings of anger and betrayal, loss of friends and potential romantic partners, problems in sexual and emotional intimacy, sexual dysfunction, high-risk sexual behaviors, a feeling of being dehumanized and untrue to self, a loss of faith, and a sense of having wasted time and resources;[18] and

**WHEREAS**, following the report issued by the APA Task Force, the American Psychological Association in 2009 issued a resolution on Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts, advising parents, guardians, young people, and their families to avoid sexual orientation change efforts that portray homosexuality as a mental illness or developmental disorder and to seek psychotherapy, social support, and educational services that provide accurate information on sexual orientation and sexuality, increase family and school support, and reduce rejection of sexual minority youth;[19] and

**WHEREAS**, the American Psychoanalytic Association in June 2012 issued a position statement on conversion therapy efforts, articulating that "As with any societal prejudice, bias against individuals based on actual or perceived sexual orientation, gender identity or gender expression negatively affects mental health, contributing to an enduring sense of stigma and pervasive self-criticism through the internalization of such prejudice" and that psychoanalytic technique "does not encompass purposeful attempts to 'convert,' 'repair,' change or shift an individual's sexual orientation, gender identity or gender expression," such efforts being inapposite to "fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by reinforcing damaging internalized attitudes;"[20] and

**WHEREAS**, the American Academy of Child & Adolescent Psychiatry

---

[17] https://www.camft.org/ias/images/PDFs/SOCE/APA_Position_Statement.pdf
[18] https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf
[19] http://www.apa.org/about/policy/sexual-orientation.pdf
[20] http://www.apsa.org/content/2012-position-statement-attempts-change-sexual-orientation-gender-identity-or-gender

in 2012 published an article in its Journal stating that clinicians should be aware that there is "no evidence that sexual orientation can be altered through therapy and that attempts to do so may be harmful;" that there is "no medically valid basis for attempting to prevent homosexuality, which is not an illness;" and that such efforts may encourage family rejection and undermine self-esteem, connectedness and caring, important protective factors against suicidal ideation and attempts; and that, for similar reasons cumulatively stated above, carrying the risk of significant harm, SOCE is contraindicated[21]; and

**WHEREAS**, the Pan American Health Organization, a regional office of the World Health Organization, issued a statement in 2012 stating: "'These supposed conversion therapies constitute a violation of the ethical principles of health care and violate human rights that are protected by international and regional agreements.'" The organization also noted that conversion therapies "lack medical justification and represent a serious threat to the health and well-being of affected people;"[22] and

**WHEREAS**, in 2014 the American School Counselor Association issued a position statement that states: "It is not the role of the professional school counselor to attempt to change a student's sexual orientation or gender identity. Professional school counselors do not support efforts by licensed mental health professionals to change a student's sexual orientation or gender as these practices have been proven ineffective and harmful;"[23] and

**WHEREAS**, a 2015 report of the Substance Abuse and Mental Health Services Administration, a division of the U.S. Department of Health and Human Services, "Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth" further reiterates based on scientific literature that conversion therapy efforts to change an individual's sexual orientation, gender identity, or gender expression is a practice not supported by credible evidence and has been disavowed by behavioral health experts and associations, perpetuates outdated views of gender roles and identities, negative stereotypes, stating, importantly, that such therapy may put young people at risk of serious harm, and recognizing that, same-gender sexual orientation (including identity, behavior, and attraction) is part of the normal spectrum of human diversity and does not constitute a mental disorder;[24] and

**WHEREAS**, the American College of Physicians wrote a position paper

---

[21] http://www.jaacap.com/article/S0890-8567(12)00500-X/pdf
[22] http://www.paho.org/hq/index.php?option=com_content&view=article&id=6803%3A2012-therapies-changesexual-orientation-lack-medical-justification-threatenhealth&catid=740%3Apress-releases&Itemid=1926&lang=en
[23] https://www.schoolcounselor.org/asca/media/asca/PositionStatements/PS_LGBTQ.pdf
[24] http://store.samhsa.gov/shin/content/SMA15-4928/SMA15-4928.pdf

in 2015 opposing the use of "conversion," "reorientation," or "reparative" therapy for the treatment of LGBT persons, stating that "[a]vailable research does not support the use of reparative therapy as an effective method in the treatment of LGBT persons. Evidence shows that the practice may actually cause emotional or physical harm to LGBT individuals, particularly adolescents or young persons;"[25]and

**WHEREAS**, In 2016, the American Medical Association issued policy statement H-160.991, which expressly opposed the use of "reparative" or "conversion" therapy for sexual orientation or gender identity;[26] and

**WHEREAS**, The World Psychiatric Association issued a policy statement in March, 2016 on Gender Identity and Same-Sex Orientation, which stated, "There is no sound scientific evidence that innate sexual orientation can be changed. Furthermore, so-called treatments of homosexuality can create a setting in which prejudice and discrimination flourish, and they can be potentially harmful. The provision of any intervention purporting to 'treat' something that is not a disorder is wholly unethical;"[27] and

**WHEREAS**, The National Association of Social Workers ("NASW") issued a policy statement stating that "No data demonstrates that reparative or conversion therapies are effective, and in fact they may be harmful." The NASW went further and stated that "conversion and reparative therapies are an infringement to the guiding principles inherent to social worker ethics and values;" [28] and

**WHEREAS**, The Agency for Healthcare Research and Quality issued a clinician's guideline for practitioners who work with children and adolescents based on research provided by the American Academy of Child and Adolescent Psychiatry. It stated that "There is no empirical evidence that adult homosexuality can be prevented if gender nonconforming children are influenced to be more gender conforming. Indeed, there is no medically valid basis for attempting to prevent homosexuality, which is not an illness. On the contrary, such efforts may encourage family rejection and undermine self-esteem, connectedness, and caring, which are important protective factors against suicidal ideation and attempts;" [29] ....

---

[25] http://annals.org/article.aspx?articleid=2292051
[26]https://www.ama-assn.org/delivering-care/policies-lesbian-gay-bisexual-transgender-queer-lgbtq-issues
[27] http://www.wpanet.org/WPA_in_News.php
[28] https://www.naswdc.org/diversity/lgb/reparative.asp
[29] https://www.guideline.gov/summaries/summary/38417

(The aforesaid legislative findings are found at pages 1-4 of the Ordinance.)[30] Similar legislative findings were favorably considered by the courts in *Doe,* 783 F.3d at 152-53, *King,* 767 F.3d at 221-222, 238, *Welch,* 834 F.3d at 1046, and *Pickup,* 740 F.3d at 1223-1224. In addition, public comment offered at City Council meetings also provides additional evidence that SOCE therapy can pose critical health risks to minors. Although the City acknowledges that there were some individuals that offered public comment in opposition to the Ordinance, the record also reflects that a substantial number of individuals offered public comment in favor of the Ordinance. Some of the individuals that spoke in favor of the Ordinance include a clinical psychologist, an associate professor of internal medicine and pediatrics at the University of South Florida board–certified in both internal medicine and pediatrics, another psychologist, an ordained minister, an individual who had been subjected to conversion therapy, a pastor, a representative of Equality Florida, and others, that expressed very significant concerns about the serious potential harms associated with conversion therapy and its impact on minors.[31]

---

[30] The aforesaid legislative findings, which are contained within Whereas Clauses, are adopted by reference into the Ordinance pursuant to Section 1 of the Ordinance. A copy of each of the publications identified in the Ordinance are attached to the certified copy of the Ordinance which is being filed of record by the City.

[31] The City is filing transcripts of excerpts of City Council meetings held on February 16, 2017, March 2, 2017, March 16, 2017 and April 6, 2017 wherein public comment was offered on the subject of the Ordinance, and the City is also requesting that the Court take judicial notice thereof. The City would note that public comment in favor of the Ordinance may be found in the transcripts as follows: March 2, 2017, at pages 3-36; March 16, 2017, at pages 3-6, and 9-34; and April 6, 2017 at pages 3-11, 13-17, and 22-37. In particular, the City commends the Court's attention to the public comments offered by the following individuals who have specialized knowledge concerning the matter: (1) Gary Howell, who on March 16, 2017, when the Ordinance was being presented for first reading before City Council, stated in relevant part:

> I'm Gary Howell. I'm a clinical psychologist here in Tampa ... I work primarily with LGBT patients, and I have an expertise in this area as well as with multicultural and diversity competency. ...
> I have worked with and treated several hundred LGBT patients thus far in my career, and I have seen the devastating effects of sexual orientation change efforts, also known as reparative therapy, also known as conversion therapy.

Allowing licensed providers to administer conversion therapy to minors in the City,

pending trial, could cause minors irreparable harm including suicidal ideation and attempts,

---

Every patient who has shared their experience with me has also experienced at some points, either during or after that treatment, an increase of suicidal ideation or attempt. And this is documented time and time again through research, through peer-view journals ....

(Pages 3-5 of March 16, 2017 transcript); (2 ) Dr. Brian Knox, who on April 6, 2017 when the Ordinance was being presented for second reading and adoption before City Council, stated in relevant part:

My name is Dr. Brian Knox ... I'm an associate professor of internal medicine and pediatrics at the University of South Florida College of Medicine. I'm board-certified in both internal medicine and pediatrics and a fellow of the American College of Physicians and the American Academy of Pediatrics.

I come to you today to speak in support of this ban. I come to you from the perspective of a physician interested in protecting health, the wellbeing and the safety of all children. Every major mainstream medical and psychological group in the United States has denounced this practice in the long term after reviewing the peer-reviewed valid medical literature.

The therapy seeks to attempt to change one's sexual orientation and gender identity. And it is well-known and accepted that sexual orientation and gender identity, while they may be fluid and we may not understand where they originate, are not changeable, not changeable through willpower nor through therapy nor through medication.

Further, the distress and the depression and the anxiety experienced by LGBT people are in large part due to the social stigmatization of being LGBT, not the orientation itself. Attempting to change the traits that cannot be willfully changed increases anxiety, distress and ultimately suicide and suicide attempts.

To allow this alleged treatment to be provided, which worsens wellbeing and increases mortality, and especially in a young, vulnerable population, when it offers no scientifically-validated chance of success, is wrong and dangerous

... Reparative therapy, which attempts to change one's sexual orientation or gender identity, is inherently coercive and inconsistent with current standards of medical care...

(Pages 13-15 of April 6, 2017 transcript.); and (3) Nancy Britton, who stated at the April 6, 2017 meeting:

My name is Nancy Britton. I'm a psychologist ... Conversion – so called conversion therapy does not work. It does not change a person's sexual orientation.

What it does, in fact, is cause additional depression, anxiety about who they are on a basic level. Some try and some complete suicide because of this therapy. Every psychological association rejects this so-called therapy. It is not therapy....

(Page 22 of April 6, 2017 transcript.) The City is also filing a motion requesting leave of Court to file, and the Court take judicial notice of, a true and correct copy of the DVDs of the City Council meetings on February 16, 2017, March 2, 2017, March 16, 2017 and April 6, 2017. Finally, the City is also filing, and requesting that the Court take judicial notice of, a certified copy of File Nos. E2017-48, E207-8 CH 14 and E2017-8 CH 19 pertaining to the adoption of the Ordinance. This certified file includes, among other documents: (1) a letter dated March 12, 2017 from Jessica Anne Deeb, LCSW, LLC., a licensed clinical social worker, which was received and filed at the March 16, 2017 City Council meeting and which states that "It is my professional opinion that conversion therapy (also known as reparative therapy) is diametrical to the objective of therapy itself and is harmful, especially to minors." (Page one of letter authored by Ms. Deeb.); and (2) a letter dated February 28, 2017 from S. W. Long, Ph.D, received and filed by City Council at the March 2, 2017 meeting, wherein Dr. Long states: "The use of Conversion Therapy, Reparative Therapy or Sexual Reorientation Therapy 'has been rejected by all of the established and reputable American medical, psychological, psychiatric and professional counseling organizations.'... 'A very large number of professional medical, scientific and counseling organizations in the U.S. and abroad have issued statements regarding the harm that reparative therapy can cause, ...'" (Page one of letter authored by Dr. Long) (citations omitted).

substantial psychological pain and depression, and these injuries may not be undone if the injunction were subsequently vacated. Conversely, although Plaintiffs may not administer conversion therapy to minors in the City pending trial, the Ordinance does not prohibit Plaintiffs from administering conversion therapy to minors outside the City. Moreover, minor patients that wish to avail themselves of conversion therapy can seek such therapy outside the City. In addition, the Ordinance does not prevent unlicensed providers, such as religious leaders, from administering conversion therapy to minors or adults in the City. Finally, the Ordinance makes clear that there is no prohibition in the City against counseling that provides support and assistance to a person undergoing gender transition or counseling that provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as such counseling does not seek to change sexual orientation or gender identity of a minor. (Section 14-311(a) of Ordinance.)

CONCLUSION

For all of the aforesaid reasons, it is respectfully requested that this Honorable Court deny Plaintiffs' Motion for Preliminary Injunction, and grant such further relief as this Court deems just and proper.

Respectfully Submitted.

By: /s/ Jerry M. Gewirtz
    Jerry M. Gewirtz, Esquire
    Florida Bar No. 0843865
    Primary: Jerry.Gewirtz@tampagov.net
    Secondary: Kimber.Spitsberg@tampagov.net
    Robin Horton Silverman, Esquire
    Florida Bar No. 0027934
    Primary: Robin.Horton-
    Silverman@tampagov.net
    Secondary: Laytecia.McKinney@tampagov.net
    5th Floor, City Hall
    315 E. Kennedy Boulevard
    Tampa, Florida 33602
    Telephone: (813) 274-8996
    Facsimile: (813) 274-8777
    Attorneys for Defendant, City of Tampa

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 12, 2018 the foregoing was electronically filed with the Clerk of Court and a copy is being furnished by email to the following: Roger K. Gannam, Esquire at rgannam@lc.org; Horatio G. Mihet, Esquire at hmihet@lc.org; Mathew D. Staver, Esquire at mat@lc.org and Daniel J. Schmid, Esquire at dschmid@lc.org (Liberty Counsel, P.O. Box 540774, Orlando, FL 32854-0774).

By: /s/ Jerry M. Gewirtz
    Jerry M. Gewirtz, Esquire