IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF FLOIDA
Tampa Division

| | | |
|---|---|---|
| ROBERT L. VAZZO, LMFT, *et al.*, | ) | |
| | ) | Civil Action No.:8:17-cv-02896-CEG-AAS |
| Plaintiffs, | ) | |
| | ) | **INJUNCTIVE RELIEF SOUGHT** |
| v. | ) | |
| | ) | |
| CITY OF TAMPA, FLORIDA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
## WITH INCORPORATED MEMORANDUM OF LAW

Pursuant to Fed. R. Civ. P. 65 and M.D. Fla. L.R. 4.06, Plaintiffs, ROBERT L. VAZZO, LMFT, individually and on behalf of his clients ("Vazzo"), DAVID H. PICKUP, LMFT, individually and on behalf of his clients ("Pickup"), and SOLI DEO GLORIA INTERNATIONAL, INC. d/b/a NEW HEARTS OUTREACH TAMPA BAY, individually and on behalf of its members, constituents and clients ("New Hearts") (collectively "Plaintiffs"), by and through counsel, respectfully move this Court to enter a preliminary injunction enjoining Defendants, CITY OF TAMPA, FLORIDA ("City") and SAL RUGGIERO, in his official capacity as Manager of the City of Tampa Neighborhood Enhancement Division ("Ruggiero") (collectively "Defendants"), together with their officers, agents, servants, employees, and others who are in active concert or participation with them, from enforcing CITY OF TAMPA ORDINANCE 2017-47 (the "Ordinance" or "Ordinance 2017-47") and from acting in a manner that violates their First Amendment rights to free speech.

## MEMORANDUM OF LAW IN SUPPORT

"**We found no empirical research on adolescents <u>who request</u> SOCE**."[1]

**"[W]hen the government polices the content of professional speech, it can fail to preserve the uninhibited marketplace of ideas in which truth will ultimately prevail. Professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields. . . . The best test of truth is the power of the thought to get itself accepted in the competition in the market, and the people lose when the government is the one deciding which ideas should prevail."[2]**

By enacting the Ordinance, Defendants are storming the office doors of therapists, thrusting themselves into the sacrosanct relationship of counselor and client, and running roughshod over the clients' and counselors' cherished First Amendment liberties. Defendants' justification for such unconscionable actions is that they do not approve of counseling which addresses the possibility of reducing or eliminating minors' unwanted same-sex attractions ("SSA") or desires to "transition to another gender," **even if the clients desire such change**. Defendants offer no evidence of harm arising from such **voluntary** treatment, but rely upon position papers from advocacy groups, an inconclusive study, and court decisions upholding similar ordinances in other states, which the Eleventh Circuit has dismissed as "dubious," *Wollschlaeger v. Florida*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc), **and which the United States Supreme Court has now gutted**. *NIFLA*, 2018 WL 3116336.

The Ordinance is in gross violation of the Constitution and Florida law, and should be enjoined.

---

[1]    2009 American Psychological Association Task Force Report on Appropriate Therapeutic Response to Sexual Orientation, on which **Defendants** principally rely. (Verified Complaint, Ex. B at 73) (emphasis added).

[2]    *Nat'l Inst. for Family & Life Advocates v. Becerra* ("*NIFLA*"), No. 16-1140, 2018 WL 3116336, *11 (June 26, 2018) (internal quotations omitted) (emphasis added).

## STATEMENT OF FACTS

### A.     ORDINANCE 2017-47.

On April 6, 2017, the City Council passed Ordinance 2017-47, which was signed into law

by Mayor Buckhorn on April 10, 2017, and took immediate effect. (First Amended Verified

Complaint, dkt. 78, "FAVC" ¶¶ 24-26). Section 5 of the Ordinance states that "[i]t shall be

unlawful for any Provider to practice conversion therapy efforts on any individual who is a minor

regardless of whether the Provider receives monetary compensation in exchange for such

services." (*Id.* ¶ 27). Section 4 defines "conversion therapy efforts" ("SOCE counseling") as:

> any counseling, practice, or treatment performed with the goal of changing an
> individual's sexual orientation or gender identity, including, but not limited to,
> efforts to change behaviors, gender identity, or gender expression, or to eliminate
> or reduce sexual or romantic attractions or feelings toward individuals of the same
> gender or sex. Conversion therapy does not include counseling that provides
> assistance to a person undergoing gender transition or counseling that provides
> acceptance, support, and understanding of a person or facilitates a person's coping,
> social support, and development, including sexual orientation-neutral interventions
> to prevent or address unlawful conduct or unsafe sexual practices, as long as such
> counseling does not seek to change sexual orientation or gender identity.

(*Id.* ¶ 28).

All violations of this Ordinance constitute a separate offense and carry a $1,000.00 fine for

the first offense and $2,000.00 for each and every subsequent violation. (*Id.* ¶ 30). The State of

Florida, which is the government body vested with exclusive jurisdiction to regulate licensed

mental health professionals has refused to prohibit SOCE counseling despite the numerous

attempts of those ideologically opposed to such counseling. (*Id.* ¶¶ 271-273). Despite not being

prohibited by the State, Plaintiffs now risk punishment for engaging in SOCE counseling in

Tampa. Fla. Stat. Ann. § 491.009(1)(c); Fla. Admin. Code r. 64B4-5.001(c).

**B.     ROBERT L. VAZZO, LMFT.**

Plaintiff, Robert L. Vazzo, LMFT, is a marriage and family therapist and is licensed to practice mental health counseling in California, Florida, Nevada, and Ohio. (FAVC ¶ 100). In his current practice, Vazzo specializes in SOCE counseling, including the areas of unwanted same-sex attractions, pedophilia, hebephilia, ephebophilia, and transvestic fetishism. (*Id.* ¶ 102). His practice includes approximately 17-25 clients each week and ten percent of those clients are minors seeking SOCE counseling. (*Id.*). Many of Vazzo's clients who desire SOCE counseling profess to be Christians with a sincerely held religious belief that homosexuality is harmful and destructive and therefore seek SOCE counseling to live a lifestyle in congruence with their faith and to conform their identity, attractions, and behaviors to their sincerely held religious beliefs. (*Id.* ¶ 104). Vazzo has never received any complaint or report of harm from any of his clients seeking and receiving SOCE counseling, including the many minors that he has counseled. (*Id.* ¶ 105). In fact, all of Vazzo's clients who have engaged in SOCE counseling for at least one year have experienced some degree of positive change with respect to their unwanted SSA. (*Id.*). **Vazzo does not coerce any client to engage in SOCE counseling and would never engage in any counseling unless the client desires such counseling and voluntary consents to it.** (*Id.* ¶106).

Vazzo has had numerous clients in Florida, provides counseling to clients in Florida, and constantly receives inquiries from all over the State concerning SOCE counseling. (*Id.* ¶ 108). Vazzo has been contacted by individuals in the City who desire to engage in SOCE counseling with Vazzo, including a fifteen-year-old minor client seeking SOCE counseling from Vazzo. (*Id.* ¶¶ 109-110). Vazzo's client desires to receive SOCE counseling from a licensed professional counselor with expertise in this particular area. (*Id.*). Vazzo's client struggles with unwanted SSA and desires to engage in SOCE counseling with Vazzo to reduce or eliminate the client's unwanted

SSA. (*Id.* ¶111). Vazzo is prohibited from providing SOCE counseling because of the Ordinance, and his client is prohibited from receiving such counseling from a licensed professional. (*Id.* ¶112).

### C.   PLAINTIFF DAVID H. PICKUP, LMFT.

Plaintiff, David H. Pickup, LMFT, is a licensed marriage and family therapist and is licensed to provide mental health counseling in California and Texas. (FAVC ¶ 113). Pickup is currently seeking licensure in Florida and has only one more requirement to complete to satisfy the requirements for becoming a licensed marriage and family therapist in Florida, which he will complete in August 2018. (*Id.* ¶113-114). Pickup specializes in providing heterosexual minors and adults with authentic Reparative Therapy, which includes the psychological industry standards of Psychodynamic, Cognitive-Behavioral and EMDR methods to help them reduce or eliminate unwanted SSA. (*Id.* ¶ 116). **Pickup only engages in such counseling with clients who voluntarily seek it and desire to and consent to such counseling**. (*Id.* ¶125).

Pickup has particular expertise in SOCE counseling because of his personal experience and success with reparative therapy for unwanted SSA. (*Id.* ¶ 118). When he was 5 years old, he was sexually molested by a 16-year-old high school boy and also suffered severe emotional abuse at the hands of other children. (*Id.*). When he reached puberty and for many years after it, he was sexually attracted to men. (*Id.*). For all of those years, he carried a feeling of immense and crushing shame for his same-sex attractions. (*Id.*). For 20 years following puberty, Pickup became clinically depressed twice, dealt with tremendous anxiety, experienced obsessive compulsive disorder, and knew that he was very confused about his sexual orientation and gender identity. (*Id.* ¶ 119-120). In the latter years of that 20-year period, Pickup found a course of counseling that was tremendously helpful to his mental health issues. (*Id.*). Pickup engaged in authentic Reparative Therapy with the late Dr. Joseph Nicolosi for many years, which he credits for saving his life. (*Id.*).

This counseling, a form of SOCE counseling, helped Pickup get rid of the shame that he had for experiencing unwanted SSA and led to the dissipation of his SSA. (*Id.* at 120). Dr. Nicolosi's counseling helped Pickup solidify his gender identity, which resulted in a profound increase in his self-confidence as a man and in his self-esteem. (*Id.*). Dr. Nicolosi's counseling allowed him to understand the nature and source of his same-sex attractions and allowed him to do the deep emotional work that he needed to do to understand those unwanted feelings. (*Id.* ¶121). As part of the counseling, Pickup learned the importance of healthy male relationships and his sexual attractions to women increased. (*Id.*). Pickup saw a real and profound change in his sexuality that resulted from Dr. Nicolosi's counseling, and he pursued training to offer others the same chance. (*Id.* ¶122).

### D.     PLAINTIFF NEW HEARTS OUTREACH TAMPA BAY.

New Hearts is a confidential healing and discipleship ministry fostering sexual and relational wholeness in people's lives through the hope of Jesus Christ. (FAVC ¶ 126). New Hearts is an unapologetically Christian organization dedicated to sharing the hope of Jesus Christ to those who choose to pursue sexual and relational wholeness. (*Id.* ¶¶130-131). As part of its ministry, New Hearts offers referrals to individuals, including minors, who are struggling with unwanted SSA, but **only refers these clients to counselors when the client himself or herself voluntarily desires and consents to such counseling**. (*Id.* ¶¶ 133-134). The Ordinance prohibits New Hearts from effectively providing for the needs of its clients because no licensed counselor can provide the SOCE counseling to minors in Tampa who desire to voluntarily engage in such counseling. (*Id.* ¶ 135). New Hearts also provides events and conferences in which its constituents, including minors, hear from licensed professionals concerning topics such as SSA and SOCE counseling, but because of the Ordinance, New Hearts cannot host such events. (*Id.* ¶¶136-143).

### E.     IRREPARABLE INJURY TO PLAINTIFFS.

Vazzo and Pickup have incurred monetary expense to lease office space in the City to provide SOCE counseling to clients, including minors. (FAVC ¶ 151). Plaintiffs desire to advertise, offer, refer to, and provide SOCE counseling, to clients and potential clients in the City, including minors. (*Id.* ¶¶152-153, 164). Vazzo and Pickup would like to offer religious leaders, organizations, and ministries, such as New Hearts, their expertise and experience in SOCE counseling. (*Id.* ¶155). Plaintiffs have received inquiries from various potential clients in the City, including minors, who desire to receive SOCE counseling. (*Id.* ¶156). Plaintiffs are prohibited from advertising, offering, referring, or providing SOCE counseling to clients and potential clients, including minors, in the City. (*Id.* ¶¶157-159, 164). The Ordinance's prohibition on SOCE counseling violates Plaintiffs' cherished First Amendment rights and chills their constitutionally protected expression. (*Id.* ¶¶170-176).

### LEGAL ARGUMENT

Injunctive relief is appropriate where, as here, Plaintiffs can establish that (1) they have a substantial likelihood of success on the merits, (2) irreparable injury will result absent injunctive relief, (3) the balance of the equities tips in their favor, and (4) the injunction would serve the public interest. *See, e.g.*, *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Plaintiffs easily satisfy this burden.

### I     PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.

#### A.     The Ordinance Unconstitutionally Discriminates On The Basis Of Viewpoint.

A viewpoint-based restriction on private speech has never been upheld by the Supreme Court or any court. Indeed, a finding of viewpoint discrimination is dispositive. *See Sorrell v. IMS Health*, 131 S. Ct. 2653, 2667 (2011). "It is axiomatic that the government may not regulate speech

based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *Good News Club v. Milford Cent. Sch. Dist.*, 533 U.S. 98, 106 (2001) ("The restriction must not discriminate against speech on the basis of viewpoint."). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Rosenberger*, 515 U.S. at 829. In fact, **viewpoint-based regulations are always unconstitutional**. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others'" (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984))). *See also Searcy v. Harris*, 888 F.2d 1314, 1324 (11th Cir. 1989) (the government "may not discriminate between speakers who will speak on the topic merely because it disagrees with their views"); *id.* at 1325 ("**The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis**." (emphasis added)).

The Ordinance is a textbook example of viewpoint discrimination. On its face, the Ordinance purports to allow licensed therapists to discuss the subject of sexual orientation, but explicitly prohibits only one particular viewpoint on that subject, namely that unwanted SSA can be reduced or eliminated to the benefit of the client. The Ordinance defines "conversion therapy" in such a way that it is clear that Defendants are targeting only one viewpoint, *i.e.*, SOCE that seeks to "eliminate or reduce sexual or romantic attractions or feelings **toward individuals of the same gender or sex**." (FAVC, Ex A at 5, §4 (emphasis added)). Similarly, the Ordinance permits a counselor to accept and facilitate SSA, even if the minor client is merely questioning such feelings, but prohibits a counselor from counseling a minor client to change unwanted SSA, **even when the minor clients themselves request such counseling and seeks that outcome**. (*Id.*).

The Ordinance purports to prohibit licensed counselors from engaging in any practice that seeks to change behaviors, gender identity, or gender expression. But the plain text of the Ordinance demonstrates that it only prohibits such counseling for minor clients who wish to reduce or eliminate behaviors, identity, or expressions that differ from their biological sex. That this is true cannot be questioned because the Ordinance specifically exempts counseling that "provides support and assistance to a person undergoing gender transition." (FAVC, Ex. A at 5, § 4). To undergo "gender transition," one has to be – at minimum – seeking to change from one gender to the other. To transition is to change. So, under the Ordinance, if a minor client wants to undergo radical surgery to alter their appearance or genitalia, the City has no problem with a counselor providing counseling to assist in that change. But, if a minor client merely wants to speak with a counselor about unwanted feelings concerning their gender identity or expression, the counselor is absolutely prohibited from engaging in such counseling if it aids the minor in reducing unwanted other-sex identity, behaviors, or expressions. There can be no question that this is viewpoint discrimination.

The Supreme Court and several other courts have invalidated regulations of professional speech as unconstitutional viewpoint discrimination. *See NIFLA*, 2018 WL 3116336, at *15; *Sorrell*, 131 S. Ct. 2653 (2011); *Legal Servs. Corp. v. Valazquez*, 531 U.S. 533 (2001); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002). In these cases, the courts recognized the axiomatic truth that the government is not permitted to impose its viewpoint on speakers, even professional speakers subject to licensing and regulation.

In *Velazquez*, the Court addressed a federal limitation on the legal profession that operated in materially the same viewpoint-based manner as does the Ordinance and prevented legal aid attorneys from receiving federal funds if their representation involved an "effort to reform" (*i.e.*,

**change**) welfare laws. *Velazquez*, 531 U.S. at 537-38. Much like the Ordinance here, the limitation permitted attorneys to represent clients involving welfare matters so long as the representation "does not involve an effort to amend" or **change** existing welfare laws. *Id.* at 538. The Court invalidated this provision because it represented "impermissible viewpoint-based discrimination." *Id.* at 537. In fact, the Court agreed with the Second Circuit's conclusion that such a prohibition on counseling seeking to **change** existing law was "inescapably viewpoint-biased." *Velazquez v. Legal Servs. Corp.*, 164 F.3d 757, 769 (2d. Cir. 1999).

In *Conant*, several physicians and their patients brought a First Amendment challenge to a federal policy that punished physicians for communicating with their patients about the benefits or options of marijuana as a potential treatment. *Conant*, 309 F.3d at 633. The Ninth Circuit began its analysis by recognizing that the doctor-patient relationship is entitled to robust First Amendment protection.

> An integral component of the practice of medicine is the communication between a doctor and a patient. **Physicians must be able to speak frankly and openly to patients**. That need has been recognized by courts through the application of the common law doctor-patient privilege.

*Id.* at 636 (emphasis added). Far from being a First Amendment orphan, the court noted that such professional speech "may be entitled to the strongest protection our Constitution has to offer." *Conant*, 309 F.3d at 637 (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)).

The court held that the ban impermissibly regulated physician speech based on viewpoint:

> The government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications. Only doctor-patient conversations that include discussions of the medical use of marijuana trigger the policy. Moreover, the **policy does not merely prohibit the discussion of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient**. Such condemnation of particular views is especially troubling in the First Amendment context.

*Id.* at 637-38 (emphasis added). The court rejected as inadequate the government's justification that the policy prevented clients from engaging in harmful behavior, and permanently enjoined enforcement of the policy. *Id.* at 638-39.

The Ordinance operates almost identically to the federal policies enjoined in *Velazquez* and *Conant*. Just as the policy in *Velazquez* permitted counseling concerning welfare laws but prohibited such counsel if it involved efforts to **change** existing welfare laws, so too the Ordinance permits counseling on the subject of SSA but prohibits counseling with minors if it involves efforts to **change** SSA. Just as the policy in *Conant* prohibited physicians from speaking about the benefits of marijuana to a suffering patient, so the Ordinance prohibits counselors from speaking about the benefits of SOCE with a client distressed about his SSA. Moreover, just as in *NIFLA*, the Ordinance "compels individuals to contradict their most deeply held beliefs, beliefs grounded in basic philosophical, ethical, or religious precepts." *NIFLA*, 2018 WL 3116336, at *15 (Kennedy, J., concurring). This unconstitutionally forces Plaintiffs to "be an instrument for fostering public adherence to an ideological point of view they find unacceptable." *Id.* The Ordinance's viewpoint discrimination cannot survive.

**B.      The Ordinance Unconstitutionally Discriminates Against Content.**

> **1.      The Supreme Court's Precedents in *NIFLA* and *Reed* Mandate that the Ordinance be Subjected to Strict Scrutiny As a Content-Based Restriction on Professional Speech.**

"Content-based laws—those that target speech on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling government interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *NIFLA*, 2018 WL 3116336 at *7; *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395

(1992) (same). Put simply, *Reed* handed down a firm rule: **laws that are content based on their face must satisfy strict scrutiny**. *Reed*, 135 S. Ct. at 2227.

This firm rule mandating strict scrutiny of facially content-based restrictions of speech applies regardless of the government's alleged purpose. *Id.* at 2227. "On its face, the [law] is a content-based regulation of speech. We thus have no need to consider the government's justifications or purposes for enacting the [law] to determine whether it is subject to strict scrutiny." *Id.* Indeed, "**[a] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the regulated speech**." *Id.* (emphasis added). "[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.*

The Supreme Court has unequivocally held that content-based restrictions **on the speech of licensed professionals** is also subject to strict scrutiny. *See NIFLA*, 2018 WL 3116336, at *7; *Reed*, 125 S. Ct. at 2229 ("it is no answer to say that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression"). It noted that while "[s]ome Courts of Appeals have recognized 'professional speech' as a separate category that is subject to different rules . . . **this Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected simply because it is uttered by 'professionals.'**" *NIFLA*, 2018 WL 3116336, at *7 (emphasis added). In so holding, the Supreme Court explicitly named and rejected the decisions in *King v. Governor of New Jersey*, 767 F.3d 216 (3d Cir. 2014) and *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014). *Id. King* and *Pickup* "except professional speech from the rule that content-based regulations of speech are subject to strict scrutiny," but "[t]his Court's precedents do not recognize such a tradition for a category called 'professional speech'" and thus it must receive the same exacting scrutiny as other content-based laws. *Id.*

In fact, "this Court's precedents have long protected the First Amendment rights of professionals." *Id.* at *10 (citing *inter alia Reed*, 135 S. Ct. at 2229; *NAACP v. Button*, 371 U.S. 415, 438-39 (1963), and noting that the Supreme Court has applied strict scrutiny to professional regulations many times). This is true because "regulating the content of professionals' speech 'poses the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas and information.'" *Id.* (quoting *Turner Broad. Sys., Inc.. v. FCC*, 512 U.S. 622, 641 (1994)).

> When the government polices the content of professional speech, it can fail to preserve an uninhibited marketplace of ideas in which truth will ultimately prevail. Professionals might have a host of good-faith disagreements, both with each other and with the government, on many topics in their respective fields. Doctors and nurses might disagree about the ethics of assisted suicide or the benefits of medical marijuana; lawyers and marriage counselors might disagree about the prudence of prenuptial agreements or the wisdom of divorce; bankers and accountants might disagree about the amount of money that should be devoted to savings or the benefits of tax reform. **The best test of truth is the power of the thought to get itself accepted in the competition of the market**, **and the people lose when the government is the one deciding which ideas should prevail**.

*Id.* at *10-11 (emphasis added) (quotes, citations and alterations omitted).

Thus, after *NIFLA* and *Reed*, there is no doubt that content-based laws such as the Ordinance must satisfy strict scrutiny, **even if targeted at licensed professionals**. *Id.* at *7; *Reed*, 135 S. Ct. at 2229. "It is rare that a regulation restricting speech because of its content will ever be permissible." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 818 (2000). The burden is on Defendants to prove the Ordinance satisfies strict scrutiny, but they cannot meet that burden here.

### 2.    There is No Compelling Government Interest for the Ordinance.

#### a.    *NIFLA* demands a finding that *King* and *Pickup* cannot and do not constitute a compelling government interest.

Defendants claim that the Ordinance is a justifiable exercise of their interests in protecting their citizens because other federal courts have upheld similar prohibitions enacted in other states.

(FAVC, Ex. A at 4 (citing *Pickup*, 740 F.3d 1208 and *King*, 767 F.3d 216)). However, after *NIFLA*, such reliance is utterly misplaced and cannot support a compelling interest as a matter of law. *See NIFLA*, 2018 WL 3116336, at \*7. Indeed, the Supreme Court eviscerated the decisions of the Ninth and Third Circuits in *King* and *Pickup*, *see supra* Section I.B.1, and relegated those erroneous decisions to the dustbin of constitutional history. *NIFLA*, 2018 WL 3116336, at \*7 (holding that the Ninth and Third Circuits were incorrect in concluding that content-based regulations of the speech of licensed professionals need to satisfy a lesser standard of scrutiny). Additionally, even if *NIFLA* had not placed the final nail in the coffin of *King* and *Pickup*, which it did, binding Eleventh Circuit precedent rejected such decisions as "dubious constitutional enterprise[s]." *Wollschlaeger*, 848 F.3d at 1309. "[W]e do not think it is appropriate to subject content-based restrictions on speech by those engaged in a certain profession to mere rational basis review," as the Ninth Circuit had done in *Pickup*. *Id.* at 1311. After *NIFLA*, not only is it inappropriate, but is foreclosed as a matter of settled law. The Ordinance is not supported by any compelling interest.

        **b.**      **Defendants cannot assert a compelling interest in preventing harm from voluntary SOCE counseling to willing minor clients.**

Defendants assert that they have a compelling interest in preventing minors from receiving SOCE counseling because it could potentially be harmful to them. This assertion is not only based on intentional misrepresentations of various studies, *see infra* Section I.B.2.c., but is also insufficient as a matter of settled law to serve as a compelling interest. *NIFLA* and *Wollschlaeger* noted that laws targeting the content of certain doctor-patient or counselor-client communications cannot be justified by the "paternalistic assertion that the policy was valid because patients might otherwise make bad decisions" if left to determine the best course of counseling for themselves. *Wollschlager*, 848 F.3d at 1310. Indeed, "[d]octors help patients make deeply personal decisions, and their candor is crucial." *NIFLA*, 2018 WL 3116336 at \*10 (citing *Wollschlager*, 848 F.3d at

1328 (Pryor, J., concurring)), and "[t]hroughout history, governments have manipulated the content of doctor-patient discourse to increase state power and suppress minorities." *Id.* But, the First Amendment does not permit such a paternalistic or tyrannical effort to suppress unpopular opinion. *Id.*

Just because Defendants "may generally believe that doctors and medical professionals should not ask about, nor express views hostile to, [a certain topic or course of counseling], [they] 'may not burden the speech of others in order to tilt the public debate in a preferred direction.'" *Wollschlaeger*, 848 F.3d at 1313-14 (quoting *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 578-79 (2011)). Where, as here, "[t]he record demonstrates that some patients do not object to questions and advice about [the prohibited content of speech], and some even express gratitude for their doctor's discussion of the topic," a law is unconstitutional if it "does not provide for such patients a means by which they can hear from their doctors on the topic." *Id.* at 1313.

There are no such means provided in the Ordinance. Instead, Defendants assert that they need to protect minors from purported harms they claim would result if licensed professionals talked to willing minors about the possibility that unwanted same-sex attractions or desires to "transition to another gender" can be changed, **even if the clients seek and desire such discussions**. (FAVC, Ex. A at 4-5). No such harm will occur, according to Defendants, if counselors support and affirm minors' same-sex attractions or desires to "transition to another gender," (*Id.* at 5), revealing that Defendants are attempting to tilt the debate in favor of those advocating against SOCE counseling, not prevent purported harm. However, Defendants do "**not have carte blanche to restrict the speech of doctors and medical professionals on a certain subject without satisfying the demands [of the First Amendment].**" *Wollschlaeger*, 848 F.3d at 1314 (emphasis added). Indeed, the government "cannot choose the protection that speech

receives under the First Amendment," and "labels cannot be dispositive of the degree of First Amendment protection." *NIFLA*, 2018 WL 3116336, at *11. Defendants cannot support the claim that the Ordinance is necessary to protect a purported state interest in preventing harm from a politically undesirable type of counseling.

> ### c. Defendants' own studies admit that "no empirical research" supports banning voluntary SOCE counseling for willing minor clients, and Defendants cannot manufacture a compelling interest by misrepresenting those studies.

Defendants also attempt to justify the Ordinance by pointing to statements and reports issued by professional associations which supposedly establish that SOCE counseling is harmful to minors. In particular, Defendants cite to the 2009 American Psychological Association Task Force Report on Appropriate Therapeutic Response to Sexual Orientation ("APA Report"), and the subsequent resolution, as justification for prohibiting SOCE counseling. (FAVC, Ex. A at 1-2).

However, the APA Report does not support the conclusion that **voluntary** SOCE counseling is harmful to minor clients **who desire to receive it**. In fact, the APA Report specifically noted that the research is inadequate to draw **any** conclusions concerning SOCE counseling. (FAVC ¶33). Thus, despite the City's claims that SOCE counseling was found to be harmful to minors, the APA Report specifically noted that "sexual orientation issues in children are **virtually unexamined**." (FAVC Ex. B at 91 (emphasis added)), and noted that "[t]here is a lack of published research on SOCE among children." (*Id.* at 72). The APA Report also concluded that "there is a dearth of scientifically sound research on the safety of SOCE. **Early and recent research studies provide no clear indication of the prevalence of harmful outcomes**." (*Id.* at 42) (emphasis added). The APA Report also noted that it could make no conclusions about SOCE

counseling for those minors who request such counseling because "**We found no empirical research on adolescents who request SOCE**." (*Id.* at 73 (emphasis added)).

The APA Report also noted that its conclusions were necessarily limited because they are not based on specific studies from individuals, including minors, who request SOCE counseling. (*Id.* at 76). In fact, contrary to Defendants' representations, the APA Report noted that it found evidence of **benefit** to individuals seeking such counseling. (*Id.* at 43, 85). The APA Report specifically noted that "[s]ome individuals report that they went on to lead outwardly heterosexual lives, developing a sexual relationship with an other-sex partner, and adopting a heterosexual identity." (*Id.* at 84-85). Since the APA admitted that its report was inconclusive and that there was **no evidence regarding** the effect of SOCE counseling on children, it does not support Defendants' claim that the Ordinance is necessary to protect children from harm.

### 3. The Ordinance is Not Narrowly Tailored.

Even if Defendants could substantiate compelling interests for the Ordinance's prohibition on SOCE counseling, which they cannot, the Ordinance would still fail strict scrutiny because it is not narrowly tailored. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). "There must be a 'fit between the . . . ends and the means chosen to accomplish those ends.'" *Wollschlaeger*, 848 F.3d at 1312 (quoting *Sorrell*, 564 U.S. 572). Indeed, "precision must be the touchstone when it comes to regulations of speech, which so closely touch our most precious freedoms." *NIFLA*, 2018 WL 3116336, at *13.

The Supreme Court has clearly established that "The government may not regulate a ['mode of speech'] based on hostility—or favoritism—towards the underlying message expressed." *R.A.V.* 505 U.S. at 386. As shown above, the Ordinance is based on political

preferences to ban such counseling, not on scientific evidence of harm. Where, as here, other, content-neutral alternatives exist, government cannot fulfill its narrow tailoring burden by ignoring those alternatives. *See id.* at 395 ("The existence of adequate content-neutral alternatives thus 'undercut[s] significantly' any defense of such a statute, casting considerable doubt on the government's protestations that the 'asserted justification is in fact an accurate description of the purpose and effect of the law.'" (citations omitted)).

The Ordinance woefully fails this test. The Ordinance is not necessary to prevent harm (which has not been proven) because existing Florida law and the ethical codes of the professions engaging in this form of counseling already prohibit practices that actually harm patients. (FAVC ¶¶ 72-84). Licensed marriage and family therapists are already prohibiting from "[m]aking misleading, deceptive, untrue, or fraudulent representations in the practice of any profession licensed, registered, or certified" by Florida's Marriage and Family Therapy Board. *See* Fla. Stat. Ann. § 491.009(1)(l). They are also prohibited from engaging in any practice that is harmful to clients, such as "[f]ailing to meet minimum standards of performance in professional activities when measured against generally prevailing peer performance." Fla. Stat. Ann. 491.009(1)(r).

Existing Florida law regulating professional counselors also imposes upon them a legal obligation to abide by the other ethical requirements of their profession. *See* Fla. Stat. Ann. § 491.001(1)(t). These ethical obligations include ethical codes promulgated by the American Association of Marriage and Family Therapists and its ethics code ("AAMFT Code"). Standard 1 of the AAMFT Code mandates that counselors not harm their clients or engage in practices that might do so. (FAVC ¶79). Standard 1.1 of the AAMFT Code prohibits marriage and family therapists, such as Vazzo and Pickup, from discriminating against clients based on their sexual orientation or gender identity (*Id.* ¶80). If violated, these provisions come with legal sanction under

18

existing Florida law. *See* Fla. Admin. Code § 64B5-5.001. Thus, Defendants' assertion that no other alternatives or existing laws prevent the alleged harm they are seeking to prevent (FAVC Ex. A at 4), is demonstrably false. The fact that children are already protected from harmful and dangerous therapies reveals that Defendants' underlying goal is not about protecting minors. Statutes, regulations and ethical rules already protect minors without suppressing speech. Under *R.A.V.*, if the City had content-neutral avenues of preventing the alleged harm, failing to employ them means the Ordinance is not narrowly tailored. *R.A.V.*, 505 U.S. at 395.

Moreover, if Defendants were concerned with alleged harms resulting to minors who are **involuntarily** subjected to counseling against their will, Defendants could have banned those practices without indiscriminately outlawing **voluntary** SOCE counseling to willing patients. Indeed, informed consent would be another less restrictive means to achieve Defendants' purported interests. When legislation virtually identical to the Ordinance was being debated in California, several mental health organizations recognized that this type of "legislation is attempting to undertake an unprecedented restriction on psychotherapy." (*See* FAVC Ex. E at 1). They proposed informed consent language that would have been much more narrowly tailored than the unprecedented intrusion into the relationship between counselor and willing client. (*Id.*). Although this alternative is in the public record, Defendants either never considered it or rejected it for no good reason. In sum, a complete ban a viewpoint regarding SSA is not the least restrictive means to achieve any governmental interest. Total prohibitions on constitutionally protected speech are "hardly an exercise of narrow tailoring." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Absent narrow tailoring the Ordinance cannot survive strict scrutiny.

### C.      The Ordinance Is An Unconstitutional Prior Restraint.

Prior restraints against constitutionally protected expression are highly suspect and disfavored. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). In fact, "any system of prior restraints comes to this Court bearing the heavy presumption against its constitutional validity." *Bantham Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). This is why "[t]he Supreme Court and [the Eleventh Circuit] consistently have permitted facial challenges to prior restraints without requiring a plaintiff to show that there are no conceivable set of facts where the application of the particular government regulation might or would be constitutional." *United States v. Frandsen*, 212 F.3d 1231, 1236 (11th Cir. 2000); *Horton v. City of St. Augustine*, 272 F.3d 1318, 1331-32 (11th Cir. 2001) ("the Supreme Court itself in *Salerno* acknowledged [that prior restraints are the] exception to the 'unconstitutional-in-every-conceivable-application' rule" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

Total prohibitions, such as the Ordinance here, constitute prior restraints. *See, e.g.*, *Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360, 1364 (M.D. Fla. 2000) ("This Court also finds that . . . moratoria are governed by prior restraint analysis in the same manners as permitting schemes."); *D'Ambra v. City of Providence*, 21 F. Supp. 2d 106, 113-14 (D.R.I. 1998) (same); *ASF, Inc. v. City of Seattle*, 408 F. Supp. 2d 1102, 1108 (W.D. Wash. 2005) (total prohibitions on protected expression fail prior restraint analysis). Here, as in *ASF*, the Ordinance goes "a step further in suppressing protected speech." *Id.* The Ordinance completely prohibits SOCE counseling, even voluntary counseling, with minors in the City. There is no exception to the Ordinance's perpetual prohibition on protected expression. As the court held in *Howard*, such bans are subject to prior restraint analysis. *Howard*, 109 F. Supp. 2d at 1364. The Ordinance fails that analysis.

### D.     The Ordinance Is Unconstitutionally Vague.

A law is unconstitutionally vague if it "either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). Government policies "must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to take." *Id.* at 393. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While all regulations must be reasonably clear, "laws which threaten to inhibit the exercise of constitutionally protected" expression must satisfy "a more stringent vagueness test." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). Such a law must give "adequate warning of what activities it proscribes" and must "set out explicit standards for those who apply it." *Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973) (citing *Grayned*, 408 U.S. at 108).

The Ordinance does not fulfill either requirement and forces both those enforcing the Ordinance and mental health professionals to guess at its meaning and differ as to its application. Because SSA are fluid and changing concepts, Plaintiffs are left to guess about what they are permitted to say to their clients who present with unwanted SSA or unwanted desires to "transition to another gender." (FAVC ¶¶85-99). The Ordinance leaves Plaintiffs uncertain at what point a particular recommendation or even a particular statement to a minor client will cost them hundreds of dollars in fines and other disciplinary actions. Similarly, officials tasked with enforcing the Ordinance are uncertain at what point a counselor has crossed the line. This does not satisfy the stringent test required for the threat to Plaintiffs' First Amendment rights. *Vill. of Hoffman,* 455 U.S. at 499.

### E.      The Ordinance Is Unconstitutionally Overbroad.

The Ordinance is overbroad because it completely bans counseling to any minor that seeks to change or reduce SSA, even when the minor desires and consents to such counseling. Instead of using a scalpel, the City took a chainsaw to the First Amendment. "Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity." *Button*, 371 U.S. at 433. The Ordinance prohibits licensed counselors under any circumstances from engaging in "any efforts" to reduce or eliminate SSA in minors. The breadth of this prohibition is astounding, and renders the Ordinance unconstitutionally overbroad. Indeed,

> it is no answer to the constitutional claims asserted by petitioner to say . . . that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression. **For a State may not, under the guise of prohibiting professional misconduct, ignore constitutional rights**.

*Id.* at 438-39 (emphasis added). The Ordinance bans Plaintiffs from providing counseling to their clients who knowingly, with informed consent, seek counseling to change SSA. This ban is "an unprecedented restriction of psychotherapy." (FAVC Ex E at 1). It chills more speech than is permissible and is thus unconstitutionally overbroad.

### F.      Defendants' Enactment Of The Ordinance Was *Ultra Vires* And *Void Ab Initio*.

Plaintiffs also have a substantial likelihood of success on the merits because the Ordinance is an *ultra vires* enactment that violate the Florida Constitution and statutes. A local government enactment will be considered inconsistent with state law if "(1) the Legislature has preempted a particular subject area or (2) the local enactment conflicts with a state statute." *Sarasota Alliance For Fair Elections, Inc. v. Browning*, 28 So.3d 880, 886 (Fla. 2010). The Ordinance violates both prongs.

The State of Florida has impliedly preempted the field of regulation of mental health professionals through enactment of a comprehensive licensing and disciplinary scheme in Florida

Statutes, Title XXXII, Chapter 491. Preemption is implied where, as here, "the state legislative scheme of regulation is pervasive and the local legislation would present the danger of conflict with that pervasive regulatory scheme." *Sarasota*, 28 So.3d at 886.

When determining if implied preemption applies, the court must look at the provisions of the policy as a whole, the nature of power exercised by the legislature, the object sought to be attained, and the character of the obligations imposed. *Classy Cycles, Inc. v. Bay Cnty.*, 201 So.3d 779, 784 (Fla. 2016). In *Classy Cycles*, an operator of a motor vehicle business sought a declaratory judgement that local ordinances relating to the insurance requirements for certain motor vehicles, and the rental of certain motor vehicles, exceeded the scope of authority of the local government. *Id.* at 781. The court held that the local ordinances were unconstitutional because the insurance requirements imposed by the local ordinances had been impliedly preempted by the State. *Id.* at 788-90. The court reasoned that the State had created a pervasive and extensive scheme of regulation and that the local ordinances were "attempt[s] to regulate in an area well-covered by existing statutes" and thus the local ordinances attempting to mandate insurance were impliedly preempted. *Id.* at 788. Where, as here, the State has not specifically granted any authority to local officials to be involved with certain regulation, the State's laws extensive law in that particular area demonstrate implied preemption. *Id.* The same is true of the Ordinance here, as Florida has enacted a pervasive scheme for regulating mental health professionals. (FAVC ¶¶268-272).

Moreover, the Ordinance conflicts with Section 491.009 and Rule 64B4-5.001 in purporting to impose additional fees and penalties and, more importantly, attempting to expand upon conduct that would subject a provider to discipline, by purporting to make illegal in Tampa a form of therapy that is legal elsewhere in Florida. (FAVC ¶¶ 195-196). Thus, the Ordinance is

in direct conflict with Florida law that has occupied the field of professional regulation. The Ordinance is void as an *ultra vires* act in violation of Defendants' authority.

## II.   PLAINTIFFS HAVE SUFFERED, ARE SUFFERING, AND WILL CONTINUE TO SUFFER IRREPARABLE INJURY ABSENT INJUNCTIVE RELIEF.

Plaintiffs are suffering and will continue to suffer immediate and irreparable injury absent injunctive relief. Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983) (same); *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

As was true of the law invalidated in *Wollschlaeger*, the Ordinance here discriminates on the basis of content and viewpoint, prohibiting only the viewpoint that SSA and desires to "transition to another gender" can be changed if unwanted. The Ordinance silences Plaintiffs who wish to engage in a course of counseling with consenting minor clients that aligns with the clients' sincerely held religious beliefs. Such a prohibition constitutes a deprivation of First Amendment rights and imposes immediate and irreparable harm on Plaintiffs and their clients.

Plaintiffs are suffering irreparable injury by being silenced in their ability to speak to their willing, minor clients about counseling which is legally available throughout Florida, and which can assist the clients in reducing or eliminating unwanted same-sex attractions. (FAVC ¶¶ 151-176). If Plaintiffs violate the Ordinance's prohibitions, then they are subject to fines and other disciplinary actions. (FAVC ¶ 77). If they follow the Ordinance, then Plaintiffs will be subject to sanctions for violating other provisions of their ethical codes mandating that the clients have the right to self-determination and that counselors should not impose an ideology on the clients. (*Id.* ¶¶ 81-83). The imposition of punishment for discussing a course of counseling desired by the clients is a deprivation of constitutional rights, and constitutes *a priori* irreparable harm.

## III.     THE BALANCE OF THE EQUITIES FAVORS INJUNCTIVE RELIEF.

An injunction in this matter will protect the very rights the Supreme Court has characterized as "lying at the foundation of a free government of free men." *Schneider v. New Jersey*, 308 U.S. 147, 151 (1939). The granting of a preliminary injunction that enjoins enforcement of the Ordinance will not impose any harm on Defendants. As noted above, "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 72 (11th Cir. 2006). Conversely, "there can be no harm to [the government] when it is prevented from enforcing an unconstitutional statute." *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). That is because the government "has no legitimate interest in enforcing an unconstitutional [law]." *KH Outdoor*, 458 F.3d at 1272. As such, there can be no comparison between the irreparable and unconscionable loss of First Amendment freedoms suffered by Plaintiffs and their clients absent injunctive relief, and Defendants' non-existent interest in enforcing an unconstitutional Ordinance.

## IV.     INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST.

The protection of First Amendment rights is of the highest public interest. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976). This protection is *ipso facto* in the interest of the general public because "First Amendment rights are not private rights [but] rights of the general public [for] the benefits of all of us." *Machesky v. Bizzell*, 414 F.2d 283, 288-90 (5th Cir. 1969) (citing *Time, Inc. v. Hill*, 385 U.S. 374 (1967)). Indeed, "[i]njunctions protecting First Amendment freedoms are **always in the public interest**," *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (emphasis added); *KH Outdoor*, 458 F.3d at 1272.

### CONCLUSION

For the foregoing reasons, the preliminary injunction should issue.

Respectfully submitted,

/s/ Horatio G. Mihet
Mathew D. Staver (FL Bar 0701092
Horatio G. Mihet (FL Bar 026581)
Daniel J. Schmid*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@lc.org

*Attorneys for Plaintiffs*

*Admitted pro hac vice

## CERTIFICATE OF SERVICE

I hereby certify that on this 26th day of June, 2018, I caused the foregoing to be electronically filed with this Court through this Court's ECF/electronic filing system. Service will be effectuated on all counsel of record via this Court's ECF/electronic notification system.

/s/ Horatio G. Mihet
Horatio G. Mihet