## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ROBERT L. VAZZO, LMFT, individually and
on behalf of his patients; DAVID H. PICKUP,
LMFT, individually and on behalf of his
patients; and SOLI DEO GLORIA
INTERNATIONAL, INC., d/b/a NEW HEARTS
OUTREACH TAMPA BAY, individually and
on behalf of its members, constituents, and
clients,

       Plaintiffs,

  v.

CITY OF TAMPA, FLORIDA; and SAUL
RUGGIERO, in his official capacity as Manager
of the City of Tampa Neighborhood
Enhancement Division,

       Defendants.

No. 8:17-cv-02896-CEH-AAS

## EQUALITY FLORIDA'S AMICUS BRIEF
## IN SUPPORT OF THE CITY'S MOTION TO DISMISS

   Amicus curiae Equality Florida Institute Inc., by and through the undersigned counsel

and in accordance with the Court's orders (Dkts. 59, 60, 88), hereby submits its Amicus Brief in

Support of the City's Motion to Dismiss.

INTRODUCTION[1]

The City Council of Tampa, Florida, passed Ordinance No. 2017-47 ("the Ordinance") unanimously on April 6, 2017.  It prohibits, within Tampa city limits, licensed mental health providers from providing treatment on minors that aims to change their sexual orientation or gender identity.  The City made a legislative determination that such treatments, commonly referred to as "conversion therapy," pose a critical health risk to LGBTQ minors.

This determination was supported by "overwhelming research" and the consensus of leading health organizations.  Ordinance, *supra*, at 4.  The many examples include:

- The American Academy of Child and Adolescent Psychiatry's 2018 Policy on Conversion Therapies, which states that such therapies "lack scientific credibility and clinical utility.  Additionally, there is evidence that such interventions are harmful.  As a result, 'conversion therapies' should not be part of any behavioral health treatment of children and adolescents.'"
  (http://www.aacap.org/AACAP/Policy_Statements/2018/Conversion_Therapy.aspx)

- A 1993 policy statement of the American Academy of Pediatrics, stating: "Therapy directed at specifically changing sexual orientation is contraindicated, since it can provoke guilt and anxiety while having little or no potential for achieving changes in orientation."
  (http://pediatrics.aappublications.org/content/pediatrics/92/4/631.full.pdf)

- The 2015 report of the Substance Abuse and Mental Health Services Administration, a division of the U.S. Department of Health and Human Services, which concluded that conversion therapy is "not supported by credible evidence and has been disavowed by behavioral health experts and associations. . . . Most importantly, it may put young people at risk of serious harm."
  (https://store.samhsa.gov/shin/content/SMA15-4928/SMA15-4928.pdf, at 1.)

- The 2009 Report of the American Psychological Association's Task Force on Appropriate Therapeutic Responses to Sexual Orientation ("APA Task Force"), which conducted a systematic review of peer-reviewed journal literature on

---

[1] Internal citations, quotation marks, and alterations are omitted, and emphasis is added unless otherwise indicated.

1

conversion therapy and "found no empirical evidence that providing any type of therapy in childhood can alter adult same-sex sexual orientation." (http://www.apa.org/pi/lgbt/ resources/ herapeutic-response.pdf, at p. 79)

Plaintiffs have now filed an amended complaint asserting that the Ordinance violates their rights under Florida law and the United States Constitution.  There is no such violation and the amended complaint should be dismissed.

Plaintiffs' constitutional claims have been squarely rejected by two federal circuit courts for laws virtually identical to the Ordinance.  In *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), the Ninth Circuit upheld such a law as fully warranted by the strong professional consensus that conversion therapy poses a risk of significant harm to minors.  *Id.* at 1229.  Likewise, in *King v. Governor of the State of New Jersey*, 767 F.3d 216 (3rd Cir. 2014), the Third Circuit upheld New Jersey's conversion therapy law in light of the overwhelming professional consensus deeming it unethical, ineffective, and unsafe for minors.  *Id.* at 237–240.

Plaintiffs wrongly claim that the Supreme Court's recent abortion-related decision in *National Institute of Family & Life Advocates (NIFLA) v. Becerra*, 138 S. Ct. 2361 (2018), "gutted" these circuit court decisions.  *See* Dkt. 85 at 1.  The *NIFLA* Court criticized *King* and *Pickup*'s characterization of "professional speech" as a category of speech that generally receives less First Amendment protection.  138 S. Ct. at 2371-72.  In doing so, however, the Court expressly reaffirmed that the government "may regulate professional conduct, even though that conduct incidentally involves speech."  *Id.* at 2372.  The Court explained that this principle was not "implicated" by the regulation challenged in that case.  *Id.*

Notably, *NIFLA* involved a "content-based regulation of speech."  *Id.* at 2371. "By compelling individuals to speak a particular message," the mandated notices for licensed facilities "alter[ed] the content of their speech." *Id.* (citing *Riley v. Nat'l Fed'n of Blind of North*

*Carolina, Inc.*, 487 U.S. 781, 795 (1988)).  The concurring opinion emphasized the serious constitutional concern over the "viewpoint discrimination" that is "inherent in the design and structure of [the] Act.*"  Id.* at 2379 (Kennedy, J. concurring).  Nothing of the sort inheres in the Ordinance here.

Further still, in stressing that the licensed facility notice requirement was not "regulation of professional conduct," the Court observed that "[i]n fact, it is not tied to a procedure at all." *Id.* at 2373.  This case presents exactly the opposite: the Ordinance prohibits only the procedure itself—conversion therapy—not any speech about such therapy or that is untethered from providing a particular ineffective and harmful treatment.

Finally, as to the unlicensed facility notice required by the state, the Court concluded that no justification had been demonstrated that was "more than 'purely hypothetical.'" *Id.* at 2377. Here, once again, the exact opposite is true: conversion therapy has been determined by the nation's medical and mental health professional organizations to pose a serious risk of significant harm to minors.

In *Wollschlaeger v. Governor*, 848 F.3d 1293 (11th Cir. 2017) (en banc), the Eleventh Circuit recognized the crucial difference between (1) the regulation of professional treatments or procedures that may incidentally burden speech and (2) a regulation that directly restricts the information and advice that professionals may give to their clients.  The statute in *Wollschlaeger* prohibited doctors from asking their patients about gun ownership or discussing its dangers; it did not regulate or prohibit any particular procedures or treatments.  *Id.* at 1309.  The Eleventh Circuit held that the statute could not survive intermediate scrutiny, especially in light of the almost complete absence of any evidence demonstrating any need to prohibit the targeted inquiries.  *Id.* at 1312.

Unlike the law in *Wollschlaeger,* the Ordinance regulates only the provision of conversion therapy to minors, a specific form of treatment that is discredited and dangerous.  Its sole purpose is to protect minor patients from a harmful practice, and it specifies that therapists remain free to "express[] their views to patients [and] recommend[] [conversion therapy] to patients."  Ordinance, *supra*, at 4.  It expressly allows, as well, religious counseling of minors regarding their sexual orientation.

The only Eleventh Circuit case to address conversion therapy, *Keeton v. Anderson-Wiley*, 664 F.3d 865 (11th Cir. 2011), held that requiring a counseling student at a state university to comply with professional standards prohibiting the use of conversion therapy does not violate the First Amendment.  The decision in *Keeton* fully supports enforcement of the Ordinance here, which has at most only an incidental impact on speech and does not prevent therapists from expressing their opinions, including any opinions about sexual orientation or conversion therapy.

In sum, the Ordinance is a narrowly tailored regulation of professional conduct within the City's power to protect minors from harm.  In addition to the argument set forth below, Equality Florida respectfully commends the Court's attention to two scholarly law review articles addressing the applicable constitutional principles.  *See* Claudia E. Haupt, *Professional Speech and the Content-Neutrality Trap*, 127 Yale L.J. Forum 150 (2017); Lee Mason, Comment, *Content Neutrality and Commercial Speech Doctrine After Reed v. Town of Gilbert*, 84 U. Chi. L. Rev. 955 (2017).

## ARGUMENT

### I.    THE ORDINANCE DOES NOT VIOLATE THE FIRST AMENDMENT'S SPEECH CLAUSE

Under Eleventh Circuit precedent, the Ordinance should be assessed under rational basis review, like other regulations of health care treatments that incidentally limit some speech while

protecting the public from harmful practices.   Nonetheless, the harms caused by conversion therapy for minors are so great, and the Ordinance is so narrowly tailored to address them, that it would survive heightened scrutiny.

**A.   The City Has Legislative Authority To Prevent Dangerous Healthcare Practices In Order To Protect the Health and Well-being of Its Residents**

Under well-settled law, the City has the legislative authority to protect the health of its minor residents by regulating the dangerous practice of conversion therapy**.**  As discussed more fully in section III, Plaintiffs' claim of state law preemption fails as a matter of law.

Indeed, "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cty. v. Automated Med. Labs, Inc.*, 471 U.S. 707, 719 (1985). As the Supreme Court has explained, "[t]he promotion of safety of persons . . . is unquestionably at the core of the State's police power," which extends to "state and local governments." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

The corollary of this principle is that patients do not have a constitutionally protected right to obtain unsound and unsafe treatments from licensed healthcare providers.  *See, e.g.*, *Mitchell v. Clayton*, 995 F.2d 772, 775 (7th Cir. 1993) ("[A] patient does not have a constitutional right to obtain a particular type of treatment or to obtain treatment from a particular provider if the government has reasonably prohibited that type of treatment or provider."); *Abigail All. for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 711 (D.C. Cir. 2007) (holding that there is no privacy right for terminally ill patients to access treatments whose safety had not yet been tested).

As the D.C. Circuit has pointedly noted, "[n]o circuit court has acceded to an affirmative access claim." *Id.* at 710 n.18.

**B. The Ordinance Is Permissible Under the First Amendment As A Reasonable Regulation Of A Particular Medical Treatment That, At Most, Incidentally Restricts Speech As A Component of the Treatment**

Laws enacted pursuant to a state or locality's police power are generally entitled to "a presumption of legislative validity." *Kelley*, 425 U.S. at 247.  Moreover, as the Eleventh Circuit has repeatedly recognized and the Supreme Court recently reaffirmed, "[t]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech . . . and professionals are no exception to this rule." *NIFLA*, 138 S. Ct. at 2373.

"A statute that governs the practice of an occupation is not unconstitutional as an abridgement of the right to free speech, so long as any inhibition of that right is merely the incidental effect of observing an otherwise legitimate regulation." *Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011).  Under *Locke*, when a professional regulation "governs "occupational conduct, and not a substantial amount of protected speech," it is not subject to heightened scrutiny under the First Amendment.  *Id.*; *accord Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1430 (11th Cir. 1998).  In contrast, a regulation that directly restricts the opinions or information professionals may communicate to their clients or to the public is generally subject to heightened scrutiny under the First Amendment.  *Locke*, 634 F.3d at 1191; *see also NIFLA*, 138 S. Ct. at 2374.

In *Wollschlaeger*, the Eleventh Circuit adhered to this distinction between regulations that incidentally restrict professional speech and those that restrict such speech directly.  *See* 848 F.3d at 1309.  The court cited the California law barring conversion therapy for minors as an example of the former: "Importantly, . . . the law in *Pickup*—like the law in *Locke*—did not restrict what the practitioner could say or recommend to a patient or client." *Id.*  The court

expressly likened the statute in *Pickup* to the licensing requirement in *Locke*, which it had upheld as a permissible professional conduct regulation under rational basis review.  *Id.*

Similarly, the Supreme Court's criticism of *Pickup* in *NIFLA* was limited to *Pickup*'s recognition of a category called "professional speech"; *NIFLA* did not abrogate *Pickup*'s central holding that California's conversion therapy ban was a permissible regulation of professional conduct.  *See NIFLA*, 138 S. Ct. at 2373; *Pickup*, 740 F.3d at 1231.

Consistent with the precedents allowing regulation of unsafe health care treatments, the Ordinance—which is virtually identical to California's law—is constitutional.  The Ordinance regulates the provision of conversion therapy—a form of mental health treatment—to minors.  Its sole purpose is to protect minor patients from a particularly harmful mental health treatment, not to prohibit recommendations or any other expression.

To eliminate any doubt on that score, the Ordinance specifies that therapists are free to "express[] their views to patients [and] recommend[] [conversion therapy] to patients."  Ordinance, *supra*, at 4.  Because the Ordinance is directed only toward a specific therapy treatment and has, at most, only an incidental impact on speech, it is subject to ordinary rational basis review.

In *Dana's Railroad Supply v. Attorney General*, 807 F.3d 1235 (11th Cir. 2015), the Eleventh Circuit applied heightened scrutiny to a law that "bann[ed] merchants from uttering the word *surcharge*," but it did so expressly because the law directly regulated *only* speech, not conduct.  *Id.* at 1251.  The law prevented merchants from using one particular word, but did not require the merchants to change their behavior in any way.  *See id.*

The court stressed that its analysis of this unusual law should not be misconstrued as suggesting that ordinary commercial regulations that incidentally restrict some protected speech

are subject to heightened scrutiny.  "Laws that target real-world commercial activity need not fear First Amendment scrutiny.  Such run-of-the-mill economic regulations will continue to be assessed under rational-basis review."  *Id.*

The Supreme Court also has repeatedly affirmed this critical distinction.  In *NIFLA*, the Court explained the difference between (1) regulations that only incidentally burden speech and (2) those that regulate "speech as speech."  138 S. Ct. at 2374.  The Court noted that the disclosure requirements there "applie[d] to all interactions between a covered facility and its clients, regardless of whether a medical procedure is ever sought, offered, or performed" and indeed were "not tied to a [medical] procedure at all."  *Id.* at 2373.  The Court contrasted these requirements with the informed consent requirement upheld in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992), which, as with the Ordinance here, "regulated speech only as part of the *practice* of medicine."  138 S. Ct. at 2373 (emphasis original).

Like the regulation in *Casey*, the Ordinance targets only the performance of conversion therapy, a dangerous and discredited form of mental health treatment for minors.  It applies only to interactions between patients and therapists that are tied directly to the provision of that specific treatment.  And the Ordinance expressly exempts all speech between Plaintiffs and their clients that is not part of the provision of that specific treatment.  As such, the Ordinance is subject only to rational basis review, which it plainly survives.

## C.  The Ordinance Also Satisfies Heightened Scrutiny

The Ordinance in all events would survive heightened scrutiny because "it is justified by a compelling interest and is narrowly drawn to serve that interest."  *Brown v. Ent. Merch. Ass'n*, 564 U.S. 786, 799 (2011).

### 1.   Tampa Has A Compelling Interest In Protecting Children From Harm

The City enacted to Ordinance to carry out its interest in "protecting the physical and psychological well-being of minors."  Ordinance, *supra*, at 4.  Governments have a compelling interest in the health and well-being of their citizens.  *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975); *Watson v. Maryland*, 218 U.S. 173, 176 (1910).  That interest is at its height when the government seeks to protect minors, as here, who often lack the capacity and resources to protect their own interests, and who are "especially vulnerable to [the] practices" barred by the Ordinance.  *King*, 767 F.3d at 238.

To survive heightened scrutiny, such a health and safety regulation must be aimed at a real problem specifically identified by the government.  *Brown*, 564 U.S. at 799.  In *Brown*, for instance, the Supreme Court held that California could not ban violent video games for minors because the Court found the purported link between such games and harmful effects on children to be insufficient.  *Id.* at 800.  The Court noted that the California legislature relied primarily on the work of one psychologist.  *Id.*

By contrast, this record shows the City relied on "overwhelming research" when it found that conversion therapy poses real dangers to its children.  Ordinance, *supra*, at 4.  The detailed legislative findings summarize that research and the conclusions of well-known, reputable professional and scientific organizations—including the American Medical Association, the American Psychiatric Association, the American Psychological Association, the American Academy of Pediatrics, the American Academy of Child & Adolescent Psychiatry, and the U.S. Department of Health and Human Services.  All of that research and reporting supports the City's determination that conversion therapy counseling is ineffective and poses critical health risks.  *Id.*

The potential harms to children and adolescents are particularly serious. Conversion therapy is typically viewed by minors as rejection of them, which is highly correlated with depression, anxiety, suicidality, substance abuse, and unsafe health behaviors. *See* Substance Abuse & Mental Health Servs. Admin., *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* 20–21 (2015).

Plaintiffs' only response to this voluminous evidentiary record accepted by the City is to quibble with some of the wording of part of a single report issued by the American Psychological Association (APA) in 2009. Dkt. 3 at 15 (citing Am. Psychological Ass'n, *Appropriate Therapeutic Responses to Sexual Orientation* 91 (2009). Read as a whole, however, its conclusions that conversion therapy is ineffective and unsafe, particularly for minors, are clear.

Moreover, subsequent research and clinical experience have corroborated these risks, particularly for children. As noted in the City's legislative findings, in 2015, the U.S. Substance Abuse and Mental Health Services Administration published a report summarizing this evidence and rejecting conversion therapy in children and adolescents as ineffective and unsafe. Ordinance*, supra*, at 3.

Plaintiffs complain that the research showing the harms of conversion therapy is not absolutely conclusive. But the First Amendment does not require the government to delay action to protect citizens from serious threats of harm until it possesses conclusive scientific proof, particularly when acquiring such proof would produce the very harm the government seeks to avoid. *See FCC v. Fox Television Stations*, 556 U.S. 502, 519 (2009). Indeed, responsible professionals stopped conducting double-blind studies on conversion therapy precisely because they realized that it was harmful, particularly to minors. *See* APA Report, at 91.

10

### 2.   The Ordinance Is Narrowly Tailored To Advance That Interest

The Ordinance is narrowly tailored to advance the City's compelling interest in protecting its children from the risks posed by conversion therapy.  By its plain terms, the Ordinance prevents Plaintiffs only from doing one specific thing: "practic[ing] conversion therapy efforts on any individual who is a minor."  Tampa, Fla., Code of Ordinances § 14-312; *see also Pickup*, 740 F.3d at 1230.  It therefore restricts no more speech than necessary to serve the City's interest in protecting children from an ineffective and harmful therapy treatment.  *See King*, 767 F.3d at 240; *Pickup*, 740 F.3d at 1223.

Plaintiffs' sole alternative suggestion—informed consent—is inadequate to accomplish that.  As the Third Circuit recognized in *King*, "hostile social and family attitudes" may pressure vulnerable minors into signing informed consent forms despite their best interests.  767 F.3d at 240 (quoting APA Report, *supra*, at 17).

Similarly, the APA explicitly rejected informed consent as an adequate safeguard against the harms of conversion therapy, noting that "simply providing [conversion therapy] to patients who request it does not necessarily increase self-determination but rather abdicates the responsibility of [therapists] to provide competent assessment and interventions that have the potential for benefit with a limited risk of harm."  APA Report, at 69.

Finally, informed consent is not an adequate safeguard when the government has determined that a health care treatment is unsafe or ineffective.  *See Washington v. Glucksberg*, 521 U.S. 702, 728 (1997).  When a medication or treatment provides no benefits and exclusively causes harm, the premise of informed consent—informing the patient about the risks as well as the benefits of a particular medication or treatment—does not exist.

Plaintiffs' claim that existing ethical standards for these professionals render the Ordinance unnecessary also has no merit.  The very fact that Plaintiffs still maintain that they are

11

entitled to subject minors to conversion therapy, despite the wealth of professional standards precluding such therapy as unethical and unsafe, demonstrates the compelling need for a specific prohibition.

### D.  The Ordinance Does Not Discriminate On The Basis Of Viewpoint

Plaintiffs argue that the Ordinance unconstitutionally restricts the "viewpoint" of therapists who wish to practice conversion therapy on minors.  It does no such thing.  It merely prohibit the procedure itself for minors – not speech about the procedure.

In *Keeton*, a counseling student alleged that a state university had engaged in impermissible viewpoint discrimination by disciplining her for seeking to use conversion therapy in treating clients, in violation of the American Counseling Association's (ACA) Code of Ethics, based on her personal view that conversion therapy can change a person's sexual orientation.

The Eleventh Circuit rejected that viewpoint discrimination claim:

> [The school's] curriculum requires that all students be competent to work with all populations, and that all students not impose their personal religious values on their clients, whether, for instance, they believe that persons ought to be Christians rather than Muslims, Jews or atheists, or that homosexuality is moral or immoral.  As such, [the school's] curriculum and the generally applicable rules of ethical conduct of the profession are not designed to suppress ideas or viewpoints but apply to all regardless of the particular viewpoint the counselor may possess.

*Keeton*, 664 F.3d at 874–75.

The Court further explained that "Keeton remains free to express disagreement with ASU's curriculum and the ethical requirements of the ACA, but she cannot block the school's attempts to ensure that she abides by them if she wishes to participate in the clinical practicum, which involves one-on-one counseling, and graduate from the program."  *Id*.

That analysis applies equally to the Ordinance here.  The Ordinance does not suppress any ideas or viewpoints, but rather applies to all licensed mental health professionals regardless

of their particular viewpoints.  Plaintiffs remain free to express disagreement with the Ordinance and the professional standards that it enforces, and the City does not, as in *NIFLA*, require Plaintiffs "to promote" the City's "own preferred message" regarding this practice.  138 S.Ct at 2379.  But they cannot engage in this dangerous and discredited therapy with Tampa children.

### E.  The Ordinance Does Not Violate the Right To Receive Information

For the same reasons the Ordinance does not violate Plaintiffs' right to free speech, it does not violate the right of minors to receive information.  As an initial matter, Plaintiffs agree with the City that Plaintiffs lack standing to assert this claim on behalf of their patients.  *See* Dkt. 84 at 10–11.  But in any case, the claim has no merit.  The Ordinance expressly permits therapists to talk with patients about conversion therapy and to share any information they wish, both publically and privately, about this treatment.  Ordinance, *supra*, at 4.

### F.  The Ordinance Is Not Unconstitutionally Vague

Even when a law regulates speech, it need not be absolutely clear or provide perfect guidance to survive a vagueness challenge.  *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).  It need only provide people with a reasonable opportunity to understand what conduct it prohibits.  *Hill v. Colorado*, 530 U.S. 703, 732 (2000).  The Ordinance does so.

The Ordinance includes an extensive and precise definition of the conduct it does and does not prohibit.  Ordinance, *supra*, at 4.  Moreover, "conversion therapy" and "SOCE" are terms of art within the professional counseling community and describe a distinct practice in which Plaintiffs themselves claim to specialize.  Dkt. 1 at 13, 15; *see also King*, 767 F.3d at 241; *Pickup v. Brown*, 42 F. Supp. 3d 1347, 1363–64 (E.D. Cal. 2012) (quoting *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993)).

There is no question that counselors in general, and Plaintiffs in particular, understand what the Ordinance prohibits.  Plaintiff Vazzo uses an "extensive informed consent form" with his patients that "outlines the nature of SOCE counseling" and "explains the controversial nature of SOCE counseling."  Dkt. 1 at 67.  Plaintiff Pickup "has particular expertise and experience in the area of SOCE counseling" prohibited under the Ordinance.  *Id.* at 80.

Plaintiffs' litany of hypothetical questions is unavailing.  "[S]peculation about possible vagueness in hypothetical situations not before the Court will not support a facial attack on a statute when it is surely valid in the vast majority of its intended applications."  *Hill*, 530 U.S. at 733; *see also Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95 (1982) (law must be "impermissibly vague in all of its applications").

Here, the law itself provides clarity about Plaintiffs' hypotheticals.  *Pickup*, 42 F. Supp. 3d at 1366 (California's law does not prohibit a therapist from merely mentioning conversion therapy, recommending a book on conversion therapy, or referring minors for conversion therapy); *King v. Christie*, 981 F. Supp. 2d 296, 328 (D.N.J. 2013) (same analysis regarding New Jersey statute).  That is even more clear here, where the Ordinance affirmatively specifies that therapists are free to "express[s] their view to patients [and] recommend[] [conversion therapy] to patients."  *Ordinance, supra*, at 4.

### G.  The Ordinance Is Not Unconstitutionally Overbroad

A speech regulation is overbroad only if "a substantial number of its applications are unconstitutional, judged in relation to [its] plainly legitimate sweep."  *United States v. Stevens*, 559 U.S. 460, 473 (2010).  Plaintiffs assert that the Ordinance is overbroad because it prohibits them from providing conversion therapy to minors even when minors and their parents request and consent to it.  Dkt. 3 at 19.

But Plaintiffs fail to demonstrate how that renders the Ordinance unconstitutional. *See Glucksberg*, 521 U.S. at 728 (holding there is no constitutional right to medical care the government has deemed harmful). Plaintiffs' overbreadth challenge is nothing more than a disagreement with the City's legislative determination, based on "overwhelming evidence," that informed consent is insufficient to protect minors from an inherently ineffective and dangerous practice. *See King*, 767 F.3d at 241; *Pickup*, 740 F.3d at 1235 (rejecting argument that California's law was overbroad given its "plainly legitimate sweep").

## II.   THE ORDINANCE DOES NOT VIOLATE PLAINTIFFS' RELIGIOUS RIGHTS

Neutral laws of general applicability need only satisfy rational basis review under the First Amendment's Free Exercise Clause. *Keeton*, 664 F.3d at 879–80. This is true even of laws that have the incidental effect of burdening a particular religious practice. *Id.*; *cf. City of Boerne v. Flores*, 521 U.S. 507, 532 (1997) (rejecting statutory application of strict scrutiny to laws that burden free exercise).

The Ordinance is both neutral and generally applicable. Its plain language underscores its purpose, which is not to target religiously motivated conduct but rather to preclude a therapeutic practice that poses a critical health risk to LGBTQ children. *See* Ordinance, *supra*, at 4. It prohibits the provision of conversion therapy to children, regardless of whether a specific provider is motivated by religion or anything else. *See id.* at § 14-312; *see also Welch v. Brown*, 834 F.3d 1041, 1045 (9th Cir. 2016) (rejecting second challenge to California conversion therapy ban, which was based on the Free Exercise Clause).

Far from evincing hostility toward religion, the Ordinance creates an express exemption for religious leaders providing religious counseling. Tampa, Fla., Code of Ordinances § 14-311.

Plaintiffs, in contrast, are providing what they characterize as therapy by mental health professionals.

The fact that Plaintiffs or their clients' interest in such therapy may be driven by religious belief is not sufficient to impute religious animus to the City. *See King*, 767 F.3d at 242–43. Indeed, aside from the conclusory allegation that the Ordinance "targets Plaintiffs' and their clients' beliefs," Dkt. 1 at 24, Plaintiffs allege no facts that even suggest that the Ordinance was motivated by impermissible animus and therefore have failed to state a valid Free Exercise claim. *See Keeton*, 664 F.3d at 1380 (finding no free exercise violation where plaintiff "has not established that [the challenged regulation] is aimed at particular religious practices"); *Welch*, 834 F.3d at 1047 (same).

Finally, although Article I of the Florida Constitution forbids laws "prohibiting or penalizing the free exercise [of religion]," it also expressly specifies that "[r]eligious freedom shall not justify practices inconsistent with public morals, peace or safety." Fla. Const. art. I § 3. This plain language provides less protection than that provided by the First Amendment. *Warner v. City of Boca Raton*, 267 F.3d 1223, 1226 n.3 (11th Cir. 2001).

*Warner* thus rejected the argument that the Florida Constitution requires strict scrutiny of any law that burdens religious practice. *Id.* at 1226 n.3. Here, because conversion therapy is a practice "inconsistent with public safety," it falls squarely within the list of practices expressly excluded from the Florida Constitution's protection. *See* Fla. Const. art. I § 3.

## VI.   THE ORDINANCE DOES NOT VIOLATE THE FLORIDA RELIGIOUS FREEDOM RESTORATION ACT

Plaintiffs have also failed to state a valid claim under Florida's Religious Freedom Restoration Act of 1998 (FRFRA), Fla. Stat. §§ 761.01–.061. Plaintiffs fail to allege facts that meet the threshold requirement of showing that the Ordinance places a "substantial burden" on

the free exercise of religion.  The Florida Supreme Court has interpreted "substantial burden" narrowly to require proof that a law "either compels the religious adherent to engage in conduct that his religion forbids or forbids him to engage in conduct that his religion requires."  *Warner v. City of Boca Raton*, 887 So. 2d 1023, 1033 (Fla. 2004).

The Ordinance does neither.  Plaintiffs have alleged no facts to suggest that the Ordinance compels them to engage in an activity their religion forbids.  Nor have they alleged that their religion requires them, or anyone else, to practice conversion therapy on minor clients.

Plaintiffs' desire to provide professional mental health treatments that purport to change a child's sexual orientation does not rise to the level of a requirement of their faith.  *See Freeman v. Dept' of Highway Safety & Motor Vehicles*, 924 So. 2d 48, 56-57 (Fla. App. 2006) (refusal to provide Muslim woman with driver's license after she would not take a photo without her veil was not substantial burden because Islam allows veil to be removed for government photos).

Plaintiffs are free to express and practice their religious views.  They are simply precluded from engaging in the prohibited therapy with children when providing treatment as licensed mental health providers.

## III.   THE ADOPTION OF THE ORDINANCE WAS NOT *ULTRA VIRES* OR VOID *AB INITIO*

Florida is a home rule state, and the Florida Constitution explicitly authorizes municipalities to "exercise any power for municipal purposes except as otherwise provided by law."  Fla. Const. art. 8 § 2(b).  Under its home rule powers, Tampa may prevent mental health care providers from subjecting children to a harmful practice within its borders.

The Florida legislature has recognized that "the legislative body of each municipality has the power to enact legislation concerning any subject matter upon which the state Legislature may act" except "[a]ny subject expressly prohibited by the constitution" or "[a]ny subject

expressly preempted to state or county government by the constitution or by general law."  Fla. Stat. § 166.021.  Tampa is a municipality with a home rule charter formed pursuant to this provision.  Tampa, Fla., Code of Ordinances § 1.01.

Plaintiffs erroneously claim that Chapter 491 of Title XXXII of the Florida Statutes preempts Tampa's authority to enact the Ordinance.  Inj., ECF No. 3, at 21.  Nothing in Chapter 491 expressly prohibits Tampa from imposing civil penalties on mental health providers.  Title XXXII, which regulates professions and occupations, makes no mention of limiting such regulation to the state level.

On the contrary, Florida Statutes § 456.003 (which outlines the legislative intent for Florida's professional regulation statutes) says the state may regulate professions for the preservation of health, safety, and welfare of the public when "*[t]he public is not effectively protected by other means [such as] local ordinances*."  Fla. Stat. § 456.003(2)(b).  Far from demonstrating a legislative intent to preempt all local regulation to protect the health and safety of its citizens, this language establishes that municipalities not only can, but should regulate professions when appropriate.

As a result, Plaintiffs must meet the heavy burden of showing implied preemption.  But, due to the ease with which the Florida Legislature can expressly preempt local authority when it so chooses, Florida courts are reluctant to conclude that a municipality is preempted from exercising its local powers in the absence of an express exemption.  *Phantom of Clearwater, Inc. v. Pinellas Cty.*, 894 So. 2d 1011, 1019 (citing *Tallahassee Mem'l Reg'l Med. Ctr., Inc. v. Tallahassee Med. Ctr., Inc.*, 681 So. 2d 826, 831 (Fla. Dist. Ct. App. 1996)).

To establish an implied preemption, Plaintiffs must show both "the legislative scheme is so pervasive as to evidence intent to preempt the particular area" and that "strong public policy reasons exist for finding such an area to be preempted by the Legislature." *Id.* at 1019.

Plaintiffs cannot meet either of those burdens here. Even apart from Section 456.003(2)(b), the most cursory reading of Chapter 491 shows that the Florida Legislature did not intend to preempt localities from protecting their minor residents from fraudulent or harmful practices by mental health providers. Chapter 491 contains only 26 provisions, the bulk of which relate to licensure procedures and requirements. *See* Fla. Stat. §§ 491.005–.0085.

The only portion of Chapter 491 that even arguably touches the same subject matter as the Ordinance is Section 491.009, which enumerates several offenses that could result in discipline for providers—including primarily the denial or revocation of their licenses. That the Legislature did not intend this list to be exhaustive is evidenced by its declared intent to "assist the public in making informed choices of [mental health] services by establishing *minimum* qualifications for entering into and remaining in the respective professions." Fla. Stat. § 491.002.

By contrast, the vehicle insurance regulatory regime deemed pervasive by the Florida Supreme Court in *Classy Cycles, Inc. v. Bay County* involved 43 provisions (including 93 definitions) spread across three chapters, one of which contained two express preemption clauses. 201 So. 3d 779, 784–85, 788 (2016). Bay County's attempt to add its own regulations would have needlessly complicated an already "pervasive scheme of regulation, coverage requirements, and limitation of liability." *Id.* at 788. That is not the case here.

Likewise, there are no strong public policy reasons for finding the protection of Tampa's children from conversion therapy to be preempted by the Legislature. Like other municipalities,

19

Tampa has a compelling interest in the health and well-being of the children within its own borders. Local officials are best situated to understand the needs and vulnerabilities of their locality's own children and to take the appropriate actions to protect them. Plaintiffs' own filings vindicate the City's concern that Tampa children are vulnerable to licensed therapists who seek to subject them to the unethical and harmful practices banned by the Ordinance. Especially where the immediate risk to local children is so clear, there is no basis for finding that implied preemption exists.

### VII. THE ORDINANCE DOES NOT VIOLATE THE FLORIDA PATIENT'S BILL OF RIGHTS

Plaintiffs also claim that the Ordinance violates the Florida Patient's Bill of Rights and Responsibilities (FPBRR), Fla. Stat. § 381.026. This claim has no merit because the FPBRR expressly precludes any private right of action. *Id.* ("This section shall not be used for any purpose in any civil or administrative action and neither expands nor limits any rights or remedies provided under any other law.").

Moreover, even if FPBRR created a private right of action, it would not give Plaintiffs the right to provide conversion therapy. FPBRR affirms that Florida patients have the "right to impartial access to medical treatment or accommodations regardless of . . . religion," including "complementary or alternative health care treatments." Fla. Stat. § 381.026(4)(d)(1), (3). But as the definition of those treatments in Section 456.41 makes clear, they include only treatments "designed to provide patients with an *effective* option to the prevailing or conventional treatment methods[.]" Fla. Stat. § 456.41(2)(a).

Plaintiffs cannot show that conversion therapy constitutes an "effective option" for minors. To the contrary, as the City legislatively determined, it is not only ineffective, but also potentially dangerous—particularly for children. Ordinance, *supra*, at 4.

CONCLUSION

For the reasons stated above, as well as those set forth by the City of Tampa, Amicus Curiae Equality Florida respectfully asks that the Court grant the City's motion to dismiss Plaintiffs' amended complaint with prejudice.

Respectfully submitted,

/s/ Sylvia Walbolt
Sylvia H. Walbolt
Florida Bar No. 0033604
swalbolt@carltonfields.com
Brian C. Porter
Florida Bar No. 0120282
bporter@carltonfields.com
CARLTON FIELDS JORDEN BURT, P.A.
4221 W. Boy Scout Boulevard
Tampa, FL  33607-5780
Telephone:  (813) 223-7000
Facsimile:  (813) 229-4133


Shannon Minter
sminter@nclrights.org
Christopher Stoll
cstoll@nclrights.org
NATIONAL CENTER FOR
LESBIAN RIGHTS
870 Market Street
Suite 370
San Francisco, CA 94102
Telephone: (415) 392-6257


Scott D. McCoy
Florida Bar No. 1004965
scott.mccoy@splcenter.org
David C. Dinielli
david.dinielli@splcenter.org
J. Tyler Clemons
tyler.clemons@splcenter.org
SOUTHERN POVERTY LAW CENTER
106 East College Avenue

Tallahassee, FL 32301
Telephone:  (850) 521-3042

*Attorneys for Amicus Curiae Equality
Florida Institute Inc.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on July 10, 2018, the foregoing was electronically filed with the Clerk of Court by using the CM/ECF system, which will also send a notice of electronic filing to all counsel of record.

*/s/ Sylvia Walbolt*
Attorney

22