UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Robert L. Vazzo, LMFT, et al.,

      Plaintiffs,

v.

City of Tampa, Florida,

      Defendant.

_____/

Case No. 8:17-cv-02896-WFJ-AAS

**DISPOSITIVE MOTION**

**DEFENDANT THE CITY OF TAMPA'S
MOTION FOR SUMMARY JUDGMENT**

Defendant, the City of Tampa, under Federal Rule of Civil Procedure 56, moves for summary judgment on Counts I, II, IV, VI, and VIII of Plaintiffs' First Amended Verified Complaint, which seek to invalidate the City's ban on practicing conversion therapy on minors:

## I. INTRODUCTION

Every major medical, psychiatric, psychological, and professional mental health organization has taken measures to end conversion therapy. Conversion Therapy, also known as Sexual Orientation Change Efforts or SOCE, which seeks to change a person's sexual orientation or gender identity, has been rejected as ineffective and unsafe for minors by our nation's leading medical and mental health professional organizations.[1] Based on that broad medical consensus, the City of Tampa, in the exercise of its legislative judgment, and enacted Tampa Ordinance 2017-47, which merely bans licensed counselors from practicing Conversion Therapy on minors.

_____

[1] The term Conversion Therapy refers to both sexual orientation change efforts and gender identity change efforts and is used as defined in the Ordinance.

Under the Ordinance, providers remain free to speak to the public about Conversion Therapy; express their views about it to patients; recommend it to patients; practice it on adults; and refer minors to licensed counselors in other jurisdictions or to unlicensed counselors, such as religious leaders. Even so, licensed marriage and family therapists seek to invalidate the Ordinance on First Amendment grounds. Because the Ordinance governs conduct—not speech—the First Amendment is not implicated. And even if the Ordinance were analyzed as regulating speech, it readily satisfies any level of scrutiny because it is narrowly tailored to further the City's compelling interest of protecting the physical and psychological well-being of minors and protecting them from potentially life-threatening harm.

## II. <u>MATERIAL FACTS</u>

After holding public hearings and considering the uniform medical consensus of our that Conversion Therapy provides no unique benefits and puts minors at risk of suicide and other serious harms, the duly elected Tampa City Council passed Tampa Ordinance 2017-47 governing the practice of Conversion Therapy. (Statement of Undisputed Facts 1, ¶ 1; 5, ¶ 17; 6, ¶ 21.) Conversion Therapy means any counseling, practice, or treatment performed with the goal of changing an individual's sexual orientation or gender identity. (*Id.* 3, ¶ 8.) Under the Ordinance, "Providers" licensed by the State of Florida are prohibited from practicing Conversion Therapy on minors. (*Id.* 4, ¶ 11.) The Ordinance does not apply to members of the clergy or to unlicensed counselors. (*Id.* 4, ¶ 12.) Nor does the Ordinance prevent providers from speaking to the public about Conversion Therapy, expressing their views to patients, recommending Conversion Therapy to patients, or referring minors to therapists in other jurisdictions or to unlicensed counselors, such as religious leaders. (*Id.* 4, ¶ 13.)

34146017 v1

## III. <u>STANDARD FOR SUMMARY JUDGMENT</u>

Summary judgment is appropriate when the movant can show that there is no genuine issue of material fact and that the movant is entitled to a judgment as a matter of law. *Fennell v. Gilstrap*, 559 F. 3d 1212, 1216 (11th Cir. 2009). When a moving party has shown the absence of a genuine issue of material fact, the non-moving party must then "go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F. 3d 1315, 1321 (11th Cir. 2006) (citation omitted). Whether "certain activity or speech is protected by the First Amendment is a question of law." *Sykes v. McDowell*, 786 F.2d 1098, 1103 (11th Cir. 1986).

## IV. <u>SUBSTANTIAL DEFERENCE</u>

At the heart of this case is a duly elected legislative body's right to enact legislation to protect its minor citizens' health and wellbeing. Courts must accord substantial deference to the predictive judgments of legislative bodies. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 665–66 (1994). This is because sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which conclusive proof may be unavailable. *See F.C.C. v. Nat'l Citizens Comm. for Broad.*, 436 U.S. 775, 814 (1978). Therefore, the relevant inquiry in determining the constitutionality of legislative action turns on whether "the legislative conclusion was reasonable and supported by substantial evidence on the record before" it—not on a reviewing court's independent evaluation of that evidence. *Turner*, 520 U.S. at 211.

"The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification

raised." *Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 391 (2000). "Legislatures are entitled to rely on the empirical judgments of independent professional organizations that possess specialized knowledge and experience concerning the professional practice under review, particularly when this community has spoken with such urgency and solidarity on the subject." *Otto v. City of Boca Raton*, 353 F. Supp. 3d 1237, 1262 (S.D. Fla. 2019). Here, this Court should defer to the City's legislative finding—based on the strong consensus of our nation's leading medical and mental health organizations—that Conversion Therapy poses an unacceptably high risk of serious harm to minors and that prohibiting licensed mental health professionals from subjecting minors to such treatment is necessary to protect minors. To do otherwise would "infringe on traditional legislative authority to make predictive judgments" when enacting policy. *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 196 (1997).

## V. STANDING

As a threshold matter, Plaintiff David Pickup ("Pickup") lacks standing. Because Pickup is invoking federal jurisdiction, he bears the burden of establishing standing, and at the summary judgment stage, Pickup must set forth specific facts (by affidavit or other evidence) establishing standing—it is not enough for him to rest on mere allegations. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013). Here, Plaintiffs allege that Pickup is "currently seeking licensure in Florida." (Stmt. 15, ¶ 45.) But the Ordinance is clear that it only applies to "Providers" licensed by the State of Florida. (Stmt. 5, ¶ 11.) Because Plaintiff Pickup is not licensed Provider in Florida, he cannot allege a "concrete, particularized, and actual or imminent that is fairly traceable to the challenged action and could be redressed by a favorable

ruling. *Id.* at 409. Therefore, this Court should grant summary judgment and find that, as a matter of law, Plaintiff Pickup lacks standing and dismiss him from this case with prejudice.

## VI. <u>FIRST AMENDMENT</u>
### (Count I)

### A.    THE ORDINANCE REGULATES CONDUCT NOT SPEECH.

Courts have long recognized a distinction between conduct and speech. While drawing a line between conduct and speech may be difficult in some cases, it is not difficult here. Because the Ordinance is tied to a particular and highly specific practice of mental health treatment, the Ordinance regulates conduct only and, thus, is subject only to a rational basis review.

As the Supreme Court recently affirmed, governments have the authority to "regulate professional conduct, even though that conduct incidentally involves speech." *National Inst. of Fam. & Life Advocates v. Becerra,* __ U.S. __, 138 S. Ct. 2361 (2018) *("NIFLA")* (citing *Ohralik v. Ohio State Bar Ass'n.,* 436 U. S. 447, 456 (1978)). Thus, governments may subject the practice of healthcare providers to reasonable regulation even though the regulation may implicate the provider's speech. *See Planned Parenthood of Southeast Pa. v. Casey*, 505 U.S. 833, 884 (1992). In *Casey*, the Supreme Court considered the constitutionality of a state law requiring doctors to provide certain information to patients seeking abortions. The Court held that the statute did not violate the First Amendment because states may regulate speech that is "part of the practice of medicine subject to reasonable licensing and regulation." *Id*. at 884. *NIFLA* expressly reaffirmed *Casey*'s holding and made clear that when speech is "tied to a medical procedure" conducted by a licensed professional, it is subject to reasonable regulation by the state. *NIFLA*, 138 S. Ct. at 2373. Like the state regulation in *Casey*, the Ordinance

regulates the practice of licensed mental health practitioners by prohibiting a very specific type of treatment effort that the City Council, as a duly elected legislative body, determined to be harmful to minors. On its face, the Ordinance does not restrict speech generally, only speech that is incidentally involved in providing that specific treatment which is "part of the practice of medicine." *Casey*, 505 U.S. at 237.

In *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014), the Ninth Circuit recognized a legislature's ability to regulate a medical provider's right to administer therapies the legislature deemed harmful. There, the court held that a similar law banning the practice of conversion therapy on minors only regulated conduct—not speech. The *Pickup* court explained that "[p]ursuant to its police power, California has authority to regulate licensed mental health providers' administration of therapies that the legislature has deemed harmful….The fact that speech may be used to carry out those therapies does not turn the regulation of conduct into a regulation of speech." *Id*. (internal citation omitted). Since the *Pickup* court found that the law only regulates conduct while leaving providers free to discuss and make recommendations about conversion therapy, the court held that any effect on speech is incidental to the conduct. Therefore, the law was upheld as satisfying rational basis scrutiny because California had a legitimate state interest in protecting minors and the law was rationally related to that interest.

So too here. The City has a legitimate—indeed a compelling—interest in protecting minor children from the dangerous practice of conversion therapy. *Sable Commc'ns of California, Inc. v. FCC*, 494 U.S. 115, 126 (1989). The City Council considered the consensus among major mental health professional organizations and determined that conversion therapy poses a risk of harm to minors. The Ordinance does not restrict what the licensed practitioner

34146017 v1

can say or recommend to a minor client. Purposely, the Ordinance is narrowly tailored so that it does not affect a professional's right to speak publicly about Conversion Therapy, to express his or her views on patients, to recommend Conversion Therapy to patients, to administer Conversion Therapy to any person who is 18 years of age or older, or to refer minors to unlicensed counselors, such as religious leaders. (Stmt. 4, ¶ 13.) It does not proscribe the practice of Conversion Therapy on minors from unlicensed providers, such as religious leaders, nor does it prevent minors from seeking Conversion Therapy from mental health providers in other political subdivisions or states outside of the City of Tampa, Florida. (*Id.*) Because the City has a legitimate interest in protecting minors from harmful conduct and the Ordinance bears a rational relationship to the City's interest, the City easily satisfies rational basis review.

Plaintiffs' attempts to characterize this regulation of professional conduct as pure speech are misguided. To be sure, in *Wollschlaeger v. Governor, Florida,* 848 F.3d 1293 (11th Cir. 2017) (en banc), the Eleventh Circuit struck down a state law that barred physicians from asking patients about gun ownership and therefore directly prohibited all speech between doctors and patients about a particular health-related subject. But there is no such restriction here. Unlike in *Wollschlaeger*, licensed therapists here remain free to speak with their patients about sexual orientation and conversion therapy, and to express any views they may have about them. The Ordinance only prohibits them from *performing* a particular, harmful mental health treatment—one that often continues for months or even years—on minors.

*Wollschlaeger* does not stand for the broad proposition that any regulation of the speech used by health care providers during medical treatment must be subjected to strict scrutiny. In fact, the *Wollschlaeger* court acknowledged the distinction between: (1) regulations like the

gun law, which directly prohibited speech "about" a medical topic, and (2) regulations like California's conversion therapy law, which regulate a particular medical treatment itself. *See* 848 F.3d at 1309. "Importantly . . . the law in *Pickup* . . . did not restrict what the practitioner could say or recommend to a patient or client." *Id.* Although the *Wollschlaeger* court noted that "[s]aying that restrictions on writing and speaking are merely incidental to speech is like saying that limitations on walking and running are merely incidental to ambulation," *id.* at 1308, the Ordinance here, unlike the gun law, does not impose any direct restrictions on "writing and speaking"—with patients or anyone else. The only restriction is on the specific treatment effort known as conversion therapy, whether accomplished through talk therapy or other methods. To the extent speech is implicated at all, it is only as part of the performance of that specific treatment, and nothing more.

Unlike the gun law, the Ordinance does not regulate speech because it is *about* a particular topic. Instead, it regulates speech only when it is used to *perform* a particular medical treatment on minor patients. That is entirely consistent with the distinction recognized in *Casey* and expressly affirmed in *NIFLA*. As these controlling precedents acknowledge, there is a dispositive difference between preventing a medical professional from talking about a particular medical issue and preventing a medical professional from giving a patient a dangerous medical treatment that violates the applicable professional standard of care. Here, speech is "*the manner of delivering the treatment.* Plaintiffs are essentially writing a prescription for a treatment that will be carried out verbally." *Otto*, 353 F. Supp. 3d at 1256. Indeed, in declining to enjoin the conversion therapy ordinances enacted by the City of Boca Raton and County of Palm Beach, the court in *Otto* correctly relied on the critical distinction

between laws that, for example, "prohibit[] *discussion* of firearm ownership with patients" or "*recommend[ing]* marijuana for medical use," and those that, like the Ordinance, prohibit specific "medical treatments that are effectuated through speech." *Id.* at 1255, 1256.

Finally, in *Wollschlaeger*, the record established that the gun law was enacted to protect gun rights, not to protect patient health and safety. But protecting patient health and safety is precisely what this Ordinance does.  As stated above, the Ordinance is consistent with the consensus of mental health professional associations that conversion therapy of any kind should not be practiced on minors because it is unethical, ineffective, and poses an unacceptable risk of serious—potentially life threatening—harm to minors. Accordingly, this Court should grant summary judgment and find that the Ordinance regulates conduct and passes rational basis review.

 **B.** **EVEN IF THE ORDINANCE IS ANALYZED AS A REGULATION OF PROFESSIONAL SPEECH, IT IS SUBJECT ONLY TO INTERMEDIATE SCRUTINY, WHICH IT EASILY SURVIVES.**

Regulations that simply require licensed professionals to adhere to professional standards while providing services to clients are subject only to intermediate scrutiny under binding Supreme Court and Eleventh Circuit precedent. Likewise, regulations that target the "secondary effects" of speech—as opposed to the speech itself—are subject only to intermediate scrutiny.

 **1.** **Longstanding precedent hold that regulations requiring licensed professionals to adhere to professional standards while providing services to clients are subject only to intermediate scrutiny.**

Under longstanding Supreme Court and Eleventh Circuit precedent, regulations of professional speech that simply require licensed professionals to adhere to professional standards of competence and ethics while providing services to clients are subject only to

intermediate scrutiny. As Justice White noted long ago, when a licensed professional is providing services to a client, he is "engaging in the practice of a profession" and his speech is "incidental to the conduct of the profession." *Lowe v. S.E.C* 472 U.S. 181, 232 (1985) (White, J., concurring). Thus, if "the government enacts generally applicable licensing provisions limiting the class of persons who may practice [a] profession, it cannot be said to have enacted a limitation on freedom of speech or the press subject to First Amendment scrutiny." *Id.* The same analysis applies to generally applicable professional regulations as well. As the Supreme Court affirmed in *NIFLA*, "[l]ongstanding torts for professional malpractice . . . 'fall within the traditional purview of state regulation of professional conduct'" and raise no special First Amendment concern, even when they involve the speech of medical professionals. *NIFLA*, 138 S. Ct. at 2373 (quoting *NAACP v. Button*, 371 U.S. 415, 438 (1963)).

In contrast, the Plaintiffs' sweeping argument that any regulation which in any way touches on the content of professional speech must be subject to strict scrutiny, if adopted, would eviscerate the ability of states and local governments to regulate any profession that primarily involves speech—not only therapists, but doctors, lawyers, and accountants as well.

For example, any malpractice claim or disciplinary action based on a professional's verbal conduct in misdiagnosing a patient, unlawfully harassing or discriminating against patients, or engaging in talk therapy that violates established professional or ethical standards necessarily is premised in part on the content of a health care professional's speech. As the Eleventh Circuit recently affirmed, "Content-based restrictions on certain categories of speech such as commercial and *professional speech*, though still protected under the First Amendment, are given more leeway because of the robustness of the speech and the greater

need for regulatory flexibility in those areas." *Dana's R.R. Supply v. AG*, 807 F.3d 1235, 1246 (11th Cir. 2017) (emphasis added); *see also Locke v. Shore*, 634 F.3d 1185, 1191 (11th Cir. 2011) ("There is a difference, for First Amendment purposes, between regulating professionals' speech to the public at large versus their direct, personalized speech with clients.").

Plaintiffs have previously argued that this precedent has been overruled by the Supreme Court's recent decision in *Reed v. Town of Gilbert*, __U.S. __, 135 S. Ct. 2218 (2015). But the Eleventh Circuit has correctly rejected that sweeping conclusion. In *Reed*, the Supreme Court affirmed that content-based restrictions on speech generally are subject to strict scrutiny and may be upheld only if the government proves that they are narrowly tailored to serve a compelling government interest. *Id*. at 2226. But in *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs*, 703 F. App'x 929, 933 (11th Cir. 2017), a panel of the Eleventh Circuit cautioned that *Reed* did not address regulations of speech that have long been recognized as being subject to a lesser form of scrutiny. *Id.* at 935. To the contrary, the *Flanigans*' court concluded that "the majority opinion in *Reed* did not address the secondary-effects doctrine. For this reason alone, we cannot read *Reed* as abrogating either the Supreme Court's or this Circuit's secondary-effects precedents." *Flanigan's Enterprises, Inc. of Georgia v. City of Sandy Springs, Georgia*, 703 F. App'x 929, 935 (11th Cir. 2017). Moreover, *Reed* did not address or even implicate cases involving professional speech. Therefore, *Reed* cannot reasonably be read to uproot cases that apply intermediate scrutiny to regulations that merely enforce professional standards of competence and ethics in the provision of personalized services to clients.

While *NIFLA* questioned the use of "professional speech" as a separate category of speech, it did not foreclose the possibility that reasons might exist for subjecting professional regulations that affect speech to intermediate scrutiny. 138 S. Ct. at 2375. As the court in *Otto* recognized in rejecting a First Amendment challenge to ordinances similar to the one here, "applying intermediate scrutiny [at most] to medical treatments that are effectuated through speech would strike the appropriate balance between recognizing that doctors maintain some freedom of speech within their offices, and acknowledging that *treatments* may be subject to significant regulation under the government's police powers." 353 F. Supp. 3d at 1256.

The *Otto* court noted that the "[p]laintiffs' words serve a function; their words constitute an act of therapy with their minor clients, which makes [the] plaintiffs' speech different from the protected dialogues in *Wollschlaeger* and *NIFLA*, and from highly protected, political speech in the metaphoric or literal '"public square."' *Id.* at 1257. Moreover, the court emphasized that "[t]he public marketplace of ideas is not limited in any way. What is limited, is the therapy (delivered through speech and/or conduct) by a licensed practitioner to his or her minor patient, within the confines of a therapeutic relationship." *Id.* Thus, intermediate scrutiny is fully consistent with the justifications for, and the principles underlying, the First Amendment. *Id.*

That same analysis is equally applicable here. Quite clearly, the Ordinance readily survives intermediate scrutiny. The legislature's interest in protecting minors is important, and prohibiting licensed therapists from the practice of conversion therapy with minors certainly furthers that interest. The Ordinance burdens no more speech than is necessary and it prohibits only the therapeutic treatment that the City Council found to be harmful. It affects only certain

34146017 v1

licensed health care providers and the treatment that they provide to minors. It does not limit the Plaintiffs' right to advocate for conversion therapy, to engage in conversion therapy with adults, or to express and discuss their views about conversion therapy to their clients or anyone else. Thus, even if it is analyzed as a content-based regulation of professional speech, the Ordinance survives intermediate scrutiny review.

> **2.    The Ordinance is subject to intermediate scrutiny under the secondary-effects doctrine.**

The Supreme Court has long recognized that even a content-based law is deemed content-neutral and subject to intermediate scrutiny if it targets the "secondary effects" of speech—not the speech itself. In *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 46–50 (1986), the Supreme Court held that a zoning ordinance that distinguished theaters that offered sexually explicit films from those that did not was nevertheless content neutral because the ordinance was not aimed at the content of the films shown at adult theaters, but rather the secondary effects of such theaters on the surrounding communities, such as encouraging crime, disrupting retail trade, and depressing property values. *Id.* at 48. Because the ordinance was "*justified* without reference to the content of the regulated speech" the Supreme Court found that it was content-neutral and subject only to intermediate scrutiny. *Id.*

In *City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000), the Supreme Court applied *Renton* in analyzing a city ordinance that prohibited public nudity and concluded that "the regulation is still properly evaluated as a content-neutral restriction because the interest in combating the secondary effects associated with those clubs is unrelated to the suppression of the erotic message conveyed by nude dancing." *Id.* at 296. Significantly, the continuing validity of the

secondary-effects doctrine after *Reed* has been affirmatively recognized by the Eleventh Circuit. *Flanigan's*, 703 F. App'x at 935 (applying the secondary effects doctrine).

The secondary effects doctrine is applicable here. In passing the Ordinance the City sought to protect minors from the harmful effects of a discredited mental health treatment that is associated with life-threatening harms—not suppressing any "message" conveyed by the practice of conversion therapy. In determining that secondary effects pose such a threat, the City need not "conduct new studies or produce evidence independent of that already generated . . . so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses." *Erie*, 529 U.S. at 296 (quoting *Renton*, 475 U.S. at 51-52). Because the purpose of the Ordinance is unrelated to the content of expression but instead targets the secondary effects of conversion therapy (harm to minors), even if the Court finds that it also may regulate speech in some way, it should nevertheless be deemed content-neutral.

### C.   PLAINTIFFS' OTHER FIRST AMENDMENT CLAIMS FAIL.

#### 1.   The Ordinance Does Not Discriminate Based on Viewpoint

Viewpoint discrimination occurs when the government favors "one speaker over another" or when speech is prohibited "because of its message." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). Here, the Ordinance does not restrict plaintiffs' ability to express their viewpoints about sexual orientation or conversion therapy (or any other topic), and its application does not depend on which viewpoint a therapist holds.

The Ordinance makes it unlawful for a provider to "*practice* conversion therapy efforts on any individual who is a minor." It does not prohibit the expression of any views about gender identity, sexual orientation, or conversion therapy. As the Eleventh Circuit held in

*Keeton v. Anderson-Wiley*, 664 F.3d 865, 874 (11th Cir. 2011), "the generally applicable rules of ethical conduct of the profession are not designed to suppress ideas or viewpoints but apply to all regardless of the particular viewpoint the counselor may possess." *See also Shapiro v. State*, 696 So. 2d 1321 (Fla. 4th DCA 1997) (rejecting First Amendment challenge to Florida statute prohibiting licensed therapists from telling patients that sexual contact with the therapist is "consistent with or part of the treatment of the client"). *Keeton* holding applies equally here. It is the practice of conversion therapy on minors that is prohibited, not Plaintiffs' viewpoint about gender identity or sexual orientation.

Consistent with that purpose, the Ordinance excludes from the definition of conversion therapy "counseling that provides support and assistance to a person undergoing gender transition." This is because providing such counseling and support is consistent with professional standards and does not cause the harms that the Ordinance is tailored to prevent. *McCullen v. Coakley*, 574 U.S. 464, 481 (2014) ("The First Amendment does not require States to regulate for problems that do not exist.") (quoting *Burson v. Freeman*, 504 U.S. 191, 207 (1992) (plurality opinion)). At its core, the Ordinance regulates the practice of conversion therapy as defined by medical and mental health professionals, not the Plaintiffs' views regarding the benefits of conversion therapy, gender identity, or gender expression.

### 2. The Ordinance Is Not Unconstitutionally Vague

A plaintiff who claims that a law is unconstitutionally vague must prove either (1) the law fails to provide people of ordinary intelligence to understand what conduct the law prohibits or (2) the law authorizes or encourages arbitrary and discriminatory enforcement. *Konikov v. Orange Cty.*, 410 F.3d 1317, 1329 (11th Cir. 2005) (citations omitted). "[P]erfect

clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989). A statute is not unconstitutionally vague if "it is clear what the [the statute] as a whole prohibits." *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972).

Here, the language in the Ordinance is clear: It prohibits certain licensed practitioners from seeking to change a minor's sexual orientation or gender identity, it defines the practice of conversion therapy by certain licensed practitioners as unprofessional conduct, and it subjects them to discipline. Surely, a licensed practitioner who claims to support the practice of conversion therapy can understand the Ordinance's plain meaning. *See Pickup*, 740 F.3d at 1234.

### 3.       The Ordinance is Not Unconstitutionally Overbroad

"[A] party [may] challenge an ordinance under the overbreadth doctrine in cases where every application creates an impermissible risk of suppression of ideas, such as an ordinance that delegates overly broad discretion to the decisionmaker. . . ." *Catron v. City of St. Petersburg*, 658 F.3d 1260, 1269 (11th Cir. 2011) (quoting *Forsyth Cnty. v. Nationalist Movement,* 505 U.S. 123 (1992)). The Supreme Court, however, has cautioned courts against finding a law overbroad and has instructed that the overbreadth doctrine should be employed by courts "sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Because the Ordinance does not suppress Plaintiffs' expression of their ideas about conversion therapy, but rather only the practice of conversion therapy on minors, the Ordinance is not unconstitutionally overbroad.

    **4.**      **The Ordinance is Not an Unconstitutional Prior Restraint on Speech**

A prior restraint describes "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993). But Plaintiffs' argument fails because the Ordinance is a regulation of professional conduct that restricts speech only incidentally as "part of the practice of medicine."

Even if the Ordinance restricted protected speech, prior restraint on speech must be distinguished from a sanction for past speech. *Alexander*, 509 U.S. at 553–54 ("[O]ur decisions have steadfastly preserved the distinction between prior restraints and subsequent punishments."). Plaintiffs ignore this critical distinction. The Ordinance is not a prior restraint because (assuming it even regulates speech) it does not regulate speech before it occurs. Instead, it penalizes providers after they have practiced conversion therapy on minors.

**D.**      **THE ORDINANCE FURTHERS THE CITY'S COMPELLING INTEREST IN PROTECTING THE PSYCHOLOGICAL AND PHYSICAL WELLBEING OF MINORS**

The City's compelling interest in enacting the Ordinance satisfies any level of review. There is substantial evidence and an overwhelming consensus of the medical community that conversion therapy can cause serious harms to minors. And, significantly for this case, the Supreme Court has repeatedly recognized that "a compelling interest in protecting the physical and psychological well-being of minors." *Sable*, 494 U.S. at 126. Here, the Ordinance establishes the City's "compelling interest in protecting the physical and psychological well-being of minors . . . against exposure to serious harms caused by sexual orientation and gender identity change efforts." (Stmt. 2-3, ¶ 6.)

Plaintiffs dispute the City's compelling interest by attacking the medical consensus the City relied on in enacting the Ordinance and arguing that the City can prevail only if it has conclusive evidence of harm. But that argument is obviously incorrect. As a duly elected legislative body, the City Council was entitled to rely on the "empirical judgments of independent professional organizations that possess specialized knowledge and experience concerning the professional practice under review. . ." *King v. Governor of the State of New Jersey*, 767 F.3d 216, 238 (3d Cir. 2014) (finding substantial evidence of harm). A legislature is not constitutionally required to wait for conclusive scientific evidence before acting to protect its citizens from serious threats of harm. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000).

The Ordinance is supported by substantial research, professional association reports, and expert clinical guidance. In finding that the practice of conversion therapy is harmful, the City considered the views of the nation's leading medical and mental health professional organizations. (Stmt. 6, ¶ 21.) Describing the professional consensus regarding the practice of conversion therapy on minors, the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration's 2015 report ("SAMHSA Report") noted that same-gender sexual orientation and variations in gender identity and gender expression are a part of the normal spectrum of human diversity and do not constitute a mental disorder. (*Id.* 14, ¶ 39(a).) It found no evidence that any type of treatment can alter gender identity or sexual orientation. (*Id.* 15, ¶ 39(b).) It concluded that "[i]nterventions aimed at a fixed outcome, such as gender conformity or heterosexual orientation, including those aimed at

changing gender identity, gender expression, and sexual orientation are coercive, can be harmful, and should not be a part of behavioral health treatments." (*Id.* 15, ¶ 39(c).)

Based on similar findings, "every major medical, psychiatric, psychological, and professional mental health organization . . . has taken measures to end conversion therapy efforts to change sexual orientation." (*Id.* 15-16, ¶ 42.) As an example, the American Psychiatric Association has concluded that the potential risks of conversion therapy include "depression, anxiety, and self-destructive behavior." (*Id.* 6-7, ¶ 21(b).) The American Psychological Association ("APA") has documented that patients perceive harms in the form of "negative social and emotional consequences include self-reports of anger, anxiety, confusion, depression, grief, guilt, hopelessness, deteriorated relationships with family, loss of social support, loss of faith, poor self-image, social isolation, intimacy difficulties, intrusive imagery, suicidal ideation, self-hatred, and sexual dysfunction." (*Id.* 7, ¶ 21(d).)

The APA Task Force, in its peer reviewed report, found no evidence "that providing [Conversion Therapy] to children or adolescents has an impact on adult sexual orientation" or "that teaching or reinforcing stereotyped gender-normative behavior in childhood or adolescence can alter sexual orientation." (*Id.* ¶ 21(e)). It recommended that mental health practitioners provide treatments that "support children and youth in identity exploration and development *without seeking predetermined outcomes*." (*Id.*) (emphasis added). After the SAMHSA Report was published, the APA supported the report's call for an end to the practice of conversion therapy on minors: "This important report makes it clear that conversion therapy is not appropriate for dealing with sexual orientation or gender identities in children and youth." (Stmt. 16, ¶ 43.)

Since the Ordinance was enacted, subsequent research has only further strengthened the basis for that conclusion. A recent peer-reviewed study found that adolescents who are subjected to conversion therapy experienced greatly increased rates of suicidality and depression. Youth who were subjected to conversion therapy were nearly *three times more likely to attempt suicide and experience serious depression* than other LGBT youth.  (*Id.* 12, ¶ 31.)  These youth also experienced negative long-term effects such as lowered life satisfaction, less social support, lower socioeconomic status, and other serious difficulties in their young adulthood that could impact them over the long term. (*Id.* 12, ¶ 31.)

The quantum of evidence considered by the City is substantial. The harms the City seeks to avoid, which are real and not merely conjectural, will in fact be alleviated by the Ordinance. *Turner*, 512 U.S. at 664. Because the City relied upon substantial evidence of harm, this Court should afford substantial deference to the legislative facts embodied in the Ordinance and find that the City had a compelling interest in protecting minors from this harm.

### E.   THE ORDINANCE IS NARROWLY TAILORED TO ACHIEVE THE CITY'S COMPELLING INTEREST IN PROTECTING MINORS FROM LIFE-THREATENING HARM

The Ordinance is narrowly tailored to protect minors from the risk of serious physical and psychological harms posed by conversion therapy. It applies only to minors receiving conversion therapy from licensed "providers." (*Id.* 4, ¶ 11.) The Ordinance does not apply to religious leaders or unlicensed counselors, nor does it prevent minors from obtaining Conversion Therapy from mental health providers outside the City. (*Id.* 4, ¶ 13.) Critically, the Ordinance does not limit a provider's expression of views on Conversion Therapy. It does not prevent providers from recommending or discussing Conversion Therapy with patients or

others, from publishing or writing about conversion therapy, or from otherwise communicating their views in any setting. (*Id.*) Its sole impact is to prevent licensed therapists from actually engaging in conversion therapy with minor patients.

The Ordinance is also the least restrictive means of serving the City's interest. While alternative means were considered, the City Council found that preventing licensed therapists from subjecting minors to conversion therapy was the only way of serving the City's interest in protecting minors. (*Id.* 10, ¶ 22.) The City specifically found that minors receiving conversion therapy from licensed therapists in the City of Tampa "are not effectively protected by other means." (*Id.* 10, ¶ 22.) The "less restrictive alternatives" proposed by Plaintiffs would allow minors to be exposed to the very physical and mental harms that the Ordinance seeks to prevent.

*Consent*. There is no realistic way for an Ordinance to prohibit only "involuntary" or "coercive" conversion therapy for minors. By definition, conversion therapy is involuntary for minors, who have no legal power or practical ability to refuse this therapy if their parents want them to be subjected to it. Florida law generally does not allow children under the age of 18 to consent to their own medical treatment, leaving all such decisions in the hands of their parents. *See* Chapter 743, Fla. Stat. So limiting the Ordinance to instances of "involuntary" or "coercive" conversion therapy would be meaningless.

*Aversive Techniques*. The Ordinance bans both aversive and non-aversive techniques. The medical consensus is that conversion therapy—of any kind—is harmful and contraindicated for changing a child's sexual orientation or gender identity. Non-aversive techniques can cause suicidal attempts just as aversive techniques can. (Stmt. 12, ¶ 33.) And

21

the aversive techniques are no longer used even in the medical community that practices conversion therapy on minors. Restricting the Ordinance only to aversive therapy would therefore fail to protect minors from the very harms the City seeks to prevent.

## VII. <u>RIGHT TO RECEIVE INFORMATION</u>
### (Count II)

Plaintiffs' claim that the Ordinance violates their clients' First Amendment right to receive information fails as a matter of law. While it is true that the First Amendment protects both the speaker and the recipient of information, the First Amendment does not contemplate that some speech may be restricted as to the speaker but not to the listener. *Doe ex rel. Doe v. Governor of New Jersey*, 783 F.3d 150, 155 (3d Cir. 2015). Because the Ordinance does not violate the Plaintiffs' right to speak then it cannot as a matter of law violate the client's right to receive information. *Id.* (rejecting First Amendment right to receive information claim because *King* upheld the New Jersey statute prohibiting conversion therapy as not violating licensed counselor's First Amendment free speech rights).

## VIII. <u>RIGHT TO LIBERTY OF SPEECH UNDER THE FLORIDA CONSTITUTION</u>
### (Count IV)

Likewise, Plaintiffs' claim that the Ordinance violates Plaintiffs' rights to liberty of speech under Article I, Section 4 of the Florida Constitution fails as a matter of law. Article I, § 4, of the Florida Constitution provides that "[n]o law shall be passed to restrain or abridge the liberty of speech." Because this language is similar to the language in the First Amendment to the United States Constitution, which provides that "Congress shall make no law ... abridging freedom of speech," Florida courts generally construe the state constitutional guarantee to be coextensive with the federal counterpart. *Warner v. City of Boca Raton*, 64 F.

Supp. 2d 1272, 1295 (S.D. Fla. 1999) *aff'd* 420 F.3d 1308 (11th Cir. 2005). For the reasons stated above, the Ordinance does not violate the Plaintiffs' right to liberty of speech because the Ordinance regulates conduct not speech. To the extent this Court finds that the Ordinance regulates speech, the Ordinance survives any level of scrutiny, and therefore, does not violate the Florida Constitution's right to liberty.

### IX. <u>ULTRA VIRES UNDER THE FLORIDA CONSTITUTION</u>
#### (Count VI)

Plaintiffs' claim that the Ordinance violates Article VIII, Section 2(b) of the Florida Constitution because the Legislature preempted the field of regulation of mental health professionals fails as a matter of law. The City had the authority under its home rule powers to prevent mental health professionals from harming minors. The Supreme Court has recognized "the regulation of health and safety matters is primarily, and historically, a matter of local concern." *Hillsborough Cty v. Automated Med Labs Inc.*, 471 U.S. 707, (1985). As such, Florida explicitly authorizes municipalities to "exercise any power for municipal purposes except as otherwise provided by law." Fla. Const. art. 8 § 2(b). While Plaintiffs claim that Chapter 491 of Title XXXII of the Florida Statutes preempts the City's authority to enact the Ordinance, nothing in Chapter 491 expressly prohibits the City from imposing civil penalties on mental health providers. Instead, Florida Statutes § 456.003(2)(b) expressly authorizes municipalities to regulate professions for the preservation of health, safety, and welfare when "*[t]he public is not effectively protected by other means [such as] local ordinances.*" *Id.*

The Ordinance is not beyond the City's authority because the Legislature did not preempt the field of regulating mental health professionals and the Ordinance does not conflict with a state statute. *Sarasota Alliance For Fair Elections, Inc. v. Browning*, 28 So. 3d 880,

885–86 (Fla. 2010). There is no legislative scheme that is so pervasive as to evidence an intent to preempt the field of mental health professionals. Nor are there strong public policy reasons for finding that regulation of mental health professionals was preempted by the Legislature. Courts are cautious to input an intent that prohibits "a local elected governing body from exercising its home rule powers." *D'Agostino v. City of Miami*, 220 So. 3d 410, 421 (Fla. 2017) (citation omitted). Because the Florida Legislature did not preempt the field of regulating mental health professionals, the City properly exercised in home rule powers in enacting the Ordinance to protect minors.

## X. FLORIDA RELIGIOUS FREEDOM RESTORATION ACT
### (Count VIII)

Finally, Plaintiffs' claim that the Ordinance violates the Florida Religious Freedom and Restoration Act ("FRFRA") similarly fails as a matter of law as the Ordinance does not substantially burden the free exercise of religion. Under FRFRA the government is prohibited from substantially burdening a person's free exercise of religion, unless the government can show that it is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that compelling governmental interest. Fla. Stat. § 761.03.

Here, Plaintiffs have failed to establish that the Ordinance substantially burdens Plaintiffs' sincerely held religious beliefs because the Ordinance does not compel Plaintiffs to "engage in conduct his religion forbids or forbids him to engage in conduct that his religion requires." *Warner v. City of Boca Raton*, 887 So. 2d 1023, 1033 (2004). For that matter, the Ordinance does not compel the Plaintiffs to engage in any conduct. Nor does the Ordinance forbid them from engaging in conduct that their religion requires. Plaintiffs' desire to provide professional mental health treatments that purport to change a child's sexual orientation does

not rise to the level of a requirement of their faith. *See Freeman v. Dept' of Highway Safety & Motor Vehicles*, 924 So. 2d 48, 56-57 (Fla. 5th DCA 2006). Plaintiffs are free to both practice and express their religious views in any manner they wish. However, they cannot engage in prohibited therapy that has been proven harmful with children when providing treatment as licensed mental health providers. Because the Ordinance does not substantially burden the free exercise of religion Plaintiffs' claim fails.

Even if this Court finds that the Ordinance substantially burdens the Plaintiffs' religious beliefs, for the reasons set forth above, the City has a compelling governmental interest in protecting the psychological health and wellbeing of minors and the Ordinance is the least restrictive means of furthering that compelling interest.

## XI. <u>CONCLUSION</u>

Defendant, City of Tampa, respectfully requests that this Court grant summary judgment in its favor as to Count I; Count II, Count IV, Count VI, and Count VIII of the First Amended Complaint and such further relief as is necessary to protect the City's rights.

Respectfully submitted

*/s/ Robert V. Williams*
Robert V. Williams
Florida Bar No. 144720
Dana L. Robbins
Florida Bar No. 106626
Primary:  rwilliams@burr.com
Secondary: pturner@burr.com
**BURR & FORMAN LLP**
201 N. Franklin Street, Ste. 3200
Tampa, Florida 33602
Telephone: (813) 221-2626
Facsimile: (813) 221-7335
*Attorneys for Defendants, City of Tampa*

Case 8:17-cv-02896-WFJ-AAS   Document 189   Filed 08/26/19   Page 26 of 26 PageID 4015

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26th day of August, 2019, I caused a true and correct

copy of the foregoing to be served via electronic mail on counsel for Plaintiff, Horatio G. Mihet

(hmihet@lc.org), Roger Gannam (rgannam@lc.org), and Daniel J. Schmid (dscmid@lc.org).

<div align="center" style="margin-left:auto;margin-right:0;">

*/s/ Robert V. Williams*
Attorney

</div>

34146017 v1