UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

Robert L. Vazzo, LMFT, et al.,

        Plaintiffs,

v.

City of Tampa, Florida,

        Defendant.
_____/

Case No. 8:17-cv-02896-WFJ-AAS

**DEFENDANT CITY OF TAMPA'S MOTION TO EXCLUDE EXPERT TESTIMONY OF BERNARDO O. HUDSON, M.D. AND CHRISTOPHER ROSIK, PH.D. AND INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rules of Civil Procedure 26 and 37, and Federal Rules of Evidence 104, 402, 403, and 702, Defendant, City of Tampa, Florida ("City"), by and through counsel, respectfully moves this Court to exclude the expert testimony of Plaintiffs' proposed experts, Bernardo O. Hudson, M.D. ("Dr. Hudson") and Christopher Rosik, Ph. D. ("Dr. Rosik").

**INTRODUCTION**

This case is about the protection of minor children. The City has a compelling governmental interest in safeguarding this vulnerable class from a potentially life-threatening treatment known as conversion therapy—a term used to describe any medical or mental health treatment that has the goal of changing a person's sexual orientation or gender identity. Over the past decade, every major medical and mental health professional association in the United States has issued formal policy statements warning practitioners and the public that conversion therapy has no scientific foundation, is not supported by any scientifically reliable evidence of efficacy, and puts minors at risk of serious harms, including suicide. The City Council, as a

duly elected legislative body, relied upon that medical consensus in enacting an Ordinance that prohibits licensed mental health providers from subjecting minors to conversion therapy within Tampa. Plaintiffs allege that the Ordinance violates their right to freedom of speech under the First Amendment. In support of their claims, Plaintiffs submitted the Declarations of Dr. Rosik and Dr. Hudson to challenge the professional consensus against the use of conversion therapy on minors.

These opinions and testimony are neither relevant nor reliable. While these expert declarations have been proffered to undermine the legislative findings supporting the Ordinance,[1] in fact, they do just the opposite. Dr. Rosik and Dr. Hudson do not dispute that there is a professional consensus rejecting conversion therapy as an unsafe and inappropriate treatment for minors. To the contrary, they acknowledge that consensus and seek to explain their own personal disagreement with it. The City was entitled to rely on that professional consensus and the seriousness of the potential harms to minors in adopting the Ordinance. The fact that some individual practitioners may disagree with that professional consensus is irrelevant and does not help this Court to resolve any probative factual dispute. Indeed, there is no factual dispute that the professional medical consensus argues against the use of conversion therapy on minors, or that some individual practitioners who reject that professional consensus and wish to continue to be able to subject minors to this practice.

The opinions of Dr. Rosik and Dr. Hudson should also be excluded because they are based on unsupported speculation and personal anecdotes, not on the "reliable principles and methods" required by *Daubert*. Because their expert opinions will not assist the Court, as the

---

[1] This Court has taken judicial notice of the Ordinance.

trier of fact, in deciding the constitutionality of the Ordinance, this Court should exclude both opinions and testimony.

## ARGUMENT

**I.  Federal Rule of Evidence 702 Permits Admission Only of Relevant, Reliable Expert Testimony.**

Under Federal Rule of Evidence 702, expert witness testimony may be admitted only if:

> a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; b) the testimony is based on sufficient facts or data; c) the testimony is the product of reliable principles and methods; and d) the expert has reliably applied the principles and methods to the facts of the case.

In assessing the admissibility of expert testimony, courts must act as an "evidentiary gatekeeper," ensuring that the testimony is both relevant and reliable. *Daubert v. Merrell Dow Pharmaceutical, Inc.*, 509 U.S. 579, 597 (1993); *United States v. Frazier*, 387 F.3d 1244, 1272 (11th Cir. 2004) (en banc), *cert. denied,* 544 U.S. 1063 (2005).

This is a "rigorous inquiry" that district courts "must" perform. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291 (11th Cir. 2005). "The proponent of expert testimony always bears the burden to show that his expert is 'qualified to testify competently regarding the matters he intend[ed] to address; [ ] the methodology by which the expert reach[ed] his conclusions is sufficiently reliable; and [ ] the testimony assists the trier of fact." *Frazier*, 387 F.3d at 1260 (internal quotation marks omitted).

3

## II. THE COURT SHOULD EXCLUDE THE OPINIONS OF DR. ROSIK AND DR. HUDSON AS IRRELEVANT.

Under Federal Rule of Evidence 702(a), testimony is permissible only if the expert's "scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue." The opinions of Dr. Rosik and Dr. Hudson fail to meet this requirement. Their testimony will not assist the court in determining a fact at issue because they do not dispute that the nation's leading medical and mental health professional organizations have concluded that conversion therapy should not be performed on minors because it puts them at risk of serious harms, including suicide. Dr. Rosik and Dr. Hudson clearly disagree with that medical consensus, explaining that it contradicts their own personal views; critically, however, they do not dispute that such a consensus exists. Because the City was entitled to rely on that medical consensus when it enacted the Ordinance, the fact that Dr. Rosik and Dr. Hudson hold different views has no legal bearing on the resolution of this case.

### A. The City Was Entitled To Rely on the Medical Consensus That Conversion Therapy Should Not Be Performed on Minors in Adopting the Ordinance.

Under the Supreme Court and Eleventh Circuit precedent that governs this case, a law that requires licensed professionals to adhere to professional standards when providing personalized services to clients is subject to rational basis review even when it incidentally regulates speech that is "part of the practice of medicine." *Nat'l Inst. of Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2373, (2018) (citing *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 884 (1992)). The Ordinance falls squarely into this category. And even if the Ordinance is analyzed as a regulation of professional speech, it would be subject only to intermediate scrutiny. *Otto v. City of Boca Raton*, 353 F. Supp. 3d 1237,

1262 (S.D. Fla. 2019). In either case, this Court must afford substantial deference to the City's determination of the relevant legislative facts.

While this Court has an obligation to exercise independent judgment when First Amendment rights are implicated, the Court does not have a license to reweigh the evidence *de novo*, or to replace the Legislature's factual determinations and predictions with its own. *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 667 (1994). As a legislative body, the City Council was entitled to consider evidence and weigh conflicting evidence during the legislative process and to make its own determinations as to the harm to be avoided and the remedial measures adopted for that end. *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 199 (1997). Under intermediate scrutiny, "[l]egislatures are entitled to rely on the empirical judgments of independent professional organizations that possess specialized knowledge and experience concerning the professional practice under review, particularly when this community has spoken with such urgency and solidarity on the subject." *King v. Governor of the State of New Jersey*, 767 F.3d 216, 238 (3d Cir. 2014). Even under strict scrutiny, a legislature is not constitutionally required to wait for conclusive scientific evidence before acting to protect its citizens from serious threats of harm. *See United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000).

Because the opinions of Dr. Rosik and Dr. Hudson merely show that they disagree with the medical consensus that minors should not be subjected to conversion therapy, their opinions fail to assist this Court as the trier of fact in determining the constitutionality of the Ordinance. Notwithstanding the disagreement of some individuals, the City was legally entitled to rely on the strong medical consensus that minors should not be subjected to

conversion therapy because it puts them at risk of potentially life-threatening harm. That reliance was eminently reasonably and, thus, should be given substantial deference in this case.

> **B. Dr. Rosik and Dr. Hudson Confirm the Current Professional Consensus That Therapists Should Not Subject Minors to Conversion Therapy; Their Personal Disagreement with That Consensus Has No Bearing on This Case.**

Both in their declarations and deposition testimony, Dr. Rosik and Dr. Hudson acknowledge that our nation's leading medical and mental health professional organizations have unanimously concluded that conversion therapy is unsupported by reliable evidence of efficacy, that it puts minors at risk of suicide and other serious harms, and that conversion therapy should not be performed on minors. Indeed, the entire purpose of their testimony is to voice disagreement with that professional consensus. They do not claim that there is a disagreement about this issue among professional organizations, but rather that they—as individuals—do not agree with the professional consensus.

For example, Dr. Rosik's declaration discusses a 2009 report by the American Psychological Association that concluded, based on a comprehensive analysis of the existing research on conversion therapy, that conversion therapy is unproven and unsafe and should not be performed on minors. (Ex. 1, Rosik Decl. 5, ¶ 8.) Dr. Rosik criticizes the 2009 report, but he does not dispute the existence of the report or its conclusions. Instead, he opines that there is a risk of confirmation bias in the APA Report because of the "ideologically left-of-center dominance of professional mental health association leadership and the community of academic psychology." (Ex. 2, Rosik Reb. Decl. 24, ¶ 77). Dr. Rosik also acknowledges that other professional organizations agree with the APA Report and have similarly concluded that conversion therapy is harmful to minors and should not be performed on minors. (Ex. 1, Rosik

Decl. 4, ¶ 7) (noting the "lack of viewpoint diversity within professional organizations and their constituent social scientists as pertains to sexual orientation research"); *see also* (Ex. 3-A, Rosik Dep. 69:14-20; 162:8-14; 167:18-171:7; 177:7-13).

Dr. Rosik does offer opinions on a few other issues, but none are relevant to a disputed factual or legal issue in this case. For example, Dr. Rosik opines that sexual orientation is not determined solely by biology or genetics (Ex. 1, Rosik Decl. 19, ¶¶ 56-60). But the cause of sexual orientation is not a disputed issue in this case and has no bearing on the constitutional validity of the Ordinance. In adopting the Ordinance, the City relied on the professional consensus that therapists should not subject minors to treatments that seek a predetermined outcome with respect to sexual orientation—whatever its origins. The Ordinance does not rest upon a particular view of sexual orientation, but rather upon the City's compelling interest in protecting minors from potentially life-threatening harm.

Dr. Hudson's opinions are similarly irrelevant to any disputed factual or legal issues in this case. Dr. Hudson takes issue with the professional medical consensus that attempts to change a child's gender identity are contrary to existing professional standards and put minors at risk of serious harms. But he does not dispute that such a professional consensus exists. (Ex. 4, Hudson Decl. 9, ¶ 35) (noting that many professional organizations have promulgated guidelines or standards about appropriate therapeutic responses to gender identity); (Ex. 5, Hudson Dep. 108:6-22; 109:12-16). Like Dr. Rosik, Dr. Hudson also offers opinions on extraneous matters that do not relate to any disputed factual or legal issue in this case, such as the definition of "natal male" and "natal female." (Ex. 4, Hudson Decl. 4, ¶ 14.) These opinions will not assist this Court in resolving this case either.

In sum, the opinions offered by Dr. Rosik and Dr. Hudson are irrelevant except insofar as they confirm the existence of a professional consensus—with which they simply disagree—that mental health professionals should not subject minors to conversion therapy. The City was entitled to rely on that consensus in adopting the Ordinance, and the fact that some individual practitioners may disagree with that consensus has no legal bearing on its validity.

### III. THE COURT SHOULD EXCLUDE THE OPINIONS OF DR. ROSIK AND DR. HUDSON AS UNRELIABLE.

Even if relevant, an expert's testimony should only be admitted if it is also sufficiently reliable. An expert's reliability "concerns whether the reasoning or methodology underlying the testimony is scientifically valid and. . .whether that reasoning or methodology properly can be applied to the facts in issue." *Seamon v. Remington Arms Co., LLC*, 813 F.3d 983, 988 (11th Cir. 2016) (quoting *Daubert*, 509 U.S. at 592-93). In making this determination, relevant factors include whether the purported expert's theory has been tested, whether it has been subjected to peer review and publication, and whether the theory has been generally accepted in the scientific community. *See Daubert*, 509 U.S. at 593-94; *Rink*, 400 F.3d at 1292. To that end, courts must assess "whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist." *Chapman v. Procter & Gamble Distributing, LLC*, 766 F.3d 1296, 1306 (11th Cir. 2014). The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of America,* 367 F.3d 1255, 1261 (11th Cir. 2004) (quoting *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999)).

### A. Conversion Therapy for Minors Is Not "Generally Accepted" by Licensed Mental Health Professionals.

Dr. Rosik and Dr. Hudson do not claim, much less establish, that the practice of conversion therapy is "generally accepted" by mental health professionals. Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified"); 702; *Daubert*, 509 U.S. at 589-95. To the contrary, conversion therapy for minors is rejected by every mainstream medical and mental health professional association. Embedded in the Ordinance are the articles, reports, position statements, policy statements, resolution, and other publications that establish a broad professional consensus that conversion therapy for minors is, in fact, *not* generally accepted.

- According to the American Academy of Pediatrics, "[t]herapy directed specifically at changing sexual orientation is contraindicated, since it can provoke guilt and anxiety while having little or no potential for achieving changes in orientation." (Doc. 24-1, p. 12.)

- The American Psychiatric Association stated and that "[t]he potential risks of 'reparative therapy' are great and include depression, anxiety, and self-destructive behavior, since therapist alignment with societal prejudices against homosexuality may reinforce self-hatred already experienced by the patient." (Doc. 24-1, p. 17.)

- The American Psychological Association ("APA") task force ("APA Task Force") was created to conduct a "systematic review of peer-reviewed journal literature on sexual orientation change efforts," which "concluded that efforts to change sexual orientation are unlikely to be successful and involve some risk of harm, contrary to the claims of SOCE practitioners and advocates." (Doc. 24-1, p. 25.)

- In its *Resolution on Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts*, the APA stated that "[d]istress and depression were exacerbated" as harms that can arise from SOCE on individuals. (Doc. 24-3, p. 39.)

- Pan American Health Organization (an office of the World Health Organization) stated that conversion therapies "lack medical justification and

represent a serious threat to the health and well-being of affected people." (Doc. 24-4, p. 27.)

- The American Psychoanalytic Association stated that "[p]sychoanalytic technique does not encompass purposeful attempts to 'convert,' 'repair,' change or shift an individual's sexual orientation, gender identity or gender expression. Such directed efforts are against fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by reinforcing damaging internalized attitudes." (Doc. 24-4, p. 6.)

- The American Academy of Child & Adolescent Psychiatry stated that "[j]ust as family rejection is associated with problems such as depression, suicidality, and substance abuse in gay youth, the proposed benefits of treatment to eliminate gender discordance in youth must be carefully weighed against such possible deleterious effects," and "[g]iven that there is no evidence that efforts to alter sexual orientation are effective, beneficial, or necessary, and the possibility that they carry the risk of significant harm, such interventions are contraindicated." (Doc. 24-4, pgs. 19—20.)

- The American School Counselor Association, "[s]chool counselors recognize the profound harm intrinsic to therapies alleging to change an individual's sexual orientation or gender identity and advocate to protect LGBTQ students from this harm." (Doc. 24-4, p. 31.)

- The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration's 2015 report ("SAMHSA Report") found that "[c]onversion therapy perpetuates outdated views of gender roles and identities as well as the negative stereotype that being a sexual or gender minority or identifying as LGBTQ is an abnormal aspect of human development. Most importantly, it may put young people at risk of serious harm." (Doc. 24-4, p. 42.)

As other courts have recognized, there is an "overwhelming consensus" that mental health practitioners should not subject minors to conversion therapy. *Pickup v. Brown*, 740 F.3d 1208, 1223 (9th Cir. 2014). In *King*, 767 F.3d at 238, the Third Circuit noted that "over the last few decades a number of well-known, reputable professional and scientific organizations have publicly condemned the practice of SOCE, expressing serious concerns about its potential to inflict harm." Likewise, the court in *Otto v. City of Boca Raton*, 353 F.

Supp. 3d 1237, 1260, 1265 (S.D. Fla. 2019) noted "substantial evidence and consensus in the medical community that conversion therapy can cause harm, including depression, self-harm, self-hatred, suicidal ideation, and substance abuse," and "the judgments of prevailing professional organizations that conclude that conversion therapy is contraindicated."

**B.     Dr. Rosik and Dr. Hudson Are Not Qualified to Discredit the Objectivity of Professional Organizations, and Their Testimony Is Based on Conjecture and Speculation.**

An expert must be "qualified to testify competently regarding the matters he intends to address." *Frazier*, 387 F.3d at 1260. Credentials are not dispositive when determining qualification. "Expertise in one field does not qualify a witness to testify about others." *Lebron v. Secretary of Florida Dept. of Children and Families*, 772 F.3d 1352, 1368 (11th Cir. 2014) (holding that a psychiatrist was properly prevented from opining on rates of drug use in an economically vulnerable population because he had never conducted research on the subject, and instead relied on studies to form his opinion). "A scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty." *Id*. (quoting *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.,* 285 F.3d 609, 614 (7th Cir. 2002)).

Dr. Rosik is a licensed clinical psychologist at the Link Care Center in Fresno, California. He is proffered as an expert witness on the alleged shortcomings and bias in the consensus of medical and mental health professional organizations that conversion therapy is unsafe and should not be performed on minors. But nothing in Dr. Rosik's background or testimony shows that he has "knowledge, skill, experience, training, or education" on professional medical and mental health organizations or the process by which their

professional conclusions and policy statements regarding conversion therapy were developed. Fed. R. Civ. P. 702.

In his declaration, Dr. Rosik attempts to discredit that professional consensus by challenging the objectivity of professional organizations. According to Dr. Rosik, "[t]heir one-sided presentation of the science is a byproduct of a pervasive lack of viewpoint diversity within professional organizations and their constituent social scientists as pertains to sexual orientation research." (Ex. 1, Rosik Decl. 4, ¶ 7.) He claims that "[p]rofessional activism and related advocacy interests have superseded allegiance to the process of scientific discovery as pertains to SOCE." (*Id*.) Rosik states that "both academic and organized psychology (particularly associational leaders) are essentially politically and ideologically homogeneous, left-of-center groups" (Ex. 2, Rosik Rebuttal Decl., 18, ¶ 55.)

But this is pure speculation and not based on any scientifically valid foundation.[2] When questioned about the basis of his beliefs about the leading mental health organizations and his claim that they are "ideologically left-of-center" he testified that he was referencing their political party affiliation and that they identify as "liberal," (Ex. 3-A, Rosik Depo, 121:5-22; 123:8-11) and that members of the APA task force were "LGB identified" or "gay" and therefore most must be members of the Democratic Party (Ex. 3-A, Rosik Depo, 144: 9-18, 152: 4-9).

Dr. Rosik's claims strain credulity and lack any valid foundation. Rule 702 requires that expert testimony rest on knowledge that is more than "subjective belief or unsupported

---

[2] In contrast, Defendant's expert Dr. Judith Glassgold, served as a member of the 2009 APA Task Force that examined the existing research on conversion therapy and described in detail both the process used to select members of the Task Force and the review process and other methods used to generate the Task Force Report.

speculation." *Daubert* requires that trial courts act as "gatekeepers" to ensure that speculative, unreliable expert testimony is excluded. *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). Similarly, expert opinions that are "conclusory," devoid of factual or analytical support, are simply not sufficiently reliable. As the Eleventh Circuit has stated, "carrying this burden requires more than 'the *ipse dixit* of the expert.'" *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1113 (11th Cir. 2005) (internal quotations omitted).

Because Dr. Rosik is neither an expert on the development of professional standards and policies nor has any direct knowledge or experience about how the relevant professional consensus in this case was developed, the Plaintiffs' have failed to meet their burden of showing that he is qualified or that his testimony on that issue is reliable. Similarly unsupported claims were rejected by a New Jersey Superior Court in deciding to exclude the opinions of proposed experts who likewise sought to discredit the medical consensus on conversion therapy. *Ferguson v JONAH*, No. HUDL547312, 2015 WL 609436, at *8 (N.J.Super.L. Feb. 05, 2015) ("JONAH hardly can argue that *all* of these organizations — including a federal appellate court — were the victims of manipulation by "gay lobbying" groups.").

The same analysis applies to Dr. Hudson. Plaintiffs proffer Dr. Hudson as an expert to discredit the professional consensus that attempts to change a child's gender identity are harmful. In particular, Dr. Hudson claims that "professional organizations are issuing 'affirming' therapy guidelines that disregard evidence-based practice therapies in favor of ideologically predetermined outcomes for plaintiffs suffering from gender dysphoria." (Ex. 5, Hudson Decl. 3, ¶ 10.)

As with Dr. Rosik's similar claims, Dr. Hudson provides no foundation for this claim regarding the alleged bias of professional organizations when developing treatment guidelines for transgender minors. Dr. Hudson describes himself as "a physician who specializes in psychiatry and sub-specializes in child and adolescent psychiatry, with additional expertise in psychiatric illness and treatment of juveniles in confinement." (Ex. 5, Hudson Decl. 2, ¶ 2). Nothing in Dr. Hudson's background establishes "knowledge, skill, experience, training, or education" on professional medical and mental health organizations or the process by which their professional conclusions and policy statements regarding conversion therapy were developed. Fed. R. Civ. P. 702.

Dr. Hudson's "theory" that these guidelines are based on ideology rather than science has not been tested, subjected to peer review or evaluation, or based on any technique that is generally accepted in the scientific community. *Frazier*, 387 F.3d at 1262 (internal citations omitted). Because Dr. Hudson is not an expert on the development of professional treatment guidelines for minors with gender dysphoria, plaintiffs' have failed to meet their burden of showing that he is qualified or that his testimony on that issue is reliable.

> **B.    Dr. Rosik and Dr. Hudson Fail to Cite any Reliable Evidence That Conversion Therapy Works.**

Both Dr. Rosik and Dr. Hudson claim that attempts to change a minor's sexual orientation or gender identity can be successful, but they do not offer any scientifically valid support for that claim. Instead, they rely on purely anecdotal reports and theories that, in addition to being outside the scientific and medical consensus as discussed above, have no scientific validity or support.

As noted above, Dr. Rosik does not claim to be an expert on sexual orientation or on lesbian, gay, bisexual, or transgender people, nor does his training or experience provide any foundation for such expertise. Nonetheless, he asserts many unsupported opinions on these topics, including, among others: that many people change their sexual orientation; that "heterosexuality is normative even for those who at one point in the past reported a non-heterosexual sexual orientation" (Ex. 1, Rosik Decl. 14, ¶ 38); that heterosexuality "likely exerts a constant, normative pull throughout the life cycle upon everyone" because "human physiology . . . is overwhelmingly sexually dimorphic, i.e,, heterosexual." (*Id.* at ¶ 39); and that "the most common natural course for a young person who develops a non-heterosexual sexual identity is for it to spontaneously disappear unless that process is discourage or interfered with by extraneous factors" (*Id.* at ¶ 40). Dr. Rosik is not qualified to make any of these assertions, and none are "generally accepted" within the mental health community.

Similarly, Dr. Hudson claims that "the vast majority of minors who experience gender dysphoria come to accept and psychologically align with their biological sex as they age into adulthood." (Ex. 4, Hudson Decl. 3, ¶ 10.) During his deposition, however, Dr. Hudson acknowledged that he has no direct knowledge of this issues. "I've seen videos. I've seen at conferences, and I've spoken with individuals who are in pediatrics and other psychiatrists, and I've been told that somewhere between 75, 90 percent of these people will, if given time, align with their biological sex." (Ex. 5, Hudson Dep. 106:24-107:4.) Dr. Hudson similarly testified that a person can change their sexual orientation based on anecdotal reports that "individuals that are homosexual or bisexual decided, I don't know how, that they were not

part of that group and became heterosexual." (Ex. 5, Hudson Dep. 128:18-23.) Dr. Hudson's conclusory opinions are devoid of factual or analytical support and are simply not enough.

The opinions of Dr. Rosik and Dr. Hudson are not supported by research or reliable evidence, and they represent views completely contrary to the mainstream medical and scientific community in the United States. For example, modern science recognizes that homosexuality is a normal variation of human sexuality. The American Medical Association, the American Psychological Association, and the American Psychiatric Association have expressly affirmed this long-established understanding. Homosexuality is not listed as a disorder in the Diagnostic and Statistical Manual of Mental Disorders ("DSM"), the official and standard guide to clinical practice for professional mental health practitioners that contains the diagnostic criteria for mental disorders. *Overstreet v. Wilson,* 686 F.3d 404, 412 (7th Cir. 2012) ("The DSM is widely recognized as the authoritative source for information about various mental conditions.")

Even though homosexuality is not a mental disorder, Dr. Rosik opines that mental health treatment can assist in changing one's sexual orientation. (Ex. 1, Rosik Decl. 12-13, ¶¶ 12-13.) But there is *no reliable evidence* that suggests that any type of treatment can alter gender identity or sexual orientation. (Doc. 24-5, p. 1.) Describing the professional consensus regarding the practice of conversion therapy on minors, the U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration's 2015 report ("SAMHSA Report") concluded that there is "no methodologically-sound research on adults undergoing conversion therapy has demonstrated its effectiveness in changing sexual orientation." (Doc. 24-5, p. 15.) Despite Dr. Rosik's attempts to legitimatize the views of the

minority of practitioners who engage in the practice of conversion therapy and have reported "change," the scientific community disagrees. The *ispse dixit* of the experts, Dr. Hudson and Dr. Rosik, fail to meet the burden of reliable evidence under Rule 702 and should therefore be excluded. *Cook,* 402 F.3d at 1113.

## CONCLUSION

The testimony and opinions of Dr. Rosik and Dr. Hudson are neither relevant nor reliable. This Court, functioning in its gatekeeper role, is required to admit only reliable and relevant evidence under Rule 702. Because the testimony and opinions of Dr. Rosik and Dr. Hudson fail to meet the requirements under *Daubert* and 702, the City respectfully requests that this Court enter its order excluding Dr. Rosik and Dr. Hudson from testifying or otherwise offering any expert opinions in this case.

## Rule 3.01(g) Certification

Under Local Rule 3.01(g), undersigned counsel consulted with Plaintiffs' counsel, regarding this motion on August 26th, 2019, and he indicated that he opposes this motion.

Respectfully submitted,

*/s/ Robert V. Williams*
Robert V. Williams
Florida Bar No. 144720
Dana L. Robbins
Florida Bar No. 106626
Primary: rwilliams@burr.com
Secondary: pturner@burr.com
**BURR & FORMAN LLP**
201 N. Franklin Street, Ste. 3200
Tampa, Florida 33602
Telephone: (813) 221-2626
Facsimile: (813) 221-7335

*Attorneys for Defendants, City of Tampa*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 26th day of August, 2019, I caused a true and correct copy of the foregoing to be served via electronic mail on counsel for Plaintiff, Horatio G. Mihet (hmihet@lc.org), Roger Gannam (rgannam@lc.org), and Daniel J. Schmid (dscmid@lc.org).

>*/s/ Robert V. Williams*
>Attorney

34145515 v1