# EXHIBIT

# 3-A

## (Deposition of Christopher Rosik, Ph.D.)

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT L. VAZZO, LFMT, individually and on behalf of his patients, DAVID H. PICKUP, LMFT, individually and on behalf of his patients, and SOLI DEO GLORIA INTERNATIONAL, INC., d/b/a NEW HEARTS OUTREACH TAMPA BAY, individually and on behalf of its members, constituents and clients,

CASE NO: 8:17-cv-02896-WFJ-AAS

Plaintiff,

vs.

CITY OF TAMPA, FLORIDA,

Defendant.

*******************************************************

DEPOSITION OF: CHRISTOPHER ROSIK, PH.D.

TAKEN: PURSUANT TO NOTICE COUNSEL FOR DEFENDANT
DATE: July 29, 2019
TIME: 9:00 a.m. - 3:45 p.m.
LOCATION: Burr & Forman, LLP
201 N. Franklin Street
Tampa, Florida
REPORTED BY: ELSA M. HERNANDEZ, FPR
Notary Public

APPEARANCES:

ROGER K. GANNAM, ESQUIRE
HORATIO G. MIHET, ESQUIRE
Liberty Counsel
P.O. Box 540774
Orlando, Florida 32854
rgannam@lc.org
hmihet@lc.org
Appearing on behalf of the Plaintiffs

ROBERT V. WILLIAMS, ESQUIRE
DANA L. ROBBINS, ESQUIRE
Burr & Forman, LLP
Post Office Box 380
Tampa, Florida 33601
rwilliams@burr.com
drobbins@burr.com

Appearing on behalf of the Defendant

I N D E X

| | PAGE |
|---|---|
| DIRECT EXAMINATION BY MR. WILLIAMS | 4 |
| STIPULATION | 210 |
| CERTIFICATE OF OATH | 211 |
| CERTIFICATE OF REPORTER | 212 |
| ERRATA SHEET | 213 |

E X H I B I T S

| FOR IDENTIFICATION | PAGE NO. |
|---|---|
| Exhibit No. 1 (Complaint) | 12 |
| Exhibit No. 2 (Article Titled - Countering a One-Sided Representation of Science: NARTH Provides the 'Rest of the story' for Legal Efforts to Challenge Antisexual Orientation Change Efforts (SOCE) legislation.) | 96 |
| Exhibit No. 3 (Declaration of Christopher Rosik, Ph.D., dated May 6th, 2019.) | 119 |
| Exhibit No. 4 (Rebuttal Declaration by Dr. Rosik) | 120 |
| Exhibit No. 5 (Ordinance No. 2017-47) | 133 |
| Exhibit No. 6 (Report by the American Psychological Association - Task Force on Appropriate Therapeutic Responses to Sexual Orientation) | 134 |
| Exhibit No. 7 (American Academy of Pediatrics publication entitled "Homosexuality and Adolescence) | 168 |
| Exhibit No. 8 (Article - APA Official Actions) | 174 |
| Exhibit No. 9 (Document - Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth) | 178 |

THE COURT REPORTER: Would you raise your right hand, please. Do you swear or affirm the testimony that you are about to give will be the truth, the whole truth and nothing but the truth?

THE WITNESS: Yes.

CHRISTOPHER ROSIK, Ph.D.,

the deponent herein, being duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. WILLIAMS:

Q. Good morning, Dr. Rosik. Would you please state your full name for the record, sir.

A. Christopher Hastings Rosik.

Q. Your age, sir?

A. 61.

Q. Where do you reside?

A. Fresno, California.

Q. How long have you resided in Fresno?

A. Since 1986. I will let you do the math. 1986.

Q. Long time. How does that sound?

What is your profession, sir?

A. I am a licensed clinical psychologist.

Q. And where do you work? Do you still work as a clinical --

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

A. Oh, yes. Oh, yes.
Q. Where do you work, sir?
A. I work at a counseling center, nonprofit, called the Link Care Center, L-I-N-K, C-A-R-E Center, three words. That's in Fresno, California.
Q. And when you say it's a nonprofit --
A. It's a -- is it a 503(c)?
Q. 501(c)(3)?
A. Yes. Religiously based.
Q. Okay. And what is the religious base, then?
A. Broadly Protestant, but -- I mean, yeah, I say Christian, tends to be more involved with the Protestant community.
Q. Is there a specific religion that supports it?
A. No. It pays for itself through counseling fees and through -- it actually had senior housing, so it's a diversified income stream.
Q. Okay. So it's a counseling center in Fresno where the professionals charge for their services, I take it?
A. Oh, sure, yes.
Q. And otherwise generates revenue to pay the expenses?
A. Yes, that would be correct.
Q. But there are no profits that go to any

shareholders. The profits are plowed back into the center itself?
A. That would be my understanding.
Q. And it's a Christian/Protestant-based center with no specific religion?
A. No specific denominational affiliation.
Q. Yes. I grew up in an Episcopal church, so I guess that includes --
A. Yeah. I did clergy evaluations for the Episcopal Diocese.
Q. All right. And you get paid a salary there?
A. I get paid a salary, and then there's -- it's kind of a two-prong system, where there's a salary and then you do get some -- after a certain base, you generate --
Q. Yeah.
A. -- a bonus based on what you generate for them.
Q. Sure. How long have you worked for Link Care?
A. Since 1986.
Q. Since '86. So you've been there the whole time you've lived in Fresno?
A. I have, indeed.
Q. I have your declaration, Doctor, and I've read it very carefully, many times, actually. So I'm very

familiar with your background, your publications, and obviously the general gist of the testimony that you are probably going to give today.
But for the record, would you describe your educational background?
A. Just higher education, I assume. I have a bachelor's degree in psychology, honors college --
Q. From where?
A. University of Oregon in 1980.
Q. University of Oregon in 1980?
A. Right. I did spend a semester at the University of Copenhagen during that time in Denmark.
Q. Let me make sure I get this correct. You got your bachelor's degree in psychology from the University of Oregon --
A. University of Oregon.
Q. -- in Eugene?
A. Correct.
Q. I was born in Portland, so I'm very familiar.
A. Oh, yeah. Okay. I have family up there.
Q. Good. All right. After your bachelor's degree, then where did you matriculate?
A. I went to Fuller Theological Seminary. They have a graduate school of psychology called Fuller Graduate School of Psychology. It's a program, a first

of it's kind in the country -- it started in the '60s -- where a student is able to study -- it's a six-year program, and you study theology alongside psychology. So it's integrative. And you take some courses in integration, which is ideally to pull the best of those two fields together.
Q. What is a course in integration? Give me a description.
A. Well, it might talk about, like, theological anthropology.
Q. Okay.
A. And how that relates to psychological understandings of human nature and Christian understandings and how those may or may not sort of interface. That would be one example.
Q. Okay. And Fuller, is that a denominational-oriented institution?
A. It tends to be Protestant, I would say, but it -- I don't think they hold themselves out -- it started back with Charles Fuller in the 1940s.
Q. I don't know who --
A. He was an evangelist at the time, and so it comes out of that tradition, but the school of psychology started in the '60s. And I think -- if I were to characterize it, I would say it's a lot of

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 9

Presbyterian, Presbyterians go there, but I know there are Episcopalians, there are Baptists. So it's fairly broad-based Protestant, although there was Catholics in the graduate school I was at.

The graduate school of psychology, there's three schools, theology, intercultural relations, and then psychology program, which I was in. And their program was, I think, the first of its kind that was approved by the APA, back in the late '60s, early '70s.

Q. The APA being?

A. American Psychological Association. Yes. So it's --

Q. First of it's kind being the integrative?

A. Exactly. Right. Religious-oriented school.

Q. Okay. Is it Mr. Fuller or Dr. Fuller?

A. Charles Fuller are you talking about? Yeah, I imagine it's a mister. I don't know think he was a doctor. Unless it was an honorary.

Q. You said he was an Evangelical. What does that mean?

A. He was an evangelist.

Q. What does that mean?

A. It's like Billy Graham.

Q. Okay. Well, I know Billy Graham.

A. Right.

Page 10

Q. I went to the same elementary school as Billy Graham.

A. Did you really?

Q. Yes, I did.

A. Anyway, so that was his -- his ministry was evangelizing, so -- he wasn't as famous as Billy Graham, but Billy Graham was in -- I think they were compatriots in some things. They worked together sometimes. Same era.

Q. All right. You said evangelicals like Billy Graham. I certainly know who Billy Graham is. I grew up in Charlotte, so that's where Billy Graham was.

MR. MIHET: For the record, did you go the same elementary school with him at the same time as him?

MR. WILLIAMS: The answer to that is no. The answer to that is no.

MR. MIHET: Okay.

MR. WILLIAMS: But my wife and I were married in Black Mountain, North Carolina, where he was headquartered in his later years. But I did go to the same elementary school, and I'm very proud of that because he's quite and individual, I think.

A. So it kind of came out of that tradition, the founding of the school. Even though the theology

Page 11

school, the seminary was founded back in the '40s, late '40s, the school of psychology wasn't really founded until the '60s.

Q. What year did you graduate from the Fuller --

A. 1986.

Q. So you were there for six years?

A. I was there for six years.

Q. After you graduated in '86, I take it you went to Fresno?

A. I did, yes.

Q. And --

A. The rest is history.

Q. Well, let me ask the question.

A. Sorry.

Q. And you were there since, and you've been involved with Link Care since?

A. Correct.

Q. All right. Thank you for that --

A. I could add that I -- since about 2001, I have been -- so affiliated as a clinical faculty at Fresno Pacific University, so that is what I -- I do that mostly to stay balanced.

(A discussion was held off the record.)

BY MR. WILLIAMS:

Q. Have you ever been involved in any litigation

Page 12

of any kind prior to today?

A. Yes.

Q. And would you describe that for me, please.

A. I can think of two things. One, I was a plaintiff in the Pickup versus Brown suit in California, and then I also submitted -- I was asked to submit a -- what do they call it, again? -- for a case in New Jersey -- I wasn't an expert witness, but I submitted, I believe, in support of plaintiffs.

Q. You were an expert witness where, sir?

A. I wasn't an expert witness. I submitted -- I'm not quite sure what the legal term is for it when you submit comments about it.

Q. Well, we'll get to that. Don't worry.

A. Yeah. Yeah.

Q. Before we go any further, let me have this marked as Exhibit 1 do Dr. Rosik's deposition.

(Exhibit No. 1 was marked for identification.)

BY MR. WILLIAMS:

Q. Here is Exhibit 1, Dr. Rosik. I'll describe it on the record in a minute, but I want to go through some preliminaries that I probably should've gone through before we got started.

This is not a game of the foxes, today's deposition. There are no trick questions. I want you

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

to feel free to ask me any questions if you don't understand my questions, if you want me to repeat it, clarify. You are under oath, and so therefore I respect the fact that you have the right to make sure that you understand what we're talking about.

And if you give an answer and then later think you need to augment it or change it, let me know. We're here to get -- this is not a gotcha process. This is to get your testimony as accurately as possible.

Do you understand what I just said?

A. Yes.

Q. If you need a break, just let me know. We're going to take a break probably every hour. We're going to take a lunch break around noon-ish. I cannot provide that today, gentlemen. This is off the record.

(A discussion was held off the record.)

BY MR. WILLIAMS:

Q. Further, Doctor, it is very important to me that we communicate very clearly. So if you want me to define something that you don't understand, just let me know and I'll do my best. And I will do the same. I will do the same. Because words matter in these situations. All right?

A. Understood.

Q. All right. I'm returning to Exhibit 1 to your deposition, which is a copy of a complaint -- a copy of a declaration, I should say, that you provided in Pickup versus Brown out in California.

Do you see that?

A. Yes.

Q. And the style of that case -- by the style of the case, that's what we lawyers call this first part -- is in the United States District Court Eastern District of California, Sacramento Division. Pickup versus Brown, Case No. 2:12-cv-04297-KJM-EFB.

Did I say that correctly?

A. It looks like it, yes.

MR. GANNAN: For the record, I think the number was 02497. I think you reversed it.

MR. WILLIAMS: Not in what I have. I have 04297.

MR. GANNAN: Oh, you know what, the filing header is 02497, but the style has what you said, so I guess --

MR. WILLIAMS: That's what I'm going on.

MR. GANNAN: Okay. I'm sure the heading is correct because that's the electronic filing stamp.

MR. WILLIAMS: Could be right. I don't who prepared this, but whoever did...

BY MR. WILLIAMS:

Q. Anyway, whether it's 249 or 429, we're talking about the same document in the same case, are we not, sir?

A. Yes.

Q. All right. Do you know Mr. Pickup, David Pickup?

A. I do know David Pickup.

Q. And who is Mr. Pickup?

A. He is a therapist. He, from what I understand, has a practice in Texas, and he had a practice obviously in this municipality too.

Q. In where?

A. In this -- in Tampa.

Q. Tampa.

A. I think he had a practice in California one time. I'm not sure if he still does. So I know him in that way.

Q. Have you met him?

A. I have met him.

Q. Where did you meet him?

A. I met him at some conferences of The Alliance for Therapeutic Choice and Scientific Integrity. It's called the Alliance from here forward.

Q. What is that, the Alliance? What you just said.

A. It's a professional organization of therapists and others that -- the mission statement is basically that we share desire to protect the rights of clients to pursue therapy of their choice when it comes to this area of same-sex attractions and the rights of therapists who provide that therapy. That is -- that is a goal, if you will.

Q. And what is the therapy? Can you tell me the name of the therapy you are referring to?

A. There is no specific therapy. There is no -- there is no specific one type of therapy. Therapists affiliated with the Alliance come from a number of different traditions in terms of therapeutic modalities, anywhere from psychodynamic, to narrative, to interpersonal, cognitive. These are all standard, mainstream therapeutic approaches.

Q. I'm familiar with the term "therapeutic modality."

A. Yeah.

Q. In fact, I've heard that quite a bit over the course of my legal career and from my wife who does that kind of stuff, so...

A. That's cool.

Q. How would you define "therapeutic modality"?

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

A. It's an approach, a theoretical approach that has practical, obviously, applications towards addressing client issues.

So a cognitive therapist would look at a person's cognitions and intervene in terms of addressing those.

A psychodynamic therapist might look at the client's developmental history, attachment history, psychodynamics of what may be involved in their behavior in the present.

A narrative therapist will look at the story of the client and see about how they construct their story and will make changes, perhaps, and how they construct that story, so it's -- you know, the client brings a certain issue, a certain problem to the therapist. The therapist's modality is going to be the framework through which he or she will address that issue.

Q. So therapeutic modality or I guess the treatment process would be client specific, one size doesn't fit all. Is that a good way to put it?

A. I would say so. I mean, therapists tend to orient towards some modalities more than others, just by virtue of personality and experience and things like that.

Q. So your colleagues there at Link Care might approach something -- a particular client differently than you might. Is that --

A. Oh, yes.

Q. Okay. So that's what you mean by therapeutic modality, a treatment process or a procedure that you choose versus what another psychologist might choose. Is that a good way to put it?

A. That would do, I think.

Q. All right. Now, we're going back to the Alliance. And I'm exploring this because I want to make sure that I understand your background.

A. Right. Right. Right.

Q. I think it's important for purposes of this litigation. So the Alliance, which you say you'll just refer to it as the Alliance, how large of an alliance of human beings, psychologists, therapists, counselors is it?

A. The last I heard I would say it's a couple of thousand.

Q. Nationwide?

A. Yeah. International.

Q. Worldwide?

A. Yeah. I mean, obviously, it's more in North America.

Q. Sure. And does it have a headquarters?

A. Well, the headquarters is sort of -- the office is based in Utah, so I guess that would be --

Q. What part? Salt Lake City?

A. Yeah, I believe so.

Q. Okay.

A. One of the board members, our executive director is there.

Q. Okay. So it has an -- it's an organization. It --

A. Yeah, it has a board. It has an executive director, yes.

Q. And the executive director, who is the executive director?

A. David Pruden.

Q. Spell the name.

A. David Pruden, P-R-U-D-E-N.

Q. And Mr. Pruden is the executive director of the Alliance which is headquartered -- physically headquarters in Salt Lake City, Utah?

A. It's his office, but, yes, documents and things like that are stored there.

Q. Why is it in Salt Lake City?

A. Because he is there.

Q. Because that's where he lives?

A. That's where he is. That's right.

(A discussion was held off the record.)

BY MR. WILLIAMS:

Q. So the Alliance has headquarters in Salt Lake City, has an executive director, and I assume the executive director kind of is the person who runs the operations?

A. Yeah, like the hub, yes.

Q. The hub?

A. Yeah.

Q. Does the Alliance have meetings?

A. We do.

Q. How often?

A. Well, the board meets monthly by conference call, and then we have a conference once a year, different cities, so that's -- for the most part, that's the meetings that we have.

Q. And the members of the Alliance attend those meetings, if they can, those conferences?

A. Sure. It's open to all members and nonmembers, for that matter.

Q. Really? Okay.

A. Oh, yeah. You can come.

Q. Okay. Well, maybe when you have one in Tampa, I'll take you up on that.

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Does the Alliance have a mission statement?
A. We do.
Q. What is the mission statement?
A. It's -- I have to -- I'd have to see it to know exactly, but it -- certainly, it includes what I told you earlier, about defending the rights of clients to pursue their goals in therapy and the rights of therapists to provide those goals.
Q. Does the Alliance have a website?
A. We do.
Q. And would the mission statement be on the website?
A. It would be, yes.
Q. And if I wanted to know more about the Alliance without spending a lot of time in today's deposition, I could look at that website?
A. Yes.
Q. Access it, even though I'm not a member; is that correct?
A. Yes.
Q. And to your knowledge, is everything that I would find on the website accurate?
MR. GANNAN: Objection. Calls for speculation.
A. I haven't read everything on the website, so I

couldn't tell you with certainty. It's a big -- it has a lot of documents on it, some of which I don't have anything to do with. So as far as things that I have been involved in, I would say, to the best of my knowledge, yes, to your question.
BY MR. WILLIAMS:
Q. Do you feel comfortable in saying that the Alliance, in maintaining their website, makes a legitimate effort to try to make sure that it's accurate?
A. I would think so. I hope so, yes.
Q. Yes. Okay.
MR. GANNAN: I just want to say for the record that Dr. Rosik is not appearing today on behalf of the Alliance.
MR. WILLIAMS: I understand that. I'm only going into it because he raised it.
A. But, again, we are -- I tempered it just by the fact that there's a lot of information over the years, a lot of that has been, you know, evolved some, and so there may be old documents that don't represent our thinking at this point in time. But, again, I don't know that. I don't manage the website. I simply -- I contribute some information to it. But it's entirely possible that there is some things on it

that I don't agree with.
Q. And I'm sure that's the case. I'm sure I don't agree with what is on the ABA's website.
A. As well, yes.
Q. All right. I was trying to get an idea of how I can obtain information about the Alliance without spending all morning on that topic.
A. Sure.
Q. Because you are not here on behalf of the Alliance. Am I correct?
A. Correct.
Q. Are you an officer of the Alliance?
A. I am.
Q. What is your office?
A. I'm on the board. I have served as the -- I'm a former president of the organization.
Q. And you still remain on the board itself?
A. I do remain on the board, yeah.
Q. All right. How long have you been on the board?
A. Probably -- I would say at least 10 to 12 years.
Q. Were you one of the founders of the Alliance?
A. I was not.
Q. Do you know who did found it?

A. Well, the Alliance in its first -- in its infancy, it was called the National Association for Research and Therapy of Homosexuality, or NARTH.
Q. Say that again, NARTH?
A. N-A-R-T-H. And that was founded by, I believe, Dr. Bieber, Socarides -- Kaufman is the other one -- Socarides, Kaufman, and Nicolosi.
Q. How do you spell Socarides? She's gotta write this down.
A. S-A-C-A-R-I-D-E-S [sic], something like that.
Q. Is Dr. Socarides still alive?
A. No. He passed way sometime ago.
Q. Are the founders, the three gentlemen that you talked still alive?
A. Dr. Kaufman, to the best of my knowledge, is still live, but he doesn't practice anymore. He's not really involved in the organization. And Dr. Nicolosi passed away a couple of years ago.
Q. Do you know why these three professionals formed NARTH, I think you called it?
A. Yeah. It was, I believe, a reaction to their disagreement with actions taken by the mental health associations in the area, I guess, of, you know -- again, I wasn't there.
Q. I understand. I'm just asking your best

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 25

knowledge.
A. I'm speculating here.
Q. The record will reflect that you're not -- you don't know of actual knowledge.
A. But I think they wanted to preserve the right for clients -- clients who were dissatisfied with their same-sex attractions to be able to have therapy. Originally, it was a clinical organization when it started.
Q. What do you mean by "clinical organization"?
A. Of therapists. It was almost exclusively therapists when it began. We have therapists now, but we also have others who are not therapists who are members of the Alliance.
Q. When you say "clinical organization," meaning it provided clinical --
A. Professional -- professional therapist membership organization.
Q. But they didn't provide clinical services as NARTH?
A. No. No. It's never been that.
Q. Okay. That was my question.
A. Sorry.
Q. And you said that they -- it was formed, you think, because of, I guess, dissatisfaction with

Page 26

positions taken by mental health organizations? I think you said mental health.
A. Right.
Q. What mental health organization?
A. American Psychiatric Organization and American Psychological Association.
Q. And what positions by those two organizations were the motivating factor for forming NARTH, which has evolved into the Alliance, if you know?
MR. GANNAN: Objection. Speculation.
A. Again, I'm speculating, but I know at least part of it was concern about the rights of clients to receive therapy, concerned about treatment options for individuals who were maybe dissatisfied with their same-sex attractions and behavior. And there may have -- you know, again, I don't want to speculate too much.
BY MR. WILLIAMS:
Q. Well, the record reflects that you are speculating, and this is a discovery deposition, Doctor, and the reason it's okay to speculate is because you may provide information that will --
A. Yes.
Q. -- help me do my own investigation separate and apart from this deposition.

Page 27

A. All right.
Q. So that's the reason I'm asking these questions. And the American Psychological Association, the American Psychiatric, they took positions that were, I guess, antithetical to what the three founders of NARTH, now the Alliance, believe were correct. Is that a good way to put?
A. It was certainly an argument within the psychoanalytic circles.
Q. Right. What were the positions that the American Psychiatric Association and the American Psychological Association took that were -- can you articulate those positions that led to the formation of NARTH, now Alliance?
MR. GANNAN: Objection. Speculation.
A. I wasn't privy to those conversations. My guess --
BY MR. WILLIAMS:
Q. Guess, go ahead. The objection is on the record. That's what we lawyers do.
A. Yeah. I mean, I think it probably came in the context of differing, changing views of the status of same-sex attractions behavior, sexual orientations.
Q. For example?
A. That at least in some instances it was a

Page 28

condition that could be treated, could -- a person could be helped in terms of adjusting, changing. Again, I think it all had to do with the treatment issue, being able to treat.
Q. So did the American Psychiatric Association and the American Psychological Association take the position that homosexuality was not something that was treatable? I want to make sure I understand what you're saying.
MR. GANNAN: Objection. Compound and speculation.
BY MR. WILLIAMS:
Q. Go ahead.
A. Repeat your question, please.
MR. WILLIAMS: Would you read it back to him, please.
(The question was read back as follow: "So did the American Psychiatric Association and the American Psychological Association take the position that homosexuality was not something that was treatable? I want to make sure I understand what you're saying.")
A. It's not a simple question, because it was evolution of the associations over time. Right. The DSM, it was declassified as a disorder. However, it

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

was left in as a -- at least in the later DSM-III, it was still a condition that could be under sexual disorders NOS, so it wasn't officially in. And then it became egodystonic from a homosexuality. And --
Q. Say that again.
A. It was -- a later edition of the DSM, which is the Diagnostic and Statistical Manual.
Q. Yes.
A. A later edition it became -- said homosexuality -- egodystonic.
Q. Egodystonic.
A. Right. And that eventually --
Q. Spell that for the court reporter.
A. D-Y-S-T-O-N-I-C. Then it was removed altogether. Although -- yeah, so...
Q. What was removed altogether?
A. Homosexuality as a condition.
Q. As a mental illness?
A. As a mental illness.
Q. Now, DSM-III --
A. As a disorder, okay, yes.
Q. -- DSM III, if I recall, was published in 1987, if my memory is correct. Is that about right?
A. It could be. I don't know the exact date.
Q. Assume that it was published in 1987. Are you

telling me that prior to the DSM-III, assuming it's '87, homosexuality was declassified?
MR. GANNAN: Objection. Speculation.
A. It was declassified at least by the organizations in, I think -- as a stand-alone category of homosexuality in 1973.
BY MR. WILLIAMS:
Q. Okay.
A. But it was still -- you know, you could diagnose egodystonic homosexuality. Right.
Q. Okay.
A. You can have ego-syntonic. People comfortable in it would not be considered that.
Q. What does declassified mean?
A. Taken out of the DSM. It was removed from the DSM as a category.
Q. Mental illness?
A. Yes.
Q. So sometime in the '70s --
A. My understanding is that when it was taken out it was voted on by the membership of the American Psychiatric Association. It was a very close vote. It was a very close vote to declassify it of the membership, and that's one of the reasons that it wasn't, you know -- I imagine that psychiatrists, like

Dr. Kaufman and Dr. Socarides were psychiatrists, that's one of the reasons that they got together eventually.
Q. Sure. I'm just trying to get the chronology so I can understand it.
A. Yeah.
Q. I'm not a psychologist. I leave that to my wife. In the 1970s, homosexuality was declassified as a mental illness by the American Psychiatric Association, and that declassification was evidenced in what? Is it a resolution by it, or how do they do that?
A. I don't know for sure. I imagine they may have made some resolutions to justify, you know. I mean, obviously, the DSM is something that -- it's a book that is done by a number of committees, and so the committees related to sexual disorders probably made that decision in the end.
Q. And then in DSM-III -- tell me, again, what you said about DSM-III. And, again, I'm pretty sure I'm right that DSM-III came out in 1987. We're up to DSM-5 now, I think.
A. My recollection would be that DSM-III did not have homosexuality as a category, and it had sexual disorders NOS, which is not otherwise specified, and it

included homosexuality that was egodystonic as a possible, you know, example for that.
Q. Just for everybody's sake, what is "egodystonic"?
A. It means that it is not -- it is unwanted, I guess, you could say that. It caused the individual distress.
Q. Homosexuality that was not wanted?
A. Right. As opposed "syntonic," which means that would be what they -- that the person was comfortable in their homosexuality.
Q. Sure.
A. It's not a problem.
Q. Sure. All right. And so in DSM-III, there was that change. It had already been declassified, and now it's either syntonic -- egosyntonic or egodystonic.
A. Uh-huh.
Q. And then when was homosexuality removed from the DSM, Diagnostic and Statistical Manual completely?
A. My guess would be it was in the DSM-IV.
Q. In IV. Okay.
So there was an evolutionary chronology, a declassification DSM-III, which you just described. And then by DSM-IV, which I think was in the '90s, it was removed altogether from DSM-IV. Am I correct?

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 33

A. I don't know about the specific years, but in general, that was the evolution.
Q. Right. And the organization which you described as NARTH, which evolved into the Alliance, you believe was started by those three gentlemen, two psychiatrists and psychologist, as a reaction to the declassification and ultimately elimination?
A. In part --
MR. GANNAN: Objection. Asked and answered. Speculation.
Q. Go ahead.
A. I suppose in part it could, yes, but it was interesting, it didn't -- I'll just say in part.
BY MR. WILLIAMS:
Q. Okay. Doctor, to become a licensed clinical psychologist in the state of California, does -- aside from the educational qualifications and requirements, does one have to have a residency or some clinical --
A. You have to have --
Q. -- practicum --
MR. GANNAN: Let him finish his question completely before you answer.
BY MR. WILLIAMS:
Q. -- before one can practice that -- provide clinical psychological treatments to clients in

Page 34

California?
A. In California, at least when I was graduating, you had to have 3,000 hours of supervised training, practical experience. 1,500 of those hours could be prior to graduation, 1,500 could be after. So that's the answer to the question.
Q. How did you acquire those 3,000 hours in your evolution from a student into a clinically -- clinical practitioner?
A. My undergrad, my last year at Fuller was mostly as an intern as a student trainee at Camarillo State Hospital.
Q. Say that again.
A. I was a student in training at Camarillo State Hospital. It was an internship. My internship was at Camarillo State Hospital.
Q. Where is that hospital?
A. In Camarillo, California.
Q. Spell it, please.
A. C-A-M-A-R-I-L-L-O.
Q. Camarillo.
A. Camarillo, yes.
Q. And where is that in California?
A. It's kind of between Thousand Oaks and Ventura.

Page 35

Q. Okay. So it's down in Southern California?
A. Yes.
Q. Is that a particular kind of hospital, a psychiatric --
A. It was a psychiatric hospital, yes, at that time. Doesn't exist anymore.
Q. Was it a long-term or short-term psychiatric hospital?
A. I don't know. They had different wings, different -- they had sex offenders. They had mental -- developmentally disabled. They had all sorts of different people.
Q. Was that a state hospital?
A. It was a state hospital, yes.
Q. So funded by the state, I take it?
A. Yes.
Q. So you spent a year there getting clinical?
A. Nine, ten months, yes.
Q. Okay. All right. Take me forward.
A. And the other hours were through supervision at Link Care.
Q. Through what?
A. Supervision, supervised hours at the Link Care Center.
Q. I see.

Page 36

A. I had a supervisor there.
Q. While you were in school?
A. No. After graduation, 1,500 hours are prior to graduation.
Q. Yes, sir.
A. 1,500 hours are after. So my 1,500 hours after were at Link Care under the supervision of a psychologist there.
Q. Were you qualified from a licensure point of view to provide clinical therapeutic procedures or modalities, however -- whatever words --
A. Until you can get your license, you qualify under the license of your supervisor.
Q. I see.
A. That's how it works.
Q. I got you. Then once you get the 3,000 hours?
A. Then you apply, take the exam, and if you pass, then you are licensed, yes.
Q. Okay. Good enough. Is that standard throughout the country that you have that kind of --
A. I don't know about the hours piece of it, but, yes, most states have tests that you have to take to be licensed, requires certain amount of hours.
Q. Why -- do you know why you became a plaintiff in the Pickup case -- I will call it the Pickup v.

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 37

Brown case -- that I described on the record about 30 minutes ago?

A. Sure. Sure. It's a little bit of a story. But at the time --

Q. I'm all ears.

A. -- at the time, I was the president of Alliance. And you may guess, I really don't have a great stomach for confrontational kinds of things. I don't enjoy them. However, I don't look for a fight, you know. But in a sense, here I am the president of this organization and the state I'm practicing in is threatening to take away the rights of clients and therapists.

I should say, this is -- it's important contextually to understand the Link Care Center, we work with a fairly conservative religious population, meaning we work with all people, of course, but a significant -- a significant percentage of that are Protestant, evangelical, conservative, traditional, theologically orthodox, whatever you want to call it, but they come from those backgrounds.

We have a program that we work with a lot of clergy and missionaries. It's a cross-cultural, it's -- those working a full-time Christian vocation. So I'm well acquainted with these individuals.

Page 38

Over the years in my working there, it was unusual for -- it wasn't frequent, but not unusual for some of these individuals to come to Link Care and among the issues were same-sex attraction issues. So from an early on, I was concerned, just, you know, sensing the wind, that the rights of these individuals were going to be taken away, the sincerely held religious beliefs to pursue and explore their same-sex attractions.

And so that's really why I got involved in this whole field in the first place. I mean, the suit itself was 15 years later, but I didn't feel like these individuals who I was seeing in my office had a voice, and I was afraid that their rights were going to be taken away to pursue the goals that are based on their religious beliefs.

Q. And you said this is why you got involved in the first place. It wasn't because of the change in the California law, but -- what you were talking about earlier, the Alliance --

A. I was involved -- yes, although it took some time. As I was involved with the Alliance -- again, if you read my writings, I talk about this early on in my writings in this area, long before the law was actually passed or actually, you know, was working through the

Page 39

legislature -- legislature in California.

So I sensed that this could happen, and I wanted to be a voice for these clients who don't have a voice. You know, they're not represented by, you know, I would say most of the voices that are on the other side anyway.

Q. What other side?

A. Well, I would say those who would support the bans on therapy.

Q. Who are "they"? Can you characterize them for me?

A. What are you looking for?

MR. GANNAN: Objection. Vague. Go ahead answer.

A. What are you looking for on that? I'm not quite sure.

BY MR. WILLIAMS:

Q. Well, I'll have her read back the colloquy and then probably help you out, I believe.

(A discussion was held off the record.)

(The record was read back as follows: "And you said this is why you got involved in the first place. It wasn't because of the change in the California law, but -- what you were talking about earlier, the Alliance --

Page 40

"ANSWER: I was involved -- yes, although it took some time. As I was involved with the Alliance -- again, if you read my writings, I talk about this early on in my writings in this area, long before the law was actually passed or actually, you know, was working through the legislature -- legislature in California.

"So I sensed that this could happen, and I wanted to be a voice for these clients who don't have a voice. You know, they're not represented by, you know, I would say most of the voices that are on the other side anyway.

"QUESTION: What other side?

"ANSWER: Well, I would say those who would support the bans on therapy.")

BY MR. WILLIAMS:

Q. That's the context, Doctor, when you said "the other side." And I would agree with Mr. Gannam that it is a vague reference, but that's why I'm asking the question, because I don't know what you mean by "the other side."

A. Well, I guess in the broad sense it would be those who wish to support in whatever fashion laws to take away the speech rights and the freedom to choose goals in regards to their presenting issues of same-sex

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

attractions if that is something they're concerned about.
Q. All right. I think I understand what you just said when you used a phrase with the pronoun "they." Are there any particular people or organizations that you can identify for me that would come within the ambit of the word "they"?
MR. GANNAN: Objection. Vague.
You can answer.
A. I do know like California Equality was the group that sponsored the bill. We had politicians that supported the bill. There were therapists and therapeutic organizations that supported the bill after some, obviously, negotiating of it.
BY MR. WILLIAMS:
Q. What do you mean by "obviously, some negotiating of it"?
A. The original bill in California -- it's very interesting. The original bill, the way I look at it was Equality California just was throwing all sorts of things against the wall and seeing what would stick, because this was the first of its kind legislation in the country.
Q. When was that? What year?
A. 2012, right, and so the original bill talked

about -- as it was originally crafted, it included adults, it included a statement of consent that was -- that therapists would have to read before doing therapy that could be construed as SOCE.
Q. SOCE being what?
A. Sexual Orientation Change Efforts, a term that I would say I have problems with.
Q. You have what? Problems with?
A. Problems with the term. We can talk about it later.
But this original legislation, it obviously prevented therapists from working with minors. That was part of it, but it was more expansive than that, like I say. And it allowed therapists to be sued if they didn't -- for up to $5,000 in damages if they either worked with a minor or did not present this consent form and also they had to -- therapists who would engage in SOCE would have to, under this law, as it originally constituted, they would have to report to the state. So it was very expansive.
Q. Report to the state what, sir?
A. They had to report to the state that they were doing it, how much they were charging, what dates it occur, all these sorts of things.
Q. Okay.

A. So all of this was thrown against the wall to see what would stick and --
Q. You mean metaphorically; correct?
A. Well, okay. Yes. Yes. They were fishing to see what would be considered. I mean, the long-term goal seemed from that to be banning this for everybody in some form or making it very difficult. And after negotiating with the professional organizations, everything apart from the minor's piece was taken out and it was referred back to the Board of Psychology as possible -- that's where the penalties would come from, not from civil litigation up to $5,000. So that's what stuck in the end, and then that, of course, was taken as a template across the country.
Q. All right. So the original proposed California law -- which would be statewide, I take it. Am I correct?
A. Statewide, yes.
Q. -- had started with one version, but when it was finally enacted, it was a --
A. A very narrow.
Q. -- much more narrow version of it?
A. Yes. Yes.
Q. And you mentioned Equality California, what is that group?

A. It's a civil rights organization that works for -- they introduced lots of legislation primarily in the area of sexual orientation-related matters, very involved.
Q. Were state psychological/psychiatric associations involved in the enactment or the promoting the enactment of that law?
A. I mean, they were negotiating with California Association of Marriage and Family Therapists, the California Psychological Association. They consulted with the APA, American Psychological Association.
Q. Who is "they"?
A. The legislators, to understand. But the APA representatives basically said that we don't do -- we don't recommend banning. Basically, we don't get involved in these things, so they did not weigh in on it.
Q. How do you know that?
A. It was a news report.
Q. From the news?
A. From the news.
Q. That's the source of your knowledge?
A. It was a quote from the --
Q. I understand that. But that is the source of your knowledge, some newspaper article?

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

A. It's the words that she used.
Q. I understand. The source --
A. Okay.
Q. -- of your knowledge is a newspaper article?
A. She was interviewed, apparently.
Q. Who is "she"?
A. Rhea Faberman, I think her name was.
Q. And who is she?
A. I don't remember her exact title, but she was a representative of the APA.
Q. Okay. All right. And so you -- did you volunteer to become a plaintiff in that lawsuit or were you asked?
A. I was asked.
Q. By whom?
A. By Liberty Counsel.
Q. Liberty Counsel, meaning these two gentlemen to your right?
A. Not these two gentlemen specifically.
Q. Other members of Liberty Counsel?
A. I believe so, yes.
Q. Do you remember their names?
A. I think one was Daniel Schmidt. That's the one I remember. I think I interacted with him more.
Q. And is he located in California?

A. I don't know. I don't think so, but I don't know.
Q. So Mr. Schmidt contacted you and asked you if you would be willing to be a plaintiff; is that correct?
A. It's been a while, but that's my --
MR. GANNAN: Before you get further. I just want to sort of preemptively address any privilege issues, that you are not to answer the content of any conversations you had with Mr. Schmidt other than to perhaps describe the subject matter, if that's responsive to the question.
MR. WILLIAMS: Nor will I get into that. I respect the attorney-client privilege very much.
BY MR. WILLIAMS:
Q. My question was how did you get involved in this lawsuit.
A. Right.
Q. So apparently Mr. Schmidt contacted you, and you agreed to be a plaintiff; is that correct?
A. After much deliberation with myself, yes.
Q. All right.
A. As I said, that was not something I wanted to do.
Q. Okay. And Robert Vazzo, do you know Mr. --

Dr. Vazzo or Mr. Vazzo?
A. I know Mr. Vazzo, not as well as Mr. Pickup. I don't know them really personally other than they're colleagues at the Alliance.
Q. And Dr. Nicolosi, who was a plaintiff in this case?
A. I knew Dr. Nicolosi, yes.
Q. He has since passed away, has he not?
A. He has. Yes, he has.
Q. And then the next one is National Association for Research and Therapy of Homosexuality (NARTH).
A. Right.
Q. And that's the organization that you referred to earlier?
A. Right.
Q. Which is now called the Alliance, is it not?
A. Correct.
Q. When did that change, that name change take place? Do you know?
A. Probably five or six years ago.
Q. And then you have the American Association of Christian Counselors (AACC).
A. Correct.
Q. And what is that organization or association?
A. I'm not a member of that organization, but I

assume -- I mean, it represents Christian counselors, you know, and others, I suppose. I don't think it discriminates that way, but mostly Christian counselors, 50,000.
Q. Which gets us back to something you said earlier that piqued my curiosity, I guess, as much as anything. You said that -- I think the words you used were the population was "a fairly conservative religious population," quote-unquote. I wrote it down --
A. Oh, at Link Care?
Q. Yes.
A. Uh-huh.
Q. Yeah.
A. Yeah, I mean, obviously we serve -- my license is with the state -- we serve people across the spectrum of belief, but we are known as a faith-based center by a lot of churches in the area, and so we get referrals from them. So a high percentage of clients tend to be people with sincere religious beliefs, and that's motivating their choice to seek counseling. They hope to see someone who at least understands, if not, shares their world view in significant ways.
Q. And when you say "fairly conservative religious population," tell me what you mean by

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 49

"conservative religious." What does that mean?
A. I would say in terms of theological belief, authority of the scripture, they would probably take that seriously. That would be a primary authority for them in terms of life, in terms of -- even in terms of morality, and that would include sexual morality, if they understand it.
Q. What does sexual morality have to do with homosexuality?
A. Well, my under- -- sexual morality, I think it's what your beliefs about sexual activity, whether that's like sex, sexuality -- well, I mean, that's the broad answer to the question. Right? I mean, sexual morality is an understanding of what's -- what's within a theological belief system, what is ideal and what is not ideal.
Q. What is moral and what is immoral?
A. That's possible, yes. That is one way of looking at it.
Q. Is that one way to characterize sexual morality from a conservative religious point of view?
A. I think that would be a fair characterization.
Q. All right.
A. They're concerned with living up to their religious ideals --

Page 50

Q. It's important that I understand.
A. Yeah, sure.
-- in terms of their sexual conduct, yes.
Q. Okay. And you also -- and I'm using the terms that you used. I'm not going to dwell on this. I just want to make sure I understand this so as we talk I get a better feel for your thinking, sir.
A. Sure.
Q. You also used the word "Protestant evangelical." What does that mean?
A. It's different definitions. Like evangelical would be someone who had a high view of the scripture.
Q. What is "a high view of the scripture"?
A. That it is the utmost authority in their life. That's how they would frame it, utmost authority. Repeat the question, if --
Q. I asked you -- you used the term "Protestant evangelical."
A. Yes.
Q. Let me set the stage so the record is fair to you and clear to whoever reads it. I'm using the terms that you used in answer to some broad question that I asked ten minutes ago, probably.
And one of the phrases that you used was "Protestant evangelical." I'm asking for your

Page 51

definition of what that means. You used the phrase, so I'm just trying to understand what you meant by that.
A. Fair enough. Fair enough. I would say it would be a high view of scripture. They often are, you know, trying to live by their beliefs. I think that's the biggest thing. And there is subject to nuance and interpretation, but, yes, the scriptures are authoritative, and they try to live by them.
Q. If somebody is living by the scriptures, does that make them automatically a Protestant evangelical?
A. Not necessarily.
Q. What's the difference? That's my question.
A. You can say, for instance, if you want to put in a hierarchy. Let's look at it this way.
Q. Okay.
A. Authority of scripture; say authority of tradition; authority of, say, reason; and authority of experience. You probably find the evangelicals saying scripture, tradition, reason, maybe science, and then experience. And probably a non-evangelical might have something like experience first. Experience tells me what's true.
Q. Okay.
A. All right. And then maybe science and then maybe -- so if you want to put these in different kind

Page 52

of hierarchies, the evangelical would probably have scripture, by and large. I mean, there's always exceptions, but would have that scripture authority on top.
Q. All right. The hierarchy --
A. And they understand the others through that -- you know, in part through that lens where it speaks to it. It doesn't always speak to it, but in part through that lens.
Q. All right. I think I understand. Thank you. That's a good way to explain it.
And the last phrase you used was -- again, I'm just trying to make sure I understand this in case it becomes relevant, and it probably won't. "Theologically orthodox." What does that mean? Same hierarchy kind of thing?
A. Yeah. I mean, I guess they would -- if you want a simple answer, I would say that they would agree with the Apostles' Creed. That would be kind of a summary statement of their belief.
Q. So somebody who is theologically orthodox believes in the Apostles' Creed?
A. I think so. I think that would be fair to say. There may be other things. So you can have orthodoxy apart from -- even though there is an

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 53

orthodox church, you know.
Q. Yes.
A. I'm not saying that only Protestant evangelicals have orthodox theology. I'm just saying, this is how they see it. They wouldn't be exclusionary of others.
Q. Well, the Apostles' Creed, you would agree with me, is not unique to any particular denomination?
A. No. That's correct.
Q. I mean, the Episcopals do it, Presbyterians say it.
A. Absolutely.
Q. Methodists say it.
A. Absolutely.
Q. I think the Latter-day Saints say it, do they not?
A. They may. I'm not an official -- I'm not totally knowledgeable about that.
Q. I have a friend who is. I'll ask him.
MR. WILLIAMS: All right. Let's do this. Let's take a short break.
(A brief recess was taken.)
BY MR. WILLIAMS:
Q. Dr. Rosik, I'm going to go through your declaration, obviously, in detail. It's a lengthy

Page 54

declaration, as you know, which I enjoyed reading. But before we get into that aspect of your involvement in this case, would you please tell me how you first became involved as an expert witness in this case?
A. I believe I was approached by Liberty Counsel, seeing if I would be willing to participate in that regard, in that capacity.
Q. Yes, sir. And is there a particular lawyer or lawyers who contacted you?
A. I think the one sitting next to me.
Q. Mr. Gannam?
A. Mr. Gannam. If my recollection is accurate.
Q. Did you know Mr. Gannam prior to him contacting you?
A. No.
Q. When did he first contact you?
A. Spring, probably, maybe early -- late winter 2019.
Q. Okay. Six months ago or so?
A. Something like that, yes.
Q. What did Mr. Gannam ask you to do?
A. He wanted to know if I was interested in serving as an expert witness in this case.
Q. And did you ask him what kind of expert witness, by any chance?

Page 55

A. Well, I knew the case, so...
Q. How did you know the case?
A. I mean, I was aware that it existed based on my affiliation with the Alliance.
Q. Well, tell me about that. How is the Alliance involved with this particular case? And by "this particular case" --
A. Alliance has nothing to do with this case. However, we have a great interest in these cases, so we have people that do follow them and what's happening with them.
Q. I see.
A. And they report on them.
Q. So as a member of the board of the Alliance, you are generally aware of these kind of cases throughout the country. Is that a good way to put it?
A. More or less.
Q. Is it more more than or more less?
A. I'm just saying I'm not aware of -- some cases I know more about, than I'm aware of others. I may not know of every case out there, because there's a lot, I guess, but by and large, yes.
Q. I'm not trying --
A. I don't take it that way.
Q. Good. Words matter, phrases matter, and when

Page 56

you read a dry record --
A. I get it.
Q. -- six months from now and you say, "What did he mean by that?" that is why I'm so picky about phrases and definitions and things like that.
As I said, I have been doing this a long time, so I know what I'm talking about when it comes to that kind of stuff.
I have in front of me, actually, a copy of -- and I'm not going to make this an exhibit to your deposition. I have a copy of the first amended verified complaint, the declaratory preliminary and permanent injunctive relief and damages that is the operative charging instrument, as I call the complaint, in this particular case, Vazzo versus City of Tampa, Florida. And that is here in the Middle District of Florida, the Tampa Division.
And I'm going to hand it to you, and just tell me if you have seen that before. Certainly Mr. Gannam and Mr. Mihet have seen it. They authored it.
A. I think I have seen it, but I don't recall.
Q. Now, the reason I ask you that question is I asked you earlier when Mr. Gannam called you to be an expert. I think what you said was you were generally familiar with the fact that this case is pending?

ANTHEM REPORTING, LLC
www.anthemreporting.com | 888.909.2720 | anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 57

A. Yes.
Q. Because of your position with the Alliance; correct?
A. I learned it through that, yes.
Q. That you keep track of things more or less; right?
A. Yes.
Q. And were you generally familiar with the issues in this case that we're here on today, the Vazzo versus Tampa case?
MR. GANNAN: Objection. Vague.
A. In the sense that these cases, the legislative language is boilerplate stuff. By and large, it's boilerplate. So being familiar with California, I'm quite -- you know, the language is echoing California's law.
BY WILLIAMS:
Q. The language of the Tampa ordinance is echoing the statute in California?
A. A lot of it.
Q. You've compared the two?
A. I mean, I haven't done a detailed analysis, but, you know, typically, you know, the citation from all the different organizations and definitions of terms and those sorts of things, it's a lot of

Page 58

boilerplate stuff.
Q. Okay. Again, boilerplate. Is it your belief, Doctor, that the substance wording and so forth of the Tampa ordinance is very similar to the substance and wording of te California Statute?
MR. GANNAN: Objection. Asked and answered.
A. There are similarities. I don't know if I would say "very," but there are similarities.
BY MR. WILLIAMS:
Q. All right. Do you believe that the Tampa ordinance was modeled after the California statute?
MR. GANNAN: Objection. Speculation.
A. I mean, is it in every detail, I don't -- I don't know. I certainly suspect that there is communication that goes on along these lines; otherwise, it would be hard to understand how they could spread so rapidly.
BY MR. WILLIAMS:
Q. Fair enough. And the reason I'm asking these questions is because we started out that you were generally familiar with the existence of the lawsuit here in Tampa because the Alliance keeps track of these things.
A. Sure.
Q. Were you aware of the specific allegations in

Page 59

the Tampa case -- I'll just call it the Tampa case -- when Mr. Gannam called you?
MR. GANNAN: Objection. Vague.
A. I don't know. To be honest.
BY MR. WILLIAMS:
Q. You don't remember, or you don't know?
A. No, I really don't know, were -- if there were specific allegations leveled against the therapist or whether this was done at kind of a preemptive way.
Q. Okay. Fair enough.
A. I don't know the answer to that question.
Q. Fair enough. All right. Let's get back to when Mr. Gannam contacted you. Recount for me, if you can, to the best of your memory, which is about six months ago, I think we agree, what that conversation was, what he said, what you said.
A. I mean, there is no way I'm going to be able to remember a narrative account of what our conversation was. There was some e-mail contact, and I'm sure in that I was asked if I would be willing to be an expert witness. And after some deliberation with my wife and within myself and my employer, I agreed to do that, and that's the gist of it.
Q. Fair enough. And do you still have those e-mails?

Page 60

A. Probably, yeah.
Q. And so you had some e-mail exchanges with Mr. Gannam --
A. Correct.
Q. -- back earlier this year?
A. Yes.
Q. Did you inquire of Mr. Gannam, once you said I'll be an expert, what am I -- what does my expert testimony, what subject matter it was going to be on?
A. Yeah. I mean, I knew what subject matter it was going to be.
Q. What did you know then?
A. Just in part the science surrounding SOCE and sexual orientation in general.
Q. SOCE -- science surrounding SOCE and sexual --
A. Or I should say science or lack thereof.
Q. Okay. Science or lack thereof surrounding SOCE and sexual orientation. Did I get that correct?
A. And therapy issues, obviously, because that's -- I'm a psychologist, so broadly speaking, you know, the issues at play here with this legislation, this bill.
Q. Delineate for me those therapy issues you are alluding to.
A. Again, whether -- I mean, again, broadly

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

speaking, whether licensed professional therapists are able to speak to clients in a way that could be construed as unopeness to change, unopeness to fluidity of sexual attractions and behaviors.
Q. When you say "can," you mean legally?
A. Are you legally allowed to.
Q. Yeah.
A. Under the bill you --
Q. That's what you mean by "can"; right?
A. Exactly.
Q. Before the break, we talked about the hierarchal concepts that you described in terms of Protestant, evangelical, and theological orthodox, conservative religion?
A. Sure.
Q. And at the top was scripture, adherence to scripture, and I assume that means a literal adherence? That's the way I heard you, at least.
A. Yeah, that would be a mischaracterization.
Q. Okay.
A. Literal. "Literal" is typically used, but what you have to understand is the scripture -- and I got this from my theological training.
Q. Sure.
A. -- scripture includes many genres, right.

Like the parables of Jesus, I don't take them as literal. Right. They're not literal in that sense. I think evangelicals would say, "Well, that the loose gospel that contains history in it, that Jesus's life, his death, his resurrection, that's historicity to that. That's literal." Right.
So you have to contextualize, you have to understand what the genre of the scripture is when you say is it literal or not. That's not a -- it's a simple question.
Q. All right. Well, I don't want to get bogged down on --
A. Okay. But it's important to understand that, because I know where this goes.
Q. Where is it going? You tell me.
A. That it's a literal -- what I meant by that is that the accusation is these are fundamentalist, literal interpretation of the scripture, as if everything -- they're made to look kind of silly by that statement.
Q. Who is made to look silly?
A. Evangelicals, conservatives, orthodox.
Q. Okay. Well, the next here, if I recall the hierarchy was science. Am I right?
A. I think I said scripture, tradition, science,

experience.
Q. All right. So number three is science.
A. Yes.
Q. That's third on the list. Okay. Right?
A. This is a hypothetical list, but it has -- it has heuristic value.
Q. But it's your list, is it not?
A. Well, not -- I would say --
Q. It's what you testified to.
MR. GANNAN: Objection. Let him answer.
BY MR. WILLIAMS:
Q. Please.
A. Yeah, it depends on the issue. Some issues I would value tradition. Other issues I would more value science.
Q. So on some issues you might elevate science above tradition. Is that what you're saying, in hierarchy?
A. Possibly, yes, because tradition is tradition. I mean, it's not as authoritative as scripture in an evangelical context.
Q. The hierarchy that you described for me earlier was scripture, tradition, science, and I think experience; right?
MR. GANNAN: Objection. Asked and answered.

BY MR. WILLIAMS:
Q. I want to make sure that I got that right. And the only reason I'm saying that again, because I did ask and you answered it, is to make sure that my next question makes sense. And that is, you said -- in response to one of my questions, you said, "Science or lack thereof surrounding SOCE, sexual orientation, and the therapy issues associated with all that." Something like that. Is that correct?
A. I believe so.
Q. Right. So when you say "science or lack thereof surrounding SOCE," first, define what SOCE means in lay terms. How would you describe that?
A. That's a great question.
Q. Thank you.
A. Because it's a very amorphous term. I would like to know what specific actions of the therapist are envisioned within that definition of "sexual orientation change efforts." Before I could really answer the question, I need to know what I'm being asked, because it's such a broad umbrella term. It's hard to know what I'm agreeing or not agreeing to. But if you give me specifics, this is what a SOCE therapist does specifically, that's in question, I might be able to answer that.

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 65

Q. If I brought my teenage daughter down to someone who is qualified to do SOCE therapy --
A. There's no -- it's not -- it's not certified.
MR. MIHET: Let him finish his --
A. Oh, I'm sorry.
MR. MIHET: Let him finish his question, please.
A. I'm sorry.
BY MR. WILLIAMS:
Q. Go ahead. Let me revise my question based on what you said.
SOCE stands for sexual orientation change efforts, does it not?
A. Yes.
Q. So if I brought my daughter, my teenage daughter down to you and said to you, "I'm here to make sure -- my daughter wants efforts towards not being homosexual, but rather being heterosexual," okay, would that be an example of SOCE?
MR. GANNAN: Objection. Vague. Calls for speculation.
A. I guess that -- I'm thinking that would be an example of a parent bringing their child in for therapy.
***

Page 66

BY MR. WILLIAMS:
Q. I'll change the question, then.
My daughter is old enough to drive and drove down to somebody who is involved in this kind of clinical practice and said, "I would like you to exert efforts to make me nonhomosexual." Is that an example of the practice of SOCE?
MR. GANNAN: Objection. Vague. Misstates testimony. Improper hypothetical.
A. She's a minor; correct?
BY MR. WILLIAMS:
Q. My daughter is.
A. Well, in this scenario she's a minor?
Q. Yes.
A. I could not talk to her without talking to you.
Q. Okay. And would that be something that any ethical clinical psychologist would follow?
A. Absolutely. It's legally required. We have a form. We have to have a parent sign that says you may meet with my child. A minor child. So if the child comes in by themself, minor child, we have to have -- we'd have to say, "Sorry. We need to contact -- have your parents contact us."
Q. You wouldn't even talk to her, basically?

Page 67

A. No.
Q. You would not; right?
A. No. The front desk would just say, "You need to have your parents contact our clinic and request counseling."
Q. All right. Well, I don't want to get too much in the weeds here, Doctor, because you used the term "science or lack thereof surrounding SOCE." That was your testimony. I wrote it down very carefully.
So let's start with the science surrounding SOCE. What is the science surrounding SOCE? Generally describe that for me.
MR. GANNAN: Objection. Vague.
A. In probably the most specific terms it would be research that has been done regarding -- in a therapy-therapist context of providing care for individuals who are, you know, looking at coming to therapy with unwanted same-sex attractions. So it's a limited literature. That's a narrow version regarding SOCE, science that's been done around that topic.
BY MR. WILLIAMS:
Q. And what do you mean by the lack thereof or a lack of science?
A. What I mean, by that, for example, is what science can and cannot say. For instance, all these

Page 68

studies, most every one of them are correlational in nature.
Q. What does that mean?
A. They look at associations between variables. All right. So they can say, "This variable is related to this variable." They seem to vary together to some extent. Right? That's what a correlation is. Science would say there could be a -- there's a relationship between these those variables. Science can't say which of these variables is causative. One -- it could go either way. And that is -- again, that's the nature of this literature by and large.
Q. And when you refer to "this literature," is there something you can point me to to identify that literature?
MR. GANNAN: Objection. Vague.
BY MR. WILLIAMS:
Q. Let me help you out.
A. Yeah -- I know you're -- okay.
Q. Have you read the Tampa ordinance that is the subject matter of this litigation here in Tampa?
A. Yes. I haven't read it recently, though.
Q. But at some point in the past you have?
A. Yeah.
Q. After you were engaged as an expert in this

ANTHEM REPORTING, LLC
www.anthemreporting.com | 888.909.2720 | anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 69

case did you read the ordinance?
A. I believe so.
Q. And I realize you haven't read it recently, but if you recall from your reading, there were a number of reports, studies, et cetera, et cetera, by any number of well-recognized organizations that are recited in the ordinance itself, are there not?
MR. GANNAN: Objection. Assumes facts not in evidence.
A. Yes, that's part of the boilerplate.
BY MR. WILLIAMS:
Q. Okay. Is that the science you are referring to that is correlated?
A. Those are resolutions. Those are policy statements. That's not science. They're saying it's based on science, but -- but those -- if you are talking about these different organizations and their statements, that's comment on it, that's their --
Q. Position?
A. -- position statements. Exactly.
Q. Okay. So correlate that, to use your term, with science. Are those position statements based on underlying scientific analysis by those organizations?
MR. GANNAN: Objection. Vague.
A. I would say that they are based in part. My

Page 70

take on it is that -- and you've read the -- you know this already, but it's incomplete.
BY MR. WILLIAMS:
Q. What's incomplete?
A. The science is incomplete. It can't possibly be complete based on the science as it's conducted currently.
Q. How is the science conducted currently?
A. It's conducted almost exclusively on -- for instance, as an example, almost exclusively on LGBT identified participants.
Q. What does that mean?
A. When they recruit for participants, they -- I mean, this a function of just, say, the idealogical lack of diversity, but the research, if you look, they describe in the research methodology how they obtain participants. And very commonly it's through gay, lesbian, transgender networks, websites, venues, because these are the ones that researchers know and people trust. So that would be -- what's the problem with that is that it's missing the people that I work with.
Q. And who are those people?
A. Well, typically theologically conservative individuals who do not identify as LGB. They -- so

Page 71

they don't -- they're not in those networks, put it that way.
Q. I got to understand this.
A. Yeah.
Q. You're really trying hard, and I appreciate it, but I'm a little confused.
The people you work with are a conservative religious population; right? Is that what you're referring to?
MR. GANNAN: Objection. Asked and answered.
BY MR. WILLIAMS:
Q. Yes?
A. By and large.
Q. Yes.
A. Not exclusively.
Q. And are you saying that people that are in that population, there are no homosexuals in it?
A. No. No.
Q. What are you saying?
A. The studies, many of them, when they recruit participants, they will, by virtue of their design, miss a good number of individuals who are not GLBT identified. And that means they cannot be generalized through that population. They can only be generalized within that population of GLB-identified individuals.

Page 72

Q. What does that mean?
A. So it's incomplete.
Q. I don't know what that means, GLB identified?
A. Gay, lesbian, bisexual.
Q. I know what that means.
A. They self-identify that way.
Q. The members of this population?
A. Yes. Yes. Right. So someone in a conservative environment might say, "I have same sex attraction, but I'm not GLB --
Q. I see.
A. -- I'm not gay identified." And those people will not be sampled.
Q. I see. Okay. Now I understand what you are saying. So somebody in that population that would say, "I might be homosexual, but I'm not GLBT," what do they call themselves?
MR. GANNAN: Objection. Vague and misstates the testimony.
BY MR. WILLIAMS:
Q. What do they call themselves?
A. They would probably call themselves Christians. They may say they have same-sex attractions.
Q. And if they have same-sex attraction, what's

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 73

the significance of that from a conservative religion point of view?

MR. GANNAN: Objection. Vague.

A. For them, I assume that it would be falling short of the religious ideal. But they are still, obviously, loved by God, you know. But, yes, it would be seen as falling short of the religious ideal for sexual expression, if they -- well, that's another distinction. Right. Whether the person acts on their sexual attractions or not.

BY MR. WILLIAMS:

Q. Falling short? Meaning sinful or something like that?

A. That --

MR. GANNAN: Objection. Vague.

A. I don't know if they would use that language, but they could. And, again, that would be their language.

BY MR. WILLIAMS:

Q. That's a possibility?

A. It is a possibility.

Q. How does that impact the correlation that you are talking about? I'm really trying to understand this, sir.

A. The correlation I'm talking about.

Page 74

Q. Yeah, the science, the correlative studies and so forth.

MR. GANNAN: Objection. Vague.

A. Again, it's really about their self-identification, because the studies, by and large, are -- are seeking -- part of the exclusion -- or the inclusion criteria is someone who is identified as gay, lesbian, bisexual. Those individuals are not, generally speaking, the ones with same-sex attractions, found in conservative religious environments.

BY MR. WILLIAMS:

Q. What are those people called within that?

A. Christians. They call themselves Christians.

Q. I see.

A. And they have same-sex attraction. At least, that's what -- how they would prioritize their identity. It's a religious identity prioritization --

Q. Got you.

A. -- as opposed to a sexual orientation identity prioritization.

Q. And to some degree, it's a labeling, is it not?

A. It's an identity, self-labeling, yes.

Q. Yeah.

A. But it has --

Page 75

Q. All right. Forgive me. I'm a lawyer --

A. It's all right.

Q. -- not a psychologist or psychiatrist.

But I do want to make sure I understand one thing. A member of -- it's your opinion, your testimony that a member of a conservative religious population would not label themselves a gay, lesbian, bisexual, or transsexual; is that correct?

MR. GANNAN: Objection. Misstates testimony.

A. Many wouldn't. There are some that do, yes.

BY MR. WILLIAMS:

Q. But most would not, would you say?

A. Probably most on the more conservative side of things.

Q. They would use a different way of describing it?

MR. GANNAN: Objection. Speculation. Asked and answered.

BY MR. WILLIAMS:

Q. Right?

A. They would describe themselves using a religious identity as their primary identity.

Q. Do you know whether that religious population deems homosexuality as sinful?

MR. GANNAN: Objection. Vague. Calls for

Page 76

speculation.

A. They certainly may.

BY MR. WILLIAMS:

Q. Have you ever heard them say that, any members of that population?

MR. GANNAN: Objection. Vague.

A. I have.

BY MR. WILLIAMS:

Q. How would that impact any therapeutic procedure that you as a clinical psychologist might provide to them, if at all?

MR. GANNAN: Objection. Vague. Calls for speculation.

A. If that is the language the client uses, I would acknowledge it. It's a reflection of their moral view and the life they aspire to live by.

Does that answer your question? I'm sorry.

BY MR. WILLIAMS:

Q. I thought you were going to say something more. If that's your answer, that's your answer.

A. Well -- what was the question?

MR. WILLIAMS: Read the question back, if you would, please.

(The question was read back as follows:

"How would that impact any therapeutic

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 77

procedure that you as a clinical psychologist might provide to them, if at all?")

A. Well, I would say that is one reason they may come with a desire to perhaps explore in speech -- in a speech-oriented therapy the fluidity of their sexual attraction and to see if they may be able to shift, experience some shifting towards their desired attraction.

BY MR. WILLIAMS:

Q. What is the desire attraction?

A. Well, it would probably be, for instance, if they were married, they'd probably wish to have more heterosexual responsivity to their wife.

Q. And so you used the term "fluidity" again. You've used that several times. What do you mean by "fluidity" in the context of our discussion here?

A. Just the research seems to suggest that the components of sexual orientation are fluid over time for many individuals, not all, but for many. They change.

Q. They're not static?

A. They're not static, no, not all. There's -- you can't classify one size fits all, but for many individuals they're not static. That's correct.

Q. They may change over time. Is that what you

Page 78

are talking about?

A. Yes, particularly for youth and for young adults.

Q. Youth being what?

A. Under 18.

Q. What would be the range under 18 that you normally would see that fluidity?

MR. GANNAN: Objection. Vague.

BY MR. WILLIAMS:

Q. Age range, I'm sorry.

A. Well, I mean, the age range where that fluidity would show up?

Q. Yes.

A. Studies were done probably mid -- I'm trying to think.

Q. Sure.

A. Again, this is not --

Q. Take your time.

A. -- 100 percent certain, but studies looking at certainly the mid-teen years to early adulthood.

Q. 14, 15 to --

A. Could be 13, 14, 15, yeah. So a lot of shifting happens during those years.

Q. Was it your opinion, sir, that human sexuality is inherently fluid?

Page 79

MR. GANNAN: Objection. Vague.

A. My opinion is that it's an extremely complex subject, a lot left to be understood; that reports are that some people experience changes in their sexuality, not in significant number, some people do not.

BY MR. WILLIAMS:

Q. Do you agree with the following statement: "Thus while same-sex attractions may not be experienced as chosen, it is reasonable to hold that they can be subject to conscious choices, such as those that might be facilitated in SOCE, sexual orientation change efforts"?

Do you agree with that statement?

MR. GANNAN: For the record, may I ask where that is being read from?

MR. WILLIAMS: From my work product notes.

MR. GANNAN: Okay.

A. With the caveat that what you're thinking about in terms of SOCE may not be what I'm thinking, I would agree with that statement.

BY MR. WILLIAMS:

Q. Would you also agree with the following statement: "Same-Sex attractions and behaviors are not strictly or primarily determined by biology or genetics and are naturalistically subject to significant change,

Page 80

particularly in youth and early adulthood"?

MR. GANNAN: Objection. Compound. Vague. Calls for speculation.

A. For many people, yes.

BY MR. WILLIAMS:

Q. What do you mean by "Naturalistically subject to significant change," then? If you agree with that statement, what does that mean?

MR. GANNAN: Objection. Vague. Calls for speculation.

A. My understanding of that is that it means it can change in kind of dynamic interaction with the environment such as affectional, romantic relationships. That's a big one. It may be subject to other influences that would change. I mean, we don't know too much about it other than it does change. For some people, again. I would never overgeneralize this.

Q. Well, does the phrase "naturalistically subject to significant change" apply to heterosexual, opposite-sex attractions?

A. Most natural --

MR. GANNAN: Objection. Vague.

A. The studies suggest most naturalistic change is occurring towards the heterosexual direction, when they do these longitudinal studies. The heterosexual

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

orientation tends to be the most stable. The next -- I think the next stable are the -- are those who are gay or lesbian who never had any kind of heterosexual or opposite-sex attractions, and then in the bisexual continuum often has a favor of fluidity.
Q. So I'm thinking as you are talking. Does that mean there's more fluidity among people with same-sex attractions than among people that have opposite-sex attractions?
MR. GANNAN: Objection. Vague.
A. That's my reading of what that research is purporting.
BY MR. WILLIAMS:
Q. Well, I'm thinking of it logically. I'm really trying to understand these series of questions. In your experience, are there many people, human beings, who identify as gay or lesbian that are sufficiently fluid -- to use your term -- that they're capable of developing an attraction for a member of the opposite sex?
MR. GANNAN: Objection. Vague. Misstates testimony.
BY MR. WILLIAMS:
Q. By themselves?
A. Are you talking about naturalistic?

Q. Yes.
A. Can you repeat the question? That was a long question.
Q. Okay. I'm learning as we're talking, and these are questions that are being posed to me in my own brain. So let me see if I can repeat -- actually, why don't you read it again, and let me see if I can improve on it if you don't understand it when she reads.
(The question was read back as follow:
"Well, I'm thinking of it logically. I'm really trying to understand these series of questions. In your experience, are there many people, human beings, who identify as gay or lesbian that are sufficiently fluid -- to use your term -- that they're capable of developing an attraction for a member of the opposite sex?")
MR. GANNAN: And I renew my same objection.
A. Well, the reason I'm struggling with it is because generally people who are, you know, identified as gay or lesbian, that's their identity and they really don't have an interest, and that's their perfect right, to pursue that identity. And so I'm not sure that I can quite follow the question.
***

BY MR. WILLIAMS:
Q. All right. Let me change the question. I think what you are saying -- correct me if I'm wrong -- that if somebody identifies themselves as gay or lesbian, they're really not all that interested of fluiditing back to where --
A. Exactly.
MR. GANNAN: Objection. Vague. Misstates testimony. Go ahead.
BY MR. WILLIAMS:
Q. So to change the terminology of the labeling here, Doctor, what if somebody doesn't identify themselves using the label "gay" or "lesbian," but rather they -- to use your terminology and this is where I'm trying to understand -- they identify themselves as Christian, albeit, with same-sex attraction and so forth, homosexual.
A. Got it.
Q. Now, do those people have enough fluidity, in your opinion, to be capable of developing an attraction to the opposite sex?
MR. GANNAN: Objection. Vague. You can answer.
A. I think that's very broad. I think there are some. That's part of what professional psychology is,

is we assess this issue. Right. We don't just go in with an agenda. We assess. For instance, what level of fluidity this person may have experienced outside of therapy.
BY MR. WILLIAMS:
Q. Okay. That's a very good question. When you say "level of fluidity," how would you determine that? We're not talking about minors now. We're talking about people over the age of 18. How would you assess the level of fluidity that an adult under the law has? -- to just follow up on the answer you just provided to me.
MR. GANNAN: Objection. Vague. Calls for a legal conclusion.
A. It would be by self-report.
BY MR. WILLIAMS:
Q. What do you mean?
A. I would ask them, for instance, you know, in experience, what percentage would you say, you know, would you experience -- do you experience same-sex attractions versus opposite-sex attractions, and they would give me a figure, and I take that into consideration.
BY MR. WILLIAMS:
Q. That would give you some sense of the level of

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 85

fluidity?
A. Exactly.
Q. And if it was -- I'm going to use some hypotheticals here because I want to make sure I understand this. Let's say the individual said, "Well, 80 percent homosexual or same-sex attraction, 20 percent opposite-sex attraction." How would your therapeutic approach be different for that person as opposed to the opposite, 20 percent homosexual, 80 percent heterosexual?
MR. GANNAN: Objection. Vague. Incomplete hypothetical.
BY MR. WILLIAMS:
Q. Those are the two levels of fluidity, if I follow your testimony.
A. What were the percentages again?
Q. One says 80 percent same-sex, 20 percent opposite-sex; and the other is the converse, the obverse, 80 percent heterosexual, 20 percent same-sex.
A. How would that affect?
Q. Your approach to the therapeutic modality that you use.
MR. GANNAN: Objection. Vague.
A. I would think one thing it would do in terms of the informed consent issue, I would probably say if

Page 86

you've had experience, you know, research may suggest that past experience of fluidity would be your ability to pursue that in therapy, might be more so than someone who had less of that fluidity, so it would affect my assessment, in part, of the likelihood that this experience could experience it.
BY MR. WILLIAMS:
Q. Could experience what?
A. Could experience fluidity, say therapy assisted fluidity.
Q. Okay. Now you're confusing me because I'm looking at my hypothetical if somebody has 80 percent opposite-sex attraction and 20 percent same-sex, what I understood you to say -- correct me if I'm wrong -- is that human being, the level of fluidity is more likely to receive the benefit of SOCE, i.e., change it back to heterosexual, than somebody who is the opposite, 20 percent heterosexual and 80 percent homosexual. Did I get that correctly?
MR. GANNAN: Objection. Vague. Misstates testimony.
A. I think what I said is the more a person has experienced fluidity in the past, whatever that percentage, I think the greater the likelihood that they could experience that in a therapy context.

Page 87

BY MR. WILLIAMS:
Q. Could experience what in therapy?
A. The fluidity.
Q. Define "fluidity" in the context of that answer.
A. If they wanted to make shifts towards, let's say, opposite-sex attraction --
Q. Yeah.
A. -- or diminishing of the same-sex attraction.
Q. So a person who has 80 percent opposite-sex, 20 percent same-sex versus a person that's 20 percent opposite-sex and 80 percent same-sex, that former person is probably a better candidate to shift back or have fluidity back towards being totally heterosexual. Is that what you are saying?
MR. GANNAN: Objection. Vague. Misstates the testimony.
A. I don't talk about categorical change, which is, you know, the person usually, I think, if they're coming, they want to see if they're attractions are subject to some degree of fluidity. So becoming completely opposite-sex attracted, you know, that's not necessarily the goal. They can experience some fluidity that is satisfying and meaningful for them, then that's a benefit to them.

Page 88

BY MR. WILLIAMS:
Q. I'm going to confess that I, in listening to your answers, I am gleaning that you are using the word "fluidity" with different nuances depending on the question that I'm asking you.
Because if someone is already 80 percent heterosexual and only 20 percent homosexual, what I have concluded from your answer is that that person is more likely to change over to pure heterosexual than somebody who is 80 percent homosexual and 20 percent, you know, and that would have an impact on the therapeutic modality that you would use?
MR. GANNAN: Objection. Vague. Misstates testimony.
BY MR. WILLIAMS:
Q. Does what I say make sense?
A. There's a lot there. If same-sex attractions are in question, I don't know if it would change -- so in my approach it would change, I think, things I want to tell the client to create realistic expectations and not set the client up for disappointment. Right? And I make no promises about these things.
Q. Sure. So, again, the 80/20, 80 being heterosexual, 20 being homosexual, probably you can have more likely expectation of some success, if that's

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 89

what they want to do, to become totally heterosexual versus the converse. Is that a good way to put it?
MR. GANNAN: Objection. Vague. Misstates testimony.
A. It might be easier for that person to get to 90 percent than the person with 20 to get to 90 percent.
BY MR. WILLIAMS:
Q. Got you. Okay. Or even 100 percent; right?
A. Potentially, but that's fairly rare.
Q. Really. Okay. Have you dealt with what we've been talking about with respect to minors in your practice?
A. I have certainly had parents bring their minors in out of concern, so if that's what you mean, you know, yes.
Q. And when that happens, are you charged with -- you know, the other word for SOCE is conversion therapy -- of trying to convert their child back to heterosexual?
MR. GANNAN: Objection. Vague. Assumes facts not in evidence and misstates testimony.
A. My experience is that parents, these kind of parents, they're not -- I've never had a parent say, "Doc, would you change my child to heterosexual."

Page 90

They're concerned with their child. Sometimes just with the behavioral aspects. If the child has been sexually active, they want information. Right. And, of course, now in California I have to -- in my informed consent, I have to say, "I cannot speak to your child in a way that may be construed as encouraging any kind of change." I can educate still. I can talk about the science. I can certainly ask questions of a minor, which I would, but in my experience the vast majority of these cases, what I end up doing is saying the child is just not a candidate for therapy. I have to make that assessment. That's my job to make that assessment.
Q. The child is not a candidate for therapy for what reason?
A. Not a candidate for change.
Q. Not a candidate for change.
A. For therapy. Correct. And that's my job as a professional. Not the state, but that's what I'm trained for. I make that assessment. And when I decide or assess that this child is not a candidate for therapy in that regard, then I would typically meet with the parents and I will educate them and tell them, "You have a precious child. You need to love your child. You need to keep the lines of communication

Page 91

open with your child, if at all possible, and -- because you don't know what's going to happen in the future. You don't know, and you don't want to alienate your child, so that they -- so that even if they make choices that you disagree with theologically that you cannot -- they cannot come back to you."
So that is what I would say to the parent of a child who is just not a candidate for, you know, the goal of change of sexual attractions and behaviors.
MR. WILLIAMS: Thank you. Read that answer back. That was a long answer, and I appreciate it, but you are a lot smarter than I am so I'm trying to follow all of this.
(The answer was read back.)
A. Yeah. Not a candidate for any focus on that issue. I can still meet with the adolescent and talk with them.
BY MR. WILLIAMS:
Q. I understand. That would be the same in Tampa, too, wouldn't it, based on the ordinance, or do you know that?
MR. GANNAN: Objection. Calls for a legal conclusion. Vague.
BY MR. WILLIAMS:
Q. If you don't feel qualified to answer the

Page 92

question, that's fine, Doctor.
A. I don't know. I don't like the fact that it's -- it's -- even in California, it's not clear what speech constitutes conduct and what speech is subject to normal speech protections.
Q. We'll get to that in this case, I think. Okay.
A. Yeah.
Q. But you made the statement make choices theologically that they don't agree with, the parents don't agree with. Does that mean the population that you are talking about is children from parents who are conservative religious?
A. That would be by and large. I mean, that would be the overwhelming number, yes.
Q. Okay. So you are basically telling the parents that your child is not a real candidate for change if that's what the parent is looking for; is that right?
MR. GANNAN: Objection. Vague. Misstates testimony.
BY MR. WILLIAMS:
Q. Is that right?
A. Not only is it illegal now in California, I would say the same thing prior to the law, that, you

ANTHEM REPORTING, LLC
www.anthemreporting.com | 888.909.2720 | anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 93

know, therapy, even a minor requires a volitional choice. Right. If it's -- and this is one of the egregious aspects of the way it's portrayed.

Coercive -- any coercive element in a therapy automatically eliminates it in my mind as being a therapy. So coercion is not a part of what I would do.

Q. So there is parental coercion that is antithetical to a legitimate therapeutic medium; is that correct?

MR. GANNAN: Objection. Vague. Misstates testimony.

A. It's not like the parent is taking the child to some kind of conversion therapy. The parent is concerned. They may not be thinking much of anything, other than they're distressed, their child is distressed. So part of my task is to help the parents decrease their distress, as well as, you know, if I'm allowed, understand and give that child some help in terms of reducing his or her distress.

BY MR. WILLIAMS:

Q. What if the child is a candidate, in your opinion? What do you do then?

MR. GANNAN: Objection. Vague.

BY MR. WILLIAMS:

Q. Assume that the law in California doesn't

Page 94

exist.

A. It would probably be the same thing as I would do with an adult. And, usually, you know, this not going to happen with a 13-year-old. This is more like a 16- or 17-year-old. The first thing I would do, and my training calls for, making a thorough assessment of the client history, one feature which may be their experience of fluidity. But I also really want to understand how they see.

This is what I tell parents, "I want to understand your child through your child's eyes," so I want to do all that empathic understanding of how the child sees their situation.

I want to ask the child, "How do you see your same-sex attraction? What do you think -- what is your understanding of where they come from? How do you feel about them? What do you believe? What are your values around that?" All right.

So I would elicit all this information to get a sense of, is this -- you know, is this child, is this person, you know, freely consenting to this, and are they a candidate? And this -- I want to make sure it's clear -- this is not some exotic therapy.

Q. Okay. Doctor, in 2013, if my homework is correct, you wrote an article in human sexuality

Page 95

entitled, "Countering a One-Sided Representation of Science: NARTH Provides the 'Rest of the Story' for Legal Efforts to Challenge Antisexual Orientation Change Efforts (SOCE) Legislation."

Is that a true statement?

A. Yes.

(A discussion was held off the record.)

BY MR. WILLIAMS:

Q. Why did you write that article, sir?

A. That, if I'm thinking correctly about this, because I've written quite a few things, it may have been adapted from my earlier declaration in the Pickup trial.

Q. Your earlier declaration?

A. I have to see it to remind myself the context.

Q. See the article?

A. See the article, yes.

MR. WILLIAMS: Let's just take a -- not a break, but a pause.

The date of your declaration in the California case, the Pickup case out there was November 16, 2012. If that helps.

MR. GANNAN: That's Exhibit 1 you are referring to?

MR. WILLIAMS: Yes.

Page 96

(A discussion was held off the record.)

(Exhibit No. 2 was marked for identification.)

BY MR. WILLIAMS:

Q. I have had marked as Exhibit 2 to your deposition here a copy of the article that I was alluding to earlier.

(A discussion was held off the record.)

BY MR. WILLIAMS:

Q. So it's a copy of the article that I read into the record prior to our pause, just so the record is clear, and the name of the article or the title of the article is "Countering a One-Sided Representation of Science: NARTH Provides the 'Rest of the story' for Legal Efforts to Challenge Antisexual Orientation Change Efforts (SOCE) legislation."

And the date of this article, according to what I'm about to give you is July 26, 2013. So let me hand you this copy. That is Exhibit 2 that I just handed to you. It's a copy of the article that --

MR. GANNAN: And just for the record, I think Exhibit 2 is the entire edition of the Journal of Human Sexuality that contains that article, if I'm not mistaken.

MR. WILLIAMS: Probably so.

MS. ROBBINS: Yes.

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

BY MR. WILLIAMS:
Q. My focus is on your article. I want to make sure --
A. I got it.
Q. You said you had to look at it, and I want to make sure that I've done my job to assist you in identifying the article that I asked you about.
A. Oh, it's going this way.
MR. GANNAN: You can unclip it if it's easier.
A. I just needed to look at...
So, yes, this is partially based on my declaration of the California case.
BY MR. WILLIAMS:
Q. Well, the question is, is Exhibit 2, does it contain the full article which you wrote and I identified on the record? Take your time to look through it to make sure you can answer my question accurately.
A. I guess I will agree to that.
Q. I'm sorry?
A. I guess, yes.
Q. You guess yes or --
A. Yes, as far as I can tell, under these circumstances.
Q. Sure. Would you turn to page 143 of your

article, please. Just let me know when you're there.
A. Okay.
Q. All right. In the bottom part of page 143 there's a roman numeral III. Do you see that down there that's bolded, the subtopic; correct?
A. Uh-huh. Okay.
Q. You have to say "yes" or "no."
A. Yes.
Q. All right. Right above that there is a paragraph, and I'm going to read that into the record, but before I do that, I would like you to take the time, at your pace, to read that paragraph that starts with the word "causatively." And the reason I'm asking this question is I'm going to tell you, is because you used that word or some derivation of it in your last answer, and it triggered my memory of this particular part of your article.
A. Yes.
Q. Have you read it?
A. Yes.
Q. I'm going to read it into the record. Follow me carefully, make sure I don't misspeak.
"Causatively, then, sexual orientation is by no means comparable to a characteristic -- such as race or biological sex -- that is thoroughly immutable.

Thus, while same-sex attractions may not be experienced as chosen, it is reasonable to hold that they can be subject to conscious choices, such as those that might be facilitated in SOCE. Same-sex attractions and behaviors are not strictly or primarily determined by biology or genetics and are naturalistically subject to significant change, particularly in youth and early adulthood. This should raise serious questions about the legitimacy of SB 1172's and AB 3371's portrayal of same-sex attractions and behaviors as static traits to be embraced only by those minors who might otherwise pursue SOCE."
Did I read that paragraph correctly?
A. Yes.
Q. Let's start at the beginning. You use the term "causatively." Please tell me what you mean by that term in the context of the sentence in which you use it.
A. It has an influence in giving rise to.
Q. Let me go to the last part of that sentence which says, "that is thoroughly immutable." I think I understand what the word "immutable" means, but I want to make sure it's the same as your understanding. Why did you use the word "immutable"?
What do you mean by that in that context?

A. Not subject to change without exception.
Q. So what you're saying there, if I understand it, is that a person's race is immutable. You're either Caucasian or not Caucasian; you're either Asian, or you're not Asian. Am I correct? It's an objective characteristic?
A. Repeat that, please.
Q. By using the term "thoroughly immutable" after the reference to race or biological sex -- I'll use biological sense -- you are either a male, or you're not a male biologically; is that correct?
A. I believe so, yes.
Q. And that's what you mean there?
A. Yes.
Q. All right. And you are saying that causatively sexual orientation is by no means comparable to that, i.e., an immutable characteristic of someone's being. Am I correct?
A. In the sense that it is subject to some degree of change and fluidity, yes.
Q. "It" being what?
A. The components of sexual orientation.
Q. Whereas my biological sex is not really subject to change, sexual orientation is. Is that what you are saying?

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 101

MR. GANNAN: Objection. Vague. Misstates testimony.
A. I either have X and Y chromosome or XX chromosome or I don't. In that sense, biological sex is immutable.
BY MR. WILLIAMS:
Q. Yes. But sexual orientation is not. Is that what you're saying?
MR. GANNAN: Objection. Vague.
BY MR. WILLIAMS:
Q. In that sentence?
A. The components of sexual orientation are -- can be subject to change. That's people's experience.
Q. Okay. Isn't that the objective of SOCE?
MR. GANNAN: Objection. Vague.
BY MR. WILLIAMS:
Q. To cause change?
A. I think a better way of putting it, at least in terms of how I would describe it, is by using mainstream techniques we will see -- and based on the client's own understanding of their sexual attractions and their history, it would be to see whether a change emerges in the process of therapy.
Q. But change is an integral part of SOCE, is it not?

Page 102

MR. GANNAN: Objection. Vague.
A. Again, in professional counseling, looking at exploring fluidity with a client is only going to happen, and it's only through talk, and it's only going to happen if that is what the client requests.
BY MR. WILLIAMS:
Q. That's a practical answer. My question is really the acronym SOCE, sexual orientation change efforts, the word "change" is there for a reason, because the efforts are to effectuate change, if you are providing SOCE to the client at the client's request?
MR. GANNAN: Objection. Vague. Asked and answered.
BY MR. WILLIAMS:
Q. Is that a correct statement, sir?
A. Not exact, no. I do not use the term "SOCE" in my practice.
Q. Well, you used it in your article.
A. I know because that's the standard language that I have to use --
Q. Why?
A. -- in these circles. For instance, I write an article, if I don't use SOCE and I try to submit it to APA journal, if I use what the Alliance would prefer to

Page 103

use "sexual attraction fluidity exploration" in therapy, if I use that term, my manuscript would be kicked out in a nanosecond.
So it's the -- there's a hegemony with regards to the language, and so if I'm going to have anything published, it's going to have to work with that language, but I personally have a distaste -- and understand that this language was developed by people who aren't sympathetic to these goals.
Q. Aren't sympathetic to what goals?
A. The goals of a client who wished to pursue the fluidity in their same-sex attractions.
Q. Fluidity in their same-sex attractions being changing their same-sex attraction; right?
MR. GANNAN: Objection. Vague. Misstates testimony.
A. See, this is where language is so poor.
BY MR. WILLIAMS:
Q. It's critical, sir.
A. But I would say experiencing shifts, experiencing movement, experiencing change. If you want to define that as change, that's fine. SOCE, in my mind, implies orientation change, and that's not something I promise. And that's not something that happens frequently. We're talking about change on a

Page 104

continuum of change.
Q. Well, SOCE stands for sexual orientation change efforts. The "E" is for "efforts," is it not?
A. That's what it stands for.
Q. Yeah. Effort doesn't necessarily mean you are going to succeed in changing back to being heterosexual. It just means you are going to make that effort. Am I right?
A. Whose effort are we talking about?
Q. Pardon?
A. I'm sorry. Whose -- what's your understanding -- whose effort is this?
Q. Whoever is utilizing SOCE in therapy?
A. Okay. So it's the client's effort, right. Okay. So I would help facilitate that if it's the client's effort. And facilitate, again, seeing if it will emerge by working on -- working with sorts of against standard therapeutic practices.
Q. Well, I think what you told me was that you wouldn't even engage in it unless the client wanted to pursue that effort?
A. Absolutely. Freely chosen.
Q. And obviously in any clinical or therapeutic situation, the client/patient has to contribute to the overall objective, do they not?

ANTHEM REPORTING, LLC
www.anthemreporting.com | 888.909.2720 | anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

A. Has to be completely client centered.
Q. Sure. I mean, that's --
A. That's psychotherapy 101.
Q. It's life 101, sir.
And that's where the "E" comes in. The client has to embrace the effort part of the SOCE, does she not?
MR. GANNAN: Objection. Vague. And objection. Calls for a legal conclusion.
A. That would have to be a freely chosen, self-determined goal of the client.
BY MR. WILLIAMS:
Q. Now, let me go to the next sentence. You say, "Thus, while same-sex attractions may not be experienced as chosen" -- take that first clause. What does that mean? Elaborate on that, "experienced as chosen"?
A. For the most part, a strong majority of individuals experiencing the same-sex attractions, they sort of discover it rather than make a choice, say, "Okay. I'm going to be a gay adolescent today." They may label that later, but it's a discovery.
Q. Okay.
A. That's how they would describe it.
Q. Thank you. I think I understand that.

And you say, "Such as those that might be facilitated" -- excuse me. Let me read the whole thing.
"Thus, while same-sex attractions may not be experienced as chosen," -- you just clarified that clause -- "it is reasonable to hold that they can be subject to conscious choices, such as those that might be facilitated in SOCE."
Okay. All right let's take that second clause, "subject to conscious choices." What do you mean by that?
A. I'm just thinking for a second.
Q. Please take your time.
A. I think it suggests that there are choices a client can make that may indirectly impact their experience of same-sex attraction but are not directly related -- they're not choices, like to chose their experience of having same-sex attraction, but choices they might make.
I mean, I guess one example would be a woman may choose to, because of romantic attraction or romantic interest on emotional attraction to a male, they may choose to be in a relationship and have a relation with that male, and through that, they may experience shifts in their attractions, so that they

actually are attracted to that male in an erotic fashion, or at least that potential would develop. So they would be making choices not directly to change, but in the context of making choices to partner with a man that they may experience that kind of fluidity.
Q. A young woman may discover that she has same-sex attractions, and then at some other time may think to herself, "Well, Charlie over there, I like him," and she may make a conscious choice to experience that kind of sexual --
A. Not exactly like --
MR. GANNAN: Objection. Vague.
A. Not exactly like that, no. She may choose, if she wishes to be with him, for other reasons, and in the course of emotional intimacy, over time, that she may find her attraction for him sexually emerge out of that. She's not making the change like that.
BY MR. WILLIAMS:
Q. And her sexual attractions for other women would then be diminished. Is that --
A. That's -- I assume that is theoretically possible, but at that point, it would not be relevant for her. And it's...
Q. And then you go on to say, "such as those that might be facilitated," which I take to mean a fancy

word for making easier, smoother or so forth, "by SOCE."
Did I read that correctly?
A. Yes.
Q. And SOCE, I recognize that you are forced to use that term?
A. Exactly.
Q. But it does mean sexual orientation change efforts. To somebody like me, who is not a member of the APA, that's the way I read it, and the "change efforts" would result in conscious choices, would they not?
MR. GANNAN: Objection. Vague.
BY MR. WILLIAMS:
Q. If they're successful. That would be the goal, at least, would it not?
MR. GANNAN: Objection. Vague.
A. I'm not sure I follow your question.
BY MR. WILLIAMS:
Q. All right. Let me see if I can rephrase it. Let me read the whole sentence, and then we'll break it down just a bit.
"Thus, while same-sex attractions may not be experienced as chosen" -- we went through that, not chosen, discovered -- "it is reasonable to hold that

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 109

they can be subject to conscious change" -- in other words, I make a decision to change, just like I might make a decision to stop smoking or start smoking. That's a conscious choice -- "such as those that might be facilitated in SOCE."

So I'm reading that to mean that a sexual orientation change effort as part of a therapeutic venue would make it easier for that person to make a conscious choice to be more heterosexual than less heterosexual?

MR. GANNAN: Objection. Vague. Misstates testimony.

BY MR. WILLIAMS:

Q. Did I -- is that --

A. No, you are incorrect.

Q. Tell me how I'm incorrect.

A. Back to this "conscious choice" piece, the woman who chooses that she wants to have a relationship with a man after -- you know, maybe she's had same-sex attractions and may be in a relationship with a woman, she's choosing at that point to follow -- maybe she likes the companionship, she has an emotional intimacy with him that she hasn't experienced with a man before, and so she chooses to relate to him, to grow in that relationship depth emotionally.

Page 110

She's not choosing not to have same-sex attractions at that point, but what she will choose is her relationship with him. And over the course of time -- and this would be an example of naturalistic change -- over the course of time, she may find that her sexual responsivity to him grows, but it's not like she's choosing, "Okay. I'm going to respond now."

Q. I get that. I understand what you just said.

A. That's what I mean. It's not like choosing.

Q. The naturalistic part I certainly understand. I'm glad you said it, because I don't read the last clause of that sentence, "such as those that might be facilitated in SOCE" as being naturalistic. I read that to mean that, if this person goes through SOCE, that process will facilitate, make easier, her ability to choose, a conscious choice, to become more heterosexual rather than naturalistically head in that direction. That's the way I read the sentence. You can convince me that I'm wrong, because I can't read it any other way, Doctor.

MR. GANNAN: Objection. Vague. Misstates testimony. And asked and answered.

A. It's hard to answer without -- I can give you an example, but I don't know if that's called for here. Again, it's -- the approach is to work on -- first work

Page 111

on the distress of the client. And if the client, for instance, feels, let's say, that they believe that trauma, childhood trauma influenced their sexual attractions, then using speech and only speech we would address the trauma, and if they believe that the trauma might be connected to the -- have some influence on the development of same-sex attraction, so we would work on the trauma, and they may find, if they do, no guarantees, that in addressing the trauma, their fluidity increases.

So in that sense they're working on related issues, but not necessarily straight head on the attractions, but they may find that the attractions do shift in relationship to the work of, like, trauma work.

Q. Fluidity and shifting being second cousins, so to speak; right?

A. Okay.

Q. Is that a good way to put it?

MR. GANNAN: Objection. Vague.

BY MR. WILLIAMS:

Q. Strict language. Can't shift without some fluidity, can you?

A. I'll just leave it at fluidity. I mean --

Q. Well, let me ask you this question, then. I

Page 112

don't want to interrupt. Did you finish?

A. Go ahead.

Q. If SOCE is irrelevant, why didn't you just say "such as those that might result from a naturalistic change"?

MR. GANNAN: Objection. Vague.

BY MR. WILLIAMS:

Q. In that sense as opposed to invoking facilitation by SOCE?

A. Again -- and this gets down to my view of it -- the difference is the client has come and has a goal of therapy. They have self-determined a goal. I would like to see what level of fluidity or -- you know, change my sexual attractions may have, you know.

So that, in my definition, is the distinctive part about what SOCE is, is that I'm following the client's goal.

If I understand these laws correctly, I have to say to that client, if the law is placed, "I cannot help you with this. I cannot serve this goal of yours through speech." I can't do that.

Q. You can talk about it under the California law, can't you?

A. I can't -- not in a way -- that's the danger. I can't talk about it in a way that can be construed as

ANTHEM REPORTING, LLC
www.anthemreporting.com | 888.909.2720 | anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 113

change, whatever that means.
Q. As facilitating a conscious choice in one direction. Is that what you're saying?
MR. GANNAN: Objection. Vague. Calls for a legal conclusion.
A. It is vague. I don't know what constitutes speech that becomes conduct and is -- could be considered the attempt to change by virtue of things I'm saying.
BY MR. WILLIAMS:
Q. Change efforts require the client to embrace the notion that, if change is going to take place, she or he is going to have to --
A. I'm sorry.
MR. MIHET: Let him finish his question, please.
A. Sorry.
BY MR. WILLIAMS:
Q. And --
MR. MIHET: Rob, are you asking or testifying?
MR. WILLIAMS: I'm thinking right now. I'm asking a leading question. I can do that because he's your expert. But it's more of an inquiry.
Read back the first part of my question.
(The question was read back as follows: "Change

Page 114

efforts require the client to embrace the notion that, if change is going to take place, she or he is going to have to --")
BY MR. WILLIAMS:
Q. The rest of that question, she or he is going to have to be cognizant of his or her own self-determination in that sense. If you don't exert efforts, Mr. and Mrs. Client, then no change is going to take place. Is that a fair way of saying that?
MR. GANNAN: Objection. Vague. Asked and answered. Compound. Misstates testimony.
A. The client has to be involved in the process for it to be therapy.
BY MR. WILLIAMS:
Q. The client has to be involved in making an effort to make any change that the client is looking for, does he or she not, also; right? If they're looking for change, they have to be a part of that change process. That is where the word "effort" comes from; right?
MR. GANNAN: Objection. Vague. Asked and answered.
A. Effort in that context may be the effort to address the trauma and to see whether it affects any fluidity experience on the part of the client. That

Page 115

would be the effort, for example.
BY MR. WILLIAMS:
Q. So I go back to my question: Why did you put the phrase "such as those that might be facilitated in SOCE"? Why didn't you just say "such as those that might be facilitated by the natural evolution of getting in touch with your feelings" or something like that?
MR. GANNAN: Objection. Asked and answered. And I'm getting the sense you are just asking the same question over and over.
MR. WILLIAMS: This is the last time I'm going to ask it, so...
A. I apologize that the language I'm forced to use is not very helpful in this. But, again, my distinction is so the issue is the client has a self-determined goal to pursue their fluidity as part of the therapeutic experience in order to see what may be possible and what may come about, what may emerge through the use of standard psychotherapeutic techniques.
BY MR. WILLIAMS:
Q. Well, the reason I've kind of focused on this, Doctor, is --
A. I see.

Page 116

Q. -- is raised by the next sentence, which says -- and I'm going to read it word for word. "Same-sex attractions and behaviors are not strictly or primarily determined by biology or genetics and are naturalistically subject to significant change, particularly in youth and early adulthood."
So I go back to the last clause of your earlier sentence, "such as might be facilitated in SOCE." Well, given what you said in the next sentence, that are "naturalistically subject to significant change," why does SOCE have anything to do with it?
Why wouldn't you put "naturalistically such as those are facilitated by naturalistic efforts which can lead to significant change." Why wouldn't you say it that way?
MR. GANNAN: Objection. Vague.
A. I'm sure that naturalistic efforts are happening frequently outside of therapists' office. However, these are individuals who are coming to their therapist because apparently those naturalistic elements have not sufficiently, anyway, addressed their goals; otherwise, they wouldn't come to therapy.
BY MR. WILLIAMS:
Q. You finally couple the first part of that paragraph that we've gone over with the sentence, "This

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

should raise serious questions about the legitimacy" of, I guess, the two pending statutes in California. Is that what they were called?
A. Well, the one was AB 3371 was the New Jersey.
Q. Oh, okay. So SB was California, and AB was New Jersey?
A. That's correct. And they were very similar.
Q. And AB New Jersey is the King case, is it not?
A. Correct.
Q. Were you an expert in that case?
A. No.
Q. How are you familiar with that, sir?
A. I was asked to, I guess -- again, I said this earlier, and I'm not sure the terminology -- but I submitted some kind of declaration on behalf of the plaintiffs in the case.
Q. So --
A. But I did not come and do a deposition or anything like that.
Q. No, I understand that.
A. Okay.
Q. But you did prepare and file a declaration on behalf of the plaintiffs in the New Jersey case?
A. That's correct.
MR. MIHET: Objection.

BY MR. WILLIAMS:
Q. At whose request?
A. I'm sure it would've been Liberty Counsel.
Q. Mr. Gannam or Mr. Mihet?
A. No. No.
Q. The other guy, Schmidt?
A. I don't know for sure who was handling that case.
Q. Just a lawyer with Liberty Counsel?
A. Yes.
Q. Do you know where that lawyer was located geographically?
A. No. I'm sorry.
Q. It wasn't Mr. Schmidt; correct?
A. I don't know for sure.
Q. You can't remember. Okay.
A. I just really don't know.
Q. All right. So your declaration in the California case and your declaration in the New Jersey case were both result of requests by lawyers from Liberty Counsel; correct?
A. I believe so.
Q. And the same is true in this case; right?
A. Yes.
MR. WILLIAMS: All right. Why don't we break

for lunch.
(A brief recess was taken.)
BY MR. WILLIAMS:
Q. Dr. Rosik, do you have your declaration handy? If not, I can give you a copy.
A. I do not have mine. I just have what you gave me here.
Q. All right. I'm going to mark --
A. Maybe it is. This is --
Q. That's different. I'll have this marked as Exhibit 3, which is a copy of your declaration in this case.
MR. WILLIAMS: I will give you a copy.
(Exhibit No. 3 was marked for identification.)
BY MR. WILLIAMS:
Q. All right. Let the record reflect that the court reporter has marked as Exhibit 3 the declaration of Christopher Rosik, Ph.D., dated May 6th, 2019. Would you turn to page 25 of Exhibit 3, Doctor, and just confirm that is your signature.
A. Yes.
Q. And would you peruse your declaration and just confirm for the record that it appears to be what I have represented it to be, and that is an authentic copy of your declaration?

A. It appears to be.
Q. Turn to page 23. Actually -- well, we can start at 23. Actually, start at 24, please. I direct your attention to paragraph 77 on page 24 of your declaration.
A. 77?
Q. Paragraph 77 on page 24 of your declaration.
MR. MIHET: That's not 24.
MR. WILLIAMS: It is in mine.
MR. MIHET: It only goes to 75 in the copy you gave me.
MR. WILLIAMS: You are absolutely right. My apologies, Doctor. I'll have marked as Exhibit 4 your rebuttal.
(Exhibit No. 4 was marked for identification.)
BY MR. WILLIAMS:
Q. And would you turn to page 27 of your rebuttal declaration and confirm that that is your signature there as well?
A. Yes.
Q. Dated July 17th, correct, of 2019?
A. Yes.
Q. Now, turn to page 24 of your rebuttal declaration, and you should see paragraph 77. Do you see that, sir?

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 121

A. Uh-huh, yes.
Q. Read the first sentence of paragraph 77 to yourself, if you would, please.
A. Okay.
Q. In the first sentence of paragraph 77 on page 24 of your rebuttal declaration, you use the phrase "ideologically left-of-center dominance of professional mental health association leadership and the community of academic psychology."
Did I read that correctly?
A. Yes.
Q. First, what do mean by "ideologically left-of-center dominance"?
A. It has multiple layers of meaning.
Q. I'd like all of them.
A. One would be political.
Q. Political in what sense?
A. I guess, party affiliation, which is somewhat of a proxy for other things, values.
Q. What do you mean "party affiliation"?
A. Republican, democrat, independent, libertarian.
Q. Okay. Let's go one by one. Of the ones that you -- of the party affiliations that you just identified, which are the ones that are left of center?

Page 122

A. Obviously, there's variation, but overall, I would say the democrat party is left of center, leans left of center.
Q. And the republicans are?
A. They would probably lean right of center.
Q. What is center?
A. With variation.
Q. What is center?
A. Well, in terms of policy, I mean, it's things like the role of government. And, of course, when you are talking about APA comes in, it would be more on social policy matters.
Q. So is your belief that -- let me correlate it back...
To turn back to page 19. Take a look at the last sentence of paragraph 56, which is at the top of page 19. Do you see that, sir?
A. Yes.
Q. And turn to the prior page, 18, paragraph 55 where the last -- next to the last sentence uses the term "essentially politically and ideologically homogenous, left-of-center groups."
Do you see that?
A. Yes.
Q. And then at the bottom of paragraph 56, you

Page 123

use the term "conservative prospectus," do you not?
A. Which paragraph? I'm sorry.
Q. 56, at the top of 19.
A. Yes, although that is the language of authors, but I would tend to concur.
Q. All right. And then we've already gone through the "ideologically left-of-center dominance."
A. I should add that that -- yeah, that's self-identified conservatives and -- liberal, progressive -- yeah, so it would be self-identification, yes.
Q. A person who identifies as a conservative person politically. Is that what you are referring to?
A. I think that would be included in there, yes.
Q. What does "conservative" mean in today's medium? Do you know?
A. I will give you my understanding of it. I have for a long time had very much of an interest in the moral dimension. And the authors here, particularly the one Jonathan Haidt, H-A-I-D-T, is a psychologist, social psychologist now at New York University.
He has done a lot of work in what he calls moral foundations theory. I don't know if I talk about it here, but basically a lot of interesting research

Page 124

that suggests that those who -- he's identified through evolutionary and a cross-cultural analysis what he describes as six different moral foundations, which are -- foundations are like taste buds is the example he gives.
So people have these six pretty universal moral foundation. And left-of-center folks would -- self-identified, I should say, have a different profile on these moral foundations than those who would be conservative. Essentially --
Q. Right of center?
A. Right. Right of center, right.
Q. So you identify conservative with the right of center, and left of center, you consider them liberal?
A. Left center would probably be liberal progressive, as you go further out. Again, I like -- I'm not so much interested in the political aspect. I'm interest in the moral aspect, which is really fascinating stuff.
And that is that of these six moral foundations, self-identified liberals tend to really emphasize what he calls the harm-care foundation. And that is essentially -- what he says is the sacred values of those left of center is caring for those who they perceive to be oppressed and that is at the heart





Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

of the care-harm foundation.

And so there's also a fairness and reciprocity --

Q. Reciprocity.

A. -- reciprocity foundation. I messed that one up.

And that's just about playing on a fair field and basic ideas of fairness.

And then is a liberty-oppression foundation, which has to do with those deemed to oppress or otherwise restrict the freedoms of individuals, and so self-described liberals tend to score very high on the harm-care foundation and the -- somewhat less so on the liberty-oppression foundation.

Now, conservatives, self-identified conservatives, there are three other foundations. One is disrespect for authority, order. They like order in society, and there is an in-group loyalty, which would be like a certain nationalism or loyalty or church or family, and then there is the purity foundation, which is a lot of the sense of sacred and avoiding contamination, bodily, spiritually.

And conservatives tend to score much higher on those three foundations than self-identified liberals do. So you have a mismatch that liberals --

self-identified liberals tend to form the moral sense around harm-care, whereas conservatives tend to have more equal distribution across all six foundations.

And so what happens is -- and this is interesting research on this -- that because of their emphasis on harm-care, liberals, they -- left of center, will -- they don't really recognize morality based on purity, based on in-group loyalty and respect for authority, especially when it comes into conflict with care-harm/harm-care considerations. Right.

So their value is caring for oppressed peoples; whereas the conservative, self-identified, tend to be more concerned with just preserving the integrity of the institutions of society. So they're concerned with groups and establishment of groups.

Another way of putting it is that for the liberal, things like the institutions and the groups in society are servants of the individual. They're there to help the individual, to serve the individual; whereas for conservatives, these groups, individuals in a sense have an obligation to the institutions. That's a big difference.

And I think it shows up in -- one of the reasons why some of these cultural debates go on is because I think we're arguing from, essentially,

different moral frameworks, although for the -- and this is one of his articles, for the left-of-center individual whose morality is based primarily on harm-care considerations. They don't recognize it as moral. It doesn't compute as a moral consideration.

Like, let's say, purity, sanctity. Example might be what you were giving earlier, like scripture. That doesn't seem you can base a moral argument on scripture. Just makes no sense in terms of harm-care, at least in places.

And so my view is underpinning a lot of this conflict, which I am very -- I grieve about. A lot of this conflict is these very discordant moral visions. What is good? What is the good life? What is -- how does one achieve fulfillment? How does one achieve what makes for a thriving life?

This is all undergirding it. And you can tell by the language people use, the moral people language use.

So that would be an answer to your question. That's how -- one of the ways I define the idealogical difference. One that I'm most familiar with and appreciate, as providing understanding in these debates, is the moral issue, moral ideology, moral beliefs. Where does morality stem from? What makes

for a moral argument? Those kinds of things.

DR. HUDSON: That's a great answer.

MR. WILLIAMS: It's an answer.

BY MR. WILLIAMS:

Q. Do you know who Graham Nash is?

A. Is that Crosby, Stills, Nash & Young?

Q. Yeah.

A. That's about all I know of him.

Q. Returning to paragraph 77 where you state -- and I'm going to read this into the record -- "The professional and academic environment within which professional SOCE is being debated is ripe for confirmation bias with ideologically left-of-center dominance of professional mental health association leadership and community" -- "and the community of academic psychology?"

I read that correctly, did I not?

A. Yes.

Q. Amplify the word "ideologically" as it is connected to "left of center." I heard your answer, and listened very carefully to it. I don't remember you saying the word "ideologue" or "ideologically" or "ideology" in your --

A. Perhaps I should've said -- with regards to in this case I could've said "moral ideology, morally

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 129

ideologically left of center." That would be included in there. I suppose it could be more, but that's primary sense that I have, and I've thought about these issues that way.
Q. A moral ideology that is left of center or right of center, as the case may be?
A. Yes.
Q. And that moral ideology would -- essentially, I can understand it by the lengthy answer you gave me a little while ago; right?
A. Yes.
Q. So if I go back and read the transcript, I should have a pretty good grasp of it?
A. I hope so. Probably there's much more to it than what I tried to explain.
Q. These are all very interesting questions. What is the source of your information that the professional mental health association leadership is dominated by morally ideologically left of center?
A. Well, I've been a member of the APA since 1984, I believe. So I'm pretty familiar with the workings of the organization. I'm not involved in them, but I certainly read what they put. You can be pretty sure, for instance, the resolutions, when they touch on social issues, you're pretty much guaranteed

Page 130

they're going to sympathize with a more socially liberal or progressive perspective.
Q. A left-of-center perspective?
A. Yeah. Yeah.
Q. And why are you assured of that fact? How would one know that?
A. Oh, you can go look at the resolutions on the website, APA website. They have a list -- source of all the resolutions that they've provided, and you can -- if you want to read them all, they will -- you'll kind of see where they come down on these.
Q. So if I -- I'm just a lawyer. I'm not a psychologist or a psychiatrist.
A. Yeah. Yeah.
Q. But if I were to go to those resolutions and read through them -- and hopefully I'm a politically and socially astute, reasonably well-read citizen of the United States of America, which I think I am --
A. Uh-huh.
Q. -- I would read all those and come to the conclusion, in your opinion, that those resolutions have a left-of-center bent in them?
A. The ones that touch on --
MR. GANNAN: I just want to object. It assumes facts not in evidence.

Page 131

A. The ones that touch on -- you know, sort of contentious social issues, yes.
BY MR. WILLIAMS:
Q. And SOCE is a contentious social issue?
A. I would say that it has become that.
Q. So what you are really saying -- and I think you've said it in your declaration -- is that the leadership of the APA is liberal, not conservative; right?
A. Broadly speaking, yes.
Q. Is that a negative thing or a positive thing, or it doesn't matter?
MR. GANNAN: Objection. Vague.
A. You know, there is a good analogy that Nicholas Cummings, the former APA president said, you know, for science to thrive and for most anything to thrive, for the plane to land -- to take off, it needs a left wing and a right wing. If it only has one wing, it doesn't function very well. And if the organization leadership has one wing, it's not going to function at its optimal because it's missing, it's missing input, it's missing perspective, it's missing like viewpoint diversity.
BY MR. WILLIAMS:
Q. And is it your belief that the APA, for

Page 132

example, which is the one you've been referring to, ignores the viewpoint of the right-of-center members of the organization?
A. It does not represent them. That is why many have left over the years. But they don't feel represented.
Q. Okay.
A. That does not mean -- I mean, for the record, like I said, I've been a member, I think APA does a lot of good things. I don't have animus toward it as an organization. It's just when they touch on these sort of social issues that it's difficult for me to feel represented by them.
Q. I understand what you're saying. And has a counter-organization been formed by those who have left the APA because they don't think they're represented, to come up with their own organization to reflect the values and thoughts and prospectus and viewpoints of more conservative psychologists? Right of center, I guess you call it.
A. That's -- that one is a little harder to say. I think the younger generation, they're not affiliating with organizations, not nearly as much. I don't know if that is the way it is with the legal associations, but younger professionals are not affiliating as much

ANTHEM REPORTING, LLC
www.anthemreporting.com | 888.909.2720 | anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 133

as the older ones did. But I certainly know of individuals who have departed or disagreed seriously with the APA on some of these sort of, like I said, social policy resolutions.

I don't really see them starting their own organizations in the mass. I think they may -- some of them have religious backgrounds may affiliate with some of the smaller faith-based mental health organizations. Some have gotten tired with all the politics and joined -- there's another American Psychological Society, APS I think it's called. It doesn't weigh in on a lot of policy stuff. They simply want to promote science. They're not -- they don't, I think, present themselves as political.

(Exhibit No. 5 was marked for identification.)

BY MR. WILLIAMS:

Q. All right. Doctor, I have marked as Exhibit 5 to your deposition a copy of Ordinance No. 2017-47, which is the ordinance that is the subject matter of this litigation that we're here today on.

It's the ordinance that was enacted by the City of Tampa City Council back in March of '17 and -- actually, April of '17 and approved by the mayor, then Mayor Bob Buckhorn on April 10th, 2017. The court has taken judicial notice of this ordinance, and I don't

Page 134

think there is any issue as to its authenticity and accuracy.

MR. GANNAN: I will stipulate the court has taken judicial notice of the ordinance, that it is the ordinance.

BY MR. WILLIAMS:

Q. Sure. Could you review it and tell me if this is the ordinance that you looked at prior to today that you alluded to earlier this morning?

A. I believe so. It's been a while.

Q. All right. We've been talking about the left-to-center/right-to-center dichotomy amongst the leadership of the American Psychological Association, among other things.

A. Sure.

Q. Are you familiar with the report --

MR. WILLIAMS: So I'm going to have marked as Exhibit 6 a copy of what I'm about to talk to you about.

(Exhibit No. 6 was marked for identification.)

BY MR. WILLIAMS:

Q. Just as an intermediary topic of discussion, Exhibit 6 is a report by the American Psychological Association and specifically a Task Force on Appropriate Therapeutic Responses to Sexual

Page 135

Orientation.

Are you familiar with that?

A. Yes.

Q. How do you define "sexual orientation," sir?

A. Well, I have a definition that I use, but it's challenging because there is lots of discussion about how to define it. But I guess you can say that sort of the bones of it might be the direction which, to a greater or lesser extent, the person's sexual attractions and behavior and identity is oriented.

MR. WILLIAMS: Read that back to me, please.

(The answer was read back.)

BY MR. WILLIAMS:

Q. "Sexual identity" I think is a word that you haven't used before. Is that the same as gender identity?

A. I don't believe so.

Q. How would you distinguish between the two?

A. Gender would be --

Q. Gender identity.

A. Yeah. The degree of which I identify as a male or female or something in between, I guess. Sexual identity would be more my sexual attractions, be they exclusively oriented to same sex or to the opposite sex or -- and behaviors, I would say. How I

Page 136

identify myself, my sexual affections and behaviors.

Q. Okay. So that's the distinction between gender identity and sexual identity, what you just articulated as far as you are concerned?

A. I mean, I'd need to probably think about it to give you the best answer more, but --

Q. We'll come back to it then.

A. But, yeah, I mean, there's --

Q. Let me move on.

A. -- there's gay, lesbian, bisexual, sexual orientation. There is transgender.

Q. Back to the ordinance, Exhibit 5.

(A discussion was held off the record.)

BY MR. WILLIAMS:

Q. You are familiar with the APA report with the Task Force on Appropriate Therapeutic Responses to Sexual Orientation, Exhibit 6, are you not?

A. Yes.

Q. And I'm going to assume that you've read that task force report thoroughly prior to today. Is that a correct statement?

A. Yes.

Q. And you've mentioned that you had also reviewed the ordinance, Exhibit 5, but it's been a while; correct?

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 137

A. Yes.
Q. All right. When you read the ordinance, whenever you read it for the first time, did you note that the task force report, Exhibit 6, was identified in the ordinance itself?
A. Yes, that's part of the boilerplate.
Q. What -- you call boilerplate. You mean it's --
A. It's in every -- every proposed legal document, proposed legislation. It's -- you are going to see that.
Q. Is that good or bad or is it indifferent, in your opinion?
A. I don't know. I know why it's there.
Q. Why is it there?
A. The appeal to authority. As I mentioned in my declaration.
Q. What do you mean by that?
A. I think the American Psychological Association is seen -- I mean, is an appeal to the broader reader, to the politician and otherwise as an authoritative organization, so they appeal that way.
Q. Do you see the American Psychological Association as an authoritative organization?
A. Depends on the domain. I think in domains

Page 138

where they have no significant advocacy interest they are very authoritative. In areas where they have clear advocacy interests, which they make no bones about, I would say that's where you get your issues with confirmation bias and incomplete science.
Q. Okay. Referring to the last "whereas" clause, on page 1 of the ordinance, Exhibit 5, there is a reference to the task force report that is Exhibit 6 to your deposition, is there not?
A. Yes.
Q. It reads "Whereas, the American Psychological Association's Task Force on Appropriate Therapeutic Responses to Sexual Orientation ('APA Task Force') conducted a systematic review of peer-reviewed journal of literature on Sexual Orientation Changes, SOCE," and then it goes on to talk about that. I'm not going to read the whole thing.
What do you know about the task force that it refers to right there?
A. I know I guess -- you know, I don't know personally the individuals on the task force, but --
Q. You don't know any of the individuals that made up the task force itself; is that true?
A. Not on a personal level. I know a few of them, I mean, in terms of some of the writings and

Page 139

things like that.
Q. Have you ever talked, literally conversed with any member of the task force that came up with Exhibit 6 about the subject matter of the task force report?
A. The subject matter of the task force report?
Q. Yes, appropriate therapeutic responses to sexual orientation, that's what I would call the subject matter. That's what they --
A. I'm just trying to think if we talked specifically about that, but I have spoken with one member of the task force.
Q. Who would that be?
A. Dr. Beckstead.
Q. And Dr. Beckstead, what is his full name?
A. A. Lee Beckstead.
Q. Is Dr. Beckstead still alive?
A. Yes.
Q. Where does he reside, if you know?
A. I believe he is in private practice in Utah.
Q. Salt Lake City?
A. I believe so.
Q. When did you talk to Dr. Beckstead about this report?
MR. GANNAN: Objection. Assumes facts not in

Page 140

evidence.
BY MR. WILLIAMS:
Q. Well, you said you talked to him, did you not?
A. Yes. I don't remember if we talked specifically about the report, though.
Q. I'm sorry. I misunderstood you.
Do you recall that you talked about the report when you talked to Dr. Beckstead?
A. I recall that he presented at an Alliance conference a couple of years back, when it was in Utah, and he spoke -- you know, referenced the report.
Q. Do you remember what he said? If you don't, that's fine too.
A. I think he said that there were aspects that he would do differently if he were doing that committee again.
Q. Well, he was a member of the task force that came up with the report, was he not?
A. Yes.
Q. Is Dr. Beckstead -- how would you characterize him, left of center or right of center?
A. In terms of his approach to these issues, we would have some differences that I would put him up to left of center. I don't know politically if that's the case. We didn't have those kind of conversations. But

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 141

I would say we have civil disagreements about certain aspects of this subject matter.
Q. SOCE?
A. SOCE and -- yeah.
Q. So as it relates to the subject matter of the report, you would consider Dr. Beckstead to be left of center; is that correct?
A. As it relates to his perspective on SOCE, I would say that would be more in keeping with someone who has sympathies in that direction. I don't know. I don't know of other things regarding his affiliation.
Q. I could care less about his political stuff.
A. Okay.
Q. I'm talking about this. If somebody can tell me what a real conservative is today --
A. But, again, I am speculating. We haven't really talked specifically about this. I just heard him talk about it.
Q. I'm just asking your opinion --
A. Yes.
Q. -- as to whether or not you deem Dr. Beckstead to be left of center, right of center, or smack dab on the center?
MR. GANNAN: Objection. Asked and answered.
***

Page 142

BY MR. WILLIAMS:
Q. You are saying that, as far as you are concerned on this subject, the subject report, he's left to center. Is that a correct statement?
A. I would say -- I mean, if he agreed with everything in the report, then we would have some differences about how to understand that. My sense would be those differences would be reflected in my earlier assessment about my -- his sort of moral prospective on things and my perhaps moral perspective on it. That's, again, how I would want to understand those issues.
Q. That's a little difficult for me to comprehend. So from a moral perspective as it relates to appropriate therapeutic response to sexual orientation, is he left of center, in your opinion?
A. It would be a general -- close to a complete guess, but if I had to completely guess, pull it out of a hat, I would say he is probably left of center, at least in comparison to me.
Q. Are you right of center, sir?
A. I would say I'm probably right of center. Part of our -- part of our obligation as professionals is to understand our biases, that's why I'm so interested in the moral -- the moral framework of

Page 143

things.
Q. Yes. All right. And so Dr. Beckstead, if I recall your testimony correctly, is the only member of this task force that you have actually spoken to; is that correct? Based on your memory?
A. That would be correct.
Q. And the other members of the task force, if you have any knowledge of them, it would be derivative? And what I mean by "derivative," it would based on reading materials that they have prepared or things of that nature?
A. Well, that would not be correct.
Q. Correct me then, please.
A. I have gone to probably half a dozen APA conferences over the years. I know for a fact, at least once, I listened to Dr. Glassgold speak on the panel. I'm trying to think of the other members. It's possible I've heard other members in the context of workshops or seminars, you know, symposiums at the APA conferences.
Q. And so whatever you know about Dr. Judith Glassgold, who is an expert in this case, as you well know, because you've rebutted her declaration --
A. Yeah.
Q. -- you would know from comments she made at

Page 144

these conferences, the APA conferences and perhaps also from what you've read of hers. Is that a true statement?
A. I believe so.
Q. All right. That's Dr. Glassgold. Any other member of the task force that you have heard or read that you've garnered some knowledge about their thinking?
A. Well, as I understand, the members of the task force, at least five of them were LGB identified, and so when you're looking at just the -- where the LGBT-identified individuals tend to affiliate or affiliate with a party, it would be a democrat party. That doesn't mean all of them do. I'm not being excessive, or I'm not trying to say there aren't exceptions. I'm just saying I believe it's pretty clear that most, many, the majority certainly would identify with a democrat party affiliation.
Q. When you say five of the members of the task force were LBG identified, you mean that they themselves are either lesbian or gay or something like that? Is that what you mean?
A. I believe that was the number, yeah.
Q. How do you know that? How do you know whether somebody is a lesbian or a gay man?

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

A. Well, what I recall is that Dr. Nicolosi had a piece that he did some work and looked at their writings and looked at their -- how they identified, and that was his conclusion. He put it out there. I mean, it's on -- I think it's probably still on the Internet. And it seemed pretty -- I haven't read it for a while, but it seemed pretty supportive of that conclusion.

Q. Okay. Let's drill down a bit down, if I may. Dr. Nicolosi was not a member of the task force, was he?

A. No.

Q. Dr. Nicolosi is someone that I think you would identify as right of center, would you not?

A. I think that's --

MR. MIHET: He was.

BY MR. WILLIAMS:

Q. Was. Thank you.

A. Correct. Yes.

Q. Dr. Nicolosi lives on in spirit. Okay.

MR. MIHET: Though, perhaps not with the party affiliation.

THE WITNESS: Yeah.

MR. WILLIAMS: Who knows. Who knows.

***

BY MR. WILLIAMS:

Q. And so Dr. Nicolosi, right of center when he was alive and perhaps still, who knows, did some research or reading and as a result of whatever he did, he put out something in writing that at least to you informed you that five of the members of the task force were gay or lesbian or --

A. Identified.

Q. -- identified, yeah.

MR. GANNAN: I just object to -- misstates the testimony.

A. I would have to review that article to -- I mean, I haven't read it in a while, so I am trying to recall to the best of my ability. I think that's what it said. Again, it was based on their own self-descriptions and affiliations and those kinds of things, as I recall.

BY MR. WILLIAMS:

Q. According to Dr. Nicolosi; right?

A. Well, I mean, I believe he pulled them from sources.

Q. I got it. But your source of information is something that Dr. Nicolosi gleaned from their writings or whatever they did, these five people; right? Isn't that correct?

A. I don't know if I gleaned it all. It was kind of confirming. I mean, it doesn't take much to do a Google search on somebody and find out sort of what their affiliations are.

Q. Have you done an individual Google search on those five?

A. No.

Q. In any event, to the extent that you believe that five of the members of the task force were -- let's just call them homosexual in one form or another, that's based on Dr. Nicolosi's writing that he obtained by looking at a bunch of other stuff; is that correct, sir?

MR. GANNAN: Objection. Misstates the testimony. Dr. Rosik testified that he believed they identified as LGBT, not that he concluded they were.

BY MR. WILLIAMS:

Q. Did they identify to you, sir, these five people?

A. Dr. Beckstead has identified as a bisexual.

Q. Say that again.

A. I said Dr. Beckstead has identified as a bisexual.

Q. Okay. So Dr. Beckstead is -- he said, "I'm

bisexual." Okay. You used the word identify, but I just talk straight language. I'm either bisexual, or I'm not bisexual. So -- and I'm not, by the way. But Dr. Beckstead has publicly stated he is bisexual; correct?

MR. GANNAN: Objection. Asked and answered.

BY MR. WILLIAMS:

Q. Correct?

A. I believe he made comments to that effect when he was at the conference, the Alliance conference. He's also talked about it in other communications, so he's identified himself that way.

Q. Well, that's fine with me. I'm just trying to find out the source of your information. Was he one of the five of the task force that you are talking about?

A. Yes.

Q. Have the other four ever identified to you, to use your term, "identified," I'm either bisexual or homosexual? Do you have any firsthand knowledge of that?

A. Not directly to me.

Q. So I go back to where I started. Any knowledge you have as to the sexual identity of the other four members of the task force that you claim to be -- believe to be LGB is based on what Dr. Nicolosi

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 149

wrote in his paper; is that correct?
A. No, it's not exclusively that.
Q. Well, what else is there? Tell me what else there is.
A. I think I make certain deductions from a person's involvement in say Division 44 of the APA, which is the division for sexual orientation and gender diversity. There was a Division 44 charge that provided people to develop the document, the report. I mean, the APA, it was the ultimate charge, but I believe many of those individuals are affiliated with Division 44.
Q. Many of what individuals?
A. On the task force.
Q. Members of the task force?
A. Yes, I believe so. I'm not -- I don't want to be -- I could have -- I may be accurate, but I think most, if not all of them, are.
Q. Dr. Rosik, if a psychologist is a member of the APA and also a member of Division 44, is it your opinion that they are -- either are gay or probably gay?
A. I think there's a strong possibility.
Q. What does that mean?
A. I mean, I'm not wanting to say it's universal.

Page 150

There are probably non-GLBT-identified individuals with the division.
Q. But the fact that they're members of Division 44 is a deduction on your part, is it not?
A. Just as if I'm a member of Division 36, which is the division of the psychology for religion and spirituality, that probably I have an interest in that, if I'm a member. I may have some active involvement in faith-based matters if I'm a member of that division.
Q. Certainly, I agree. That doesn't necessarily mean you are religious person, does it? Devout Christian, that doesn't mean that, does it? It doesn't actually lead to the conclusion that you, sir, are a devout Christian, does it?
MR. GANNAN: Objection. Compound.
A. I wouldn't use the word universally. I would use the word "probabilistically."
BY MR. WILLIAMS:
Q. More probable than not? How does that sound?
MR. GANNAN: Objection. Vague.
A. I guess I would agree with that.
BY MR. WILLIAMS:
Q. How many members of the task force were there? Do you know?
A. I believe there were six members and one,

Page 151

sometimes he is counted a sixth or seventh, but the executive director or something. I don't have -- I mean, it's right here. Yes, six members and the staff liaison.
Q. And who is that?
A. Mr. Anderson, probably Dr. Anderson.
Q. So I think what you are saying is that out of the six members of the task force, it is far more probable than not that five of them were either homosexual or bisexual?
MR. GANNAN: Objection. Misstates the testimony.
BY MR. WILLIAMS:
Q. Well, tell me if it misstates it. I want to be correct.
A. I think that's possible. I am not wanting to conclusively say that that is the case, but based on, again, my sense of Division 44, and how divisions work, that there's a -- there's a reasonable probability that five or so have that identification.
Q. As homosexual or bisexual?
A. They don't -- no, as gay or lesbian, bisexual.
Q. What is the difference between a gay and lesbian?
A. They detest the word homosexual unless it's

Page 152

used in a medical sense.
Q. All right. Let's use gay and lesbian.
A. Yeah.
Q. Five of the six, because they're part of Division 44, are either gay or lesbian or bisexual. We know that Beckstead has said he is bisexual, so knock him off. The other four you believe were either gay or lesbian because they are member of the Division 44; is that correct?
MR. GANNAN: Objection. Vague. Compound. Misstates the testimony.
BY MR. WILLIAMS:
Q. Correct me if I'm wrong. I don't want to misstate your testimony. I'm trying to understand it.
MR. MIHET: He has already corrected you a number of times.
MR. WILLIAMS: Good. He can correct me another time.
A. They -- there is a -- again, this is to my knowledge of it. They're a probabilistic possibility that that many other -- not all, but some of the others are, in fact, LGBT identified, LBG identified. Certainly, they are, you know -- they certainly share a moral and philosophical perspective, I guess, or that would be my -- my sense of it based on the document.

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 153

Q. All right. Which document, the report itself?
A. Yes.
Q. All right. So other than Dr. Beckstead, we can agree you have no direct knowledge of the other members of the task force because you haven't talked to them; they've never said to you, "I'm gay, I'm lesbian," have they? Isn't that correct, sir?
A. I'm trying to remember what I heard Dr. Glassgold talk about. She talked about I think her mother being -- kind of lapsing from her Jewish faith when she was -- I don't know if it was growing up or later in her life and how she, I guess, into more of a feminist, ardent feminist perspective, and I think that was influential for her.
Q. All right. That's your answer?
MR. MIHET: Let him finish. He's still thinking.
BY MR. WILLIAMS:
Q. If you are still thinking, think away and answer away.
A. I do recall that she said during her talk -- and this is in San Francisco last year, that -- I'm trying to get this right -- that "love overcomes even religious law." Pretty sure that's what the quote -- "love overcomes even religious law." Which isn't

Page 154

something you would hear a conservative say. They would have a different understanding of it, I think.
What I do recall from these -- and I've been to a number of these symposiums from the APA, probably three over the years that they -- the subject matter is the conflict between religious values and same-sex attractions, and they present cases, case material from their practices of individuals who have this conflict between their religious values and their same-sex sexual behavior, and what I'm pretty confident about is, as they go through these cases, every single case is resolved in the direction of prioritizing sexual identity and essentially revising religious belief.
What struck me as -- and given the fact that I work with individuals for whom their religious identity tends to remain primary, even though they may experience same-sex attractions. And so it struck me as not in keeping with a broad client experience.
Q. Does that conclude your answer?
A. I'll stop, yes.
Q. Given your answers to the last half dozen questions I've posed to you, sir, is it your belief that the -- withdraw that question.
Do you know how the task force was selected by at APA?

Page 155

A. I'm not confident in this. But I think they -- yeah, I'm not confident in it. There's a couple of ways you can do it. One is you can select directly: They can ask people to serve. Otherwise, they can have nominations of people, and then they go to those people and see if they're willing to serve.
So I don't know if it was a direct process of selection or if it was people needing to be nominated and then they select from those who are nominated. But it was probably something like that.
Q. Well, my question is do you know, and I think your answer is you don't know; is that correct?
A. Not more specifically than that.
Q. Well, that tells me you don't know. That's the way I understood your answer. You are speculating to the possibilities. You have no personal knowledge, do you, sir, actual direct knowledge as to how the task force was actually selected, do you?
MR. GANNAN: Objection. Asked and answered.
A. Only from my understanding of how the task force in general have -- operate within the APA.
BY MR. WILLIAMS:
Q. I'm not talking about task force in general. I'm talking about this task force.
A. I don't know why this task force would deviate

Page 156

from that, but if that's the case, then I don't know within those specifics I've listed which was done.
Q. If you were to find out, how would you -- what inquiries would you make -- let me rephrase it.
If you wanted to know how the task force was constituted by the APA, what inquiries would you make and of whom?
A. I'm not sure. Is it in the document? It often is, but I don't know. I don't remember.
Q. Let me ask a follow-up question: Have you ever inquired of the APA as to how they constituted this particular task force?
A. I have not inquired.
Q. Why not?
A. In the broadest sense, the document, I mean, stands on its own, in terms of I don't need to know the backgrounds, the process of selection or the identities of the task force specifically to -- as I read the document, to understand that they're approaching this from a -- certain aspects of it anyway -- I think their interpretation of things would reflect as sort of a left-of-center perspective.
Q. So you can glean that left-of-center perspective for certain aspects of Exhibit 6 just by reading the substance --

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 157

A. Well --
Q. Let me finish.
A. I'm sorry.
Q. -- substance of those sections that you just alluded to; correct?
MR. GANNAM: Objection. Vague. Misstates testimony.
A. Let me give you an example.
BY MR. WILLIAMS:
Q. Well, answer my question if you would, please.
Read the question back, please. And see if you can answer the question and then you can talk about it all you want, Doctor. I just want to make sure the record is clean here.
(The question was read back.)
A. I think I can make an educated guess.
BY MR. WILLIAMS:
Q. Is that the same as gleaning it?
A. All right. I guess, yes.
Q. Okay. Now, with that in mind, what you just confirmed in your last answer that you were able to glean from certain sections of reading the report by the task force that the task force had a left-of-center -- I used the word "bend" a lot.
A. Grid.

Page 158

Q. -- grid on those topics, those sections; is that correct?
A. Aspects of the report, yes.
Q. Yes. And in that sense, do you believe the report was rigged to begin with because of the constituted members of the task force?
MR. GANNAN: Objection. Vague.
A. "Rigged," I wouldn't use the language. I would probably say --
BY MR. WILLIAMS:
Q. It just seems to be in the national news so much.
A. I would say that there was risk of confirmation bias.
Q. Okay. And that risk of confirmation bias was itself confirmed when you read certain aspects of the report, because there it was. Is that what you are saying?
A. Yes.
Q. Thank you.
A. I will give you an example of this.
Q. Please. No, go ahead. Please give me example.
A. As part of preparation for this, I -- in 2008, the APA had a report on abortion and mental health. I

Page 159

think I alluded to this. And what's fascinating about that report is that the methodological critique that was used to conclude that SOCE is ineffective, that same methodological critique, in many respects, was used to show that there was no harm from abortion, at least first trimester abortions for women who don't have subsequent abortions.
So, again, the methodological criteria were applied very differently depending on the nature of the issue, and that gets back to the idealogical and moral perspective. So that with abortion, these studies that may have suggested there were harms, were ruled or basically ruled out or dismissed because these studies did not meet the methodological criteria that were efficient. Whereas, with the APA task force, there appear -- versus sexual orientation, they use many of those same methodological criteria to dismiss the efficacy, but they didn't use it -- they did not use those same criteria to talk about harms.
So with abortion, they use the criteria to talk about harms. With SOCE, they don't use it to talk about harms. They use it to talk about efficacy. That is a huge distinct -- I mean, that's the kind of thing that makes one suspect that there is a different standard being applied.

Page 160

Q. You would agree with me that the American Psychological Association is a generally well-respected professional association in the United States, wouldn't you?
MR. GANNAN: Objection. Vague. Facts not in evidence.
A. The research is suggesting that they're becoming less respected, especially by -- you know, the country, unfortunately, is polarizing, but they're becoming less respected by half the country who would consider themselves not in support of these -- some of these kinds of resolutions that they're putting out.
BY MR. WILLIAMS:
Q. Half the country, meaning the population -- there is about 340 million of us.
A. Oh, okay. I mean the red part of the country, conservative part. They're distrustful.
Q. I'm not talking about those people. I'm talking about psychologists.
A. Uh-huh.
Q. Is it generally a well-respected professional association in the United States of America by your colleagues, the psychologist in the country?
A. It depends again. I mean, psychologists are largely left of center. It's a caring profession. So

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 161

one would understand that you would likely have more individuals in that profession that really stress the harm-care moral foundation. But there are certainly conservative psychologists who they just don't affiliate with the APA, but they --
Q. You said that earlier.
A. -- they don't -- they would not agree with the APA on these kinds of resolutions and policy statements and that sort of thing. I think I said there in my declaration, too, I mean, APA represents probably a 40 percent of psychologists in the country, which is a lot, but it's not the majority of psychologists. We don't know where they lean. I would suspect many of them probably are --
Q. Is the American --
MR. MIHET: Were you finished?
THE WITNESS: I'm done.
BY MR. WILLIAMS:
Q. I thought you were.
A. That's okay.
Q. If I interrupt you because I glean from your testimony that you're finished and you are not finished, you just to stop me and say, "I'm not finished, Mr. Williams. Let me finish."
A. Fair enough.

Page 162

Q. And I will be happy to do that, because I do not intend ever to interrupt your answer.
A. I'm sorry for interrupting you.
Q. I just want to make sure that you and I clear.
A. Right.
Q. You're the witness. You have a right to say anything you want.
Doctor, is the American Psychological Association the most visible psychological association in the United States?
A. I would say that's accurate.
Q. Is it the most prominent?
MR. GANNAM: Objection. Vague.
A. I guess if I had to lean, it would be yes.
BY MR. WILLIAMS:
Q. Now, you've spent quite a bit of time answering my questions, and I want to thank you for being as thorough as you've been, because I'm not a psychologist. I'm just a simple lawyer. I'm married to one, so I have some osmotic understanding of what you are talking about. I hardly believe that I'm an expert at all.
So if I'm a layperson, which I am when it comes to psychology, and I read Exhibit 6, this report, how would I know all about the biases and so forth that

Page 163

you have gleaned from reading it because I don't have the expertise that you do?
MR. GANNAN: Objection. Vague. Calls for speculation.
A. The sad fact is you probably wouldn't.
BY MR. WILLIAMS:
Q. Would not; right?
A. You would not be -- you know, you would have to be able to dig into the science to understand it, to understand what it says, what it can't say. You have to have knowledge of the APA, how it operates, their resolutions in these areas to kind of look at the whole -- a broader swath and say, you know, this is does not seem even handed.
Q. So as a layperson -- and as a layperson, I will confess, I would be also ignorant of this, just like I think you would probably be a layperson who is ignorant of a lot of legal stuff; right?
A. Yes.
Q. As a layperson ignorant of the science and profession of psychology, if I read this and said, "It makes sense to me," there's no real way to slice and dice it the way you have and to determine, as you've said, flawed, is there?
MR. GANNAN: Objection. Vague. Calls for

Page 164

speculation.
A. Not unless you were, I suppose, to talk with someone like myself, or I suppose there are some -- I mean, there are critiques of the APA. There are critiques of mental health organizations.
BY MR. WILLIAMS:
Q. Sure. Sure.
A. Along some of these lines that are on the Internet.
Q. There is no reason why, as a layperson, I can read the king's English and I'm pretty good at it, that I could read it and say it sounds okay to me, right, because the American Psychological Association is --
A. That's the appeal to authority.
Q. That's what you call the appeal to authority. I agree. I agree with you that's what you call it. Okay.
So if I wanted to learn about this stuff and read this and say, "Okay. American Psychological Association, this report is, gosh, over 100 pages long, all kinds of citations, the task force seems to be a pretty impressive group of people, well presented, no reason for me not to just accept it at face value," is there?
MR. GANNAN: Objection. Vague. Calls for

ANTHEM REPORTING, LLC
www.anthemreporting.com | 888.909.2720 | anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 165

speculation.
A. I mean, can you rephrase the question? It's a little -- I'm not quite sure I get it.
BY MR. WILLIAMS:
Q. What I'm trying to convey to you, sir, is that -- I think you've already answered it, but I, as a layperson, could read a report like this, just like you could read an ABA report and not have any real reason to say, "This sounds okay to me"; right?
MR. GANNAN: Objection. Calls for speculation. And I think it's also getting beyond the scope of Dr. Rosik's assignment.
MR. WILLIAMS: Answer that question. And then if -- I don't want to spend a lot of time on it either.
A. I mean, I think that happens all the time.
BY MR. WILLIAMS:
Q. What happens all the time?
A. People who are ignorant by and large of the issues that go into play here, the inner workings of how scientific organizations are and the APA in particular, they would simply accept it on the authority of the APA, even if it is, like I say, flawed, although that is becoming -- like I said, that's becoming less. People are --

Page 166

Q. But as a layperson -- but as a layperson, that's a reasonable thing for me to do, would you agree?
A. I think -- no, here's --
MR. GANNAN: Objection. Vague. Asked and answered.
A. I think a better of way of saying it really, if you are so inclined that way morally, you probably would agree. If you are not, I think you would have more skepticism. Right. So really -- and this is how anybody approaches science, because, you know, research even is subject to different interpretations. Certain questions shape how the data shows up. So if there was something that -- about it, a conclusion whatever, that didn't meet with my sense of morality, I would have a problem with it.
Example would be, you know, if -- and it didn't call for this, but if I as a conservative have a strong emphasis on respect for authority, like parental authority, I will just instinctively react to bans that take away that parental authority --
BY MR. WILLIAMS:
Q. Okay.
A. -- when it's just a matter of speech.
Q. Well, let me go back to the ordinance, if I

Page 167

may.
(A brief recess was taken.)
MR. WILLIAMS: We're back on the record.
BY MR. WILLIAMS:
Q. Doctor, I refer you to the second "whereas" clause in the ordinance on page 1. That refers to the American Academy of Pediatrics. Do you see that, sir?
A. Yes.
Q. Are you familiar with the American Academy of Pediatrics?
A. I know of them. I -- you know, in some of the research, you know, obviously, from my declaration, I looked at it a little bit, but I'm not nearly as familiar with them as I am with the APA. I'm not a pediatrician.
Q. Correct. You are a psychologist?
A. Correct.
Q. Do you have any reason to believe that the American Academy of Pediatrics isn't a well-regarded professional organization?
MR. GANNAN: Objection. Calls for speculation. Beyond the scope of Dr. Rosik's opinions.
A. I really have no idea how they're -- how they're viewed within the public. I mean, it's just --

Page 168

if I had to guess, I guess I would say they probably carry some esteem.
BY MR. WILLIAMS:
Q. Let me hand to you exhibit what I will have marked as Exhibit 7.
(Exhibit No. 7 was marked for identification.)
BY MR. WILLIAMS:
Q. Exhibit 7 is an article from Pediatrics -- or American Academy of Pediatrics publication in 1993. It's entitled "Homosexuality and Adolescence," and apparently it was written by the Committee on Adolescents, a committee of the American Pediatric Association.
I will represent to you that the document that we've marked as Exhibit 7 is the document that is referred in the second "whereas" clause on page 1 of the ordinance. Are you with me so far, sir?
A. Okay. Page 1?
Q. Of the ordinance.
A. Yes.
Q. The second "whereas" clause in the ordinance says, "Whereas the American Academy of Pediatrics in 1993 published an article in its Journal stating," okay, and then it says, it quotes, it has a quote in the whereas clause, does it not?

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 169

A. Yes.
Q. All right. Now, look page 633 of Exhibit 7, the "Homosexuality and Adolescence." And I'm going to read from page 633 under the subtopic "Concept of Therapy." If you go down about six or seven lines, you will see the following sentence: "Therapy directed specifically at changing sexual orientation is contraindicated, since it can provoke guilt and anxiety while having little or no potential for achieving changes in orientation."
Did I read that correctly?
A. Yes.
Q. Now, if you look at the second "whereas" clause on page 1 of the ordinance, Exhibit 5 to your deposition, that is the same sentence that's quoted in the "whereas" clause in the ordinance, is it not?
A. Appears to be, yes.
Q. Okay. Look at the third "whereas" clause on page 1 of the ordinance, which -- and I will read it out loud -- states as follows: "Whereas, the American Psychiatric Association in December of 1998 published its opposition to any psychiatric treatment, including reparative or conversion therapy, which therapy regime is based on the assumption that homosexuality is a mental disorder per se and that a patient should change

Page 170

his or her homosexual orientation."
Did I read that correctly?
A. Yes.
MR. MIHET: For the record, I think you said "and that" where it says "or that," but the document speaks for itself.
MR. WILLIAMS: Yes, it does. And if I said that, I mean "or."
BY MR. WILLIAMS:
Q. My first question to you is, is the American Psychiatric Association a well-regarded professional association?
MR. WILLIAMS: Objection. Vague. Calls for speculation.
BY MR. WILLIAMS:
Q. To your knowledge, sir.
A. I would say, you know, given the limitations I expressed before, I think within a certain segment of individuals it's esteemed. With others, they probably, when it comes to these kinds of proclamations, is probably suspect, at the public level.
Q. The public level meaning what?
A. People in general and --
Q. Non-psychiatrists?
A. Yes, but also psychiatrists that perhaps don't

Page 171

share that perspective.
Q. But aside from that -- there is always a minority opinion -- is it a well-regarded professional association, to your knowledge, sir?
MR. GANNAN: Object. Asked and answered.
A. Within those circles, I would assume it is, yes.
BY MR. WILLIAMS:
Q. All right. And before I get into the quote and everything or the document itself that is referenced, it says, "which therapy regime is based on the assumption that homosexuality is a mental disorder."
Do you see that part?
A. Uh-huh.
Q. Do you agree that homosexuality is a mental disorder or mental illness?
A. I would not use that language, no.
Q. You disagree with that?
A. I don't think it's -- I don't think inherently it has to be. Okay.
Q. I don't know what you mean by that. Please expand on that.
A. And, again, I mean, I've done some assessments with individuals with same-sex attractions that are,

Page 172

you know, quite good, I mean quite healthy, so clearly in and of itself, that's not language I would use.
Q. Okay. It's not the language you would use. Do you agree or disagree that homosexuality is a mental disorder?
A. I think I would --
Q. Yes or no, please, and then you can expand.
MR. MIHET: I'm sorry. You have to let the witness answer.
BY MR. WILLIAMS:
Q. I want a yes-or-no answer. You either agree or don't agree, sir.
MR. MIHET: It may or may not be answerable with a yes or no.
MR. WILLIAMS: Sure, it is.
MR. MIHET: You can't dictate the answer. You get to ask the question. The witness gets to --
BY MR. WILLIAMS:
Q. I don't dictate the answer, but the question is answerable, yes or no. You either agree, or you don't agree. If you don't agree, expand on it.
MR. MIHET: You need to let the witness answer the way he wants to answer, not the way you want him to answer.
MR. WILLIAMS: I'm entitled to a straight

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 173

answer. You know that.
MR. MIHET: You are entitled to his answer, not yours.
BY MR. WILLIAMS:
Q. Can you answer the question, Doctor?
A. I would disagree that it is a mental disorder.
Q. In short, you don't consider homosexuality a mental disorder; is that correct?
MR. GANNAN: Objection. Asked and answered.
BY MR. WILLIAMS:
Q. Is that correct?
A. Not in terms of meaning that there is inherent mental pathology, emotional psychological pathology.
Q. If I changed the phrase "mental disorder" to "mental illness," would you agree that homosexuality is a mental illness?
A. I don't see the difference.
Q. Okay. You know that DSM-III and ultimately IV dropped homosexuality as a mental illness, do you not?
A. Yes.
Q. And it hasn't been indicated as a mental illness in DSM for a couple of decades or more; correct?
A. Yes.
Q. Do you agree with that?

Page 174

A. Do you agree that the decision to remove homosexuality as a mental illness in DSM-IV and 5 is a correct decision.
MR. GANNAN: Objection. Vague. Asked and answered.
A. I understand it, and I can agree with it.
BY MR. WILLIAMS:
Q. Let me hand to you Exhibit 8.
(Exhibit No. 8 was marked for identification.)
BY MR. WILLIAMS:
Q. Exhibit 8 is referenced on the footnote to the third "whereas" clause, No. 2, I believe, and it is a hard copy, printed copy of the position statement that is alluded to in the third "whereas" clause, and it's entitled at the top, "APA Official Actions." APA in this case meaning the American Psychiatric Association, and that's different than the American Psychological Association, is it not, sir?
A. Yes.
Q. And the position statement, the title is "Position Statement on Therapies Focused on Attempts to Change Sexual Orientation (Reparative Or Conversion Therapies)."
Did I read that correctly?
A. I'm sorry. What paragraph?

Page 175

Q. That's the title.
A. Oh, the title. Okay. Yes.
Q. And then it says, before the substance of the article, or the position statement, "Approved by the Board of Trustees, March 2000, Approved By the Assembly, May 2000."
Did I read that correct?
A. Yes.
Q. Then it says, in quotes, "Policy documents," and I assume this is what this or else they wouldn't say it -- "are approved by the APA Assembly and Board of Trustees. These are position statements that define APA official policy and specific subjects." And then it quotes the APA Operations Manual.
Did I read that correct?
A. Yes.
Q. All right. Let me read into the record, and you tell me if I read it correctly.
In the preamble, it says, "In December of 1998, the Board of Trustees issued a position statement (see attached) that the American Psychiatric Association opposes any psychiatric treatment, such as 'reparative' or conversion therapy, which is based on the assumption that homosexuality is per se a mental disorder or based upon on a priori assumption that the

Page 176

patient should change his or her sexual homosexual orientation."
Did I read that correctly?
A. Yes.
Q. Do you agree with that?
A. Yes.
Q. Then it says, "In doing so, the APA" -- again, in this context, it's the American Psychiatric Association -- "joined many other professional organizations that either oppose or are critical of 'reparative' therapies, including the American Academy of Pediatrics, the American Medical Association, the American Psychological Association, the American Counseling Association, and the National Association of Social Workers."
Did I read that correctly?
A. Yes.
Q. Go down to page 3, go to the fourth "whereas" clause down.
MR. MIHET: You're back on the ordinance now?
MR. WILLIAMS: Yes. I'm sorry. I apologize. Thank you.
BY MR. WILLIAMS:
Q. Page 3 of the ordinance, fourth "whereas" clause down, which reads as follows, Doctor: "Whereas,

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 177

In 2016, the American Medical Association issued policy statement H-160.991, which expressly opposed the issue of 'reparative' or 'conversion' therapy for sexual orientation or gender identity."

Did I read that correctly?

A. Yes.

Q. Is the American Medical Association a well-regarded professional association?

MR. GANNAN: Objection. Vague. Calls for speculation.

A. Again, within -- when it comes to these kinds of pronouncements, I think it is respected within certain circles and not within others.

BY MR. WILLIAMS:

Q. And, apparently, Dr. Hudson represents the others.

A. Well, it's important to remember that AMA represents, at most, 20 percent of the doctors in the country. Many have left the AMA over things like Obama. The Affordable Care Act was opposed by a large portion of the membership, and so it can't be said to speak for probably 80 percent of the -- for sure 80 percent of physicians in the country.

Q. All right. The ordinance, you will agree with me has a number of "whereas" clauses referring to a

Page 178

number of associations, organizations which according to the "whereas" clauses take the position that is very similar to that of the American Psychological Association as relates to conversion therapy; is that correct?

MR. GANNAN: Objection. Vague. Assumes facts not in evidence calls for speculation.

A. Can you repeat the question.

(The question was read back.)

A. I guess I would agree with that, yes.

BY MR. WILLIAMS:

Q. Are you familiar with the term "SAMHSA"?

A. I'm familiar with it.

Q. What does it stand for, if you know?

A. Substance abuse and something, so I'm not as familiar with that document.

(Exhibit No. 9 was marked for identification.)

BY MR. WILLIAMS:

Q. I have handed to you Exhibit 9. Exhibit 9 is a lengthy document dated October 2015, and it is entitled Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth."

Do you see that on the cover?

A. Yes.

Q. And SAMHSA stands for, according to the front

Page 179

page, Substance Abuse and Mental Health Services Administration.

Do you see that?

A. Yes.

Q. And over to the left, it talks about the Department of Health & Human Services; correct?

A. Correct.

Q. Which is a federal agency, is it not?

A. Yes.

Q. Are you familiar with this SAMHSA document?

A. I've read it, but I wouldn't say that I've been able to dig into it to the same extent.

Q. You have read it, did you say?

A. I have read it.

Q. When did you read it, sir?

A. Within the last month. I think I read it once before that, a few years aback.

Q. Why did you read it in the last month? In connection with this litigation, for example?

A. Yes.

Q. Why did you read it in connection with this litigation?

A. Because it was referenced in Dr. Glassgold's declaration and I thought it would be important to at least have some cursory knowledge of it.

Page 180

Q. And when you read the SAMHSA report, Exhibit 9, did you obtain at least a cursory knowledge of its contents and substance?

A. Very cursory.

Q. It's a lengthy document. It's over, gosh, 65 pages or so, cites a lot of -- a lot of papers, like all you guys do.

A. Right.

Q. Everybody cites a lot of papers.

A. Right.

Q. Did you understand the contents of Exhibit 9, the SAMHSA report, sir?

A. As much as a cursory reading might allow, but there may be things that I don't fully understand because I couldn't dig into them.

Q. You couldn't dig into them. Is that what you just said?

A. Yeah, well, I mean, right, reflect on them.

Q. Why couldn't you?

A. The time I had to prepare was limited.

Q. The time you had to prepare for what? I'm sorry.

A. Prepare my rebuttal declaration.

Q. I see. So you read the SAMHSA report, Exhibit 9, in connection with preparing your rebuttal

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 181

declaration; is that correct?
A. Yes.
Q. And because you had a limited amount of time, you weren't able to perform more than a cursory review of Exhibit 9. Is that your testimony?
A. Yes.
Q. All right. And therefore had obtained a cursory understanding of what its contents are. Is that a correct statement?
A. Yes.
Q. Turn to page 11 of Exhibit 9. About a third of the way down you'll see a -- I have the advantage of a color version, so yours is not like mine, but it's a rectangular block that says "Professional Consensus on Conversion Therapy with Minors."
Did you see that?
A. Uh-huh.
Q. The ordinance that you have been reviewing with me from time to time today bans SOCE or conversion therapy as relates to minors only, does it not?
A. Yes.
Q. All right. Let me read into the record paragraph 1 under the heading, I suppose, the best way to put it, heading of "Professional Consensus on Conversion Therapy with Minors."

Page 182

Now, first, when it says "Professional Consensus," what does that mean to you?
A. That looking just at the paragraph on top of it there, that these organizations, at least, I won't to say members of the organization, but the leadership and those who formulate these statements are in consensus.
Q. Okay.
A. Subject to the same sort of issues I'm concerned about with regards to restricted moral and political diversity.
Q. Right. You have said more than once today that you have some questions, issues, you take issue with the -- what you perceive to be a left-of-center bent I call that. You used another term. What did you use? I'll just say "way of thinking." Okay?
A. Viewpoint.
Q. That permeates the leadership of some of these organizations, particularly the American Psychological Association. Am I correct?
A. Certainly in these arenas.
Q. Yes. And the professional associations that are apparently included here, at least from what I read, is the American Psychiatric Association and the

Page 183

American Psychological Association, the National Association of Social Workers. Those are the three that are identified at least right above the phrase --
A. Right.
Q. -- "Professional Consensus Conversion Therapy with Minors." And then the statements of professional consensus at the top speaks for itself, and I won't take the time to go over that.
So let me direct your attention, if I may, to paragraph 1 under "Professional Consensus of Conversion Therapy with Minors," and I will read it into the record out loud.
"Same-gender sexual orientation (including identity, behavior, and/or attraction) and variations in gender identity and gender expression are a part of the normal spectrum of human diversity and do not constitute a mental disorder."
Do you agree with that statement?
A. Can you clarify what is meant by "normal" in this context?
Q. I gave it its plain and simple meaning, because I don't know of any other meaning that you would ascribe to that word in the context of this.
A. Well, you can prescribe normal as being free of psychopathology, which may be the case. I think I

Page 184

mentioned in the declaration there are other definitions. Statistically what normal would be, and then there is the definition, which probably many people that I work with would be working under, which would be a sort of a natural law definition.
Q. Are you finished?
A. Well, in other words, normal is framed by the physical realities of the body, and so normal might be defined as that which functions according to design, and so many people -- and that isn't necessarily implicitly implying any kind of pathology, but it is a different moral evaluation of the -- of behavior, so -- and I would say many people from a conservative religious context would read that and disagree with it based on a different definition than probably what's implied here. I'm assuming implied here is it's not pathological -- you know, maybe it occurs naturally, which is also not -- can't speak to the issue of the moral evaluation of the behavior.
Q. Well, let me rephrase my question and say this. From your answer that you just articulated into the record, I am concluding that you are not sure what the phrase "normal spectrum of human diversity" means in the context of the sentence numbered 1 in the document.

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

MR. GANNAN: Objection.
BY MR. WILLIAMS:
Q. Is that correct?
MR. GANNAN: Asked and answered. Assumes facts not in evidence.
A. I'm just saying there are different understandings of these words, probably from what these committees that have put these statements together and what they intend and what consumers or individuals that may come to therapists with conservative religious values, how they would read something like that.
BY MR. WILLIAMS:
Q. And I go back to my question. Just reading it as it is in plain simple English language, "normal spectrum of human diversity" -- "spectrum" you know what that means, don't you, Doctor?
A. Yes. But that's too simplistic. I mean, it's not --
Q. Hold on. Let me finish if I may.
A. I'm sorry.
Q. You know what "spectrum," means; right?
A. Uh-huh.
Q. You know what "human" means, don't you?
A. Yes.
Q. And "diversity," do you know what that means?

A. Yes.
Q. So the word that you are having some question about is the word "normal" modifying "spectrum of human diversity"; is that correct?
A. Well, we can argue some about whether spectrum -- you know, spectrum implies, generally speaking, a fairly equal distribution across a continuum, but in the case of sexual orientation, for instance, you have 90 percent heterosexual oriented and then much smaller percentages across the spectrum all the way to a -- maybe a -- yeah, it's not even a big number percentage.
Q. Okay.
A. So it's really more of a skewed distribution.
Q. All right. So you do understand what "human" means, that word?
A. Yes. Yes.
Q. You understand what the word "diversity" means?
A. Yes.
Q. You give it the plain and simple meaning that --
A. Human beings.
Q. Yes. But the word "normal" as used in that phrase and the word "spectrum," I think you are telling

me that you are not sure exactly how those words -- the intended meaning of those words in that sentence. Is that what you are saying?
A. I'm saying, I guess. I mean, I'm thinking here that these are words that are embedded, just embedded with values that come outside of psychology. Psychology can't determine values. Psychology can comment on human behavior and study it and see what consequences are related to two different behaviors and psychological experiences, but a value of what is normal is going to probably come -- it's going to come from outside psychology per se. You are going to pick your definition of what that means. I'm sure that -- my hunch is, anyway, the committee would mean this is normal, it has no moral evaluation of significance; therefore, it's good, it's a good.
Q. Well, I'm not asking for your hunch.
A. Okay.
Q. Okay. What I'm asking is whether you can tell me what the word "normal" means in the context of that phrase, and I think your answer is it could be a lot of things, so you are not sure; right?
MR. GANNAN: Objection. Asked and answered. Calls for speculation.
***

BY MR. WILLIAMS:
Q. Correct?
A. I would be -- you know, I guess I would say I would be guessing. The words --
Q. All right. There you go. All right. Thank you.
Now, this phrase -- excuse me -- this sentence uses the term "gender identity." I think I've seen that in some of your stuff as well.
What is gender identity?
A. Again, the sense that a person has of being masculine or feminine or something in between.
Q. If a human being has a gender identity as you just described it, but differs from their birth sex, do you know what causes that?
A. The thing I would say with some confidence is that there are multiple factors involved that probably differ for different people. I myself have worked with trauma victims, severe trauma victims who have dissociative identity disorder, which is a very interesting disorder.
And these individuals sometimes -- it's not unusual -- sometimes have gender -- gendered states, mental identity states that are opposite of their biological sex. So there might be a male identity

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 189

state inside a female-bodied person.
And this would be, for instance, because extreme sexual trauma, they would in a sense mentally create a part of their mind that is relatively subjectively experiences autonomous that notices that the sexual abuse isn't happening to boys, but it is happening with girls so I will be a girl. And that state -- I'm sorry, I will be a boy.
And so that state then identifies in a gendered sense itself as a boy. It can actually look in a mirror and see itself -- this is extreme disassociation, but it can see itself as a -- as a male, and it will talk it -- it will be absolutely convinced that it is male.
I'm not saying this is the majority of gender dysphoric situations, although it is something that WPATH guidelines say you need to assess for because I think it does happen in some situations, but from my experience, that would be one -- that would be one potential way that this would show up in a counselor's office, not the only way, but it could happen; that a highly traumatized individual who has multiple identity states that are disassociated from one another would have one of those states that would be opposite gendered in reference to its biological sex.

Page 190

Q. So if there is a causal relationship between -- that results in a gender identity different from one's birth sex, that causal relationship could be a lot of things. Is that what you are saying?
A. For any person, you have to, yeah, probably take a good history.
Q. Yeah. One size doesn't fit all; correct?
A. Oh, yes.
Q. All right. So tell me what your understanding of "transgender" is.
MR. GANNAN: Objection. Vague. Calls for speculation.
BY MR. WILLIAMS:
Q. Well, that's a good question. Do you know what "transgender" is?
A. In a -- it's not my field of deep study, but obviously these issues touch upon one another. I believe it would be someone who would identify in some form or other in the gendered -- a sense of gender that is different from their biological sex.
Q. In that sense, do you think there's a -- how would I put it, a developmentally normal pathway that would lead to someone being transgender?
A. I do not know the answer to that question. It's conceivably possible; however, the cases that I've

Page 191

worked with where that's an issue, like extreme trauma cases, that is definitely not the case.
Q. Have you dealt with minors who identify as transgender in your practice?
A. On a few occasions.
Q. Did you reach any conclusions in dealing with those minors that identify as transgender that they were -- they identified that way because of any other unresolved mental health issues?
MR. GANNAN: Objection. Vague.
A. I'm just trying to think back. It's been a while.
BY MR. WILLIAMS:
Q. Sure.
A. I don't believe the therapy lent itself, my contact really lent itself to a thorough examination of those issues. Usually, I'm working with -- again, I'm working with the parents, helping them to love and care for their child and, you know, keep the connection and understand that things can change over time, not a promise of that, but they do, so you need to love and care for your child even the transgender child, of course.
Q. I hope you would agree with me that a parent shouldn't need a psychologist to tell them that, do

Page 192

they?
A. Sometimes parents think that what is loving is actually doing damage to their attachment to their child.
Q. Help me out on that. I would like to understand that.
A. Severe kinds of discipline. If the parent has problems with emotional regulation themself, by that I mean they blow up their emotions, they can't control their emotions.
Q. The parent?
A. Yes, the parent. That that is not helpful for connection to their child. Those would be the examples. Issues of discipline, issues of connection, emotional regulation.
Q. You keep affirming Graham Nash through this entire deposition. Thank you.
Earlier we talked about normal spectrum of human diversity, and I want to go there again, because I'm going to ask you a simple question. Do you believe that transgender identity is a natural part of that spectrum of human diversity?
MR. GANNAN: Objection. Vague.
A. I wouldn't see it as a spectrum, again, because it's very -- it's not distributed even close to

ANTHEM REPORTING, LLC
www.anthemreporting.com | 888.909.2720 | anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b619381790b09

evenly across any --

BY MR. WILLIAMS:

Q. Then I will rephrase the question to a natural part of human diversity. Forget the spectrum part.

MR. GANNAN: Objection. Vague.

A. I do not know every instance of transgender experience. I do know that what I see with traumatized individuals lends me to believe that there is a subpopulation of transgenders that quite conceivably -- that trauma history is a major factor in the development of their sense of opposite-sexed gender.

BY MR. WILLIAMS:

Q. Do you think there's ever a situation where going through a gender transition is ever appropriate as a treatment modality for a minor?

MR. GANNAN: Objection. Vague. Assumes facts not in evidence.

A. I can't really give a professional opinion on that. As a parent, I would have a hard time letting my daughters -- I have two daughters -- I would have a hard time letting them at 13 or 14 or 15 or 12 -- you know, obtain puberty-blocking drugs cross-sex hormones, hormones that have serious -- can have serious repercussions with regards to fertility, among other things. That would be a real hard sell for me as a

parent to do.

Q. But you can't give me a professional opinion because it's not in the ambit of your expertise; is that right? I get the parent part. I'm a parent too.

A. Yeah. If I was presented with that situation, I mean, I would have to use my common sense as a parent.

Q. Yeah, I agree.

A. And, again, the parents coming -- they would probably -- given their backgrounds, would probably have -- support that kind of maybe watchful waiting kind of thing.

Q. Well, then let's switch to the same question, is it ever an appropriate treatment for somebody over the age of 18?

MR. GANNAN: Objection.

BY MR. WILLIAMS:

Q. An adult in the eyes of the law?

MR. GANNAN: Beyond the scope of Dr. Rosik's assignment as an expert.

A. I guess theoretically it's feasible that it could be. However, I would say the state of science regarding this is not nearly as definitive as I would want it to be. In other words, the long-term studies. I would like to see some 10-, 20-year studies of those

that have transitioned, particularly surgically.

There aren't many out there, there are a few, the one I'm familiar with in particular, would suggest that these individuals, they feel a great deal of relief related to their gender identity, but over time their comorbidity conditions or their, I say, co-occurring conditions do not remit, suicide, depression, those sorts of things. So one would have to -- you'd have to kind of balance those things.

Q. Do you know what the term "gender dysphoria" means?

A. If I had to hazard a definition, I would say an individual who is dissatisfied in some way with their biological sex, does not feel like it's consistent with their gender experience, feelings.

Q. My research in preparation for this deposition led me to, I believe, uncover the simple fact that the American Psychiatric Association, which decided to change the diagnosis of gender identity disorder to gender dysphoria.

A. Right.

Q. Are you familiar with that?

A. Yes.

Q. Do you agree with that, that change?

MR. GANNAN: Objection. Vague. Calls for

speculation. Beyond the scope.

A. I don't know if I can say directly. I think I understand either perspective. I understand it as a disorder. I understand it as a dysphoria. My understanding is that it was -- a reason why it was labeled "gender dysphoria" as opposed to just removed from the DSM, like homosexuality, is because transgender individuals who wish to have these medical treatments need insurance coverage, and so to remove it altogether, they would not be able to have insurance coverage, and so it kind of put the profession in a bit of a bind. How do we depathologize transgenderism and yet allow there still to access medical benefits because insurances don't pay for -- often for nondiagnostic conditions, and so gender dysphoria was kind of a way, at least partially a way around that concern.

Q. A way around --

A. The concern of --

Q. -- no insurance coverage?

A. -- if we declassify this, if it's not longer in the DSM, we cannot get surgery, we cannot get medical treatment, at least for the insurance to cover them.

Q. So does changing it to "dysphoria" solve that

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

problem?
A. Yeah, it's not a disorder. That was the point. And I understand that was the point.
Q. That was the motivation for the American Psychiatric Association to change --
A. No, that --
Q. -- the diagnosis of gender identity?
A. No, no, no.
MR. GANNAN: Objection. Vague. Calls for speculation. Misstates testimony.
A. It was the reason why it wasn't eliminated altogether. They could've easily, just like homosexuality, struck it from a diagnostic category, but they needed to preserve -- they need to preserve something to enable transgender individuals who wish to change their biological sex to have insurance, access to insurance coverage for these very expensive procedures.
BY MR. WILLIAMS:
Q. I'm sure it is. And by changing it to gender dysphoria, they solved that problem. Is that what you are saying?
A. Yes, exactly.
Q. Turn to page 12 of the SAMHSA report, sir. Paragraph 3, under the heading "Professional Consensus

on Sexual Orientation and Youth," do you see that, sir?
A. In the top, the top portion?
Q. Yes.
A. Okay. Yes.
Q. Page 12.
A. Right.
Q. And I'm going to direct your attention to paragraph 3 under that heading, and I'm going to read that paragraph 3 into the record out loud. "There is a lack of published research on efforts to change sexual orientation among children and adolescents; no existing research supports that mental health and behavioral intervention of children and adolescents alter sexual orientation. Given the research on secondary outcomes of such efforts, the potential for risk of harm suggests the need for other models of behavioral health treatment."
Did I read that correctly?
A. Yes.
Q. Do you agree with that statement?
A. Let me read it again.
Q. Please.
MR. GANNAN: I'm going to make an objection. Beyond the scope of Dr. Rosik's opinions.
A. Let's say there's a lack of research that

meets the extremely rigorous methodological standard of, say, the APA task force. If those are the standards you are dealing with, yes, there is a lack, but I think those are artificially high.
My understanding is that there is -- I think the APA report talked about, you know, research done on adolescents and children. But one has to understand, again, there's a context here with the declassification of homosexuality. Research has stopped -- not stopped, but it drastically changed. There is no money going to support researchers who wish to -- who might wish to investigate these issues. No grant funder now is going to fund a study that might be sympathetic to change, the possibility of change.
Q. Why is that?
A. I would add researchers as well to that, and I think that's because they are likely to be punished.
Q. By whom?
A. In the public domain.
Q. By whom?
A. I would look at the same individuals that -- what happened to Mark Regnerus, look what happened to Spitzer, they're colleagues. With Regnerus, I mean, he had colleagues that came down on him. Basically, you are risking your -- you know, it's kind of a career

suicide move even if your research would be solid because it's just -- again, it's the ideological --
Q. Left of center?
A. -- lack of diversity. The lack of diversity, yes.
Q. Well, I said left of center. The left-of-center bent -- I used that term because it fit for me -- results in ostracization of people who do not comport to that left-of-center ideology. Is that what you are saying?
MR. GANNAN: Objection. Vague. Asked and answered.
A. If you look up what happened to Mark Regnerus.
BY MR. WILLIAMS:
Q. Mark who?
A. He is a researcher out of the University of Texas or something, but anyway, and what happened to Spitzer after this study. I mean, it's distressing.
Q. What happened to those two gentlemen?
A. Well, Regnerus was brought up for review, as I understand. He was criticized extremely in the scholarly and in the popular press, because the study did not -- it had limitations, like all studies, but it was the fact that he found and suggested some interpretation of the data that did not comport with

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Page 201

the narrative that I think the mental health associations and others would want to -- would agree with. And, again, it probably worked against the narratives that they wished to support. And I think I cite one article in my declaration by Woods that talks about a lot of this if you're interested in it.

Q. I'm interested in everything, Doctor.

Would you look at page 1 of your original declaration, which is dated May 6, 2019.

A. Page 1. Okay. That's the table of contents.

Q. Yes, sir. Under the heading number roman numeral III, "Analysis and Opinion," you say, A, "The Objectivity of the 2009 APA Task Force Report on SOCE is demonstratively suspect; Therefore the Report's Representation of the Relevant Literature Concerning Efficacy of and Harm from SOCE is Neither Complete nor Definitive."

Did I read that --

A. Yes.

Q. Is the way of or methodology for determining efficacy the same as it is for harm?

A. I believe there are differences.

Q. What are those differences?

A. Something that is not effective is not necessarily a -- I think it would -- less urgency as

Page 202

opposed to something that was shown to be definitively speech that harmed people.

MR. WILLIAMS: Read that back. I'm not sure I understood it. Late in the day.

(The answer was read back.)

BY MR. WILLIAMS:

Q. You are going to have to amplify that, Doctor. I sorry. I didn't really understand what you just said. Could you repeat it and perhaps elaborate on it? The question is --

A. Yes.

Q. -- you determine -- I used the word "methodology," and maybe that's not the right word, but you talk about the "Literature Concerning Efficacy of and Harm from." So does that literature use a methodology to determine the efficacy of SOCE, and is that same methodology or approach used to determine the harm of SOCE?

A. Something that is not efficacious and not harmful would not be considered in the same way something that was not efficacious and harmful would be.

Q. Are you saying if something is not efficacious, that doesn't ipso mean it's harmful?

A. Efficacy on its own would not necessarily have

Page 203

anything to say about -- again, this is a complex issue. I would say if you are holding out as -- you had given out guarantees of sexual orientation change, that kind of thing, that could be harmful when the client does not experience that.

Q. So in that context, efforts to be effective could, in fact, lead to harm because of the expectation level that was represented at the beginning and did not eventuate or actually take place. Is that what you are saying?

MR. GANNAN: Objection. Vague. Misstates testimony.

A. Potentially, if that was promised by a therapist; however, I know of no therapist that promises this. I'm talking about a licensed therapist.

BY MR. WILLIAMS:

Q. Sure. So going back to my original question. I want to make sure I intellectually comprehend the difference between, I guess, evaluating, measuring efficacy versus determining harm. They're not necessarily synonymous but they're not necessarily totally unrelated. Is that what you are saying?

MR. GANNAN: Objection. Vague. Asked and answered.

Are you asking him how those subjects were

Page 204

treated in the APA report, or are you asking in general?

MR. WILLIAMS: In general.

A. Well, there are different criteria that you have to weigh. Something --

BY MR. WILLIAMS:

Q. For each?

A. What's that?

Q. For each? Different criteria for efficacy than for harm?

A. Well, let's put it -- I'm sorry -- in a medical sense. You may have a drug that gives you a chance of ameliorating your cancer at some percentage of efficacy, but it may have a high percent of doing harm. So you have to weigh, you know, what is the -- looking at this, given my condition do I want to take this sort of risk. So you are weighing efficacy. A client would be weighing that in their decision to pursue that treatment.

Q. You know, we're inundated with drug ads, legal drug ads, I should say, on TV all the time that always have smiling people saying how wonderful the drug is, and then some guy in a subliminal boasts, and by the way, it could cause a heart attack, cancer, this -- you know what I'm talking about.

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 205

Is that what you are referring to? Each treatment modality may be effective, but it also may have adverse impacts?
A. You know, I guess I'm referring to like a medical doctor talking about the risks, potential risks and benefits of a treatment.
Q. Sure.
A. That's just appropriate practice.
Q. Is it the ethics of the psychological profession that the client is informed of potential harms before you possibly proceed forward with the particular treatment modality that the professional believes is efficacious?
MR. GANNAN: Objection. Vague. Calls for speculation.
A. I would assume that that would be a part of ethical practice.
BY MR. WILLIAMS:
Q. You assume. Do you know? You are a clinical psychologist.
A. That's what I do.
Q. That's what you do.
And would you expect all your colleagues to do the same?
MR. GANNAN: Objection. Calls for

Page 206

speculation.
BY MR. WILLIAMS:
Q. Is that standard of care? Let me put it that way.
A. All the colleagues that I know, we have compared consent forms and all that, so they all have various consent forms that have certain disclosures that are necessary, understanding that this is a potentially -- you know, it's a controversial area of practice, so you better be prepared and better show that there is clear consent of risks and harms, potential harms, you know.
Q. And you are referring to SOCE when you talk about --
A. I'm referring, again, just because I don't -- the word is constraining -- that acronym is constraining, but I'm referring to clients who would come with a self-determined goal of pursuing their degree of sexual fluidity through speech, talk-oriented psychotherapy, to determine to what extent that might be possible for them. It's hard to say that. It's much easier to say SOCE, but --
Q. Well, I heard you say that earlier, and I respect the fact that you don't like the word -- the term "SOCE," but since I'm not educated like you are,

Page 207

I'm not so smart as you are, I'm just going to use SOCE as a lay synonym for what you just described. Is that fair?
A. Unfortunately, with the way the word is thrown around, what it's often come to mean, I think I understand what you are saying, but it has the -- carries the risk of, you know, creating prejudice with regards to what I do. That's why I don't like to use the word.
Q. Well, you used it in your paper, though?
A. I did, and I --
Q. Because you had to get it published?
A. With that proviso, right.
Q. Yeah, I get that. When you used the term "SOCE" in your paper, you were really referring to the more elaborate description that you just gave me?
A. That's correct.
Q. Doctor, I have heard the term "aversive therapy" as it relates to conversion therapy or SOCE or whatever you want to call it. Are you familiar with what I'm talking about?
A. Yes.
Q. What am I talking about? What does that refer to, that term?
A. These are generally behavioral techniques that

Page 208

were applied to sexual orientation back in the '60s and the '70s. They would include -- I mean, this was with -- they were applied not just to sexual orientation. This was at the time in psychology when these types of techniques were being utilized with a number of different conditions.
Q. Not just sexual orienting?
A. Correct. But they might include electric -- or some mild shocking paired with images of whatever -- images of spiders or exposure kind of to things. It was kind of a conditioning paradigm, trying to decondition your association of the same-sex attraction by setting some aversive stimuli to pair it with that attraction and then pairing some more positive stimuli with the heterosexual or the opposite-sexed image.
That's just an example. But, honestly, these were determined to not be effective and to be potentially harmful when it -- when it comes to sexual orientation, and so they were discarded back in the '80s. Haven't been used by -- haven't been used professionals, even professionals in the Alliance and people who are in this would be -- are open to working with clients to explore their fluidity, hasn't been used by those individuals, professional therapists I'm speaking about, probably in decades, and that's what,

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923) c4c595dd-fed5-4497-8306-b61938179b09

Page 209

as I note in my declaration, Clifford Rosky in Utah had mentioned, these have not been used by a licensed therapist, since all we do is talk, and which makes it personally upsetting that these kind of portrayals are continually brought before governing boards like the Tampa Council, like the California State Legislature, describing, directly or by allusion, these kinds of practices that are alleged to be currently used by therapists such as myself, and there's not a stick of truth in it.

Q. Well, I have some familiarity with that personally, because I used to represent a long-term psychiatric hospital here in the Tampa Bay area, and you are right, they used it even to the early '80s, not for that, but for other --

A. Yeah.

Q. -- other issues. But my experience, sir, and I will just say it, is that that stopped a long, long time ago, decades. I agree with you.

And so can you state on the record that you believe affirmatively that these aversive techniques are no longer used and have not been used in connection with conversion therapy, SOCE, whatever you want to use, in the United States of America?

MR. GANNAN: Objection. Vague.

Page 210

BY MR. WILLIAMS:

Q. To your knowledge, sir.

A. I cannot think of an exception with regards to any of my colleagues that I know through the Alliance or just professional circles that these are techniques that are in use.

Q. Today?

A. Yes, today and probably for decades.

Q. Okay.

(A discussion was held off the record.)

MR. WILLIAMS: After consultation with my colleague, Ms. Robbins, I have no further questions. Doctor, thank you very much for your efforts today. It's been a long day, and I appreciate you willing to talk to me.

THE WITNESS: Thank you.

MR. GANNAN: Dr. Rosik will read and sign.

STIPULATION

It was stated by counsel that the exercise of reading and signing the transcript would not be waived.

(WHEREUPON, the taking of the deposition was concluded at 3:45 p.m.)

Page 211

CERTIFICATE OF OATH

STATE OF FLORIDA )
COUNTY OF HILLSBOROUGH )

************************

I, ELSA HERNANDEZ, FPR, Notary Public, State of Florida, certify that the witness CHRISTOPHER ROSIK, Ph.D., who produced a driver's license for identification, personally appeared before me and was duly sworn.

WITNESS my hand and official seal this date: 29th day of July, 2019.

-------------------------------
ELSA HERNANDEZ, FPR
Notary Public, State of Florida
Commission No. FF897203
Expires 9/30/2019

Page 212

CERTIFICATE OF REPORTER

STATE OF FLORIDA )
COUNTY OF HILLSBOROUGH )

I, ELSA HERNANDEZ, FPR, Court Reporter, and Notary Public, do hereby certify that I was authorized to and did stenographically report the deposition of CHRISTOPHER ROSIK, Ph.D.; that a review of the transcript was requested; and that the foregoing transcript, pages 1 through 209, is a true record of my stenographic notes.

I FURTHER CERTIFY that I am not a relative, employee, or attorney, or counsel of any of the parties' attorneys or counsel connected with the action, nor am I financially interested in the action.

DATED this 12th day of August, 2019.

------------------------
ELSA HERNANDEZ, FPR
Notary Public

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

ERRATA SHEET

IN RE: ROBERT L. VAZZO v. CITY OF TAMPA
CASE NO: 8:17-cv-02896-WFJ-AAS
DATE TAKEN: July 29, 2019
DEPOSITION OF: CHRISTOPHER ROSIK, Ph.D.

DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

Please sign, date, and return this sheet to our office. If additional lines are required for corrections, attach additional sheets.

At the time of the reading and signing of the deposition, the following changes were noted:

PAGE LINE CHANGE REASON

______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________
______________________________________________

Under penalties of perjury, I declare that I have read my deposition and that it is true and correct subject to any changes in form or substance entered here.

SIGNATURE OF DEPONENT: ________________________

DATE: ____________________

August 12, 2019

ROGER K. GANNAM, ESQUIRE
HORATIO G. MIHET, ESQUIRE
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854
hmihet@lc.org

In Re: Vazzo v City of Tampa

Dear Mr. Gannam:

Enclosed please find the original errata page with your copy of the transcript so Dr. Rosik may read and sign. Please have him make whatever changes are necessary on the errata page and sign it. Please make a copy of the errata page and place it in your copy of the transcript. Please then forward the original errata page back to our office at 101 South Franklin Street, Suite 101, Tampa, Florida 33602.

If the errata page is not signed by the witness within 30 days after this letter has been furnished, we will then process the transcript without a signed errata page. If your client wishes to waive their right to read and sign, please have her sign on the signature line at the bottom of this letter and send it back to our office.

Your prompt attention to this matter is appreciated.

Sincerely,

Elsa Hernandez, FPR
Anthem Reporting

I do hereby waive my signature

_________________________
CHRISTOPHER ROSIK, Ph.D.

Cc:

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
c4c595dd-fed5-4497-8306-b61938179b09

Mary E. McAlister SB# 148570
Mathew D. Staver*
Stephen M. Crampton*
Rena M. Lindevaldsen*
Liberty Counsel
P.O. Box 11108
Lynchburg, VA 24506
(434) 592-7000 (telephone)
(434) 592-7700 (facsimile)
court@lc.org Email
Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
SACRAMENTO DIVISION

DAVID PICKUP, CHRISTOPHER H. ROSIK, PH.D., JOSEPH NICOLOSI, PH.D, ROBERT VAZZO, NATIONAL ASSOCIATION FOR RESEARCH AND THERAPY OF HOMOSEXUALITY (NARTH), AMERICAN ASSOCIATION OF CHRISTIAN COUNSELORS (AACC), JOHN DOE 1, by and through JACK AND JANE DOE 1, JACK DOE 1, individually, and JANE DOE 1, individually,
JOHN DOE 2, by and through JACK AND JANE DOE 2, JACK DOE 2, individually, and JANE DOE 2, individually

Case No.:2:12-cv-04297-KJM-EFB

Plaintiffs

v.

EDMUND G. BROWN, Jr., Governor of the State of California, *in his official capacity*, ANNA M. CABALLERO, Secretary of the California State and Consumer Services Agency, *in her official capacity*, KIM MADSEN, Executive Officer of the California Board of Behavioral Sciences, *in her official capacity*, MICHAEL ERICKSON, PH.D, President of the California Board of Psychology, *in his official capacity*; SHARON LEVINE, President of the Medical Board of California, *in her official capacity*.

Defendants.

EXHIBIT 1
Deponent: Rosik
Depo Date: 7/29/19
Reporter: E. Hernandez
Anthem Reporting, LLC

I, Dr. Christopher Rosik, hereby declare as follows:

1. I am over the age of eighteen years and am one of the Plaintiffs in this action. The statements in this Declaration are true and correct and if called upon to testify to them I would and could do so competently.

2. I am submitting this Declaration in rebuttal to the Declarations submitted by the State of California when filing their Memorandum in opposition to Plaintiffs Motion for a Preliminary Injunction.

3. I am a Phi Beta Kappa graduate of the University of Oregon's honors college and graduated with a Bachelor of Arts in Psychology in 1980. I also studied one semester at the University of Copenhagen, Denmark while completing my undergraduate work. I received my Master of Arts degree in Theological Studies from the Fuller Graduate School of Psychology, Fuller Theological Seminary in 1984. I received a Doctor of Philosophy degree in Clinical Psychology from the Fuller Graduate School of Psychology, Fuller Theological Seminary in 1986. I am a clinical psychologist licensed by the State of California and have been so licensed since 1988. (A copy of my curriculum vitae is attached as Exhibit A).

4. My practice is located at the Link Care Center, which is a religious non-profit foundation in Fresno, California. Link Care Center employs a staff of twelve clinicians, which include psychologists, marriage and family therapists, a social worker, and an intern, and it employs two pastoral counselors. The majority of Link Care Center's clients come to the facility because of its Christian identity and their trust that their Christian values and beliefs will be represented in treatment. I served as the Clinical Director for Link Care Center Counseling Center from 1996-1999.

5. Since 2001, I have also been on the clinical faculty of Fresno Pacific University, and I teach psychology research practicum every year. I have published over 40 articles and book chapters in peer reviewed journals, many of them on the subject of homosexuality. I am a member of the American Psychological Association and have been a member in good standing since 1984; a member of the International Society for the Study of Trauma and Dissociation and have been a member in good standing since 1992; and member and former-president and board member of the Christian Association of Psychological Studies, Western Region; and am the current President of the National Association for Research and Therapy of Homosexuality.

**The Objectivity of the APA Task Force Report on SOCE is Demonstrably Suspect; Therefore the Task Force's Representation of the Relevant Literature Concerning the Efficacy of and Harm from SOCE is neither Complete nor Definitive**

6. Although many qualified psychologists were nominated to serve on the Task Force, they were rejected because they did not align with the one-sided view of the Task Force. This fact was noted in a book co-edited by a past-president of the American Pyschological Association (APA) (Yarhouse, 2009) (A copy of a bibliography of all cited studies is attached as Exhibit B). The director of the APA's Lesbian, Gay and Bisexual Concerns Office, Clinton Anderson, offered the following defense: "We cannot take into account what are fundamentally negative religious perceptions of homosexuality—they don't fit into our world view." (Carey, 2007). It appears that the APA operated with a litmus test when considering Task Force membership—the only views of homosexuality that were tolerated are those that uniformly endorsed same-sex behavior as a moral good. Thus from the outset of the Task Force, it was predetermined that religious or other viewpoints would only be acceptable when they fit within their pre-existing worldview. One example of this is the Task Force's failure to recommend any religious resources that adopt a traditional or conservative approach to addressing conflicts

between religious beliefs and sexual orientation. This bias can hardly be said to respect religious diversity and had predictable consequences for how the Task Force addressed its work.

7. This bias was particularly evident in the Task Force's highly uneven implementation of standards of scientific rigor in the utilization and evaluation of published findings pertaining to SOCE (Jones, et al., 2010). Of particular note is the contrast between the exceptionally rigorous methodological standards applied to SOCE outcomes and the considerably less rigorous and uneven standards applied to the question of harm. With regard to SOCE outcomes, the Task Force dismisses most of the relevant research because of methodological limitations, which are outlined in great detail (Task Force, 2009, pp. 26-34). Studies pertaining to SOCE outcomes that fall short of the Task Force's rigorous standards are deemed unworthy of examination and dismissed as containing no evidence of value to the questions at hand. Meanwhile, the Task Force appears to adopt very different evidentiary standards for making statements about harms attributed to SOCE. The standard as regards efficacy is to rule out substandard studies as irrelevant; however, no such standards are employed in considering studies purporting to document harm. In addition, the Task Force uses the absence of evidence to argue that SOCE is unlikely to produce change and thus strongly questions the validity of SOCE, but shows no parallel reticence to endorse affirmative therapy despite acknowledging that, "…it has not been evaluated for safety and efficacy" (Task Force, 2009, p. 91).

8. The six studies deemed by the Task Force to be sufficiently methodologically sound to merit the focus of the Task Force targeted samples that would bear little resemblance to those seeking SOCE today and used long outdated methods that no current practitioner of SOCE employs. This brings into question the Task Force's willingness to move beyond scientific

agnosticism (i.e., that we do not know the prevalence of success or failure in SOCE) to argue affirmatively that sexual orientation change is uncommon or unlikely. The Task Force seems to affirm two incompatible assertions: (a) we do not have credible evidence on which to judge the likelihood of sexual orientation change and (b) we know with scientific certainty that sexual orientation change is unlikely. However, the absence of conclusive evidence of effectiveness is not logically equivalent to positive evidence of ineffectiveness (Altman & Bland, 1995).

9. There are places where the Task Force does seem to acknowledge that, given their methodological standards, we really cannot know anything scientifically definitive about the efficacy of or harms attributable to SOCE. For example, the Task Force states, "Thus, we cannot conclude how likely it is that harm will occur from SOCE." (Task Force, 2009, p. 42). Similarly the Task Force observes, "Given the limited amount of methodologically sound research, we cannot draw a conclusion regarding whether recent forms of SOCE are or are not effective" (Task Force, p. 43). The Task Force argues at length that only the most rigorous methodological designs can clearly establish a causal relationship between SOCE methods and subsequent change, but the Task Force does not hesitate to make such causal attributions consistently regarding harm while repudiating any such claims for efficacy. From this highly uneven application of literature review methodology, the Task Force goes on to assert confidently that success of SOCE is unlikely and that SOCE has the potential to be harmful. It is also telling that in subsequent references to the Task Force the potential for harm has morphed into "the potential to cause harm to *many* clients" (APA, 2012, p. 14) (emphasis added) and a "*substantial* risk of harm" (Beckstead Decl, p. 10) (emphasis added). The harms from SOCE appear to grow greater the farther away one gets from the original Task Force's conclusions.

10. That the Task Force utilized a far lower methodological standard in assessing harm and other aspects of the science than it did in assessing SOCE outcomes can be demonstrated by a few examples. Echoing the Task Force, Herek (Herek Decl., pp. 12-13) references the many varieties of methodological problems deemed sufficient to render useless most of the SOCE research. Yet the Task Force and scholars such as Herek seem ready to overlook such limitations when the literature addresses preferred conclusions. Consider the work of Hooker (1957), which is routinely touted as groundbreaking in the field and affirmed by the Task Force and other APA publications as evidence indicating no differences in the mental health of heterosexual and gay men. However, this research contains such serious methodological flaws that it is inconceivable an even-handed methodological evaluation by the Task Force would have not have mentioned these problems. Among the many methodological problems noted by Schumm (2012), the control group was told the purpose of the study in advance, clinical experts were not blind to the objectives of the study, imperfect matching of participants, low scale reliability, the use of a small and recruited control group rather than existent national standardized norms, the post hoc removal of tests that actually displayed differences, and the screening out of men from the study if they appeared to have pre-existing psychological troubles. As she wrote many years later (Hooker, 1993), "I knew the men for whom the ratings were made, and I was certain as a clinician that they were relatively free of psychopathology." Despite these serious methodological problems, which would never be tolerated by the Task Force were this SOCE research, Herek described this Hooker's study as part of the "overwhelming empirical evidence" that there is no association of sexual orientation with psychopathology (Herek, 1991, p. 143; see also Herek, 2010). The point here is not to argue for such an association, but to underscore that a consistent application of the Task Force

standards Herek affirms should have led to the dismissal of the Hooker study as supportive of the no differences hypothesis.

11. Perhaps the most egregious example of the Task Force's methodological double standard is evidenced in their heavy reliance on the Shildo and Schroeder (2002) and Schroeder and Shidlo (2003) research in conclusions about harm from SOCE. Several methodological problems cited to dismiss the SOCE outcome literature complicate these studies. These studies were conducted in association with the National Gay and Lesbian Task Force, with the explicit mandate to find clients who had been harmed and document ethical violations by practitioners. This was abundantly clear in the study's original title: "Homophobic therapies: Documenting the damage" (See Exhibit C). In addition, over 50% of the 202 sample participants were recruited through the GLB media, hardly a random or generalizable sampling procedure. Only 20 participants in this study were women, creating significant skew toward gay male accounts. These subjects reported their experiences came from a mix of licensed therapists, nonlicensed peer counselors, and religious counselors, leaving open the reasonable suspicion that negative therapeutic experiences might differ significantly by level of training. The study results are thus based on a non-representative sample likely to be heavily biased in the direction of retrospectively reporting negative therapy experiences, some of which occurred decades ago. The Task Force appears to have ignored the warnings from the study's authors: "*The data presented in this study do not provide information on the incidence and prevalence of failure, success, harm, help, or ethical violations in conversion therapy*" (Shildo & Schroeder, 2002, p. 250, emphases original). It is difficult to understand how this research can be cited without qualification or context as demonstrating likely harm from SOCE conducted by licensed professionals. Again, what we can say with confidence is that some SOCE clients report harm

and others report benefit, and we do not know from the literature how often either outcome occurs.

12. A third example of the Task Force's uneven application of methodological standards concerns their conclusion that, "Studies failed to support theories that regarded family dynamics, gender identity, or trauma as factors in the development of sexual orientation" (Task Force, 2009, p. 23). Of the ten studies cited in support of this conclusion, three were not readily accessible on databases and one was a review article, which is an interpretation and not an empirical study. An examination of the remaining six studies (Bell, Weinberg, & Hammersmith, 1981; Freund & Blanchard, 1983; McCord, McCord, & Thurber, 1962; Peters & Cantrell, 1991; Siegelman, 1981; Townes, Ferguson, & Gillem, 1976) revealed many of the same methodological flaws cited in the Task Force critique of SOCE (Rosik, 2012). For example, Beckstead (Decl., p. 3) cites the Freud & Blanchard (1983) study as evidence against any role of family dynamics or trauma in the origin of same-sex attractions but fails to mention this study's methodological problems, including unclear scale reliability, participants being known to the researchers as patients, the use of a convenience sample, and a narrow and therefore non-generalizable sample composition of psychiatric patients. All these problems were considered to be fatal flaws in the Task Force's appraisal of the SOCE outcome literature.

13. Given that many of the methodological limitations used by the Task Force to assail the SOCE research existing in the etiological literature, questions have to be raised as to why they chose to definitively dismiss this literature as "failing to support" developmental theories. It appears, based on the same criteria they used to dismiss SOCE, that their own conclusions have little basis in the literature. A fairer rendering of the etiological literature they reference would appear to be that this research is so methodologically flawed that we cannot

make any conclusive statements concerning the applicability of developmental factors in the origin of homosexuality. Thus by the Task Force's own methodological standards, the literature they cite fails to support *or rule out* a role for these potential developmental influences in the genesis of sexual orientation. If such ambiguity exists in the SOCE literature on methodological grounds, then by the Task Force's own criteria, this ambiguity also is present in the referenced etiological research. It appears that the Task Force has been inconsistent in the application of their methodological critique to the broader literature on homosexuality and they have been willing to offer more definitive conclusions about theories they wish to dismiss than is warranted by their own standards. In a word, there is again the appearance of substantial bias.

14. Contra to the repeated claims of Beckstead and the Task Force that it is an established "scientific fact" that "no empirical studies or peer-reviewed research supports theories attributing same-sex sexual orientation to family dysfunction or trauma" (Task Force, 2009, p. 86), there currently exists recent, high quality, and large-scale studies that provide empirical evidence consistent with potential familial or traumatic contributions to sexual orientation (Bearman & Bruckner, 2002; Francis, 2008, Frisch & Hviid, 2006; Wilson & Widom, 2009). Despite their significant relevance for scientific discussions on the etiology of same-sex attractions, these studies were ignored by the Task Force.

15. A fourth example of uneven methodological implementation of standards is the Report's treatment of the "grey literature," which is dismissed in favor of only peer-reviewed scientific journal articles in the assessment of SOCE. No developed rationale is offered for this choice. Consequently, a highly scholarly study on SOCE supportive of change for some individuals is dismissed in a footnote (Jones & Yarhouse, 20007; the footnote is found on page 90 of the Report). Yet the Task Forces appears to have no compunction in citing the grey

literature on other subjects, such as demographics relating to sexual orientation (Laumann, Gagnon, Michael, & Michaels, 1994) or the issue of psychological and familial factors in the development of sexual orientation (Bell, et al., 1981), even though the latter book utilizes a sample of questionable representativeness.

16. A fifth example of differential application of methodological critique highlights the systemic nature of this problem within the broader literature pertaining to homosexuality. A recent analysis of the 59 research studies cited in the APA's brief supporting same-sex parenting (Marks, 2012) in essence applied methodological standards of similar rigor to those the Task Force applied to the SOCE literature. The study concluded that,

> "…some same-sex parenting researchers seem to have contended for an 'exceptionally clear' verdict of 'no difference' between same-sex and heterosexual parents since 1992. However, a closer examination leads to the conclusion that strong, generalized assertions, including those made by the APA Brief, were not empirically warranted. As noted by Shiller (2007) in American Psychologist, 'the line between science and advocacy appears blurred'" (p. 748).

While Marks' analysis does not focus on SOCE, it is relevant in that it underscores that APA's worldview regarding homosexuality appears to result in public policy conclusions and development (whether right or wrong) that go beyond what the data can reasonably support. This is appears to be precisely what is occurring in the linking of the Task Force with the banning of professional SOCE as represented in SB 1172.

17. A final example of this problem of differential rigor in methodological critique can in fact be found in SB 1172 itself. The bill cites a study by Ryan, Huebner, Diaz, and Sanchez (2009) in the respected journal *Pediatrics*, presumably as its best support for claims that SOCE with minors results in serious harms. It is evident that this study also contains many of the methodological limitations cited by the Task Force to invalidate the SOCE literature, including participants not being blind to the study purposes, likely biases in the participant recruitment

process, and the reliance on self-report measures that had participants recalling experiences from the distant past. Generalization difficulties are also created by the sample composition of Ryan, et al. (2009). The sample is limited to young adult non-Latino and Latino LGB persons. The Task Force (2009) noted that research on SOCE has "...limited applicability to non-Whites, youth, or women" (p. 33) and, "No investigations are of children and adolescents exclusively, although adolescents are included in a very few samples" (p. 33). This means that even had Ryan and colleagues assessed for SOCE backgrounds among participants, it would be inappropriate to generalize their findings in a manner that would cast aspersions on all SOCE experiences of minors, which again is precisely what AB 1172 is determined to do. In addition, Ryan, et al. (2009) acknowledge that "...given the cross-sectional nature of this study, we caution against making cause-effect interpretations from these findings" (p. 351). Presumably, this caution alone should have been enough to prevent the authors of SB 1172 from employing the Ryan study. Even had the study findings been generalizable, they would have not been able to indicate whether SOCE caused the negative health outcomes or if youth with negative health markers disproportionately sought SOCE. Based on this analysis, there appears to be no scientific grounds for referencing the Ryan study as justification for a ban on SOCE to minors. The study's findings, while likely reflecting some underlying connection between family rejection and mental health outcomes, are not reliable and have no scientific justification for being generalized to minors who engage in SOCE with licensed therapists. It is troubling that SB 1172 would utilize Ryan, et al.'s work when the internal and external validity limitations of the study make such claims profoundly misguided, as underscored by the Task Force.

18. The Task Force's concludes that, "None of the recent research (1999-2007) meets methodological standards that permit conclusions regarding efficacy or safety" (Task Force,

2009, p. 2). Taking this statement at face value, which is arguable as noted above, nevertheless only serves to underscore the enduring validity of comments from Zucker (2003), long-time editor of the *Archives of Sexual Behavior*, who observes:

> From a scientific standpoint, however, the empirical database remains rather primitive and any decisive claim about benefits or harms really must be taken with a grain of salt and without such data it is difficult to understand how professional societies can issue any clear statement that is not contaminated by rhetorical fervor. Sexual science should encourage the establishment of a methodologically sound database from which more reasoned and nuanced conclusions might be drawn (p. 400).

A scientific response as opposed to a response based largely on advocacy would pursue research that will allow for more nuanced conclusions about SOCE, not create new law that sets the precedent of placing a blanket prohibition on an entire form of psychological care.

**Spitzer's Reassessment of His 2003 Study on SOCE**

19. Herek understandably pointed out that Robert Spitzer, M.D., author of one of the primary studies conducted on SOCE (Spitzer, 2003), has recently changed his assessment of the study and believes that it does not provide clear evidence of sexual orientation change (Spitzer, 2012; Herek Declaration, p. 14). ). It appears that he may have originally wished to retract the 2003 study, but the editor of the journal in which the study was published, Kenneth Zucker, Ph.D., denied this request. Zucker has been quoted regarding his exchange with Spitzer as observing:

> You can retract data incorrectly analyzed; to do that, you publish an erratum. You can retract an article if the data were falsified—or the journal retracts it if the editor knows of it. As I understand it, he's [Spitzer] just saying ten years later that he wants to retract his interpretation of the data. Well, we'd probably have to retract hundreds of scientific papers with regard to interpretation, and we don't do that. (Dreger, 2012)

What Zucker is essentially saying is that there is nothing in the science of the study that warrants retraction, so all that is left for one to change is his interpretation of the findings, which is what

Spitzer appears to have done. Spitzer's change of interpretation hinges on his new belief that reports of change in his research were not credible, an assertion made by others at the time of the study. Instead, he now asserts that participant's accounts of change were "self-deception or outright lying" (Spitzer, 2012).

20. It is curious that Spitzer's (2012) apology seems to imply that he earlier claimed his researched proved the efficacy of SOCE. As was understood at the time, the design of Spizter's study ensured his research would not definitively *prove* that SOCE can be effective. Certainly it did not prove that all gays and lesbians can change their sexual orientation or that sexual orientation is simply a choice. The fact that some people inappropriately drew such conclusions appears to be a factor in Spitzer's reassessment. Yet the fundamental interpretive question did and still does boil down to one of plausibility: Given the study limitations, is it *plausible* that some participants in SOCE reported actual change?

21. Since nothing has changed regarding scientific merit of the Spitzer's study, the interpretive choice one faces regarding the limitations of self-report in this study also remains. Either all of the accounts across all of the measures of change across participant and spousal reports are self-deceptions and/or deliberate fabrications, or they suggest it is possible that some individuals actually do experience change in the dimensions of sexual orientation. Good people can disagree about which of these interpretive conclusions they favor, but assuredly it is not unscientific or unreasonable to continue to believe the study supports the plausibility of change.

22. In fact, the reasonableness of this position has been bolstered recently by the willingness of some of the participants in Spitzer's research to speak up in defense of their experience of change (Armelli, Moose, Paulk,& Phelan, in press). They expressed clear disappointment in Spitzer's new claims:

> Once thankful to Spitzer for articulating our experience and those of others, we are now blindsided by his "reassessment," without even conducting empirical longitudinal follow-up. We know of other past participants who also feel disappointed that they have been summarily dismissed. Many are afraid to speak up due to the current political climate and potential costs to their careers and families should they do so.

It seem clear, then, that unless one postulates initial and ongoing self-deception and fabrication by participants to an incredulous degree, Spitzer's study still has something to contribute regarding the possibility of change in sexual orientation.

**How Enduring is Sexual Orientation?**

23. Herek contends that sexual orientation is an enduring trait (Herek Decl., pp. 5-6), and by implication that it cannot be changed, which would indicate the futility of change attempts, including among minors. However, there is solid data to suggest this understanding is by no means universally accurate. The definitive study by Laumann, et al. (1994), cited by both the Task Force and Herek, involved hundreds of thousands of American adults between the ages of 18 and 60. This report contains the most careful and extensive database ever obtained on the childhood experiences of matched homosexual and heterosexual populations.

24. One of the major findings of the Lauman, et al. study, which even surprised the authors, was that homosexuality as a fixed trait scarcely even seemed to exist (Laumann, Michael, and Gagnon, 1994). Sexual identity is not the least fixed at adolescence but continues to change over the course of life. For example, the authors report

> ...this implies that almost 4 percent of the men have sex with another male before turning eighteen but not after. These men, who report same-gender sex only before they turned eighteen, not afterward, constitute 42 percent of the total number of men who report ever having a same-gender experience. (Laumann, Gagnon, et al., p. 296)

They also note that their findings comport well with other large-scale studies.

> [O]verall we find our results remarkably similar to those from other surveys of sexual behavior that have been conducted on national populations using probability sample methods. In particular two very large-scale surveys...one in France [20,055 adults] and one in Britian [18,876 persons]. (p. 297)

25. This data seem to suggest that heterosexuality is normative even for those who at one point in the past reported minority sexual orientation. Heterosexuality appears to exert a constant, normative pull throughout the life cycle upon everyone. While admittedly Laumann attributes this reality to American society, the same findings have been found in other societies where it has been studied. A simpler explanation might look to human physiology, including the physiology of the nervous system, which is overwhelmingly sexually dimorphic, i.e, heterosexual. Therefore it is not surprising that the brain would self-organize behavior in large measure in harmony with its own physiological ecology, even if not in a completely deterministic fashion. Whether measures by action, feeling, or identity, Laumann, Gagnon, et al.'s (1994) data concerning the prevalence of homosexuality before age 18 and after age 18 reveal that its instability over the course of life was unidirectional and reflected significant decline. This evidence of spontaneous change with the progression of time among both males and females is hardly a picture of sexual orientation stasis in adolescence that SB 1172 assumes. To be fair, we cannot tell from this data how many, if any, of those reporting change pursued SOCE. However, the data do provide a developmental context for the plausibility that SOCE could aide some individuals (including minors) in modifying same-sex attractions and behavior. It appears that the most common natural course for a young person who develops a homosexual identity is for it to spontaneously disappear unless that process is discouraged or interfered with by extraneous factors. Conceivably, therapies unlike SOCE that obstruct this process could be interfering with normal sexual development.

26. A New Zealand study by Dickson, Paul, and Herbison (2003) further brings into question the claim that change might affect same-sex *behavior* but not same-sex *attraction*. This study found large and dramatic drops in homosexual attraction that occurred spontaneously for both sexes. Interestingly, the results also indicated a slight but statistically significant net movement toward homosexuality and away from heterosexuality between the ages of 21 and 26, which suggests the influence of environment on sexual orientation, particularly for women. Specifically, it appears likely that the content of higher education in a politically liberal environment contributed to the upswing in homosexuality in this educated sample of twenty-somethings. This notion is further supported by the fact that this increase in homosexuality follows a much larger decrease that would have had to taken place in the years prior to 21 in order to account for the above findings. Furthermore, once the educational effect wears off, the expected decline in homosexual identification resumed. The authors conclude that their findings are consistent with a significant (but by no means exclusive) role for the social environment in the development and expression of sexual orientation.

27. A large longitudinal study by Savin-Williams and Ream (2007) is also noteworthy as it focuses on the stability of sexual orientation components for adolescents and young adults. Three waves of assessment began when participants were on average just under 16 years of age and concluded when participants were nearly 22 years old. The authors observed a similar decline in homosexuality over the time of the study: "All attraction categories other than opposite-sex were associated with a lower likelihood of stability over time" (p. 389). For example, 16 year olds who reported exclusive same-sex attractions or a bisexual pattern of attractions are approximately 25 times more likely to change toward heterosexuality at the age of 17 than those with exclusively opposite sex attractions are likely to move towards bisexual or

exclusively same-sex (Whitehead & Whitehead, 2010). Ninety-eight percent of 16 to 17 year olds moved from homosexuality or bisexuality towards heterosexuality over the course of the study. To be fair, such changes were more pronounced among bisexuals and women. But keep in mind that SB 1172 does not discriminate in its prohibition between SOCE provided for exclusively same-sex attracted minors and those whose unwanted same-sex attractions are part of a bisexual attraction pattern. Nor does SB 1172's ban distinguish between boys and girls. Savin-Williams and Ream observed that, "The instability of same-sex attraction and behavior (plus sexual identity in previous investigations) presents a dilemma for sex researchers who portray nonheterosexuality as a stable trait of individuals" (p. 393). They acknowledge that developmental processes are involved even as they focus mostly on problems with measurement. The reality of such spontaneous changes in sexual orientation among teenagers is not in accord with SB 1172 whose defenders contend sexual orientation is a universally enduring trait. In fact, these data suggest it is irresponsible to legally prevent access to SOCE and only allow affirmation of same-sex feelings in adolescence on the grounds that the feelings are intrinsic, unchangeable, and therefore the individual can only be homosexual.

28. Finally in this regard, it is instructive to observe what Herek did not tell us about his 2005 survey findings (Herek et al., 2006; Herek Decl., p. 6). He reported that "only" 7% of gay men reported experiencing a small amount of choice about their sexual orientation and slightly more than 5% reported having a fair amount or great deal of choice. Lesbian woman reported rates of choice at 15% and 16%, respectively. It is worth noting that these statistics, which are not inconsequentially small, do suggest that sexual orientation is not immutable for all people and again suggest the plausibility that modification of same-sex attractions and behaviors could occur in SOCE for some individuals. Even more important, however, is what Herek failed

to disclose: 22% of male bisexuals and 15% of female bisexuals report having a small amount of choice about their sexual orientation and 40% of bisexual males and 44% of bisexual females reported having a fair amount or great deal of choice. These numbers create a significantly different impression about the enduring nature sexual orientation than the picture painted by Herek. If such a large minority of individuals (albeit mostly bisexuals) experience a self-determinative choice as being involved in the development of their sexual orientation, why would it not be conceivable that SOCE might augment this process for some individuals with unwanted same-sex attractions and behaviors?

**Stigma, Discrimination, and SOCE**

29. Defenders of SB 1172 frame a significant degree of their arguments concerning harm and SOCE on the negative consequences of stigma and discrimination. While these factors certainly can have deleterious consequences for those with minority sexual orientation, this possibility must be balanced by additional considerations. First, stigma and discrimination alone do not appear to be the complete explanation for greater psychiatric and health risks. Several examples can illustrate this point. Mays and Cochran (2001) reported that discrimination experiences attenuated but did not eliminate associations between psychiatric morbidity and sexual orientation. Men with same-sex attractions and behaviors were found to have a higher risk for suicidal ideation and acute mental and physical health symptoms than heterosexual men in Holland, despite that country's highly tolerant attitude towards homosexuality (Sandfort, Bakker, Schellevis, & Vanwesenbeeck, 2006; de Graaf, Sandfort, & ten Have, 2006). Differential rates of health problems resulted from sexual orientation-related differences in coping styles among men, with an emotion-oriented coping style mediating the differences in mental and physical health

between heterosexual and homosexual men (Sandfort, Bakker, Schellevis, & Vanwersenbreeck, 2009).

30.    Second, some health risks, such as HIV transmission among gay men, may be influenced by stigma but are ultimately grounded in biological reality. A recent comprehensive review suggested just this conclusion, finding an overall 1.4% per-act probably of HIV transmission for anal sex and a 40.4% per-partner probability (Beyer, et al., 2012). The authors noted, "The 1.4% per-act probability is roughly 18-times greater than that which has been estimated for vaginal intercourse" (p. 5). Recent CDC statistics indicate the rate of new HIV diagnoses in the United States among men who have sex with men is more than 44 times that of other men (CDC, 2011). Sharing such information with prospective SOCE clients is not inherently manipulative but rather, when balanced with other considerations, constitutes an ethically obligated aspect of informed consent.

31.    Third, and perhaps most importantly, the lessening of stigma associated with "coming out" need not imply an affirmation of a gay, lesbian, or bisexual identity or the enactment of same-sex behavior. SOCE practitioners often encourage the client's acceptance of his or her unwanted same-sex attractions and the disclosure of this reality with safe others as a potential aid in the pursuit of change or, in cases where change does not occur, behavioral management of sexual identity. This typically occurs when clients desire to live within the boundaries of their conservative religious values and beliefs. SB 1172 would eliminate this potential means of reducing the effects of stigma and consequently prevent clients from one means of prioritizing their religious values above their same-sex attractions when these factors are in conflict. The contention that a desire to modify same-sex attractions and behaviors can

only be an expression of self-stigma reflects a serious disregard for and misunderstanding of conservative religious and moral values (Jones, et al., 2010).

32. While stigma and discrimination are real concerns, they are not universal explanations for greater psychiatric and health risks among sexual minorities, some of which are likely to be grounded in the biology of certain sexual practices. Moreover, the effects of stigma and discrimination can be addressed significantly within SOCE for many clients, though this is no doubt hard for those not sharing the religious values of SOCE consumers to comprehend. There is no longitudinal research involving consumers of SOCE that link the known effects of stigma and discrimination to the practice of SOCE. SOCE is simply *ipso facto* presumed to constitute a form of stigma and discrimination. This is in keeping with the unfavorable manner in which SOCE is portrayed by the mental health associations. SOCE practitioners and consumers are associated with poor practices as a matter of courses (Jones, et al, 2010; APA, 2009), despite that fact that they have developed their own set of practice guidelines that, when followed, can be expected to reduce the risk of harm to SOCE consumers (NARTH, 2010).

**Concluding Statements**

33. There should be no doubt that licensed mental health professionals who practice some form SOCE care deeply about the well-being of sexual minority youth and see SOCE as a valid option for psychological care, while simultaneously affirming as well the client's right to pursue gay affirmative forms of psychotherapy. While it is not possible here to respond to all the accusations that have been made regarding SOCE, the information in the present declaration should be sufficient to question the scientific (not to mention constitutional) merits of SB 1172.

34. As outlined above, there is evidence to reasonably suggest that professional associations such as the APA do not approach the SOCE literature in an objective manner but

rather with an eye to their advocacy interests. This is seen in the purposeful exclusion of conservative and SOCE sympathetic psychologists from the APA Task Force as well as the clearly uneven application of methodological standards in assessing evidence of SOCE efficacy and harm. As the Task Force noted, the prevalence of success and harm from SOCE cannot be determined at present. Anecdotal accounts of harm, which are a focal point of attention by supporters of SB 1172, cannot serve as a basis for the blanket prohibition of an entire form of psychological care, however meaningful they may be on a personal level. Furthermore, such accounts cannot tell us if the prevalence of reported harm from SOCE is any greater than that from psychotherapy in general, where research demonstrates 5-10% of clients report deterioration while up to 50% experience no reliable change during treatment (Hansen, Lambert, & Forman, 2002; Lambert & Ogles, 2004).

35. The normative occurrence of spontaneous change in sexual orientation among youth, the nontrivial degree of choice reported by some in the development of sexual orientation, and the questionable blanket application of the literature on stigma and discrimination to SOCE further bring into question the appropriateness of SB 1172. Sexual orientation is not a stable and enduring trait among youth, and this lends plausibility to the potential for professionally conducted SOCE to assist in change in unwanted same-sex attraction and behaviors with some minors. Granted, research is needed to confirm this suspicion. However, it should be mentioned in this regard that SB 1172 would make further research on SOCE with minors impossible in California, despite the APA Task Force's clear mandate that such research be conducted (Task Force, 2009).

36. Any genuine harm that results from SOCE practice with minors can most appropriately be remedied by the application of ethical principles of practice, including informed

consent, and addressed through the existing oversight functions of state regulatory boards and state mental health associations. One has to wonder: if the tangible, prosecutable harms from SOCE are as widespread as SB 1172 sponsors claim, why have we heretofore not seen SOCE practitioners losing their licenses and mental health association memberships? SB 1172 is a legislative overreach (*LA Times*, 2012) that takes an overly broad and absolute approach to SOCE harm and success despite evidence suggesting age, gender, and sexual minority orientation differences in the experience and degree of change in sexual orientation. In particular, it is fair to ask whether bisexual youth are well served by SB 1172, a distinction the bill does not make.

37. The religiously conservative faith community will not be well served if SOCE among minors is judged *never* to be an appropriate modality for psychological care, especially when the affirmative interventions include the "correction of the client's false assumptions." (Beckstead Decl., p. 6). Should the court agree with this line of argument, then the court is unconstitutionally taking a stand on the validity of certain forms of religious belief. By implying that there is always a better method than any form of SOCE, backers of SB 1172 presume to know what form of psychological care for unwanted same-sex attractions and behaviors is best for the religiously motivated minor clients and their parents. Neither the courts nor the APA should be substituting their judgment for that of a 17-year old who is calculating a cost-benefit analysis in deciding whether to undergo SOCE despite the risks. The APA is quite clear that it supports the competence of a 17-year old girl to give consent to an abortion. Why does the 17-year old lose competence when it comes to SOCE? Similarly, the APA is on record as supporting the availability of sexual reassignment surgery for adolescents (APA, 2008). Should one 17-year old be allowed to surgically remove genitalia while another with unwanted same-sex attractions

and behavior not be allowed to seek change in the dimensions of sexual orientation? This question is especially relevant in light of recent high quality longitudinal research that suggests such surgery does not remedy high rates of morbidity and mortality among these individuals (Dhejne, et al., 2011).

38. The Task Force Report (Task Force, 2009), and the mental health associations that subsequently relied on it for their resolutions on SOCE, provide one viewpoint into research and reasoning that may some merit but must be considered incomplete and therefore not definitive enough to justify a complete ban on SOCE with minors. Currently, there is a lack of sociopolitical diversity within mental health associations (Redding, 2001), which has an inhibitory influence on the production of scholarship in controversial areas such as SOCE that might run counter to preferred worldviews and advocacy interests. An authentically scientific approach to a contentious subject must proceed in a different direction in order to give confidence that the relevant database is a sufficiently complete one on which to base public policy:

> Fostering hypothesis competition and a heterogeneity of views and methods can simultaneously serve the search for the truth and the search for the good. But there is a pressing need to better articulate the boundary between adversarialism and what might be called heterogeneous inquisitorialism—a partnership of rigorous methodological standards, a willingness to tolerate uncertainty, a relentless honesty, and the encouragement of a diversity of hypotheses and perspectives" (MacCoun, 1998, pp.281-282)

A truly scientific response to the concerns of the sponsors of SB 1172 would be to encourage bipartisan research into SOCE with minors that could provide sound data to answer questions of harm and efficacy that currently are only primitively understood. SOCE practitioners would assuredly embrace such an opportunity (Jones, et al., 2010). Unfortunately, the approach taken by SB 1172 sponsors represented only one (political and legislative) perspective on how to best

address the challenges that come with the psychological care of unwanted same-sex attractions and behaviors. It is therefore a scientifically premature curtailment of the rights of SOCE consumers, their parents, and their therapists and should not be allowed to stand.

39. I declare under penalty of perjury of the laws of the United States and California that the foregoing statements are true and accurate.

Executed this 16th day of November, 2012

Christopher Rosik

**Christopher Hastings Rosik**
1734 W. Shaw Avenue
Fresno, California 93711

**I. Education.**

B. A. University of Oregon (Honors college), Eugene, Oregon, 1980 (psychology).
M.A. Fuller Theological Seminary, Pasadena, California, 1984 (theological studies).
Ph.D. Fuller Graduate School of Psychology, Pasadena, California, 1986 (clinical psychology - APA approved program).

**II. Honors.**

Phi Beta Kappa, Alpha of Oregon, 1980.

**III. Professional Experiences.**

| | |
|---|---|
| 9/85 - 8/ 86 | Clinical psychology intern, Camarillo State Hospital, Camarillo, California (APA approved internship). |
| 11/86 - 5/88 | Postdoctoral intern, Link Care Center, Fresno, California. |
| 5/88 - Present | Licensed clinical psychologist, Link Care Center, Fresno, California. |
| 11/94 - 6/96 | Assistant Clinical Director, Link Care Center, Fresno, California. |
| 7/96 - 12/99 | Clinical Director, Link Care Center, Fresno, California. |
| 1/01 – Present | Clinical Faculty, Fresno Pacific University |
| 3/05 - Present | Director of Research, Link Care Center, Fresno, California |

**V. Professional Affiliations.**

| | |
|---|---|
| 1/84 - Present | Member, American Psychological Association. |
| 1/92 - Present | Member, International Society for the Study of Dissociation. |

**IV. Selected Publications.**

Rosik, C.H. (1989). The impact of religious orientation on conjugal bereavement among older adults. International Journal of Aging and Human Development, 28, 251-260.

Rosik, C.H. (1992). Multiple personality disorder: An introduction for pastoral counselors. The Journal of Pastoral Care, 46, 291-298.

Rosik, C.H. (1993). Mission-affiliated versus non-affiliated counselors: A brief research report on missionary preferences with implications for member care. Journal of Psychology and Christianity, 12, 159-164.

Ritchey, J.K., & Rosik, C.H. (1993). Clarifying the interplay of developmental and contextual factors in the counseling of missionaries. Journal of Psychology and Christianity, 12, 151-158.

Rosik, C.H. (1995). The misdiagnosis of MPD by Christian counselors: Vulnerabilities and safeguards. Journal of Psychology and Theology, 23, 72-86.

Rosik, C.H. (1995). The impact of religious orientation in conjugal bereavement among older adults. In J. Hendricks (Ed.), The Ties of Later Life (pp. 87-96). New York: Baywood Publishing Company.

Rosik, C.H. (1997). Geriatric Dissociative Identity Disorder. Clinical Gerontologist, 17, 63-66.

Rosik, C.H., & Killbourne-Young, K. (1999).  Dissociative disorders in adult missionary kids: Report on five cases.  Journal of Psychology and Theology, 27, 163-170.

Rosik, C.H. (2000). Utilizing religious resources in treating dissociative trauma symptoms: Rationale, current status, and future directions. Journal of Trauma and Dissociation, 1, 69-89.

Rosik, C. H. (Ed.) (2000). Dissociative Identity Disorder [Special Issue]. Journal of Psychology and Christianity, 19(2).

Rosik, C.H. (2000).  Some effects of world view on the theory and treatment of DID. Journal of Psychology and Christianity, 19, 166-180.

Brown, S. W., Gorsuch, R. L., Rosik, C. H., & Ridley, C. R. (2001). The development of a forgiveness scale.  Journal of Psychology and Christianity, 20, 40-52.

Rosik, C. H., & Brown, R. K. (2001). Professional Use of the Internet: Legal and Ethical Issues in a Member Care Environment. Journal of Psychology and Theology, 29, 106-120.

Rosik, C. H. (2004). Possession Phenomena in North America: A Case Study Exploration with Ethnographic, Psychodynamic, Religious, and Clinical Implications. Journal of Trauma and Dissociation, 5, 49-76.

Rosik, C. H., Richards, A., & Fannon, T. (2005).  Member care experiences and needs: Findings from a study of East African missionaries. Journal of Psychology and Christianity, 24, 36-45

Rosik, C. H. (2005). Psychiartic symptoms among prospective bariatric patients: Rates of prevalence and their relation to social desirability, pursuit of surgery and follow-up attendance. Obesity Surgery, 15, 677-683.

Rosik, C. H., Griffith, L. K., & Cruz, Z. (2007). Homophobia and conservative religion: Toward a more nuanced understanding. American Journal of Orthopsychiatry, 77, 10-19.

Rosik, C. H. (2007). Ideological concerns in the operationalization of homophobia, Part 1: An analysis of Herek's ATLG-R scale.  Journal of Psychology and Theology, 35, 132-144

Rosik, C. H. (2007). Ideological concerns in the operationalization of homophobia, Part II: The need for interpretive sensitivity with conservatively religious persons. Journal of Psychology and Theology, 35, 134-152.

Rosik, C. H., & Byrd, A. D. (2007).  Marriage and the civilizing of male sexual nature.  American Psychologist, 62, 711-712

Cousineau, A. E., Hall, M. E., Rosik, C. H., & Hall, T. W. (2007). The 16PF and Marital Satisfaction Inventory as predictors of missionary job success. Journal of Psychology and Theology, 35(4), 317-327.

Rosik, C. H., & Pandzic, J. (2008). Marital satisfaction among missionaries: A longitudinal analysis from candidacy to second furlough. Journal of Psychology and Christianity, 27, 3-15.

Rosik, C. H., & Smith, L. L. (2009). Perceptions of religiously-based discrimination among Christian students in a secular versus Christian university setting. Psychology of Religion and Spirituality, 1(4), 207-217.

Rosik, C. H., Summerford, A., & Tafoya, J. (2009). Assessing the effectiveness of intensive outpatient care

for Christian missionaries and clergy. Mental Health, Religion, & Culture, 12, 687-700.

Jones, S. L., Rosik, C. H., Williams, R. N., & Byrd, A. D. (2010). A Scientific, Conceptual, and Ethical Critique of the Report of the APA Task Force on Sexual Orientation. The General Psychologist, 45(2), 7-18.

Cousineau, A.E., Hall, M.E.L, Rosik, C.H., & Hall, T.W. (2010). Predictors of missionary job success: A review of the literature and research proposal. Journal of Psychology and Christianity, 29(4), 354-363.

Rosik, C. H. (2011). Long-Term Outcomes of Intensive Outpatient Psychotherapy for Missionaries and Clergy. Journal of Psychology and Christianity, 30(3), 175-183.

Rosik, C. H., & Soria, A. (2012). Spiritual well-being, dissociation and alexithymia: Examining direct and moderating effects. Journal of Trauma and Dissociation, 13(1), 69-87.

Rosik, C. H., Renteria, T., & Pitman, A. (2012). Psychological Profiles of Individuals Seeking Ordination in the Episcopal or Presbyterian (PCUSA) Churches: Comparisons and Contrasts. Pastoral Psychology, 61(3), 359-373.

Rosik, C. H., & Byrd, A. D. (In press).  Moving back to science and self-reflection in the debate over SOCE. Social Work.

Rosik, C. H., Jones, S. L., & Byrd, A. D. (In press). Knowing what we do not know about sexual orientation change efforts. American Psychologist.

Rosik, C. H., Dinges, L., & Saavedra, N. (2012). *Moral Intuitions and Attitudes toward Gay Men: Can Moral Psychology Add to Our Understanding of Homonegativity?* Manuscript submitted for publication.

References

Altman, D., & Bland, J. M. (1995). Statistics notes: Absene of evidence is not evidence of absence. *British Medical Journal, 311*, 485.

American Psychological Association (2008). *Transgender, gender identity, and gender expression non-discrimination.* Retrieved from http://www.apa.org/about/policy/transgender.espx

American Psychological Association. (2009). *Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation.* Retrieved from http://www.apa.org/pi/lgbt/resources/therapeuticresponse.pdf

American Psychological Association (2012). Guidelines for psychological practice with lesbian, gay, and bisexual clients. *American Psychologist, 67*(1), 10-42. doi: 10.1037/a0024659

Armelli, J. A., Moose, E. L., Paulk, A., & Phelan, J. E. (In press). A response to Spitzer's (2012) reassessment of his 2003 study of reparative therapy of homosexuality. *Archives of Sexual Behavior.*

Bearman, P. S., & Bruckner, H. (2002). Opposite-sex twins and adolescent same-sex attraction. *American Journal of Sociology, 107*, 1179-1205.

Bell, A. P., Weinberg, M., & Hammersmith, S. K. (1981). *Homosexuality: A study of diversity among men and women.* New York: Simon & Schuster.

Beyer, C., Baral, S. D., van Griensven, F., Goodreau, S. M., Chariyalertsak, S., Wirtz, A., and Brookmeyer, R. (2012). Global epidemiology of HIV infection in men who have sex with men. *The Lancet.* Advance online publication. Retrieved from http://dx.doi.org/10.1016/So140-6736(12)60821-6

Carey, D. (2007, September 20). Group to review therapy stance. *Oakland Tribune.* Retrieved from http://findarticles.com/p/articles/mi_qn4176/is_20070711/ai_n19358074

Centers for Disease Control (2011). *HIV and AIDS among Gay and Bisexual Men.* Retrived from http://www.cdc.gov/nchhstp/newsroom/docs/2012/CDC-MSM-0612-508.pdf

de Graaf, R., Sandfort, T. G. M., & ten Have, M. (2006). Suicidality and sexual orientation: differences between men and women in a general population-based sample from the Netherlands. *Archives of Sexual Behavior, 35*, 253-262.

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L. V., Langstrom, N., & Landen, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PLoS ONE, 6*(2), 1-8. doi:10.1371/journal.pone.0016885

Dickson, N., Paul, C., & Herbison, P. (2003). Same-sex attraction in a birth cohort: Prevalence and persistence in early adulthood. *Social Science & Medicine, 56*, 1607-1615.

Dreger, A. (2012, April 11). How to ex and "ex-gay" study. [Web log post]. Retrieved from http://psychologytoday.com/blog/fetishes-i-dont-get/201204/how-ex-ex-gay-study

Francis, A. M. (2008). Family and sexual orientation: The family-demographic correlates of homosexuality in men and women. *Journal of Sex Research, 45,* 371-377.

Freund, K., & Blanchard, R. (1983). Is the distant relationship of fathers and homosexual sons related to the sons' erotic preference for male partners, or to the sons' atypical gender identity, or both? *Journal of Homosexuality, 9*, 7-25.

Frisch, M., & Hviid, A. (2006). Childhood family correlates of heterosexual and homosexual marriages: A national cohort study of two million Danes. Archives of Sexual Behavior, 35, 533-547.

Hansen, N. B., Lambert, M. J., & Forman (2002). The psychotherapy dose-response effect and its implications for treatment delivery services. *Clinical Psychology: Science and Practice, 9*, 329-343. doi: 10.1093/clipsy.9.3.329

Herek, G. M. (1991). Myths about sexual orientation: A lawyer's guide to social science research. *Law and Sexuality, 1*, 133-172.

Herek, G. M. (2010). Sexual orientation differences as deficits: Science and stigma in the history of American psychology. *Perspectives on Psychological Science, 5*, 693-699.

Herek, G. M., Norton, A. T., Allen, T. J., & Sims, C. L. (2006). Demographic, psychological, and social characteristics of self-identified lesbian, gay, and bisexual adults in a US probability sample. *Sexuality Research and Social Policy, 7*, 176-200.

Hooker, E. (1957). The adjustment of the male overt homosexual. *Journal of Projective Techniques, 21*, 18-31.

Hooker, E. (1993). Reflections of a 40-year exploration. *American Psychologist, 48*, 450-453.

James, W. H. (2005). Two hypotheses on the causes of male homosexuality and paedophilia. *Journal of Biosocial Science, 38*, 745-761.

Jones, S. L., Rosik, C. H., Williams, R. N., & Byrd, A. D. (2010). A Scientific, Conceptual, and Ethical Critique of the Report of the APA Task Force on Sexual Orientation. *The General Psychologist, 45*(2), 7-18. Retrieved May 31, 2011, from http://www.apa.org/divisions/div1/news/fall2010/Fall%202010%20TGP.pdf

Jones, S. L., & Yarhouse, M. A. (2007). *Ex-gays?: A longitudinal study of religiously mediated change in sexual orientation.* Downers Grove, IL: InterVarsity Press Academic.

Lambert, M. J., & Ogles, B. M. (2004). *The efficacy and effectiveness of psychotherapy.* New York, NY: Wiley.

Laumann, E. O., Gagnon, J. H., Michael, R. T., & Michaels, S. (1994). *The social organization of sexuality.* Chicago, IL: University of Chicago Press.

Laumann, E. O., Michael, R. T., & Gagnon, J. H. (1994). A political history of the national sex survey of adults. *Family Planning Perspectives, 26*, 34-38.

*Los Angles Times* (May 11, 2012). Bill overkill in Sacramento. Retrieved from http://articles.latimes.com/2012/may/11/opinion/la-ed-0511-therapy-20120511

Marks, L. (2012). Same-sex parenting and children's outcomes: A closer examination of the American Psychological Associations brief on lesbian and gay parenting. *Social Science Research, 41*, 735-751. Retrieved from http://dx.doi.org/10.1016/j.ssresearch.2012.03.006

McCord, J., McCord, W., & Thurber, E. (1962). Some effects of paternal absence on male children. *Journal of Abnormal and Social Psychology, 64*, 361-369.

Marks, L. (2012). Same-sex parenting and children's outcomes: A closer examination of the American Psychological Associations brief on lesbian and gay parenting. *Social Science Research, 41*, 735-751. Retrieved from http://dx.doi.org/10.1016/j.ssresearch.2012.03.006

Mays, V. M., & Cochran, S. D. (2001). Mental health correlates of perceived discrimination among lesbian, gay, and bisexual adults in the United States. *American Journal of Public Health, 91*, 1869-1876.

MacCoun, R. J. (1998). Biases in the interpretation and use of research results. Annual Review of Psychology, 49, 259-87.

National Association for Research and Therapy of Homosexuality. Practice Guidelines for the Treatment of Unwanted Same-Sex Attractions and Behaviors. *Journal of Human Sexuality, 2*, 5-65.

Peters, D. K., & Cantrell, P. J. (1991). Factors distinguishing samples of lesbian and heterosexual women. *Journal of Homosexuality, 2*, 1- 15.

Redding, R. E. (2001). Sociopolitical diversity in psychology. *American Psychologist, 56*, 205-215.

Rosik, C. H. (2012). Did the American Psychological Association's *Report on Appropriate Therapeutic Responses to Sexual Orientation* Apply its Research Standards Consistently? A Preliminary Examination. *Journal of Human Sexuality, 4*, 70-85.

Ryan, C., Huebner, D., Diaz, R. M., & Sanchez, J. (2009). Family rejection as a predictor of negative health outcomes in white and Latino lesbian, gay, and bisexual young adults. *Pediatrics, 123*, 346-352.

Sandfort, T. G. M., Bakker, F., Schellevis, F. G., & Vanwesenbeeck, I. (2006). Sexual orientation and mental and physical health status: Findings from a Dutch Population Survey. *American Journal of Public Health, 96*, 1119-1125.

Sandfort, T. G. M., Bakker, F., Schellevis, F. G., & Vanwesenbeeck, I. (2009). Coping styles as mediator of sexual orientation-related health differences. *Archives of Sexual Behavior, 38*, 253-263. doi:10.1007/s10508-007-9233-9

Savin-Williams, R. C., & ream, G. L. (2007). Prevalence and stability of sexual orientation *components during adolescence and young adulthood. Archives* of Sexual Behavior, 36, 385-349. doi:10.10007/s10508-006-9088-5

Schroeder, M., & Shildo, A., (2002). Ethical issues in sexual orientation conversion therapies. In A. Shildo, M. Schroeder, & J. Drescher (Eds.), *Sexual conversion therapy: Ethical, clinical and research perspectives*. New York: Haworth. Pp.131-166.

Schumm, W. R. (2012). Re-examining a landmark research study: A teaching editorial. Marriage & Family Review, 48, 465-489. doi: 10.1080/01494929.2012.677388

Shildo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumer's report. *Professional Psychology: Research and Practice*, *33*, 249-259.

Siegelman, M. (1981). Parental backgrounds of homosexual and heterosexual men: A cross national replication. *Archives of Sexual Behavior, 10*, 505-513.

Spitzer, R. L. (2003a). Can some gay men and lesbians change their sexual orientation? 200 participants reporting a change from homosexual to heterosexual orientation. *Archives of Sexual Behavior, 32*(5), 403-417.

Spitzer, R. L. (2012). Spitzer reassess his 2003 study of reparative therapy of homosexuality [Letter to the editor]. *Archives of Sexual Behavior*. Advance online publication. doi: 10.1007/s10508-012-9966-y

Townes, B. D., Ferguson, W. D., & Gillam,S. (1976). Differences in psychological sex, adjustment, and familial influences among homosexual and nonhomosexual populations. *Journal of Homosexualitly, 1*, 261-272.

Whitehead, H., & Whitehead, B. (2010). *My genes made me do it! A scientific look at sexual orientation.* Whitehead Associates. Retrieved from http://www.mygenes.co.nz/download.htm

Wilson, H. W., & Widom, C. S. (2010). Does physical abuse, sexual abuse, or neglect in childhood increase the likelihood of same-sex sexual relationships and cohabitation? A prospective 30-year follow-up. *Archives of Sexual Behavior, 39,* 63-74.

Yarhouse, M. (2009). The battle regarding sexuality. In N. C. Cummings, W. O'Donahue, & J. Cummings, Eds. (pp. 63-93). Phoenix, AZ: Zeig, Tucker & Theisen, Inc.

Zucker, K. J. (2003). The politics and science of "reparative therapy." *Archives of Sexual Behavior, 32*(5), 399-401.

# HELP US DOCUMENT THE DAMAGE OF HOMOPHOBIC THERAPIES

In association with the National Lesbian and Gay Health Association, we are conducting research on the outcome of treatments that claim to "cure" homosexuality. Our purpose is to document the damage that we believe occurs when a lesbian, gay or bisexual client receives psychological help from a provider who promises to change a person's sexual orientation.

We are looking for individuals who have experienced such a program and who are willing to talk about it confidentially by telephone, email or by filling out a written survey.

**For more information, please contact Dr. Michael Schroeder and Dr. Ariel Shidlo telephone (212) 353-2558, email gayconvert@aol.com**

IN THE FAMILY April 1996 page 27

***Journal of Human Sexuality***

The *Journal of Human Sexuality* is an academic, peer-reviewed journal, an official publication of the National Association for Research and Therapy of Homosexuality (NARTH).

*Editorial Offices:*

5282 So. Commerce Drive—Suite D272, Murray, UT 84107
Telephone: 1-888-364-4744; E-mail: journal@narth.com; Web: http://www.narth.com

**Editorial Board**

Editor: Philip M. Sutton, PhD
NARTH Officers
Members of NARTH Scientific Advisory Committee
Managing Editor: David C. Pruden, M.S.

**National Association for Research and Therapy of Homosexuality**

5282 So. Commerce Drive—Suite D272, Murray, UT 84107
E-mail: info@narth.com; Web: http://www.narth.com

**Board of Directors**

Christopher Rosik, PhD, President
Julie Harren Hamilton, PhD, Past President
Chauncey Adams, PhD
Michelle Cretella, MD
Anthony Duk, MD
Floyd Godfrey, LPC
Daniel Harrop, MD
Joseph Nicolosi, PhD
Carolyn Pela, PhD
Philip M. Sutton, PhD
David C. Pruden, MS, Executive Director

© Copyright 2013, by the National Association for Research and Therapy of Homosexuality. All rights reserved. Written permission to reprint articles or reproduce materials from this journal for publication, use in the classroom, research, and other scholarly purposes must be requested from journal@narth.com. NARTH reserves the right to deny permission at its sole discretion.

Requests for copies of this journal should be addressed to the National Association for Research and Therapy of Homosexuality, 5282 So. Commerce Drive—Suite D272, Murray, UT 84107 or can be ordered by phone at 1-888-364-4744 or online at http://www.narth.com.

EXHIBIT 2
Deponent: Rosik
Depo Date: 7/24/19
Reporter: E. Hernandez
Anthem Reporting, LLC

# Contents

Editor's Comments ....................................................................................................3

**Papers**

Carolyn Pela, Narrative Therapy and Women with Same-Sex Attraction (SSA): Claiming Lost Stories ....................................................................................9

Lester G. Pretlow, The Impact of Neurophysiologic Development on the Regulation and the Management of Homosexual Impulses .................................24

Neil E. Whitehead, Is First Same-Sex Attraction a Developmental Milestone? ...............37

**Book Review**

Philip M. Sutton and Robert L. Vazzo, What *Did* Make Me Do It? A Review and Summary of Neil Whitehead and Briar Whitehead's *My Genes Made Me Do It!—Homosexuality and the Scientific Evidence* .......................................63

**Documents in Defense of Client and Therapist Rights**

Rosik, Christopher H. (May 7, 2012). California Senate Bill 1172: A Scientific and Legislative Travesty—A Look at the Bill's Misuse of Science.......................83

Rosik, Christopher H. (May 18, 2012). Fact-Checking California Senate Bill 1172—Serious Inaccuracies and Distortions Abound: Are Politicians Willing to Listen?............................................................94

Rosik, Christopher H. (August 15, 2012). The (Complete) Lack of a Scientific Basis for Banning Sexual-Orientation Change Efforts (SOCE) with Minors. ....103

International Federation for Therapeutic Choice (October 1, 2012). IFTC Intervention at OSCE/ODIHR 2012 Human Dimension Implementation Meeting—Warsaw, Poland. ...................................................................112

Rosik, Christopher H. (July 26, 2013). Countering a One-Sided Representation of Science: NARTH Provides the "Rest of the Story" for Legal Efforts to Challenge Antisexual Orientation Change Efforts (SOCE) Legislation.............120

# Editor's Comments

The National Association for Research and Therapy of Homosexuality (NARTH) is a professional and scientific organization founded in 1992. NARTH's mission is to promote and ensure a fair reading and the responsible conduct and reporting of scientific and clinical research about the factors that contribute to and/or co-occur with homosexuality (same-sex attraction and behavior, or SSA) and that allow psychological care to be effective for those with unwanted SSA. NARTH upholds the rights of individuals with unwanted SSA to receive competent professional medical and mental health care and the rights of professionals to offer that care.

In 2009, NARTH launched the *Journal of Human Sexuality* (*JHS*) in service of this mission and as a way of presenting, encouraging, and producing quality clinical and scientific scholarship on these topics. After its inaugural issue, *JHS* also has included articles on other sexual minority issues and on human sexuality in general.

## Same-Sex Attraction is a *Bio-Psycho-Social* Phenomenon

In 2008, the American Psychological Association (APA) published a brochure titled *Answers to Your Questions for a Better Understanding of Sexual Orientation & Homosexuality.*

In this brochure, APA addressed the question of what causes a person to have a particular sexual orientation with this statement:

> There is no consensus among scientists about the exact reasons that an individual develops a heterosexual, bisexual, gay or lesbian orientation. Although much research has examined the possible genetic, hormonal, developmental, social, and cultural influences on sexual orientation, no findings have emerged that permit scientists to conclude that sexual orientation is determined by any particular factor or factors. Many think that nature and nurture both play complex roles. (p. 4)

Reflecting on this statement, which was a significant change from a decade-old APA statement that emphasized the genetic and biological bases of homosexuality, Byrd (2008) noted that APA finally had concluded that "a bio-psycho-social model best fits the data."

Unfortunately, the general public has failed to hear—or at least to understand—that the APA does *not* espouse the belief that persons with SSA are "born that way"! The first volume of the *Journal of Human Sexuality* concluded after a review of public opinion polls that "over the past few decades there has been a clear trend toward the belief that homosexuals are born that way—a belief that is increasing among the general public, as well as in the homosexual community" (NARTH, 2009, p. 44). And a recent Gallup poll reported:

> Currently, 47% of Americans view being gay or lesbian as a sexual orientation individuals are born with, while 33% instead believe it is due to external factors such as upbringing or environment. That 14-percentage-point gap in favor of "nature" over "nurture" is the largest Gallup has measured to date. (May 16, 2013)

Clearly, much education is needed if the public is to come to understand with the APA that "nature and nurture both play complex roles" in the development of SSA. With that goal in mind, volume 5 of the *JHS* offers several articles and a book review. Readers unaware of the range of opinions, theories, and studies about how SSA develops are encouraged to begin with the review and summary of Neil Whitehead and Briar Whitehead's book, *My Genes made Me Do It!* This review/summary tries to simplify what is already an excellent, comprehensive review by the Whiteheads of the scientific and clinical evidence about the bio-psycho-social causes of SSA.

The articles by Lester G. Pretlow ("The Impact of Neurophysiologic Development on the Regulation and the Management of Homosexual Impulses") and by Neil E. Whitehead ("Is First Same-Sex Attraction a Developmental Milestone?")

provide an in-depth examination of questions about how biological factors in particular may influence the development of SSA. Finally, the article by Carolyn Pela—"Narrative Therapy and Women with Same-Sex Attraction (SSA): Claiming Lost Stories"—describes how clinicians may better serve some women but also focuses on how the human need for understanding and drawing meaning from the experiences of our lives may contribute to developing or maintaining SSA.

## In Defense of Client and Therapist Rights

Volume 5 of the *JHS* also contains a number of documents in a section entitled "In Defense of Client and Therapist Rights." These documents express NARTH's commitment to the responsible conduct, dissemination, and use of science by professionals and public policymakers, legislators, and other nonmental health professionals involved in promoting personal and public medical and mental health. In particular, these documents express NARTH's unabashed *advocacy* in support of the rights of licensed mental health professionals and their clients to give and receive competent care.

When volume 4 of *JHS* was published a year ago, the governor of the state of California had just signed SB 1172, which seeks to prevent licensed mental health providers from helping *minors* either to change their behaviors or expressions of gender, or to eliminate or reduce sexual or romantic attractions or feelings toward persons of their own gender. Nine months after the California bill was passed, the governor of the state of New Jersey passed a similar bill preventing licensed medical and mental health professionals from serving minors in this way.

This section includes a number of documents with which NARTH and/or NARTH clinical partners have attempted to clarify what clinical and scientific research does and does not reveal about the alleged harmfulness of "sexual orientation change efforts" (SOCE). Unfortunately, as these laws were written and revised, the APA and

other national associations of mental health professionals were negligent in clarifying the nature of the actual research on the potential harmfulness of SOCE—and *all* approaches—to professional care. While the APA and others have persistently warned of the potential harmfulness of SOCE for clients, these associations have failed to inform the general public that *every* approach to medical and mental health care has the potential for harmful—or at least unwanted—side effects.

Lambert (2013) reports that reviews "of the large body of psychotherapy research," particularly the research "literature on negative effects" of psychotherapy, offer "substantial … evidence that psychotherapy can and does harm a portion of those it is intended to help." These include "the relatively consistent portion of adults (5% to 10%) and a shockingly high proportion of children (14% to 24%) who deteriorate while participating in treatment" (p. 192). This general finding is found for all approaches to psychotherapy for all manner of presenting problems.

Can anything but ideological bias allow the APA and others to warn against the *potential* harmfulness of SOCE while failing to warn about the documented harmfulness of *all* approaches? We think that anyone who gives the documents in this section of *JHS* a fair reading will realize that nonscientific and nonprofessional standards—under the guise of science—are being used to prevent medical and mental health professionals from offering care to which minors and their parents freely consent. We think that readers may agree with the NARTH president's response to the news that California governor Jerry Brown has signed SB 1172 into law: "Anecdotal stories of harm are no basis from which to ban an entire form of psychological care. If they were, the psychological professions would be completely out of business" (Rosik, October 1, 2012).

## A Note for Potential Authors

Authors of articles, reviews, and official statements of *JHS* are held to the same criteria; namely, what is written needs to be based on a fair reading and the responsible reporting of scientific data and demonstrable professional experience. Readers of *JHS* are invited to review this, as well as past and future volumes, and to decide for themselves and even critique how well—or poorly—we have achieved this goal. Authors interested in submitting papers for future volumes should contact the editor at 1-888-364-4744 or via e-mail at info@narth.com

Philip M. Sutton, PhD

Editor, *Journal of Human Sexuality*

National Association for Research and Therapy of Homosexuality (NARTH)

# References

American Psychological Association. (2008). *Answers to your questions: For a better understanding of sexual orientation and homosexuality*. Washington, DC: Author. Retrieved from www.apa.org/topics/sorientation.pdf

Byrd, A. D. (2008). *APA's new pamphlet on homosexuality de-emphasizes the biological argument, supports a client's right to self-determination.* Retrieved from http://www.narth.com/docs/deemphasizes.html

Jones, J. M. (May 16, 2013). *More Americans see gay, lesbian orientation as birth factor: By 47% to 33%, Americans say it is inherent rather than product of environment.* Gallup Poll. Retrieved from http://www.gallup.com/poll/162569/americans-gay-lesbian-orientation-birth-factor.aspx

Lambert, M. (2013). The efficacy and effectiveness of psychotherapy. In Michael J. Lambert (Ed.), *Bergin and Garfield's handbook of psychotherapy and behavior change* (6th ed.), pp. 169–218. Hoboken, NJ: Wiley.

National Association for Research and Therapy of Homosexuality (NARTH) Scientific Advisory Committee (2009). What research shows: NARTH's response to the American Psychological Association's (APA) claims on homosexuality. *Journal of Human Sexuality*, *1*, 1–128. Retrieved from http://www.scribd.com/doc/115507777/Journal-of-Human-Sexuality-Vol-1

Rosik, Christopher H. (October 1, 2012). Governor signs SB 1172—NARTH responds: Statement regarding the signing into law of California Senate Bill 1172. Retrieved from http://narth.com/2012/10/governor-signs-sb-1172-narth-responds/

# Narrative Therapy and Women with Same-Sex Attraction (SSA): Claiming Lost Stories

Carolyn Pela[1]

[1] Carolyn Pela, PhD, is the chair of the Department of Behavioral Studies at Arizona Christian University in Phoenix, Arizona. A licensed marriage and family therapist, she specializes in treating sexual issues and eating disorders and conducts marriage and family therapy.

# Abstract

A metaphor of the construction of a Roman arch has been used to describe the process of narrative therapy. This metaphor is applied to the process of conducting narrative therapy with women presenting with same-sex attraction (SSA). The dominant cultural narrative about SSA is that it is part of the client's identity and is intransient. The foundational philosophy of narrative therapy is suspicious of any claim of permanence. Narrative therapy for SSA helps individuals deconstruct stories that have limited options about sexuality and then facilitates construction of stories that support self-determination. This report offers an alternative to the purely biological, developmental, and psychodynamic approaches to interacting with same-sex attraction.

## Narrative Therapy and Women with SSA: Claiming Lost Stories

Marriage and family therapist Bill O'Hanlon (1994) has used the metaphor of the careful construction of a Roman arch to explain the process of narrative therapy. The classical Roman arch is built with wedge-shaped stones that are held together with the pressure of gravity (Lusted, 2009). The builders carefully and patiently shape each stone to fit with the adjoining stones. When the final stone, the keystone, is put in place, the arch becomes a solid structure—but until the keystone is positioned, the arch needs external support (Lusted, 2009). It may be helpful to imagine the builders laying the stones one at a time, first on the right, then on the left, continuing to alternate sides. Finally, the builders solidify the new construction with the keystone at the center top of the arch. While the stones of the arch are representative of the steps of narrative therapy, the supporting structure is the metaphor for the therapist and other collaborators who are involved in the reconstruction of the client's narrative.

## Laying the Foundation

A solid arch needs a solid foundation; in this case, a solid foundation is built with a clear understanding of the philosophy of narrative therapy. The founders of narrative therapy, Michael White and David Epston (Nichols, 2010; O'Hanlon, 1994), approached their work with individuals and families influenced by Bateson's communications theory and Michel Foucault's views on the power of words (White & Epston, 1990). In brief, narrative therapy is concerned with identifying troublesome stories, deconstructing these stories, and constructing (or reclaiming lost) helpful stories. Yarhouse (2008) has written a comprehensive yet accessible review of Foucault's influence on the development of narrative therapy. In summary, Foucault, White, and Epston claim that individuals' realities are constructed within society and through the use of language (White & Epston, 1990). This cocreation of reality is synergistic as we rehearse, elaborate, and together create the discourse.

"Life is about telling and retelling" (M. White, personal communication, October 11, 1996), and because of our tendency to rehearse these stories and to see only what we already believe to be reality, our personal discourses become fixed, shaping our identity. An example is the current Western cultural story about homosexuality as a fixed component of an individual's identity. The dominant narrative continues with the supposition that dissatisfaction with the influence of homosexuality on oneself is actually internalized homophobia. When these dominant discourses are clearly troubling to the individual, the narrative therapist's task is to collaboratively deconstruct the story and build (or discover, reclaim, etc.) a more helpful story.

Underlying this task is the narrative supposition that the problem—not the client—is the problem. This view necessarily impacts the language used in the deconstruction of the old story and ultimately creates freedom from the dominant discourse that the problem is within the individual. This brings into play the core technique of externalization of the problem. Externalizing language begins with the first interview as the therapist asks the client about the problem using language that places the problem outside of the client. Typically, the story that the client brings to therapy is the dominant cultural story that contends that the problem is who she is—whereas the narrative therapist insists, through the consistent use of externalizing language, that the identity of the client is separate from the problem.

Narrative theory is philosophically opposed to practicing psychotherapy from the dominant tradition, which privileges the therapist with knowledge about the client that the client herself is not privy to (White & Epston, 1990). A power differential between the counselor and therapist was troubling to Michael White (M. White, personal communication, October 11, 1996), and the limitations that come with these fixed narratives are problematic in the quest to discover a more helpful story. For example, the dominant paradigm concerning women with same-sex attraction (SSA) may be that they tend to *be* "borderline" or *have* "poor ego functioning." Since therapy is a collaborative

process between the client and the therapist in which stories are cocreated, the concern of the narrative philosophy is that these stories about the woman, owned by the therapist, will permeate the conversation and quite possibly lead to the continued power of SSA over the woman. Challenging the dominant psychotherapeutic approaches, narrative therapy seeks to privilege the client's understanding of the development and meaning of the problem in order to locate the stories that have been lost under the dominant cultural narratives (including the stories from the mainstream mental health culture) and the client's unhelpful, personal narratives.

With this foundational understanding of reality, the narrative approach to SSA will inherently question the current cultural discourse about same-sex attraction (along with related stories about homosexuality, sexual orientation, and gender identity), and will defer to the meaning the client has developed. Toward that end, the therapist will want to ask questions that reveal the client's perceptions. For example, is she bothered, distressed, limited, coerced, or oppressed by the SSA discourse? What is her understanding of the discourse? What does SSA say that she can and cannot do or be? Is she satisfied with these limits or are they distressing? As discussed earlier, one does not need to look far to find the dominant cultural discourse of SSA; this narrative views SSA as permanent and intransient. Conversely, the viewing of problems from a narrative perspective automatically brings those problems claiming intransience under suspicion ("stability is an illusion"—M. White, personal communication, October 11, 1996). A natural response to SSA from a narrative perspective is to doubt the claim that women should accept and embrace unwanted SSA as an identity.

Alice Morgan (2006) has published a comprehensive, user-friendly review of narrative therapy. For those interested in pursuing a clearer understanding and possibly desiring to incorporate narrative theory into their work, Morgan's *What Is Narrative Therapy?* is highly recommended.

# Building the Arch

## Stone #1: Identifying the Problem

Beginning with laying this first stone—identification of the problem—it is important to start privileging the client's account of her relationship to the problem and her agenda for therapy. This therapeutic predisposition will influence the language the therapist chooses and will set the stage for laying the subsequent stones.

The process of problem-labeling often results in the emergence of subtexts that become the agreed-upon label for the problem. For a woman initially presenting with a global problem of SSA, these subtexts may involve the impact of sexual abuse, the emptiness that she may feel, or a troubling relationship with her father. She may have concluded that men are unsafe or that she cannot have "normal" relationships with them. She may believe that she cannot have nonsexual relationships with women. Through the conversation around the presenting problem of SSA, the collaborators (therapist and client) may finally label the initial problem as one or more of these subtexts.

Whether the collaboration results in the global problem-label of SSA or a subtext of the SSA narrative (mother-hunger, fear of femininity, wounds from father, etc.), it is important to make this label clear before moving on. If the label does not resonate with the client or if she is using a label that the therapist does not yet understand, the therapist and client cannot set an agenda. A mutual understanding of the label is also a confirmation of the therapist's awareness of the client's perspective. Further, a clear and salient label is essential for continuing the use of externalizing language and for successfully personifying the problem. .

When working with a woman experiencing SSA, another task in laying this first stone is discovering if the client has adopted cultural stories around SSA. For example, she may have adopted the "born that way" paradigm. She may also see SSA as an integral piece of her identity, with the internalized conclusion, "I am a lesbian." According

to narrative philosophy, we are prone to rewrite our own history so that it becomes congruent with our current reality. She may have done this, and the resulting theme of her story may read, "I have always been sexually attracted to women." Additionally, she may have created an identity deeply informed by her relationship with the gay community. A narrative therapist will keep in mind that the deconstruction of the problematic personal narrative may involve the deconstruction of the dominant cultural narrative.

## Stone #2: Discovering the Client's Agenda

Discovering the agenda of the client should naturally progress from laying the first stone. The agenda often begins to take shape during the first step, but it needs further honing and should be firmly set in place during this phase. When laying this second stone, it is important to continue to use externalizing language, insisting that the problem is the problem. During this phase, the therapist discovers more about the client's relationship with the problem.

White (1991) provided a categorization of two types of questions that may be used for the process of clarifying the client's agenda: landscape-of-action questions and landscape-of-consciousness questions. Landscape-of-action questions direct the individual toward revealing preferred events in her life. They ask, "What does she want to be doing differently?" Landscape-of-consciousness questions focus on preferred beliefs and values that are lived out through the woman's actions. They may ask, "What does she want to be feeling or believing?" Examination of the relationship between preferred actions and preferred beliefs may further reveal the source of distress that the client is experiencing. Establishing congruence between actions and values may be the sole agenda of a woman experiencing SSA.

Some examples of the final agendas for women that I have worked with are diminishing SSA, resolving the incongruence between her values and her actions or desires (often resulting in a heterosexual orientation and identity), a wish to pursue

celibacy, or even acceptance of SSA. It is possible that a more nuanced agenda will emerge from the conversation with the client. Perhaps the agenda is specifically about dealing with sexual abuse or a problematic relationship. The client may have complex goals, but the goals need to be simplified into a workable agenda.

Laying stone #2 may be an iterative process with establishing stone #1. As the agenda becomes clear, the problem definition may shift. During the construction of the agenda, the problem may be further deconstructed, revealing a different view of the problem. In this process it is important to keep the problem label externalized, and the agenda feasible. The collaborators are only ready for the next stone when the client's agenda is clear and necessary adjustments have been made to the first stone.

### Stone #3: Personification

Personification is a hallmark of narrative therapy (Durrant & Kowalski, 1990; O'Hanlon, 1994; White & Epston, 1990). The process of personification of the problem began earlier in the arch construction with the use of externalizing language, and it continues in this stage with the primary focus on extricating the client from a shallow, limiting, or unhelpful story. The label of the problem established in the laying of the first stone will often be the metaphor used in personification. For example, if the complaint is SSA, the discussion will involve talking about SSA as if it holds a personality and a mind of its own. Personification of the problem reinforces the perception of the problem—not the client—as the problem.

A key to using metaphors in the process of personification is to avoid language that implies causation. The problem does not cause clients to think, feel, or behave—it only influences, coerces, convinces, tricks, and so on. Personal agency in relationship to SSA, gender identity, and sexual orientation is further enforced through the avoidance of deterministic language and a preference for language that allows hope and autonomy. Personification is a transitional step between stone #2, determining the agenda, and stone

#4, discovering the influence of the problem. Clear personification and externalization of the problem reduces the risk that the client will fear that she is losing a piece of herself rather than an unwanted visitor.

## Stone #4: Discovering the Impact of the Problem

In the discovery of the impact of the problem, the therapist uses the label identified in the first step to ask questions about how the problem has influenced, coerced, haunted, tricked, or otherwise impacted the client. Landscape-of-action and landscape-of-consciousness questions (White, 1991) should be used in this phase as in the earlier process of discovering the agenda. For the same-sex-attracted woman, perhaps the problem has been labeled as ambivalence in regard to SSA. In that case, the therapist will want to ask questions like, "How long has Ambivalence been in your life?" "How has Ambivalence kept you from living fully, isolated you from others, maybe even isolated you from God?" "What are the lies that Ambivalence tells you?" "What does Ambivalence tell you about your relationship with God?" "How has Ambivalence wedged its way between you and your family?" "How has Ambivalence limited your choices?" The goal is for the client to continue to externalize the problem, recognize the *problem* as the problem, and further deconstruct the limiting narrative.

Laying stone #4 fosters a view of the problem as external to the client, sees the problem as having ill intent, and should ultimately incite a renewed desire to battle the problem. This desire to battle against the personified problem will allow the conversation to move to laying the next stone. Without the motivation that comes out of seeing the oppressive intentions of the problem—the limitations on the choices and identity of the client—the next stone will not fit with the previous ones. Waiting for evidence that the client sees the problem as separate from her identity and an indication that she is ready to do battle with the problem will facilitate a smooth fit with the next stone.

## Stone #5: Exception-Seeking: Discovering Unique Outcomes

Laying stone #5 is the pivotal point in the therapeutic process as it moves from deconstructing the old story to constructing a new story (Durrant & Kowalski, 1994). Prior to laying this stone, the problem has been identified, externalized, and personified. The negative influences of the problem have been documented, and now the therapist and client are ready to find exceptions to the problem. Reclaiming the lost story—wherein the preferred identity lives—is the goal of exception-seeking.

It may be important to pause here to clarify different ways of conceptualizing the "new" story. Since exception-seeking is about finding a history of exceptions to the problem, it presupposes that the new story isn't really new at all, just lost. The alternative, parallel story has been hidden, and "events in the shadows should be reverenced" (White, personal communication, October 11, 1996). The very idea that there are exceptions to the dominant story reveals a core supposition of the narrative theory, that "stability is an illusion" (M. White, personal communication, October 11, 1996). The only thing that we can count on is change (S. de Shazer, personal communication, October 11, 1996).

This process of exception-seeking can be challenging. It is natural for individuals to notice the tyranny of the presenting problem. It gets their attention as it blocks them from experiencing a life of freedom and from experiencing themselves and others deeply. On the other hand, it is very difficult to pay attention to the exceptions to the problem. The insistence of a collaborator becomes crucial during this process. Questions should be crafted to point the client toward times when the problem was not a problem. For example, the therapist might ask, "Tell me about a time when you expected __________ to get in your way, but it didn't." "Tell me about a time when things were going a little better. What was different then?" "Has ___________ever taken a vacation? When have you felt free from its tyranny for even a brief period of time?" "What's the longest time that you've stood up to _________?" In his discussion about narrative therapy (specifically applied to problems of sexual identity), Yarhouse (2008) offers this question:

"In what ways are you understanding your sexual identity differently than when you first thought of yourself?" (p. 206) The process of discovery of unique outcomes allows the reclaimed parallel story to emerge.

Since stories are created in community, it may be helpful to ask the client what others may have observed as she seemed to stand up to the problem. The client may choose to ask this question of significant others in her life in order to invite them as co-authors of this reclaimed story. During this time, the collaborators want to underscore, in particular, the times that the client's agenda is supported. Yarhouse (2008) identifies these moments as "identity-congruent actions and attributions" (p. 207). The next stone, stone #6, can be fitted recursively with stone #5 as the exceptions are identified. Highlighting personal agency in the reclaimed story reinforces the reclaimed identity.

## Stone #6: Finding Personal Agency in the Exceptions

Since the client has now identified the exceptions, it is critical in this next phase to seek evidence of her personal agency in producing these exceptions (Durrant & Kowalski, 1990). This process will function to further diminish the influence of the old, dominant story in which the client is powerless. The therapist might ask, "How did you manage to maintain this part of your identity in spite of the Ambivalence?" "What made you decide to pursue your interests in spite of Fear?" "How did you stand up to Lesbianism's stereotypes about you?" The therapist wants to know how the client did it and what this tells her about herself (Durrant & Kowalski, 1990). Questions are constructed to take the experiences out of the category of random events so the client can see them as choices she has made from the position of this recovered identity.

Epston's therapeutic letters (White & Epston, 1990) may be introduced here, although they could be used throughout the therapeutic process to document the new story. In short, therapeutic letters are the therapist's reflections and observations of the conversations with the client, written in a letter form, to the client. These letters serve to

punctuate this important part of the client's story now that she has identified a series of exceptions to the problem. These letters seek to highlight the personal agency of the client and capitalize on the personification of the problem. The use of direct quotes or summaries of what the client has communicated is often part of the letter. Inclusion of client-constructed metaphors is especially powerful. My experience has been that the client's own words serve as particularly effective agents of healing as they are reflected in the letters.

The therapeutic letter will often set the agenda for the next session, and it may be sent to the client with that in mind. Letters may also be read at the beginning of the next session as a way of connecting the conversation from one session to the next. On a practical note, the letter may also serve as a progress note for the client file. A rich resource of examples of therapeutic letters can be found in White and Epston's *Narrative Means to Therapeutic Ends* (1990), and a quickly accessible source of examples is found on Epston's website: *http://www.narrativeapproaches.com/antianorexia%20folder/anti_anorexia_index.htm* (n.d.).

## Stone #7 The Keystone: Celebrating a New Story/Identity

The seventh stone in the arch is the keystone, which is the apex of the arch. The keystone of an arch is often embellished—and it is fitting for the final metaphorical stone of this process to look special, because it *is* special. Stone #7 functions as the support for the six stones that were previously laid. Once the keystone is set in place, the supporting structure can be removed, and the arch becomes self-supporting (Lusted, 2009). During this phase the therapist asks questions that solidify the identity that has been pulled out of the clutches of the problem. These questions move the client into recovering a complex, rich history of her identity. The therapist encourages the client to reach back and find historical evidence of this new view of herself and to invite others to testify to her recovered story. It is important to be aware that the witnesses to the client's life have often been just as duped as the client in believing the limiting story. The selection of friends and family who will support the reclaimed story is essential.

Another task of this phase is looking to the future and considering how it may be different in light of the recovered story. A question might be, “In light of your ability to stand up to Fear of Femininity, what might be different about your future?” A question for her family might be, “What do you think your daughter’s life will be like now that Fear of Femininity is not pushing her around?” Just as the cocreation of the old problematic narrative influenced her story, the cocreation of the reconstructed narrative gives it power. It is not enough for the client and the therapist to have knowledge of this new story; the client must also have an audience. My typical experience has been that this audience has emerged over the course of the therapy and has been celebrating and enjoying the emerging story of the client all along. Nevertheless, this is an important element of keeping the arch together for the long haul. The client’s audience may be invited to a session for a celebration, or the client may want to plan a party at home to celebrate with her family and friends.

This is a good place to include another of Epston’s contributions to the narrative approach. Near the end of therapy, the client may be invited to co-construct a certificate that celebrates and acknowledges her accomplishments. In addition to serving as a celebratory tool, this process further emphasizes the personal agency in claiming the recovered story. These certificates will typically use the metaphor that was established during the laying of the first stone, emphasizing the client’s victory. As an example, the certificate might read, “This is to certify that Jasmine has been victorious over Fear of Femininity (FOF) and all the lies and shame that FOF contains. This will serve as a reminder to Jasmine, and all those who love her, that her identity is no longer controlled by FOF.” One of the best resources for this tool can be found in *Narrative Means to Therapeutic Ends* (White & Epston, 1990).

As in the previous arch construction, the keystone is dropped in place only after evidence of the new or recovered story has clearly emerged. An earlier attempt to obtain historical evidence of the reclaimed story might at worst threaten the client’s identity, and at best it might frustrate her as she is unable to see the evidence. It is at this point that

the "history of the alternative present has become more deeply rooted than the problem story" (M. White, personal communication, October 11, 1996).

## The Therapist's Narrative

My work using narrative therapy has involved collaborating with clients to claim lost stories of power and hope in the midst of their dominant stories of defeat and hopelessness. From the foundation to the final keystone, the construction of the arch requires patient, insistent deconstruction of taken-for-granted discourses and the reclamation of forgotten stories hidden in the shadows. The arch is finally held together with this recovered story that reaches back to the past and extends forward into the future with a discourse that is identity-congruent. While we have taken the arch supports off with the laying of the keystone, the arch will need community to maintain the story, to tell the story, and to retell the story.

The tradition of narrative therapy requires rethinking standards of practice, terms, and worldviews, including psychological paradigms. This work has been for me as much about liberating myself from limiting practice narratives as it has been about collaborating with clients as they free themselves from the dominant discourses about SSA. This challenge is ongoing as I continue to be pressured by dominant understandings that the therapist owns the privileged discourse.

# References

Durrant, M., & Kowalski, K. (1990). Exceptions, externalizing and self-perception—A clinical map. Paper presented at the Annual Conference of the American Association for Marriage and Family Therapy, Washington, DC.

Epston, D. (n.d.). http://www.narrativeapproaches.com/antianorexia%20folder/anti_anorexia_index.htm

Lusted, M. A. (2009). Life under the arches. *Appleseeds*, *12*, 2.

Morgan, A. (2000). *What is narrative therapy?* Adelaide, Australia: Dulwich Centre Publications.

Nichols, M. P. (2010). *Essentials of family therapy* (5th ed.). Upper Saddle River, NJ: Prentice Hall.

O'Hanlon, B. (1994). The third wave. *Family Therapy Networker*, *18*, 6.

White, M. (1991). Deconstruction and therapy. *Dulwich Centre Newsletter*, *3*.

White, M., & Epston, D. (1990). *Narrative means to therapeutic ends*. New York: W. W. Norton & Company.

Yarhouse, M. A. (2008). Narrative sexual identity therapy. *The American Journal of Family Therapy*, *36*, 196–210.

# The Impact of Neurophysiologic Development on the Regulation and the Management of Homosexual Impulses[2]

Lester G. Pretlow[3]

[2] This paper was originally presented at the annual conference of the National Association for Research and Therapy of Homosexuality (NARTH) in Philadelphia in November 2010.

[3] Lester G. Pretlow, PhD, is associate professor and department chairman of the Medical Laboratory, Imaging and Radiologic Sciences Department of the College of Allied Health Sciences at Georgia Regents University in Augusta, Georgia.

# Abstract

An understanding of central and autonomic nervous system (CNS/ANS) development is foundational for understanding many human behaviors. The purpose of this article is to explore challenges to the development of these systems and the impacts of these challenges on behavior, specifically on the development of gender identity and same-sex attraction. In situations of good-enough development, the CNS and ANS work in a coordinated effort to manage environmental input (audio and visual) to maintain a *steady-state*. When development of the CNS and ANS are inadequate, the individual can face challenges in managing auditory and visual input and experience an accompanying need to act in some way to restore balance. This article hypothesizes that the developed inability to manage visual, auditory, and other sensory input is a key factor in individuals suffering from unwanted same-sex attraction issues. Learning to modify or even avoid disruptive sensory inputs is helpful in overcoming some of the negative outcomes associated with the development of these—and any other—unwanted behaviors.

# Introduction

A bio-psycho-social model of development has been proposed as the best current explanation for understanding how persons come to experience SSA—homosexual (same-sex) attractions (American Psychological Association, 2008; Byrd, 2008). As a biomedical scientist who leads a support group for men dealing with unwanted SSA, I have found that there is a need to demystify the nature and origin of homosexual impulses. Group members have found it helpful to understand that same-sex impulses are in and of themselves morally neutral inputs to (stimulations of) the central nervous system (CNS) through the brain's limbic structures and connections of the limbic structures with the autonomic nervous system (ANS).

## Visual and Auditory Stimulation May Influence One's Actions by Impacting the CNS

The ANS is comprised of the sympathetic and parasympathetic nervous systems. These systems allow the body to regain its accustomed, familiar level of body tension or activation—in other words, its steady-state regulation. It does this either by revving up the body (the sympathetic branch causes the body to become more "aroused" and ready for possible reaction) or calming down the body (the parasympathetic branch causes the body to be less aroused and more comfortable with not reacting) (Guyton, 1991; Schore, 1994). Overall, these systems work to maintain the emotional and physiological balance of the body (Carroll, 2009). In other words, sensory inputs or arousals perceived as pleasant or unpleasant to the body are managed by the various nervous systems.

Stimulation and regulation of the CNS and ANS are in one sense influenced by, but in another sense independent of, the meaning—including the "moral" meaning—of any desire, impulse, thought, imagination, memory, or appetite, including sexual appetite. On the one hand, one cannot escape the physiology of the body. For example, in times of stress,

strong stimulation of the sympathetic nervous system provides extra activation—mass or body-wide arousal and a need for discharge of energy—in order for the body to perform far more strenuous physical activity than would otherwise be possible (Guyton, 1991).

In and of themselves, physiological (neurologically reflexive) impulses have no moral significance, but they may lead a person to act in ways that are morally—consciously, cognitively, and volitionally—significant (Guyton, 1991; Schore, 1994).

As mentioned, the sympathetic nervous system revs the body up and the parasympathetic calms the body down (Carroll, 2009; Guyton, 1991). Inputs to these nervous systems come in many different forms. Visual and auditory stimulation have a profound impact on the immediate and long-term structure and function of the nervous system (Schore, 1994). Sights and sounds—as well as touches, smells, and tastes—are internalized as memory; however, they are also internalized as nervous system structure (Schore, 1994). Chronic activation of the limbic system may lead to structural changes in the circuitry of the nervous system—the growth and habitual, coordinated stimulation and functioning of relevant nerves. Such chronic activation is significant, especially if traumatic interactions occur during critical periods when the CNS is developing (Schore, 1994; Schore, 2003a).

Problems can arise when sympathetic and parasympathetic systems become imbalanced due to the chronic activation of the limbic system (Schore, 1994; Schore, 2003a; Schore, 2003b). In these instances, structural problems—for example, neuronal development and habits of arousal or the lack of arousal—may become part of the architecture of the brain (in other words, become "hard-wired") and may inhibit or suppress future functional areas of the limbic and autonomic nervous systems (Schore, 1994; Schore, 2003a).

For example, the sympathetic nervous system may dominate the parasympathetic (or vice versa), leading the body to become chronically or typically over- (sympathetic) or under-(parasympathetic) stimulated. This would lead to a child's

inability to maintain a physiological steady-state, which in turn leads to physical and/or emotional "discomfort" (Carroll, 2009; Schore, 2003a). In effect, the CNS cannot then function optimally because of its challenged architecture (in other words, the habitually over- or under-stimulated nerves); therefore, the child's nervous system becomes inefficient at metabolizing visual and auditory input. In other words, the child becomes over- or under-aroused by what he or she sees and hears (Schore, 1994; Schore, 2003b).

## Inhibited Structure-Function of the Nervous System

Inhibited structure-function of the nervous system can begin to develop during infancy (Schore, 1994). This means that an infant who experiences too much or too little stimulation may develop chronic difficulties in how his or her brain and nervous system function. For example, when an infant's excitement (sympathetic arousal) is met with indifference or disapproval by a parent, the child may respond with parasympathetic activation that is experienced as a downward fall into shame, grief, disappointment, and/or guilt (Carroll, 2009; Schore, 1994).

If this mode of communication is reinforced by continued perceived parental rejection, the child's sympathetic structure-function—his or her ability to become excited—may become inhibited. If this happens, the child's parasympathetic structure-function—his or her ability to reduce or avoid physiological/emotional arousal—may become the child's dominant regulator or arousal (Carroll, 2009; Schore, 1994). As mentioned above, if a child's physical and emotional arousal are subject to excessive, habitual parasympathetic control, then his or her emotional life will be dominated by feelings such as depression, shame, grief, disappointment, and/or guilt.

It is important to understand that structural changes in the ANS—such as habitual patterns of nervous arousal—originate in the limbic system (Schore, 2003a). The limbic system is the part of the brain that responds to all external stimuli, but especially to any stimulus—sight, sound, touch, and so on—that is perceived as a threat, such as the loss

of a valued experience or the threat of an aversive experience (Guyton, 1991; Rothschild, 1998; Schore, 2003a). If the child is unable to escape a threat (for example, the separation from his or her mother as in cases of hospitalization), the limbic system may respond with the parasympathetic response of freezing or dissociation (Rothschild, 1998; Schore, 2003a). Bowlby (1960) described this type of behavior as a response in a child who was separated from his mother during hospitalization; the child went through a sequence of behaviors observed as protest, despair, and detachment.

The freezing or dissociated response is mediated by the secretion of hormones involved in the response to a perceived threat. The CNS stimulates hormone secretion from the endocrine system (Guyton, 1991; Morris, 2004; Schore, 1994). Endocrine regulation is a major function of the limbic system and has a long-lasting influence on CNS growth and development (Guyton, 1991; Nolte, 2002; Schore, 1994). If perceived threats persist, the absence of normal hormonal regulation during critical developmental periods causes permanent physical changes and profound structural anomalies in the limbic system and the ANS (Schore, 1994; Schore, 2003a). When a child's limbic system is using its resources to defend against threat, there may be too few resources left for his or her growth and development (Lee, Ogle, & Sapolsky, 2002; Sapolsky, 2003).

During times of extreme threat (for example, a prolonged or even brief stay in the hospital), the child's limbic system sacrifices the secretion of hormones that stimulate growth in exchange for the secretion of hormones that protect the individual against threat—such as those that help the child deal with the aversive arousal of separation from his or her mother (Bowlby, 1973; Sapolsky, 2003). If the infant otherwise survives the threat (for example, endures the separation from his or her mother), an overall negative consequence of this experience can be a lack of development of sufficient neuronal connections between the CNS and ANS that may appear as a parasympathetic over-activation (depression) as the child continues to develop and mature (Sapolsky, 2003; Schore, 1994; Schore, 2003a). In this scenario, the parasympathetic nervous system

becomes the dominant peripheral nervous system regulator. In layman's terms, the child develops an inordinate need for emotional "self-soothing" to ease the uncomfortable, parasympathetic overactivation.

## A Compromised Ability to Differentiate One's Gender

During critical developmental stages of the infant nervous system, other CNS structures and functions may be inhibited or suppressed. Since gender identity is also developing during infancy, the neurobiological structures that impart a sense of one's gender may also be inhibited by experiences such as separation anxiety between a child and his or her mother. Traumatic interactions during critical developmental periods may damage the developing structural links (neurobiological circuitry) between the brain (CNS/ limbic system) and the body (ANS) so that a child's sense of his or her gendered body is challenged or even lost. In this situation, the primary and secondary characteristics of gender (in other words, male/female sex) are intact—biological males look like men, and biological females look like women. But what is challenged is the child's—and if it persists, the adolescent's and adult's—ability to differentiate gender (male/female) in his or her own ANS (in other words, in his or her body). In such situations, a neurological/physiological sensory deficit has developed. This may be caused by the suppression or death of neuronal circuitry between the limbic system and the ANS.

Another cause of such a neurological/physiological sensory deficit may be a compromised limbic system. In addition to functions described above, the limbic system controls reproductive behavior (Aggleton, 1992; Guyton, 1991; Sapolsky, 2000). Changes in the limbic structure due to traumatic stress may potentially leave the infant with an inability to differentiate his or her gendered body. Dissociation from one's body becomes a function of neuronal death or suppression due to traumatic interactions—for example, experiencing an inadequate attachment to one's caregivers—on the developing CNS and ANS (Schore, 2003a). The infant is fundamentally left "body-less" with respect to gender

identity because of structural changes in the traumatized CNS and ANS. Bowlby (1969) hypothesized that some neurological impairments caused by separation anxiety may have varying functional consequences that range from total absence to dormancy, in which the underlying structures are partially or completely developed yet remain nonfunctional (Bowlby, 1969). If gender is in—and of—the body (ANS) and if one dissociates from one's body, then one's sense of gender identity can be irrevocably impaired.

## How Immature and/or Nonheterosexual Arousal May Develop

A potential arousal and behavioral consequence of this type of impairment of gender identity may be that the infant will learn or imitate gender characteristics from the closest body to it, usually the mother. This may account for the preponderance of cross-gender behavior seen in prehomosexual male children (Green, 1975; Zucker, 1992). As these children reach physiological sexual maturity, the capacity for reproductive behavior (copulation) remains intact, because reproduction is bound to survival behavior, which is also a major function of the limbic system (Sapolsky, 2003). However, the absence or inhibition of certain neuronal circuitry between the brain (CNS) and body (ANS) may leave these individuals with the inability to differentiate not only their own gendered bodies, but also other objects of reproductive significance—in other words, whether one is sexually attracted to a person with a body whose gender would allow reproductive copulation.

This confusion of reproductive objects may manifest itself as attempts to copulate with objects of the same sex, immature objects of the same or different sex, and even inanimate objects. This type of behavior has been demonstrated in animal models and is known as the Kluver-Bucy syndrome, a syndrome in which cell death in specific areas of the limbic system produces atypical copulation behaviors (Aggleton, 1992; Guyton, 1991). This type of confusion may likely be the foundation for homosexual feelings and behaviors in humans.

One consequence of this type of CNS/ANS derailment is that individuals have difficulty processing visual and auditory cues of their gendered self. What he or she may interpret as sexual feelings is really a lack of synchrony between the CNS and ANS. For example, visual input—such as a picture of partially clad males—can lead men who experience SSA to experience "emotionally unbalanced" or overactivated parasympathetic arousal. Instead of perceiving the visual input and subsequent arousal as an indicator of CNS and ANS detachment, a man may interpret this stimulation—or himself—as intrinsically "homosexual." Such an interpretation is unfortunate, because it confuses or mystifies the underlying causes of any subsequent same-sex "reproductive" behavior, as well as the person's self-identification.

## Understanding and "Neutralizing" Homosexual Feelings

Some people who experience "homosexual" feelings (same-sex attraction) would rather not. Regardless of whether one wants to experience SSA, persons with SSA may find it helpful to understand such feelings as a challenge to—in other words, a need for—CNS/ANS steady-state regulation. Using the example above, when a man sees a picture of partially clad males and experiences homosexual arousal, it is possible for the man who is aroused to understand how this visual input has affected his nervous system. If and when he is able to see such input and subsequent arousal as a challenge to his steady-state regulation, he is able to neutralize—in other words, normalize or render understandable and commonplace—this visual "input" and the subsequent arousal. Put simply, he can see the same-sex arousal for what it really is—and isn't.

This neutralization—or proper understanding—of visual, auditory, tactile, and other stimuli transforms the input from a "purely" sexual stimulus to an impulse that must be discarded and/or digested (processed) by the CNS/ANS. In this light, the input may come to be understood as not really a sexual cue but a "reflexive" indication of the asynchrony—functional imbalance—between the CNS and ANS. However, the power of

the input (the external stimuli) cannot be underestimated because the processing of the input is bound to the survival behavior of reproduction.

It is important to emphasize that the homosexual "reflex" (SSA) is not about someone else's body, but about one's own—in other words, the CNS/ANS disconnection in one's own body. This disconnection is part of the ever-present, ongoing functioning of the central and peripheral nervous systems and how these systems are accustomed to metabolizing (processing) input from the environment. Just as some foods may give a person a stomachache, some stimuli (such as visual nudity) may give someone's nervous system an overwhelmingly uncomfortable physiological challenge, such as arousal in need of calming or other resolution.

A key ingredient to maintaining steady-state regulation, including reacquiring a measure of internal comfort or peace, is to discard stimuli that we have experienced that can negatively impact steady-state regulation—in other words, that can leave one tense or otherwise uncomfortable. Continued exposure to some stimuli reinforces the positive or negative physiological and emotional consequences on the CNS and ANS, maintaining and/or intensifying one's physical and emotional arousal. Lessening the exposure to such stimuli has value in decreasing physiological discomfort. A teacher once said, "If the eye offends thee, cut it out and throw it away" (Matthew 5:29). Of course, it may be easier to just avoid (as much as possible) stimuli that have a powerful negative impact on one's nervous system regulation than to stop attending to the stimuli. For example, it may be easier to never look at stimulating pictures than to stop looking or recalling what one looked at. But ceasing to look as well as never looking to begin with are both possible.

For persons who find homosexual feelings troublesome, the mere avoidance of stimuli (such as pornographic pictures or videos) that impact the CNS and ANS in a negative way can be extremely helpful to maintaining steady-state regulation. However, keeping oneself physiologically/emotionally calm may require further vigilance, such as

Case 8:17-cv-02896-WFJ-AAS Document 191-4 Filed 08/26/19 Page 122 of 329 PageID 5189

learning to be more cautious about activities as simple as going to the grocery store or spending a day at the beach. Maintaining and restoring steady-state regulation is the goal.

My group members' overall goal is to lessen the impact of all challenges to their steady-state regulation—in other words, experiences of SSA resulting from visual and auditory stimulation—by reducing or limiting such stimulation. In doing so, they hope to learn how to return to a more physiologically and emotionally balanced (less tense and more comfortable) state.

Group members also have found it helpful to recognize the potential root causes of their SSA. Realizing, understanding, feeling, and dealing with emotional trauma that they experienced early or later in their development appears to have a profound influence on gender identity for some of the men. It appears that my group members' efforts to intentionally become aware of the consequences of these traumatic life experiences have enabled the CNS of some of these men to rebound from this trauma. In general, the men in my group have been helped by understanding their experience of SSA in this way.

# References

Aggleton, J. P. (1992). *The amygdala.* New York: Wiley-Liss.

American Psychological Association. (2008). *Answers to your questions: For a better understanding of sexual orientation and homosexuality.* Washington, DC: Author. Retrieved May 6, 2013, from www.apa.org/topics/sorientation.pdf

Bowlby, J. (1960). Separation anxiety. *The International Journal of Psycho-Analysis*, 41, 89–113.

Bowlby, J. (1969). *Attachment and loss, volume 1—Attachment.* New York: Basic Books, Inc.

Bowlby, J. (1973). *Attachment and loss, volume 2—Separation anxiety and anger.* New York: Basic Books, Inc.

Byrd, A. D. (2008). *APA's new pamphlet on homosexuality de-emphasizes the biological argument, supports a client's right to self-determination.* Retrieved May 6, 2013, from http://www.narth.com/docs/deemphasizes.html

Carroll, R. (2009, September 9). *The autonomic nervous system: Barometer of emotional intensity and internal conflict.* Retrieved July 2, 2007, from http://www.thinkbody.co.uk/papers/autonomic-nervous-system.htm

Green, R. (1975). The significance of feminine behavior in boys. *Journal of Child Psychology & Psychiatry & Allied Disciplines*, *16*, 341–344.

Guyton, A. C. (1991). *Medical physiology* (8th ed.). Philadelphia: W. B. Saunders Company.

Lee, A. L, Ogle, W. O., & Sapolsky, R. M. (2002). Stress and depression: Possible links to neuron death in the hippocampus. *Bipolar Disorders*, *4*(2), 117–128.

Morris, J., Jordan, C., & Breedlove, S. (2004). Sexual differentiation of the vertebrate nervous system. *Nature Neuroscience*, *7*(10), 1034–1039.

Nolte, J. (2002). *The human brain: An introduction to functional anatomy* (5th ed.). St. Louis, MO: Mosby, Inc.

Rothschild, B. (1998). *Post-traumatic stress disorder: Identification and diagnosis*. Retrieved October 5, 2013, from http://www.healing-arts.org/tir/n-r-rothschild.htm

Sapolsky, R. M. (2003). Stress and plasticity in the limbic system. *Neurochemical Research*, *28*(11), 1735–1742.

Sapolsky R. M., Romero L. M., & Munck A. U. (2000). How do glucocorticoids influence stress responses? Integrating permissive, suppressive, stimulatory, and preparative actions. *Endocrine Reviews*, *21*(1), 55–89.

Schore, A. N. (1994). *Affect regulation—Origin of self.* Hillsdale, NJ: Lawrence Erlbaum Associates, Inc.

Schore, A. N. (2003a). *Affect dysregulation and disorders of the self.* New York: W. W. Norton and Company, Inc.

Schore, A. N. (2003b). *Affect regulation—Repair of self.* New York: W. W. Norton & Company, Inc.

Zucker K. J., & Green, R. (1992). Psychosexual disorders of children and adolescents. *Journal of Child Psychology & Psychiatry & Allied Disiplines*, *33*(1), 107–151.

# Is First Same-Sex Attraction a Developmental Milestone?

Neil E. Whitehead[4]

## Acknowledgment

I greatly appreciate the hospitality extended during my stay at Hiroshima University, particularly by Professor Masaharu Hoshi, in the framework of the Visiting Professor Programme. I appreciate the contribution of the Levene test from an anonymous reviewer.

---

[4] Neil E. Whitehead, PhD, is a biochemist who presently works at Whitehead Associates in Lower Hutt, New Zealand. This manuscript was written while the author was working at the Institute of Radiation Biology and Medicine, Hiroshima University, Kasumi 1-2-3, Minami-ku, Hiroshima, Japan 734-8553.

# Abstract

This paper combines the well-known concept of developmental milestones with standard statistical analysis of their spread in time to gauge the milestone status/genetic influence on the timing of first same-sex attraction (SSA) by comparison with timing of puberty. SSA is not a developmental milestone, nor does its timing have high genetic influence. The relative standard deviation (RSD) of the average age of first SSA is 40%, which is very high compared with the approximately 7% for milestones with very high known genetic influence, such as puberty. As reported in many studies over a period of thirty years, first attraction occurs at a mean age of ten for both sexes, both orientations, and cross-culturally. While it is commonly claimed in the literature that first SSA is a genuine sexually related attraction and biologically preprogrammed, both of these claims are doubtful. First attraction is on average about two years before puberty; hence it is mostly not puberty-driven. The age of ten is possibly connected with peak awareness of social gender differences. Alternatively but much less probably, the age of first SSA is connected with adrenarche (maturing of the adrenal glands). Age of first attraction turns out to be a poor choice to illustrate alleged innateness. Very few individuals have SSA as their earliest memories, which is hence a false stereotype.

# Introduction

It is rather common to hear gay people say, "Oh, I've always been this way. My earliest memories are of feeling different, and attracted to males" (Hillier, Turner, & Mitchell, 2005). In context this usually means that their earliest memories are of SSA, and it implies that such individuals must have been born with those feelings. This is even claimed to be the case cross-culturally (McLelland, 2000). It is still possible to find academic statements implicitly or explicitly suggesting that one is born gay. For example, LeVay (2010) declares that "I am inclined to place most of the developmental control in the hands of prenatal hormones" (p. 279), and *Born Gay* is even the title of one book (Wilson & Rahman, 2005). By this, the authors mean that SSA is influenced predominantly by prenatal factors.

Clearly, people with SSA are not "born that way"—immediately after birth, such individuals cannot even differentiate between themselves and their mothers, let alone distinguish between the genders. The phrase "born that way" therefore means in this context *predestined*, or bound to develop SSA. If this were true, the development of SSA would be a milestone event, like puberty or gestation, which is biologically programmed to occur in a set developmental sequence. The term *milestone* has been applied to various stages in the "coming out" process of GLB people (Floyd & Bakeman, 2006), and first same-sex sexual attraction is one of the milestones included. As the balance of this paper shows, this term is applied inaccurately, since no evidence of biological programming for SSA has been documented.

## Statistics of Developmental Milestones

Developmental milestones are tabulated in the literature for things like fetal growth, motor skills development, social skills, teeth eruption, puberty, and menopause. Failure or delay in reaching a milestone may be an important indicator of an underlying medical problem. As typical with a biological system, there will be a range of ages for a particular milestone derived from surveys of normal individuals. There will be a mean, and then a measure of age-spread, normally confidence intervals or the standard deviation, finally tabulated and used by medical professionals. These are generally larger, the later the milestone.

For example, there is a 3.8y standard deviation on the timing of menopause, but only a 0.023y standard deviation on gestation length (Table 1). Clearly the two measures are not directly or usefully comparable. The standard mathematical measurement that avoids this problem uses the coefficient of variation, or the *relative* standard deviation (RSD). The RSD is the standard deviation divided by the mean—in this case, the mean age. If an RSD exceeds 50%, the event is not a milestone. The RSD is used extensively in this paper for comparisons, and it should be noted that some are close to the 50% cutoff. RSDs for selected postnatal milestones are given in Table 1. The literature for first same-sex attraction is treated later (see Table 3). RSD is calculated using time since conception. *First heterosex/homosex* is first sexual experience/initiation.

**Table 1. Postnatal Milestones**

| *Milestone* | *Reference* | *RSD%* |
|---|---|---|
| Gestation length | (Kieler, Axelsson, Nilsson, & Waldenström, 1995) | 3.0 |
| First crawling, walking | (Adolph, Vereijken, & Denny, 1998) | 7.6 |
| First word, sentence | (Neligan & Prudham, 1969) | 5.5, 3.8 (M/F) |
| Teeth eruption | (Hägg & Taranger, 1985) | 8 |
| Puberty | (Kaltiala-Heino, Marttunen, Rantanen, & Rimpela, 2003) | 8.6 |
| First heterosex | (Laumann, Gagnon, Michael, & Michaels, 1994) | 7.1 |
| First homosex | (Savin-Williams & Diamond, 2000) | 33, 27 (M/F) |
| Hetero-marriage | (Laumann et al., 1994) | 6.2 |
| First birth | (Martin et al., 2002) | 25 |
| Graying | (Keogh & Walsh, 1965) | 26 |
| Balding | (Paik, Yoon, Sim, Kim, & Kim, 2001) | 28 |
| Menopause | (de Bruin et al., 2001) (Hayakawa et al., 1992) | 7.3 |
| Lifespan | (CDC, 2008) | 25[a] |

We notice that same-sex initiation seems to have a much larger RSD than opposite-sex initiation or other milestones. High milestone variability is the result of a combination of genetic influences, family/social influences, and random events. These act to increase

the RSD, so it might be a natural interpretation to say that many other influences are involved. It is not very surprising that the RSD for age of first birth to a mother is large, because many more factors enter into this than marriage, including deliberate postponement, difficulties conceiving, and so on. It is no surprise that lifespan has a larger RSD because many factors, such as accidents and lifestyle choices, are involved.

However, things might not be so simple. Sometimes a societal stricture or legal requirement may actually decrease the RSD; for example, all Swedish children must start school at age seven, and the RSD of the exact age is only about 4%. Similarly, it might be thought rather strange that age of marriage is so tightly constrained, but there are many social factors that reduce the spread and tend to produce similarity. If all of one's friends are getting married, there is pressure to get married at a similar time. Because graduation from tertiary education is a normal transition point, age at first marriage might also converge then, and the RSD might be small.

The rule of thumb is that most environmental influences act to increase differences and enlarge the RSD, and that probably also applies to first SSA attraction. Since the degree of environmental influence increases a great deal after birth; one of the clearest illustrations of minimum milestone variability (i.e., relatively small RSD) is prenatal development. Such data is available and can be calculated now from MRI scans and ultrasounds, as shown in Table 2.

**Table 2. Prenatal Milestones**

| *Milestone* | *Reference* | *Mean Years* | *RSD%* |
|---|---|---|---|
| Size of 10 mm fetal sac | (Creighton University Medical Center, 2006) | 0.115 | 4.1 |
| First head rotation | (Creighton University Medical Center, 2006) | 0.200 | 4.6 |
| Singular sulcus development | (Garel et al., 2001) | 0.433 | 2.2 |
| First arm movement | (Kurjak et al., 2006) | 0.538 | 3.8 |

RSD expressed as time since conception.

The mean of these relative standard deviations (RSDs) is 3.7%, which is less than the lowest *postnatal* milestones in Table 1.

For purely genetic influence, there is evidence from colonies of laboratory mice that the degree of timing-spread might be even lower (Murray et al., 2010). For laboratory mice, with environmental conditions held very constant by researchers, the timing of gestation has a relative standard deviation of about 1.9%. This varies a little depending on the particular mouse strain. This is lower than the prenatal RSDs for humans in Table 2, but for a fuller comparison with humans, more research is needed.

## First Attraction Conceptual Difficulties

The concept of first sexual attraction is now discussed in light of the above background. The concept of attraction is more fundamental than sexual identity, because the latter will have a significant social input; similarly, a behavioral criterion is possibly unreliable. The first attraction data under consideration, although apparently more fundamental, do not necessarily involve genuine erotic arousal and may be less clear-cut than one might imagine. The answers obtained to questionnaires designed to gather data

on first attraction depend on how the questions are framed (Rich Savin-William, personal communication, June 2009). The first attraction may consist of admiration, fascination, or hero worship, and may only later become sexualized. It is assumed here that any reported first attraction has at least a sexualized tinge (Herdt, McClintock, Henderson, Lehavot, & Simoni, 2000).

Another criticism of the attraction data is that adult memories of age of first attraction may be imprecise and unreliable. However, it is reassuring that the test-retest reliability of first attraction age is good (Schrimshaw et al., 2006) and little different from those for sexual identity realization and first same-sex encounter, which are likely to be better remembered.

## First Attraction Literature Data

Kinsey, Pomeroy, and Martin (1948) and Kinsey, Pomeroy, Martin, and Gebhard (1953)—the first to investigate sexuality on a really large scale—give lots of sexual data with age, but ironically none on first attraction. They accumulated data on first arousal instead, and by this they explicitly meant physiological arousal, not just attraction. In a review of the literature, Herdt and colleagues (2000) cite the first published calculation of a first-attraction age (ten years) as a long time after the work of Kinsey et al. (Saghir & Robins, 1973).

Since Saghir and Robins (1973), there have been many subsequent studies that measured first attraction (see Table 3). Some studies give only an estimate of the age, while others also give the standard deviation of the age, or enough information so that a standard deviation may be calculated.

**Table 3. Mean Ages for First Same-Sex Attraction**

| *Reference* | *Mean First Attraction* | *Comment* |
|---|---|---|
| Remafedi, Farrow, & Deisher (1991) | 10 | Both sexes combined |
| Savin-Williams (1995) | 9.6±3.6, 10.1±3.7 | Male/female |
| Bailey & Oberschneider (1997) | 10.4 | |
| D'Augelli, Hershberger, & Pilkington (1998) | 10±4 | Both sexes combined |
| Savin-Williams (1998) | 7.5±3 10.5±6 | Male/female |
| D'Augelli et al.(2005) | 10±3.4 | Both sexes combined |
| Schrimshaw et al. (2006) | 10.9±3.8 | Both sexes combined |
| Floyd & Bakeman (2006) | 11.4±4.8 15.3±6.9 | Male/Female |
| McCabe, Hughes, Bostwick, Morales, & Boyd (2012); McCabe et al. (2012) | 10 | |
| Grossman (2008) | 12.9± ca. 7, and 9.8±3.5 | Two estimates: men only |
| Corliss, Cochran, Mays, Greenland, & Seeman, (2009) | 16±8 | Women only. May include attractions other than first. |

The mean and standard deviation of the measurements for age at first same-sex attraction for the twelve studies listed in Table 3 is 10.0±4.0 years for both sexes.

The Whitam and Mathy (1986) study of males and the Whitam, Daskalos, Sobolewski, and Padilla (1998) study of females give cross-cultural data that is consistent

with the studies cited in Table 3. In the Witam et al. studies (see Tables 4 and 5), standard deviations for first same-sex attraction were calculated from age ranges provided rather than from year-by-year data. Note that the measured ages of first opposite-sex attraction (OSA) also is included. Comments about the comparison between age of first SSA and OSA are offered in the technical appendix.

**Table 4. Age for First SSA for Males**

| | *Brazil* | *Guatemala* | *Philippines* | *USA* |
|---|---|---|---|---|
| SSA | 10.6±5.5 | 8.2±4.9 | 11.4±3.4 | 10.9±4.5 |
| OSA | 11.6±2.9 | 9.1±4.2 | 11.8±3.3 | 10.3±4.8 |

(Whitam & Mathy, 1986) Values are years, and errors are one standard deviation

**Table 5. Age for First SSA for Females**

| | *Brazil* | *Peru* | *Philippines* | *USA* |
|---|---|---|---|---|
| SSA | 14.8±6.9 | 14.7±7.2 | 15.2±6.1 | 13.7±7.3 |
| OSA | 12.5±2.8 | 12.4±3.7 | 15.1±3.2 | 9.9±3.6 |

(Whitam et al., 1998) Values are years and errors are one standard deviation.

Overall, the RSDs are similar to the data in Table 3—that is, the standard deviations are a large fraction of the ages rather than a small fraction.

In their review of the literature, Herdt et al. (2000) describe data from various primitive and sophisticated cultures and estimate that the first attraction (for both SSA and OSA) occurs at age ten. This is interpreted as evidence of a biological origin for first

attraction. The title of their paper is the memorable phrase: "The Magical Age of 10." Significantly, the age tabulated in their work does not correlate with the measured age of puberty. This is problematic as evidence for the biological origin of first attraction.

At least in the United States, in more than thirty years of studies—from Saghir and Robins (1973) to Corliss et al. (2009)—measured age of first attraction has changed little. While the age of puberty in the West has decreased considerably over several decades (Katiala-Heino et al., 2003; Kinsey et al., 1948, 1953), in some of the primitive cultures, normal puberty occurs as late as age 19. Herdt et al. (2000) claim that since the age of first attraction is not changing, this must mean that first SSA (and OSA) are biologically programmed and occur independent of puberty and culture. In effect, they assert that age of first attraction is much more tightly biologically constrained than the age of puberty itself, which is very unlikely. The data in the present paper refute this interpretation because the spread in the timing of first attraction is much too large when compared with the age of puberty.

## Comparison of Developmental Milestones with First SSA and OSA and First SS and OS Sexual Initiation

The RSD for all of the previously tabulated data on developmental milestones and first SSA (see Tables 1–5) are compared below in Figure 1. The larger the RSD, the wider the spread in the data.

**Figure 1. Developmental Milestone RSDs Combined with RSD for First SSA**

In the figure, *First Homosex* and *First Het Sex* are data points for first intercourse/ initiation for homosexual and heterosexual respectively.

The highest horizontal thick line for *First SSA/OSA Attraction* emphasizes the 40% relative standard deviation, compared with other lesser relative standard deviations elsewhere in Figure 1; the enlarged diamond is merely for emphasis. This figure shows visually the point in this paper that most biological events are more tightly clustered in age than first attraction. For example, menopause occurs over a restricted age range, but graying of hair is much more variable in age. Lines indicating approximate lowest RSDs for prenatal and postnatal developmental events are included. The OSA first attraction RSD point, which is the same as for SSA, was derived from Tables 4 and 5.

In Figure 1 the values for the relative standard deviation statistic are much higher for deciduous (baby) teeth than for permanent teeth. This is reasonable, because it is less important that deciduous teeth erupt at fixed times.

It is interesting that even walking and first verbal production seem restricted in time to a surprising extent. In contrast, events like balding and lifespan are much more heavily influenced by the environment. Any genetic heterogeneity is included in the table/ figure data and could increase some RSD results.

The same-sex milestones have much larger RSDs than the heterosexual ones. It would be tempting to say that this is the result of societal pressures interfering with SSA, and making the ages at which milestones occur more variable, but this is not correct because the OSA first attraction RSD is similar to the SSA first attraction RSD (and very different from the other OSA milestones). This means either that the concept of "first attraction" is quite unsuitable as a measure of sexual orientation, or similar influences are impacting both.

**Comparison of Relative Genetic Influence of Specific Developmental Milestones**

Table 6 shows the genetic influence on milestone timing, where known.

**Table 6. Percentage Genetic Influence from Twin Studies**

| *Milestone* | *Reference* | *% Genetic Influence* |
|---|---|---|
| Gestation length | (Clausson, Lichtenstein, & Cnattingius, 2000) | 31[a] |
| First crawling, walking | Not found | |
| First word, sentence | Not found | |
| Teeth eruption timing | (Townsend, Hughes, Luciano, Bockmann, & Brook, 2009) | 94 |
| Puberty timing | (Silventoinen, Haukka, Dunkel, Tynelius, & Rasmussen, 2008) | 91 |
| First heterosex | (Dunne et al., 1997) | 72, 49 (M/F) |
| Marriage | (Trumbetta, Markowitz, & Gottesman, 2007) | 27[d] |
| Graying | Not found | |
| Balding | (Rexbye et al., 2005) | 79[b] |
| Menopause timing | (de Bruin et al., 2001) | 86 |
| Lifespan | (Hjelmborg et al., 2006) | 26[c] |

(a) Mother gene influence only—there is also a contribution from the fetus. (b) To a mean baldness criterion rather than age. (c) For 96-year-olds. (Similar results for 2 individual decades previous.) (d). Maximum from ages 20–40, but is RSD on marital status, not RSD on age.

We now compare the RSD on points with a known high genetic influence (more than 50%) from Table 6, such as teeth eruption, puberty, first heterosexual intercourse, balding, and menopause. The mean and standard error of the mean for RSD of these selected milestones are 0.120±0.031. This is very statistically different from the 0.40 for RSD of first attraction ($P<0.001$) so presumably both SSA and OSA first attraction do not have a predominant genetic component.

For a more specific example, the data for first SSA and puberty for males—derived and redrawn from Hamer, Hu, Magnuson, Hu, and Pattatucci, (1993)—are particularly clear, because they are given separately for each year of age rather than as summary statistics. In Figure 2, note that the data for first SSA are very spread out, compared with the data for puberty.

**Figure 2. Male First SSA Attraction (Hamer et al, 1993) The numbers are per year.**



From Figure 2, SSA age-occurrence is not like the genetically influenced shape of puberty. The two means and standard deviations are respectively 10.0±4.1 years, and 12.5±1.4 years; very different at the $p<0.001$ level by either a t-test or the Levene test for homogeneity of variance.

Using the known very strong genetic influence on puberty timing, the likely genetic influence on first SSA is calculated in the technical appendix. However, the conclusion from the comparison as seen in the figures is that the genetic influence is low and other influences predominate. There is no support for the idea that first attraction is an innate, or inevitable, developmental milestone.

## The Possible Involvement of Adrenarche (Full Adrenal Maturity)

Herdt et al. (2000) speculate that the "magical age of 10" may be due to adrenarche, which is a biological milestone. Adrenarche is the first achievement of full adrenal maturity, the point at which androgenic hormones are produced to mature levels and which has been observed to occur also at age ten (Auchus, 2011). Adrenal maturity occurs independent of puberty. It is possible to have puberty without adrenarche (as in the case of adrenal failure), and adrenarche without puberty (as in Turner's syndrome), and sexual attraction will still develop in either case (this example is for OSA). Auchus mentions that adrenarche is not an abrupt and signaled process occurring in mid childhood but rather a continuous process since birth. It therefore is not only independent of puberty but a different type of process and very spread out over time.

One possibility is that first attraction might be due to some prolonged genetic influence connected with hormones from the adrenal gland, which theoretically might explain the spread-out nature of first attraction. However, this seems very unlikely, given the example of girls with congenital adrenal hyperplasia and OSA (Meyer-Bahlburg, Dolezal, Baker, Ehrhardt, & New, 2006). Such girls have grossly excessive androgen production from well before birth, but not excessive attraction to the opposite sex; in

fact, they have less attraction to the opposite sex. A small but increased proportion of girls with this condition is attracted to the same sex. These girls are not born precociously attracted to the opposite sex; rather they become attracted to the opposite sex in a way similar to those exposed to normal hormone levels. This suggests adrenarche is likely to be a quite minor influence on first attraction.

## A Social Hypothesis

An alternative hypothesis is that social environmental factors strongly influence the development of first same- (and opposite-) sex attraction. As described (Whitehead & Whitehead, 2010), the age of ten also coincides with an approximate peak in the differential social gender-development of each sex. For several years after birth, boys and girls have been following the diverging psychological trajectories appropriate to their sex (or for SSA children, often not following them). Having developed social gender characteristics that differ from the opposite sex, boys and girls commonly begin to be interested in those differences, and even attracted to those who are different. This is essentially the "exotic becomes erotic" idea of Bem for OSA, as well as SSA (Bem, 1996). Some of the spread in age at first attraction could simply derive from the variability in time required for encountering a person who is perceived as attractive. Twin studies have shown that romantic opposite-sex attraction has zero genetic influence for adults (Zietsch, Verweij, Heath, & Martin, 2011). Work using a quite large sample of adolescent twins found the same for same-sex attraction in teenagers, i.e., no genetic influence (Bearman & Brueckner, 2002). There seems little doubt that a similar survey for first attraction prepuberty would have a similar result.

A strength of the current paper is that the standard combination of the concept of genetically influenced developmental milestones and the variation of their age-spread has a large and well-established literature but has never before been applied to SSA. This is a fresh approach to the problem of genetic influence that is normally tackled by twin

studies or family studies. First SSA has such a wide relative standard deviation compared to other clearly genetically influenced milestones that it seems clear the appearance of first SSA is only weakly influenced by genetics. This means that the common belief that people with SSA are "born that way" is not supported by the literature on first attraction.

A possible limitation to this conclusion is that measuring first attraction is commonly done by asking only one question in a retrospective, self-report survey. Also, since the concept of "attraction" is so multifaceted, more research is needed to allow for a fuller exploration of this topic. For the present comparison, puberty was not too different in age from first attraction, but other comparisons with wider age disparities may introduce extra mathematical uncertainty.

## Conclusions

Although it is common to hear that first same-sex attraction coincides with earliest memories, numerous surveys show this is a very misleading generalization—half of all reported first attractions are later than age ten. It is doubtful whether this attraction is more than a possible harbinger of possible future sexualized attraction, particularly for SSA. Its very spread-out occurrence in time (about 40% relative standard deviation) makes it nearly impossible that it is predominantly biologically influenced. Human post-natal events that are known to be biologically preprogrammed have a much smaller relative standard deviation of about 7% and prenatal events of about 4%. It is also doubtful that adrenarche—adrenal maturity—is an adequate explanation for this "magical age of 10." A social explanation based on the development of psychosexual gender differences is more plausible.

# References

Adolph, K. E., Vereijken, B., & Denny, M. A. (1998). Learning to crawl. *Child Development, 69*(5), 1299–1312.

Auchus, R. J. (2011). The physiology and biochemistry of adrenarche. *Endocrine Development, 20*, 20–27.

Bailey, J. M., & Oberschneider, M. (1997). Sexual orientation and professional dance. *Archives of Sexual Behavior, 26*, 433–444.

Bearman, P. S., & Brueckner, H. (2002). Opposite-sex twins and adolescent same-sex attraction. *American Journal of Sociology, 107*, 1179–1205.

Bem, D. J. (1996). Exotic becomes erotic: A developmental theory of sexual orientation. *Psychological Review, 103*, 320–335.

CDC. (2008). Table 3. Numbers of deaths. http://www.disastercenter.com/cdc/Death%20rates%202005.html

Clausson, B., Lichtenstein, P., & Cnattingius, S. (2000). Genetic influence on birthweight and gestational length determined by studies in offspring of twins. *BJOG, 107*(3), 375–381.

Corliss, H. L., Cochran, S. D., Mays, V. M., Greenland, S., & Seeman, T. E. (2009). Age of minority sexual orientation development and risk of childhood maltreatment and suicide attempts in women. *American Journal of Orthopsychiatry, 79*(4 ), 511–521.

Creighton University Medical Center. (2006). Ultrasound of early pregnancy. Retrieved December 2006 from http://radiology.creighton.edu/pregnancy.htm_

D'Augelli, A. R., Grossman, A. H., Salter, N. P., Vasey, J. J., Starks, M. T., & Sinclair, K. O. (2005). Predicting the suicide attempts of lesbian, gay and bisexual youth. *Suicide and Life-Threatening Behavior, 35*(6), 646–660.

D'Augelli, A. R., Hershberger, S. L., & Pilkington, N. W. (1998). Lesbian, gay, and bisexual youths and their families: disclosure of sexual orientation and its consequences. *American Journal of Orthopsychiatry, 68*, 361–371.

de Bruin, J. P., Bovenhuis, H., van Noord, P. A. H., Pearson, P. L., Arendonk, J. A. M., . . . & Dorland, M. (2001). The role of genetic factors in age at natural menopause. *Human Reproduction, 16*, 2014–2018.

Dunne, M. P. , Martin, N. G., Statham, D. J., Slutske, W. S., Dinwiddie, S. H., Bucholz, K. K., . . . & Heath, A. C. (1997). Genetic and environmental contributions to variance in age at first sexual intercourse. *Psychological Science, 8*(3), 211–216.

Floyd, F. J., & Bakeman, R. (2006). Coming-out across the life course: Implications of age and historical context. *Archives of Sexual Behavior, 35*(3), 287–296.

Garel, C., Chantrel, E., Brisse, H., Elmaleh, M., Luton, D., Oury, J. F., . . . & Hassan, M. (2001). Fetal cerebral cortex: Normal gestational landmarks identified using prenatal MR imaging. *AJNR American Journal of Neuroradiology, 22*, 183–189.

Grossman, A. H. (2008). The unique experiences of older gay and bisexual men: Associations with health and well-being. In R. J. Wolitski, R. Stall, & R. O. Valdiserri (Eds.), *Unequal opportunity: Health disparities affecting gay and bisexual men in the United States* (pp. 303–326). New York: Oxford University Press.

Hamer, D. H., Hu, S., Magnuson, V. L., Hu, N., & Pattatucci, A. M. L. (1993). A linkage between DNA markers on the x-chromosome and male sexual orientation. *Science, 261*, 321–327.

Hayakawa, K., Shimizu, T., Ohba, Y., Tomioka, S., Takahasi, S., Amano, K., . . . & Hayakata, Y. (1992). Intrapair differences of physical aging and longevity in identical twins. *Acta Geneticae Medicae Et Gemellologiae, 41,* 177–185.

Herdt, G., McClintock, M., Henderson, A. W., Lehavot, K., & Simoni, J. M. (2000). The magical age of 10. *Archives of Sexual Behavior, 29* (6), 587–606.

Hershberger, S. L. (1997). A twin registry study of male and female sexual orientation. *Journal of Sex Research, 34*, 212–222.

Hillier, L., Turner, A., & Mitchell, A. (2005). *Writing themselves in again: 6 years on.* Melbourne: La Trobe University.

Hjelmborg, B. J., Iachine, I., Skytthe, A., Vaupel, J. W., McGue, M., Koskenvuo, M., . . . & Christensen, K. (2006). Genetic influence on human lifespan and longevity. *Human Genetics, 119*(3), 312–321.

Hägg, U., & Taranger, J. (1985). Dental development, dental age and tooth counts. *Angle Orthodontist, 55*, 93–107.

Kaltiala-Heino, R., Marttunen, M., Rantanen, P., & Rimpela, M. (2003). Early puberty is associated with mental health problems in middle adolescence. *Social Science and Medicine, 57*, 1055–1064.

Keogh, E. V., & Walsh, R. J. (1965). Rate of greying of human hair. *Nature, 207*, 877–878.

Kieler, H., Axelsson, O., Nilsson, S., & Waldenström, U. (1995). The length of human pregnancy as calculated by ultrasonographic measurement of the fetal biparietal diameter. *Ultrasound in Obstetrics & Gynecology, 6*(5), 353–357.

Kinsey, A. C., Pomeroy, W. B., & Martin, C. E. (1948). *Sexual behavior in the human male*. Philadelphia: W. B. Saunders.

Kinsey, A. C., Pomeroy, W. B., Martin, C. E., & Gebhard, P. H. (1953). *Sexual behavior in the human female.* Philadelphia: W. B. Saunders.

Kurjak, A., Andonotopo, W., Hafner, T., Salihagic, A., Standojevic, M., Azumendi, G., . . . & Troyano, J. M. (2006). Normal standards for fetal neurobehavioral developments—longitudinal quantification by four-dimensional sonography. *Journal of Perinatal Medicine, 34*, 56–65.

Laumann, E. O., Gagnon, J. H., Michael, R. T., & Michaels, S. (1994). *The social organization of sexuality*. Chicago: University of Chicago Press.

LeVay, S. (2010). *Gay, straight and the reason why*. New York: Oxford University Press.

Martin, J. A., Hamilton B. E., Ventura, S. J., Menacker, F., Park, M. M., & Sutton, P. D. (2002). Births: final data for 2001. *National Vital Statistics Reports, 51*(2), 1–104.

McCabe, S. E., Hughes, T. L., Bostwick, W., Morales, M., & Boyd, C. J. (2012). Measurement of sexual identity in surveys: Implications for substance abuse research. *Archives of Sexual Behavior, 41*(3), 649–657.

McLelland, M. J. (2000). *Male homosexuality in modern Japan: cultural myths and social realities*. Richmond, Surrey, UK: Curzon Press.

Meyer-Bahlburg, H., Dolezal, C., Baker, S., Ehrhardt, A., & New, M. (2006). Gender development in women with congenital adrenal hyperplasia as a function of disorder severity. *Archives of Sexual Behavior, 35*(6), 667–684.

Murray, S. A., Morgan, J. L., Kane, C., Sharma, Y., Heffner, C. S., Lake, J., & Donahue, L. R. (2010). Mouse gestation length is genetically determined. *PLoS One, 5*(8), e12418.

Neligan, G., & Prudham, D. (1969). Norms for standard developmental milestones by sex, social class and place in family. *Developments in Medical Child Neurology, 11*, 413–422.

Paik, J. H., Yoon, J. B., Sim, W. Y., Kim, B. S., & Kim, N. I. (2001). The prevalence and types of androgenetic alopecia in Korean men and women. *British Journal of Dermatology, 145*, 95–99.

Remafedi, G., Farrow, J. A., & Deisher, R. W. (1991). Risk factors for attempted suicide in gay and bisexual youth. *Pediatrics, 87*, 869–875.

Rexbye, H., Petersen, I., Iachina, M., Mortensen, J., McGue, M., Vaupel, J. W., & Christensen, K. (2005). Hair loss among elderly men: Etiology and impact on perceived age. *Journal of Gerontology: A Biological Sciences and Medical Science, 60*(8), 1077–1082.

Saghir, M. T., & Robins, E. (1973). *Male and female homosexuality, a comprehensive investigation*. Baltimore, MD: Williams and Wilkins.

Savin-Williams, R. C. (1995). Lesbian, gay male, and bisexual adolescents. In A. R. D'Augelli & C. J. Patterson (Eds.). *Lesbian, gay, and bisexual identities over the lifespan* (pp. 166–189). New York: Oxford University Press.

Savin-Williams, R. C. (1998). The disclosure to families of same sex attractions by lesbian, gay, and bisexual youths. *Journal of Research on Adolescence, 8,* 149–168.

Savin-Williams, R. C., & Diamond, L. M. (2000). Sexual identity trajectories among sexual-minority youths: Gender comparisons. *Archives of Sexual Behavior, 29*, 607–627.

Schrimshaw, E., Rosario, M., Meyer-Bahlburg, H., Scharf-Matlick, A., Langstrom, N., & Hanson, R. K. (2006). Test-retest reliability of self-reported sexual behavior, sexual orientation and psychosexual milestones among gay, lesbian and bisexual youths: High rates of sexual behavior in the general population: correlates and predictors. *Archives of Sexual Behavior, 35,* 225–234.

Silventoinen, K., Haukka, J., Dunkel, L., Tynelius, P., & Rasmussen, F. (2008). Genetics of pubertal timing and its associations with relative weight in childhood and adult height: The Swedish young male twins study. *Pediatrics, 121*(4), e885-891.

Townsend, G., Hughes, T., Luciano, M., Bockmann, M., & Brook, A. (2009). Genetic and environmental influences on human dental variation: A critical evaluation of studies involving twins. *Archives of Oral Biology, 54* (Suppl. 1), s45–s51.

Trumbetta, S. L., Markowitz, E. M., & Gottesman, I. I. (2007). Marriage and genetic variation across the lifespan: Not a steady relationship? *Behavior Genetics, 37*(2), 362–375.

Whitam, F. L., Daskalos, C., Sobolewski, C. G., & Padilla, P. (1998). The emergence of lesbian sexuality and identity cross-culturally: Brazil, Peru, the Philippines, and the United States. *Archives of Sexual Behavior, 27*, 31–56.

Whitam, F. L., & Mathy, R. M. (1986). *Male homosexuality in four societies. Brazil, Guatemala, the Philippines, and the United States.* New York: Praeger.

Whitehead, N. E. (2011). Neither genes nor choice: Same-sex attraction is mostly a unique reaction to environmental factors. *Journal of Human Sexuality, 3*, 81–114.

Whitehead, N. E., & Whitehead, B. K. (2010). *My genes made me do it!* (2nd ed.). Lower Hutt, New Zealand: Whitehead Associates. See also www.mygenes.co.nz

Wilson, G., & Rahman, Q. (2005). *Born gay: The psychobiology of sex orientation.* London: Peter Owen.

Zietsch, B. P., Verweij, K. J., Heath, A. C., & Martin, N. G. (2011). Variation in human mate choice: Simultaneously investigating heritability, parental influence, sexual imprinting, and assortative mating. *American Naturalist, 177*(5), 605–616.

# Technical Appendix

In this appendix, data from tables in the body of the paper are used to estimate the genetic and other influences on timing of first attraction. This method is a minor novelty in the literature, but follows from the mathematics used. Comparison of variances is universally employed, but rarely applied to milestones.

The data for timing derived from Figure 2 are 10.0±4.1 years, and 12.5±1.4 years for first SSA and puberty respectively. The variance of these measures, which is the square of the standard deviation of each mean, is used. Therefore, variances of $4.1^2$ and $1.4^2$ or 16.81 and 1.96, were compared. The genetic contribution to the timing of puberty from Table 6 is 0.91 or 1.96*0.91 or 1.78 (because the genetic contribution to puberty is only 91% instead of 100%). Other things being equal, we compare 1.78 units of variance contribution for timing of puberty with 16.81 units of variance for first SSA. This means that the genetic contribution to first SSA is about 10%. It could possibly be somewhat less, because the mean age of 10 for first SSA is less than the mean age of 12.5 for puberty (see Figure 2). For a general conclusion, it is enough to know that the genetic contribution to the variance of first same-sex attraction timing is weak rather than overwhelming. The result is similar to a previous estimation from twin studies by a quite different method (Whitehead, 2011).

Figure 2 does not give information we could use to repeat the calculation for OSA. Some first attraction ages (standard deviation in parentheses) can be used from Tables 4 and 5, though they are less precise than the Figure 2 data, i.e., OSA(m) 10.3 (47%) OSA(f) 9.9 (36%).

These two results for OSA again indicate a weak effect of genetics, for both males and females and in the order of 10%.

It may surprise readers that the genetic contribution to OSA timing is apparently so low. While it is quite widely assumed that one is "born OSA," there has been only

one other quantitative test of this hypothesis (Hershberger, 1997). Hershberger tested the existence—not the timing of first appearance—of OSA contrasted with other sexual orientations and found that the genetic contribution to OSA was 18 to 26%. This is a weak to modest influence and puzzling in light of the general assumption that heterosexual orientation is genetically inherited. But this finding apparently has received no subsequent comment. The present finding is reasonably consistent with Hershberger's work, though for the measurement of the timing of appearance rather than the perceived existence of the orientation itself. This implies that nongenetic factors, such as the role of family and society in developing OSA, are much greater than usually thought and the role of genetics much less (Whitehead & Whitehead, 2010). An alternative interpretation is that "first attraction" is not a reflection of adult sexual orientation and either should not be used, or should be used only with caution.

# What *Did* Make Me Do It? A Review and Summary of Neil Whitehead and Briar Whitehead's *My Genes Made Me Do It!—Homosexuality and the Scientific Evidence*

Philip M. Sutton[5] and Robert L. Vazzo[6]

[5] Philip M. Sutton, PhD, is licensed as a psychologist (in Michigan and Ohio), marriage and family therapist, and clinical social worker (in Indiana) and practices full-time. Dr. Sutton is the editor of NARTH's *Journal of Human Sexuality.*

[6] Robert L. Vazzo is licensed as a marriage and family therapist in California, Florida, and Ohio, and currently practices in Encino, California. Mr. Vazzo also holds an advanced degree in linguistics and periodically writes and edits articles for NARTH's *Journal of Human Sexuality.*

*My Genes Made Me Do It!—Homosexuality and the Scientific Evidence,* authored by Neil Whitehead, biochemist and science researcher/consultant, and edited by Briar Whitehead, journalist and author of *Craving for Love* (2003)—is a facetious title for a book whose main point is that *our genes don't and can't make us do anything*! That includes feeling or acting on homosexual or same-sex attractions (SSA).

The 2010 version of *My Genes* is a thorough revision of the original 1999 edition. For more than twenty years, Neil Whitehead has personally dedicated himself to reviewing the historical and current professional and scholarly papers relevant to the development and enactment of SSA. By his conservative estimate, he has reviewed more than "10,000 scientific papers" (back cover). The updated 2010 version alone involves the citation of more than 460 scientific and professional papers and publications, almost 200 more than the 1999 edition. These additional citations include the most up-to-date literature from the past decade that is relevant to understanding the origins and outcomes of homosexuality (SSA).

## Where to Start Reading

While we agree that the book is a reasonably "comprehensive and accessible" book (back cover), we submit that the Whiteheads cover so many topics and cite so many studies and reports that at times the writing may be daunting for nonscientists. We strongly encourage readers to *begin at the end* with the book's summary (pp. 264–273). This final chapter lists all of the major conclusions of the preceding twelve, including sound-bite conclusions about the evidence for the changeability of SSA and evidence from the twin studies that SSA is *not* genetically determined. In addition to summaries at the end of each chapter, particular bullet-point summaries throughout the text are worth reading before tackling the chapters themselves (see, for example, pp. 36–37, 80–81, 144, and 159–160).

In the following ten sections, the reader will find further commentary on the idea that *our genes can't and don't make us do anything* and on other major ideas specifically concerning homosexuality.

## Section 1. Our genes do *not* make us *do anything*!

In spite of a cultural bias that human beings are genetically determined to behave in certain ways, the Whiteheads' review of the biogenetic literature leads them to assert otherwise. In Chapter 1 ("Can genes create sexual preferences?"), they offer a brief review of introductory genetics and conclude that *while genes have an influence in and on* all *human behavior*—making it possible to live and act in and through our bodies—*genes themselves do not make or compel* any *behavior*.

The Whiteheads explain that while the concept of genetic influence is a valid scientific phenomenon, genetic effects are indirect. In other words, genes create an individual who can grow, adapt, and evolve in his environment; however, genes do not dictate behavior. In fact, they represent no more than 10 to 15% of the factors that *do* influence human sexual behavior, whether toward a person of the same or the opposite gender.

The summary at the end of Chapter 1 (pp. 36–37; cf. pp. 265–267) offers not only a clear and simple presentation of the authors' comprehensive review of the scientific literature on genetics, but also a good introduction to the breadth and depth of the research evidence and the scientific logic that they employ throughout the book.

## Section 2. While genetic factors are not irrelevant, *neither* heterosexuals *nor* homosexuals are "born that way."

The major part of Chapter 3 ("Are heterosexuals 'born that way'?") reviews research on the development of heterosexuality. The Whiteheads finally conclude that genes do not determine heterosexuality, just as they do not determine homosexuality. Rather, they conclude that heterosexuality also develops in response to environmental stimuli.

To further support the assertion that no one is born with any specific sexual preference, the Whiteheads review in Chapter 9 the reported evidence that claimed a

scientist had found a gay gene. Beginning in 1993, the public was inundated with news reports from the Western media that "a gene determining homosexuality" had been found, even though scientists responsible for the study (Hamer et al., 1993) had reported otherwise.

Attempts to replicate these and other studies to confirm findings of a gay gene have largely failed to show the same results (pp. 164–171). The Whiteheads note that with "the availability now of thorough 'whole genome' scans, gene linkage studies are now becoming rather passé" (p. 164). Also, as the authors discuss in Chapters 1 and 8, we now know that literally thousands of genes may be involved in a single trait. In addition, scientists have observed and believe that the environment may influence the expression of these genes. In other words, *genes provide the blueprints for the formation of the human body, but they seldom dictate particular characteristics of human behavior.*[7]

The study of how genes may influence the behavior of a person—"the way in which the expression of heritable traits is modified by environmental influences or other mechanisms without a change to the DNA sequence"—is called *epigenetics* by biologists (Dictionary.com). Behavioral, social, and developmental psychologists, and other researchers commonly use interaction theory (Magnusson, 1985) to explain the ways that genetic and biological factors affect and are affected by environmental and nonbiological factors (i.e., how "nature" affects and is affected by "nurture"). The Whiteheads' use of *epigenetics* to explain the real but limited influence of genes on sexual behavior may be also—and to professionals in the arts and sciences, perhaps better—explained using interaction theory.

---

[7] An example of how to understand this comes from understanding how people develop oral language. Persons with normal, healthy genes and otherwise benign pre- and post-natal physical and psychosocial influences will learn to speak and hear language. The language(s) they learn will be the one(s) used by those with whom they interact while growing up. In this sense, the genes themselves do not determine whether a person learns a language, or which language he or she learns. But the genes are necessary—even if not sufficient—for a particular language to be learned.

However, *the fact that both heterosexuality and homosexuality are not genetically determined does not mean that genetic factors are irrelevant to their development.* The Whiteheads describe such influences as "indirect random genetic factors" (p. 12). Throughout the book, the authors maintain that "in any human behavior . . . any genetic influence is weak and indirect" (p. 10). Consistent with their estimate in the summary of the first edition of *My Genes*, the Whiteheads conclude that genetic factors represent no more than 10% of the total influence on sexuality and emphasize that everyone has about that amount for all kinds of behaviors.

## Section 3. Nongenetic (epigenetic) biological factors also do not *make* us develop or act on SSA.

*Epigenetic Factors*

A number of nongenetic, biological factors (such as fetal developmental disorder, instincts, pre-/postnatal hormones, sex-atypical brain structures) have been either speculated or reported as contributing to the development of SSA, but a careful review and consideration of relevant research shows such claims are unsupported and unlikely, if not implausible. Such factors generally are called *epigenetic*, meaning nongenetic (see above). Figure 5 (p. 32) shows a graphic comparison of the frequency of occurrence of SSA compared with the frequency of actual developmental (epigenetic) disorders. This comparison reveals that "the occurrence of SSA is [five times or more] higher than any [other] single occurrence of epigenetic abnormality, and hence is very unlikely to arise from some random developmental disorder before birth" (pp. 32–33). In brief, SSA occurs too frequently compared with such nongenetic, biological disorders that occur much less frequently.

*Hormonal Factors*

Chapter 7 ("Prenatal hormones? Stress? Immune attack?") discusses whether homosexuality might be attributable to abnormal prenatal hormonal levels in the mother. Studies of various factors such as exposure to diethylstilbestrol, adrenogenital syndrome,

finger length ratios, other prenatal hormone effects, adult exposure to sex hormones, maternal stress, and the maternal immune hypothesis have shown that the evidence to support this hypothesis is weak.

### *"Gay" Brains?*

In Chapter 8 ("Are brains gay?"), the Whiteheads review older as well as recent research and scientific thinking about how homo- or heterosexuality might in some manner be hardwired in the internal structures of the brain. In addition to older and recent research—which in general has failed to find consistent, innate anatomical/structural differences between male and female brains at birth and beyond (pp. 143–148)—the authors consider the studies undertaken in the nineties, including the LeVay (1991) hypothalamus study.

A consistent pattern exists: when one study claims to have found anatomical brain differences between the brains of persons *presumed* to be homosexual and heterosexual, subsequent studies have failed to replicate the findings. Also, even well-conducted studies have failed to rule out that any differences in brain structure among people who clearly practice homosexual behavior are not the result of "learning." In other words, such differences, if they exist, could be the result—and not the cause—of homosexual behavior. This point is consistent with recent research concerning brain *neuroplasticity*—how the brain can physically change over the lifespan, and the way in which repeated new behaviors can cause predictable changes (e.g., Doidge, 2007).

### *What if SSA Is an Instinct or a Reflex?*

In Chapter 4 ("How strong are instincts?"), the Whiteheads respond to the argument that homosexuality may be "like a powerful instinct" or reflex, meaning that it is so much a part of a person that it is instinctual. Those who support that argument believe that SSA behavior is so deeply rooted in the personality that it is difficult, if not impossible, to change. The Whiteheads consider this speculation in light of what is known about other instincts.

Among the "strong instincts" or "reflexes" humans have are the fight/flight response, a mother's concern for an infant, the need to eat and sleep, yawning, sneezing, pulling a hand away from a flame, and digestion, to name just a few. As powerful as any and all of these instincts or reflexes are, none is so powerful that it cannot be "trained"—in other words, brought under some degree of conscious control.

Considering what this means for the desire to engage in heterosexual behavior, the authors write that even though the desire to reproduce is instinctual, it can be trained and brought under control. Considering homosexuality in this light, the Whiteheads point out that unlike heterosexuality, homosexuality is certainly not connected to reproduction of the human species. Yet even if SSA deserved to be called an "instinct" of any kind, "it is no less malleable than any other of the powerful instincts that man experiences, which, we have seen, are subject to a huge degree to man's will and other environmental influences" (p. 102).

**Section 4. Environmental (family and social) factors *are* influential, but they do *not,* in and of themselves, determine SSA.** (This section reviews only what *My Genes* reports about the environmental and social factors that may influence the development of a given person's SSA and behavior. Neil Whitehead has written two articles that address these topics at greater length, both of which are cited in the reference section of this review.)

As discussed above in Section 2, studies of identical twins reveal that postbirth environmental factors contribute to one twin being homosexual while the other is usually not. These factors include the individual's family and social environment, as well as his or her personal psychology.

### *Developmental Struggles*

In Chapter 3 ("Are heterosexuals 'born that way'?"), the Whiteheads review the stages of development that result in heterosexuality and conclude that those who have a

homosexual orientation often have had struggles with different stages of psychosexual development. These stages include a lack of attachment and weak identification with the same-sex parent and lack of bonding with same-sex peers. Such developmental "breakdown(s)" lead "to needs for same-sex affection and affirmation that become eroticized" (p. 90; cf. pp. 82–85). Sexual abuse, which can cause trauma, can also play a role. The Whiteheads note that "rates of male sexual abuse are higher in homosexuals and lesbians than in heterosexuals" (p. 90; cf. pp. 85–86). While such factors are significant for *some* persons who develop SSA, the Whiteheads emphasize that *not all* persons with SSA report these experiences.

As previously mentioned, studies of identical twins in which one twin is homosexual reveal that the identical co-twin is usually *not* homosexual. Therefore, we can conclude that the predominant things that create homosexuality in one identical twin (and not in the other) have to be *postbirth* factors (p. 174; cf. Whitehead, 2011a). As the authors point out, most people indicate that multiple factors led to the development of their SSA, and that no one factor can be considered primary.

*Path analysis studies do* not *identify unique or individual pathways into SSA*[8]

In Chapter 11 ("Path Analysis: Social factors do lead to homosexuality"), the Whiteheads review studies by Bell, Weinberg, and Hammersmith (1981); Van Wyk and Geist (1984); and Bem (2000). All of those studies used the statistical tool called *path analysis* to try to identify the most common path(s) leading to SSA. Notably, the results of these path analyses—especially in the Bell et al. (1981) study—have been interpreted as failing to support social causes for SSA. The path analysis approach works by statistically minimizing or eliminating "those factors that do not apply to everyone in

---

[8] For a more extensive explanation and discussion of the results of the studies of homosexuality that have used path analysis, see Whitehead (2011b) elsewhere in this volume.

the sample in the simple attempt to find common factors" (p. 218). Unfortunately, this means that "unique experiences" or individualistic pathways to developing SSA are not identified in the process (p. 218).

The Whiteheads maintain that a proper interpretation of Bell et al. (1981) and other path analyses actually provides evidence that social factors do influence the development of SSA (cf. Whitehead, 2011b). The Whiteheads explain that while path analysis is not the preferred tool for studying homosexuality, it has proven useful when accurately interpreted. While it's true that the development of homosexuality cannot be attributed to a few common causes, multiple identifiable causes have been observed in many different clients, with gender nonconformity being the predominant one. According to the Whiteheads, Bell et al. actually found that social factors are significant; however, no one social factor can be identified as the sole or primary influence in the development or practice of homosexuality. Again, this is consistent with the modern understanding of interaction theory.

In the Van Wyk and Geist (1984) study, the strongest precursors of SSA were found to be "intense sexual experiences and feelings of arousal and pleasure or discomfort associated with those experiences" (p. 219). In particular, males with SSA reported having had childhoods characterized by poor relationships with their fathers during the teenage years, more female companions at age ten, fewer male friends at ages ten and sixteen, avoidance of sports activities, and predominant sexual experiences with males. The exact opposite has been found for females with SSA (pp. 219–220).

Finally, the path analysis done by Bem (2000) also found that childhood gender nonconformity was an important factor in the later development of SSA, a finding that confirmed Bell et al.'s (1981) finding. Bem also concluded that compared to childhood gender nonconformity, "genetic influence is near zero" (p. 221).

## Section 5. Idiosyncratic responses to "chance" or "random" life experiences have the greatest influence on who does—and doesn't—develop SSA.

It must be acknowledged that postbirth factors include not only influences that come from a person's family and social environment, but also the psychological and behavioral responses that he or she has in response to these influences. One goal of psychology as a science is to investigate such individual differences in response to the experiences of one's environment. The importance of individual, unique, or idiosyncratic perceptions of and responses to common factors—for example, circumstantially similar family or social events to and with which a person interacts—are discussed in this section.

Those who accept that SSA develops primarily through *psychogenesis*—the interaction of psychological factors and processes, notably psychopathological—may find this section, if not the entire book, disappointing. While the Whiteheads do examine some of the historical issues surrounding this understanding of SSA as the result of a personal interactive process—including some of the work of current clinicians and theoreticians who have championed primarily or exclusively psychological theories of causation—the authors do not attempt to present these professionals' views comprehensively. It is not that understanding the evidence from psychotherapeutic experience is unimportant; the authors specifically criticize the American Psychiatric Association and the American Psychological Association for ignoring these reports (see Section 10). Rather, it was simply not the intent or scope of the book to discuss them (see Section 7).

Concerning the material discussed in Section 4, the authors emphasize that what is of paramount importance in the development of SSA are the idiosyncratic cognitive and emotional reactions to particular environmental events, many of which have been identified as pathways to the development of SSA. Whether it happens within

or outside the family, an experience proves influential if it both catches and keeps a person's attention. The influence increases if the person also responds behaviorally to the experience and his or her response becomes a *habit* (see Section 6).

*Chance, Random, One-off Experiences*

Along with the consistent conclusion that a person's genes didn't and couldn't make him or her feel or act on SSA, the most significant idea of the Whiteheads is their repeated mention that idiosyncratic responses to chance, random, or one-off (British-English synonym for the preceding terms) events are *the* most significant factor in the development of SSA. The use of terms like *chance* and *random* warrants further explanation.

The Whiteheads define *chance* as "an individual's reaction to random life events" (p. 16). Their definition includes two assumptions. 1. Everyone in a given age group does *not* have the same objective experience or event. 2. Everyone who *does* share an objective experience does not have the same personal, idiosyncratic, subjective experience and/or will not respond to the experience in the same way. (See Section 6 for a further discussion of subjective, individualistic responses.)

As seen in Section 4, twin studies research (Chapter 10) offers good illustrations of chance or random experiences. For example, research shows that perceptions among even identical twins can be erratic even though both twins witnessed or participated in the same objective experience of their parent(s). Furthermore, individual chance events can affect one child in unique ways. For example, a child who stumbles across pornography during adolescence may react in a way that his brother does not. It is not unlikely that an initial experience of pornography or sexual arousal by another means *may* lead to repeated similar experiences and, eventually, a tenacious habit.

Though not primarily related to SSA, another example helps illustrate this. All persons of a certain age have not experienced and will not ever experience sexual abuse.

Of those who have experienced sexual abuse, some will be more distressed than others, and their distress will last for a longer time. Some, but not all, of those abused will abuse others or might develop SSA. In statistical terms, this may be called an *interaction effect*—the combination of one or more unusual, attention-getting, nonuniversal (chance, random, one-off) experiences with certain personal, internal, and external responses. The main effect—the experience of sexual abuse—alone does not determine how the person is affected by the event (having been sexually abused).

## Section 6. Early sexual experience that becomes habituated appears to significantly influence the persistence of SSA into adulthood.

*Sexual Habits*

Along with the message that same-sex and opposite-sex attractions are *not* genetically determined, the Whiteheads emphasize throughout their book that patterns of sexual feelings and behaviors—heterosexual as well as homosexual—are learned habits of thinking, feeling, fantasizing, and behaving. They state, "According to Gebhard (1965) of the Kinsey Institute, unusual behaviors and preferences can often be traced back to *one-off incidents* of this nature" (i.e., "*chance incidents—random circumstances* unique to the individual that are in some way associated with sexual arousal") (p. 79; emphasis added). As discussed in Section 3, the authors report that sexual behaviors are developed by episodes of training or habit.

It is not the random experience itself but the person's "random reaction" to the experience that matters most. Random reaction, if it structures itself into self-image, can become a significant contributor to homosexuality, as twin studies show. The overriding outcome is a homo-emotional focus on people of the same sex that, at puberty, gets confused or melded with genital sex. This begins to finds expression in sexual acts with others of the same sex that become habitual and often (particularly in males) addictive (p. 272, emphasis added).

**Section 7. SSA (or homosexual orientation) is *not* immutable. People *can* and many *have* changed, some spontaneously and others with assistance.**

Based on their review of the literature, the Whiteheads summarize: "There is nothing fixed or final about the homosexual orientation and its natural expression—homosexual behavior" (p. 10). In fact, numerous reports in the scientific literature over many decades reveal that a significant amount of orientation change occurs during the lifespan, some of it spontaneously and some of it through the medium of counseling. Many persons who once felt same-sex attractions and/or acted to gratify them have diminished or ceased doing so, and some of these have developed opposite-sex attractions and behaviors. A similar number of persons who once categorized themselves as OSA (opposite-sex attracted) develop SSA, but this number constitutes only one-seventeenth of heterosexuals (instead of half of all homosexuals). This change illustrates that homosexuality is not hard-wired in the brain nor is it the result of predetermined genetic factors.

In Chapter 12 ("Can sexual orientation change?"), the Whiteheads review the clinical and research literature on both *assisted* (professionally or pastorally aided) and *unassisted* (spontaneous) change in sexual orientation. They note that research shows that change occurs in both directions—from homosexual to heterosexual and from heterosexual to homosexual (pp. 224–231).

In answer to the question posed by the heading of Chapter 12 ("Can sexual orientation change?"), the Whiteheads summarize:

> There is abundant documentation that people with SSA do move toward a heterosexual orientation, often with therapeutic assistance, but mostly without it. Some achieve great change, some less, but it is clear that sexual orientation is fluid, not fixed. (p. 259)

The Whiteheads make special mention of the fact that if we can find even one person whose sexual orientation has changed, that alone will disprove the theory that sexual orientation is immutable.

*Areas for Future Research*

At times, the Whiteheads mention findings or offer impressions about changes in SSA and behavior that warrant further research. For example, the authors advocate more thorough study of how those who change without assistance do so and under what conditions professional assistance is necessary or warranted. Another important area for further research is clarifying which factors are most helpful for those who do seek assistance.

## Section 8. Science provides a basis for encouragement and hope for those who experience unwanted SSA and for those who care about and for them.

Section 7 documents that many persons who once experienced unwanted SSA no longer do so, to various degrees. Such persons have reported—or it has been reported by others—that they have changed in satisfying ways, either through their own efforts alone or with professional or other assistance. Although the primary purpose of *My Genes* is to review what the scientific evidence does—and does not—show about what may influence the small minority of persons who do experience SSA, the Whiteheads offer more. At times, they write more as humanitarians, offering words of compassionate encouragement, hope, and challenge to those who experience SSA and their parents.

## Section 9. It is unrealistic to expect that future research will change any of the preceding conclusions.

Many ask the question: Is it possible for science to find some biological link to SSA that resolves its etiology once and for all? The Whiteheads answer: "No!"

The Whiteheads offer the current body of empirical knowledge and scientific logic as a basis for asserting that future research will *not* someday prove that people with SSA *were* "born that way" and that their genes *did* make them do it after all. The authors mention several reasons for their confidence. First, most of these scientific findings have been clearly established from facts that will not change (p. 271).

Second, the strongest reason for confidence that the conclusions in *My Genes* will not be contradicted by future research comes from the studies of identical twins. As already discussed in Sections 2 and 4, MZ twins have identical genes—but in most cases, if one is homosexual, the identical brother or sister usually isn't. There is only an 11 to 14% chance that an identical twin is also homosexual. Involved in this are all the influences we know about now as well as those we have yet to discover. Added together, all those influences have only a rather weak effect on what leads a given person to feel and experience SSA (p. 271). We can reasonably conclude that future research will enter new fields and come up with new links, but none of them will be definitive (p. 271).

Even if scientists one day *were* to discover a gene that all persons who experience SSA have and that persons who do *not* experience SSA lack, it would not mean that such a gene *makes* those who have it feel and behave accordingly. The point of Chapter 1 (and Section 1 of this review) is that genes simply don't work that way in human beings. In all but the most primitive living organisms, including humans, single or multiple genes may influence but do not dictate behavior. Such influence may be cooperated with or transcended. The Whiteheads offer an insightful challenge:

> DNA *is* a measure of what you are . . . but depending on what you *do*, and the *choices* you make, you may end up merely letting your genes *define* you, or totally *transcending* them. The staircase upwards only *starts* at the genetic level. (p. 37, emphasis added)

While future research will undoubtedly further clarify the relationship between genetic and biological factors and the development of SSA and behaviors, it is *not* realistic to expect future research to change the truth that the feelings, thoughts, fantasies, and behaviors of SSA are not determined wholly or primarily by one's genes or biology.

## Section 10. Current professional, political, and social cultures make it difficult to research, educate about, and provide professional care for unwanted SSA.

Along with reviewing relevant scientific research, the Whiteheads at times engage in professional and social criticism and advocacy. Along with their humanitarian comments, which are reviewed in Section 8, their attempts at social commentary and advocacy may be seen primarily in the introduction and toward the end of Chapter 12 (pp. 241–254). At the outset, they assert that for the last two to three decades, the West has been bombarded with propaganda and misinformation about SSA. This misinformation has affected everything from public institutions, such as legislatures and courts, to churches to mental health institutions.

In writing the book, the Whiteheads were both mindful that political correctness and fashion have allowed misinformation and disinformation about SSA to trump scientific accuracy and determined to clearly and responsibly state what scientists can and cannot say about these matters. They voice particular concerns about the politically—instead of scientifically—grounded positions and activities of the mental health professions about matters related to SSA (cf. pp. 5–6, 241–246).

The current gay-activist climate within the mental health professions makes the responsible conduct of research and therapy difficult. For example, mental health professionals in many jurisdictions in the West are prohibited by law from offering therapies that assist individuals in changing their sexual orientation.

*What* Did *Make Me Do It? A Review and Summary of* My Genes Made Me Do It!

The Whiteheads criticize particular pronouncements and other activities by both the American Psychiatric Association (2000) and the American Psychological Association (2009) (pp. 241–246). Both organizations have demanded "a level of proof" that is not required of therapies for other problems that efforts to change SSA works (p. 243).

*Why Persons with SSA May Attempt to Make It More Difficult for* Others *to Change*

Of particular interest are the Whiteheads' speculations about why gay activists *resist* change (pp. 248–250). For example, among gay activists are those who attempt to discredit others who claim that they have changed and actually become enraged when mental health professionals claim that change is possible. The Whiteheads speculate that many may have tried alone for years to change but have failed.

Others feel that by admitting to the possibility of change, they may end up surrendering political gains made in the area of human rights. Still others may not want to give up the gratification of their sexual activities now that such activities have become mainstream. Finally, some gay activists believe that those who desire change have been pressured by others and are acting out of shame or guilt for having same-sex attractions.

The Whiteheads take issue with the hypothesis that societal attitudes have made gays and lesbians commit suicide more than heterosexuals. Research doesn't support this notion. The authors note that Bell and Weinberg (1978) found that "gay suicide attempts, when they are directly related to homosexuality, are often over the break-up of a [SSA] relationship" (p. 257). Likewise, more current studies that have tried to establish a link between societal oppression and discrimination have failed to do so (p. 257).

## Concluding Comments

As a fitting conclusion to this review of the 2010 edition of *My Genes,* two important ideas from the last chapter of the book suffice. First, the Whiteheads inform us that our genes can't and don't make us do anything. Next, they tell us that SSA is

*multifactorial*—that is, the causes of SSA cannot be reduced to one or two variables. In the end, a person who develops SSA does so for a variety of reasons, none of which are determinative but all of which are influential as he or she interacts with these factors in individual—even if at times commonly shared—ways as a unique human being.

Professionals, scholars, parents, pastors, legislators, and especially those who experience SSA—or who are concerned that they do or will—will find it well worth the time to read the scientific data and reasoning that allow the Whiteheads to form their conclusions.

Finally, the reader of this review is encouraged to visit the Whiteheads' website (http://www.mygenes.co.nz/). In addition to a copy of their 2010 book that is available for download, additional reviews of reports of studies concerning "homosexuality and the scientific evidence" that were published after *My Genes* may also be found.

# References

Bell, A. P., Weinberg, M. S., & Hammersmith, S. K. (1981). *Sexual preference: Its development in men and women*. Bloomington, IN: Indiana University Press.

Bem, D. J. (1996). Exotic becomes erotic: A developmental theory of sexual orientation. *Psychological* Review, *103*, 320–335.

*Dictionary.com*. Retrieved September 2, 2013 from http://dictionary.reference.com/browse/epigenetics

Doidge, N. (2007). *The brain that changes itself*. London: Penguin.

Gebhard, P. H. (1965). Situational factors affecting human sexual behavior. In F. A. Beach (Ed.), *Sex and behavior*, pp. 483–495. New York: John Wiley & Sons.

Hamer, D., Hu, S., Magnuson, V., Hu, N., & Pattatucci, A. (1993). A linkage between DNA markers on the X-chromosome and male sexual orientation. *Science, 261*, 321–327.

LeVay, S. (1991). A difference in hypothalamus structure between heterosexual and homosexual men. *Science*, *253*, 1034–1037.

LeVay, S. (2011). Gay, straight, and the reason why: The science of sexual orientation. New York: Oxford University Press.

LeVay, S., & Baldwin, J. I. (2008). *Human sexuality* (3rd ed.). Sunderland, MA: Sinauer Associates.

Magnusson, D. (1985). Implications of an interactional paradigm for research on human development. *International Journal of Behavioral Development*, *8*(2), 115–137.

Van Wyk, P. H., & Geist, C. S. (1984). Psychosocial development of heterosexual, bisexual and homosexual behavior. *Archives of Sexual Behavior*, *13*(6), 505–544.

Whitehead, B. (2003). *Craving for love: Relationship addiction, homosexuality, and the God who heals*. London: Monarch Books.

*What* Did *Make Me Do It? A Review and Summary of* My Genes Made Me Do It!

Whitehead, N. (2011a). Neither genes nor choice: Same-sex attraction is mostly a unique reaction to environmental factors. *Journal of Human Sexuality, 3*, 81–114. Download at http://www.scribd.com/doc/115507954/Journal-of-Human-Sexuality-Vol-3.

Whitehead, N. (2011b). Sociological studies show social factors produce adult SSA. *Journal of Human Sexuality, 3*, 115–136. Download at http://www.scribd.com/doc/115507954/Journal-of-Human-Sexuality-Vol-3

Whitehead, N., & Whitehead, B. (1999). *My genes made me do it!: A scientific look at sexual orientation.* Lafayette, LA: Huntington House.

Whitehead, N., & Whitehead, B. (2010). *My genes made me do it: Homosexuality and the scientific evidence.* Lower Hutt, New Zealand: Whitehead Associates. Download at http://www.mygenes.co.nz/MGMMDIInfo.htm

82

# California Senate Bill 1172: A Scientific and Legislative Travesty—
# A Look at the Bill's Misuse of Science[9]
## May 7, 2012

Christopher H. Rosik, PhD

[9] Editor's note: This document was a response to an early version of SB 1172 that included language prohibiting mental health professionals from engaging in SOCE with adults as well as minors.

*California Senate Bill 1172: A Scientific and Legislative Travesty*

California Senate Bill 1172 is a first-of-its-kind legislative effort to usurp the role of professional mental health associations and ban change-oriented psychological care to minors. This legislation assumes that sexual-orientation change efforts (SOCE) constitute a form of family rejection that will likely result in harm.

In reality, however, there is virtually no evidence to support this claim. In fact, the SOCE literature reporting harm among youth is extremely scarce and conducted only with nonrepresentative samples. A single study was used by the bill's supporters to support their claim—and it is remarkable that the authors of SB 1172 could even conceive that this particular study had any relevance to their legislative aims.

Furthermore, National Association for Research and Therapy of Homosexuality (NARTH) clinicians have long advocated that parents with traditional values need not "reject" their child. Parents can be encouraged to love and accept their children, even when they disapprove of their child's sexual lifestyle choices.

Secondarily, SB 1172 will also dictate the content of consent forms in SOCE therapy with adults and will create the threat of legal action against therapists. Despite the existence of a substantial body of research evidence that some clients can change, and the lack of any research showing that harm is likely, clinicians will be required to tell their clients that the therapy they offer has no scientific validity and often results in harm.

While NARTH opposes this bill on many counts (see http://narth.com/2012/04/narth-statement-on-california-sb-1172-sexual-orientation-change-efforts/), this legislation is particularly worrisome in its use of scientific research. The bill cites only one study to support its claims—a study that is presumably the most scientifically important research from the perspective of the sponsors of the bill (a group called "California Equity"). The use of a single study as justification to create new civil law can serve to clarify how activist agendas and politicians who are ignorant of research methods can work together to distort science and dictate a particular partisan outcome.

In the case of SB 1172, the specific aspect of the bill suited for this analysis regards the effects of SOCE on minors.

## Claims of SB 1172

In Section 1, following a laundry list of quotes from professional organizations handpicked to directly or indirectly discourage SOCE, the bill states in item (i):

> Minors who experience family rejection based on their sexual orientation face especially serious health risks. In one study, lesbian, gay, and bisexual young adults who reported high levels of family rejection during adolescence were 8.4 times more likely to report having attempted suicide, 5.9 times more likely to report high levels of depression, 3.4 times more likely to use illegal drugs, and 3.4 times more likely to report having engaged in unprotected sexual intercourse compared with peers from families that reported no or low levels of family rejection. This is documented by Caitlin Ryan, et al., in their article entitled Family Rejection as a Predictor of Negative Health Outcomes in White and Latino Lesbian, Gay, and Bisexual Young Adults (2009), 123, Pediatrics, 346.

This is followed by item (j):

> California has a compelling interest in protecting the lives and health of lesbian, gay, and bisexual people.

NARTH is clearly on record in its *Practice Guidelines* (http://narth.com/2011/12/narth-practice-guidelines/) as being very concerned that minors who engage in SOCE and

the parents who bring them to treatment are provided with a high level of professional care. Such care extensively evaluates the clinical and motivational context of all parties to minimize any risk of harm.

In my own clinical work, I have told several parents upon initial evaluation that their teenage child was not invested in change at that time, and therefore their best path forward was to love their child and keep the lines of communication as open as possible. Yet SB 1172 appears to be engaging in a guilt-by-association argument, whereby SOCE with minors is *by definition a marker of family rejection* that endangers the lives and well-being of these youth.

The rhetoric coming from the office of Senator Ted W. Lieu, who introduced this bill, certainly seems to confirm this assertion (see http://sd28.senate.ca.gov/news/2012-04-23-senate-panel-cracks-down-deceptive-sexual-orientation-conversion-%E2%80%98therapies). It asserts, among other things, that:

- "[SOCE] . . . has resulted in much harm, including a number of lesbian, gay, bisexual and transgender youth committing suicide."
- "Some individuals perceived that they had benefited from sexual orientation change therapy, but the *vast majority* of participants perceived that they had been harmed."
- "Sexual orientation change therapies . . . are the types of sham therapies that California law does not protect against for minors."
- "These bogus [SOCE] efforts have led in some cases to patients later committing suicide, as well as severe mental and physical anguish. This is junk science and it must stop."

These quotes, not to mention the greater content of the bill, make it painfully obvious that the sponsors of this legislation believe that licensed clinicians who engage

in SOCE are placing significant numbers of their minor clients in serious physical and psychological danger.

To bolster their case with research, the sponsors cite a study by Ryan, Huebner, Diaz, and Sanchez (2009) in the respected journal *Pediatrics* that provides the genuinely sobering statistics noted above. But does this study really support the bill's implication that SOCE constitutes a form of family rejection that results in increased risk of negative health outcomes for minors? To answer this question, it's imperative to take a closer look at the actual research.

## Methodological Analysis of Ryan et al. (2009)

In order to provide a certain degree of objectivity to this analysis, I will refer to the standards for conducting research outlined in the *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (2009). Keep in mind that these are the standards that the APA used in its report to justify the nearly complete dismissal of the vast body of research literature supporting the effectiveness of SOCE. Thus, it is appropriate and highly relevant to examine the Ryan et al. (2009) study through the APA's own analytical lens, since in this instance research is being cited not to support, but rather to ban, SOCE.

*Sampling issues*. The Ryan et al. (2009) study described its sample procedure as one of "participatory research" whereby the researchers "advised at all stages . . . the population of interest (LGB adolescents, young adults, and family members), as well as health care providers, teachers, and advocates" (p. 347). However, as the APA report (2009) noted, "Knowing that one is being studied and what the experimenter hopes to find can heighten people's tendencies to self-report in socially desirable ways and in ways that please the experimenter" (p. 32).

This same standard of avoiding potential demand characteristics was clearly violated in the Ryan et al. (2009) study, where "providers, youth, and family members

met regularly with the research team to provide guidance on all aspects of the research, including methods, recruitment, instrumentation, analysis, coding, materials development, and dissemination and application of findings" (p. 347).

*Recruitment issues*. Ryan et al. (2009) described their procedure for recruitment of participants as follows:

> Participants were recruited conveniently from 249 LGB venues within 100 miles from our office. Half of the sites were community and social organizations that serve LGB young adults, and half were from clubs and bars serving this group. Bilingual recruiters conducted venue-based recruitment from bars and clubs and contacted each agency to access all young adults who use their services. (p. 347)

A main methodological critique of the SOCE literature offered by the APA report (2009) concerned the limitations of convenience sampling. The task force that authored the report (2009) warned that "additionally, study respondents are often invited to participate in these studies by [therapists] who are proponents of SOCE, introducing unknown selection biases into the recruitment process" (p. 34). Furthermore, the APA observed that since "study recruiters were open proponents of the techniques under scrutiny, it cannot be assumed that the recruiters sought to encourage the participation of those individuals whose experiences ran counter to their own view of the value of these approaches" (p. 34).

Although the Ryan et al. (2009) study had an admittedly different focus than the APA report (family rejection of LGB young adults versus outcomes of SOCE), the APA's warnings are relevant here: selection bias in recruitment is certainly a plausible risk. While it no doubt appears probable that LGB youth face higher risks of family rejection that can contribute to negative health consequences, Ryan et. al.'s recruitment methods make their findings unreliable for generalization to LGB youth as a whole and provide

no scientifically relevant information for assessing perceptions of family rejection among SOCE minor clients. In fact, SOCE-related family rejection experiences were not even assessed in Ryan et al.'s study.

Generalization difficulties are also created by the sample composition of Ryan et al. (2009). The sample is limited to young adult non-Latino and Latino LGB persons. The APA report (2009) noted that research on SOCE has "limited applicability to non-Whites, youth, or women" (p. 33), further stating, "No investigations are of children and adolescents exclusively, although adolescents are included in a very few samples" (p. 33). This means that even had Ryan and colleagues assessed for SOCE backgrounds among participants, it would be inappropriate to generalize their findings in a manner that would cast aspersions on all SOCE experiences of minors—which, again, is precisely what SB 1172 is determined to do.

The SOCE literature pertaining to harm among youth is extremely scarce and is conducted only with nonrepresentative samples. I am unaware of any studies assessing specifically for family rejection among SOCE with minors. This may be why the authors of SB 1172 had to set aside all pretensions of scientific restraint in their citation of Ryan et al. (2009).

*Measurement issues*. Finally, the inapplicability of Ryan et al. (2009) as demonstrable support for SB 1172 can be questioned on measurement grounds as well. The APA task force (2009) severely critiqued the SOCE research on measurement grounds, observing that "overreliance on self-report measures and/or measures of unknown validity and reliability is common" (p. 31). Even more to the point, "people find it difficult to recall and report accurately on feelings, behaviors, and occurrences from long ago, and with the passage of time, will often distort the frequency, intensity, and salience of things they are asked to recall" (p. 29).

It appears that these cautions could equally apply to the Ryan et al. (2009) study, since participants averaged just under twenty-three years of age—in other words,

they were recalling experiences that occurred on average three to ten years earlier. Furthermore, psychometric information on reliability and validity was not provided by Ryan et al. for some of the measures they developed (for example, substance use and abuse and sexually risky behavior).

In addition, Ryan et al. (2009) acknowledge that "given the cross-sectional nature of this study, we caution against making cause-effect interpretations from these findings" (p. 351). Presumably, this caution alone should have been enough to prevent the authors of SB 1172 from employing the Ryan study. Even had the study findings been generalizable, they would have not been able to indicate whether SOCE caused the negative health outcomes or if youth with negative health markers disproportionately sought SOCE.

Other problematic aspects of Ryan et al.'s (2009) construct development include the dangers of losing important interpretive information by dichotomizing continuous variables, the limitations of using perceptions of family rejection (such as being blamed by a parent) versus objectively verifiable variables (such as registration at a homeless shelter), and the lack of a measure of impression management.

The question is not why the designers of SB 1172 failed to report such limitations of the Ryan study. Rather, it is how the authors could even conceive that this research had relevance to their legislative aims.

## SB 1172: A Legislative Solution in Search of a Clinical Problem

This analysis of the science behind SB 1172's intention to ban SOCE to minors should in no way be construed to imply that psychological injury does not occur from family rejection for some GLB youth. NARTH clinicians share a concern for the welfare of GLB youth and therefore take great care to determine if coercive influences are implicated when minors present for SOCE. While some opponents no doubt view SOCE with minors *by definition* as reflecting family rejection, there is no data to back up this

claim, and the experience of NARTH professionals is that parents can be assisted to love and accept their child without having to sacrifice their traditional values regarding sexual expression.

My intent in this brief investigation of the Ryan et al. (2009) study through the lens of the methodological standards of the APA report (2009) is simply to demonstrate how science appears to have been hijacked in the service of concocting an authoritative-sounding link between SOCE, family rejection, and negative health outcomes.

Based on this analysis, there appears to be no scientific grounds for referencing the Ryan et al. (2009) study as justification for a ban on SOCE to minors. The study's findings, while likely reflecting some underlying connection between family rejection and mental health outcomes, are not reliable and have no scientific justification for being generalized to minors who engage in SOCE with licensed therapists. It is troubling that SB 1172 would utilize Ryan et al.'s work when the internal and external validity limitations of the study make such claims profoundly misguided, as underscored by the APA task force that authored the report (2009). SB 1172 therefore supports its attempt to ban SOCE for minors with a study that cannot be generalized. Additionally, its authors cherry-picked citations from several mental health associations, *none of which* have banned SOCE with minors.

By way of conclusion, it needs to be pointed out that an unmistakable implication of SB 1172 is that the California licensing agencies and mental health associations are so derelict in their protection of GLB youth that politicians must step in and do their work for them. How else should we understand the complete absence of licensure revocations or membership suspensions among California therapists who provide SOCE when suicides and severe mental and physical anguish are so presumably widespread among GLB youth and attributable to this form of psychological care? Either these agencies and professional associations are incredibly negligent and inept, or SB 1172 is an ideological agenda masquerading as a legislative solution to a clinical problem that

*California Senate Bill 1172: A Scientific and Legislative Travesty*

simply does not exist. Citing research that cannot be generalized and making professional pronouncements in the absence of censorious actions against SOCE professionals cannot, by any reasonable measure, provide sufficient justification for the ban on SOCE with minors that SB 1172 sponsors seek.

92

*California Senate Bill 1172: A Scientific and Legislative Travesty*

# References

American Psychological Association (2009). *Report of the APA task force on appropriate therapeutic response to sexual orientation*. Retrieved from http://www.apa.org/pi /lgbt/resources/therapeutic-response.pdf

Ryan, C., Huebner, D., Diaz, R. M., & Sanchez, J. (2009). Family rejection as a predictor of negative health outcomes in white and Latino lesbian, gay, and bisexual young adults. *Pediatrics, 123*, 346–352.

93

# Fact-Checking California Senate Bill 1172[1]— Serious Inaccuracies and Distortions Abound: Are Politicians Willing to Listen?

**May 18, 2012**

Christopher H. Rosik, PhD

The same week California governor Jerry Brown announced that the state was now $16 billion over budget, with the implication that more social-welfare cutbacks affecting thousands of children would be necessary, SB 1172 was passed by the California Senate Judiciary Committee. It will now enter deliberation by the full California Senate with a stated purposed to protect an unknown number of minors and others from the "dangers" of sexual orientation change efforts (SOCE).

Even the *L.A. Times*, not known to be a voice of conservatism, has come out against this legislation, saying it constitutes unnecessary government intrusion into what should be mental health association policy matters. (On matters of science, however, the *Times* naively accepted the picture spun by the sponsors of SB 1172; see htttp://articles.latimes.com/2012/may/11/opinion/la-ed-0511-therapy-2012051).

But will this legislation really do much to protect minors and adults who might otherwise avail themselves of SOCE? When we examine some of the contentions SB 1172 touts as "facts," greater clarity can be obtained regarding the partisan nature of this bill.

**SB 1172**: States that SOCE practitioners use aversive treatments such as electric shock or nausea-inducing drugs.

**Fact:** Aversive treatments were common for a wide variety of psychological conditions in the 1960s and 1970s, including sexual orientation (see http://narth.com/2011/05/facts-and-myths-on-early-aversion-techniques-in-the-treatment-of-unwanted-homosexual-attractions/). However, aversive treatments were eventually determined to be ineffective in addressing sexual orientation and have not been utilized for decades. In fact, in a quick analysis of the psychological and medical databases, I could find no published new research on aversive treatments and homosexuality after 1981. Similarly, the APA's (2009) *Task Force Report on Appropriate Therapeutic Responses to Sexual Orientation* did not identify any such studies after 1981. Even the bill's authors had to

rely on a 1994 report from the American Medical Association, a nearly twenty-year-old document.

The linking of SOCE practitioners with aversive and shock treatments is a favorite smear tactic of SOCE opponents, but it has not had any basis in fact for more than thirty years. Moreover, NARTH is on record as *not* recommending these practices due to ethical and efficacy concerns (NARTH, 2010). The fact that this inaccuracy is highlighted so prominently in SB 1172 certainly lends credence to the suspicion that the primary aim of the bill's sponsors is to demonize SOCE and the clinicians who engage in this practice.

**SB 1172**: Claims that SOCE can be harmful or carry some risk of harm and that this is something SOCE practitioners deny.

**Fact:** SOCE, as is the case with all forms of psychological care, carries some risk of harm. No professional therapist engaged in SOCE would deny this. The question is whether SOCE carries an exceptionally greater risk than all other forms of psychological intervention—and the answer is that no studies exist that can truly speak to this issue. The studies cited by the APA task force (2009) concerning harm are unable to be generalized beyond their specific samples, and the task force report concluded, "Thus, we cannot conclude how likely it is that harm will occur from SOCE" (p. 42). For the sponsors of SB 1172 to use this literature as a means of casting aspersions on all SOCE is an act of scientific dishonesty.

The most popularly cited study regarding harm from SOCE (Shidlo & Schroeder, 2002) *specifically warns* readers about generalizing from their research, which did not distinguish licensed professionals and religiously based providers of SOCE in their reports of harm. Furthermore, the authors of the study advertised for respondents with this notice: "Help Us Document the Harm." To be able to know the exact prevalence

of harm in SOCE and the significance of this prevalence rate, we would need to see prospective, longitudinal studies using representative samples, *not* personal anecdotes or samples that were advertised as being sought to "help" the researchers achieve a desired outcome. Such studies would need to track harm in other forms of psychological intervention (such as marital therapy) for interpretive comparison. The fact that an intervention might be harmful in the absence of any scientific data that speak to the prevalence and significance of this harm is not a sufficient justification for banning or marginalizing an intervention. An ideologically based political activism rather than an objective scientific outlook appears to again be lurking in the background of SB 1172.

**SB 1172**: Claims that the bill will protect minors from the potential, harmful effects associated with SOCE, including severe mental or emotional problems such as suicide.

**Fact**: Notwithstanding the considerations regarding claims of harm noted above, there is reason to believe that *this bill* will likely *increase* harm to minors through its unintended consequences.

Here's how I come to this very plausible conclusion. It would appear quite likely that the majority of parents who bring their children to therapists for SOCE are conservatively religious. SB 1172 sponsors assume that if SOCE is prohibited among licensed mental health professionals, these parents would then bring their children to clinicians who would provide only that care aimed at encouraging their children to embrace their GLB identity and behavior.

I think the more likely scenario is that these parents, many of whom are already suspicious of the mental health professions, will simply pursue SOCE for their children from unlicensed, unregulated, and unaccountable religious counselors who do not fall under the jurisdiction of this bill. The vast majority of anecdotal accounts of harm to minors from SOCE seem attributable to these types of counselors and to religiously

oriented programs. Parents who receive professional care by SOCE clinicians whom they sense are understanding of and sympathetic to their worldview will be receptive to their guidance, especially when their child is not interested in SOCE. It is highly unlikely that the average unlicensed conservatively religious counselor will be as sensitive to the contextual and motivational considerations licensed therapists must assess when determining if change-oriented intervention is appropriate for a minor client. This is a prescription for an increased risk of harm. It would indeed be a tragic but foreseeable irony if the sponsor's zeal to ban SOCE for minors via SB 1172 ends up actually increasing the harm these youth experience.

SB 1172 makes it clear that SOCE includes "psychotherapy aimed at altering the sexual or romantic desires, attractions, or *conduct* of a person toward people of the same sex so that the desire, attraction, or *conduct* is eliminated or *reduced* or might instead be directed toward people of a different sex" (Article 15. 865 [d]; emphases added). This language seems to imply that psychotherapeutic intervention to reduce same-sex behaviors among minors is to be prohibited. It is worth asking whether such broad language will have a chilling effect on even non-SOCE therapists who are asked to help minors reduce or manage their addictive or compulsive same-sex behaviors. It seems quite conceivable that a minor at some later point could feel retrospectively slighted by this treatment and therefore be enticed by SB 1172 to file legal action against the therapist to the tune of up to $5,000.

So again, another unintended consequence of this bill could be to reduce the pool of non-SOCE therapists willing to wade into the incredibly murky clinical waters that SB 1172 would create, thus increasing harm by reducing the availability of any psychological services to LGB youth in California.

One last observation that can provide further perspective: One wonders what the sponsors of SB 1172 would say about a widespread intervention for minors that carries the following warning: *"[This intervention] increased the risk of suicidal thinking and*

*behavior (suicidality) in short-term studies in children, adolescents, and young adults with major depressive disorder (MDD) and other psychiatric disorders."* This is, in fact, the warning for the antidepressant Prozac. You can check out the potential side effects for other medications at www.pdf.net. It seems to me that if we are going to begin to ban certain types of psychological interventions on the basis of real (as opposed to uncertain) harms to minors, the sponsors of SB 1172 should be spending a lot more time focusing on the millions of youth (including GLB youth) currently being prescribed these powerful psychoactive medications (I say this as a therapist who thinks medications can have a place in treatment but are currently being overprescribed).

**SB 1172**: Defines informed consent for adult clients as having to include four statements from mental health organizations about SOCE.

**Fact**: The statements used in SB 1172 are actual pronouncements, but the lack of context is clearly meant to depict SOCE in deceptively unflattering terms. The degree to which these four statements have been cherry-picked to provide an unduly negative picture of SOCE can be seen in their publication dates. Three of the four were published between 1993 and 1997, which makes me wonder if these associations have in nearly twenty years said nothing that the sponsors of SB 1172 found sufficient for their purposes. Only the APA's (2009) task force report was recent in origin. Unfortunately, the task force consisted only of psychologists who were against SOCE from the start and excluded several excellent scholars sympathetic to SOCE (Jones, Rosik, Williams, & Byrd, 2010).

This fact raises the curtain on the sociopolitical culture within the major professional mental health associations. While they do good work on many fronts, when it comes to social issues being debated in the culture, the APA and other associations are reliably left of center in their outlook. One example suffices: In 2011, the APA council of representatives voted **157-0** to support gay marriage. This is not a typographical

error. *Not a single vote* in favor of the keeping the male-female definition as the social ideal. This is a statistically impossible lack of diversity. Whatever one believes about this issue, it stretches incredulity to contend that such a vote does not reflect a mix of political activism and political correctness. In a similar fashion, I believe that many of the pronouncements concerning SOCE cited in SB 1172 represent what occurs in professional mental health organizations when science is allowed to stagnate in the absence of support for viewpoint diversity.

Former APA president Dr. Nicholas Cummings observed that while unsuccessful attempts have been made in the APA to ban SOCE, the APA refused to take a stand on "rebirthing therapy," which resulted in the suffocation death of one child when the birth process was simulated with tight blankets (Cummings, 2008). Cummings then concluded, "If the APA rushes to judgment in the matter of sexual reorientation therapy while remaining derelict in its silence toward proven harmful techniques, therapists will be intimidated and patients will lose their right to choose their own treatment objectives. The APA, not the consumer, will become the de facto determiner of therapeutic goals" (p. 208). This sentiment is equally valid for SB 1172—only in this case California politicians, not the California consumer, will dictate which goals for psychological care are acceptable.

**SB 1172**: Says that SOCE assumes that homosexual orientation is both pathological and freely chosen.

**Fact**: SB 1172 provides no documentation to support this claim. In fact, NARTH represents many professional SOCE providers and is on the record as taking the position that same-sex attractions are usually *not* something people choose in some volitional manner (NARTH, 2010). Though historically many SOCE providers (not to mention most mental health professionals in general) viewed homosexuality as psychopathological, this

is typically not the case today. NARTH's position is rather that same-sex attractions and behavior may reflect a developmental adaptation to certain biological and/or psychosocial environments, possibly in conjunction with a weak and indirect genetic predisposition. And while this adaptation may not constitute psychopathology per se, it does appear to place these individuals at greater risk for mental illness and physical disease, not all of which is likely to be attributable to social stigmatization.

In conclusion, this quick tour through some of the factual claims made by the sponsors of SB 1172 makes it clear that this legislation is playing fast and loose with its assertions about SOCE. It would be a travesty of immense proportions if the California legislature allows these falsehoods and inaccuracies to be enshrined into California law. It would also constitute a corruption of the political process by activists who would certainly invite a legal challenge.

# References

American Psychological Association. (2009). *Report of the APA task force on appropriate therapeutic response to sexual orientation*. Retrieved from http://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf

Cummings, N. A., & Donohue, W. T. (2008). Eleven blunders that cripple psychotherapy in America: A remedial unblundering. New York: Taylor & Francis Group.

Jones, S. L., Rosik, Christopher H., Williams, R. N., & Byrd, A. D. (2010). A scientific, conceptual, and ethical critique of the Report of the APA Task Force on Sexual Orientation. *The General Psychologist, 45*(2), 7–18. Retrieved May 31, 2011, from http://www.apa.org/divisions/div1/news/fall2010/Fall%202010%20TGP.pdf

NARTH Task Force on Practice Guidelines for the Treatment of Unwanted Same-Sex Attractions and Behavior. (2010). Practice guidelines for the treatment of unwanted same-sex attractions and behavior. *Journal of Human Sexuality, 2,* 5–65. Retrieved from http://narth.com/2011/03/practice-guidelines-for-the-treatment-of-unwanted-same-sex-attractions-and-behaviors/

Shidlo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumer's report. *Professional Psychology: Research and Practice, 33*(3), 249–259.

# The (Complete) Lack of a Scientific Basis for Banning Sexual-Orientation Change Efforts (SOCE) with Minors[10]

## Claims by Sen. Lieu and SB 1172 of Widespread Harm to Minors from SOCE Represent Rhetoric, Not Research

## August 15, 2012

Christopher H. Rosik, PhD

*"The attack on parental rights is exactly the whole point of the bill because we don't want to let parents harm their children," he said. "For example, the government will not allow parents to let their kids smoke cigarettes. We also won't have parents let their children consume alcohol at a bar or restaurant."*

—California State senator Ted Lieu, as quoted by the *Orange County Register*, August 2, 2012

[10] Editor's note: This document was a response to the final version of SB 1172, which no longer included language prohibiting mental health professionals from engaging in SOCE with adults.

## Introduction

Sponsored by California State senator Ted W. Lieu (D-Torrance), California Senate Bill 1172, which will prohibit mental health professionals from engaging in sexual orientation change efforts (SOCE) with minors under any conditions, appears on its way to the desk of Governor Jerry Brown and could very well become state law. The most important revision to the bill reads as follows:

> 865.2—Any sexual orientation change efforts attempted on a patient under 18 years of age by a mental health provider shall be considered unprofessional conduct and shall subject a mental health provider to discipline by the licensing entity for that mental health provider.

As is plainly evident, should SB 1172 become law, licensed therapists in California who would otherwise be willing to assist minor clients in modifying their unwanted same-sex attractions and behaviors will be seriously jeopardizing their professional livelihoods. In defense of this bill's clear intent to intimidate therapists and supplant the rights of parents, Sen. Lieu has publicly compared the harm of SOCE to minors with the harm of alcohol and cigarettes. This comparison certainly sounds like a compelling analogy and clearly implies there is a conclusive body of scientific evidence behind the legislation.

But like so many claims of SB 1172 supporters, this analogy seems to have been accepted at face value without the appropriate scientific research to support it. Since Sen. Lieu's claim can be subjected to empirical verification by searching relevant databases, I decided to conduct such a search. Assuming the scientific basis for banning SOCE with minors is similar to that of banning cigarettes and alcohol, we should expect that the number of articles in the scientific literature for each of these health concerns would be roughly equivalent.

## Procedure and Results

To test this hypothesis, I conducted a search of the PsycARTICLES and MEDLINE databases. PsycARTICLES is a definitive source of full-text, peer-reviewed, scholarly and scientific articles in psychology, including articles appearing in the nearly 80 journals published by the American Psychological Association. MEDLINE provides authoritative medical information on medicine, nursing, and other related fields and covers articles published in more than 1,470 journals. I searched all abstracts from these databases using combinations of key words best suited to identify studies related to the question of interest.

Below are the totals for articles on cigarettes and alcohol. Words preceding an asterisk indicate that the search included all words with that stem, so that a search for *minor** would include both *minor* and *minors*.

| Key Words | Total Articles | Earliest Article |
|---|---|---|
| Children & Alcohol | 4465 | 1917 |
| Children & Cigarettes | 883 | 1970 |
| Adolescent* & Alcohol | 6180 | 1917 |
| Adolescent* & Cigarettes | 1252 | 1971 |
| Minor* & Alcohol | 2670 | 1944 |
| Minor* & Cigarettes | 356 | 1973 |

As is clear from these totals, the literature regarding alcohol and cigarettes as related to youth is extensive, with studies numbering in the thousands. With such a sizeable database, one could reasonably expect that observations relative to the harms of cigarettes and alcohol among youth reflect reliable scientific information that has been replicated in numerous ways. These results, then, form the standard by which we can evaluate the volume of scientific literature from which any claims about SOCE and youth are based.

*The (Complete) Lack of a Scientific Basis for Banning SOCE with Minors*

Since *SOCE* is a relatively new term in the literature, I also conducted searches utilizing the terms *reparative therapy*, *conversion therapy*, and *sexual reorientation therapy*, terms that were in use long before *SOCE* was coined. My extensive search of the databases to identify scientific literature supportive of Sen. Lieu's comparison yielded the following findings:

| Key Words | Total Articles | Earliest Article |
|---|---|---|
| *Children & Sexual Orientation* | | |
| Change Efforts | 0 | — |
| Children & Reparative Therapy | 0 | — |
| Children & Conversion Therapy | 0 | — |
| Children & Sexual Reorientation Therapy | 0 | — |
| *Adolescent* & Sexual Orientation* | | |
| Change Efforts | 0 | — |
| Adolescent* & Reparative Therapy | 1 | 2010 |
| Adolescent* & Conversion Therapy | 0 | — |
| Adolescent* & Sexual Reorientation Therapy | 0 | — |
| *Minor* & Sexual Orientation* | | |
| Change Efforts | 0 | — |
| Minor* & Reparative Therapy | 0 | — |
| Minor* & Conversion Therapy | 0 | — |
| Minor* & Sexual Reorientation Therapy | 0 | — |
| Sexual Orientation Change Efforts & Harm | 0 | — |
| Reparative Therapy & Harm | 1 | 2010 |
| Conversion Therapy & Harm | 1 | 2002 |
| Sexual Reorientation Therapy & Harm | 0 | — |
| Homosexual* & Psychotherapy & Harm | 1 | 1977 |

| | | |
|---|---|---|
| Gay & Psychotherapy & Harm | 1 | 1996 |
| Lesbian & Psychotherapy & Harm | 0 | — |
| Bisexual & Psychotherapy & Harm | 0 | — |

In stark contrast to the thousands of articles related to alcohol and cigarette usage by youth, my search of the scientific literature for references that would back up Sen. Lieu's claims yielded a total of four articles. Interestingly, three of these articles were not research-oriented. Hein and Matthews (2010) discussed the potential harms of reparative therapy for adolescents but cited no direct research on SOCE with adolescents to support their concerns. They relied instead primarily on adult anecdotal accounts and did not distinguish between the provision of SOCE by licensed clinicians and unlicensed religious practitioners.

Jones (1996) described a case of self-harm by a young gay man in response to "profound" and "thematic" relationship difficulties. The author reported that psychodynamic therapy was beneficial in helping the patient deal with relational conflict without making any mention of internalized homophobia or stigmatization.

Hochberg (1977) discussed her treatment of a suicidal adolescent male who finally disclosed his homosexual experience as termination neared. After this disclosure, Hochberg reported, "Therapy subsequently exposed long-standing inhibitions in masculine assertiveness, longing for a love object that would increase his masculinity, (and allay his homosexual anxiety) and intense fear of physical harm" (p. 428). This article, then, would in some respects appear to provide anecdotal support *for* SOCE, not surprisingly coming in an era before reports of harm gained favored status over reports of benefit within the psychological disciplines.

The only article my database search identified that could be considered quantitative research was Shidlo and Schroeder's (2002) well-known study on reported harms from SOCE. The Shidlo and Schroeder study suffered from many methodological

limitations, including recruiting specifically for participants who had felt harmed by their SOCE, obtaining recollections of harm that occurred decades prior to the study, and failing to distinguish between SOCE provided by licensed mental health professionals and unlicensed religious counselors. As the authors correctly acknowledged, the findings of this study cannot be generalized beyond their specific sample of consumers. This research can therefore tell us nothing about the prevalence of harm from SOCE provided by licensed therapists.

## Discussion

In an effort to corroborate the scientific accuracy of Sen. Lieu's comparison between the harm to minors of cigarettes, alcohol, and SOCE, I conducted a search of one major medical database and one main mental health database associated with the American Psychological Association. Results from this analysis revealed that the literature related to youth and cigarettes or youth and alcohol numbered in the thousands, while studies relating directly to SOCE and minors appeared to be nonexistent. While the utilization of different sets of related key words might yield slightly different totals with additional database searches, it seems highly unlikely the results would differ substantively. Consequently, I have to conclude from this investigation that Sen. Lieu's comparison lacks scientific merit, and that SB 1172's prohibition of SOCE on the basis of harm to minors lacks a clear scientific justification.

Some additional observations from this investigation seem worth noting. First, the case against SOCE with minors is typically based on four sets of data: anecdotal accounts of harm (mostly from adults), a very few quantitative studies (compilations of anecdotal accounts from adults with severe methodological limitations), inferences from other research domains of questionable relatedness to SOCE (such as harm from family rejection of gay youth), and citations of the pronouncements on SOCE from professional mental health and medical associations. These various sources tend to cite one another

in an almost symbiotic manner that provides little if any new information relevant to answering important questions about SOCE.

It seems the science pertaining to SOCE is stuck in neutral, and the professional associations and critics of SOCE do not appear interested in doing any cooperative research with proponents of SOCE that might actually move our understanding forward. With SOCE on the defensive, those in government and public university settings in a position to make large-scale scientific contributions to this literature appear content to speak out of both sides of their mouths. On the one hand, they demand rigorous empirical support for SOCE; on the other hand, they display no interest in facilitating bipartisan research that could potentially address their demands. One could make the case that this is hardly a shining moment in the history of social scientific integrity.

Additionally, the lack of a clear and direct grounding in the scientific literature for the claims of harm to youth from SOCE lend credence to the suspicion that political rather than scientific motivations are the driving force behind SB 1172. Reasonable clinicians and mental health association representatives should agree that anecdotal accounts of harm constitute no basis upon which to prohibit a form of psychological care. If this were not the case, the practice of any form of psychotherapy could place the practitioner at risk of regulatory discipline, as research indicates that 5 to 10% of all psychotherapy clients report deterioration and as many as 50% experience no reliable change during treatment (Hansen, Lambert, & Forman, 2002; Lambert & Ogles, 2004).

What may be at play among supporters of SB 1172 is a dislike for how many SOCE therapists view same-sex attractions—as a developmental adaptation. It would certainly be a new and sobering development if approaches to psychological care can now be prohibited on the basis of disputed aspects of its theory rather than on a scientifically established prevalence of harm that significantly exceeds those of other therapeutic approaches.

*The (Complete) Lack of a Scientific Basis for Banning SOCE with Minors*

Without a basis in the scientific literature, the claims by Sen. Lieu and SB 1172 of widespread harm to minors from SOCE represent rhetoric, not research. My database search suggests this is a superfluous piece of legislation from the perspective of harm. Any harm that might occur from the unprofessional practice of SOCE by licensed therapists can and should be handled within the existing regulatory structures on a case-by-case basis. But rather than take such a rational approach, SB 1172 supporters have politicized the issues in the form of this legislative overreach (*Los Angeles Times*, May 11, 2012), declaring SOCE with minors *ipso facto* unprofessional conduct. They have thrown their anti-SOCE wish list against the proverbial wall in order to see what politicians and mental health associations would let stick. Sadly, the blanket prohibition of SOCE with minors appears to be sticking and may become law in California. If this occurs, the present analysis indicates it will be in the absence of scientific literature and not because of it.

# References

Hansen, N. B., Lambert, M. J., & Forman, E. M. (2002). The psychotherapy dose-response effect and its implications for treatment delivery services. *Clinical Psychology: Science and Practice, 9*, 329–343. doi:10.1093/clipsy.9.3.329

Hein, L. C., & Matthews, A. K. (2010). Reparative therapy: The adolescent, the psych nurse, and the issues. *Journal of Child and Adolescent Psychiatric Nursing, 23*(1), 29–35. doi:10.1111/j.1744-6171.2009.00214.x

Hochberg, R. (1977). Psychotherapy of a suicidal boy: Dynamics and interventions. *Psychotherapy: Theory, Research, and Practice, 14*(4), 428–433.

Jones, A. (1996). An equal struggle (psychodynamic assessment following repeated episodes of deliberate self-harm). *Journal of Psychiatric and Mental Health Nursing, 3*(3), 173–180.

Lambert, M. J., & Ogles, B. M. (2004). *The efficacy and effectiveness of psychotherapy.* New York, NY: Wiley.

*Los Angeles Times* (May 11, 2012). Bill overkill in Sacramento. Retrieved from http://articles.latimes.com/2012/may/11/opinion/la-ed-0511-therapy-20120511

Shidlo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumers' report. *Professional Psychology: Research and Practice, 33*(3), 249–259.

# International Federation for Therapeutic Choice
# IFTC Intervention at OSCE/ODIHR 2012 Human Dimension Implementation Meeting—Warsaw, Poland
# October 1, 2012

To: The Organization for Security and Cooperation in Europe (OSCE) Office of Democratic Institutions and Human Rights (OHIHR) Human Dimension Implementation Meeting (HDIM)

From: Dr. Philip M. Sutton, PhD, International Federation for Therapeutic Choice (IFTC), USA

Date: October 1, 2012: *Working Session 10*

Re: Freedom of Thought, Conscience, Religion, or Belief

Intolerance and Discrimination against Medical and Mental Health Professionals and Researchers Threaten the Freedom of Professionals to Serve the Health Care Needs of Their Clients; the Right of Clients to Self-Determination in Choosing Wanted Education, Guidance, and Therapy; and the Right of Researchers to Scientific and Academic Freedom

*IFTC Intervention at OSCE/ODIHR 2012 Human Dimension Implementation Meeting*

This intervention is being given on behalf of the International Federation for Therapeutic Choice (IFTC), which supports the rights of sexual minorities who have unwanted attractions, orientation, behavioral tendencies, behavior, and/or identity to receive competent professional guidance and therapeutic care. The IFTC also supports the rights of medical and mental health professionals to offer that care (www.therapeutic -choice.org).

*Central Recommendation to Participating States of the OSCE*:

To draft legislation to safeguard the freedom of medical and mental health practitioners, educators, and researchers:

1. to offer professional guidance and therapeutic expertise to persons whose sexual minority behaviors, orientations, and/or identities are unwanted and who freely choose help in order to overcome or diminish their unwanted sexual attractions and behaviors; and

2. to study, publish, and educate other professionals and the public about the possible causes, consequences, and amelioration of sexual minority attractions, behaviors, orientations, and identities.

*Some* sexual minorities find their attractions, orientation, behavioral tendencies, behavior, and/or identity unwanted. Some of these people *freely choose* or have *freely chosen* to seek professional guidance and therapeutic assistance to avoid basing their relational and sexual lives on their unwanted sexual minority attractions, behaviors, orientations, and/or identifications. More than one hundred years of clinical reports and other research literature document that some persons *have* been successful in achieving this goal *without* undue harm. For detailed information, see the first volume of the *Journal of Human Sexuality*, which reviews the clinical and scientific literature on this

issue (http://www.scribd.com/doc/115507777/Journal-of-Human-Sexuality-Vol-1), or the summary of this volume (http://www.scribd.com/doc/125145105/Summary-of-Journal-of-Human-Sexuality-Volume-1).

Medical and mental health professionals who research, educate, and offer guidance and therapeutic services to people with unwanted sexual minority concerns are experiencing increasing intolerance and discrimination. Those who attempt to train for and conduct their work are often labeled as "homophobic" and are even accused of "hate crimes." This intolerance and discrimination not only impedes the ability of these professionals to do their work but also hinders the freedom of people who want to receive health care, guidance, and education from these professionals.

I offer two recent examples:

- First, on September 29, 2012, Governor Jerry Brown of the state of California in the United States signed SB 1172, a law that had passed both houses of the California Legislature a month earlier. The law declares it illegal for "mental health provider(s)" to engage "in sexual orientation change efforts with a patient under 18 years of age." For the purpose of this law, "sexual orientation change efforts" are defined as any "efforts to change behaviors or gender expressions, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same sex."

- If allowed to become effective on January 1, 2013, this law formally declares any "sexual orientation change efforts" (SOCE)—even if freely sought by the minor and his or her parents—as "unprofessional conduct" that subjects the "mental health provider to discipline by the licensing entity for that mental health provider."

- This law subjects every "mental health provider" who engages in SOCE in the state of California to disciplinary action—including the potential loss of the state-regulated license to practice one's profession—by the relevant California professional licensing board. (In the United States, each state licenses health care professionals and determines how their practice will be monitored and controlled; such licensing and monitoring is not done by the federal government.) Professionals affected include *anyone* "designated as a mental health professional under California law or regulation," including—but not limited to—all licensed or certified physicians and surgeons specializing in psychiatry, clinical practitioners, counselors, educational and school psychologists, marriage and family therapists, clinical social workers, professional clinical counselors, and all of the assistants, interns, and trainees under their supervision.

- Thus, if enforced, SB 1172 subjects to "disciplinary action" any medical or mental health professional who provides education, guidance, counseling, and/or therapy to minors who themselves *freely* seek *and* whose parents *freely* seek services to resolve unwanted same-sex attractions and/or behaviors. Such professionals face discipline for having engaged in SOCE, which now is considered unprofessional conduct by the state of California.

- This law not only usurps the rights and authority of parents and minors to make decisions about the minor's welfare but also usurps the rights of mental health licensing and certification boards to regulate their professions.

- As its primary rationale, the law cites the 2009 *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation*, which concluded "that sexual orientation change efforts

can pose critical health risks to lesbian, gay, and bisexual people." In reality, the task force report actually concluded: "There are no scientifically rigorous studies of recent SOCE that would enable us to make a definitive statement about whether recent SOCE is safe or harmful and for whom" (*Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation*, www.apa.org/pi/lgbc/publications/, p. 83; cf. http://narth .com/2012/08/the-complete-lack-of-a-scientific-basis-for-banning/; http://narth .com/2012/05/california-senate-bill-1172-a-scientific-and-legislative-travesty/).

- A second example involves the study on same-sex parenting by University of Texas sociology professor Mark Regnerus, who found that young-adult children of parents who had same-sex relationships had negative outcomes when compared to children raised in intact biological families. (See Regnerus, M. (2012). "How different are the adult children of parents who have same-sex relationships? Findings from the New Family Structures Study." *Social Science Research, 41*(4), 752–777.) Following a rigorous peer review process prior to publication of the study, Regnerus's person and work were subject to unjustified and unacceptable criticism and harassment. Public and professional critiques of his work did point out the unavoidable limitations of his research methods but failed to report that his research design and methods were superior to those of prior studies on this contentious topic that have supported the GLBT ideological and political agenda (cf., http://www.citizenlink.com/2012/07/13/sociologist-comes-under-fire-from -activists-for-gay-parenting-study/; http://chronicle.com/article/Son-of-a-Lesbian -Mother-Backs/133992/).

- Regnerus's employer, the University of Texas, investigated whether the accusations of "scientific misconduct" made by a self-identified "gay blogger"

had merit. The preliminary investigation involved the sequestering of Regnerus's computers, including his e-mails and documents, and the acquisition of all of his grant proposal, correspondence, and IRB protocols. Regnerus was required to respond in writing to the written and oral allegations of his accuser. In addition, an in-depth interview was conducted in which Regnerus was questioned about his responses to his accuser's allegations, and his answers were recorded and transcribed by a court reporter.

- On August 29, it was reported that the university had decided that the accusations did not have merit and that the case was closed (cf., http://blog.heritage.org/2012/08/31/case-closed-at-ut-austin-regnerus-exonerated/ and the links to primary documents).

These examples illustrate just a few of many recent instances of harassment, intolerance, and discrimination toward medical and mental health professionals, researchers, and educators who attempt to study or serve persons with sexual minority attractions, behavioral tendencies, behaviors, and/or identities.

Such intolerant behavior by people who themselve*s* claim to be victims of intolerance violates a number of rights upheld by the Convention on the Rights of the Child (CRD) (http://www2.ohchr.org/english/law/crc.htm) and the Universal Declaration of Human Rights (UDHR) (http://www.un.org/en/documents/udhr/index.shtml#a11). These include the right:

- and responsibility that when adults make decisions that affect children, the best interests of children must be the primary concern (CRD, Article 3)
- of families to be allowed to direct and guide their children so they can grow and

reach their potential and the responsibility of governments to support them in doing so (UCDHR, Articles 4 and 5)

- of children to procure and share information, form and express their opinions, and otherwise be involved in decision-making appropriate to their level of maturity, especially when adults are making decisions that affect the children's welfare (UCDHR, Articles 12 and 13)
- of children to think and believe what they want and to practice their religion, and of parents to provide religious and moral guidance to their children (UCDHR, Article 14)
- of children to have access to information that is important to their health and well-being and the responsibility of governments to encourage mass media—radio, television, newspapers and Internet content sources—to provide information that children can understand and to not promote materials that could harm children (UCDHR, Article 17)
- of parents to provide appropriate guidance to their children and the responsibility of governments to provide support services to parents on doing so (UCDHR, Article 18)
- of children to an education that would develop their personality, talents, and abilities to the fullest (UCDHR, Article 18)
- to freedom for the full development of one's human personality (UDHR, Article 26)
- to medical care and necessary social services (UDHR, Article 25)
- to freedom of thought, conscience, and religion (UDHR, Article 18)
- to freedom of opinion and expression, which includes the freedom to hold opinions without interference, and to seek, receive, and impart information and ideas through any media (UDHR, Article 19)
- to the protection of the law against arbitrary interference with one's privacy or family and attacks on one's honor and reputation (UDHR, Article 12)

In light the aforementioned fundamental rights upheld by the Convention on the Rights of the Child and the Universal Declaration of Human Rights, we therefore recommend to OSCE participating states:

1. to recognize and condemn intolerance and discrimination against sexual minorities who freely choose to receive help in order to overcome or diminish their unwanted sexual attractions, orientation, behaviors, and/or identity.
2. to draft legislation to safeguard the freedom of medical and mental health practitioners, educators, and researchers 1) to study, publish, and educate other professionals and the public about the possible causes, consequences, and amelioration of sexual minority attractions, orientations, behaviors, and identities; and 2) to offer their professional guidance and therapeutic expertise to people whose sexual minority concerns are *unwanted* and who *freely* choose help in order to overcome or diminish their unwanted sexual attractions, orientation, behaviors, and/or identity.

We recommend to OSCE/ODIHR and OSCE Missions:

1. to be aware of and condemn intolerance and discrimination against sexual minorities who freely choose help in order to overcome or diminish their unwanted sexual attractions, orientation, behaviors, and/or identity.

2. to assist OSCE participating states in monitoring and drafting legislation, with special attention to safeguarding the above-mentioned rights upheld by the CRC and the UDHR.

# Countering a One-Sided Representation of Science: NARTH Provides the "Rest of the Story" for Legal Efforts to Challenge Antisexual Orientation Change Efforts (SOCE) Legislation[11]
## July 26, 2013

Christopher H. Rosik, PhD, President

National Association for Research and Therapy of Homosexuality

Salt Lake City, UT

---

[11] In response to state-sponsored legislation to prohibit the provision of sexual orientation change efforts (SOCE) to minors by licensed therapists, NARTH submitted this document to our attorneys at Liberty Counsel. This document was crafted in particular as preparation for possible legal action against New Jersey's anti-SOCE legislation (AB 3371), and it reflects a similar, but less extensive compilation of the information that was entered into the legal record in NARTH's lawsuit against SB 1172 in California. This document was unanimously approved by the NARTH board of directors on July 26, 2013.

# Abstract

NARTH compiled science-based information in this document in response to the proposal, passage, and subsequent adjudication of legislation in California (SB 1171) in 2012 and in New Jersey (AB 3371) in 2013 to prohibit the provision of sexual orientation change efforts (SOCE) to minors by licensed therapists. The information in this document is intended for use in various formats to counter the sometimes faulty and often incomplete presentation of science used to defend such anti-SOCE legislation. The information is presented in four sections under the following themes: I. The objectivity of the *Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation* (hereafter referred to as the *Report*) is demonstrably suspect; therefore, the *Report*'s representation of the relevant literature concerning the efficacy of and harm from SOCE is neither complete nor definitive. II. Nonheterosexual identities, attractions, and behaviors are subject to change for many people, particularly youth. III. There is no scientific basis for blaming SOCE for the harmful stigma and discrimination reportedly experienced by persons with a nonheterosexual sexual orientation. IV. Spitzer's reassessment of his *interpretation* of the results of his 2003 study on SOCE does *not* invalidate the results he reported. Licensed mental health professionals (LMHP) who practice some form of SOCE care deeply about the well-being of sexual minority youth and see SOCE as a valid option for professional care, an option that deserves to be protected by state legislatures. LMHPs who do offer SOCE support the right of *all* clients to self-determination.

## Statement of Purpose

Five main objectives animate NARTH's submission of this information to the court:

(1) to counterbalance the one-sided presentation of the science related to harm and efficacy of SOCE by proponents of California SB 1172 and New Jersey AB 3371—a presentation that we will demonstrate is a byproduct of an absence of sociopolitical diversity within professional mental health organizations concerning sexual orientation;

(2) to show thereby that claims of the blanket ineffectiveness and intrinsic harmfulness of SOCE are not ultimately grounded in science but rather advocacy, as evidenced strikingly in the differing rigor utilized by these professional organizations to evaluate efficacy and harm;

(3) to underscore from research that minority sexual orientation, particularly among youth, cannot be considered immutable but instead is fluid and subject to change for many, though not all, persons;

(4) to demonstrate that the realities of stigma and discrimination form a highly incomplete understanding of negative health outcomes among nonheterosexual identities, and applying this literature uncritically to SOCE is scientifically and ethically dubious; and

(5) to argue for the propriety of a scientific and research-based response to the questions that remain regarding SOCE instead of a politically inspired legal prohibition that curtails science, of which California SB 1172 and New Jersey AB 3371 are a quintessential expression.

## I. The Objectivity of the *Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation* is Demonstrably Suspect; Therefore the *Report*'s Representation of the Relevant Literature Concerning Efficacy of and Harm from SOCE is neither Complete nor Definitive

### Bias in Task Force Selection

Although many qualified conservative psychologists were nominated to serve on the APA Task Force (hereafter referred to as the Task Force), all of them were rejected. This fact was noted in a book coedited by a past president of the APA (Yarhouse, 2009). Clinton Anderson—director of the APA's Lesbian, Gay, and Bisexual Concerns Office—offered the following defense: "We cannot take into account what are fundamentally negative religious perceptions of homosexuality—they don't fit into our world view" (Carey, 2007).

It appears that the APA operated with a litmus test when considering Task Force membership—the only views of homosexuality that were tolerated were those that uniformly endorsed same-sex behavior as morally good. From the outset of the Task Force, then, it was predetermined that conservative or religious viewpoints would only be acceptable when they fit within the preexisting worldview of the Task Force. One example of this is the *Report*'s failure to recommend any religious resources that adopt a traditional or conservative approach to addressing conflicts between religious beliefs and sexual orientation. This bias can hardly be said to respect religious diversity and had predictable consequences for how the Task Force addressed its work.

### Bias Regarding Statements of SOCE Harm and Efficacy

This bias was particularly evident in the Task Force's highly uneven implementation of standards of scientific rigor in the utilization and evaluation of published findings pertaining to SOCE (Jones, Rosik, Williams, & Byrd, 2010). Of

particular note is the contrast between the exceptionally rigorous methodological standards applied to SOCE outcomes and the considerably less rigorous and uneven standards applied to the question of harm.

With regard to SOCE outcomes, the *Report* dismisses most of the relevant research because of methodological limitations that are outlined in great detail (APA, 2009, pp. 26–34). Studies pertaining to SOCE outcomes that fall short of the Task Force's rigorous standards are deemed unworthy of examination and are dismissed as containing no evidence of value to the questions at hand.

Meanwhile, the *Report* appears to adopt very different evidentiary standards for making statements about harms attributed to SOCE. The standard regarding efficacy is to rule out substandard studies as irrelevant; however, no such standards are employed in considering studies purporting to document harm. In addition, the *Report* uses the absence of evidence to argue that SOCE is unlikely to produce change and thus strongly questions the validity of SOCE, but shows no parallel reticence to endorse affirmative therapy despite acknowledging that "it has not been evaluated for safety and efficacy" (APA, 2009, p. 91).

The six studies deemed by the Task Force to be sufficiently methodologically sound to merit the focus of the *Report* targeted samples that would bear little resemblance to those seeking SOCE today; the studies also used long-outdated methods that no current practitioner of SOCE employs. This brings into question the *Report*'s willingness to move beyond scientific agnosticism (in other words, to admit that we do not know the prevalence of success or failure in SOCE) to argue affirmatively that sexual orientation change is uncommon or unlikely. The *Report* seems to affirm two incompatible assertions: a) we do not have credible evidence on which to judge the likelihood of sexual orientation change, and b) we know with scientific certainty that sexual orientation change is unlikely. However, the absence of conclusive evidence of effectiveness is not logically equivalent to positive evidence of ineffectiveness (Altman & Bland, 1995).

There are places in the *Report* that do seem to acknowledge that, given their methodological standards, we really cannot know anything scientifically definitive about the efficacy of, or harms attributable to SOCE. For example, the *Report* states, "Thus, we cannot conclude how likely it is that harm will occur from SOCE" (APA, 2009, p. 42). Similarly, the *Report* observes, "Given the limited amount of methodologically sound research, we cannot draw a conclusion regarding whether recent forms of SOCE are or are not effective" (APA, 2009, p. 43). Similarly, "[T]here are no scientifically rigorous studies of recent SOCE that would enable us to make a definitive statement about whether recent SOCE is safe or harmful and for whom" (APA, 2009, p. 83; cf. p. 67, 120).

These expressions of agnosticism are justified by the Task Force but then are not adhered to in the *Report*'s conclusions. Instead, the *Report* argues at length that only the most rigorous methodological designs can clearly establish a causal relationship between SOCE methods and subsequent change, but the *Report* does not hesitate to make such causal attributions consistently regarding harm while repudiating any such claims for efficacy. From this highly uneven application of literature review methodology, the *Report* goes on to assert confidently that the success of SOCE is unlikely and that SOCE has the potential to be harmful. It is also telling that in subsequent references to the *Report*, the potential for harm has morphed into "the potential to cause harm to *many* clients" (APA, 2012, p. 14; emphasis added). The harms from SOCE appear to grow greater the further one gets from the original *Report*.

## Bias in Favor of Preferred Conclusions

A few examples adequately illustrate that the Task Force utilized a far lower methodological standard in assessing harm and other aspects of the science than it did in assessing SOCE outcomes. The *Report* references the many varieties of methodological problems deemed sufficient to render useless most of the SOCE research. Yet the *Report* is ready to overlook such limitations when the literature addresses preferred conclusions.

First, consider the work of Hooker (1957), which is routinely touted as groundbreaking in the field; the *Report* and other APA publications affirmed Hooker's work as evidence indicating there are no differences in the mental health of heterosexual and gay men. However, this research contains such serious methodological flaws that it is inconceivable that an evenhanded methodological evaluation by the Task Force would have not have mentioned these problems. Among the many methodological problems noted by Schumm (2012), the control group was told the purpose of the study in advance, and clinical experts were not blind to the objectives of the study. There were other serious problems, including an imperfect matching of participants, low scale reliability, the use of a small and recruited control group rather than existent national standardized norms, the post hoc removal of tests that actually displayed differences, and the screening out of men from the study if they appeared to have preexisting psychological problems. Hooker (1993) herself wrote many years later, "I knew the men for whom the ratings were made, and I was certain as a clinician that they were relatively free of psychopathology."

Despite these serious methodological problems, which would never be tolerated by the Task Force were this SOCE-supportive research, APA experts such as Gregory Herek described Hooker's study as part of the "overwhelming empirical evidence" that there is no association of sexual orientation with psychopathology (Herek, 1991, p. 143; see also Herek, 2010). The point here is not to argue for such an association but to underscore that a consistent application of the methodological standards affirmed in the *Report* should have led to the dismissal of the Hooker study as supportive of the no-differences hypothesis.

## Bias Regarding Treatment of the Primary Study on Harm

Perhaps the most egregious example of the Task Force's methodological double standard is evidenced in its heavy reliance on the Shidlo and Schroeder (2002) and Schroeder and Shidlo (2003) research regarding harm from SOCE. Several

methodological problems cited to dismiss the SOCE outcome literature complicate these studies:

- These studies were conducted in association with the National Gay and Lesbian Task Force, and researchers were given the explicit mandate to find clients who had been harmed and to document ethical violations by practitioners. This was abundantly clear in the study's original title: "Homophobic Therapies: Documenting the Damage" (see Exhibit A).

- More than 50% of the 202 sample participants were recruited through the GLB media, hardly a random or generalizable sampling procedure.

- Only 20 participants in this study were women, creating significant skew toward accounts and experiences of gay men.

- Twenty-five percent of study participants had already attempted suicide *before* starting therapy, making very dubious the claim that suicide attempts were actually caused by the therapy.

- Finally, these subjects reported their experiences came from a mix of licensed therapists, nonlicensed peer counselors, and religious counselors, leaving open the reasonable suspicion that negative therapeutic experiences might differ significantly by level of training.

The Shidlo and Schroeder (2002) and Schroeder and Shidlo (2003) results thus are based on a nonrepresentative sample likely to be heavily biased in the direction of retrospectively reporting negative therapy experiences, some of which occurred decades

ago. The Task Force appears to have ignored the warnings from the study's authors: "*The data presented in this study do not provide information on the incidence and prevalence of failure, success, harm, help, or ethical violations in conversion therapy*" (Shidlo & Schroeder, 2002, p. 250; emphases in the original). It is difficult to understand how this research can be cited without qualification or context as demonstrating likely harm from SOCE conducted by licensed medical and mental health professionals. What we *can* say with confidence is that some SOCE clients report harm and others report benefit—and the literature does not specify how often either outcome occurs. While harm may occur with any form of psychological care, the "evidence" provided in this study is essentially nothing more than unverifiable "hearsay." This is hardly a legitimate ground for legal prohibition.

## Bias Regarding the Lack of Context Concerning Harm in Psychotherapy

The APA and other professional bodies that utilize the *Report* are negligent if not fraudulent in giving a technically true warning that SOCE may potentially cause harm but failing to do so within a broader context: This warning certainly applies to all forms of psychological care for any and all problems or concerns. For example, regardless of theoretical orientation or treatment modality, some psychological or interpersonal deterioration or other negative consequences appear to be unavoidable for a small percentage of clients, especially those who begin therapy with a severe "initial level of disturbance" (Lambert & Ogles, 2004, p. 117). Clients who experience significant negative counter-transference or whose clinicians may lack empathy or may underestimate the severity of their problem may also be at greater risk for deterioration (Mohr, 1995).

Furthermore, it must be remembered that, on average, persons with same-sex attraction already experience and/or are at greater risk for experiencing a number of

medical and mental health difficulties *prior* to participating in any SOCE (Whitehead & Whitehead, 2010). This makes it extremely difficult to disentangle psychological distress directly attributable to SOCE from that which preceded commencement of SOCE. And since SOCE commonly involves helping clients become more aware of the stress and distress in their lives in order to manage or alleviate it, as do many approaches to mental health care, persons who leave therapy prematurely may have an increased awareness or experience of their (pre)existing stress and distress. In other words, they may "feel worse" as a consequence of not having allowed sufficient time for therapy to help resolve the difficulties. Anecdotal personal stories of harm certainly cannot scientifically establish the proportion of distress derived directly from SOCE, and high-quality research that might be able to distinguish such causation simply does not exist.

## Bias in the Omission of Medical Outcomes Associated with Same-Sex Behavior

It should also be mentioned in the discussions of harm and benefit from SOCE that the *Report* makes no mention of the well-documented medical outcomes associated with homosexual and bisexual behavior. For example, men having sex with men (MSM) comprise 48% of all individuals with HIV/AIDS in the United States, but make up only an estimated 2–4% of men in the population (Newcomb & Mustanski, 2011). Despite increasing cultural acceptance, MSM are reporting higher rates of sexual risk behaviors in recent years. Similarly, the prevalence of suicidal ideation and attempts for bisexual and lesbian girls has steadily increased since the mid-1990s (Savin-Williams & Ream, 2007).

Certainly whatever unclear risk of harm that might occur to an individual SOCE minor client must be weighed against the clear medical risks that arise from enacting homosexual behavior, particularly salient among adolescents. Yet a therapist's efforts to change or otherwise discourage even homosexual behavior among minors, if construed

by the client later as SOCE, could jeopardize the license of the therapist under California SB 1172 and New Jersey AB 3371.

## Bias Regarding Research on the Origins of Same-Sex Attractions

Another example of the Task Force's uneven application of methodological standards concerns the *Report*'s conclusion that "studies failed to support theories that regarded family dynamics, gender identity, or trauma as factors in the development of sexual orientation" (APA, 2009, p. 23). Of the ten studies cited in support of this conclusion, three were not readily accessible on databases; another was a review article that was an interpretation, not an empirical study. An examination of the remaining six studies (Bell, Weinberg, & Hammersmith, 1981; Freund & Blanchard, 1983; McCord, McCord, & Thurber, 1962; Peters & Cantrell, 1991; Siegelman, 1981; Townes, Ferguson, & Gillam, 1976) revealed many of the same methodological flaws cited in the Task Force critique of SOCE (Rosik, 2012). For example, the Freud and Blanchard study is cited as evidence against any role of family dynamics or trauma in the origin of same-sex attractions but contains many serious methodological problems, including unclear scale reliability, participants being known to the researchers as patients, the use of a convenience sample, and a narrow and therefore nongeneralizable sample composed of psychiatric patients. All of these problems were considered to be fatal flaws in the Task Force's appraisal of the SOCE outcome literature for documenting evidence of change.

Given that many of the methodological limitations used by the Task Force to assail the SOCE research exist in the literature exploring the possible causal influences for sexual orientation, questions have to be raised as to why the Task Force members chose to definitively dismiss this literature as "failing to support" developmental theories. It appears, based on the same criteria they used to dismiss SOCE, that their own conclusions have little support in the literature. A fairer rendering of the literature they reference in this regard would appear to be that this research is so methodologically

flawed that one cannot make any conclusive statements concerning the applicability of developmental factors in the origin of homosexuality. Thus by the Task Force's own methodological standards, the literature they cite fails to support *or rule out* a role for these potential developmental influences in the genesis of sexual orientation.

If such ambiguity exists in the SOCE literature on methodological grounds, then by the Task Force's own criteria, this ambiguity is also present in the referenced etiological research. It appears that the Task Force has been inconsistent in the application of its methodological critique to the broader literature on homosexuality, and it has been willing to offer more definitive conclusions about theories it wishes to dismiss than is warranted by its own standards. In a word, there is again the appearance of substantial bias.

Contrary to the repeated claims of the *Report* that it is an established "scientific fact" that "no empirical studies or peer-reviewed research supports theories attributing same-sex sexual orientation to family dysfunction or trauma" (APA, 2009, p. 86), there currently exists recent, high-quality, and large-scale studies that provide empirical evidence consistent with the theory that familial or traumatic factors potentially contribute to the development of sexual orientation (Bearman & Bruckner, 2002; Francis, 2008; Frisch & Hviid, 2006; Roberts, Glymour, & Koenen, 2013; Wilson & Widom, 2010). Despite their significant relevance for scientific discussions on the etiology of same-sex attractions, these studies were ignored by the Task Force. It is perfectly reasonable to believe that *not* offering professional SOCE to some minors with unwanted same-sex attractions and behaviors who seek such care *may actually harm* them by *not* helping them deal with what is one of the possible consequences of sexual molestation and abuse.

## Bias Regarding Use of the "Gray Literature"

The uneven methodological implementation of standards is again seen in the *Report*'s treatment of the "gray literature," which is dismissed in favor of only peer-reviewed scientific journal articles in the assessment of SOCE. No developed rationale

is offered for this choice. Consequently, a highly scholarly study on SOCE supportive of change for some individuals is dismissed in a footnote (Jones & Yarhouse, 2007; the footnote is found on p. 90 of the *Report*). Yet the Task Force appears to have no compunction in citing the "gray literature" on other subjects, such as the demographics relating to sexual orientation (Laumann, Gagnon, Michael, & Michaels, 1994) or the issue of psychological and familial factors in the development of sexual orientation (Bell et al., 1981), even though the latter book utilizes a sample of questionable representativeness.

## Bias in the APA's Broader Treatment of Sexual Orientation

A sixth example of differential application of methodological critique highlights the systemic nature of this problem within the broader literature pertaining to homosexuality. A recent analysis of the fifty-nine research studies cited in the APA's brief supporting same-sex parenting (Marks, 2012) in essence applied methodological standards of similar rigor to those the Task Force applied to the SOCE literature. The Marks study concluded that

> some same-sex parenting researchers seem to have contended for an "exceptionally clear" verdict of "no difference" between same-sex and heterosexual parents since 1992. However, a closer examination leads to the conclusion that strong, generalized assertions, including those made by the APA Brief, were not empirically warranted. As noted by Shiller (2007) in *American Psychologist*, "the line between science and advocacy appears blurred." (p. 748)

While Marks's analysis does not focus on SOCE, it is relevant in that it underscores that the APA's worldview regarding homosexuality appears to result in public policy

conclusions (whether right or wrong) that go beyond what the data can reasonably support. This is precisely what appears to be occurring in linking the *Report* with the banning of professional SOCE as represented in California SB 1172 and New Jersey AB 3371.

## Bias Regarding the Use of the Ryan et al. Study in SB 1172 and AB 3371

A final example of the problem of differential rigor in methodological critique can in fact be found in AB 3371 itself. The bill cites a study by Ryan, Huebner, Diaz, and Sanchez (2009) in the respected journal *Pediatrics*, presumably as its best support for claims that SOCE with minors results in serious harm. It is evident that this study also contains many of the methodological limitations cited by the Task Force to invalidate the SOCE literature, including participants not being blind to the study purposes, apparent biases in the participant recruitment process, and the reliance on self-report measures that had participants recalling experiences from the distant past.

Generalization difficulties are also created by the sample composition of Ryan et al. (2009). The sample is limited to young-adult non-Latino and Latino LGB persons. The APA Task Force (2009) noted that research on SOCE has "limited applicability to non-Whites, youth, or women" (p. 33) and "no investigations are of children and adolescents exclusively, although adolescents are included in a very few samples" (p. 33). This means that even had Ryan and colleagues assessed for SOCE backgrounds among participants, it would be inappropriate to generalize their findings in a manner that would cast aspersions on all SOCE experiences of minors, which again is precisely what AB 3371 is determined to do. In addition, Ryan et al. (2009) acknowledge that "given the cross-sectional nature of this study, we caution against making cause-effect interpretations from these findings" (p. 351).

Presumably, this caution alone should have been enough to prevent the authors of AB 3371 from employing the Ryan et al. study. Even had the study findings been applicable to SOCE consumers, they would not have been able to indicate whether SOCE caused

the negative health outcomes or if youth with negative health markers disproportionately sought SOCE. Based on this analysis, there appear to be no scientific grounds for referencing the Ryan study as justification for a ban on SOCE to minors. The study's findings, while likely reflecting some underlying connection between family rejection and mental health outcomes, are not reliable and have no scientific justification for being generalized to minors who engage in SOCE with licensed therapists. It is troubling that AB 3371 utilizes Ryan et al.'s work when the internal and external validity limitations of the study make such claims profoundly misguided, as underscored by the APA Task Force.

The Task Force concludes that "none of the recent research (1999–2007) meets methodological standards that permit conclusions regarding efficacy or safety" (APA, 2009, p. 2). Taking this statement at face value—which is arguable, as noted above—nevertheless only serves to underscore the enduring validity of comments from Zucker (2003), longtime editor of the *Archives of Sexual Behavior*, who observed:

> From a scientific standpoint, however, the empirical database remains rather primitive and **any decisive claim about benefits or harms really must be taken with a grain of salt and without such data it is difficult to understand how professional societies can issue any clear statement that is not contaminated by rhetorical fervor**. Sexual science should encourage the establishment of a methodologically sound database from which more reasoned and nuanced conclusions might be drawn. (p. 400; emphasis added)

A scientific response as opposed to a response based largely on advocacy would encourage research that will allow for more nuanced conclusions about SOCE, not create a new law that sets the precedent of placing a blanket prohibition on an entire category of psychological care.

## II. Nonheterosexual Identities, Attractions, and Behaviors Are Subject to Change for Many People, Particularly among Youth

Central to the notion that some individuals can and do report change on a continuum in their sexual orientation is the issue of *immutability*. Were all same-sex attractions and behaviors fixed and not subject to change, then sexual orientation would indeed be an enduring trait and SOCE would be a futile exercise, including among minors. However, there is solid data to suggest that same-sex attractions and behaviors are not fixed and are subject to varying degrees of change. As summarized by Ott et al. (2013), "Reported sexual identity, attraction, and behavior have been shown to change substantially across adolescence and young adulthood" (p. 466). This viewpoint has long been maintained within scientific circles. Klein, Sepekoff, and Wolf (1985) decades earlier affirmed "the importance of viewing sexual orientation as a process which often changes over time" and noted "the simplicity and inadequacy of the labels heterosexual, bisexual, and homosexual in describing a person's sexual orientation" (p. 43).

### Nonheterosexuality Is Not a Fixed Trait

The definitive study by Laumann, Michael, and Gagnon (1994), cited by the Task Force, involved several thousand American adults between the ages of eighteen and sixty. This report contains the most careful and extensive database ever obtained on the childhood experiences of matched homosexual and heterosexual populations. One of the major findings of the study that surprised even the authors was that homosexuality as a fixed trait scarcely seemed to exist (Laumann et al., 1994). Sexual identity is not fixed at adolescence but continues to change over the course of life. For example, the authors report:

> This implies that almost 4 percent of the men have sex with another male before turning eighteen but not after. These men, who report same-gender sex only before they turned eighteen, not afterward, constitute 42

> percent of the total number of men who report ever having a same-gender experience. (Laumann et al., p. 296)

They also note that their findings comport well with other large-scale studies:

> Overall we find our results remarkably similar to those from other surveys of sexual behavior that have been conducted on national populations using probability sample methods. In particular two very large-scale surveys . . . one in France [20,055 adults] and one in Britian [18,876 persons]. (p. 297)

This data seem to suggest that heterosexuality is normative even for those who at one point in the past reported a nonheterosexual sexual orientation. Sexual orientation stability appears to be greatest among those who identify as heterosexual (Savin-Williams, Joyner, & Rieger, 2012): "This limited empirical evidence based on four large-scale or nationally representative populations indicates that self-reports of sexual orientation are stable among heterosexual men and women, but less so among nonheterosexual individuals" (p. 104).

Heterosexuality likely exerts a constant, normative pull throughout the life cycle upon everyone. While admittedly Laumann attributes this reality to American society, the same findings have been found in other societies where it has been studied. A simpler explanation might look to human physiology, including the physiology of the nervous system, which is overwhelmingly sexually dimorphic—in other words, heterosexual. Therefore it is not surprising that the brain would self-organize behavior in large measure in harmony with its own physiological ecology, even if not in a completely deterministic fashion.

Whether measured by action, feeling, or identity, Laumann and colleagues' (1994) data concerning the prevalence of homosexuality before and after age eighteen reveal that

its instability over the course of life occurred in one direction toward heterosexuality and reflected significant decline in nonheterosexual identities. This evidence of spontaneous change with the progression of time among both males and females is hardly the picture of sexual orientation stasis in adolescence assumed by California SB 1172 and New Jersey AB 3371. To be fair, we cannot tell from this data how many, if any, of those reporting change pursued SOCE. However, the data do provide a developmental context for the plausibility that SOCE could aid some individuals (including minors) in modifying same-sex attractions and behavior. It appears that the most common natural course for a young person who develops a nonheterosexual sexual identity is for it to spontaneously disappear unless such is discouraged or interfered with by extraneous factors. Conceivably, non-SOCE therapies that obstruct this process (in other words, those that are "gay-affirmative") could be interfering with normal sexual development.

Diamond's longitudinal studies of women with nonheterosexual identities revealed that 67% reported changing their identities over a ten-year period of time (Diamond, 2005, 2008). Diamond noted that, "hence, identity *change* is more common than identity *stability*, directly contrary to conventional wisdom" (p. 13; emphasis in original). While changes in same-sex physical and emotional attractions among these women were admittedly more modest, they nevertheless occurred to the point where the findings "demonstrate considerable fluidity in bisexual, unlabeled, and lesbian women's attractions, behaviors, and identities and contribute to researcher's understanding of the complexity of sexual-minority development over the life span" (Diamond, 2008, p. 12). Clearly, change in sexual attractions and behaviors on a continuum of change would appear possible for many women and adolescent girls, leaving no rational reason to preclude professionally conducted SOCE as one option for minor girls experiencing unwanted same-sex attractions and behaviors, provided parental and informed consent. Finally, echoing the earlier observation by Laumann et al. (1994), Diamond (2005) concluded that "in light of such findings, one might argue for an end to sexual categorization altogether, at least within the realm of social scientific research" (p. 125).

## Change Not Limited to Sexual Behavior

A New Zealand study by Dickson, Paul, and Herbison (2003) further questions the claim that change might affect same-sex *behavior* but *not* same-sex *attraction*. This study found large and dramatic drops in homosexual attraction that occurred spontaneously for both sexes, a finding underscored even more by its occurrence in a country with a relatively accepting attitude toward homosexuality. Interestingly, the results also indicated a slight but statistically significant net movement toward homosexuality and away from heterosexuality between the ages of twenty-one and twenty-six, which suggests the influence of environment on sexual orientation, particularly for women. Specifically, it appears likely that the content of higher education in a politically liberal environment contributed to the upswing in homosexuality in this educated sample of twenty-somethings. This notion is further supported by the fact that this increase in homosexuality follows a much larger decrease that would have to have taken place in the years prior to twenty-one in order to account for the above findings. Additionally, once the educational effect wears off, the expected decline in homosexual identification resumed. The authors conclude that their findings are consistent with a significant (but by no means exclusive) role for the social environment in the development and expression of sexual orientation.

## Change Particularly Evident for Youth and Bisexuals

A large longitudinal study by Savin-Williams and Ream (2007) is also noteworthy, as it focused on the stability of sexual orientation components for adolescents and young adults. Three waves of assessment began when participants were on average just under sixteen years of age and concluded when participants were nearly twenty-two years old. The authors observed a similar decline in nonheterosexuality over the time of the study, specifying that "all attraction categories other than opposite-sex were associated with a lower likelihood of stability over time" (p. 389). For example, sixteen-year-olds

who reported exclusive same-sex attractions or a bisexual pattern of attractions are approximately twenty-five times more likely to change toward heterosexuality at the age of seventeen than those with exclusively opposite-sex attractions are likely to move toward bisexual or exclusively same-sex attractions (Whitehead & Whitehead, 2010). Over the course of the study, 98% of sixteen- to seventeen-year-olds moved from homosexuality or bisexuality toward heterosexuality.

To be fair, such changes were more pronounced among bisexuals and women. But keep in mind that California SB 1172 and New Jersey AB 3371 do not discriminate in their prohibition between SOCE provided for exclusively same-sex-attracted minors and those whose unwanted same-sex attractions are part of a bisexual attraction pattern. Nor does the bill's ban distinguish between boys and girls. Savin-Williams and Ream observed that "the instability of same-sex attraction and behavior (plus sexual identity in previous investigations) presents a dilemma for sex researchers who portray non-heterosexuality as a stable trait of individuals" (p. 393). They acknowledged that developmental processes are involved even as they focused mostly on problems with measurement. The reality of such spontaneous changes in sexual orientation among teenagers is not in accord with a bill whose defenders contend sexual orientation is a universally enduring trait. In fact, these data suggest it is irresponsible to legally prevent access to SOCE and allow only affirmation of same-sex feelings in adolescence on the grounds that the feelings are intrinsic, unchangeable, and therefore the individual can be only homosexual.

The intent of SB 1172 and AB 3371 for a blanket prohibition on SOCE for all minors with unwanted same-sex attractions and behaviors is akin to doing heart surgery with a chainsaw: it is unable to address the complex realities of sexual orientation. For example, a study by Herek, Norton, Allen, and Sims (2010) reported that "only" 7% of gay men reported experiencing a small amount of choice about their sexual orientation and slightly more than 5% reported having a fair amount or great deal of choice. Lesbian

women reported rates of choice at 15% and 16%, respectively. It is worth noting that these statistics, which are not inconsequentially small, do suggest that sexual orientation is not immutable for all people and again suggest the plausibility that modification of same-sex attractions and behaviors could occur in SOCE for some individuals.

Even more important, however, are the findings for bisexuals: 40% of bisexual males and 44% of bisexual females reported having a fair amount or great deal of choice in the development of their sexual orientation. This is in addition to 22% of male bisexuals and 15% of female bisexuals who reported having at least a small amount of choice about their sexual orientation. Other studies confirm the particular instability of a bisexual sexual orientation (Savin-Williams et al., 2012). These numbers create a significantly different impression about the enduring nature of sexual orientation than the picture often painted by proponents of SB 1172 and AB 3371. At a minimum, such data suggest that proponents of this legislation would have done better to exclude bisexuality from the scope of this bill. If such a large minority of individuals (albeit mostly bisexuals) experience a self-determinative choice as being involved in the development of their sexual orientation, why would it not be conceivable that SOCE might augment this process for some individuals with unwanted same-sex attractions and behaviors?

## Identification of the Mostly Heterosexual Orientation

Further evidence that SB 1172 and AB 3371 ignore distinctions in sexual orientation relevant to SOCE is the recent identification of the "mostly heterosexual" orientation. This orientation has been reported by 2 to 3% men and 10 to 16% of women over time, and constituted a sexual orientation larger than all other nonheterosexual identities combined (Savin-Williams et al., 2012). Moreover, it appears to be a highly unstable sexual orientation in comparison to other nonheterosexual identities. The reality of the "mostly heterosexual" orientation category has been additionally supported by recent physiological evidence in a sample of men (Savin-Williams et al., 2013). This

apparently viable and unique group of nonheterosexuals raises serious questions for the scope of AB 3371—for example, are "mostly heterosexual" minors exempt from the law's ban on SOCE? The fact that SB 1172 and AB 3371 appear to have been outdated even before they were signed into law highlights the folly of politicians attempting to adjudicate the complex scientific matters surrounding SOCE at the behest of activists within and outside of professional organizations.

All of the above evidence of fluidity and change in sexual orientation strongly suggests that change in the dimensions of sexual orientation does take place for some people (and likely more so for youth). It also suggests that this change is best conceptualized as occurring on a continuum and not as an all-or-nothing experience. The experience of NARTH clinicians is that while some clients report complete change and some indicate no change, many clients report achieving sustained, satisfying, and meaningful shifts in the direction and intensity of their sexual attractions, fantasy, and arousal as well as behavior and sexual orientation identity.

Descriptions of licensed SOCE therapists as trying to "cure" their clients of homosexuality are either ignorant or willfully slanderous of how these therapists conceptualize their care (National Association for Research and Therapy of Homosexuality, 2010). Professional SOCE practitioners recognize that change of sexual orientation typically occurs on a continuum, and this is consistent with how change is understood to occur for most, if not all, other psychological and behavioral conditions addressed in psychotherapy.

## Genetics and Biology Are at Best Partial Explanations for Same-Sex Attractions

Moreover, such fluidity and change makes clear that simple causative genetic or biological explanations are inappropriate. The later development of same-sex attractions and behaviors is not determined at birth, and there is no convincing evidence that biology is

decisive for many, if not most, individuals. The American Psychiatric Association has observed that "to date there are no replicated scientific studies supporting any specific biological etiology for homosexuality" (American Psychiatric Association, 2013). Peplau, Spalding, Conley, and Veniegas (1999) earlier summarized, "To recap, more than 50 years of research has failed to demonstrate that biological factors are a major influence in the development of women's sexual orientation. . . . Contrary to popular belief, scientists have not convincingly demonstrated that biology determines women's sexual orientation" (p. 78).

It is important to note in this regard that the APA's own stance on the biological origin of homosexuality has softened in recent years. In 1998, the APA appeared to support the theory that homosexuality is innate and people were simply "born that way": "There is considerable recent evidence to suggest that biology, including genetic or inborn hormonal factors, play a significant role in a person's sexuality" (APA, 1998). But in 2008, the APA described the matter differently:

> There is *no consensus among scientists about the exact reasons that an individual develops a heterosexual, bisexual, gay, or lesbian orientation*. Although much research has examined the possible genetic, hormonal, developmental, social, and cultural influences on sexual orientation, no findings have emerged that permit scientists to conclude that sexual orientation is determined by any particular factor or factors. Many think that *nature and nurture both play complex roles*." (APA, 2008a; emphasis added)

Yet the APA has made minimal effort to publicize the change in its official position on such causation or to correct the accompanying popular misconception—often promoted by the media—that persons with same-sex attractions are simply "born that way." It is difficult not to perceive this as significant professional neglect.

The absence of genetic or biological determinism in sexual orientation is underscored and clarified by large-scale studies of identical twins. These studies indicate that if one twin sibling has a nonheterosexual orientation the other sibling shares this orientation only about 11% of the time (Bailey, Dunne, & Martin, 2000; Bearman & Bruckner, 2002; Langstrom, Rahman, Carlstrom, & Lichtenstein, 2010). If factors in common like genetics or conditions in the womb overwhelmingly caused same-sex attractions, then identical twins would *always* be identical for same-sex attraction. These studies instead suggest that the largest influence on the development of same-sex attractions are environmental factors that affect one twin sibling but not the other, such as unique events or idiosyncratic personal responses.

Causatively, then, sexual orientation is by no means comparable to a characteristic—such as race or biological sex—that is thoroughly immutable. Thus, while same-sex attractions may not be experienced as chosen, it is reasonable to hold that they can be subject to conscious choices, such as those that might be facilitated in SOCE. Same-sex attractions and behaviors are not strictly or primarily determined by biology or genetics and are naturalistically subject to significant change, particularly in youth and early adulthood. This should raise serious questions about the legitimacy of SB 1172's and AB 3371's portrayal of same-sex attractions and behaviors as static traits to be embraced only by those minors who might otherwise pursue SOCE.

## III. There Is No Scientific Basis for Blaming SOCE for the Harmful Stigma and Discrimination Reportedly Experienced by Persons with a Nonheterosexual Sexual Orientation

Proponents of California SB 1172 and New Jersey AB 3371 frame a significant degree of their arguments concerning harm and SOCE on the negative consequences of stigma and discrimination. While these factors certainly can have deleterious

consequences for those with nonheterosexual sexual orientations, this possibility must be placed within a broader context and balanced by additional considerations.

**The Limited Understanding of the Dynamics of Stigma and Discrimination**

From an overall perspective, the meta-analytic research (that summarizes results over multiple studies) on the association between perceived discrimination and health outcomes indicates that the strength of this relationship is significant but small (Pascoe & Richman, 2009). Furthermore, research into what influences this association has most typically found no significant role for theoretically linked factors such as social support and identification with one's group. For example, data suggest that the impact of "internalized homophobia" for understanding risk behavior among MSM is now negligible, and "the current utility of this construct for understanding sexual risk taking of MSM is called into question" (Newcomb & Mustanski, 2011, p. 189). By contrast, poly-drug use by these men continued to be a strong predictor of risky sexual behavior. Such findings should be sufficient to indicate that there is a great deal left to be understood about this entire field of study.

Other lines of inquiry suggest that stigma and discrimination alone are far from a complete explanation for greater psychiatric and health risks among nonheterosexual orientations. Mays and Cochran (2001) reported that discrimination experiences attenuated but did not eliminate associations between psychiatric morbidity and sexual orientation. In Holland, men with same-sex attractions and behaviors were found to have a higher risk for suicidal ideation and acute mental and physical health symptoms than heterosexual men, despite that country's highly tolerant attitude toward homosexuality (de Graaf, Sandfort, & ten Have, 2006; Sandfort, Bakker, Schellevis, & Vanwesenbeeck, 2006).

Research in this area is almost entirely reliant on self-reports of *perceived* discrimination, and the relation of this to objective discrimination is not well understood. Recent literature also finds that particular emotion/avoidant-based coping mechanisms

used by people reporting SSA almost entirely account for the effects of this perceived discrimination (Whitehead, 2010). For example, differential rates of health problems resulted from sexual orientation-related differences in coping styles among men, with an emotion-oriented coping style mediating the differences in mental and physical health between heterosexual and homosexual men (Sandfort et al., 2009).

**Some Health Outcomes Are Likely Based in Anatomy More Than Stigma**

In addition, some health risks, such as HIV transmission among gay men, may be influenced by stigma but are ultimately grounded in biological reality. A recent comprehensive review found an overall 1.4% per-act probably of HIV transmission for anal sex and a 40.4% per-partner probability (Beyer et al., 2012). The authors noted, "The 1.4% per-act probability is roughly 18-times greater than that which has been estimated for vaginal intercourse" (p. 5). Recent CDC statistics indicate the rate of new HIV diagnoses in the United States among men who have sex with men is more than forty-four times that of other men (Centers for Disease Control, 2011). Young gay and bisexual men age thirteen to twenty-nine accounted for 27% of all new HIV infections in 2009 and were the only group for whom new HIV infections increased between 2006 and 2009 (Prejean et al., 2011). Sharing such information with prospective SOCE clients is not inherently manipulative but rather, when balanced with other considerations, constitutes an ethically obligated aspect of informed consent.

**SOCE Not a Proxy for Stigma or Discrimination**

The lessening of stigma associated with "coming out" need not imply an affirmation of a gay, lesbian, or bisexual identity or the enactment of same-sex behavior. SOCE practitioners often encourage the client's acceptance of his or her unwanted same-sex attractions and the disclosure of this reality with safe others as a potential aid in the pursuit of change or, in cases where change does not occur, behavioral management of

sexual identity. This typically occurs when clients desire to live within the boundaries of their conservative religious values and beliefs. While it is often assumed that conservative religious environments are stigmatizing and harmful for sexual minorities by definition, this is by no means a universal finding. One study of black lesbian, gay, and bisexual young adults, 86% of whom were open about their sexual identity, found that "participants who reported lower religious faith scores and lower internalized homonegativity scores reported the lowest resiliency, while those reporting higher religious faith scores and higher internalized homonegativity reported the highest resiliency scores" (Walker & Longmire-Avital, 2012, p. 5).

Referral for SOCE therefore cannot be designated as a proxy for harm-inducing family rejection and stigma, as the proponents of SB 1172 and AB 3371 seem to assume. Only a few studies have directly examined the link between family rejection and health risk among minors (Saewyc, 2011). The derived findings from those studies can be contrary to expected theories, such as the discovery that same-sex-attracted boys who participated in more shared activities with their parents were *more likely* to run away from home and use illegal drugs than those who participated in fewer shared activities (Pearson & Wilkinson, 2013). Even more importantly, no studies have examined family relationships in the context of SOCE participation (APA, 2009). Thus, SB 1172 and AB 3371 would unnecessarily and without scientific warrant eliminate the potential role of conservative religious values for ameliorating the effects of stigma in the context of SOCE. This would prevent clients from one means of prioritizing their religious values above their same-sex attractions when these factors are in conflict. The contention that a desire to modify same-sex attractions and behaviors can only be an expression of self-stigma reflects a serious disregard for and misunderstanding of conservative religious and moral values (Jones et al., 2010).

## Encouraging Same-Sex Behavior May Result in Risk-Justifying Attitudes

Finally, new research is raising the possibility that some widely accepted theories germane to the discussion of stigma, discrimination, and health outcomes may in fact have gotten things backward. A longitudinal study of gay and bisexual men by Heubner, Neilands, Rebchook, and Kegeles (2011) found that

> in contrast to the causal predictions made by most theories of health behavior, attitudes and norms did not predict sexual risk behavior over time. Rather, sexual risk behavior at Time 1 was associated with changes in norms and attitudes at Time 2. These findings are more consistent with a small, but growing body of investigations that suggest instead that engaging in health behaviors can also influence attitudes and beliefs about those behaviors. (p. 114)

Thus, safe-sex norms and attitudes did not lead to reduced unprotected anal intercourse; rather, participants' engagement in such HIV-risk behavior appeared to change how they thought and felt about the behavior and enhanced their willingness to engage in it. Such findings raise serious concerns about the impact of SB 1172 and AB 3371: A law that allows only for the affirmation and ultimate enactment of same-sex attractions may in fact increase HIV risk and negative health outcomes for some minors who might otherwise have sought SOCE.

While stigma and discrimination are real concerns, they are not universal explanations for greater psychiatric and health risks among sexual minorities, some of which are likely to be grounded in the biology of certain sexual practices. Moreover, the effects of stigma and discrimination can be addressed significantly within SOCE for many clients, though this is no doubt hard to comprehend for those not sharing the religious

values of SOCE consumers. There is no longitudinal research involving consumers of SOCE that links the known effects of stigma and discrimination to the practice of SOCE. SOCE is simply *ipso facto* presumed to constitute a form of stigma and discrimination. This is in keeping with the persistently unfavorable manner in which SOCE is portrayed by mental health associations. SOCE practitioners and consumers are associated with poor practices as a matter of course (APA, 2009, 2012; Jones et al., 2010). This arguably is a form of stigma and discrimination toward practitioners of SOCE, who have ironically developed their own set of practice guidelines that, when followed, can be expected to reduce the risk of harm to SOCE consumers (NARTH, 2010).

## IV. Spitzer's Reassessment of His *Interpretation* of the Results of His 2003 Study on SOCE Does *Not* Invalidate the Results He Reported

Finally, proponents of New Jersey's AB 3371 have understandably pointed out that Robert Spitzer, MD—author of one of the primary studies conducted on SOCE (Spitzer, 2003)—has recently changed his assessment of the study and believes that it does not provide clear evidence of sexual orientation change (Spitzer, 2012). It appears that he may have originally wished to retract the 2003 study, but Kenneth Zucker, PhD—the editor of the journal in which the study was published—denied this request. Zucker has been quoted regarding his exchange with Spitzer as observing:

> You can retract data incorrectly analyzed; to do that, you publish an erratum. You can retract an article if the data were falsified—or the journal retracts it if the editor knows of it. As I understand it, he's [Spitzer] just saying ten years later that he wants to retract his interpretation of the data. Well, we'd probably have to retract hundreds of scientific papers with regard to interpretation, and we don't do that. (Dreger, 2012)

What Zucker is essentially saying is that there is nothing in the science of the study that warrants retraction, so all that is left for one to change is his interpretation of the findings, which is what Spitzer appears to have done. Spitzer's change of interpretation hinges on his new belief that reports of change in his research were not credible, an assertion made by others at the time of the study. Instead, he now asserts that participants' accounts of change may have involved "self-deception or outright lying" (Spitzer, 2012).

It is curious that Spitzer's (2012) apology seems to imply that he earlier claimed his researched proved the efficacy of SOCE. As was understood at the time, the design of Spitzer's study ensured his research would not definitively *prove* that SOCE can be effective. Certainly it did not prove that all gays and lesbians can change their sexual orientation or that sexual orientation is simply a choice. The fact that some people inappropriately drew such conclusions appears to be a factor in Spitzer's reassessment. Yet the fundamental interpretive question did and still does boil down to one of plausibility: Given the study limitations, is it *plausible* that some participants in SOCE reported actual change?

Since nothing has changed regarding the scientific merit of the Spitzer study, the interpretive choice one faces regarding the limitations of self-report in this study also remains. Either all of the accounts across all of the measures of change across participant and spousal reports are self-deceptions and/or deliberate fabrications, or they suggest it is possible that some individuals actually do experience change in the dimensions of sexual orientation. Good people can disagree about which of these interpretive conclusions they favor, but assuredly it is not unscientific or unreasonable to continue to believe the study supports the plausibility of change.

In fact, the reasonableness of this position has been bolstered recently by the willingness of some of the participants in Spitzer's research to speak up in defense of their experience of change (Armelli, Moose, Paulk, & Phelan, 2013). They expressed clear disappointment in Spitzer's new claims:

> Once thankful to Spitzer for articulating our experience and those of others, we are now blindsided by his "reassessment," without even conducting empirical longitudinal follow-up. We know of other past participants who also feel disappointed that they have been summarily dismissed. Many are afraid to speak up due to the current political climate and potential costs to their careers and families should they do so. (p. 1336)

It seems clear, then, that unless one postulates initial and ongoing self-deception and fabrication by participants to an incredulous degree, Spitzer's study still has something to contribute regarding the possibility of change in sexual orientation.

## Concluding Statements

There should be no doubt that licensed mental health professionals who practice some form of SOCE care deeply about the well-being of sexual minority youth and see SOCE as a valid option for psychological care, while simultaneously affirming the client's right to pursue gay-affirmative forms of psychotherapy. While it is not possible here to respond to all the accusations that are typically leveled against SOCE, the information in the present document should be sufficient to question the scientific (not to mention Constitutional) merits of California SB 1172 and New Jersey AB 3371.

As we noted at the outset:

(1) The science as pertains to SOCE efficacy and harm is not nearly as conclusive and definitive as proponents of SB 1172 and AB 3371 portray them to be. Their one-sided presentation of the science is a byproduct of a pervasive lack of viewpoint diversity within professional organizations and their constituent social scientists regarding sexual orientation research.

(2) Professional activism and related advocacy interests have superseded allegiance to the process of scientific discovery regarding SOCE, as is evident in the highly discrepant methodological standards professional organizations have utilized to evaluate efficacy and harm.

(3) An impressive body of scientific data indicates that nonheterosexual sexual orientations should not be viewed as always immutable but are often, though not always, subject to change, especially among youth.

(4) The role of stigma and discrimination on negative health outcomes among nonheterosexual identities is real but provides only a small and partial understanding of these concerns. Most importantly, applying this literature uncritically to SOCE is scientifically and ethically dubious.

(5) The proper course of action for politicians and the courts to take given the current limited scientific base of knowledge regarding SOCE should be to encourage further and ideologically diverse research, not to place a ban on its professional practice that supersedes existing regulatory oversight and may create unintended consequences for licensed therapists.

As this brief has documented, there is reasonable evidence to suggest that professional associations such as the APA do not approach the SOCE literature in an objective manner, but rather with an eye to their advocacy interests. This is seen in the purposeful exclusion of conservative and SOCE-sympathetic psychologists from the APA Task Force as well as the clearly uneven application of methodological standards in assessing evidence of SOCE efficacy and harm.

As the Task Force noted, the prevalence of success and harm from SOCE cannot be determined at present. Anecdotal accounts of harm, which are a focal point of attention by supporters of SB 1172 and AB 3371, cannot serve as a basis for the blanket prohibition of an entire form of psychological care, however meaningful they may be on a personal level. While such "hearsay" evidence is "not nothing," it is negligent if not fraudulent that APA and other professional organizations accept such unverified claims that experiences of SOCE were "harmful" while dismissing much better-documented claims that experiences of SOCE were "beneficial" and were not "harmful" (Phelan, Whitehead, & Sutton, 2009). Indeed, it is not difficult to find counterbalancing anecdotal accounts of benefit from SOCE (see http://www.voices-of-change.org/). Furthermore, accounts of harm cannot tell us if the prevalence of reported harm from SOCE is any greater than that from psychotherapy in general, where research demonstrates that 5 to 10% of clients report deterioration while up to 50% experience no reliable change during treatment (Hansen, Lambert, & Forman, 2002; Lambert & Ogles, 2004).

The normative occurrence of spontaneous change in sexual orientation among youth, the nontrivial degree of choice reported by some in the development of sexual orientation, and the questionable blanket application of the literature on stigma and discrimination to SOCE further bring into question the appropriateness of SB 1172 and AB 3371. Sexual orientation is not a stable and enduring trait among youth, and this lends plausibility to the potential for professionally conducted SOCE to assist in change in unwanted same-sex attraction and behaviors with some minors. Granted, high-quality research is needed to confirm this suspicion. However, it should be mentioned in this regard that SB 1172 and AB 3371 would make further research on SOCE with minors impossible in California and New Jersey, respectively, despite the APA Task Force's clear mandate that such research be conducted (APA, 2009).

Any genuine harm that results from SOCE practice with minors can most appropriately be remedied by the application of ethical principles of practice, including

informed consent, and addressed through the existing oversight functions of state regulatory boards and state mental health associations. It is questionable and unlikely that the tangible, prosecutable harms from SOCE are as widespread as SB 1172 and AB 3371 sponsors claim. If such harms did exist, why have we heretofore not seen SOCE practitioners losing their licenses and mental health association memberships in droves? Both SB 1172 and AB 3371 are a legislative overreach that takes an overly broad and absolute approach to SOCE harm and success despite evidence suggesting age, gender, and nonheterosexual sexual orientation differences in the experience and degree of change in sexual orientation. In particular, it is fair to ask whether bisexual and mostly heterosexual youth are well served by SB 1172 and AB 3371, a distinction these laws do not make.

Proponents of SB 1172 and AB 3371 reason that because homosexuality is no longer considered to be a disorder, providing professional SOCE to minors with unwanted same-sex attractions and behaviors is at best unnecessary and at worst unethical. However, this reasoning betrays a profound misrepresentation of the scope of psychotherapeutic practice, as there are numerous examples of professionally sanctioned targets of treatment that are not considered to be disorders. These include relationship distress, normal grief reactions, and unplanned pregnancy. Clients often pursue psychological care for such difficulties due to deeply held religious and moral beliefs—such as beliefs that divorce or abortion are wrong—and may experience significant emotional distress in addressing these issues. In this context, the selective attention that SB 1172 and AB 3371 give to SOCE again hints at political advocacy rather than science as a primary inspiration for this law.

The religiously conservative faith community will not be well served if SOCE among minors is judged *never* to be an appropriate modality for psychological care, especially when the affirmative interventions include the correction of the client's "false assumptions." Should the court agree with this line of argument, then the court

is unconstitutionally taking a stand on the validity of certain forms of religious belief. By implying that there is always a better method than any form of SOCE, backers of SB 1172 and AB 3371 presume to know what form of psychological care for unwanted same-sex attractions and behaviors is best for the religiously motivated minor clients and their parents. Neither the courts nor the APA should be substituting their judgment for that of a seventeen-year-old who is calculating a cost-benefit analysis in deciding whether to undergo SOCE despite the risks. The APA is quite clear that it supports the competence of a seventeen-year-old girl to give consent to an abortion. Why does the seventeen-year-old lose competence when it comes to SOCE? Similarly, the APA is on record as supporting the availability of sexual reassignment surgery for adolescents (APA, 2008b), and AB 3371 explicitly protects this option. Is it reasonable that seventeen-year-olds who believe themselves to be the wrong biological sex be allowed to surgically alter genitalia while others with unwanted same-sex attractions and behavior be prohibited from even *talking* to a licensed therapist in a manner that could be construed as promoting the pursuit of change? This question is especially relevant in light of recent high-quality longitudinal research that suggests sexual reassignment surgery does not remedy high rates of morbidity and mortality among transgendered individuals (Dhejne et al., 2011).

The Task Force *Report* (APA, 2009) and the mental health associations that subsequently relied on it for their resolutions on SOCE provide one viewpoint into research and reasoning that likely has some merit but must be considered incomplete and therefore not definitive enough to justify a complete ban on SOCE with minors. Currently, there is a lack of sociopolitical diversity within mental health associations (Redding, 2001) that has an inhibitory influence on the production of scholarship in controversial areas such as SOCE that might run counter to preferred worldviews and advocacy interests. An authentically scientific approach to a contentious subject must proceed in a different direction in order to give confidence that the relevant database is

a sufficiently complete one on which to base public policy. As Haidt (2012) observed, genuine diversity of perspective is absolutely necessary:

> In the same way, each individual reasoner is really good at one thing: finding evidence to support the position he or she already holds, usually for intuitive reasons. . . . This is why it's so important to have intellectual and ideological diversity within any group or institution whose goal is to find truth (such as an intelligence agency or a community of scientists) or to produce good public policy (such as a legislature or advisor board). (p. 90)

Such diversity is precisely what is currently lacking in professional mental health organizations and their associated scientific communities when it comes to the study of contested social issues related to sexual orientation, including SOCE (Wright & Cummings, 2005). If this were not true, it would be hard to understand how the American Psychological Association's leadership body—the Council of Representatives—could vote 157-0 to support same-sex marriage, a result that undoubtedly represents a "statistically impossible lack of diversity" (Jayson, 2011; Tierney, 2011).

To repeat a final time, a truly scientific response to the concerns of the sponsors of California SB 1172 and New Jersey AB 3371 would be to encourage bipartisan research into SOCE with minors that could provide sound data to answer questions of harm and efficacy that currently are only primitively understood. SOCE practitioners would assuredly embrace such an opportunity (Jones et al., 2010). Unfortunately, the approach taken by SB 1177 and AB 3371 sponsors represented only one political and legislative perspective on how to best address the challenges that come with the psychological care of unwanted same-sex attractions and behaviors. That approach is therefore a scientifically premature—and unjust—curtailment of the rights of current and potential SOCE consumers, their parents, and their therapists and should not be allowed to stand.

# References

Altman, D., & Bland, J. M. (1995). Statistics notes: Absence of evidence is not evidence of absence. *British Medical Journal*, *311*, 485.

American Psychological Association. (1998). *Answers to your questions for a better understanding of sexual orientation and homosexuality*. Washington, DC: Author.

American Psychological Association (2008a). *Answers to your questions for a better understanding of sexual orientation and homosexuality*. Washington, DC: Author. Retrieved from www.apa.org/topics/sorientation.pdf

American Psychological Association. (2008b). *Transgender, gender identity, and gender expression non-discrimination.* Retrieved from http://www.apa.org/about/policy /transgender.espx

American Psychological Association. (2009). *Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation*. Retrieved from http:// www.apa.org/pi/lgbt/resources/therapeuticresponse.pdf

American Psychological Association. (2012). Guidelines for psychological practice with lesbian, gay, and bisexual clients. *American Psychologist*, *67*(1), 10–42. doi:10.1037/a0024659

American Psychiatric Association. (2013). *LGBT-sexual orientation*. Retrieved from http://www.psychiatry.org/mental health/people/lgbt-sexual-orientation

Armelli, J. A., Moose, E. L., Paulk, A., & Phelan, J. E. (2013). A response to Spitzer's (2012) reassessment of his 2003 study of reparative therapy of homosexuality. *Archives of Sexual Behavior*, *41*, 1335–1336. doi:10.1007/s10508-012-0032-6

Bailey, J. M., Dunne, M. P., & Martin, N. G. (2000). Genetic and environmental influences on sexual orientation and its correlates in an Australian twin sample. *Journal of Personality and Social Psychology*, *78*, 524–536. doi:10.1037//0022-3514.78.3.524

Bearman, P. S., & Bruckner, H. (2002). Opposite-sex twins and adolescent same-sex attraction. *American Journal of Sociology, 107*, 1179–1205.

Bell, A. P., Weinberg, M., & Hammersmith, S. K. (1981). *Homosexuality: A study of diversity among men and women*. New York: Simon & Schuster.

Beyer, C., Baral, S. D., van Griensven, F., Goodreau, S. M., Chariyalertsak, S., Wirtz, A., and Brookmeyer, R. (2012, July 28). Global epidemiology of HIV infection in men who have sex with men. *The Lancet*, *380,* 366–377.

Carey, D. (2007, September 20). Group to review therapy stance. *Oakland Tribune*. Retrieved from http://findarticles.com/p/articles/mi_qn4176/is_20070711/ai_n19358074

Centers for Disease Control. (2011). *HIV and AIDS among gay and bisexual men*. Retrieved from http://www.cdc.gov/nchhstp/newsroom/docs/2012/CDC-MSM-0612-508.pdf

de Graaf, R., Sandfort, T. G. M., & ten Have, M. (2006). Suicidality and sexual orientation: Differences between men and women in a general population-based sample from the Netherlands. *Archives of Sexual Behavior*, *35,* 253–262. doi:10.1007/s10508-006-9020-z

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L. V., Langstrom, N., & Landen, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment surgery: Cohort study in Sweden. *PLoS ONE*, *6*(2), 1–8. doi:10.1371/journal.pone.0016885

Diamond, L. M. (2005). A new view of lesbian subtypes: Stable versus fluid identity trajectories over an 8-year period. *Psychology of Women Quarterly*, *29*, 119–128.

Diamond, L. M. (2008). Female bisexuality from adolescence to adulthood: Results from a 10-year longitudinal study. *Developmental Psychology, 44*, 5–14. doi:10.1037/0012-1649.44.1.5

Dickson, N., Paul, C., & Herbison, P. (2003). Same-sex attraction in a birth cohort: Prevalence and persistence in early adulthood. *Social Science & Medicine*, *56*, 1607–1615. doi:10.1016/S0277-9536(02)00161-2

Dreger, A. (2012, April 11). How to ex an "ex-gay" study. Retrieved from http://psychologytoday.com/blog/fetishes-i-dont-get/201204/how-ex-ex-gay-study

Francis, A. M. (2008). Family and sexual orientation: The family-demographic correlates of homosexuality in men and women. *Journal of Sex Research*, *45*, 371–377. doi:10.1080/00224490802398357

Freund, K., & Blanchard, R. (1983). Is the distant relationship of fathers and homosexual sons related to the sons' erotic preference for male partners, or to the sons' atypical gender identity, or both? *Journal of Homosexuality*, *9*, 7–25.

Frisch, M., & Hviid, A. (2006). Childhood family correlates of heterosexual and homosexual marriages: A national cohort study of two million Danes. *Archives of Sexual Behavior*, *35*, 533–547.

Haidt, J. (2012). *The righteous mind: Why good people are divided by politics and religion*. New York: Pantheon Books.

Hansen, N. B., Lambert, M. J., & Forman, E. M. (2002). The psychotherapy dose-response effect and its implications for treatment delivery services. *Clinical Psychology: Science and Practice*, *9*, 329–343. doi:10.1093/clipsy.9.3.329

Herek, G. M. (1991). Myths about sexual orientation: A lawyer's guide to social science research. *Law and Sexuality*, *1*, 133–172.

Herek, G. M. (2010). Sexual orientation differences as deficits: Science and stigma in the history of American psychology. *Perspectives on Psychological Science*, *5*, 693–699. doi:10.1177/1745691610388770

Herek, G. M., Norton, A. T., Allen, T. J., & Sims, C. L. (2010). Demographic, psychological, and social characteristics of self-identified lesbian, gay, and bisexual adults in a US probability sample. *Sexuality Research and Social Policy*, *7*, 176–200.

Hooker, E. (1957). The adjustment of the male overt homosexual. *Journal of Projective Techniques*, *21*, 18–31.

Hooker, E. (1993). Reflections of a 40-year exploration. *American Psychologist*, *48*, 450–453.

Huebner, D. M., Neilands, T. B., Rebchook, G. M., & Kegeles, S. M. (2011). Sorting through chickens and eggs: A longitudinal examination of the associations between attitudes, norms, and sexual risk behaviors. *Health Psychology*, *30* (1), 110–118. doi:10.1037.a0021973

Jayson, S. (2011, August 5). Citing new research, psychology group supports gay marriage. *USA Today*. Retrieved from http://usatoday30.usatoday.com/news /health/wellness/marriage/story/2011/08/Citing-new-research-psychology-group -supports-gay-marriage/49798054/1

Jones, S. L., Rosik, Christopher H., Williams, R. N., & Byrd, A. D. (2010). A scientific, conceptual, and ethical critique of the report of the APA Task Force on Sexual Orientation. *The General Psychologist*, *45*(2), 7–18. Retrieved May 31, 2011, from http://www.apa.org/divisions/div1/news/fall2010/Fall%202010%20TGP.pdf

Jones, S. L., & Yarhouse, M. A. (2007). *Ex-gays?: A longitudinal study of religiously mediated change in sexual orientation.* Downers Grove, IL: InterVarsity Press Academic.

Klein, F., Sepekoff, B., & Wolf, T. J. (1985). Sexual orientation: A multi-variable dynamic process. *Journal of Homosexuality*, *11*, 35–49.

Lambert, M. J., & Ogles, B. M. (2004). *The efficacy and effectiveness of psychotherapy.* New York, NY: Wiley.

Langstrom, N., Rahman, Q., Carlstrom, E., & Lichtenstein, P. (2010). Genetic and environmental effects on same-sex sexual behavior: A population study of twins in Sweden. *Archives of Sexual Behavior*, *39*, 75–80. doi:10.1007/s10508-008-9386-1

Laumann, E. O., Gagnon, J. H., Michael, R. T., & Michaels, S. (1994). *The social organization of sexuality.* Chicago, IL: University of Chicago Press.

Laumann, E. O., Michael, R. T., & Gagnon, J. H. (1994). A political history of the national sex survey of adults. *Family Planning Perspectives*, *26*, 34–38.

Marks, L. (2012). Same-sex parenting and children's outcomes: A closer examination of the American Psychological Associations brief on lesbian and gay parenting. *Social Science Research*, *41,* 735–751. Retrieved from http://dx.doi.org/10.1016/j.ssresearch.2012.03.006

Mays, V. M., & Cochran, S. D. (2001). Mental health correlates of perceived discrimination among lesbian, gay, and bisexual adults in the United States. *American Journal of Public Health*, *91*, 1869–1876.

McCord, J., McCord, W., & Thurber, E. (1962). Some effects of paternal absence on male children. *Journal of Abnormal and Social Psychology*, *64*, 361–369.

Mohr, D. C. (1995). Negative outcome in psychotherapy: A critical review. *Clinical Psychology: Science and Practice*, *2*, 1–27.

National Association for Research and Therapy of Homosexuality. (2010). Practice guidelines for the treatment of unwanted same-sex attractions and behaviors. *Journal of Human Sexuality*, *2*, 5–65. Retrieved from http://www.scribd.com/doc/115506183/Journal-of-Human-Sexuality-Vol-2

Newcomb, M. E., & Mustanski, B. (2011). Moderators of the relationship between internalized homophobia and risky sexual behavior in men who have sex with men: A meta-analysis. *Archives of Sexual Behavior*, *40*, 189–199. doi:10.1007/s10508-009-9573-8

Ott, M. Q., Wypij, D., Corliss, H. L., Rosario, M., Reisner, S. L., Gordon, A. R., . . . . Bryn, S. (2013). Repeated changes in reported sexual orientation identity linked to substance use behaviors in youth. *Journal of Adolescent Health*, *52*, 465–472. doi:10.1016/j.jadohealth.2012.08.004

Pascoe, E. A., & Richman, L. S. (2009). Perceived discrimination and health: A meta-analytic review. *Psychological Bulletin*, *135*, 531–554. doi:10.1037/a0016059

Pearson, J., & Wilkinson, L. (2013). Family relationships and adolescent well-being: Are families equally protective for same-sex attracted youth? *Journal of Youth and Adolescence*, *42*, 376–393. doi:10.1007/s10964-012-9865-5

Peplau, L., Spalding L. R., Conley, T. D., & Veniegas, R. C. (1999). The development of sexual orientation in women. *Annual Review of Sex Research*, *10*, 70–99.

Peters, D. K., & Cantrell, P. J. (1991). Factors distinguishing samples of lesbian and heterosexual women. *Journal of Homosexuality*, *2*, 1–15.

Phelan, J. E., Whitehead, N., & Sutton, P. M. (2009). What the research shows: NARTH's response to the APA claims on homosexuality. *Journal of Human Sexuality*, *1*, 5–118. Retrieved from http://www.scribd.com/doc/115507777/Journal-of-Human-Sexuality-Vol-1

Prejean, J., Song, R., Hernandez, A., Ziebell, A., Green, T., Walker, F., . . . . Hall, H. I. (2011). Estimated HIV incidence in the United States, 2006–2009. *PLos ONE*, *6*, 1–13. doi:10.1371/journal.pone.0017502

Redding, R. E. (2001). Sociopolitical diversity in psychology. *American Psychologist*, *56*, 205–215. doi:10.1037//0003-066X.6.3.205

Roberts, A. L., Glymour, M. M., & Koenen, K. C. (2013). Does maltreatment in childhood affect sexual orientation in adulthood? *Archives of Sexual Behavior*, *42*, 161–171. doi:10.1007/s10508-012-0021-9

Rosik, Christopher H. (2012). Did the American Psychological Association's *Report on Appropriate Therapeutic Responses to Sexual Orientation* apply its research standards consistently? A preliminary examination. *Journal of Human Sexuality*, *4*, 70–85.

Ryan, C., Huebner, D., Diaz, R. M., & Sanchez, J. (2009). Family rejection as a predictor of negative health outcomes in white and Latino lesbian, gay, and bisexual young adults. *Pediatrics*, *123*, 346–352. doi:10.1542/peds.2007-3524

Sandfort, T. G. M., Bakker, F., Schellevis, F. G., & Vanwesenbeeck, I. (2006). Sexual orientation and mental and physical health status: Findings from a Dutch population survey. *American Journal of Public Health, 96*, 1119–1125.

Sandfort, T. G. M., Bakker, F., Schellevis, F. G., & Vanwesenbeeck, I. (2009). Coping styles as mediator of sexual orientation-related health differences. *Archives of Sexual Behavior*, *38*, 253–263. doi:10.1007/s10508-007-9233-9

Savin-Williams, R. C., Joyner, K., & Rieger, G. (2012). Prevalence and stability of self-reported sexual orientation identity during young adulthood. *Archives of Sexual Behavior*, *41*, 103–110. doi:10.1007/s10508-012-9913-y

Savin-Williams, R. C., & Ream, G. L. (2007). Prevalence and stability of sexual orientation components during adolescence and young adulthood. *Archives of Sexual Behavior*, 36, 385–349. doi:10.10007/s10508-006-9088-5

Savin-Williams, R. C., Rieger, G., & Rosenthal, A. M. (2013). Physiological evidence for a mostly heterosexual orientation among men. *Archives of Sexual Behavior*. Advance online publication. doi:10.1037/s10508-013-0093-1

Saewyc, E. M. (2011). Research on adolescent sexual orientation: Development, health disparities, stigma, and resilience. *Journal of Research on Adolescence*, *21*, 256–272. doi:10.1111/j.1532-7795.2010.00727.x

Schroeder, M., & Shildo, A., (2002). Ethical issues in sexual orientation conversion therapies. In A. Shildo, M. Schroeder, & J. Drescher (Eds.), *Sexual conversion therapy: Ethical, clinical and research perspectives* (pp. 131–166). New York: Haworth.

Schumm, W. R. (2012). Re-examining a landmark research study: A teaching editorial. *Marriage & Family Review*, *48*, 465–489. doi:10.1080/01494929.2012.677388

Shildo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumer's report. *Professional Psychology: Research and Practice*, *33*, 249–259. doi:10.1037//0735-7028.33.3.249

Siegelman, M. (1981). Parental backgrounds of homosexual and heterosexual men: A cross national replication. *Archives of Sexual Behavior*, *10*, 505–513.

Spitzer, R. L. (2003). Can some gay men and lesbians change their sexual orientation? 200 participants reporting a change from homosexual to heterosexual orientation. *Archives of Sexual Behavior*, *32*(5), 403–417.

Spitzer, R. L. (2012). Spitzer reassesses his 2003 study of reparative therapy of homosexuality [Letter to the editor]. *Archives of Sexual Behavior*. Advance online publication. doi:10.1007/s10508-012-9966-y

Tierney, J. (2011, February 11). Social scientist sees bias within. *The New York Times*. Retrieved from http://www.nytimes.com/2011/02/08/science/08tier.html?_r=3

Townes, B. D., Ferguson, W. D., & Gillam, S. (1976). Differences in psychological sex, adjustment, and familial influences among homosexual and nonhomosexual populations. *Journal of Homosexuality*, *1*, 261–272.

Walker, J. J., & Longmire-Avital, B. (2012). The impact of religious faith and internalized homonegativity on resiliency for black lesbian, gay, and bisexual emerging adults. *Developmental Psychology.* First online publication. doi:10.1037/a0031059

Whitehead, N. E. (2010). Homosexuality and co-morbidities: Research and therapeutic implications. *Journal of Human Sexuality*, *2*, 124–175. Retrieved from http://www.mygenes.co.nz/whiteheadcomorbid10_2.pdf

Whitehead, N. E., & Whitehead, B. (2010). *My genes made me do it! A scientific look at sexual orientation.* Whitehead Associates. Retrieved from http://www.mygenes.co.nz/download.htm

Wilson, H. W., & Widom, C. S. (2010). Does physical abuse, sexual abuse, or neglect in childhood increase the likelihood of same-sex sexual relationships and cohabitation? A prospective 30-year follow-up. *Archives of Sexual Behavior*, *39*, 63–74. doi:10.1007/s10508-008-9449-3

Wright, R. W., & Cummings, N. E. (2005). *Destructive trends in mental health: The well-intentioned path to harm*. New York: Routledge.

*Countering a One-Sided Representation of Science*

Yarhouse, M. (2009). The battle regarding sexuality. In N. C. Cummings, W. O'Donahue, & J. Cummings (Eds.), *Psychology's war on religion* (pp. 63–93). Phoenix, AZ: Zeig, Tucker & Theisen, Inc.

Zucker, K. J. (2003). The politics and science of "reparative therapy." *Archives of Sexual Behavior*, *32*(5), 399–401.

164

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| ROBERT L. VAZZO, LMFT, etc., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 8:17-cv-2896-T-02AAS |
| | ) | |
| CITY OF TAMPA, FLORIDA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**DECLARATION OF CHRISTOPHER ROSIK, PH.D.**

I, Dr. Christopher Rosik, hereby declare as follows:

**TABLE OF CONTENTS**

I. ENGAGEMENT AND QUALIFICATIONS. ....3

II. SUMMARY AND PRELIMINARY CONSIDERATIONS. ....3

III. ANALYSIS AND OPINIONS. ....5

A. The Objectivity of the 2009 APA Task Force Report on SOCE Is Demonstrably Suspect; Therefore the Report's Representation of the Relevant Literature Concerning Efficacy of and Harm from SOCE Is Neither Complete nor Definitive. ....5

i. Bias in Task Force Selection. ....5

ii. Bias Regarding Statements of SOCE Harm and Efficacy. ....5

iii. Bias in Favor of Preferred Conclusions. ....6

iv. Bias Regarding Treatment of the Primary Study on Harm. ....7

v. Bias Regarding the Lack of Context Concerning Harm in Psychotherapy. ....8

vi. Bias in the Omission of Medical Outcomes Associated with Same-Sex Behavior. ....9

vii. Bias Regarding Research on the Origins of Same-Sex Attractions. ....9

viii. Bias Regarding Use of the "Grey Literature". ....11

ix. Bias in the APA's Broader Treatment of Sexual Orientation. ....11

x. The APA Report Is Not Definitive Regarding the Risk of Harm from SOCE Due to Its Scientific Shortcomings and Pervasive Bias, and This Undermines All Position Statements Based on It. ....12

EXHIBIT 3
Deponent: Rosik
Depo Date: 7/29/19
Reporter: E. Hernandez
Anthem Reporting, LLC

B. Non-heterosexual Identities, Attractions, and Behaviors Are Subject to Change for Many People and Particularly Among Females and Youth. ....12

i. Lack of Agreement Regarding What Constitutes Sexual Orientation. ....13

ii. Non-Heterosexuality Is Not a Fixed Trait. ....13

iii. Fluidity of Non-Heterosexual Sexual Attractions and Identity is Commonplace. ....15

iv. Change Among Transgendered/Transsexual Individuals. ....16

v. Change Not Limited to Sexual Behavior. ....17

vi. Change Particularly Evident for Youth and Bisexuals. ....17

vii. Identification of the Mostly Heterosexual Orientation. ....18

viii. Genetics and Biology Are at Best Partial Explanations for Same-Sex Attractions ....19

C. The Reality of Sexual Fluidity Underscores the Impropriety of Prohibiting Change-Allowing Talk Therapies. ....20

D. Professional SOCE Bans Target Speech, Not Aversive Practices. ....21

E. State Regulatory Boards Already Are Equipped to Discipline Abusive Practitioners. ....22

IV. Concluding Statements ....22

## I. ENGAGEMENT AND QUALIFICATIONS.

1. I am over the age of 18 and am submitting this Declaration as expert testimony in support of Plaintiffs. I have been asked to offer my analysis and opinions regarding the state of science on the issues of sexual orientation and gender identity, with a focus on the published quantitative literature, specifically with respect to the claimed scientific justifications for City of Tampa Ordinance 2017-47, An Ordinance Of The City Of Tampa, Florida, Relating To Conversion Therapy On Patients Who Are Minors (hereinafter "Ordinance 2017-47"). The facts in this Declaration are true and correct, and if called upon to testify to them I would and could do so competently.

2. I hold a Ph.D. in clinical psychology from an APA-approved program at Fuller Graduate School of Psychology in Pasadena, California. I have been a licensed clinical psychologist for over thirty years, and I currently practice at the Link Care Center in Fresno, California, where I am also the Director of Research. Attached hereto as Exhibit A is a copy of my curriculum vitae, which includes my qualifications and publications, including all publications I have authored in the previous ten years. I have not testified at trial or by deposition in any case during the previous four years.

3. In preparing this report, I relied on the case filings and academic, scientific, and other reference materials identified in the table of References attached hereto as Exhibit B.

4. My compensation for this engagement will be $450 per hour for deposition and trial testimony, $200 per hour for travel time, and actual expenses. I provide the remainder of my time for this engagement *pro bono*.

## II. SUMMARY AND PRELIMINARY CONSIDERATIONS.

5. With reference to legislation banning licensed therapists from engaging in therapies that allow for change in the components of sexual orientation generally, and specifically regarding Ordinance 2017-47, I offer below several considerations. I note at the outset that the terminology of sexual orientation change efforts (SOCE) and "conversion therapy" are in many ways misnomers. These terms imply that categorical change (from exclusive same-sex attraction to exclusive opposite sex attraction) is the goal and the focus, although change typically is on a continuum and can occur without a direct therapeutic focus on sexuality. SOCE also is not clear about what constitutes an "effort" and whether this effort is that of the client and/or the therapist. However, ethical change-allowing talk therapy is client-directed and does not impose goals on the client, but seeks instead to facilitate the voluntary goals of the client which sometimes include change. "Conversion therapy" gives the false impression that there is a singular exotic therapy being practiced when in fact ethical practitioners in this area utilize a variety of mainstream therapeutic approaches, all centered on and delivered through speech. Finally, these terms do not always distinguish between professionally conducted psychotherapy and religious or other forms of counseling practice, a blurring of categories that carries immense significance for accurately representing change-allowing professional therapies. Unfortunately, SOCE terminology is the current standard vernacular so I will employ it at times in this declaration to signify change-allowing professional talk therapies, though I recognize that licensed therapists in this area of

practice find the language of sexual attraction fluidity exploration or therapy-assisted fluidity to be more accurately descriptive of their work.

6.    There should be no doubt that licensed mental health professionals who practice some form of SOCE care deeply about the well-being of sexual minority youth and see change-allowing therapies as a valid option for psychological care, while simultaneously affirming as well the client's right to pursue gay affirmative forms of psychotherapy. While it is not possible here to respond to all the accusations that are typically leveled against professional SOCE, the information in the present declaration should be sufficient to question the scientific (not to mention constitutional) merits of Ordinance 2017-47.

7.    To summarize my main points:

(1st)   The science as pertains to SOCE efficacy and harm is not nearly as conclusive and definitive as proponents of Ordinance 2017-47 portray it to be. Their one-sided presentation of the science is a byproduct of a pervasive lack of viewpoint diversity within professional organizations and their constituent social scientists as pertains to sexual orientation research. Notwithstanding this demonstrable bias, the scientific literature does not support the conclusion that voluntary, speech-based SOCE causes harm. In fact, the actual research studies reject causal attribution of harm to SOCE as an empirical matter, rendering any pro-SOCE-ban position statements based on the studies at best unreliable and at worst dishonest.

(2nd)   Given the empirically determined fact that all therapy includes some risk of harm, and the absence of any empirical data on harm specifically from SOCE therapy, the actual degree of harm attributable to SOCE is unknowable at this time. This is a critical fact of basic research methodology.

(3rd)   Professional activism and related advocacy interests have superseded allegiance to the process of scientific discovery as pertains to SOCE, as is evident in the highly discrepant methodological standards professional organizations have utilized to evaluate efficacy and harm.

(4th)   An impressive body of scientific data indicates that non-heterosexual sexual orientations should not be viewed as always immutable but are often fluid and subject to change, especially among youth and young adults. Assertions to the contrary should be considered in light of Diamond and Rosky's (2016) observation that, in spite of its scientific inaccuracy, "Some advocates clearly believe that immutability claims are necessary to advocate effectively for sexual minorities" (p. 372).

(5th)   The proper course of action for politicians and the courts to take given the current limited scientific base of knowledge regarding SOCE should be to encourage further and ideologically diverse research, not place a ban on its professional practice that supersedes existing regulatory oversight and may

create unintended consequences for licensed therapists who work with non-heterosexual clients.

## III.   ANALYSIS AND OPINIONS.

### A.   The Objectivity of the 2009 APA Task Force Report on SOCE Is Demonstrably Suspect; Therefore the Report's Representation of the Relevant Literature Concerning Efficacy of and Harm from SOCE Is Neither Complete nor Definitive.

#### i.   Bias in Task Force Selection.

8.      Although many qualified conservative psychologists were nominated to serve on the task force that published the 2009 Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation (the "Report"), all of them were rejected.  This fact was noted in a book co-edited by a past-president of the APA (Yarhouse, 2009). The director of the APA's Lesbian, Gay and Bisexual Concerns Office, Clinton Anderson, offered the following defense: "We cannot take into account what are fundamentally negative religious perceptions of homosexuality—they don't fit into our world view" (Carey, 2007). It appears that the APA operated with a litmus test when considering task force membership—the only views of homosexuality that were tolerated are those that uniformly endorsed same-sex behavior as a moral good. Thus, from the outset of the task force, it was predetermined that conservative or religious viewpoints would only be acceptable when they fit within their pre-existing worldview. One example of this is the Report's failure to recommend any religious resources that adopt a traditional or conservative approach to addressing conflicts between religious beliefs and sexual orientation. This bias can hardly be said to respect religious diversity and had predictable consequences for how the task force addressed its work.

#### ii.   Bias Regarding Statements of SOCE Harm and Efficacy.

9.      This bias was particularly evident in the task force's highly uneven implementation of standards of scientific rigor in the utilization and evaluation of published findings pertaining to SOCE (Jones, et al., 2010). Of particular note is the contrast between the exceptionally rigorous methodological standards applied to SOCE outcomes and the considerably less rigorous and uneven standards applied to the question of harm. With regard to SOCE outcomes, the Report dismisses most of the relevant research because of methodological limitations which are outlined in great detail (APA, 2009, pp. 26-34). Studies pertaining to SOCE outcomes that fall short of the task force's rigorous standards are deemed unworthy of examination and dismissed as containing no evidence of value to the questions at hand. Meanwhile, the Report adopts very different evidentiary standards for making statements about harms attributed to SOCE. The standard as regards efficacy is to rule out substandard studies as irrelevant; however, no such standards are employed in considering studies purporting to document harm. In addition, the Report uses the absence of evidence to argue that SOCE is unlikely to produce change and thus strongly questions the validity of SOCE, but shows no parallel reticence to endorse affirmative therapy despite acknowledging that, "...it has not been evaluated for safety and efficacy" (APA, 2009, p. 91).

10. The six studies deemed by the task force to be sufficiently methodologically sound to merit the focus of the Report targeted samples that would bear little resemblance to those seeking SOCE today and used long outdated methods that no current practitioner of change-allowing talk therapies employs. This brings into question the Report's willingness to move beyond scientific agnosticism (i.e., that we do not know the prevalence of success or failure in SOCE) to argue affirmatively that sexual orientation change is uncommon or unlikely. The Report seems to affirm two incompatible assertions: a) we do not have credible evidence on which to judge the likelihood of sexual orientation change and b) we know with scientific certainty that sexual orientation change is unlikely. However, the absence of conclusive evidence of effectiveness is not logically equivalent to positive evidence of ineffectiveness (Altman & Bland, 1995).

11. There are places in the Report that do seem to acknowledge that, given their methodological standards, we really cannot know anything scientifically definitive about the efficacy of or harms attributable to SOCE. For example, the Report states, "Thus, we cannot conclude how likely it is that harm will occur from SOCE" (APA, 2009, p. 42). Similarly the Report observes, "Given the limited amount of methodologically sound research, we cannot draw a conclusion regarding whether recent forms of SOCE are or are not effective" (APA, 2009, p. 43). Similarly, "[T]here are no scientifically rigorous studies of recent SOCE that would enable us to make a definitive statement about whether recent SOCE is safe or harmful and for whom" (APA, 2009, p. 83; cf. p. 67, 120).

12. These expressions of agnosticism are justified by the task force but then are not adhered to in the Report's conclusions. Instead, the Report argues at length that only the most rigorous methodological designs can clearly establish a causal relationship between SOCE methods and subsequent change, but the Report does not hesitate to make such causal attributions consistently regarding harm while repudiating any such claims for efficacy. From this highly uneven application of literature review methodology, the Report goes on to assert confidently that success of SOCE is unlikely and that SOCE has the potential to be harmful. It is also telling that in subsequent references to the Report the potential for harm has morphed into "the potential to cause harm to *many* clients" (APA, 2012, p. 14, emphasis added). The harms from SOCE appear to grow greater the farther away one gets from the original Report.

**iii. Bias in Favor of Preferred Conclusions.**

13. That the task force utilized a far lower methodological standard in assessing harm and other aspects of the science than it did in assessing SOCE outcomes can be demonstrated by a few examples. The Report references the many varieties of methodological problems deemed sufficient to render useless most of the SOCE research. Yet the Report is ready to overlook such limitations when the literature addresses preferred conclusions. First, consider the work of Hooker (1957), which is routinely touted as groundbreaking in the field and affirmed in the Report and other APA publications as evidence indicating no differences in the mental health of heterosexual and gay men. However, this research contains such serious methodological flaws that it is inconceivable that an even-handed methodological evaluation by the task force would not have mentioned these problems. Among the many methodological problems noted by Schumm (2012), the control group was told the purpose of the study in advance, and clinical experts were not blind to the objectives of the study. There also was an imperfect matching of participants, low scale reliability, the use of a small and recruited control group rather than existent national standardized

norms, the post hoc removal of tests that actually displayed differences, and the screening out of men from the study if they appeared to have pre-existing psychological troubles.

14. As Hooker (1993) wrote many years later, "I knew the men for whom the ratings were made, and I was certain as a clinician that they were relatively free of psychopathology." Despite these serious methodological problems, which would never be tolerated by the task force were this SOCE-supportive research, APA experts such as Gregory Herek described Hooker's study as part of the "overwhelming empirical evidence" that there is no association of sexual orientation with psychopathology (Herek, 1991, p. 143; see also Herek, 2010). Furthermore, the APA has cited Hooker's "rigorous" study in several of its recent amicus briefs (Schumm, 2014). The point here is not to argue for an association between homosexuality and pathology, but to underscore that a consistent application of the methodological standards affirmed in the Report should have led to the dismissal of the Hooker study as supportive of the no differences hypothesis.

**iv. Bias Regarding Treatment of the Primary Study on Harm.**

15. Perhaps the most egregious example of the task force's methodological double standard is evidenced in their heavy reliance on the Shidlo and Schroeder (2002) and Schroeder and Shidlo (2003) research in conclusions about harm from SOCE. Several methodological problems cited to dismiss the SOCE outcome literature complicate these studies:

- These studies were conducted in association with the National Gay and Lesbian Task Force, initially with the explicit mandate to find clients who had been harmed and document ethical violations by practitioners. This was abundantly clear in the study's original title: "Homophobic therapies: Documenting the damage".

- Over 50% of the 202 sample participants were recruited through the GLB media, hardly a random or generalizable sampling procedure.

- Only 20 participants in this study were women, creating significant skew toward gay male accounts.

- Twenty-five percent of study participants had already attempted suicide *before* starting therapy, making very dubious the claim that suicide attempts were actually caused by the therapy.

- Finally, these subjects reported their experiences came from a mix of licensed therapists, nonlicensed peer counselors, and religious counselors, leaving open the reasonable suspicion that negative therapeutic experiences might differ significantly by level of training.

The Shidlo and Schroeder (2002) and Schroeder and Shidlo (2003) results thus are based on a non-representative sample likely to be heavily biased in the direction of retrospectively reporting negative therapy experiences, some of which occurred decades prior. The task force appears to have ignored the warnings from the study's authors: "*The data presented in this study do not provide information on the incidence and prevalence of failure, success, harm, help, or ethical*

*violations in conversion therapy*" (Shidlo & Schroeder, 2002, p. 250, emphases in the original). It is difficult to understand how this research can be cited without qualification or context as demonstrating likely harm from change-allowing talk therapies conducted by licensed medical and mental health professionals.

16. Again, what we can say with confidence is that some SOCE clients report harm and others report benefit and we do not know from the literature how often either outcome occurs. While harm may occur with any form of psychological care, the "evidence" provided in this study is essentially nothing more than unverifiable "hearsay." This is hardly a legitimate ground for legal prohibition.

**v. Bias Regarding the Lack of Context Concerning Harm in Psychotherapy.**

17. The APA and other professional bodies that utilize this Report, including those identified in the Ordinance, are negligent if not fraudulent in giving a warning that SOCE may potentially cause harm but failing to do so within the broader context that this warning certainly applies to all forms of psychological care for any and all forms of presenting problems or concerns. For example, regardless of theoretical orientation or treatment modality, some psychological or interpersonal deterioration or other negative consequences appear to be unavoidable for a small percentage of clients, especially those who begin therapy with a severe "initial level of disturbance" (Lambert & Ogles, 2004, p. 117). Clients who experience significant negative counter-transference or whose clinicians may lack empathy or underestimate the severity of their problem may also be at greater risk for deterioration (Mohr, 1995).

18. It should be noted in this regard that there is not a single study which provides prevalence estimates of harm from SOCE using a representative and population-based sample. The APA Report does not make this fact clear and has no way of knowing if the prevalence of reported harm from SOCE is any greater than that from psychotherapy in general, where research demonstrates 5-10% of clients report deterioration while up to 50% experience no reliable change during treatment (Hansen, Lambert, & Forman, 2002; Lambert, 2013; Lambert & Ogles, 2004; Lambert & Ogles, 2004; Nelson, Warren, Gleave, & Burlingame, 2013; Warren, Nelson, Burlingame, & Mondragon, 2012). In addition to psychotherapy deterioration rates, 40-60% of youth drop out of all forms of psychological treatment early (Kazdin, 1996; Nelson, et al. 2013; Wierzbicki & Perkarik, 1993).

19. These facts have considerable implications for contextualizing the alleged reports of harm and efficacy from SOCE. Deterioration rates significantly beyond 20% would need to be established for professionally conducted SOCE in order for claims of approach-specific harms among youth to be substantiated. Otherwise, Ordinance 2017-47 proponents are simply targeting one approach to psychological care on ideological and not scientific grounds.

20. Further, the high dropout rates among youth in all forms of psychotherapy add insight to the risk of premature termination in SOCE, wherein emotional distress arising from initial discussions of difficult issues may not be allowed sufficient therapeutic process to be adequately resolved. This could result in a feeling of harm that would be attributable to the premature termination and not SOCE per se.

21. Furthermore, it must be remembered that, on average, persons with same-sex attraction already experience and/or are at greater risk for experiencing a number of medical and mental health difficulties *prior* to participating in any SOCE (Hottes, Bogaert, Rhodes, Brennan, & Gesink, 2016; Pakula, Shoveller, Ratner & Carpiano, 2016; Whitehead & Whitehead, 2010). This makes it extremely difficult to disentangle psychological distress directly attributable to SOCE from that which preceded commencement of SOCE. And since change-allowing talk therapies commonly involve helping clients become more aware of the stress and distress in their lives in order to manage or alleviate them, as do many approaches to mental health care, persons who leave therapy prematurely may have an increased awareness or experience of their (pre-) existing stress and distress. Thus, they may "feel worse" as a consequence of not having allowed therapy sufficient time to help resolve the difficulties. Anecdotal personal stories of harm certainly cannot scientifically establish the proportion of distress derived directly from SOCE, and high quality research that might be able to distinguish such causation simply does not exist.

### vi. Bias in the Omission of Medical Outcomes Associated with Same-Sex Behavior.

22. It should also be mentioned in the discussions of harm and benefit from SOCE that the Report makes no mention of the well-documented medical outcomes associated with homosexual and bisexual behavior. For example, men having sex with men (MSM) comprise 48% of all individuals with HIV/AIDS in the U.S., but make up only an estimated 2-4% of men in the population (Newcomb & Mustanski, 2011). This is occurring in a context where MSM are reporting higher rates of sexual risk behaviors in recent years in spite of increasing cultural acceptance. Similarly, the disparities in emotional distress, suicidal ideation, and suicide attempts between non-heterosexual and heterosexual persons have persisted since the 1990s and even appear to be getting worse for bisexual and lesbian girls (Peter, Edkins, Watson, Adjei, Homma, & Saewyc, 2017; Porta, Watson, Doull, Eisenberg, Grumdahl, & Saewyc, 2018; Savin-Williams & Ream, 2007). Certainly, whatever unclear risk of harm that might occur to an individual SOCE minor client must be weighed against the clear medical risks that arise from enacting homosexual behavior, particularly salient among adolescents. Yet desires of the client to change attractions or even homosexual behavior could jeopardize the license of the therapist under Ordinance 2017-47.

### vii. Bias Regarding Research on the Origins of Same-Sex Attractions.

23. Another example of the task force's uneven application of methodological standards concerns the Report's conclusion that, "Studies failed to support theories that regarded family dynamics, gender identity, or trauma as factors in the development of sexual orientation" (APA, 2009, p. 23). Of the ten studies cited in support of this conclusion, three were not readily accessible on databases and one was a review article, which is an interpretation and not an empirical study. An examination of the remaining six studies (Bell, Weinberg, & Hammersmith, 1981; Freund & Blanchard, 1983; McCord, McCord, & Thurber, 1962; Peters & Cantrell, 1991; Siegelman, 1981; Townes, Ferguson, & Gillam, 1976) revealed many of the same methodological flaws cited in the task force critique of SOCE (Rosik, 2012). For example, the Freud and Blanchard study is cited as evidence against any role of family dynamics or trauma in the origin of same-sex attractions but contains many serious methodological problems, including unclear scale reliability, participants being known to the researchers as patients, the use of a convenience sample, and a narrow and therefore non-generalizable sample composed of psychiatric patients. All of these

problems were considered to be fatal flaws in the task force's appraisal of the SOCE outcome literature for documenting evidence of change, but were ignored for conclusions that the task force wanted to draw.

24.     Given that many of the methodological limitations used by the task force to assail the SOCE research exist in the literature exploring the possible causal influences for sexual orientation, questions have to be raised as to why the task force members chose to definitively dismiss this literature as "failing to support" developmental theories. It appears, based on the same criteria they used to dismiss SOCE, that their own conclusions have little support in the literature. A fairer rendering of the literature they reference in this regard would appear to be that this research is so methodologically flawed that one cannot make any conclusive statements concerning the applicability of developmental factors in the origin of homosexuality. Thus by the task force's own methodological standards, the literature they cite fails to support *or rule out* a role for these potential developmental influences in the genesis of sexual orientation.

25.     If such ambiguity exists in the SOCE literature on methodological grounds, then by the task force's own criteria, this ambiguity also is present in the referenced etiological research. The task force has been inconsistent in the application of their methodological critique to the broader literature on homosexuality and they have been willing to offer more definitive conclusions about theories they wish to dismiss than is warranted by their own standards. In a word, there is again the appearance of substantial bias.

26.     Contra to the repeated claims of the Report that it is an established "scientific fact" that "no empirical studies or peer-reviewed research supports theories attributing same-sex sexual orientation to family dysfunction or trauma" (APA, 2009, p. 86), there currently exists recent, high quality, and large-scale studies that provide empirical evidence consistent with the theory that familial or traumatic factors potentially contribute to the development of sexual orientation (Bearman & Bruckner, 2002; Francis, 2008, Frisch & Hviid, 2006; Roberts, Glymour, & Koenen, 2013; Wells, McGee, & Beautrais, 2011; Wilson & Widom, 2010). Despite their significant relevance for scientific discussions on the etiology of same-sex attractions, these studies were ignored by the task force.

27.     It is perfectly reasonable to believe that *not* offering professional SOCE to some minors with unwanted same-sex attractions and behaviors who seek such care *may actually harm* them by *not* helping them deal with what is one of the possible consequences of sexual molestation and abuse.

28.     This is underscored by the much higher prevalence rates of childhood sexual abuse (CSA) among non-heterosexuals (Andersen & Blosnich, 2013; Outlaw et al., 2011; Sweet & Wells, 2012; Xu & Zheng, 2015) and the fact that men experience more distress when sexually assaulted by a man as opposed to a woman (Artime, McCallum, & Peterson, 2014). Across relevant studies, median CSA prevalence among non-heterosexuals is estimated to be 35% for women and 23% for men compared to 3-27% of heterosexual women and 0-16% of heterosexual men respectively (Rothman, Exner, & Baughman, 2011). Furthermore, as Xu and Zheng observe, "It is possible that CSA causes an individual to develop a same-sex sexual attraction" (p. 328). The disparities in CSA between non-heterosexual and heterosexual individuals are in addition to the much greater odds of exposure non-heterosexuals have to multiple adverse developmental factors

beyond physical, sexual, and emotional abuse. Such adverse life events in childhood could reasonably be expected to contribute to attachment insecurity among children, which has predicted atypical gender identity and a lack of gender contentedness (Cooper et al., 2013). These researchers favor the view that attachment insecurity plays a causal role in gender atypicality, though they acknowledge that longitudinal studies are needed to confirm their suspicions. Andersen and Blosnich (2013) reported higher levels of exposure to adverse childhood factors (e.g., mentally ill, substance abusing, or incarcerated family members) for non-heterosexuals that were not likely to be the result of the child's nascent homosexuality, as is sometimes alleged as an explanation for elevated rates of physical and sexual abuse. The authors disagree but acknowledge that, "Some researchers posit that childhood adversity (particularly sexual abuse) may play a causal role in the development of same-sex preferences or sexual minority identity" (p. 5).

29.     One example of this is research suggesting a causal role for childhood sexual abuse in the development of same-sexual orientation is based on a developmental and conditioning paradigm (Beard et al. 2013; Bickham et al. 2007; Hoffman, 2012; O'Keefe et al. 2014). For example, O'Keefe et al. (2014) and Beard et al. (2013) studied the effects of brother-brother incest and sister-brother incest in a sample of 1,178 men. They concluded that, "The origins of this increased interest in sex and the origins of bisexual or same-sex sexual orientations as well as the origins of many of the powerful urges to engage in behaviors such as exhibitionism or to use objects sexually can be explained as arising from early childhood experiences through the synergistic actions of critical period learning, sexual imprinting, and conditioning" (O'Keefe, et al., 2013, p. 27). These researchers also observed that such processes could account for much of the data that has been utilized to suggest a dominant biological or genetic explanation for non-heterosexuality.

### viii.     Bias Regarding Use of the "Grey Literature".

30.     The uneven methodological implementation of standards is again seen in the Report's treatment of the "grey literature," which is dismissed in favor of only peer-reviewed scientific journal articles in the assessment of SOCE. No developed rationale is offered for this choice. Consequently, a highly scholarly, prospective, longitudinal study on SOCE supportive of change for some individuals and finding no harm on average and significantly improving psychological symptoms is dismissed in a footnote (Jones & Yarhouse, 2007; the footnote is found on page 90 of the Report; see also Jones & Yarhouse, 2011). Yet the task force appears to have no compunction in citing the grey literature on other subjects, such as the demographics relating to sexual orientation (Laumann, Gagnon, Michael, & Michaels, 1994) or the issue of psychological and familial factors in the development of sexual orientation (Bell, et al., 1981), even though the latter book utilizes a sample of questionable representativeness.

### ix.     Bias in the APA's Broader Treatment of Sexual Orientation.

31.     A final differential application of methodological critique highlights the systemic nature of this problem within the broader literature pertaining to homosexuality. A recent analysis of the 59 research studies cited in the APA's brief supporting same-sex parenting (Marks, 2012) in essence applied methodological standards of similar rigor to those the task force applied to the SOCE literature. The Marks study concluded that,

> "…some same-sex parenting researchers seem to have contended for an 'exceptionally clear' verdict of 'no difference' between same-sex and heterosexual parents since 1992. However, a closer examination leads to the conclusion that strong, generalized assertions, including those made by the APA Brief, were not empirically warranted. As noted by Shiller (2007) in *American Psychologist*, 'the line between science and advocacy appears blurred'" (p. 748).

While Marks' analysis does not focus on change-allowing talk therapies, it is relevant in that it underscores that APA's worldview regarding homosexuality appears to result in public policy conclusions (whether right or wrong) that go beyond what the data can reasonably support. This is precisely what appears to be occurring in linking the APA task force Report with the banning of professional SOCE as represented in Ordinance 2017-47.

**x. The APA Report Is Not Definitive Regarding the Risk of Harm from SOCE Due to Its Scientific Shortcomings and Pervasive Bias, and This Undermines All Position Statements Based on It.**

32. In addition to the pervasive bias demonstrated above, a fatal scientific flaw in the APA Report and all subsequent studies and position statements based on it is their inability to account for pre-SOCE levels of distress, which is a key component for disentangling distress attributable to a psychotherapeutic intervention and distress experienced by clients prior to ever engaging in therapy. Without this data, the actual degree of harm attributable to therapy is unknowable. This is a critical fact of basic research methodology, particularly when the population under study is known to have high levels of adverse childhood experiences. To cite only one example, non-heterosexual persons report much higher levels of childhood sexual abuse (CSA) than heterosexual persons (Friedman et al., 2011; Rothman et al., 2011: Xu & Zheng, 2015), and CSA has been linked to later suicidality (Bebbington, et al., 2009; Bedi et al., 2011; Eskin, Kaynak-Demir, & Demir, 2005). Hence, without pre-SOCE assessment of participants' suicidality, claims attributing frequent suicidal thoughts and behaviors to be the direct result of change-allowing talk therapies constitute empirically unfounded speculation.

33. To summarize, a proper conclusion regarding the 2009 APA Report and its progeny is that these reports and position statements cannot provide a scientifically sound basis for restricting the rights of individuals to engage in and therapists to provide change-allowing professional psychotherapy. Utilizing this research to evaluate the provision of change-allowing talk therapies makes no more sense than studying a sample of former marital therapy patients who have subsequently divorced to determine the effectiveness and harm of marital therapy in general.

**B. Non-heterosexual Identities, Attractions, and Behaviors Are Subject to Change for Many People and Particularly Among Females and Youth.**

34. Central to the notion that some individuals can and do report change on a continuum of change in their sexual orientation is the issue of *immutability*. The APA Task Force Report said one of the "key findings in the research" on which it based its conclusion was that sexual orientation does not change through life events (APA, 2009, pp. 63, 86). Were all same-sex

attractions and behaviors fixed and not subject to change, then sexual orientation would indeed be an enduring trait and SOCE would be a futile exercise, including among minors. However, there is solid data to suggest that same-sex attractions and behaviors are not fixed and are subject to varying degrees of change. As summarized by Ott et al. (2013), "Reported sexual identity, attraction, and behavior have been shown to change substantially across adolescence and young adulthood" (p. 466). Hu, Xu, and Tornello (2016) studied longitudinal data and observed, "In the LGB [lesbian, gay, and bisexual] population, the dominant pattern was change." Dickson, van Roode, Cameron, and Paul (2013) further asserted that, "People with changing sexual attractions may be reassured to know that these are common rather than atypical (p. 762). This viewpoint has long been maintained within scientific circles. Klein, Sepekoff, and Wolf (1985) decades earlier affirmed "…the importance of viewing sexual orientation as a process which often changes over time" and noted "…the simplicity and inadequacy of the labels heterosexual, bisexual, and homosexual in describing a person's sexual orientation" (p. 43).

### i.    Lack of Agreement Regarding What Constitutes Sexual Orientation.

35.     Contrary to the conventional wisdom, there is substantial debate with scientific circles as to what constitutes sexual orientation, and this uncertainty extends to terms such as "sexual orientation change efforts." Sexual orientation may be said to comprise same-sex attractions, fantasies, and behaviors, but this is insufficient to guide change-allowing talk therapists in knowing clearly whether what they are discussing with a client could be considered as a *sexual orientation* change effort. That term is nebulous, and many scholars admit they have no precise means of distinguishing sexual orientation from same-sex sexuality, *i.e.*, same-sex behaviors and attractions that may not signify a same-sex orientation (Diamond, 2003). Relatedly, Savin-Williams (2016) described sexual orientation as being a continuum rather than discreet categories, which theoretically could mean that an isolated same-sex attraction among an otherwise completely heterosexual person might be considered as a separate sexual orientation.

36.     Echoing the earlier observation by Laumann, Gagnon et al. (1994), Diamond (2005) concluded that, "In light of such findings, one might argue for an end to sexual categorization altogether, at least within the realm of social scientific research" (p. 125). Finally, Diamond and Rosky (2016) acknowledged these problems when they indicated,

> ….it is important to note that sexual orientation is not easy to define or measure. This obviously poses a problem for research on the causes of sexual orientation, given that the first step in such research is to identify individuals with different sexual orientation. (p. 365).

One could rationally argue that this also poses a problem for the politics of SOCE ban legislation.

### ii.    Non-Heterosexuality Is Not a Fixed Trait.

37.     The definitive study by Laumann, Gagnon et al. (1994), cited by the APA (2009) task force, involved several thousand American adults between the ages of 18 and 60. This report contains the most careful and extensive database ever obtained on the childhood experiences of

matched homosexual and heterosexual populations. One of the major findings of the Laumann, Gagnon et al. study, which even surprised the authors, was that homosexuality as a fixed trait scarcely seemed to exist (Laumann, Michael, and Gagnon, 1994). Sexual identity is not the least fixed at adolescence but continues to change over the course of life. For example, the authors report:

> ...this implies that almost 4 percent of the men have sex with another male before turning eighteen but not after. These men, who report same-gender sex only before they turned eighteen, not afterward, constitute 42 percent of the total number of men who report ever having a same-gender experience. (Laumann, Gagnon, et al., p. 296)

They also note that their findings comport well with other large-scale studies.

> [O]verall we find our results remarkably similar to those from other surveys of sexual behavior that have been conducted on national populations using probability sample methods. In particular two very large-scale surveys...one in France [20,055 adults] and one in Britian [18,876 persons]. (p. 297)

38. This data suggest that heterosexuality is normative even for those who at one point in the past reported a non-heterosexual sexual orientation. Sexual orientation stability appears to be greatest among those who identify as heterosexual (Savin-Williams, Joyner, & Rieger, 2012): "This limited empirical evidence based on four large-scale or nationally representative populations indicates that self-reports of sexual orientation are stable among heterosexual men and women, but less so among non-heterosexual individuals" (p. 104). Moch & Eiback (2010) found that heterosexuality was more stable than homosexuality or bisexuality over a 10-year period in middle aged adults. Nearly half of women with initial bi- or homosexual identity opted for a different label 10 years later. Diamond and Rosky summarize the matter well: "Given the consistency of these findings, it is no longer scientifically accurate to describe same-sex sexual orientation as a uniformly immutable trait" (p. 370).

39. Heterosexuality likely exerts a constant, normative pull throughout the life cycle upon everyone. While admittedly Laumann attributes this reality to American society, the same findings have been found in other societies where it has been studied. A simpler explanation might look to human physiology, including the physiology of the nervous system, which is overwhelmingly sexually dimorphic, i.e., heterosexual. Therefore, it is not surprising that the brain would self-organize behavior in large measure in harmony with its own physiological ecology, even if not in a completely deterministic fashion.

40. Whether measured by action, feeling, or identity, Laumann, Gagnon, et al.'s (1994) data concerning the prevalence of homosexuality before age 18 and after age 18 reveal that its instability over the course of life occurred largely in one direction—toward heterosexuality—and reflected significant decline in non-heterosexual identities. This evidence of spontaneous change with the progression of time among both males and females is hardly a picture of sexual orientation stasis in adolescence that Ordinance 2017-47 seems to assume. To be fair, we cannot tell from this

data how many, if any, of those reporting change pursued SOCE. However, the data do provide a developmental context for the plausibility that change-allowing talk therapies could aide some individuals (including minors) in modifying same-sex attractions and behavior. It appears that the most common natural course for a young person who develops a non-heterosexual sexual identity is for it to spontaneously disappear unless that process is discouraged or interfered with by extraneous factors. Conceivably, therapies disallowing the potential for change (e.g., "gay-affirmative") could be interfering with normal sexual development.

### iii. Fluidity of Non-Heterosexual Sexual Attractions and Identity is Commonplace.

41. Diamond's longitudinal studies of women with non-heterosexual identities revealed that 67% reported changing their identities over a ten-year period of time (Diamond, 2005, 2008). Diamond noted that, "Hence, identity *change* is more common than identity *stability*, directly contrary to conventional wisdom" (italics in original, p. 13). While changes in same-sex physical and emotional attractions among these women were admittedly more modest, they nevertheless occurred to the point where the findings "...demonstrate considerable fluidity in bisexual, unlabeled, and lesbian women's attractions, behaviors, and identities and contribute to researcher's understanding of the complexity of sexual-minority development over the life span" (Diamond, 2008, p. 12).

42. Farr, Diamond, and Boker (2014) presented evidence for the existence of subtypes of non-heterosexual women, both in the intensity or degree of their same-sex attractions and in how these attractions change over time. She noted that these women appear more likely than men to specifically report the roles of circumstance, chance, and choice in their sexual identity and orientation, concluding that, "These results support the notion that some degree of plasticity may be a fundamental component of female same-sex sexuality" (p. 1487). Dickson et al. (2013) reviewed the relevant scientific literature and concluded, "These studies demonstrate that there is more change in sexual orientation than would be expected from repeated cross-sectional studies and change appears to be more common among women than men" (p. 754).

43. Clearly, change in sexual attractions and behaviors on a continuum of change would appear possible for many women and adolescent girls, leaving no rational reason to preclude professionally conducted change-allowing talk therapies as one option for minor girls experiencing unwanted same-sex attractions and behaviors, provided adequate assessment to insure voluntary and informed consent. Finally, echoing the earlier observation by Laumann, Gagnon et al. (1994), Diamond (2005) concluded that, "In light of such findings, one might argue for an end to sexual categorization altogether, at least within the realm of social scientific research" (p. 125).

44. Although the general scholarly consensus is that non-heterosexual women are more fluid in their sexual attractions and behaviors than are men, this may not be the case. As Diamond (2017) noted, "Female sexuality was once thought to be more fluid and plastic than men's, but recent research has begun to challenge this view" (p. 1184). This includes research on sexual orientation fluidity by Katz-Wise (2015) and Katz-Wise & Hyde (2015). These researchers studied a sample of young adults (18-26 years of age) who reported a same-gender sexual orientation. They discovered that 63% of the women and 50% of the men reported fluidity in their sexual

attractions, and of these individuals 48% of the women and 34% of the men also reported change in their sexual orientation identity. Of additional import for evaluating the legitimacy of Ordinance 2017-47, participants who reported fluidity indicated that their initial experience of change in sexual attractions occurred on average *before* the age of 18.

45. More recently, Diamond (2016) reviewed relevant studies and concluded,

> The other major conclusion that we can draw from these studies is that change in patterns of same-sex attraction is a relatively common experience among sexual minorities. Across the subgroups represented…between 25% and 75% of individuals reported substantial changes in their attractions over time, and these findings concord with the results of retrospective studies showing that gay, lesbian, and bisexual-identified individuals commonly recall having undergone previous shifts in their attractions. Such findings pose a powerful corrective to previous oversimplifications of sexual orientation as a fundamentally stable and rigidly categorical phenomenon. (p. 253)

46. It is also noteworthy that the Katz-Wise studies reported sexually fluid participants were more likely than sexually non-fluid participants to believe that sexual orientation is changeable. Non-sexually fluid men were more likely than sexually fluid men to believe that sexuality is something an individual is born with, while men who reported experiencing sexual fluidity were more likely than men who did not report sexual fluidity to view sexuality as changeable and subject to environmental influences. These findings may help explain the overwhelming dominance of men who provide testimony and personal anecdotes in favor SOCE bans, suggesting that non-heterosexual men who have not experienced change may assume that this is the case for all non-heterosexuals and support laws that ban professional change-allowing talk therapies for even sexually fluid male youths who freely seek assistance with their pursuit of change.

**iv. Change Among Transgendered/Transsexual Individuals.**

47. Intriguing research among transgendered persons finds that these individuals often report a change in their sexual orientation (Auer, Fuss, Hohne, Stalla, & Sievers, 2014). These researchers found almost 21% of their sample of 115 transsexual participants reported experiencing a change in their sexual orientation. They noted that, "Transition [surgically from one sex to the other] was not directly involved in this change, since a significant number of participants reported a change in sexual orientation prior to first psychological counseling and prior to initiation of cross-sex hormone treatment. The participants provided diverse individual explanation models, revealing that personal history, social environment as well as autoerotic feelings may impact on a change in sexual orientation" (p. 11). They observed that these changes may even be affected by personal decision, quoting one participant as stating, "While some people think that gender identity is something you acquire or learn, I think this was rather true for my alleged sexual orientation" (p. 9). While this study may raise more questions than it ultimately answers, it further undercuts an understanding of sexual orientation as a stable self-construct that is unchangeable for all persons in all circumstances.

**v. Change Not Limited to Sexual Behavior.**

48. A New Zealand study by Dickson, Paul, and Herbison (2003) further questions the claim that change might affect same-sex *behavior* but *not* same-sex *attraction*. This study found large and dramatic drops in homosexual attraction that occurred spontaneously for both sexes, a finding underscored even more by its occurrence in a country with a relatively accepting attitude toward homosexuality. Interestingly, the results also indicated a slight but statistically significant net movement toward homosexuality and away from heterosexuality between the ages of 21 and 26, which suggests the influence of environment on sexual orientation, particularly for women. Specifically, it appears likely that the content of higher education in a politically liberal environment contributed to the upswing in homosexuality in this educated sample of twenty-somethings. This notion is further supported by the fact that this increase in homosexuality follows a much larger decrease that would have had to take place in the years prior to 21 in order to account for the above findings. Additionally, once the educational effect wears off, the expected decline in homosexual identification resumed. The authors conclude that their findings are consistent with a significant (but by no means exclusive) role for the social environment in the development and expression of sexual orientation.

49. More recently, similar findings were reported among a sample of 116 polyamorous and monoamorous individuals (Manley, Diamond, & van Anders, 2015). The authors suggest "the prevalence of attraction shifts contradicts notions of attraction as stable and partnering behaviors and sexual identities as more fluid. Attraction shifts were far more common than shifts in either sexual identity or partner gender" (p. 177).

**vi. Change Particularly Evident for Youth and Bisexuals.**

50. A large longitudinal study by Savin-Williams and Ream (2007) is also noteworthy as it focused on the stability of sexual orientation components for adolescents and young adults. Three waves of assessment began when participants were on average just under 16 years of age and concluded when participants were nearly 22 years old. The authors observed a similar decline in non-heterosexuality over the time of the study: "All attraction categories other than opposite-sex were associated with a lower likelihood of stability over time" (p. 389). For example, 16-year-olds who reported exclusive same-sex attractions or a bisexual pattern of attractions are approximately 25 times more likely to change toward heterosexuality at the age of 17 than those with exclusively opposite sex attractions are likely to move towards bisexual or exclusively same-sex attractions (Whitehead & Whitehead, 2010). Ninety-eight percent of 16 to 17-year-olds moved from homosexuality or bisexuality towards heterosexuality over the course of the study.

51. To be fair, such changes were more pronounced among bisexuals and women. But keep in mind that Ordinance 2017-47 does not discriminate in its prohibition between SOCE provided for exclusively same-sex attracted minors and those whose unwanted same-sex attractions are part of a bisexual attraction pattern. Nor does the bill's ban distinguish between boys and girls. Savin-Williams and Ream observed that, "The instability of same-sex attraction and behavior (plus sexual identity in previous investigations) presents a dilemma for sex researchers who portray non-heterosexuality as a stable trait of individuals" (p. 393). They acknowledged that developmental processes are involved even as they focused mostly on problems with measurement. The reality of such spontaneous changes in sexual orientation among teenagers

is not in accord with a bill whose defenders contend sexual orientation is a universally enduring trait. In fact, these data suggest it is irresponsible to legally prevent access to change-allowing talk therapies and only allow affirmation of same-sex feelings in adolescence on the grounds that the feelings are intrinsic, unchangeable, and therefore the individual can only be homosexual.

52.     Ordinance 2017-47's intent for a blanket prohibition on SOCE for all minors with unwanted same-sex attractions and behaviors is akin to doing heart surgery with a chainsaw in its inability to address the complex realities of sexual orientation. For example, a study by Herek et al. (2010) reported that "only" 7% of gay men reported experiencing a small amount of choice about their sexual orientation and slightly more than 5% reported having a fair amount or great deal of choice. Lesbian women reported rates of choice at 15% and 16%, respectively. It is worth noting that these statistics, which are not inconsequentially small, do suggest that sexual orientation is not immutable for all people and again suggest the plausibility that modification of same-sex attractions and behaviors could occur in change-allowing talk therapies for some individuals who voluntarily desire and seek such change. Even more important, however, are the findings for bisexuals: 40% of bisexual males and 44% of bisexual females reported having a fair amount or great deal of choice in the development of their sexual orientation. This is in addition to 22% of male bisexuals and 15% of female bisexuals who reported having at least a small amount of choice about their sexual orientation. Other studies confirm the particular instability of a bisexual sexual orientation (Savin-Williams, Joyner, & Rieger, 2012). These numbers create a significantly different impression about the enduring nature of sexual orientation than the picture often painted by proponents of Ordinance 2017-47. At a minimum, such data suggest that proponents of the Ordinance would have done better to exclude bisexuality from the scope of this bill. If such a large minority of individuals (albeit mostly bisexuals) experience a self-determinative choice as being involved in the development of their sexual orientation, why would it not be conceivable that change-allowing talk therapies might augment this process for some individuals with unwanted same-sex attractions and behaviors?

### vii.     Identification of the Mostly Heterosexual Orientation.

53.     Further evidence that Ordinance 2017-47 ignores distinctions in sexual orientation relevant to SOCE is the recent identification of the "mostly heterosexual" orientation. This orientation has been reported by 2-3% men and 10-16% of women over time and constituted a sexual orientation larger than all other non-heterosexual identities combined (Savin-Williams, Joyner, & Rieger, 2012). Moreover, it appears to be a highly unstable sexual orientation in comparison to other non-heterosxual identities. The reality of the "mostly heterosexual" orientation category has been additionally supported by recent physiological evidence in a sample of men (Savin-Williams, Rieger, & Rosenthal, 2013). This apparently viable and unique group of non-heterosexuals raises serious questions for the scope of Ordinance 2017-47; namely, are "mostly heterosexual" minors exempt from the law's ban on SOCE? The fact that the Ordinance is oblivious to such important nuances highlights the folly of politicians attempting to adjudicate the complex scientific matters surrounding change-allowing talk therapies at the behest of activists within and outside professional organizations.

54.     All of the above evidence of fluidity and change in sexual orientation strongly suggests that change in the dimensions of sexual orientation does take place for some people (and likely more so for youth) and that this change is best conceptualized as occurring on a continuum

and not as an all-or-nothing experience. The experience of clinicians who engage in change-allowing talk therapies is that while some clients report complete change, and some indicate no change, many clients report achieving sustained, satisfying, and meaningful shifts in the direction and intensity of their sexual attractions, fantasy, and arousal as well as behavior and sexual orientation identity.

55. Descriptions of licensed therapists engaged in SOCE as trying to "cure" their clients of homosexuality are either ignorant or willfully slanderous of how these therapists conceptualize their care (see Alliance for Therapeutic Choice and Scientific Integrity (ATSCI), 2018). Licensed therapists who provide change-allowing care recognize that change of sexual orientation typically occurs on a continuum of change, and this is consistent with how change is understood to occur for most if not all other psychological and behavioral conditions addressed in psychotherapy.

### viii. Genetics and Biology Are at Best Partial Explanations for Same-Sex Attractions

56. Moreover, such fluidity and change make clear that simple causative genetic or biological explanations are inappropriate. The later development of same-sex attractions and behaviors is not determined at birth and there is no convincing evidence that biology is determinative for many if not most individuals (Diamond & Rosky, 2016). The American Psychiatric Association has observed that, "...to date there are no replicated scientific studies supporting any specific biological etiology for homosexuality" (American Psychiatric Association, 2013). Peplau et al. (1999) earlier summarized, "To recap, more than 50 years of research has failed to demonstrate that biological factors are a major influence in the development of women's sexual orientation...Contrary to popular belief, scientists have not convincingly demonstrated that biology determines women's sexual orientation."

57. It is important to note in this regard that the APA's own stance on the biological origin of homosexuality has softened in recent years. In 1998, the APA appeared to support the theory that homosexuality is innate and people were simply "born that way": "There is considerable recent evidence to suggest that biology, including genetic or inborn hormonal factors, play a significant role in a person's sexuality" (APA, 1998). But in 2008, the APA described the matter differently:

> "There is no consensus among scientists about the exact reasons that an individual develops a heterosexual, bisexual, gay, or lesbian orientation. Although much research has examined the possible genetic, hormonal, developmental, social, and cultural influences on sexual orientation, no findings have emerged that permit scientists to conclude that sexual orientation is determined by any particular factor or factors. Many think that nature and nurture both play complex roles...." (APA, 2008a; emphases added).

Yet the APA has made minimal effort to publicize the change in its official position on such causation or to correct the accompanying popular misconception – often promoted by the media – that persons with same-sex attractions are simply "born that way" and "can't change." It is difficult not to perceive this as significant professional neglect.

58. The absence of genetic or biological determinism in sexual orientation is underscored and clarified by large scale studies of identical twins. These studies indicate that if one twin sibling has a non-heterosexual orientation the other sibling shares this orientation only about 11% of the time with upper estimates at 24% (v, Dunne, & Martin, 2000; Bearman & Brueckner, 2002; Langstrom, Rahman, Carlstrom, & Lichtenstein, 2010; Xu, Norton, & Rahman, 2019). If factors in common like genetics or conditions in the womb overwhelmingly caused same-sex attractions, then identical twins would *always* be identical for same-sex attraction. These studies instead suggest that the largest influence in the development of same-sex attractions are environmental factors that affect one twin sibling but not the other, such as unique events or idiosyncratic personal responses. Xu and colleagues (2019) concluded, "Thus, most of the differences between people in their sexual orientation are due to environmental factors (often nonshared) pointing to multiple etiology" (p. 1).

59. Similarly, heritability of sexual orientation is approximately .32, indicating that 32% of the population variability in sexual orientation is due to genetic factors (Diamond & Rosky, 2016). Heritability is the variability between persons in a population, not an indicator of the relative contributions of genetic and environmental influences within individuals. Diamond and Rosky put this in perspective by stating, "…it is helpful to note that higher estimations of heritability (ranging from .4 to .6) have been found for a range of characteristics that are not widely considered immutable, such as being divorced, smoking, having low back pain, and feeling body dissatisfaction" (p. 366). Given these statistics, it is curious that, for example, smoking is a behavior considered subject to change, while proponents of SOCE bans often maintain sexual orientation is an immutable behavioral characteristic.

60. Causatively, then, sexual orientation is by no means comparable to a characteristic such as race or biological sex which are thoroughly immutable. Thus, while same-sex attractions may not be experienced as chosen, it is reasonable to hold that they can be subject to conscious choices such as those which might be facilitated in change-allowing therapies. Same-sex attractions and behaviors are not strictly or primarily determined by biology or genetics and are naturalistically subject to significant change, particularly in youth and early adulthood. This should raise serious questions about the legitimacy of Ordinance 2017-47's portrayal of same-sex attractions and behaviors as static traits only to be embraced by those minors who might otherwise desire the option of exploring change.

### C. The Reality of Sexual Fluidity Underscores the Impropriety of Prohibiting Change-Allowing Talk Therapies.

61. Although no reputable scholar can now deny that the components of sexual orientation evidence significant fluidity for many non-heterosexual persons, the adamant contention of SOCE ban supporters is that such naturalistic change occurs spontaneously and hence can never be achieved through the agency of clients in change-allowing talk therapies. This is essentially to contend that sexual orientation change may occur via many influences and in a variety of settings, with the singular exception of involving the assistance of a licensed therapist. Such a stance overlooks the reality that clinicians engaged in change-allowing talk therapies often address these exact influences with their clients. For example, same-sex attraction fluidity is known to sometimes occur in response to changes in emotional and romantic attachments. Hu et al. (2016) reported, "The results suggested that people who report same-sex attractions with no

relationship or an opposite sex partner were more likely to shift their same-sex attractions than those who reported a same-sex relationship" (p. 658). In evaluating neurobiological research, Diamond and Rosky (2016) noted that "...one possibility [for shifts in sexual attractions] is that the formation of emotional attachments may facilitate unexpected changes in sexual desire" (p. 370). Similarly, Manely et al. (2015) assert, "...research on sexual fluidity suggest that, for some people, relationships may in fact influence sexual orientation, meaning that emotionally intimate relationships may lead to sexual attractions toward a gender to which one had not previously been attracted" (p. 168). Change-allowing talk therapy may address exactly such influences, assisting clients with their relationships in ways that for some may facilitate genuine shifting in sexual attractions and behaviors.

62. At this point in time there are only political as opposed to theoretical obstacles to acknowledging some people can be their own agents of change in a process assisted by change-allowing talk therapy, including minors. Therapists who engage in this work report such experiences with some regularity, though certainly not for all clients. Research in this arena is of course very desirable, but hard to come by, for many reasons. Demands for such research seem to ignore the fact that (1) it is quite difficult to study a therapy process that is being made illegal, (2) funding sources for such research typically have vested interests in the outcomes as do the researchers, (3) obtaining findings favorable in any way to change-allowing talk therapies will likely result in the marginalization and professional ostracization of the researcher (Wood, 2013). It appears there will need to be a change, or at least a significant shifting, in the ideologically unbalanced professional culture of psychology before we can undo the current politically required foreclosure on the science of talk therapy-assisted fluidity in same-sex attractions and behaviors. As noted by Chambers, Schlenker, & Collisson (2013), "To the extent that social scientists operate under one set of assumptions and values, and fail to recognize important alternatives, their scientific conclusions and social-policy recommendations are likely to be tainted" (p. 148).

**D. Professional SOCE Bans Target Speech, Not Aversive Practices.**

63. There is now clear evidence from state legislative proceedings that the intent of bans such as Ordinance 2017-47 is to stifle therapist speech and not certain aversive practices. Across the country where ban legislation for minors has been debated, politicians are hearing testimonials that directly or by implication associate SOCE provided by licensed therapists with painful aversive techniques such as shocking genitals, chemically induced vomiting, taking ice baths, and the like. This caricature of contemporary change-allowing talk therapies as promoting such child abuse is both disingenuous and slanderous, as was revealed in the legislative process surrounding proposed therapy bans in the states of Washington in 2015 and Utah in 2019. In both instances, amendments were made in committee that would have preserved a legal prohibition on the harmful aversive techniques but would have specially protected therapist speech. In the Utah example, the amendment would even have penalized guarantees of "a complete and permanent reversal in the patient or client's sexual orientation."

64. Nevertheless, despite the prospect of bipartisan support for these bills, proponents pulled the legislation, complaining they did not go far enough despite their targeting of the same aversive practices that were prominently mentioned as a basis for these bans (Backholm, 2015; "Watered down anti-conversion therapy bill," 2019). Particularly telling were the comments by

University of Utah College of Law professor Clifford Rosky, who developed the original ban bill in Utah, as reported in the local gay press:

> "Licensed therapists haven't been doing electric shock therapy and adversant [sic] practices in decades," Rosky continued. What they do these days, he said was talk therapy. "As we know, words are just as damaging to children."

Clearly then, proponents of change-allowing talk therapy bans have known all along that allowing abusive aversive practices to be associated with contemporary professional SOCE is a fundamentally dishonest political maneuver. Politicians and judges need to hear from ban proponents examples of what specific words change-allowing talk therapy practitioners say to minors that creates damage on a par with electroshocking their genitals.

### E.   State Regulatory Boards Already Are Equipped to Discipline Abusive Practitioners.

65.   If any minors in the care of licensed therapists have been subjected to any of the aversive practices often declared by ban proponents, it is incomprehensible that some of these clinicians would not have been brought before their state licensing boards for such egregiously unethical child abuse. This raises a question for proponents of bans such as Ordinance 2017-47: Are these bans a solution to a problem that does not exist for minor clients of licensed therapists?

66.   State regulatory boards exist and are funded for the purposes of addressing exactly the kinds of unacceptable aversive practices ban proponents claim is occurring with some licensed SOCE providers. It is imperative any concerns along these lines be addressed by a state regulatory body of other therapists who have the training and expertise to ensure ethical counseling practices. Such a body will understand the nuances of psychotherapeutic work and hence be in a position to accurately determine genuine malpractice. Given that mental health professionals who engage in change-allowing therapies have expended great amounts of time and money on their education and careers and have much to lose, genuine justice demands any questions about their therapy-related speech be adjudicated by their professional peers in state regulatory agencies. Untrained politicians and city officials are by no means qualified to police professional practice issues, including the goals and content of therapy offered by licensed mental health practitioners.

## IV.   Concluding Statements

67.   As this declaration has documented, there is reasonable evidence to suggest that professional associations such as the APA do not approach the SOCE literature in an objective manner but rather with an eye to their advocacy interests. This is seen in the purposeful exclusion of conservative and SOCE sympathetic psychologists from the APA task force as well as the clearly uneven application of methodological standards in assessing evidence of SOCE efficacy and harm. As the task force noted, the prevalence of success and harm from SOCE cannot be determined at present, and recent SOCE research does not advance the field sufficiently to provide a scientific basis for ban legislation. Anecdotal accounts of harm, which are a focal point of attention by supporters of bans such as Ordinance 2017-47, cannot serve as a basis for the blanket prohibition of an entire form of psychological care, however meaningful they may be on a personal

level. It is negligent if not fraudulent that APA and other professional organizations accept such unverified claims that experiences of SOCE were "harmful" while dismissing much better documented claims that experiences of SOCE were "beneficial," and were not "harmful" (Phelan, Whitehead, & Sutton, 2009). Indeed, it is not difficult to find counterbalancing anecdotal accounts of benefit from change-allowing talk therapies (see http://voicesofchange.net; https://changedmovement.com/). Furthermore, as observed earlier, accounts of harm cannot tell us if the prevalence of reported harm from change-allowing therapies is any greater than that from psychotherapy in general.

68. The normative occurrence of spontaneous change in sexual orientation among youth and adults and the nontrivial degree of choice reported by some in the development of sexual orientation further bring into question the appropriateness of Ordinance 2017-47. Sexual orientation is not a stable and enduring trait among youth, and this lends plausibility to the potential for professionally conducted SOCE to assist in change in unwanted same-sex attraction and behaviors with some minors. Granted, high quality research is needed to confirm clinical reports of change. However, it should be mentioned in this regard that Ordinance 2017-47 would make further research on change-allowing talk therapies with minors impossible in Tampa, despite the APA task force's clear mandate that such research be conducted (APA, 2009).

69. Any purported concerns of harm anecdotally attributed to SOCE practice with minors can most appropriately be remedied by the application of ethical principles of practice, including informed consent, and addressed through the existing oversight functions of state regulatory boards and state mental health associations. Ordinance 2017-47 is a legislative overreach that takes an overly broad and absolute approach to SOCE harm and success despite evidence suggesting age, gender, and non-heterosexual sexual orientation differences in the experience and degree of change in sexual orientation. In particular, it is fair to ask whether bisexual and mostly heterosexual youth are well served by Ordinance 2017-47, a distinction this law does not make.

70. Proponents of Ordinance 2017-47 reason that because homosexuality is no longer considered to be a disorder, providing change-allowing talk therapies to minors with unwanted same-sex attractions and behaviors is at best unnecessary and at worst unethical. However, this reasoning betrays a profound misrepresentation of the scope of psychotherapeutic practice, as there are numerous examples of professionally sanctioned targets of treatment that are not considered to be disorders. These include relationship distress, normal grief reactions, and unplanned pregnancy. Clients often pursue psychological care for such difficulties due to deeply held religious and moral beliefs (i.e., that divorce or abortion are wrong) and may experience significant emotional distress in addressing these issues. In this context, the selective attention Ordinance 2017-47 gives to SOCE again hints at political advocacy rather than science as a primary inspiration for this law.

71. Clients will not be well served if change-allowing talk therapy with minors is judged *never* to be an appropriate modality for psychological care. Neither the courts nor the professional associations should be substituting their judgment for that of a 17-year old who is calculating a cost-benefit analysis in deciding whether to undergo change-allowing talk therapy, understanding through informed consent that fluidity in unwanted same-sex attractions may or may not occur. The APA is quite clear that it supports the competence of a 17-year old girl to give

consent to an abortion. Why does the 17-year old lose competence when it comes to change-allowing talk therapies?

72. Similarly, the APA is on record as supporting the availability of sexual reassignment surgery for adolescents (APA, 2008b) and Ordinance 2017-47 implicitly protects this option. Is it reasonable that 17-year olds who experience themselves to be the wrong biological sex be allowed to surgically remove breasts and alter genitalia while others with unwanted same-sex attractions and behavior be prohibited from even *talking* to a licensed therapist in a manner that could be construed as promoting the pursuit of change? This question is especially relevant in light of high quality longitudinal research that suggests sexual reassignment surgery does not remedy high rates of morbidity and mortality among transgendered individuals (Dhejne, et al., 2011).

73. The task force Report (APA, 2009), and the mental health associations that subsequently relied on it for their resolutions on SOCE, including those cited in the Ordinance, provide one viewpoint into research and reasoning which must be considered incomplete and therefore not definitive enough to justify a complete ban on change-allowing therapies with minors. Currently, there is a lack of sociopolitical diversity within mental health associations (Duarte et al., 2015; Redding, 2001), which has an inhibitory influence on the production of scholarship in controversial areas such as change-allowing talk therapies that might run counter to preferred worldviews and advocacy interests. An authentically scientific approach to a contentious subject must proceed in a different direction in order to give confidence that the relevant database is a sufficiently complete one on which to base public policy. As Haidt (2012) observed, genuine diversity of perspective is absolutely necessary:

> "In the same way, each individual reasoner is really good at one thing: finding evidence to support the position he or she already holds, usually for intuitive reasons...This is why it's so important to have intellectual and ideological diversity within any group or institution whose goal is to find truth (such as an intelligence agency or a community of scientists) or to produce good public policy (such as a legislature or advisor board)" (p. 90).

Such diversity is precisely what is lacking currently in professional mental health organizations and their associated scientific communities as regards the study of contested social issues related to sexual orientation, including SOCE (Duarte et al., 2015; Wright & Cummings, 2005). It would hard to understand, for example, how the leadership of the National Association of Social Workers could endorse a total of 542 candidates in federal elections between 2014 and 2018—all of whom were affiliated with the Democratic Party (NASW, 2018). These figures undoubtedly represent a "statistically impossible lack of diversity" (Tierney, 2011).

74. The APA lost 10% of its members between 2008 and 2013 and now represents less than 44% of psychologists in America (Robiner, Fossum, & Hong, 2015). The American Medical Association now represents less than 20% of physicians in the country. These downward trends have in part come about due to these associations' taking left-of-center positions on several social and policy issues, alienating conservative members and leading many of them to disaffiliate. It is evident from these kinds of statistics that, when it comes to socially contentious issues such as

change-allowing talk therapies, the mental health and medical associations likely do not speak for many of those professionals who practice in their respective fields.

75.     To repeat a final time, a truly scientific response to the concerns of the sponsors of Ordinance 2017-47 would be to encourage bipartisan research into SOCE with minors that could provide sound data to answer questions of harm and efficacy that currently are only primitively understood. Change-allowing talk therapy practitioners take seriously their responsibility to do no harm and would assuredly embrace such an opportunity (Jones, et al., 2010). Were proponents of Ordinance 2017-47 not playing a winner-take-all approach to the issue of professional SOCE, there would undoubtedly be substantial ground both sides could agree upon that would address concerns regarding alleged harms and reported benefits from change-allowing talk therapies. Unfortunately, the approach taken by Ordinance 2017-47 sponsors represented only one (political and legislative) perspective on how to best address the challenges that come with the psychological care of unwanted same-sex attractions and behaviors. It is therefore a scientifically premature, and therefore unjust, violation of the rights of current and potential change-allowing talk therapy consumers, their parents, and their therapists and should not be allowed to stand.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and accurate.

Executed this May 6, 2019.

Christopher Rosik, Ph.D.

# Christopher Hastings Rosik

1734 W. Shaw Avenue
Fresno, California 93711

**I. Education.**

B. A. University of Oregon (Honors college), Eugene, Oregon, 1980 (psychology).
M.A. Fuller Theological Seminary, Pasadena, California, 1984 (theological studies).
Ph.D. Fuller Graduate School of Psychology, Pasadena, California, 1986 (clinical psychology - APA approved program).

**II. Honors.**

Phi Beta Kappa, Alpha of Oregon, 1980.
Exemplary Paper in Humility Theology Award, John Templeton Foundation, 1998.

**III. Professional Experiences.**

| | |
|---|---|
| 9/85 - 8/ 86 | Clinical psychology intern, Camarillo State Hospital, Camarillo, California (APA approved internship). |
| 11/86 - 5/88 | Postdoctoral intern, Link Care Center, Fresno, California. |
| 5/88 - Present | Licensed clinical psychologist, Link Care Center, Fresno, California. |
| 11/94 - 6/96 | Assistant Clinical Director, Link Care Center, Fresno, California. |
| 7/96 - 12/99 | Clinical Director, Link Care Center, Fresno, California. |
| 1/01 – Present | Clinical Faculty, Fresno Pacific University |
| 1/05 – Present | Director of Research, Link Care Center, Fresno, California |

**IV. Professional Affiliations.**

| | |
|---|---|
| 1/84 - Present | Member, American Psychological Association. |
| 1/86 - Present | Member, Christian Association for Psychological Studies (CAPS). |
| 6/90 - 6/93 | Member, board of directors, CAPS-Western region. |
| 6/01 – 5/05 | President-Elect, President, and Past-President, CAPS-Western Region |
| 1/92 - Present | Member, International Society for the Study of Dissociation. |
| 7/99 – Present | Member, Alliance for Therapeutic Choice and Scientific Integrity (Alliance) |
| 1/11 – 12/17 | President-Elect, President, and Past President, Alliance |
| 1/11 - Present | Member, National Association of Social Workers. |

**V. Selected Publications.**

Rosik, C.H. (1989). The impact of religious orientation on conjugal bereavement among older adults. International Journal of Aging and Human Development, 28, 251-260.

Rosik, C.H. (1992). Multiple personality disorder: An introduction for pastoral counselors. The Journal of Pastoral Care, 46, 291-298.

Rosik, C.H. (1992). On introducing multiple personality disorder to the local church. Journal of Psychology and Christianity, 11, 263-268.

Rosik, C.H. (Ed.) (1993). Counseling Christians in Ministry [Special issue]. Journal of Psychology and

**EXHIBIT A**

Christianity, 12(2).

Rosik, C.H. (1993). Mission-affiliated versus non-affiliated counselors: A brief research report on missionary preferences with implications for member care. Journal of Psychology and Christianity, 12, 159-164.

Ritchey, J.K., & Rosik, C.H. (1993). Clarifying the interplay of developmental and contextual factors in the counseling of missionaries. Journal of Psychology and Christianity, 12, 151-158.

Rosik, C.H. (1993). Establishing a foundation for dialogue: A response to articles on possession, exorcism, and MPD. Dissociation, 4, 246-250.

Rosik, C.H. (1995). The misdiagnosis of MPD by Christian counselors: Vulnerabilities and safeguards. Journal of Psychology and Theology, 23, 72-86.

Rosik, C.H. (1995). The impact of religious orientation in conjugal bereavement among older adults. In J. Hendricks (Ed.), The Ties of Later Life (pp. 87-96). New York: Baywood Publishing Company.

Rosik, C.H. (1995). The unification of consciousness: Approaches to the healing of dissociation. Journal of Religion and Health, 34, 233-246.

Rosik, C.H. (1996). "Outing" the moral dimension in research on homosexuality. Journal of Psychology and Christianity, 15, 377-388.

Rosik, C.H. (1997). Geriatric Dissociative Identity Disorder. Clinical Gerontologist, 17, 63-66.

Rosik, C. H. (1998). Religious Contributions to the Healing of Dissociative Disorders. Many Voices, 10, 6-8.

Rosik, C.H., & Killbourne-Young, K. (1999).  Dissociative disorders in adult missionary kids: Report on five cases.  Journal of Psychology and Theology, 27, 163-170.

Rosik, C.H. (2000). Utilizing religious resources in treating dissociative trauma symptoms: Rationale, current status, and future directions. Journal of Trauma and Dissociation, 1, 69-89.

Rosik, C. H. (Ed.) (2000). Dissociative Identity Disorder [Special Issue]. Journal of Psychology and Christianity, 19(2).

Rosik, C.H. (2000).  Some effects of world view on the theory and treatment of DID. Journal of Psychology and Christianity, 19, 166-180.

Rosik, C.H. (2001).  Conversion therapy revisited: Parameters and rationale for ethical care. Journal of Pastoral Care, 55, 47-67.

Brown, S. W., Gorsuch, R. L., Rosik, C. H., & Ridley, C. R. (2001). The development of a forgiveness scale.  Journal of Psychology and Christianity, 20, 40-52.

Rosik, C. H., & Brown, R. K. (2001). Professional Use of the Internet: Legal and Ethical Issues in a Member Care Environment. Journal of Psychology and Theology, 29, 106-120.

Rosik, C. H. (2003). Motivational, ethical, and epistemological foundations in the treatment of unwanted homoerotic attraction. Journal of Marital and Family Therapy, 29, 13-28.

Rosik, C. H. (2003). When therapists do not acknowledge their moral values: Green's response as a case study. Journal of Marital and Family Therapy, 29, 39-46.

Rosik, C. H. (2003). Critical Issues in the Dissociative Disorders Field: Six Perspectives from Religiously-Sensitive Practitioners. Journal of Psychology and Theology, 31, 113-128.

Rosik, C. H. (2004). Possession Phenomena in North America: A Case Study Exploration with Ethnographic, Psychodynamic, Religious, and Clinical Implications. Journal of Trauma and Dissociation, 5, 49-76.

Rosik, C. H., Richards, A., & Fannon, T. (2005). Member care experiences and needs: Findings from a study of East African missionaries. Journal of Psychology and Christianity, 24, 36-45.

Rosik, C. H. (2005). Psychiartic symptoms among prospective bariatric patients: Rates of prevalence and their relation to social desirability, pursuit of surgery and follow-up attendance. Obesity Surgery, 15(5), 677-683.

Rosik, C. H., Griffith, L. K., & Cruz, Z. (2007). Homophobia and conservative religion: Toward a more nuanced understanding. American Journal of Orthopsychiatry, 77, 10-19.

Rosik, C. H. (2007). Ideological concerns in the operationalization of homophobia, Part 1: An analysis of Herek's ATLG-R scale. Journal of Psychology and Theology, 35, 132-144

Rosik, C. H. (2007). Ideological concerns in the operationalization of homophobia, Part II: The need for interpretive sensitivity with conservatively religious persons. Journal of Psychology and Theology, 35, 134-152.

Rosik, C. H., & Byrd, A. D. (2007). Marriage and the civilizing of male sexual nature. American Psychologist, 62, 711-712.

Cousineau, A. E., Hall, M. E., Rosik, C. H., & Hall, T. W. (2007). The 16PF and Marital Satisfaction Inventory as predictors of missionary job success. Journal of Psychology and Theology, 35(4), 317-327.

Rosik, C. H., & Pandzic, J. (2008). Marital satisfaction among missionaries: A longitudinal analysis from candidacy to second furlough. Journal of Psychology and Christianity, 27, 3-15.

Rosik, C. H., & Smith, L. L. (2009). Perceptions of religiously-based discrimination among Christian students in a secular versus Christian university setting. Psychology of Religion and Spirituality, 1(4), 207-217.

Rosik, C. H., Summerford, A., & Tafoya, J. (2009). Assessing the effectiveness of intensive outpatient care for Christian missionaries and clergy. Mental Health, Religion, & Culture, 12, 687-700.

Jones, S. L., Rosik, C. H., Williams, R. N., & Byrd, A. D. (2010). A Scientific, Conceptual, and Ethical Critique of the Report of the APA Task Force on Sexual Orientation. The General Psychologist, 45(2), 7-18.

Cousineau, A.E., Hall, M.E.L, Rosik, C.H., & Hall, T.W. (2010). Predictors of missionary job success: A review of the literature and research proposal. Journal of Psychology and Christianity, 29(4), 354-363.

Rosik, C. H. (2011). Long-Term Outcomes of Intensive Outpatient Psychotherapy for Missionaries and Clergy. Journal of Psychology and Christianity, 30(3), 175-183.

Rosik, C. H., & Soria, A. (2012). Spiritual well-being, dissociation and alexithymia: Examining direct and moderating effects. Journal of Trauma and Dissociation., 13(1), 69-87.

Rosik, C. H., Renteria, T., & Pitman, A. (2012). Psychological Profiles of Individuals Seeking Ordination

in the Episcopal or Presbyterian (PCUSA) Churches: Comparisons and Contrasts. Pastoral Psychology, 61(3), 359-373.

Rosik, C. H. (2012). Opposite-gender identity states in Dissociative Identity Disorder: Psychodynamic insights into a subset of same-sex behavior and attractions. Journal of Psychology and Christianity. 31(3), 278-284.

Rosik, C. H., Jones, S. L., & Byrd, A. D. (2012). Knowing what we do not know about sexual orientation change efforts. American Psychologist. 67 (6), 498-499.

Rosik, C. H., & Byrd, A. D. (2013). Moving back to science and self-reflection in the debate over SOCE. Social Work, 58 (1), 83-85.

Rosik, C. H., Dinges, L., & Saavedra, N. (2013). Moral Intuitions and Attitudes toward Gay Men: Can Moral Psychology Add to Our Understanding of Homonegativity? Journal of Psychology and Theology.41(4), 315-326.

Rosik, C. H., & Popper, P. (2014). Clinical Approaches to Conflicts Between Religious Values and Same-Sex Attractions: Contrasting Gay-Affirmative, Sexual Identity, and Change-Oriented Models of Therapy. Counseling & Values, 59, 222-237.

Rosik, C. H. (2014). Same-Sex Marriage and the Boundaries of Diversity: Will Marriage and Family Therapy Remain Inclusive of Religious and Social Conservatives? Marriage & Family Review, 50(8), 714-737.

Rosik, C. H., Teraoka, N. K., & Moretto, J. D. (2016). Experiences of Religiously-based Prejudice and Self-censorship among Christian Therapists and Educators. Journal of Psychology and Christianity, 35, 52-67.

Rosik, C. H., Silvoskey, M. M., Odgon, K. M., Kincaid, T. M., Roos, I. K., & Castanon, M. R. (2016). Toward normative MMPI-2 profiles for evangelical missionaries in candidate and clinical settings: Examining differences by setting, generation, and marital status. Journal of Psychology & Theology, 44, 315-328.

Rosik, C. H., Rosel, G., Silvoskey, M. M., Odgon, K. M., Kincaid, T. M., Roos, I. K., & Castanon, M. R. (2017). MMPI-2 Profiles Among Asian American Missionary Candidates: Gendered Comparisons for Ethnicity and Population Norms. Asian American Journal of Psychology, 8, 167-175.

Rosik, C. H. (2017). An unfortunate comparison of apples to oranges: Comment on Jensma (2016). Journal of Psychology & Theology, 43, 233-236.

Rosik, C. H. (2017). Sexual orientation change efforts, professional psychology, and the law: A brief history and analysis of a therapeutic prohibition. BYU Journal of Public Law, 32, 47-84. Retrieved from https://digitalcommons.law.byu.edu/jpl/vol32/iss1/3

Lefevor, G. T., Beckstead, L. A., Schow, R. L., Raynes, M., Mansfield, T. R., & Rosik, C. H. (2019). Satisfaction and health with four sexual identity relationship options. Journal of Sex & Marital Therapy. Advance online publication. https://doi.org/10.1080/0092623X.2018.1531333

Lefevor, G. T., Sorrell, S. A., Kappers, G., Plunk, A., Schow, R. L., Rosik, C. H., & Beckstead, A. L. (2019). Same-sex attracted, not LGBT: The associations of sexual identity labeling on religiousness, sexuality, and health among Mormons. Journal of Homosexuality. Advance online publication. https://doi.org/10.1080/00918369.2018.1564006

## References

Alliance for Therapeutic Choice and Scientific Integrity (2018). Guidelines for the practice of sexual attraction fluidity exploration in therapy. *Journal of Human Sexuality, 9*, 3-58.

Altman, D., & Bland, J. M. (1995). Statistics notes: Absence of evidence is not evidence of absence. *British Medical Journal, 311*, 485.

American Psychological Association (1998). *Answers to your questions for a better understanding of sexual orientation and homosexuality*. Washington, DC: Author

American Psychological Association (2008a). *Answers to your questions for a better understanding of sexual orientation and homosexuality*. Washington, DC: Author Retrieved from www.apa.org/topics/sorientation.pdf

American Psychological Association (2008b). *Transgender, gender identity, and gender expression non-discrimination.* Retrieved from http://www.apa.org/about/policy/transgender.espx

American Psychological Association. (2009). *Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation*. Retrieved from http://www.apa.org/pi/lgbt/resources/therapeuticresponse.pdf

American Psychological Association (2012). Guidelines for psychological practice with lesbian, gay, and bisexual clients. *American Psychologist, 67*(1), 10-42. http://dx.doi.org/10.1037/a0024659

American Psychiatric Association (2013). *LGBT-Sexual Orientation*. Retrieved from http://www.psychiatry.org/mental-health/people/lgbt-sexual-orientation.

Andersen, J. P., & Blosnich, J. (2013). Disparities in adverse childhood experiences among sexual minority and heterosexual adults: Results from a multi-state probability-based sample. *Plos One, 8*, 1-7. http://dx.doi.org/10.1371/journal-pone.0054691

Artime, T. M., McCallum, E. B., & Peterson, Z. D. (2014). Men's acknowledgment of their sexual victimization experiences. *Psychology of Men & Masculinity, 15*, 313-323. http://dx.doi.org/10.1037/a0033376

Auer, M. K., Fuss, J., Hohne, N., Stalla, G. K., & Sievers, C. (2014). Transgender transitioning and change of self-reported sexual orientation. *PLoS ONE, 9*(10), 1-11. http://dx.doi.org/10.1371/journal.pone.0110016

Backholm, J. (2015, March 25). Who doesn't oppose child abuse? *Family Police Institute*. Retrieved from http://www.fpiw.org/blog/2015/03/25/doesnt-oppose-child-abuse/

**EXHIBIT B**

Bailey, J. M., Dunne, M.P., & Martin, N.G. (2000). Genetic and Environmental influences on sexual orientation and its correlates in an Australian twin sample. *Journal of Personality and Social Psychology, 78,* 524-536. http://dx.doi.org/10.1037//0022-3514.78.3.524

Beard, K. W., O'Keefe, S. L., Swindell, S., Stroebel, S. S., Griffee, K., Young, D. H., & Linz, T. D. (2013). Brother-brother incest: Data from an anonymous computerized survey. *Sexual Addiction & Compulsivity, 20*, 217-253. http://dx.doi.org/10.1080/10720162.2013.807483.

Bearman, P. S., & Bruckner, H. (2002). Opposite-sex twins and adolescent same-sex attraction. *American Journal of Sociology, 107*, 1179-1205.

Bebbington, P. E., Cooper, C., Minot, S., Brugha, T. S., Jenkins, R., Meltzer, H., & Dennis, M. (2009). Suicide attempts, gender, and sexual abuse: Data from the 2000 British psychiatric mortality survey. *American Journal of Psychiatry, 166*, 1135-1139. http://dx.doi.org/10.1176/appi.ajp.2009.09030310

Bedi, S., Nelson, E. C., Lynskey, M. T., McCutcheon, V. V., Heath, A. C., Madden, P. A. F., & Martin, N. G. (2011). Risk for suicidal thoughts and behavior after childhood sexual abuse in women and men. *Suicide and Life-Threatening Behavior, 41*, 406-415. http://dx.doi.org/10.1111/j.1943-278X.2011.00040.x

Bell, A. P., Weinberg, M., & Hammersmith, S. K. (1981). *Homosexuality: A study of diversity among men and women*. New York: Simon & Schuster.

Bickham, P. J., O'Keefe, S. L., Baker, E., Berhie, G., Kommor, M. J., & Harper-Dorton, K. V. (2007). Correlates of early overt and covert sexual behaviors in heterosexual women. *Archives of Sexual Behavior, 36*, 724-740. http://dx.doi.org/10.1007/s10508-007-9220-1

Carey, D. (2007, September 20). Group to review therapy stance. *Oakland Tribune*. Retrieved from http://findarticles.com/p/articles/mi_qn4176/is_20070711/ai_n19358074

Chambers, J. R., Schlenker, B. R., & Collisson, B. (2013). Ideology and prejudice: the role of value conflicts. *Psychological Science, 24*, 140-149. http://dx.doi.org/10.1177/0956797612447820

City of Tampa Ordinance 2017-47, An Ordinance Of The City Of Tampa, Florida, Relating To Conversion Therapy On Patients Who Are Minors (and all publications cited therein).

Cooper, P. J., Pauletti, R. E., Tobin, D. D., Menon, M., Menon, M., & Perry, D. G. (2013). Mother-child attachment and gender identity in preadolescence. *Sex Roles, 69*, 618-631. http://dx.doi.org/10.1007/s11199-013-0310-3

Dhejne, C., Lichtenstein, P., Boman, M., Johansson, A. L. V., Langstrom, N., & Landen, M. (2011). Long-term follow-up of transsexual persons undergoing sex reassignment

surgery: Cohort study in Sweden. *PLoS ONE, 6*(2), 1-8. http://dx.doi.org/10.1371/journal.pone.0016885

Diamond, L. M. (2003). New Paradigms for Research on Heterosexual and Sexual-Minority Development. *Journal of Clinical Child & Adolescent Psychology*, *32*, 490-498. http://dx.doi.org/10.1207/s15374424jccp3204_1

Diamond, L. M. (2005). A new view of lesbian subtypes: Stable versus fluid identity trajectories over an 8-year period. *Psychology of Women Quarterly, 29*, 119-128. http://dx.doi.org/10.1111/j.1471-6402.2005.00174.x

Diamond, L. M. (2008). Female bisexuality from adolescence to adulthood: Results from a 10-year longitudinal study. *Developmental Psychology, 44*, 5-14. http://dx.doi.org/10.1037/0012-1649.44.1.5

Diamond, L. M. (2016). Sexual fluidity in male and females. *Current Sexual Health Reports, 8*, 249-256. http://dx.doi.org/1007/s11930-016-0092-z

Diamond, L. M. (2017). Wanting women: Sex, gender, and the specificity of sexual arousal. *Archives of Sexual Behavior, 46,* 1181–1185. http://dx.doi.org/10.1007/s10508-017-0967-8

Diamond, L. M., & Rosky, C. J. (2016). Scrutinizing immutability: Research on sexual orientation and U.S. legal advocacy for sexual minorities. *Journal of Sex Research, 53*, 363-391. http://dx.doi.org/10.1080/00224499.2016.1139665

Dickson, N., Paul, C., & Herbison, P. (2003). Same-sex attraction in a birth cohort: Prevalence and persistence in early adulthood. *Social Science & Medicine, 56*, 1607-1615. http://dx.doi.org/10.1016/S0277-9536(02)00161-2

Dickson, N., van Roode, T., Cameron, C., & Paul C. (2013). Stability and change in same-sex attraction, experience, and identity by sex and age in a New Zealand birth cohort. *Archives of Sexual Behavior, 42*, 753-763. http://dx.doi.org/10.1007/s10508-012-0063-x

Duarte, J. L., Crawford, J. T., Stern, S., Haidt, J., Jussim, L., & Tetlock, P. E. (2015). Political diversity will improve psychological science. *Behavioral and Brain Sciences*, *38*, 1-13. http://dx.dor.org/10.1017/S0140525X14000430

Eskin, M., Kaynak-Demir, H., & Demir, S. (2005). Same-sex sexual orientation, childhood sexual abuse, and suicidal behavior in university students in Turkey. *Archives of Sexual Behavior, 34*, 185-195. http://dx.doi.org/10.1007/s10508-005-1796-8

Farr, R. H., Diamond, L. M., & Boker, S. M. (2014). Female same-sex sexuality from a dynamical systems perspective: Sexual desire, motivation, and behavior. *Archives of Sexual Behavior, 43*, 1477-1490. http://dx.doi.org/10.1007/s10508-014-0378-z

First Amended Verified Complaint for Declaratory, Preliminary And Permanent Injunctive Relief, and Damages (Doc. 78, June 12, 2018), *Vazzo, et al. v. City of Tampa, Fla.*, No. 8:17-cv-02896-CEH-AAS, U.S. Dist. Ct., M.D. Fla.

Francis, A. M. (2008). Family and sexual orientation: The family-demographic correlates of homosexuality in men and women. *Journal of Sex Research, 45,* 371-377. http://dx.doi.org/10.1080/00224490802398357

Freund, K., & Blanchard, R. (1983). Is the distant relationship of fathers and homosexual sons related to the sons' erotic preference for male partners, or to the sons' atypical gender identity, or both? *Journal of Homosexuality, 9*, 7-25. http://dx.doi.org/10.1300/J082v09n01_02

Frisch, M., & Hviid, A. (2006). Childhood family correlates of heterosexual and homosexual marriages: A national cohort study of two million Danes. *Archives of Sexual Behavior, 35*, 533-547.

Haidt, J. (2012). *The righteous mind: Why good people are divided by politics and religion.* New York: Pantheon Books.

Hansen, N. B., Lambert, M. J., & Forman (2002). The psychotherapy dose-response effect and its implications for treatment delivery services. *Clinical Psychology: Science and Practice, 9*, 329-343. http://dx.doi.org/10.1093/clipsy.9.3.329

Herek, G. M. (1991). Myths about sexual orientation: A lawyer's guide to social science research. *Law and Sexuality, 1*, 133-172.

Herek, G. M. (2010). Sexual orientation differences as deficits: Science and stigma in the history of American psychology. *Perspectives on Psychological Science, 5*, 693-699. http://dx.doi.org/10.1177/1745691610388770

Herek, G. M., Norton, A. T., Allen, T. J., & Sims, C. L. (2010). Demographic, psychological, and social characteristics of self-identified lesbian, gay, and bisexual adults in a US probability sample. *Sexuality Research and Social Policy, 7*, 176-200.

Hoffman, H. (2012). Considering the role of conditioning in sexual orientation. *Archives of Sexual Behavior, 41*, 63-71. http://dx.doi.org/s10508/012-9915-9

Hooker, E. (1957). The adjustment of the male overt homosexual. *Journal of Projective Techniques, 21*, 18-31.

Hooker, E. (1993). Reflections of a 40-year exploration. *American Psychologist, 48*, 450-453.

Hottes, T. S., Bogaert, L., Rhodes, A. E., Brennan, D. J., & Gesink, D. (2016). Lifetime prevalence of suicide attempts among sexual minority adults by study sampling

strategies: A systematic review and meta-analysis. *American Journal of Public Health, 106*, e1-e12. http://dx.doi.org/10.2105/AJPH.2016.303088

Hu, Y., Xu, Y., & Tornello, S. M. (2016). Stability of self-reported same-sex and both-sex attraction from adolescence to young adulthood. *Archives of Sexual Behavior, 45,* 651-659. http://dx.doi.org/10.1007/s10508-015-0541-1

Jones, S. L., Rosik, C. H., Williams, R. N., & Byrd, A. D. (2010). A Scientific, Conceptual, and Ethical Critique of the Report of the APA Task Force on Sexual Orientation. *The General Psychologist, 45*(2), 7-18. Retrieved May 31, 2011, from http://www.apa.org/divisions/div1/news/fall2010/Fall%202010%20TGP.pdf

Jones, S. L., & Yarhouse, M. A. (2007). *Ex-gays?: A longitudinal study of religiously mediated change in sexual orientation.* Downers Grove, IL: InterVarsity Press Academic.

Jones, S. L., & Yarhouse, M. A. (2011). *A Longitudinal Study of Attempted Religiously Mediated Sexual Orientation Change*. Journal of Sex & Marital Therapy, 37, 404-427. http://dx.doi.org/10.1080/0092623X.2011.607052

Katz-Wise, S. L. (2015). Sexual fluidity in young adult women and men: Associations with sexual orientation and sexual identity development. *Psychology & Sexuality*, *6*, 189–208 http://dx.doi.org/10.1080/19419899.2013.876445

Katz-Wise, S. L., & Hyde, J. S. (2015). Sexual fluidity and related attitudes and beliefs among young adults with a same-gender orientation. *Archives of Sexual Behavior, 44*, 1459–1470. http://dx.doi.org/10.1007/s10508-014-0420-1

Klein, F., Sepekoff, B., & Wolf, T. J. (1985). Sexual orientation: A multi-variable dynamic process. *Journal of Homosexuality, 11,* 35-49.

Lambert, M. J. (2013). The efficacy and effectiveness of psychotherapy. In Michael J. Lambert (Ed.), *Bergin and Garfield's Handbook of Psychotherapy and Behavior Change* (6th Edition), (pp. 169-218). Hoboken, NJ: Wiley.

Lambert, M. J., & Ogles, B. M. (2004). *The efficacy and effectiveness of psychotherapy.* New York, NY: Wiley.

Langstrom, N., Rahman, Q., Carlstrom, E., & Lichtenstein, P. (2010). Genetic and environmental effects on same-sex sexual behavior: A population study of twins in Sweden. *Archives of Sexual Behavior, 39,* 75-80. http://dx.doi.org/10.1007/s10508-008-9386-1

Laumann, E. O., Gagnon, J. H., Michael, R. T., & Michaels, S. (1994). *The social organization of sexuality.* Chicago, IL: University of Chicago Press.

Laumann, E. O., Michael, R. T., & Gagnon, J. H. (1994). A political history of the national sex survey of adults. *Family Planning Perspectives, 26*, 34-38.

Manley, M. H., Diamond, L. M., & van Anders, S. M. (2015). Polyamory, monoamory, and sexual fluidity: A longitudinal study of identity and sexual trajectories. *Psychology of Sexual Orientation and Gender Diversity, 2*, 168-189. http://dx.doi.org/10.1037/sgd0000098

Marks, L. (2012). Same-sex parenting and children's outcomes: A closer examination of the American Psychological Associations brief on lesbian and gay parenting. *Social Science Research, 41,* 735-751. Retrieved from http://dx.doi.org/10.1016/j.ssresearch.2012.03.006

McCord, J., McCord, W., & Thurber, E. (1962). Some effects of paternal absence on male children. *Journal of Abnormal and Social Psychology, 64*, 361-369.

Mohr, D. C. (1995). Negative outcome in psychotherapy: A critical review. *Clinical Psychology: Science and Practice,* 2, 1–27.

National Association of Social Workers (2018). *2018 PACE Endorsements*. Retrieved from https://www.socialworkers.org/advocacy/political-action-for-candidate-election-pace/2018-pace-endorsements

Nelson, P.L., Warren, J.S., Gleave, R. L., & Burlingame,G. M. (2013). Youth psychotherapy change trajectories and early warning system accuracy in a managed care setting. *Journal of Clinical Psychology, 69,* 880-895. http://dx.doi.org/10.1002/jclp.21963

Newcomb, M. E., & Mustanski, B. (2011). Moderators of the relationship between internalized homophobia and risky sexual behavior in men who have sex with men: A meta-analysis. *Archives of Sexual Behavior, 40*, 189-199. http://dx.doi.org/10.1007/s10508-009-9573-8

O'Keefe, S. L., Beard, K. W., Swindell, S., Stroebel, S. S., Griffee, K., & Young, D. H. (2014). Sister-brother incest: Data from anonymous computer assisted self interviews. *Sexual Addiction & Compulsivity, 21*, 1-38. http://dx.doi.org/10.1080/10720162.2013.877410

Ott, M.Q., Wypij, D., Corliss, H. L., Rosario, M., Reisner., S. L., Gordon, A. R., et al. (2013). Repeated changes in reported sexual orientation identity linked to substance use behaviors in youth. *Journal of Adolescent Health, 52*, 465-472. http://dx.doi.org/10.1016/j.jadohealth.2012.08.004

Outlaw, A. Y., Phillips, G., Hightow-Weidman, L. B., Fields, S. D., Hidalgo, J.,…& Green-Jones, M. (2011). Age of MSM sexual debut and risk factors: Results from a multisite study of racial/ethnic minority YMSM living with HIV [Supplement 1]. *AIDS patient care and STDs, 25*, S23-S29. http://dx.doi.org/10.1089/apc.2011.9879

Pakula, B., Shoveller, J., Ratner, P. A., & Carpiano, R. (2016). Prevalence and co-occurrence of heavy drinking and anxiety and mood disorders among gay, lesbian, bisexual and heterosexual Canadians. *American Journal of Public Health, 106*, 1042-1048. http://dx.doi.org/10.2105/AJPH.2016.303083

Peplau, L., Spalding L. R., Conley, T.D., & Veniegas, R.C. (1999). The development of sexual orientation in women. *Annual Review of Sex Research, 10,* 70-99.

Peter, T., Edkins, T., Watson, R., Adjei, J., Homma, Y., & Saewyc, E. (2017). Trends in suicidality among sexual minority and heterosexual students in a Canadian population-based cohort study. *Psychology of Sexual Orientation and Gender Diversity, 4*, 115-123. http://dx.doi.org/10.1037/sg0000211

Peters, D. K., & Cantrell, P. J. (1991). Factors distinguishing samples of lesbian and heterosexual women. *Journal of Homosexuality, 2*, 1- 15.

Phelan, J. E., Whitehead, N., & Sutton, P. M. (2009). What the research shows: NARTH's response to the APA claims on homosexuality. *Journal of Human Sexuality, 1*, 5-118. Retrieved from http://www.scribd.com/doc/115507777/Journal-of-Human-Sexuality-Vol-1

Porta, C. M., Watson, R. J., Doull, M., Eisenberg, M. E., Grumdahl, N., & Saewyc, E. (2018). Trend disparities in emotional distress and suicidality among sexual minority and heterosexual Minnesota adolescents from 1998 to 2010. *Journal of School Health, 88,* 605-614. http://dx.doi.org/10.1111/josh.12650

Redding, R. E. (2001). Sociopolitical diversity in psychology. *American Psychologist, 56*, 205-215. http://dx.doi.org/10.1037//0003-066X.6.3.205

Robiner, W. N., Fossum, T. A., & Hong, B. A. (2015). Bowling alone: The decline of social engagement and other challenges for the American Psychological Association and its divisions. *Clinical Psychology: Science and Practice, 22*, 366-383. http://dx.doi.org/10.1111/cpsp.12124

Roberts, A. L., Glymour, M. M., & Koenen, K. C. (2013). Does maltreatment in childhood affect sexual orientation in adulthood? *Archives of Sexual Behavior, 42*, 161-171. http://dx.doi.org/10.1007/s10508-012-0021-9

Rosik, C. H. (2012). Did the American Psychological Association's *Report on Appropriate Therapeutic Responses to Sexual Orientation* Apply its Research Standards Consistently? A Preliminary Examination. *Journal of Human Sexuality, 4,* 70-85.

Rothman, E. F., Exner, D., & Baughman, A. L. (2011). The prevalence of sexual assault against people who identify as gay, lesbian, or bisexual in the United States: A systemic review. *Trauma, Violence, & Abuse, 12*, 55-66. http://dx.doi/org/10.1177/1524838010390707

Saewyc, E. M. (2011). Research on adolescent sexual orientation: Development, health disparities, stigma, and resilience. *Journal of Research on Adolescence, 21*, 256-272. http://dx.doi/org/10.1111/j.1532-7795.2010.00727.x

Savin-Williams, R. C. (2016). Sexual orientation: Categories or continuum? Commentary on Bailey et al. (2016). *Psychological Science in the Public Interest. 17,* 37-44. http://dx.doi.org/10.1177/1529100616637618

Savin-Williams, R. C., Joyner, K., & Rieger, G. (2012). Prevalence and stability of self-reported sexual orientation identity during young adulthood. *Archives of Sexual Behavior, 41*, 103-110. http://dx.doi.org/10.1007/s10508-012-9913-y

Savin-Williams, R. C., & Ream, G. L. (2007). Prevalence and stability of sexual orientation *components during adolescence and young adulthood. Archives* of Sexual Behavior, 36, 385-349. http://dx.doi.org/10.10007/s10508-006-9088-5

Savin-Williams, R. C., Rieger, G., & Rosenthal, A. M. (2013). Physiological evidence for a mostly heterosexual orientation among men. *Archives of Sexual Behavior*, *42*, 697-9. http://dx.doi.org/ 10.1037/s10508-013-0093-1

Schroeder, M., & Shidlo, A., (2003). Ethical issues in sexual orientation conversion therapies. In A. Shidlo, M. Schroeder, & J. Drescher (Eds.), *Sexual conversion therapy: Ethical, clinical and research perspectives* (pp. 131-166). New York: Haworth.

Schumm, W. R. (2012). Re-examining a landmark research study: A teaching editorial. *Marriage & Family Review, 48*, 465-489. http://dx.doi.org/10.1080/01494929.2012.677388

Schumm, W. (2014). Intergenerational Transfer of Parental Sexual Orientation and other myths. *International Journal of the Jurisprudence of the Family*, *4*, 267-433

Shidlo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumer's report. *Professional Psychology: Research and Practice*, *33*, 249-259. http://dx.doi.org/10.1037//0735-7028.33.3.249

Siegelman, M. (1981). Parental backgrounds of homosexual and heterosexual men: A cross national replication. *Archives of Sexual Behavior, 10*, 505-513.

Sweet, T., & Welles, S. L. (2012). Associations of sexual identity or same-sex behaviors with history of childhood sexual abuse and HIV/SDI risk in the United States. *Journal of Acquired Immune Deficiency Syndromes, 59*, 400-408. http://dx.doi.org/10.1097/QAI.0b013e3182400e75

Tierney, J. (2011, February 11). Social scientist sees bias within. *The New York Times*. Retrieved from http://www.nytimes.com/2011/02/08/science/08tier.html?_r=3

Townes, B. D., Ferguson, W. D., & Gillam, S. (1976). Differences in psychological sex, adjustment, and familial influences among homosexual and nonhomosexual populations. *Journal of Homosexualitly, 1*, 261-272.

Warren, J.S., Nelson, P. L., Burlingame, G. M., & Mondragon, S. A. (2012). Predicting patient deterioration in youth mental health services: Community mental health vs. managed care settings. *Journal of Clinical Psychology, 68*, 24-40. http://dx.doi.org/10:1002/jclp.20831

Watered down anti-conversion therapy bill passes Utah House committee; original sponsors vote against it (2019, March 5). *QSaltlake Magazine*. Retrieved from https://qsaltlake.com/news/2019/03/05/watered-down-anti-conversion-therapy-bill-passes-utah-house-committee-original-sponsors-vote-against-it/

Wells, J. E., McGee, M. A., & Beautrais, A. L. (2011). Multiple aspects of sexual orientation: Prevalence and sociodemographic correlates in a New Zealand national survey. *Archives of Sexual Behavior, 40*, 155-169. http://dx.doi.org/10.1007/s10508-010-9636-x

Whitehead, N. E., & Whitehead, B. (2010). *My genes made me do it! A scientific look at sexual orientation.* Whitehead Associates. Retrieved from http://www.mygenes.co.nz/download.htm

Wierzbicki, M., & Pekarik, G. (1993). A meta-analysis of psychotherapy dropout. *Professional Psychology: Research and Practice, 24*, 190-195. http://dx.doi.org/10.1037/0735-7028.24.2.190

Wilson, H. W., & Widom, C. S. (2010). Does physical abuse, sexual abuse, or neglect in childhood increase the likelihood of same-sex sexual relationships and cohabitation? A prospective 30-year follow-up. *Archives of Sexual Behavior, 39,* 63-74. http://dx.doi.org/ 10.1007/s10508-008-9449-3

Wood, P. (2013). The campaign to discredit Regnerus and the assault on peer review. *Academic Questions, 26*, 171-181. http://dx.doi.org/10.1007/s12129-013-9364-5

Wright, R. W., & Cummings, N. E. (2005). *Destructive Trends in Mental Health: The Well-Intentioned Path to Harm*. New York: Routledge.

Xu, Y., Norton, S., & Rahman, Q. (2019). Early life conditions and adolescent sexual orientation: A prospective birth cohort study. *Developmental Psychology*. Advance online publication. http://dx.doi.org/10.1037/dev0000704

Xu, Y., & Zheng, Y. (2015). Prevalence of childhood sexual abuse among lesbian, gay, and bisexual people: A meta-analysis. *Journal of Child Sexual Abuse, 24*, 315-331. http://dx.doi.org/10.1080/10538712.2015.1006746

Yarhouse, M. (2009). The battle regarding sexuality. In N. C. Cummings, W. O'Donahue, & J. Cummings, (Eds.), *Psychology's War on Religion* (pp. 63-93). Phoenix, AZ: Zeig, Tucker & Theisen, Inc.

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| ROBERT L. VAZZO, LMFT, etc., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Case No. 8:17-cv-2896-T-02AAS |
| | ) | |
| CITY OF TAMPA, FLORIDA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**REBUTTAL DECLARATION OF CHRISTOPHER ROSIK, PH.D.**

I, Dr. Christopher Rosik, hereby declare as follows:

**TABLE OF CONTENTS**

TABLE OF CONTENTS ....... 1

I. SUMMARY OF REBUTTAL POINTS AND PRELIMINARY CONSIDERATIONS. ....... 3

II. REBUTTAL ANALYSIS AND OPINIONS ....... 3

A. Creation of Straw Arguments and False Dichotomies Regarding Change-Allowing Talk Therapies. ....... 3

B. Recent Research Is being Used to Advance an Agenda, Not the Science of SOCE. ....... 6

i. Flentje et al. (2013). ....... 6

ii. Dehlin et al. (2015). ....... 6

iii. Ryan et al. (2018). ....... 7

iv. General Critique of Recent SOCE Research. ....... 8

C. Spitzer's Reassessment of His 2003 Study on SOCE ....... 9

D. The Limited Understanding of the Dynamics of Stigma and Discrimination. ....... 11

i. Alternatives to Minority Stress Theory ....... 13

ii. Some Health Outcomes Are Likely Based in Anatomy More Than Stigma. ....... 15

iii. SOCE Not a Proxy for Stigma or Discrimination ....... 15

iv. Encouraging Same-Sex Behavior May Result in Risk-Justifying Attitudes. ....... 16

EXHIBIT 40
Deponent: Rosik
Depo Date: 7/25/19
Reporter: E. Hernandez
Anthem Reporting, LLC

E. Understanding the Dramatic SOCE Prevalence Numbers of the Williams Institute Survey. ....17

F. The Limits of Appeals to Authority. ....18

G. Terminology Creep Suggests Political Not Scientific Motives and These Can Harm Therapists. ....20

H. Overstated Claims Suggest Advocacy and Not Science. ....21

I. Confirmation Bias: A True Danger When the Science Behind Social and Legal Policy Making is Produced by Ideologically Homogeneous Communities. ....23

III. Summary. ....26

REFERENCES ....28

## I.   SUMMARY OF REBUTTAL POINTS AND PRELIMINARY CONSIDERATIONS.

1.     Ordinance 2017-47 (City of Tampa, 2017) is a very serious curtailment of the rights and liberties of minor clients and their families to pursue and licensed therapists to provide change-allowing talk therapies.  As such, it can only be justified by an extremely rigorous body of scientific evidence that is exhaustive in scope and undisputable in its integrity.  Here I will add to my initial declaration and show further that this standard is not met on any level by Ordinance 2017-47, and the Declaration of Judith M. Glassgold (the "Glassgold Declaration") does not sufficiently advance a case to challenge this conclusion.

2.     While it is impossible under time limited conditions to address all my concerns with the Glassgold Declaration, I will below attempt to bring to light some of my most serious concerns with this declaration in both fact and style.  I will show that the Glassgold Declaration presents a straw version of "conversion therapy" not practiced by licensed therapists who provide change-allowing talk therapies to minors and adults.  This straw therapy is then contrasted with supportive therapy, as if to imply (falsely) that professional SOCE clinicians do not support their clients in their self-determined goals.

3.     I then attend to a representative sample of the more recent research on SOCE and contend that the Glassgold Declaration does not attend to the methodological limitations of these studies that make it scientifically inappropriate to generalize their findings to change-allowing talk therapies provided by licensed therapists.  I go on to address the Spitzer study and the literature on sexual orientation stigma and discrimination, making it clear that justification is lacking for using professional SOCE as a proxy for these terms.

4.     I also address the ubiquitous appeals to authority offered in the Glassgold Declaration and Ordinance 2017-47 and note the need for a healthy skepticism when professional organizations whose leaders lack ideological diversity make scientific claims concerning subject matter in which they are highly invested in advocacy goals. This is followed by my observations on the occurrence and meaning of the rapidly evolving and broadening scope of "conversion therapy" terminology.   Finally, I point out the many overstatements in the Glassgold Declaration and suggest that many of my concerns can be understood in terms of the influence of confirmation bias.

5.     Although ban proponents have many advocacy and political reasons for Ordinance 2017-47, the evidence I present in my declarations, both before and below, indicate there is not a sufficient nor scientifically justified basis for abolishing the right of minors and licensed therapists to engage in client-centered change-allowing talk therapies.

## II.   REBUTTAL ANALYSIS AND OPINIONS.

### A.   Creation of Straw Arguments and False Dichotomies Regarding Change-Allowing Talk Therapies.

6.     As is common in legal proceedings pertaining to therapy bans, the Glassgold Declaration paints a picture of licensed mental health professionals who engage in change-allowing talk therapies as essentially monstrous human beings.  These clinicians are described as

universally seeing same-sex attractions as psychopathological disorders, having predetermined etiologies, coercing and pressuring clients into therapy, imposing an *a priori* therapy outcome, forcing a singular gender expression, and teaching parents to invalidate their children's feelings. Although any association of therapists may include a few outlier bad actors, the Glassgold Declaration, along with other documents such as the SAMHSA report (SAMHSA, 2015), suggest there are no responsible, ethical, licensed therapists who provide change-allowing talk therapies. This characterization can only be described as a false caricature in the service of a straw argument.

7. I address some of these caricatures below. In my experience, licensed therapists who provide professional change-allowing talk therapy have a variety of beliefs regarding the origins of nonheterosexuality and its status as a normal expression of sexual and gender diversity. But in a real sense, this focus simply misses the point: It is not the therapist's view of etiology or normality that matters but that of the client. Change-allowing talk therapy clinicians are client-centered in focus. They know as do all good therapists that first and foremost one must *actually listen* to their clients. They know one must take special care when working with minors. And they do not pressure clients of any age toward adopting *either* their etiological and moral perspective *or* that of their professional associations (Benoit, 2005; Rosik & Popper, 2014).

8. Clients with distress about their same-sex attractions and behavior rarely seek out change-allowing therapies with a belief that they have a mental disorder needing cure, but rather they overwhelmingly report experiencing a moral and religious problem. These concerns are well acknowledged as legitimate within the Diagnostic and Statistical Manual of Mental Disorders (DSM-5) (American Psychiatric Association, 2013; Code Z65.8 – "Religious or Spiritual Problems") and therapists of all varieties regularly address other issues that are not considered to be mental disorders, such as relationship distress, unplanned pregnancy, or normal grief reactions.

9. The Glassgold Declaration concludes definitively ("no scientific basis") that parental dynamics or childhood sexual abuse play no causal role in any experience of nonheterosexuality. Although this was addressed in my initial declaration, I return to the issue here to underscore Defendant's premature and unjustified foreclosure of the scientific record. The scientific consensus is that the origins of homosexuality are multifactorial, which suggests there are likely to be many pathways to the development of same-sex attractions and behaviors. The Bell, Weinberg, and Hammersmith (1981) research cited in the Glassgold Declaration considered all known factors to that date and concluded each could only be numerically responsible for a small fraction of the causation. This means that no pathway to homosexuality was dominant for all individuals, which is often misinterpreted as meaning there can be no social or family influence on the development of homosexuality at all. However, the environmental factors, including family experiences, when taken together were statistically significant (Whitehead, 2011). This means a more accurate interpretation of the Bell et al. findings would allow for some (though perhaps not most) instances of nonheterosexual development to be strongly influenced by environmental factors such as family dynamics. Again, this underscores the necessity of *listening* to the client.

10. Regarding the potential role of childhood sexual abuse on the development of subsequent nonheterosexuality, I refer back to my original declaration to emphasize that the nature of the research pertinent to this issue cannot conclusively rule in *or* rule out a causal influence for some individuals. The indeterminate nature of the scientific record therefore allows for causal theorizing that involves trauma generally and sexual abuse in particular. As Mustanski, Kuper,

and Geene (2014) conclude in the *APA Handbook of Sexuality and Psychology* regarding this issue, "Overall, these associative or potentially causal links are not well understood and are in need of further research" (pp. 609-610). This uncertainty is a far cry from claims that such considerations have been "thoroughly discredited."

11.     The issue of the normality of homosexuality is also much more complex than the Glassgold Declaration recognizes. Although it is not clear within the declaration, the definition of normality in view may be one common to these issues which alludes to nonheterosexual sexual expressions being found broadly within the animal kingdom and therefore not implicitly psychopathological. Science certainly supports these conclusions to some degree, although, as Bancroft (Jannini, Blanchard, Camperio-Ciani, and Bancroft, 2010) observed, "We should also keep in mind that whereas homosexual interactions are common across many species, exclusive homosexual involvement, with the rejection of opportunities for heterosexual activity, is exceedingly rare in nonhumans" (p. 3252). However, clients who seek change-allowing talk therapists may often operate with other conceptions of normality that are equally valid and which prompt them to explore their potential for change in same-sex attractions and behaviors. Apart from statistical definitions of normal, many religious clients who pursue change operate under a natural law model where "normal is that which functions according to design." Change-allowing talk therapy clinicians are sensitive to these nuances of terminology and values, which cannot be resolved by psychology, and they do not pressure clients toward adopting *either* their vision of normal *or* that of their professional associations.

12.     Licensed therapists who engage in change-allowing talk therapies know that real therapy by definition does not include coercion but must promote client autonomy and self-determination. Where this exists, and with proper informed consent, such freedom should include the freedom to explore their heterosexual potential. As such, these clinicians are not "imposing outcomes" on clients but simply allowing them to pursue their self-determined goals with an understanding that change is not guaranteed. The Glassgold Declaration asserts (p. 35) that bedrock ethical practices of informed consent and client self-determination are not practiced in or do not apply to change-allowing talk therapies and again trots out a caricature of "conversion therapy" to justify such a conclusion. Beyond the false portrayals of professional SOCE, such statements represent a remarkably low view of human agency, particularly when a significant minority of nonheterosexual persons report experiencing some choice in their sexual orientation (Herek, Norton, Allen, & Sims, 2010). Moreover, research seems to indicate that although changes in sexual orientation are more difficult to achieve than changes in depression or personality, they are more likely to occur than achieving long-term change in weight loss or criminality (Turkheimer, 2011), implying a role for agency and the applicability of self-determination for consumers of change-allowing talk therapies.

13.     The Glassgold Declaration also creates a false dichotomy by contrasting the demonized portrayal of "conversion therapy" with supportive therapies, which help families understand their child's conflicts and concerns, assist them in loving and open communication, and reassure youth of their worth. An accurate representation of change-allowing talk therapies provided by licensed clinicians would describe them as encompassing all of these important goals with the additional goal, where clinically appropriate, of exploring the client's potential for experiencing change and fluidity in their unwanted same-sex attractions and behaviors. Licensed clinicians who provide change-allowing therapies know the value of providing safety and

protection from bullying, discrimination, and harassment, as well as providing accurate information about sexual orientation. Contrary to the declaration's portrayal (p. 25), such provision of care is regularly provided in professional change-allowing talk therapy.

14. The Alliance for Therapeutic Choice and Scientific Integrity (ATCSI), the largest association of licensed clinicians engaged in change-allowing talk therapy, has developed practice guidelines for their members that underscore the Defendant's mischaracterization of these clinicians and their psychotherapeutic practices (ATCSI, 2018; Appendix A). In the present context, it should be noted that these guidelines recognize the heightened caution and sensitivity that must be exhibited by any therapist when working with sexual minority youth.

**B. Recent Research Is being Used to Advance an Agenda, Not the Science of SOCE.**

15. Recently, as the Glassgold Declaration points out, some additional research has reported an elevated risk of harm for SOCE (e.g., Bradshaw, Dehlin, Crowell, & Bradshaw, 2015; Dehlin, Galliher, Bradshaw, Hyde, & Crowell, 2015; Flentje, Heck, & Cochran, 2013; Ryan, Toomy, Diaz, & Russell, 2018). Yet these studies share many of the same methodological limitations of the Shidlo and Schroeder (2002) study I mentioned in my initial declaration.

**i. Flentje et al. (2013).**

16. Flentje et al. utilized a small, non-representative sample of 38 participants who self-identified as "ex-ex-gay." The majority of the self-reported, retrospective therapy "episodes" documented were in fact provided by religious, pastoral, and peer counselors. Only 34.6% of therapy "episodes" were reported as actually being provided by licensed therapists. There is no way of knowing from this study which provider types engaged in the alleged ethically dubious interventions. However, the authors did acknowledge that *no* licensed therapist was ever described by participants as utilizing aversion therapy. Ten participants reported having attempted suicide. Of these, 6 participants reported a suicide attempt prior to their therapy, 7 reported a suicide attempt during SOCE, and one indicated suicide attempts following the conclusion of their treatment. These findings suggest a significant portion of the sample was experiencing serious emotional distress *prior to* their SOCE, and the occurrence or degree of emotional harm due to their therapy experience simply cannot be ascertained in the absence of longitudinal data. Reported costs of SOCE appear to be highly skewed by the presence of one or more outliers. For example, the costs of all SOCE per participant were $7,105 and the median costs $2,150, with a standard deviation of $11,384. These costs were reported to range between $0 and $52,000, again indicating at least one severe outlier. It is curious that when the authors attempt to make the case against SOCE in the discussion section they choose to cite the inflated mean figure for total costs rather than the more appropriate (and less dramatic) median statistic.

**ii. Dehlin et al. (2015).**

17. Dehlin et al. tend to tout their study as providing a large and diverse sample of Mormon SOCE participants. Although the study sample is relatively large, it lacked diversity in that only 29% of participants were still actively engaged with the LDS church. Thus, the sample consisted overwhelmingly of participants who were moderately to highly disaffected from their

church, which raises concerns about the representativeness of the sample and the response bias this disaffection may have introduced against SOCE specifically and conservative values in general. Participants were asked to rate their SOCE experiences on a 5-point scale, from 1 = *highly effective*, 2 = *moderately effective*, 3 = *not effective*, 4 = *moderately harmful*, and 5 = *severely harmful*. This is a highly unusual rating scale in that it is anchored by terms that are actually measuring different dimensions, i.e., effectiveness and harm. To be consistent with most research, Dehlin and colleagues should have provided participants with two scales, one anchored by *highly effective* on one end and *highly ineffective* on the other end and the other by *significantly beneficial* and *significantly harmful*.

18. Note also that the midpoint of the scale is *not effective*, which is far from the typical neutral rating one would expect to find at the center point of a scale. This also is hard to fathom and clearly promotes a biasing effect toward SOCE as lacking effectiveness. As it stands, the conflation of harm and effectiveness in the response scale used in this study creates significant uncertainties about what the results actually mean. Certainly, outcomes would have been more favorable had Dehlin et al. defined the midpoint as *not harmful* rather than *not effective*, which would have been an equally arbitrary methodological decision. In spite of these problems with scale definitions and their potential biasing toward ineffective SOCE ratings, therapist-led SOCE methods actually did receive mildly positive endorsements. Psychotherapy was found to have moderately or greater *effectiveness* by 44% of respondents who sought it, with respective effectiveness ratings of 48% for psychiatry and 41% for group therapy. Finally, as with Flentje et al., the study combined religious and professional SOCE providers in deriving its findings, and the vast majority of SOCE did not involve licensed therapists. It should be noted that while Bradshaw et al. (2015) analyzed a subsample of the Dehlin et al. database who reported engaging in professional psychotherapy, this study suffers from the same sample and measurement concerns.

**iii. Ryan et al. (2018).**

19. This study is important in that it focuses on minors and concludes with the implication their research supports legislative and professional regulatory efforts to prohibit licensed therapists from engaging any minor in change-allowing talk therapies. This is a highly questionable conclusion for several reasons. Ryan et al. did not disentangle participants' retrospective perceptions of the effects of licensed therapists from that of unregulated and unaccountable religious counselors, so it is impossible to rule out the common-sense suspicion that negative effects were an outcome far more attributable to the practices of the latter group, as the Dehlin et al. (2015) data suggest. Participants were asked if they were involved in attempts to "cure, treat, or change" their sexual orientation. The concept of "cure, treat, or change" is also quite nebulous. This language may not only have served as a prompt for more negative responding, but presumably was elastic enough in participants' minds to include anything from simple prayers for healing ubiquitous in conservative religious circles to much rarer and harmful practices like exorcisms for which no change-allowing talk therapist advocates.

20. The Glassgold Declaration acknowledges that many children and adolescents "experience their sexual orientation as fluid" (p. 27). By limiting their sample to LGBT identified young adults recruited through LGBT venues who self-identified in adolescence and who did not report experiencing any sexual orientation fluidity, Ryan et al.'s sample excludes by definition those sexual minorities who may have felt some benefit from religious and professional

experiences that could be viewed as non-affirming. Thus, the nature of the sample may overestimate harm.

21. There is also growing evidence that constructs and conclusions derived from LGBT-identified samples such as Ryan et al.'s may not be easily transferrable to non-LGBT identified sexual minorities with primary religious identities (Hallman, Yarhouse, & Suarez, 2018; Lefevor, Sorrell, Kappers, Plunk, Schow & Rosik, 2019). For example, there is evidence of differences in conceptions of and pathways to happiness and life satisfaction between religious and secular cultures/worldviews (Joshanloo, 2018; Pawar, 2017; Tamir Schwartz, Oishi, & Kim, 2017). This may further complicate straightforward generalizations from religiously disaffiliated or unaffiliated LGB-identified research participants to conservatively religious non-LGB-identified sexual minorities.

22. The Glassgold Declaration points to higher suicide rates in the Ryan et al. study among those who have experienced "conversion therapy." In addition to the above methodological limitations, it is worth noting in this regard the author's own acknowledgements:

> Third, the design is retrospective, and thus causal claims cannot be made. We cannot rule out the possibility that those who were most maladjusted as young adults retrospectively attribute parental behaviors during adolescence as attempts at changing their sexual orientation; we also cannot rule out the possibility that well-adjusted LGBT young adults may be less likely to recall experiences related to SOCE. (p. 12)

Ryan et al. argue that the alternatives are less plausible than SOCE undermining health and well-being, but this remains scholarly *speculation*. Such speculation is not a substitute for clear and unambiguous data when justifying laws such as Ordinance 2017-47 that curtail the speech of licensed clinicians engaged in change-allowing talk therapies. Indeed, the APA (2009) Task Force Report contains an entire subsection highlighting the unreliability and limitations of retrospective reports (APA, 2009, p. 29). Although the Report applies this conclusion only to SOCE efficacy studies, there is no scientific rationale for not also applying it to research on SOCE harm such as Ryan et al.

### iv. General Critique of Recent SOCE Research.

23. Licensed therapists on all sides of the debate over SOCE are agreed in the commitment to do no harm to their clients. The question is whether the harms attributed to change-allowing talk therapies are unambiguously grounded in scientific data sufficient to justify legal bans or whether what we are witnessing is the triumph of advocacy interests over sober science. As noted above, the more recent SOCE research all contain serious methodological limitations, including sample bias favoring negative SOCE accounts, measures defined in a manner that inflates estimates of harm, and the confounding of professional and religious SOCE providers and interventions. The findings of this body of research cannot therefore be generalized beyond the samples employed and provide an insufficient scientific basis for justifying therapy bans.

24. However, the fatal flaw these studies all evidence is their inability to control for pre-SOCE levels of distress, which is a key component for disentangling distress attributable to a psychotherapeutic intervention and distress experienced by clients prior to ever engaging in therapy. Without this data, the actual degree of harm attributable to therapy is unknowable. This is a critical fact of basic research methodology, particularly when the population under study is known to have high levels of adverse childhood experiences (Andersen & Blosnich, 2013). To cite only one example, non-heterosexual persons report much higher levels of childhood sexual abuse (CSA) than heterosexual persons (Friedman et al., 2011; Rothman, Exner, & Baughman, 2011: Xu & Zheng, 2015), and CSA has been linked to later suicidality (Bebbington, et al., 2009; Bedi et al., 2011; Eskin, Kaynak-Demir, & Demir, 2005). Hence, without pre-SOCE assessment of participants' suicidality, claims attributing frequent suicidal thoughts and behaviors to be the direct result of change-allowing talk therapies constitute empirically unfounded speculation.

25. It is also worth evaluating these more recent studies using the same methodological standards the APA (2009) Task Force utilized to discard most of the SOCE literature. As summarized by Beckstead (2012):

> Methodological errors in SOCE research included the following: (1) results are based on restricted, self-selected samples that represented a socially stigmatized population who affirmed heterocentric biases; (2) methods did not account for participants' interests to manage self-impressions and potential to promote their beliefs and lifestyles and misreport ''successes''and ''failures''; (3) some results were based on therapists' subjective impressions; (4) researcher biases or lack of expertise were not managed or addressed; (5) comparison or control groups were not used; and (6) longitudinal methods were not utilized to determine the duration or process of any positive changes. (p. 124)

With the possible exception of #3, all of these "errors" the Task Force found in the research purporting SOCE effectiveness could equally be applied to the recent research alleging SOCE harms. This double standard in scientific evaluation was noted at the time of the Report (Jones, Rosik, Williams, & Bird, 2010) and apparently continues into the present, suggesting the enduring influence of advocacy interests over scientific humility.

26. To summarize, a proper conclusion regarding the recent research is that these studies cannot provide a scientifically sound basis for restricting the rights of individuals to engage in and licensed therapists to provide change-allowing professional psychotherapy. In fact, due to the sampling problems, utilizing this research to evaluate the provision of change-allowing talk therapies makes no more sense than studying a sample of former marital therapy patients who have subsequently divorced to determine the effectiveness and harm of marital therapy in general.

### C. Spitzer's Reassessment of His 2003 Study on SOCE.

27. Finally, proponents of talk therapy bans such as Ordinance 2017-47 have understandably pointed out that Robert Spitzer, M.D., author of one of the primary studies conducted on SOCE (Spitzer, 2003), changed his assessment of the study and came to believe that

it did not provide clear evidence of sexual orientation change (Spitzer, 2012). It appears that he may have originally wished to retract the 2003 study, but the editor of the journal in which the study was published, Kenneth Zucker, Ph.D., denied this request. Zucker has been quoted regarding his exchange with Spitzer as observing:

> You can retract data incorrectly analyzed; to do that, you publish an erratum. You can retract an article if the data were falsified—or the journal retracts it if the editor knows of it. As I understand it, he's [Spitzer] just saying ten years later that he wants to retract his interpretation of the data. Well, we'd probably have to retract hundreds of scientific papers with regard to interpretation, and we don't do that. (Dreger, 2012)

What Zucker is essentially saying is that there is nothing in the science of the study that warrants retraction, so all that is left for one to change is the interpretation of the findings, which is what Spitzer appears to have done. Spitzer's change of interpretation hinges on his new belief that reports of change in his research were not credible. Others made such assertions at the time of the study, and Spitzer defended the integrity of the study then. Now, however, he now asserts that participant's accounts of change may have involved "self-deception or outright lying" (Spitzer, 2012).

28. It is curious that Spitzer's (2012) apology seems to imply that he earlier claimed his research proved the efficacy of SOCE. As was understood at the time, the design of Spizter's study ensured his research would not definitively *prove* that change-allowing talk therapies can be effective. Certainly it did not prove that all gays and lesbians can change their sexual orientation or that sexual orientation is simply a choice. The fact that some people inappropriately drew such conclusions appears to be a factor in Spitzer's reassessment. Yet the fundamental interpretive question did and still does boil down to one of plausibility: Given the study limitations, is it *plausible* that some participants in SOCE reported actual change?

29. Since nothing has changed regarding the scientific merit of Spitzer's study, the interpretive choice one faces regarding the limitations of self-report in this study also remains. Either *all* of the accounts across *all* of the measures of change across participant and spousal reports are self-deceptions and/or deliberate fabrications, or they suggest it is possible that some individuals actually do experience change in the dimensions of sexual orientation that may be assisted by licensed therapists. Good people can disagree about which of these interpretive conclusions they favor, but assuredly it is not unscientific or unreasonable to continue to believe the study supports the plausibility of change for some individuals.

30. In fact, the reasonableness of this position was bolstered by the willingness of some of the participants in Spitzer's research to speak up in defense of their experience of change (Armelli, Moose, Paulk, & Phelan, 2013). They expressed clear disappointment in Spitzer's new claims:

> Once thankful to Spitzer for articulating our experience and those of others, we are now blindsided by his "reassessment," without even conducting empirical longitudinal follow-up. We know of other past

> participants who also feel disappointed that they have been summarily dismissed. Many are afraid to speak up due to the current political climate and potential costs to their careers and families should they do so.

It seems clear, then, that unless one postulates initial and ongoing self-deception and fabrication by participants to an incredulous degree, Spitzer's study still has something to contribute regarding the possibility of change in sexual orientation.

### D. The Limited Understanding of the Dynamics of Stigma and Discrimination.

31. Proponents of change-allowing talk therapy bans typically frame a significant degree of their arguments concerning harm and SOCE on the negative consequences of stigma and discrimination (e.g., SAMHSA, 2015). The Glassgold Declaration is no different. While these factors certainly can have deleterious consequences for those with non-heterosexual sexual orientations, this possibility must be placed within a broader context and balanced by additional considerations.

32. From an overall perspective, the meta-analytic research (which summarizes results over multiple studies) on the association between perceived discrimination and health outcomes indicates that the strength of this relationship is significant but small (Pascoe & Richman, 2009). Schmitt, Branscombe, Postmes, and Garcia's (2014) updated meta-analysis found LGB-related discrimination (i.e., heterosexism) explained less than 9% of the relationship between discrimination and well-being and discrimination and psychological distress. Furthermore, research into what influences this association has most typically found no significant role for theoretically linked factors such as various coping strategies, social support, concealing one's LGB identity, and identification with one's group (i.e., claiming a gay identity) (Denton, Rostosky, & Danner, 2014; Schmitt et al., 2014). For example, data suggest that the impact of "internalized homophobia" for understanding risk behavior among men who have sex with men (MSM) is now negligible and, "The current utility of this construct for understanding sexual risk taking of MSM is called into question" (Newcomb & Mustanski, 2011, p. 189). By contrast, poly drug use by these men continued to be a strong predictor of risky sexual behavior. Similarly, a meta-analysis of studies examining the higher substance use rates among LGB youth compared to their heterosexual peers concluded that internalized homophobia was not a significant predictor (Goldbach, Tanner-Smith, Bagwell, and Dunlap, 2014). Such findings should be sufficient to indicate that there is a great deal left to be understood about this entire field of study.

33. Other lines of inquiry suggest that sexual orientation stigma and discrimination alone are far from a complete explanation for greater psychiatric and health risks among non-hetersexual orientations. Goldbach et al. (2014) discovered that the factors having the greatest relationship to substance use in LGB youth were not distinct from those reported by teens in the general population, regardless of sexual minority status. Victimization that was not specifically gay-related had the strongest association with substance use for these youth. Mays and Cochran (2001) reported that discrimination experiences attenuated but did not eliminate associations between psychiatric morbidity and sexual orientation. The associations between non-heterosexual orientation and poorer mental health have persisted over time with recent studies showing the same effects as older studies despite a more accepting culture (Branstrom & Pachankis, 2018; Sandfort,

de Graaf, ten Have, Ransome, & Schnabel, 2014; Semlyen, King, Varney, & Hagger-Johnson, 2016).

34.     The issue of suicide among non-heterosexual persons is worthy of great concern. Yet contrary to a singular reliance on minority stress theory to explain sexual orientation disparities, research is discovering that suicide related ideation and behavior disparities are not uniformly decreasing with the greater social acceptance of LGB people, both among minors and adults (Peter, Edkins, Watson, Adjei, Homma, & Saewyc, 2017; Wang, Ploderl, Hausermann, & Weiss, 2015). Men with same-sex attractions and behaviors were found to have a higher risk for suicidal ideation and acute mental and physical health symptoms than heterosexual men in Holland, despite that country's highly tolerant attitude towards homosexuality (Sandfort, Bakker, Schellevis, & Vanwesenbeeck, 2006; de Graaf, Sandfort, & ten Have, 2006). Even in a highly tolerant country such as Sweden, same-sex married individuals evidenced a higher risk for suicide than other married persons (Bjorkenstam, Andersson, Dalman, Cochran, & Kosidou, 2016). Wang et al. chastised researchers studying suicidality among non-heterosexual persons for their failure to consider other common factors in the general suicide literature: "It is notable, however, that certain areas of mainstream suicide research—e.g., consideration of biologic factors, psychological factors (e.g., personality traits), and stressful life events—have not been addressed in suicide research among sexual minorities to date" (p. 499). They reported neither mental disorder nor discrimination has been shown to explain the excess risk of suicide attempts among non-heterosexual people. A study by Skerrett, Kolves, and De Leo (2014) discovered that while LGB people who died by suicide had a higher incidence (65.7%) of interpersonal problems prior to death than their heterosexual counterparts (33.3%), they actually had *lower* levels of family conflict (5.7% to 17.1%).

35.     Studies outside of Western culture appear to indicate that culture may play a significant role in this literature as well. Using an LGB sample from China, Shao, Ching, and Chen (2018) found that minority stress was not related to psychological maladjustment, whereas respect for parents and perceived parental support were associated with positive adjustment. The authors conclude that the minority stress model cannot be generalized to individuals living in cultural contexts that emphasize family connections over one's sexual identity. This may have relevance for non-heterosexual persons who identify with conservative religious communities, many of which adhere to less individualistic cultural values.

36.     Research in this area is almost entirely reliant upon self-reports of *perceived* discrimination, and the relation of this to objective discrimination is not well understood. Self-report data make it difficult to tell how much of the association between perceived discrimination and well-being or psychological distress reflects the effects of perceptions of discrimination per se and how much is the effect of actual encounters with discrimination and negative treatment (Schmitt et al., 2014). Burgess, Lee, and van Ryn (2007) found that although perceived discrimination was associated with almost all indicators of poor mental health, adjusting for discrimination did not significantly reduce mental health disparities between heterosexual and LGBT persons, indicating that discrimination did not account for the disparity. Also supporting the notion that perceptions of discrimination may play a more prominent role than actual discrimination is research indicating minority stress theory can explain distress even among numerically and socially dominant groups, such as Christians (Parent, Brewster, Cook, & Harmon, 2018).

### i. Alternatives to Minority Stress Theory.

37. The relationship of sexual orientation related stigma and discrimination to psychological and physical well-being among LGB persons is undoubtedly complex, and no single theory is likely to provide a universal explanation. Lick, Durso, and Johnson (2013) observed that the mechanisms linking sexual orientation-related stigma to physical health outcomes remain poorly articulated and causality cannot be inferred. In spite of these uncertainties, minority stress theory (Meyer, 2003) has assumed a favored status in academic and policy discussions, including discussion related to prohibiting professional SOCE. This theory posits that experiencing or even fearing stigma specifically related to one's LGB identity arouses feelings of distress that can have profound consequences for the well-being of LGB persons. As is evident from the Glassgold Declaration, opponents of change-allowing talk therapies often view them as inherently stigmatizing and discriminatory (and thus responsible for subsequent emotional and physical distress), but this is a dubious assertion given the substantial uncertainties surrounding minority stress theory.

38. Indeed, as Savin-Williams (2006) has observed, evidence for the causal pathway of this theory (i.e., sexual orientation to discrimination to mental and physical health disparities) are "more circumstantial than conclusive" (p. 42). McGarrity (2014) reported that LGB individuals are more highly educated than the general population, a finding not consistent with an unqualified minority stress position. She also indicated that the lower income levels of gay and bisexual men may not stem from discrimination but from their tendency to pursue "typically female" fields of study in college. Another study found that components of minority stress predicted no more than 5% of non-heterosexual drug and alcohol usage (Livingston, Oost, Heck, & Cochran, 2014). Even if it were to be (and it clearly has not been) proven that change-allowing talk therapies with minors were a form of stigma, Wald (2006) asserted that, "While the presence of stigma is clear, the research does not find that it has a significant harmful impact on the children's mental health" (p. 399). Important alternative theories have been proposed to challenge or supplement the causal assumptions of the minority stress view.

39. **Mediation theories**. Some theories with empirical support suggest that other factors indirectly mediate the pathways linking discrimination and stigma with disparities in LGB psychological health (Hatzenbuehler, 2009). Other theories assert that LGB discrimination and stigma may itself mediate the relationship between other factors that result in such disparities. In other words, specific sexual orientation discrimination or stigma may be minimally or unrelated to psychological distress and physical health in the absence of certain intra- or interpersonal processes (Schumm, 2014). While many theoretically favored factors thought to influence LGB health disparities have been questioned (as noted above), several examples of other mediating factors can be provided.

40. Recent literature also finds that particular emotion/avoidant-based coping mechanisms used by people reporting same-sex attractions can almost entirely account for the effects of this perceived discrimination (Whitehead, 2010). For example, the inability to regulate one's negative emotions was found to be a primary contributor to the pathway from sexual minority stressors and physical health symptom severity (Denton et al., 2014). In addition, differential rates of health problems resulted from sexual orientation-related differences in coping styles among men, with an emotion-oriented coping style mediating the differences in mental and

physical health between heterosexual and homosexual men (Sandfort, Bakker, Schellevis, & Vanwersenbreeck, 2009). Passive coping style has been found to mediate mental health disparities between LGB and heterosexual youth (Bos, van Beusekom, & Sandfort, 2014) while emotion-focused coping (the ability to regulate negative emotions) mediated physical health disparities between adult LGB and heterosexual individuals (Denton et al., 2014). Rumination (the tendency to passively and repetitively focus on one's distress and distress-related circumstances) has also been found to mediate the relationship between stigma and distress (Hatzenbuehler, Nolen-Hoeksema, & Dovidio, 2009).

41. Worries among sexual-minority youth concerning friendships and never finding a romantic partner have also been observed to mediate such disparities (Diamond & Lucas, 2004). Health disparities between gay and heterosexual men may also be mediated by the emotional and physical stresses of living with HIV/AIDS or other related physical ailments (Lick et al., 2013). In one study, disparities in heart disease, liver disease, digestive problems and urinary incontinence disappeared after accounting for HIV status (Cochran & Mays, 2007).

42. **Nonheterosexual lifestyle theory**. This perspective posits that LGB lifestyles are inherently riskier than those of heterosexuals because of certain features of LGB social communities (Vrangalova & Savin-Williams, 2014). Schumm (2014) has suggested that differences in conduct between non-heterosexuals and heterosexual persons rather than sexual orientation identity may lead to or reinforce discrimination. These behaviors may include antisocial behaviors, unsafe sexual practices, and drug use. For example, Hatzenbuehler, Keyes, & Hasin (2009) found that drug use as a psychiatric disorder increased over time for LGB persons in states that had *more* protective policies. Higher substance use may be due to many LGB communities being structured around bars and clubs (Trocki, Drabble, & Midanik, 2005, 2009).

43. **Common factors theory**. This theory asserts that the elevated health problems among nonheterosexuals could be directly or indirectly due to genetic or environmental "common causes" of both health risks and nonheterosexuality (Vrangalova & Savin-Williams, 2014; Zietsch, 2012). Gender nonconformity, and divergence in behavior, personality, and identity from those typical of one's sex are likely influenced by the same genetic and neurodevelopmental factors as non-heterosexuality, and therefore may be linked to both victimization and mental health regardless of sexual orientation. Other personality traits may be implicated as common causes as well. Increased internalizing (e.g., self-harm) and externalizing risk behaviors (e.g., sexual risk taking) may be due to direct or indirect shared genetic effects between non-heterosexuality and neuroticism or sensation seeking, rather than non-heterosexuality per se. Common causes could also be environmental. For example, to the extent the same environments (e.g., large cities, college campuses, night clubs) that provide opportunities for exposure to sexually arousing stimuli also provide opportunities for engagement in various risk behaviors or carry other health risks, this could be a common cause for both health risks and nonheterosexuality.

44. The review article by Vrangalova and Savin-Williams (2014) is particularly intriguing in that they focused on psychological and physical health disparities among mostly heterosexual individuals. The mostly heterosexual (MH) orientation is characterized by a strong presence of other-sex sexuality and a slight amount of same-sex sexuality. MH may comprise about 4% of men and 9% of women in the general population (Savin-Williams & Vrangalova, 2013). Because MH persons tend to view themselves and are viewed by others as essentially

heterosexual in their sexual orientation and lifestyle, they are plausibly exposed to much less sexual orientation discrimination and stigma than LGB identified persons. One study reviewed indicated that only 8% of MH teenagers reported experiencing sexual orientation-based discrimination. Yet Vrangalova and Savin-Williams (2014) reported that MH individuals are closer to bisexuals than heterosexuals in their health risks (see also Rosario et al., 2016). These authors further noted that people with exclusive opposite-sex or same-sex attractions may have less elevated health risks than individuals who experience any proportion of sexual attraction to both sexes. They concluded that, "This raises the possibility that it is something about nonexclusivity in sexual attractions or lifestyles that is linked to negative health outcomes" (p. 437).

45. The existence of such variant theories to explain the relationship (or lack thereof) of stigma and discrimination to psychological and physical health disparities between LGB and heterosexual persons argues strongly for the exercise of legislative and judicial restraint when making public policy that rests in part on such disparities. The pathways to elevated health risks among nonheterosexuals may certainly include discrimination and stigma, but the extent, causal direction, and mediation of such a relationship is currently far from understood. Moreover, there is no direct empirical basis for linking SOCE with such health disparities. It is therefore both simplistic and unscientific for proponents of Ordinance 2017-47 to imply a causal link between the practice of professional change-allowing talk therapies and health disparities among youth.

**ii. Some Health Outcomes Are Likely Based in Anatomy More Than Stigma.**

46. In addition, some health risks, such as sexually transmitted diseases (including HIV) among gay men, may be influenced by stigma but are ultimately grounded in biological reality. One comprehensive review found an overall 1.4% per-act probably of HIV transmission for anal sex and a 40.4% per-partner probability (Beyer, et al., 2012). The authors noted, "The 1.4% per-act probability is roughly 18-times greater than that which has been estimated for vaginal intercourse" (p. 5). Swartz (2014) found sexually transmitted infections other than HIV/AIDS in 35.6% of men who had sex with men compared to 6.6% of matched population sample of heterosexual men. CDC statistics indicate the rate of new HIV diagnoses in the United States among men who have sex with men has been more than 44 times that of other men (CDC, 2011). Young gay and bisexual men age 13-29 accounted for 27% of all new HIV infections in 2009 and were the only group for whom new HIV infections increased between 2006 and 2009 (Prejean et al., 2011). In 2017, gay and bisexual men disproportionally accounted for 66% of all HIV diagnoses and 82% of HIV diagnoses among males (CDC, 2019). Oswalt and Wyatt (2013) surveyed college students and found that while 69.5% of heterosexual males had never engaged in anal sex only 10.8% of gay males had not engaged in this sexual behavior. Sharing such information with prospective SOCE clients is not inherently manipulative but rather, when balanced with other considerations, constitutes an ethically obligated aspect of informed consent.

**iii. SOCE Not a Proxy for Stigma or Discrimination.**

47. The lessening of stigma associated with "coming out" need not imply an affirmation of a gay, lesbian, or bisexual identity or the enactment of same-sex behavior. Licensed SOCE practitioners often encourage the client's acceptance of his or her unwanted same-sex

attractions and the disclosure of this reality with safe others as a means of shame-reduction and a potential aid in the pursuit of change or, in cases where change does not occur, behavioral management of sexual identity. This typically occurs when clients desire to live within the boundaries of their conservative religious values and beliefs. While it is often assumed that conservative religious environments are stigmatizing and harmful for sexual minorities by definition, this is by no means a universal finding (Barringer & Gay, 2017). One study of black lesbian, gay, and bisexual young adults, 86% of whom were open about their sexual identity, found that, "Participants who reported lower religious faith scores and lower internalized homonegativity scores reported the lowest resiliency, while those reporting higher religious faith scores and higher internalized homonegativity reported the highest resiliency scores" (Walker & Longmire-Avital, 2013, p. 1727).

48. Referral for change-allowing talk therapies therefore cannot be designated as a proxy for harm-inducing family rejection and stigma, as the proponents of Ordinance 2017-47 seem to assume. Only a few studies have directly examined the link between family rejection and health risk among minors (Saewyc, 2011) and the derived findings can be contrary to expected theories, such as the discovery that same-sex attracted boys who participated in more shared activities with their parents were *more likely* to run away from home and use illegal drugs than those who participated in fewer shared activities (Pearson & Wilkinson, 2013). The Ryan et al. (2018) study is the first of its kind in this arena, but with serious aforementioned limitations that make it little more than a non-generalizable pilot study. Thus, Ordinance 2017-47 would unnecessarily and without scientific warrant eliminate the potential role of conservative religious values and social networks for ameliorating the effects of stigma in the context of change-allowing talk therapy. This would prevent clients from one means of prioritizing their religious values above their same-sex attractions when these factors are in conflict. The contention that a desire to modify same-sex attractions and behaviors can only be an expression of self-stigma reflects a serious disregard for and misunderstanding of conservative religious and moral values (Jones, et al., 2010).

**iv. Encouraging Same-Sex Behavior May Result in Risk-Justifying Attitudes.**

49. Finally, some research has raised the possibility some widely accepted theories germane to the discussion of stigma, discrimination, and health outcomes may in fact have gotten things backwards. A longitudinal study of gay and bisexual men by Heubner, Neilands, Rebchook, and Degeles (2011) found that,

> … in contrast to the causal predictions made by most theories of health behavior, attitudes and norms did not predict sexual risk behavior over time. Rather, sexual risk behavior at Time 1 was associated with changes in norms and attitudes at Time 2. These findings are more consistent with a small, but growing body of investigations that suggest instead that engaging in health behaviors can also influence attitudes and beliefs about those behaviors. (p. 114)

50. Thus, safe-sex norms and attitudes did not lead to reduced unprotected anal intercourse; rather, participants' engagement in such HIV risk behavior appeared to change how they thought and felt about the behavior and enhanced their willingness to engage in it. Such findings raise serious concerns about the impact of Ordinance 2017-47, in that a law which only allows for the affirmation and ultimate enactment of same-sex attractions may in fact increase HIV risk and negative health outcomes for some minors who might otherwise have sought change-allowing talk therapy. Engaging in homosexual behavior in adolescence has been linked with an elevated prevalence of many serious risk behaviors and emotional problems (Arnarsson, Sveinbjornsdottir, Thorsteinsson, & Bjarnason, 2015; Outlaw et al., 2011). In addition, experiencing rape or sexual assault before the age of 16 has been strongly associated with belonging to any non-heterosexual group (Wells, McGee, & Beautrais, 2011).

51. While stigma and discrimination are real concerns, they are not universal explanations for greater psychiatric and health risks among sexual minorities, some of which are likely to be grounded in the biology of certain sexual practices. Moreover, the effects of stigma and discrimination can be addressed significantly within change-allowing talk therapies for many clients, though this is no doubt hard to comprehend for those not sharing the religious values of SOCE consumers. There is no longitudinal research involving consumers of change-allowing talk therapies that link the known effects of stigma and discrimination to the practice of SOCE. SOCE is simply *ipso facto* presumed to constitute a form of stigma and discrimination. This is in keeping with the persistently unfavorable manner in which change-allowing talk therapies are portrayed by the mental health associations. Change-allowing talk therapy practitioners and consumers are associated with poor practices as a matter of course (Jones, et al, 2010; APA, 2009, 2012). This arguably is a form of stigma and discrimination toward licensed practitioners of SOCE, who ironically, as noted earlier, have developed their own set of practice guidelines that, when followed, can be expected to reduce the risk of harm to consumers of change-allowing talk therapies (ATCSI, 2018; Appendix A).

### E. Understanding the Dramatic SOCE Prevalence Numbers of the Williams Institute Survey.

52. Statistics from the Williams Institute are being widely disseminated regarding the prevalence of "conversion therapy" (CT) and are unsurprisingly cited in the Glassgold Declaration (Mallory, Brown, & Conron, 2018, 2019). This survey claims that nearly 700,000 adults have received CT, 350,000 who were adolescents when they experienced CT. Furthermore, they claim that between 16,000 and 20,000 youths ages 13-17 will receive CT from a licensed therapist before turning 18. These are stunning statistics, but the study methodology raises some serious questions about their validity as applied to change-allowing talk therapies. The study utilized questions from the Generations Study, in particular the question, "Did you receive treatment from someone who tried to change your sexual orientation (such as try to make you straight/heterosexual)?" followed by an option for indicating whether the provider of treatment was a health care professional. Not only is the retrospective self-report nature of the survey problematic given the likely need for participants to recall events from decades earlier, but "treatment" is left undefined and is so nebulous that one can gain no idea about the frequency or seriousness of the treatment techniques (encompassing anything from a felt sense that the therapist preferred heterosexuality on the one end to the application of electroshock aversive procedures on the other end). Furthermore, the survey included only LGBT identified persons, which by definition would include a preponderance

of individuals who had not experienced change. Although one might reasonably surmise these individuals would be less likely to have experienced positive benefits from their therapy, this question was not asked. The degree of distress attributable to these treatments is not known and assertions to the contrary are mere speculation. It is much more plausible that the non-LGBT identified persons with same-sex attractions and behaviors who were excluded from the survey would have reported benefit from their change-allowing therapy, but again, we cannot ultimately know from the study what degree of harm or benefit any non-heterosexual participant experienced.

53. If the Williams Institute's numbers are not in some manner inflated, and even if only 1% of the tens of thousands of minors the Williams Institute indicates have undergone or are undergoing SOCE with a licensed therapist have been subjected to the aversive practices suggested by the study—"...practitioners have also used 'aversion treatments, such as inducing nausea, vomiting, or paralysis; providing electric shocks...."—it is incomprehensible that some of these clinicians would not have been brought before their state licensing boards for such egregiously unethical child abuse. Strikingly, however, Drescher et al. (2016) noted, "To our knowledge, there have been no formal actions by a regulatory body against a provider for engaging in conversion therapy." The most probable means of understanding the disconnect between the Williams Institute's numbers and the lack of any therapist having lost a license for unethical SOCE related conduct is that licensed practitioners of change-allowing therapies (whatever their number) are conducting themselves in an ethical and professional manner. This conclusion strongly suggests bans such as Ordinance 2017-47 are a 'solution' to a problem that does not exist for licensed therapists.

54. The Glassgold Declaration raises the concern that it would be difficult for minors to file complaints against their licensed care provider to state regulatory boards. Two points are worth making in response. First, surely it would be equally challenging for a minor to make a complaint under Ordinance 2017-47. Second, it is inconceivable that a minor with a verifiable complaint of misconduct against a licensed therapist would not find considerable administrative guidance and financial support from groups such as Equity Florida in filing a complaint with a state regulatory agency. Hence, this line of argument does not provide a compelling reason to usurp existing state regulatory board oversight.

### F. The Limits of Appeals to Authority.

55. Ordinance 2017-47 and the Glassgold Declaration rely heavily on appeals to the authority of mental health organizations. Uncritical assessment of such appeals may be justified in areas of social science that do not intersect with significant political, legal, and advocacy interests. However, to do so in the arena of professional SOCE would be a serious and naïve mistake. In assessing such appeals, it is critical to consider the cultural and ideological climate of organized psychology. What is undeniable is that both academic and organized psychology (particularly associational leaders) are essentially politically and ideologically homogeneous, left-of-center groups. Below I add a few further examples to the evidence provided in my earlier declaration.

56. Consistently in the social sciences generally and in organized psychology specifically, self-identified liberal/progressives and Democrats outnumber self-identified conservatives and Republicans by ratios of 8:1 to 11:1 (Duarte, Crawford, Stern, Haidt, Jussim, &

Tetlock, 2015; Jussim, Crawford, Anglin, & Stevens, 2016; Martin, 2016). Al-Gharbi (2018) examined extensive survey data for Heterodox Academy and concluded, "In other words, the lack of ideology diversity seems to be vastly more pronounced in social research fields than underrepresentation in terms of gender, sexuality and race." In other words, conservative perspectives are much less present among contemporary psychology faculty than even racial (Hispanic and Black), gender, and sexual minority viewpoints.

57. Within mental health associations, and most severely among their leadership bodies, left-of-center ideological homogeneity also appears to be entrenched. Former APA President Cummings reflected on his decades within APA leadership and observed (Cummings & O'Donahue, 2008):

> The APA has more than 100,000 members, associates, and affiliates, yet less than 200 elitists control its governance. They rotate year after year through its offices, boards, Council of Representatives, and its plethora of committees, in a kind of organizational musical chairs that ensures the perpetuation of political ideology and essentially disenfranchises the thousands of psychologists who might disagree. (p. 216)

58. Exacerbating this ideological dominance is the general lack of connection by APA leaders with the membership at large. For example, in the most recent vote for apportionments to determine the composition of the APA's 2020 main governing body, the Council of Representative, only 9,490 of the APA's 118,000 members casts ballots (APA, 2019a, 2019b). If such a level of membership involvement is indicative of general participation, this means APA resolutions, reports, and policy statements are approved by officials representing approximately 8% percent of the membership. There are no minority reports solicited for such documents, and no polling of the entire membership concerning such pronouncements is conducted. These dynamics help explain, for example, how the Council in 2011 voted 157-0 to support same-sex marriage initiatives (Jayson, 2011), which in a representative governing structure implies no one in the membership disagreed with this proposal, which I know in talking to many APA colleagues was not the case.

59. These sorts of structural problems are not limited to psychological associations. Recently the American Academy of Pediatrics (AAP) released a policy statement, *Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents* (Raffery, 2018). While a vast majority of clinics and professional associations world-wide encourage the "watchful waiting" approach to helping gender dysphoric children, the AAP statement repudiated that consensus and encouraged only gender affirmation. James Cantor, a gay psychologist and well know sexologist, was struck by this disconnect, carefully examined all of the statement's references, and was led to conclude, "...AAP's statement is a systematic exclusion and misrepresentation of entire literatures. Not only did the AAP fail to provide *extraordinary* evidence, it failed to provide the evidence at all. Indeed, AAP's recommendations are *despite* the existing evidence" (author's emphasis)(Cantor, 2018, p. 4; Appendix B).

60. Examination of the AAP statement indicated that a maximum of 36 members of the association (24 pediatricians and 12 members of the board of directors) directly approved the

policy, which translates to a startlingly minute .05% of the AAP's 67,000 members (Kearns, 2018). Similar to the APA, the AAP statement was not presented to all members for a vote, and a minority report was not solicited. These considerations raise questions about the AAP's treatment of other subjects where there is inherent ideological and advocacy investment, including "conversion therapy."

61. These concerns are not even limited to a North American context. The Academy of Science of South Africa (ASSA) published a report, *Diversity of Sexuality*, in order to influence policy in Africa (ASSA, 2015). However, Diamond and Rosky found the report's claim of immutability of sexual orientation to be in error: "The authors deployed the same exaggerations of scientific evidence that have long characterized immutability debates, concluding that 'all sexual orientations are biologically based, largely innate and mostly unchangeable' (p. 22)." (p. 10)

### G. Terminology Creep Suggests Political Not Scientific Motives and These Can Harm Therapists.

62. It is important to recognize that until very recently, "conversion therapy" bans referenced only sexual orientation. The inclusion of gender identity in Ordinance 2017-47 and the Glassgold Declaration was not found in earlier ban legislation or mental health association resolutions. It is very likely that motives other than those guided by science are at play, as the science relative to gender identity and "conversion therapy" does not exist. As Cantor (2018) observed regarding claims made by the aforementioned AAP policy statement, "These claims struck me as odd because *there are no studies of conversion therapy for gender identity*. Studies of conversion therapy have been limited to *sexual orientation*—specifically, the sexual orientation of *adults*—not *gender identity*, and not *children* in any case" (p. 1; author's emphasis).

63. How might such terminology creep be explained given the complete absence of research examining "conversion therapy" for gender identity? One possible reason is that ban supporters have been very effective at promoting their demonized version of "conversion therapy" and now wish to extend that demonization to any care for gender identity that does not meet their definition of affirmation. What the AAP did, for example, was "simply relabeling non-gender affirmation models as conversion clinics" (Cantor, 2018, p. 3). This is a brilliant political strategy, but it has left science behind.

64. Such expansion in the scope of what "conversion therapy" covers can have real world consequences for therapists. In one particularly striking example, publicity leading up to the passage of a ban on SOCE for minors in the province of Ontario, Canada, in the summer of 2015 helped fuel allegations against world renowned psychologist Kenneth Zucker and his heretofore highly respected Child and Youth Gender Identity Clinic in Toronto. Zucker and his clinic received this scrutiny in large part due to their openness to helping young gender dysphoric children attempt to feel more comfortable in their own biological bodies. In response to years of pressure by activists, intensified by the professional climate fomented by the SOCE ban, a review was instigated by the hospital which housed Zucker's clinic. This external review was commissioned in February of 2015 and the subsequent document included claims of Zucker providing "conversion" or "reparative" therapy and linked the clinic's approach to youth suicide. Though Zucker denied these claims, none of the accusations appear to have been fact checked by the hospital's reviewers. Finally, on December 15, 2015, Zucker was unceremoniously fired and

his clinic closed down (Anderssen, 2016; Singal, 2016). Zucker subsequently filed a lawsuit against the hospital and in October of 2018 the hospital acknowledged wrongdoing and settled out of court for $586,000 (Rizza, 2018).

65. While there at least is research whose significance can be debated concerning professional SOCE pertaining to same-sex attractions and behaviors, the complete lack of any studies specific to "conversion therapy" for gender identity raises serious questions for supporters of Ordinance 2017-47. How can they in good conscience place licensed therapists and physicians in legal jeopardy for providing alleged non-affirmative models of conversational care in the absence of any research on the subject? Either they remove entirely gender identity as a focus of the law or admit that their employment of the "conversion therapy" terminology was a sloppy attempt to prejudice public and judicial opinion.

**H. Overstated Claims Suggest Advocacy and Not Science.**

66. The Glassgold Declaration repeatedly makes claims about the literature framed in absolute and misleading terms. "...current scientific evidence...confirm *unequivocally* that conversion therapy in *any* form is ineffective and harmful" (p. 5). There is not "*any* valid scientific evidence of lasting change in sexual behaviors" (p. 19). "Research shows that *all* forms of CT also poses [sic] a significant risk of harm to gender diverse people" (p. 22). There is "*no* credible link between same-sex sexual orientation and sexual abuse" (p. 33). "There is *no* safe form of CT; *all* CT poses significant risk to health and well-being of minors" (p. 37; my emphases). Such unequivocal pronouncements make good advocacy but reflect poor science.

67. Below I will address these statements as overstatements, but it is worth asking what may motivate such advocacy? Jussim, Crawford, Stevens, Anglin, and Duarte (2016) highlight one factor that seems consistent with the passion often displayed by therapy ban proponents in advancing such inflated claims:

> If scientists believe that it is their moral obligation to marginalize their ignorant and immoral ideological opponents, they put themselves at risk for purveying invalid scientific claims. Because strongly held ideological beliefs subjectively feel like objective truths, it is possible that such scientists are unaware of the biased nature of their science, squashing their ideological opponents may be subjectively experienced as a core component of advancing science (p. 184).

68. I have documented on numerous occasions in my declarations that the science pertaining to change-allowing talk therapies is very limited and a non-advocacy motivated reading of this literature would adopt a much more circumspect and nuanced interpretation. It is telling that the Glassgold Declaration in support of the claim of unequivocal evidence regarding "conversion therapy" cites only a qualitative study, a methodology which at best can serve as a source for generating hypotheses for later empirical research but simply cannot reach generalizable conclusions about any literature as a whole.

69. Regarding validity of studies on change, an extraordinary standard of what qualifies as valid is likely at play. As noted in my earlier declaration, the APA (2009) Report provided extremely rigorous methodological standards (e.g., random controls and longitudinal design) that conveniently eliminated all studies of contemporary professional SOCE. In fact, the Report's methodological standards eliminated from consideration all but six studies of SOCE generally, studies conducted between 1969 and 1978 using samples of men mostly in court-ordered or other mandated treatment for psychiatric and sexual concerns, sometimes facing criminal or legal penalties. This is a far cry from modern professional SOCE participants, who tend to be motivated by religious conviction. It must be said in this context that by these standards, there are also no valid studies of harm from professional change-allowing talk therapies. As Jones et al. (2010) noted, "The standard with regards to efficacy is to rule out substandard studies as irrelevant. No such standards appear to be used with regard to studies of harm" (p. 9).

70. As for research showing all forms of "conversion therapy" pose a serious risk of harm to gender diverse people, this is a curious conclusion of certainty given Cantor's (2018) detailed assessment that "*there are no studies of conversion therapy for gender identity.*" He later observes, "...in the context of GD [gender dysphoric] children, it simply makes no sense to refer to external 'conversion': The majority of children 'convert' to cisgender or 'desist' from transgender *regardless* of any attempt to change them." (p. 2; author's emphasis).

71. As outlined in my earlier declaration, there is an abundance of studies that are consistent with the possibility of nonheterosexuality being causally influenced by childhood sexual abuse for some individuals. These studies are correlational and not longitudinal and hence cannot "prove" a causal pathway in either direction. My statements accurately reflect this reality. However, asserting such studies provide "no credible evidence" is to speculate beyond what the research can tell us. Again, good therapists *listen* to their clients, some of whom have determined sexual abuse in childhood contributed to the development of their same-sex attractions. The pertinent research gives us no reason to dismiss these clients' beliefs even when political and legal advocacy may make such dismissals an enticing practice.

72. To cite just one further example, Walker, Archer, and Davies (2005) studied 40 men who had been raped by men between the ages of 16 and 25. Among their findings they reported, "Several men reported changes in their sexual behavior after the assault...One described his sexual experience after his assault as one of promiscuity and sexual compulsion:

> Before the assault I was straight; however, since the assault I have begun to engage in voluntary homosexual activity. This causes me a great deal of distress as I feel I am not really homosexual but I cannot stop myself having sex with men. I feel as if having sex with men I am punishing myself for letting the assault happen in the first place." (p. 76)

Should such a person, be he a minor or adult, be prohibited from exploring same-sex attraction and behavior fluidity in change-allowing talk therapies provided by a licensed therapist? Is such a therapist's only legal option to be to tell this person that psychological experts and their associations have determined sexual abuse cannot cause his same-sex behavior in any way and

thus he must affirm the behavior he finds distressful? This is not *listening* to the client. This is the situation Ordinance 2017-47 appears to create.

73. Finally, declaring there is *no* safe form of "conversion therapy," *all* of which pose significant health risks, wildly overstates the reality for licensed change-allowing talk therapists who do not engage in the caricature of "conversion therapy" portrayed in the Glassgold Declaration. As I have stressed before, there is no scientific way to establish the degree of harms specific to professional SOCE in the absence of studies which control for pre-therapy levels of distress. Furthermore, what is really in question here is not a form of therapy but a particular client goal, i.e., exploring the degree to which change in unwanted same-sex attractions and behaviors may be assisted through talk therapy provided by licensed clinicians. The Defendant's claim more accurately can be translated as saying there is no safe way for a client to explore the possibility of change in psychotherapy, even when voluntarily sought and only involving speech (p. 37), despite the fact change-allowing talk therapies employ mainstream therapeutic approaches to address this goal. While psychotherapy in general can lead to some increased distress for a minority of clients (Lambert, 2013), such confident overstatements implying a universal lack of safety and a certitude of harm, when applied to change-allowing talk therapies, is not scientifically justifiable and appears based in advocacy rather than an objective examination of the literature.

## I. Confirmation Bias: A True Danger When the Science Behind Social and Legal Policy Making is Produced by Ideologically Homogeneous Communities.

74. Confirmation bias is the well-documented tendency of people to search for evidence that will confirm their existing beliefs while also ignoring or downplaying disconfirming evidence. Similarly, confirmation bias leads people to have a less rigorous standard of critical evaluation for information with which they agree than for information with which they disagree. As Duarte et al. (2015) observe:

> Indeed, people are far better at identifying the flaws in other people's evidence gathering than in their own, especially if those other people have dissimilar beliefs. Although such processes may be beneficial for communities whose goal is social cohesion (e.g., a religious or activist movement), they can be devastating for scientific communities by leading to widely accepted claims that reflect the scientific community's blind spots more than they reflect justified scientific conclusions. (p. 8).

75. Certainly, confirmation bias is a characteristic of human reasoning across the sociopolitical spectrum. However, in the current context, as I have repeatedly shown, mental health associations and the community of academic researchers are currently lacking the ideological diversity needed for the public to have confidence their pronouncements regarding change-allowing talk therapies are not tainted by such bias. The field of psychology is shifting evermore leftward, with the ratio of liberals to conservatives now being greater than 10:1 and hardly any conservative students in the pipeline (Duarte et al., 2015). Bailey (2019) puts this even more starkly, "...there can be no doubt that sex research is among the most ideologically suspect of disciplines" (p. 1010). He cites the alleged progress surrounding transgender issues as an example:

> But this "progress" has nothing to do with scientific advances and everything to do with ideology. Considering any of the following is ideologically off limits for the progressive: Whether a male who says he is a woman may differ importantly from natal women; whether an adolescent girl who decides she is transgender might be wrong; whether gender dysphoric children should be required to wait before "gender affirmation;" or whether transgender males who dislike autogynephilia theory may be in denial…I have never been as worried about the future of sex research specifically, and social science generally, as I have been in recent years. (p. 1010).

Thus, the most dangerous risk from confirmation bias in the current professional and legal debates over change-allowing talk therapies is the premature foreclosing on what we may learn from science in order for some to achieve political and legal advocacy goals.

76. In the study of sexual orientation, confirmation bias has likely contributed to several conclusions that were politically expedient at the time but later turned out to be inaccurate. For example, Schumm (2018) noted that, "For decades some, if not most scholars have denied any relationship between parental and child sexual orientation" (p. 113). He concluded, "I think this has to be one of the better examples of how scientists can get their science or facts very wrong. There are now dozens of studies that appear to refute the 'no difference' hypothesis with only a few studies that do not essentially refute it" (p. 135). A recent example of studies refuting the "no difference" conventional wisdom (Gartrell, Bos, & Koh, 2019) concluded, "Our findings suggest that being raised by sexual minority parents may lead to more diverse sexual expression for both female and male offspring, and a greater likelihood of same-sex attraction and sexual minority identity" (p. 8).

77. The professional and academic environment within which professional SOCE is being debated is ripe for confirmation bias, with ideologically left-of-center dominance of professional mental health association leadership and the community of academic psychology. For example, confirmation bias is a probable factor in the APA's 2009 Report, given the exclusion of conservative psychologists from the task force. This helps explain how such different evidentiary standards were utilized for determining efficacy of and harm from SOCE. "The Report," notes Jones et al. (2010), "goes to some lengths to argue that only the most rigorous methodological designs can clearly establish a causal relationship between SOCE methods and resulting change, yet the Report makes such causal attributions consistently regarding harm while repudiating any such claims for efficacy" (p. 10).

78. When the focus is on subject matter where the APA has a vested interest in downplaying harm, the rigorous standards that were used to evaluate SOCE efficacy suddenly become utilized to evaluate potential harms. Consider the subject of abortion. In 2008, the APA released its *Report of the APA Task Force on Mental Health and Abortion* (APA, 2008). This report reviewed the literature on psychological harms attributed to abortion and noted many of the same methodological limitations noted by the APA 2009 Task Force review of SOCE. These included small sample sizes, retrospective reports, uncertain reliability and validity of outcome measures, lack of longitudinal designs, and lack of controls for pre-existing and co-occurring conditions. However, the 2008 APA Task Force applied these rigorous methodological standards

to the literature purporting mental health *harms* from abortion while the 2009 APA Task Force applied them only to the issue of SOCE *efficacy* and not to alleged harms. Adler, David, Major, Roth, Russo, and Wyatt (1992), foreshadowed the 2008 APA task force by using similarly stringent methodological criteria to eliminate from their review studies that suggested psychological harms from abortion.

79. This contrast, wherein the standards for methodological acceptability are applied in an extremely rigorous manner to dismiss studies suggesting SOCE efficacy and abortion harms, but applied in a very lax manner to the studies on alleged SOCE harms, is consistent with the influence of confirmation bias among left-of-center social scientists. The 2008 APA Report regarding the mental health problems attributed to abortion concludes in a fashion that would have been equally applicable to purported professional SOCE harms had the APA been consistent in its application of its methodological critique:

> This report has highlighted the methodological failings that are pervasive in the literature on abortion and mental health. This focus on methodological limitations raises the question of whether empirical science is capable of informing understanding of the mental health implications of and public policy related to abortion. (p. 92)

The same scientific humility should be appropriately applied to the research alleging harms from change-allowing talk therapies, but this would not be in keeping with the dictates of confirmation bias, not to mention APA and academia's advocacy interests.

80. Even the Glassgold Declaration citing the APA's criticism of "conversion therapy" studies seems to be influenced by confirmation bias. For example, consider how the declaration's following analysis can be turned on its head but remain equally accurate when substituting the struck through terms with the bracketed terms:

> ....subjects in studies purporting to validate CT [harms] were often referred by ~~CT practitioners~~ [anti-SOCE advocates] or were referred by ~~"ex gay"~~ [LGBT] organizations. This "sampling bias" runs counter to the scientific standard of trying to find a broad range of participants, and renders the results unreliable. When working with small communities or ~~faith~~ [sexual minority] groups, participants should be randomly selected from as many potential participants to avoid bias. Selecting only participants who have been "chosen" by ~~pro-SOCE practitioners~~ [anti-SOCE advocates] or that are selected from ~~a specific program~~ [an LGBT venue or network] risks selecting only those who are biased ~~in favor of~~ [against] a particular result, or avoiding those who have been ~~harmed~~ [helped] or feel the experience is a ~~failure~~ [success]. (APA, 2009, p. 32-33)

81. These examples underscore the potential for confirmation bias to shape scientific and professional perspectives and this must be acknowledged in the debates over politically and morally contentious subjects such as professional SOCE. Therefore, the science concerning

change-allowing talk therapies is very likely to be incomplete and should not be prematurely foreclosed by legal intrusions such as Ordinance 2017-47. Ideologically diverse research teams should be encouraged as a check on confirmation bias (e.g., Lefevor, Beckstead, Schow, Raynes, Mansfield, & Rosik, 2018) or, in their absence, ideologically diverse perspectives on SOCE should be solicited. The truly science-based response to important professional practice questions imbued with intense political ramifications should be further research. In the absence of an extensive and unambiguous base of scientific evidence relative to professional SOCE, ideologically diverse science, not the political process, should settle controversies over change-allowing talk therapies. However, this can only occur if the normal process of science is allowed to run its course and is not derailed by legal prohibitions such as Ordinance 2017-47.

**III. Summary.**

82. The Glassgold Declaration notwithstanding, there is good reason to reject Ordinance 2017-47 as a scientifically unjustified prohibition on the goals of those minor clients who, after careful professional screening, are judged to be making self-determined choices to purse change-allowing talk therapy with a licensed therapist. As I noted in my earlier declaration, the same mental health associations, academic researchers, and politicians that wish to prohibit professional change-allowing talk therapies for minors without exception also are willing to allow for circumstances whereby gender dysphoric minors can voluntarily choose to risk sterility and other serious health complications through the administration of puberty blockers and cross-sex hormones (Hembree et al., 2017; Nota et al., 2019) and, given parental consent, even have healthy body parts altered or removed despite a significant possibility of eventually identifying with their biological sex without such interventions (Murphy, 2019; Olson-Kennedy, Rosenthal, Hastings, & Wesp, 2016; Ristori & Steensma, 2016). Ordinance 2017-47 promotes such options for minors by explicitly excluding from their definition of "conversion therapy" "...counseling that provides support and assistance to a person undergoing gender transition..." (p. 5). Science is the window dressing for this pursuit to ban professional SOCE, but, as the evidence presented in my declarations suggest, science is not the driving force.

83. The Glassgold Declaration does not seriously engage the concerns I outlined in my initial declaration. Instead, the declaration relies on false portrayals of professional change-allowing talk therapies as provided by licensed mental health providers, greatly overstates what can be concluded from more recent SOCE studies, unjustifiably links contemporary change-allowing talk therapies with the literature on stigma and discrimination, relies heavily on appeals to ideologically homogeneous and advocacy-invested sources of authority, and displays in its one-dimensional presentation of the literature the likely presence of confirmation bias.

84. Licensed mental health professionals who sometimes engage in change-allowing talk therapies are ethical providers who understand the need for client self-determination in the context of what current science can and cannot authoritatively say about therapy assisted sexual attraction and behavior fluidity. These therapists are willing to *listen* to clients, both minor and adult, some of whom make self-determined choices to explore change in same-sex attractions and/or behaviors. They do not pressure or otherwise coerce such clients to adopt their views. They understand that in truly ethical psychotherapy the causes of same-sex attractions, the goals of clients, and the religious and moral beliefs concerning same-sex behavior should not be dictated by *either* the therapist *or* their professional associations. Likewise, these sacred freedoms to

believe and act upon those beliefs in the context of professional therapy should not be dictated by the politicians behind Ordinance 2017-47.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and accurate.

Executed this July 17, 2019.

Christopher Rosik, Ph.D.

**REFERENCES**

Academy of Science of South Africa (2015). *Diversity in Human Sexuality: Implications for Policy in Africa*. Pretoria; Author. Retrieved from http://www.assaf.co.za/wp-content/uploads/2015/06/8-June-Diversity-in-human-sexuality1.pdf

Adler, N. E., David, H. P., Major, B. N., Roth, S. H., Russo, N. F., & Wyatt, G. E. (1992). Psychological factors in abortion: A review. *American Psychologist, 47*, 1194-1204. http://dx.doi.org/10.1037/0003-066X.47.10.1194

Al-Gharbi, M. (2018, March 29). Data on how ideological (under) representation compares to (under) representation along the lines of race, gender or sexuality [Web log post]. Retrieved from https://heterodoxacademy.org/ideological-underrepresentation-compared-to-race-gender-sexuality/

Alliance for Therapeutic Choice and Scientific Integrity (2018). Guidelines for the practice of sexual attraction fluidity exploration in therapy. *Journal of Human Sexuality, 9*, 3-58.

American Psychological Association (2008). *Report of the APA Task Force on Mental Health and Abortion*. Retrieved from https://www.apa.org/pi/women/programs/abortion/mental-health.pdf

American Psychological Association. (2009). *Report of the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation*. Retrieved from http://www.apa.org/pi/lgbt/resources/therapeuticresponse.pdf

American Psychological Association (2012). Guidelines for psychological practice with lesbian, gay, and bisexual clients. *American Psychologist, 67*(1), 10-42. http://dx.doi.org/10.1037/a0024659

American Psychological Association (2019a). *About APA*. Retrieved from https://www.apa.org/about/

American Psychological Association (2019b). *APA Apportionment Ballot Results for Composition of Council Seats Council Representation Year 2020*. Retrieved from https://www.apa.org/about/governance/elections/2018-apportionment-results.pdf

American Psychiatric Association (2013). *Diagnostic and Statistical Manual of Mental Disorders* (5th Ed.). Washington, DC: Author.

Andersen, J. P., & Blosnich, J. (2013). Disparities in adverse childhood experiences among sexual minority and heterosexual adults: Results from a multi-state probability-based sample. *Plos One, 8*, 1-7. http://dx.doi.org/10.1371/journal-pone.0054691

Anderssen, E. (2016, February 14). Gender identity debate swirls over CAMH psychologist, transgender program. *The Globe and Mail*. Retrieved from

http://www.theglobeandmail.com/news/toronto/gender-identity-debate-swirls-over-camh-psychologist-transgender-program/article28758828/

Armelli, J. A., Moose, E. L., Paulk, A., & Phelan, J. E. (2013). A response to Spitzer's (2012) reassessment of his 2003 study of reparative therapy of homosexuality. *Archives of Sexual Behavior, 41*, 1335-1336. http://dx.doi.org/10.1007/s10508-012-0032-6

Arnarsson, A., Sveinbjornsdottir, S., Thorsteinsson, E. B., & Bjarnason, T. (2015). Suicidal risk and sexual orientation in adolescence: A population-based study in Iceland. *Scandinavian Journal of Public Health, 43*, 497-505. http://dx.doi.org/10.1177/1403494815585402

Bailey, J. M. (2019). How to ruin sex research. *Archives of Sexual Behavior, 48*, 1007-1011. http://dx.doi.org/10.1007/s10508-019-1420-y

Barringer, M. N., & Gay, D. A. (2017). Happily Religious: The Surprising Sources of Happiness Among Lesbian, Gay, Bisexual, and Transgender Adults. *Sociological Inquiry, 87*, 75-96. http://dx.doi.org/10.1111/soin.12154

Bebbington, P. E., Cooper, C., Minot, S., Brugha, T. S., Jenkins, R., Meltzer, H., & Dennis, M. (2009). Suicide attempts, gender, and sexual abuse: Data from the 2000 British psychiatric mortality survey. *American Journal of Psychiatry, 166*, 1135-1139. http://dx.doi.org/10.1176/appi.ajp.2009.09030310

Beckstead, A. L. (2012). Can we change sexual orientation? *Archives of Sexual Behavior, 41*, 121–134. http://dx.doi.org/10.1007/s10508-012-9922-x

Bedi, S., Nelson, E. C., Lynskey, M. T., McCutcheon, V. V., Heath, A. C., Madden, P. A. F., & Martin, N. G. (2011). Risk for suicidal thoughts and behavior after childhood sexual abuse in women and men. *Suicide and Life-Threatening Behavior, 41*, 406-415. http://dx.doi.org/10.1111/j.1943-278X.2011.00040.x

Bell, A. P., Weinberg, M., & Hammersmith, S. K. (1981). *Homosexuality: A study of diversity among men and women.* New York: Simon & Schuster.

Benoit, M. (2005). Conflict between religious commitment and same-sex attraction: Possibilities for a virtuous response. *Ethics & Behavior, 15*, 309-325. http://dx.doi.org/10.1207/s15327019eb1504_3

Beyer, C., Baral, S. D., van Griensven, F., Goodreau, S. M., Chariyalertsak, S., Wirtz, A., and Brookmeyer, R. (2012, July 28). Global epidemiology of HIV infection in men who have sex with men. *The Lancet, 380,* 366-377. http://dx.doi.org/10.1016/S0140-6736(12)60821-6

Bjorkenstam, C., Andersson, G., Dalman, C., Cochran, S., & Kosidou, K. (2016). Suicide in married couples in Sweden: Is the risk greater in same-sex couples. *European Journal of Epidemiology, 31*, 685-690. http://dx.doi.org/10.1007/s10654-016-0154-6

Bos, H., van Beusekom, G., & Sandfort, T. (2014). Sexual attraction and psychological adjustment in Dutch adolescents: Coping style as a mediator. *Archives of Sexual Behavior, 43*, 1579-88. http://dx.doi.org/10.1007/s10508-014-0308-0

Bradshaw, K., Dehlin, J. P., Crowell, K. A., & Bradshaw, W. S. (2015). Sexual orientation change efforts through psychotherapy for LGBQ individuals affiliated with the Church of Jesus Christ of Latter-Day Saints. *Journal of Sex & Marital Therapy, 41*, 391-412. http://dx.doi.org/10.1080/0092623X.2014.915907

Branstrom, R., & Pachankis, J. E. (2018). Sexual orientation disparities in the co-occurrence of substance use and psychological distress: A national population-based study (2008-2015). *Social Psychiatry and Psychiatric Epidemiology, 53*, 403-412. https://dx.doi.org/10.1007/s00127-018-1491-4

Burgess, D., Lee, R., Tran, A., & van Ryn, M. (2007). Effects of perceived discrimination on mental health and mental health services utilization among gay, lesbian, bisexual and transgender persons. *Journal of LGBT Health Research, 3*, 1-14.

Cantor, J. (2018, October 17). American Academy of Pediatrics policy and trans-kids: Fact-checking [Web log post]. Retrieved from http://www.sexologytoday.org/2018/10/american-academy-of-pediatrics-policy.html

Centers for Disease Control (2011). *HIV and AIDS among Gay and Bisexual Men*. Retrived from http://www.cdc.gov/nchhstp/newsroom/docs/2012/CDC-MSM-0612-508.pdf

Centers for Disease Control (2019). *HIV in the United States and Dependent Areas*. Retrieved from http://www.cdc.gov/hiv/statistics/overview/ataglance.html

City of Tampa Ordinance 2017-47, An Ordinance Of The City Of Tampa, Florida, Relating To Conversion Therapy On Patients Who Are Minors (and all publications cited therein).

Cochran, S. D, & Mays, V. M. (2007). Physical health complaints among lesbians, gay men, and bisexual and homosexually experienced heterosexual individuals: Results from the California Quality of Life Survey. *American Journal of Public Health, 91*, 2048-2055. http://dx.doi.org/10.2105/AJPH.2006.087254

Cummings, N. A., & O'Donahue, W. T. (2008). *Eleven blunders that cripple psychotherapy in America: A remedial unblundering*. New York: Rougledge.

Dehlin, J. P., Galliher, R. V., Bradshaw, W. S., Hyde, D. C., & Crowell, K.A. (2015). Sexual orientation change efforts among current or former LDS church members. *Journal of Counseling Psychology, 62*, 95-105. http://dx.doi.org/10.1037/cou0000011

Denton, F. N., Rostosky, S. S., & Danner, F. (2014). Stigma-related stressors, coping self-efficacy, and physical health in lesbian, gay, and bisexual individuals. *Journal of Counseling Psychology, 61*, 383-391. http://dx.doi.org/10.1037/a0036707

Diamond, L. M., & Lucas, S. (2004). Sexual-minority and heterosexual youths' peer relationships: Experiences, expectations, and implications for well-being. *Journal of Research on Adolescence, 14*, 313-340. http://dx.doi.org/10.1111/j.1532-7795.2004.00077.x

Diamond, L. M., & Rosky, C. J. (2016). Scrutinizing immutability: Research on sexual orientation and U.S. legal advocacy for sexual minorities. *Journal of Sex Research, 53*, 363-391. http://dx.doi.org/10.1080/00224499.2016.1139665

Dreger, A. (2012). *How to ex an "ex-gay" study*. Web log post retrieved from http://psychologytoday.com/blog/fetishes-i-dont-get/201204/how-ex-ex-gay-study

Dresher, J., Schwartz, A., Casoy, F., McIntosh, C. A., Hurley, B., Ashley, K.,…and Tompkins, A. (2016). The growing regulation of conversion therapy. *Journal of Medical Regulation, 102,* 7-12.

Duarte, J. L., Crawford, J. T., Stern, S., Haidt, J., Jussim, L., & Tetlock, P. E. (2015). Political diversity will improve psychological science. *Behavioral and Brain Sciences*, *38*, 1-13. http://dx.dor.org/10.1017/S0140525X14000430

de Graaf, R., Sandfort, T. G. M., & ten Have, M. (2006). Suicidality and sexual orientation: differences between men and women in a general population-based sample from the Netherlands. *Archives of Sexual Behavior, 35,* 253-262. http://dx.dor.org/10.1007/s10508-006-9020-z

Eskin, M., Kaynak-Demir, H., & Demir, S. (2005). Same-sex sexual orientation, childhood sexual abuse, and suicidal behavior in university students in Turkey. *Archives of Sexual Behavior, 34*, 185-195. http://dx.doi.org/10.1007/s10508-005-1796-8

First Amended Verified Complaint for Declaratory, Preliminary And Permanent Injunctive Relief, and Damages (Doc. 78, June 12, 2018), *Vazzo, et al. v. City of Tampa, Fla.*, No. 8:17-cv-02896-CEH-AAS, U.S. Dist. Ct., M.D. Fla.

Flentje, A., Heck, N. C., Cochran, B. N. (2013). Sexual reorientation therapy interventions: Perspectives of ex-ex-gay individuals. *Journal of Gay & Lesbian Mental Health, 17*, 256-277. http://dx.doi.org/10.1080/19359705.2013.773268.

Freedman, M. S., Marshal, M. P., Guadamuz, T. E., Wei, C., Wong, C. F., Saewyc, E. M., & Stall, R. (2011). A meta-analysis of disparities in childhood sexual abuse, parental physical abuse, and peer victimization among sexual minority and sexual nonminority

individuals. *American Journal of Public Health, 101*, 1481-1494. http://dx.doi.org/10.2105/AJPH.2009190009

Gartrell, N., Bos, H., & Koh, A. (2019). Sexual attractions, sexual identity, and same-sex experiences of adult offspring in the U.S. National Longitudinal Lesbian Family study. *Archives of Sexual Behavior*. Advance online publication. http://dx.doi.org/10.1007/x10508-019-1434-5

Goldbach, J. T., Tanner-Smith, E. E., Bagwell, M., & Dunlap, S. (2014). Minority stress and substance use in sexual minority adolescents: A meta-analysis. *Prevention Science, 15*, 350-363. http://dx.doi.org/10.1007/s11121-013-0393-7

Hallman, J. M., Yarhouse, M. A., & Suarez, E. C. (2018). Shame and psychosocial development in religiously affiliated sexual minority women. *Journal of Psychology and Theology, 46*, 3-21. http://dx.doi.org/10.1177/0091647117748450

Hatzenbeuhler, M. L. (2009). How does sexual minority stigma "get under the skin"? A psychological mediation framework. *Psychological Bulletin, 135*, 707–730. http://dx.doi.org/10.1037/a001644

Hatzenbuehler, M. L., Keyes, K. M., & Hasin, D. S. (2009). State-level policies and psychiatric morbidity in lesbian, gay, and bisexual populations. *American Journal of Public Health, 99*, 2275-2281. http://dx.doi.org/10.2105/AJPH.2008.153510

Hatzenbuehler, M. L., Nolen-Hoeksema, S., & Dovidio, J. (2009). How does stigma "get under the skin"? The mediating role of emotion regulation. *Psychological Science, 20*, 1282-1289.

Hembree, W. C., Cohen-Kettenis, P. T., Gooren, L., Hannema, S. E., Meyer, W. J., Murad, M. H.…T'Sjoen, G. G. (2017). Endocrine treatment of gender-dysphoric/gender-incongruent persons: An Endocrine Society clinical practice guideline. *Journal of Clinical Endocrinology and Metabolism, 102*, 3869–3903. http://dx.doi.org/10.1210/jc.2017-01658

Herek, G. M., Norton, A. T., Allen, T. J., & Sims, C. L. (2010). Demographic, psychological, and social characteristics of self-identified lesbian, gay, and bisexual adults in a US probability sample. *Sexuality Research and Social Policy, 7*, 176-200.

Huebner, D. M., Neilands, T. B., Rebchook, G. M., & Kegeles, S. M. (2011). Sorting through chickens and eggs: A longitudinal examination of the associations between attitudes, norms, and sexual risk behaviors. *Health Psychology, 30*(1), 110-118. http://dx.doi.org/10.1037.a0021973

Jannini, E. A., Blanchard, R., Camperio-Ciani, A., & Bancroft, J. (2010). Male homosexuality: Nature or culture? *Journal of Sex Medicine, 7*, 3245-3253. http://dx.doi.org/10.1111/j.1743-6109.2010.01014.x

Jayson, S. (2011, August 5). Citing new research, psychology group supports gay marriage. *USA Today*. Retrieved from http://usatoday30.usatoday.com/news/health/wellness/marriage/story/2011/08/Citing-new-research-psychology-group-supports-gay-marriage/49798054/1

Jones, S. L., Rosik, C. H., Williams, R. N., & Byrd, A. D. (2010). A Scientific, Conceptual, and Ethical Critique of the Report of the APA Task Force on Sexual Orientation. *The General Psychologist, 45*(2), 7-18. Retrieved May 31, 2011, from http://www.apa.org/divisions/div1/news/fall2010/Fall%202010%20TGP.pdf

Joshanloo, M. (2018). Cultural religiosity as the moderator of the relationship between affective experience and life satisfaction: A study in 147 countries. *Emotion.*. Advance online publication. http://dx.doi.org/10.1037/emo0000469

Jussim, L., Crawford, J. T., Stevens, S. T., Anglin, S. M., & Duarte, J. L. (2016). Can high moral purposes undermine scientific integrity? In J. P. Forgas, L. Jussim, & P. A. M. Van Lange (Eds.). *Sydney symposium of social psychology. The social psychology of morality* (pp. 173-195). New York, NY: Routledge/Taylor & Francis Group.

Kearns, M. (2018, October 10). Don't let transgender activists politicize child health care. *National Review*. Retrieved from https://www.nationalreview.com/2018/10/dont-let-transgender-activists-politicize-child-health-care/

Lambert, M. J. (2013). The efficacy and effectiveness of psychotherapy. In Michael J. Lambert (Ed.), *Bergin and Garfield's Handbook of Psychotherapy and Behavior Change* (6th Edition), (pp. 169-218). Hoboken, NJ: Wiley.

Lefevor, G. T., Beckstead, A. L., Schow, R. L., Raynes, M., Mansfield, T. R., & Rosik, C. H. (2018). Satisfaction and health options within for sexual identity relationship options. *Journal of Sex & Marital Therapy*. Advance online publication. https://dx.doi.org/10.1080/0092623X.2018.1532333

Lefevor, G. T., Sorrell, S. A., Kappers, G., Plunk, A., Schow, R. L., & Rosik, C. H. (2019). Same-sex attraction, not LGBQ: The implications of sexual identity labeling on religiousness, sexuality and health among Mormons. *Journal of Homosexuality*. Advance online publication. http://dx.doi.org/10.1080/00918369.2018.1564006

Lick, D. J., Durso, L. E., & Johnson, K. L. (2013). Minority stress and physical health among sexual minorities. *Perspectives on Psychological Science, 8*, 521-548. http://dx.doi.org/10.1177/1745691613497965

Livingston, N. A., Oost, K. M., Heck N. C., & Cochran, B. N. (2014). The role of personality in predicting drug and alcohol use among sexual minorities. *Psychology of Addictive Behavior*. Advance online publication. http://dx.doi.org/10.1037/adb0000034

Mallory, C., Brown, T. N. T., & Conron, K. J. (2018, January). *Conversion therapy and LGBT youth*. Los Angeles, The Williams Institute, UCLA School of Law. Retrieved from https://williamsinstitute.law.ucla.edu/wp-content/uploads/Conversion-Therapy-LGBT-Youth-Jan-2018.pdf

Mallory, C., Brown, T. N. T., & Conron, K. J. (2019, June). *Update: Conversion therapy and LGBT youth*. Los Angeles, The Williams Institute, UCLA School of Law. Retrieved from https://williamsinstitute.law.ucla.edu/demographics/conversion-therapy-and-lgbt-youth/

Martin, C. C. (2016). How ideology has hindered sociological insight. *American Sociologist, 47*, 115-130. http://dx.doi.org/10.1007/s12108-015-9263-z

Mays, V. M., & Cochran, S. D. (2001). Mental health correlates of perceived discrimination among lesbian, gay, and bisexual adults in the United States. *American Journal of Public Health, 91*, 1869-1876.

McGarrity, L. A. (2014). Socioeconomic status as context for minority stress and health disparities among lesbian, gay, and bisexual individuals. *Psychology of Sexual Orientation and Gender Diversity, 1*, 383-397. http://dx.doi.org/10.1037/sgd0000067

Meyer, I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. *Psychological Bulletin, 129*, 674-697. http://dx.doi.org/10.1037/0033-2909.129.5.674

Murphy, T. F. (2019). Adolescents and body modification for gender identity expression. *Medical Law Review*. Advance online publication. http://dx.doi.org/10.1093/medlaw/fwz006  Retrieved from https://academic.oup.com/medlaw/advance-article/doi/10.1093/medlaw/fwz006/5475457

Mustanski, B., Kuper, L., & Greene, G. J. (2014). Development of sexual orientation and identity. In L. Diamond (Ed.), *APA Handbook of Sexuality and Psychology* (pp. 597-628). Washington, DC: APA.

Newcomb, M. E., & Mustanski, B. (2011). Moderators of the relationship between internalized homophobia and risky sexual behavior in men who have sex with men: A meta-analysis. *Archives of Sexual Behavior, 40*, 189-199. http://dx.doi.org/10.1007/s10508-009-9573-8

Nota, N. M., Wiepjes, C. M., de Blok, C. J. M., Gooren, L. J. G., Kreukels, B. P. C., & den Heijer, M. (2019, March 12). Occurrence of acute cardiovascular events in transgender individuals receiving hormone therapy: Results from a large cohort study. *Circulation, 139*, 1-2. http://dx.doi.org/10.1161/CIRCULATIONAHA.118.038584

Olson-Kennedy, J., Rosenthal, S. M., Hastings, J, & Wesp, L. (2016, June). Health considerations for gender non-conforming children and transgender adolescents. UCSF transgender care. Retrieved from https://transcare.ucsf.edu/guidelines/youth

Oswalt, S. B., & Wyatt, T. J. (2013). Sexual health behaviors and sexual orientation in a U.S. national sample of college students. *Archives of Sexual Behavior, 42*, 1561–1572. http://dx.doi.org/10.1007/s10508-012-006-9

Outlaw, A. Y., Phillips, G., Hightow-Weidman, L. B., Fields, S. D., Hidalgo, J.,…& Green-Jones, M. (2011). Age of MSM sexual debut and risk factors: Results from a multisite study of racial/ethnic minority YMSM living with HIV [Supplement 1]. *AIDS patient care and STDs, 25*, S23-S29. http://dx.doi.org/10.1089/apc.2011.9879

Parent, M. C., Brewster, M. E., & Cook, S. W. (2018). Is minority stress in the eye of the beholder? A test of minority stress theory with Christians. *Journal of Religion and Health, 57*, 1690-1701. http://dx.doi.org/10.1007/s10943-017-0550-6

Pascoe, E. A., & Richman, L. S. (2009). Perceived discrimination and health: A meta-analytic review. *Psychological Bulletin, 135*, 531-554. http://dx.doi.org/10.1037/a0016059

Pawar, D. P. (2017). Happiness as loss of self. *Indian Journal of Positive Psychology, 8*, 659-662.

Pearson, J., & Wilkinson, L. (2013). Family relationships and adolescent well-being: Are families equally protective for same-sex attracted youth? *Journal of Youth and Adolescence, 42*, 376-393. http://dx.doi.org/10.1007/s10964-012-9865-5

Peter, T., Edkins, T., Watson, R., Adjei, J., Homma, Y., & Saewyc, E. (2017). Trends in suicidality among sexual minority and heterosexual students in a Canadian population-based cohort study. *Psychology of Sexual Orientation and Gender Diversity, 4*, 115-123. http://dx.doi.org/10.1037/sg0000211

Prejean, J., Song, R., Hernandez, A., Ziebell, A., Green, T., et al. (2011). Estimated HIV incidence in the United States, 2006-2009. *PLos ONE, 6*, 1-13. http://dx.doi.org/10.1371/journal.pone.0017502.

Rafferty, J. (2018). Ensuring comprehensive care and support for transgender and gender-diverse children and adolescents. *Pediatrics, 142*, e20182162. http://dx.doi.org/10.1542/peds.2018-2162

Ristori, J., & Steensma, T. D. (2016). Gender dysphoria in childhood. *International Review of Psychiatry, 28*, 13-20. http://dx.doi.org/10.3109/09540261.2015.1115754.

Rizza, A. (2018, October 8). CAMH to pay more than half a million settlement to head of gender identity clinic after releasing fallacious report. *National Post*. Retrieved from https://nationalpost.com/news/camh-reaches-settlement-with-former-head-of-gender-identity-clinic

Rosario, M., Wypij, D., Roberts, A. L., Corliss, H. L., Charlton, B. M., Frazier, A. L., & Austin, S. B. (2016). Disparities by sexual orientation in frequent engagement in cancer-related

risk behaviors: A 12-year follow-up. *American Journal of Public Health, 106*, 698-706. http://dx.doi.org/10.2105/AJPH.2015.302977

Rosik, C. H., & Popper, P. (2014). Clinical approaches to conflicts between religious values and same-sex attractions: Contrasting gay-affirmative, sexual identity, and change-oriented models of therapy. *Counseling & Values, 59*, 222-237. http://dx.doi.org/10.1002/j.2161-007X.2014.00053.x

Rothman, E. F., Exner, D., & Baughman, A. L. (2011). The prevalence of sexual assault against people who identify as gay, lesbian, or bisexual in the United States: A systemic review. *Trauma, Violence, & Abuse, 12*, 55-66. http://dx.doi/org/10.1177/1524838010390707

Ryan, C., Toomey, R. B., Diaz, R. M., & Russell, S.T. (2018).  Parent-Initiated sexual orientation change efforts with LGBT adolescents: Implications for young adult mental health and adjustment. *Journal of Homosexuality*. Advance online publication. http://dx.doi.org/10.1080/00918369.2018.1538407

Saewyc, E. M. (2011). Research on adolescent sexual orientation: Development, health disparities, stigma, and resilience. *Journal of Research on Adolescence, 21*, 256-272. http://dx.doi/org/10.1111/j.1532-7795.2010.00727.x

Sandfort, T. G. M., Bakker, F., Schellevis, F. G., & Vanwesenbeeck, I. (2006). Sexual orientation and mental and physical health status: Findings from a Dutch Population Survey. *American Journal of Public Health, 96*, 1119-1125. http://dx.doi.org/10.2105/AJPH.2004.058891

Sandfort, T. G. M., Bakker, F., Schellevis, F. G., & Vanwesenbeeck, I. (2009). Coping styles as mediator of sexual orientation-related health differences. *Archives of Sexual Behavior, 38*, 253-263. http://dx.doi.org/10.1007/s10508-007-9233-9

Sandfort, T. G. M., de Graaf, R., ten Have, M., Ransome, Y., & Schnabel, P. (2014). Same-sex sexuality and psychiatric disorders in the second Netherlands Mental Health Survey and Incidence Study (NEMESIS-2). *LGBT Health, 1*, 292-3-1.

Savin-Williams, R. C. (2006). Who's gay? Does it matter? *Current Directions in Psychological Science, 15*, 40-44.

Savin-Williams, R. C., & Vrangalova, Z. (2013). Mostly heterosexual as a distinct sexual orientation group: A systemic review of the empirical evidence. *Developmental Review, 33*, 55-88. http://dx.doi.org/10.1016/j.dr.2013.01.001

Schmitt, M. T., Branscombe, N. R., Postmes, T., & Garcia, A. (2014). The consequences of perceived discrimination for psychological well-being: A meta-analytic review. *Psychological Bulletin, 140*, 921-948. http://dx.doi.org/10.1037/a0035754

Schumm, W. R. (2014). Intergenerational transfer of parental sexual orientation and other myths. *International Journal of the Jurisprudence of the Family*, *4*, 267-433

Schumm, W. R. (2018). *Same-sex parenting research: A critical assessment.* London: Wilberforce Publications Limited

Semlyen, J., King, M., Varney, J., & Hagger-Johnson, G. (2016). Sexual orientation and symptoms of common mental disorder or low wellbeing: Combined meta-analysis of 12 UK population health surveys. *BMC Psychiatry, 16*, 67. http://dx.doi.org/10.1186/s12888-016-0767-z

Shao, J., Chang, E. S., & Chen, C. (2018). The relative importance of parent-child dynamics and minority stress on the psychological adjustment of LGBs in China. *Journal of Counseling Psychology, 65*, 598-604. http://dx.doi.org/10.1037/cou0000281

Shidlo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumer's report. *Professional Psychology: Research and Practice*, *33*, 249-259. http://dx.doi.org/10.1037//0735-7028.33.3.249

Singal, J. (2016, February 7). How the fight over transgender kids got a leading sex researcher fired. *New York Magazine.* Retrieved from http://nymag.com/scienceofus/2016/02/fight-over-trans-kids-got-a-researcher-fired.html

Skerrett, D. M., Kolves, K., & De Leo, D. (2014). Suicides among lesbian, gay, bisexual, and transgender populations in Australia: An analysis of the Queenland Suicide Register. *Asia Pacific Psychiatry*, *6*, 440-446. http://dx.doi.org/10.1111/apply.12128

Spitzer, R. L. (2003). Can some gay men and lesbians change their sexual orientation? 200 participants reporting a change from homosexual to heterosexual orientation. *Archives of Sexual Behavior, 32*(5), 403-417.

Spitzer, R. L. (2012). Spitzer reassess his 2003 study of reparative therapy of homosexuality [Letter to the editor]. *Archives of Sexual Behavior, 41*, 757-757. http://dx.doi.org/10.1007/s10508-012-9966-y

Substance Abuse and Mental Health Services Administration, Ending conversion therapy: Supporting and affirming LGBTQ youth. HHS Publication No. (SMA) 15-4928. Rockville, MD: Substance Abuse and Mental Health Services Administration, 2015.

Swartz, J. A. (2015). The relative odds of lifetime health conditions and infectious diseases among men who have sex with men compared with a matched general population sample. *American Journal of Men's Health*, *9*,150-62. http://dx.doi.org/10.1177/1557988314533379

Tamir, M., Schwartz, S. H., Oishi, S., & Kim, M. Y. (2017). The secret to happiness: Feeling good or feeling right? *Journal of Experimental Psychology: General, 146*, 1448-1459. http://dx.doi.org/10.1037/xge0000303

Trocki, K. F., Drabble, L. A., & Midanik, L. T. (2005). Use of heavier drinking contexts among heterosexuals, homosexuals, and bisexuals: Results from a national household probability survey. *Journal of Studies on Alcohol, 66*, 105-110.

Trocki, K. F., Drabble, L. A., & Midanik, L. T. (2009). Tobacco, marijuana, and sensation seeking: Comparisons across gay, lesbian, bisexual, and heterosexual groups. *Psychology of Addictive Behaviors, 23*, 620-631. http://dx.doi.org/10.1037/a0017334

Turkheimer, E. (2011). Genetics and human agency: Comment on Dar-Nimrod and Heine (2011). *Psychological Bulletin, 137*(5), 825-828. Doi: 10.1037/a0024306

Vrangalova, Z., & Savin-Williams, R. C. (2014). Psychological and physical health of mostly heterosexuals: A systemic review. *Journal of Sex Research, 31*, 410-455. http://dx.doi.org/10.1080/00224499.2014.883589

Wald, M. S. (2006). Adults' sexual orientation and state determinations regarding placement of children. *Family Law Quarterly, 40*, 381-434.

Walker, J., Archer, J., & Davies, M. (2005). Effects of rape on men: A descriptive analysis. *Archives of Sexual Behavior, 34*, 69-80. http://dx.doi.org/10.1007/s10508-005-1001-0

Walker, J. J., & Longmire-Avital, B. (2013). The impact of religious faith and internalized homonegativity on resiliency for black lesbian, gay, and bisexual emerging adults. *Developmental Psychology, 49,* 1723-1731. http://dx.doi.org/10.1037/a0031059

Wang, J., Ploderl, M., Hausermann, M., & Weiss, M. G. (2015). Understanding suicide attempts among gay men from their self-perceived causes. *Journal of Nervous and Mental Disease, 7*, 499-506. http://dx.doi.org/10.1097/NMD.0000000000000319

Wells, J. E., McGee, M. A., & Beautrais, A. L. (2011). Multiple aspects of sexual orientation: Prevalence and sociodemographic correlates in a New Zealand national survey. *Archives of Sexual Behavior, 40*, 155-169. http://dx.doi.org/10.1007/s10508-010-9636-x

Whitehead, N. E. (2010). Homosexuality and co-morbidities: Research and therapeutic implications. *Journal of Human Sexuality, 2*, 124-175. Retrieved from https://docs.wixstatic.com/ugd/ec16e9_996981251933490a96b5c7098b4719ad.pdf

Whitehead, N. E. (2011). Sociological studies show social factors produce adult SSA. *Journal of Human Sexuality, 3*, 115–136. Retrieved from https://docs.wixstatic.com/ugd/ec16e9_ccbd1fbeba4040799e4c448d13267d4d.pdf

Xu, Y., & Zheng, Y. (2015). Prevalence of childhood sexual abuse among lesbian, gay, and bisexual people: A meta-analysis. *Journal of Child Sexual Abuse, 24*, 315-331. http://dx.doi.org/10.1080/10538712.2015.1006746

Zietsch, B. P. (2012). Explanations for elevated psychiatric vulnerability in nonheterosexuals. Environmental stressors, genetics, and the HPA and HPG axes.  In T. Uehara (Ed.) *Psychiatric disorders: Worldwide advances* (pp. 277-300). Rijeka, Croatia: InTech.