# EXHIBIT

# 5

# (Deposition of Bernard Hudson, M.D.)

Page 1

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT L. VAZZO, LMFT,
individually and on behalf
of his patients, DAVID H.
PICKUP, LMFT, individually
and on behalf of his
patients, and SOLI DEO
GLORIA INTERNATIONAL, INC.,   CASE NO:
d/b/a NEW HEARTS OUTREACH   8:17-cv-02896-WFJ-
TAMPA BAY, individually and   AAS
on behalf of its members,
constituents and clients,
          Plaintiffs,
vs.

CITY OF TAMPA, FLORIDA,

          Defendant.

*********************************************************

DEPOSITION OF:       BERNARD HUDSON, M.D.
TAKEN:        PURSUANT TO NOTICE
          COUNSEL FOR DEFENDANT

DATE:        July 30, 2019

TIME:        9:00 a.m. - 3:16 p.m.

LOCATION:       Burr & Forman, LLP
          201 North Franklin Street
          Tampa, Florida

REPORTED BY:       ELSA M. HERNANDEZ, FPR
          Notary Public

Page 2

1   APPEARANCES:
2
      ROGER K. GANNAM, ESQUIRE
3     HORATIO G. MIHET, ESQUIRE
      Liberty Counsel
4     P.O. Box 540774
      Orlando, Florida 32854
5     rgannam@lc.org
      hmihet@lc.org
6
        Appearing on behalf of the Plaintiffs
7
8     ROBERT V. WILLIAMS, ESQUIRE
      DANA L. ROBBINS, ESQUIRE
9     Burr & Forman, LLP
      Post Office Box 380
10    Tampa, Florida 33601
      rwilliams@burr.com
11    drobbins@burr.com
12      Appearing on behalf of the Defendant
13
14           I N D E X
15                    PAGE
16  DIRECT EXAMINATION BY MR. WILLIAMS       3
    STIPULATION                   151
17  CERTIFICATE OF OATH            152
    CERTIFICATE OF REPORTER        153
18  ERRATA SHEET                   154
19
20
21           E X H I B I T S
22  FOR IDENTIFICATION          PAGE NO.
23  Exhibit No. 1              52
    (Declaration of Bernard O. Hudson MD)
24
25

Page 3

1       THE COURT REPORTER:  Would you raise your
2   right hand, please.  Do you swear or affirm the
3   testimony that you are about to give will be the
4   truth, the whole truth and nothing but the truth?
5       THE WITNESS:  Yes.
6           BERNARD HUDSON, M.D.,
7   the deponent herein, being duly sworn under oath, was
8   examined and testified as follows:
9           DIRECT EXAMINATION
10  BY MR. WILLIAMS:
11      Q.  Please state your full name, sir.
12      A.  Bernard O'Grady Hudson, III.
13      Q.  Where do you reside, sir.
14      A.  Franklin, Tennessee.
15      Q.  What do you -- do you do work?
16      A.  No.
17      Q.  Are you retired?
18      A.  Yes.
19      Q.  What are you retired from?  What did you do
20  before you retired?
21      A.  I was a physician.
22      Q.  What kind of physician?
23      A.  My specialty was psychiatry.  My subspecialty
24  was child and adolescent psychology.
25      Q.  For how long did you practice psychiatry and

Page 4

1   in particular child and adolescent psychiatry?
2       A.  From 1982 to midnight December 31st, 2018.
3       Q.  Okay.  I have your declaration, and it tells
4   me all about your background, but just for the record,
5   would you bring us up to date as to your educational
6   matriculation, starting with college.
7       A.  I attended the University of California, San
8   Diego from 1975 to 1979.  I was accepted into medical
9   school at Loyola University, Cardinal Stritch School of
10  Medicine in Chicago from July 1st, 1979, until
11  June 30th, 1982.  I then completed an internship and
12  residency at the Medical College of Wisconsin in
13  Milwaukee from 1982 until 1985.  And then on July 1st,
14  1985, I attended the University of California, Davis,
15  School of Medicine, a two-year fellowship, and I
16  finished that June 30th, 1987.
17      Q.  So do you have an MD degree?
18      A.  Yes.
19      Q.  Do you have any other, like a Ph.D. as well?
20      A.  No.
21      Q.  Are you licensed in the state of Tennessee to
22  practice psychiatry and medicine?
23      A.  Yes.
24      Q.  And that license is current?
25      A.  Yes.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)          2b293f70-452a-4746-9273-f93183a2d9b3

Page 5

1    Q.   Where else are you licensed?
2    A.   I retired officially from California, and that
3    license expired under the retirement March 31st, 2019.
4    Q.   So currently you are licensed to practice only
5    in Tennessee, an active license?
6    A.   Correct.
7    Q.   I note from our discussion before this
8    deposition started that you returned to Tennessee a
9    couple of years ago, approximately; correct?
10   A.   Yes.
11   Q.   And where did you return from?
12   A.   We lived in Tarzana, California.
13   Q.   How long did you live in California?
14   A.   November of 2000 until November of 2017.
15   Q.   And did you practice medicine in Tarzana?
16   A.   I practiced medicine in Los Angeles.
17   Q.   You lived in Tarzana but practiced in --
18   A.   In Los Angeles and other cities around in Los
19   Angeles County and one place outside of Los Angeles
20   County, in Ventura County.
21   Q.   Did you have a private practice?
22   A.   Not when I went to Los Angeles.
23   Q.   How did you practice medicine then?  What was
24   your medium?
25   A.   I went to Los Angeles to work with Dr. Doris

Page 6

1    Soghor, who was the supervisor of the juvenile justice
2    program, and I worked with her from November of 2000
3    until August of 2011 and -- which point she retired,
4    and then Christopher Thompson, a medical doctor, a
5    psychiatrist, took over for her, and I worked under him
6    from August of 2011 until I retired November 2018.
7    Q.   How do you spell Dr. Soghor's last name?
8    A.   S-O-G-H-O-R.
9    Q.   And was there a specific reason why you wanted
10   to work with Dr. Soghor?
11   A.   Yes.  When I had -- the reason I did my
12   fellowship in -- at UC Davis is that an individual
13   named Robert Dorn was a psychiatrist there and a child
14   adolescent psychiatrist.  He had worked with Anna Freud
15   and Melanie Klein at the London Clinic, and he had been
16   psychoanalyzed by Melanie Klein, and I wanted to work
17   with him and know him and get consultation from him.
18        He had left Los Angeles.  He had worked with
19   Dr. Soghor's husband, who is a psychoanalytic
20   physician, and so one thing led to another, and I
21   called her in August of 2000.  We had a great
22   conversation, and I had finished my work with the
23   Department of Justice Civil Rights Division.  We had
24   been investigating Georgia and Louisiana juvenile
25   facilities, and they had said that they were about to

Page 7

1    investigate Los Angeles County Juvenile Hall.  So --
2    Q.   They being the Department of Justice.
3    A.   Department of Justice.  And so I went out
4    there to work and to see what they did, and then I was
5    designated the instructor/teacher for probation, mental
6    health services and health services.
7    Q.   By DOJ?
8    A.   By DOJ and by LA County.
9    Q.   And that is how you hooked up with Dr. Soghor
10   eventually?
11   A.   Yes.
12   Q.   How long did you work for the Department of
13   Justice, sir?
14   A.   It was while I was in Tennessee, and I believe
15   it was from 1997 until 2000.
16   Q.   And I noticed from your declaration that you
17   were an adjunct professor at Vanderbilt; is that
18   correct?
19   A.   No.  I was an assistant professor.
20   Q.   Assistant.  Okay.  And when was that, sir?
21   A.   August of 1995 until August of 2000.
22   Q.   Was that a full-time position?
23   A.   Yes.
24   Q.   And that was before you went with DOJ?
25   A.   It was while I was With the Department of

Page 8

1    Justice.
2        (A discussion was held off the record.)
3    BY MR. WILLIAMS:
4    Q.   All right.  So you were with DOJ while you
5    were also an assistant professor at Vanderbilt?
6    A.   Yes.
7    Q.   And in your tenure, during your tenure as an
8    assistant professor of medicine at Vanderbilt, did you
9    teach psychiatry?
10   A.   Yes, I taught psychiatry and child and
11   adolescent psychiatry.
12   Q.   Did you work with residents?
13   A.   Yes.
14   Q.   Did you actually teach classes to the medical
15   students prior to residency?
16   A.   Yes.
17   Q.   You were out in California for a number of
18   years working with Dr. Soghor and Dr. Thompson.  Was
19   there a specific area that you focused on during that
20   part of your professional career?
21   A.   There were three -- three items.  My primary
22   job, which was my focus, was the psychiatric treatment
23   of juveniles in confinement.  LA County has the largest
24   juvenile justice program in the country.  They have
25   three juvenile halls that can hold up to 600 to 700

2 (Pages 5 to 8)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 9

1  youth.  They have 14 to 15 camps that can hold up to
2  2,000 or 3,000 youth.  So that was my primary job.  And
3  within that job, I was teaching courses that were four
4  hours and eight hours, to probation staff, to health
5  services staff, and to mental health services staff.
6         My second position was I was working in the
7  community and I was working at a residential facility
8  and a place downtown in LA.
9         And in the third position, I occasionally flew
10 back to Tennessee to take on forensic cases, primarily
11 out of Nashville and Knoxville.  I think I did three or
12 four of those cases.  They were criminal cases, and I
13 had picked up those cases while I was at Vanderbilt
14 School of Medicine, and then I continued them while I
15 was in Los Angeles for a short period of time.
16      Q.  All right.  Under roman numeral II of your
17 primary declaration -- when I say primary, I'm not
18 talking about the rebuttal declaration.
19         In paragraph 10, which is under roman numeral
20 II, Summary of Opinions, you state in your declaration,
21 "My opinions regarding the lack of scientific
22 justification for Ordinance 2017-47," which is the
23 ordinance which is the subject matter of this lawsuit,
24 "may be summarized as follows."  And then you go down
25 seven separate paragraphs to finish that concept.

Page 10

1         Now, when were you retained to be an expert
2  witness in this case, Doctor?
3      A.  March of this year.
4      Q.  March of 2019?
5      A.  Yes.
6      Q.  And who retained you, or who contacted you?
7      A.  Vernadette Broyles.
8      Q.  Who is Ms. Broyles?
9      A.  She's Vernadette Broyles.
10     Q.  I know she is, but what is her connection?
11     A.  She's an attorney in Georgia.
12     Q.  Do you know why she contacted you?
13     A.  I was sending e-mails to a friend, Jim Hashem,
14 and he was sharing them with Vernadette Broyles because
15 Jim Hashem's wife is Vernadette Broyles' sister.
16     Q.  Okay.  And what does Vernadette Broyles do for
17 a living?  What's her --
18     A.  She's an accomplished attorney.
19     Q.  Where?
20     A.  In Georgia.
21     Q.  What kind of accomplishments does she have?
22     A.  I believe she went to Yale undergrad, Harvard
23 Law School.  She worked for Child Protective
24 Services.  She worked in the Georgia state adoption
25 systems.  And she has done a lot of stuff.  I don't

Page 11

1  have her CV, but I know that she's done a lot of
2  different things.
3      Q.  Okay.  Tell me about your initial conversation
4  with Vernadette Broyles then.
5      A.  By e-mail or phone?
6      Q.  Phone.
7      A.  Okay.
8      Q.  Verbal communication.
9      A.  Say it again.
10     Q.  Verbal communication.
11     A.  Verbal, okay.  We talked by phone the first
12 time.  I was in Southern California, and we talked
13 about her interest in talking with me because she was
14 involved in cases where children and adolescents were
15 telling people in the public school system that they
16 were the opposite sex.  And she got involved in it
17 because the parents were not doing anything that the
18 school wanted them to do, and they were taking the
19 children away from the parents, and then they were --
20     Q.  "They" being?
21     A.  Child Protective Services.
22     Q.  The governmental agency in Georgia, I take it?
23     A.  Yes.  Of which she had worked at since I think
24 the late '90s for like ten years maybe.
25     Q.  She being Vernadette Broyles?

Page 12

1      A.  Vernadette Broyles, yes.
2         And so she was wanting to know if I had any
3  experience with children or adolescents that claimed to
4  be the opposite sex.
5      Q.  Define what you mean "claimed to the opposite
6  sex."  I mean, I think I know, but I want you to
7  articulate on the record.
8      A.  The child or the adolescent at some point
9  during therapy or some point during evaluation would
10 say that "I'm a female" or "I'm a male" when they were
11 clearly not.
12     Q.  In other words, the adolescent would say --
13 would be biologically a male but say "I'm really a
14 female"?
15     A.  Right.
16     Q.  Something like that?
17     A.  Yes.
18     Q.  Okay.  Please go ahead.
19     A.  And so I have -- over the years, I have seen
20 those kinds of individuals in a variety of settings.
21 And so she was asking me experience about that and how
22 long and what basically my CV was and whether or not I
23 was this and that.  And so that was our conversation.
24         The initial conversation took place either in
25 very late February of 2019 or early March of 2019, and

3 (Pages 9 to 12)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 13

1  then she said, "My husband is a Tennessee Volunteer
2  fanatic, and we're coming up to the Nashville area to
3  see them play basketball in the tournament." So we met
4  for lunch.
5       Q.  You and Vernadette?
6       A.  Vernadette Broyles and her --
7       Q.  Husband?
8       A.  No, her brother-in-law, Jim Hashem, and my
9  wife.
10      Q.  Who you knew?
11      A.  So we met for lunch, and then we drove back to
12 our house, and then we spoke that afternoon for about
13 three to four hours.
14      Q.  About what?
15      A.  About me coming alongside to work with her to
16 provide her psychiatric expertise around the issue of
17 psychiatric illness, treatment, and my experience with
18 individuals who claim to be the opposite sex.
19      Q.  Is there a term you use for an adolescent who
20 is male but claims to be female?  Is there a term that
21 we can agree on?
22          MR. GANNAN:  Objection.  Vague.
23      A.  The term that's colloquially used is
24 "transgender."  That's the term that I hear tossed
25 around and I see in the media.  If I work with somebody

Page 14

1  long enough and I'm able to establish a diagnosis, the
2  diagnosis, if they're really distressed by the fact
3  that they feel that they are the opposite sex, then the
4  diagnosis of gender dysphoria is proffered.
5       Q.  That's the reason I asked the question because
6  I'm familiar with the term "transgender."  It's used by
7  a lot people.  I'm more interested in a more medically
8  oriented term, and that term would be?  Say it again,
9  please, for the record.
10      A.  Gender dysphoria, which is a psychiatric term,
11 not a medical term.
12      Q.  Well, psychiatry is a branch of medicine, is
13 it not?
14      A.  I'm trying to be specific for you.
15      Q.  Sure.  I appreciate that.  I'll go with what
16 you said.  It's a psychiatric term that is recognized
17 within the psychiatric profession.  Am I correct?
18      A.  Yes.
19      Q.  And so define for the record "gender
20 dysphoria," just so the record is very clear as to what
21 definition you are ascribing to that two word couplet.
22      A.  This is an individual who, for a minimum time,
23 usually six months, is extremely distressed over the
24 fact that they believe that they are the opposite sex.
25 So if they're a male, they believe they're female.  If

Page 15

1  they're female, they believe they're a male.
2          And they're verbal about it.  Some of their
3  behaviors indicate it.  The parents are concerned.
4  Siblings are concerned.  Peers are concerned, and they
5  tend to vocalize in a variety of settings:  At home,
6  at school, in the community, and especially on social
7  media platforms.
8          So the diagnosis is offered when you see these
9  symptoms and sometimes signs for probably a minimum of
10 six months.
11      Q.  And when you say "distressed," would you
12 elaborate on what you mean by that term?
13      A.  They are upset.  They have episodes of
14 depression.  They have episodes of high anxiety.  They
15 may be using substances.  They may be badgering their
16 parents or peers or friends.  They're extremely
17 disturbed by the sense that they're in the wrong body.
18      Q.  And tell me if you would -- I'm going to
19 circle back.  You've had a lot of experience with
20 adolescents in the Los Angeles area, as you described
21 earlier.  Was that your first introduction to I'll just
22 use the phrase "in the trenches experience with gender
23 dysphoria with adolescents"?
24      A.  No.
25      Q.  When was your first introduction to that?

Page 16

1       A.  I was medical director of a juvenile sex
2  offenders program in Nashville, Tennessee, while I was
3  at Vanderbilt School of Medicine, and we averaged about
4  90 to 100 children and adolescents who had, for
5  whatever reason, been adjudicated and required
6  residential treatment, because they had been involved
7  in sexual activity with someone either older, same age,
8  or younger.
9          And there were individuals that came in
10 stating that they were in the wrong body, that they
11 were the opposite sex, that they were highly distressed
12 about that, and that's my first encounter with it.
13      Q.  What time period would that be?
14      A.  I was at Vanderbilt from August of '95 until
15 August of 2000, and I believe I was at Hermitage Hall
16 from '97 to 2000.
17      Q.  So over 20 years ago when you first had actual
18 practical experience with gender dysphoria.  Is that a
19 good generalization?
20      A.  No.  I was also medical director of a facility
21 called Pine Point in Jackson, Tennessee, and we had, I
22 think, two or three individuals.  Pine Point had a male
23 side and a female side, and the male side was for
24 juvenile sex offenders, but the female side was not.
25 It was just for adolescents who could not stay in the

4 (Pages 13 to 16)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                              2b293f70-452a-4746-9273-f93183a2d9b3

Page 17

1    community or stay at home.  But we had one or two girls
2    that were claiming to be boys, and then we had one or
3    two boys that were claiming to be girls.
4        Q.  What time period are we talking about there?
5        A.  I believe it was from 1993 to 1995.
6        Q.  All right.  So was '93, that period of time,
7    the first time you had actual, I'll call it in the
8    trenches experience with adolescents who are --
9        A.  That was the first time as a physician.
10       Q.  Yes.
11           MR. GANNAN:  Make sure you let him finish his
12       question before you answer.
13       A.  Sorry.
14   BY MR. WILLIAMS:
15       Q.  Well, did you have experience before you
16   became a physician --
17       A.  Well --
18       Q.  -- or not as a physician, I should say.
19       A.  It's unusual.  I worked in Detroit at
20   Chryslers on the line for a year.
21       Q.  Before college, during college, after college?
22       A.  Before college.  A friend of mine and I were
23   building a 32-foot catamaran in Grand Haven, Michigan,
24   but we discovered that we didn't have any money, so we
25   worked at Chryslers, and we got paid a lot of money,

Page 18

1    and there were people there that were -- that looked --
2    that acted like men but were dressed like women.  And I
3    remember several times talking to my peer group and
4    asking, "What's up with those people?"  And they said
5    they -- they had a specific word for them, but they
6    were -- they were men claiming to be women, and so they
7    wore skirts.  They wore bras.  They had their hair all
8    done.  They had makeup on, and they worked at
9    Chryslers.
10           So that's the first time in my life that I'm
11   aware of that I encountered that kind of issue.
12       Q.  What was the term they used?
13       A.  I don't remember the term.
14       Q.  Was it transvestite?
15       A.  No.  It was a pejorative term, and I don't
16   remember what it was.
17       Q.  All right.  Having had that experience at
18   Chrysler, did that pique an interest in that part of
19   psychiatry when you eventually went to medical school
20   and started focusing on psychiatry?
21       A.  No.
22       Q.  When did your interest in what I'll call
23   gender dysphoria actually start?
24           MR. GANNAN:  Objection.  Vague.  Assumes facts
25       not in evidence.

Page 19

1        A.  I had no particular interest in any particular
2    diagnosis.  I was interested in psychiatry, and I was
3    interested in child and adolescent psychiatry, and
4    positions were offered, and I took the positions.  And
5    in some of the positions, I encountered individuals
6    that were claiming to be the opposite sex.
7    BY MR. WILLIAMS:
8        Q.  Did that engender in your mind a need to learn
9    more about that from a professional point of view?
10       A.  Every patient that I encountered in my career
11   engendered an interest in knowing more about what they
12   were suffering from.
13       Q.  Okay.  Did you take any special coursework or
14   seminars or a more targeted formal or even informal
15   education to learn more about what we're talking about
16   here?
17       A.  Yes.
18       Q.  What did you do?
19       A.  I used the -- when I was at Vanderbilt, I used
20   the Vanderbilt medical library.  I also attended
21   conferences in San Diego and Vancouver about
22   individuals, children, adolescents that had been
23   involved in sexual activity.  And during some of those
24   conferences, grand rounds, research in the medical
25   school, I would come across individuals who claimed to

Page 20

1    be the opposite sex and I would read about them or I
2    would listen to the presentation.
3        Q.  Just for my edification, obviously, you've had
4    decades of experience in this area.  Is there a typical
5    age where this gender dysphoria might manifest itself
6    in adolescents?
7        A.  When you use the word "adolescents," I'm not
8    sure what you mean by "adolescents."
9        Q.  Well, let me refine it.  Thank you.  Because
10   different people define that term differently.
11           Adolescents for me are typically 12, 13, up
12   until probably late teens, 16, 17, but that may not be
13   a technical term that is correct.  I'm just telling you
14   what I use it for.
15       A.  The medical definition of "adolescence" is
16   when puberty starts, that is the beginning of
17   adolescence.
18       Q.  And that can be different for different
19   children; right?
20       A.  In the African American population, it's
21   happening at eight and nine years old.
22       Q.  Is there a typical age that you can point to
23   that you would be looking for?
24       A.  The typical standard age for girls is between
25   10 and 12 and for boys it's 11 and 13.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 21

1    Q.  So if you use those as benchmark, that would
2  be the chronological beginning of adolescence, would
3  that be correct?
4    A.  With puberty.
5    Q.  Yes.  And when does adolescence end typically?
6    A.  Medically adolescence doesn't really end until
7  the very early 20s.  We know that the brain matures
8  from the brain stem forward to the frontal lobe, and so
9  technically, medically, adolescence ends in the very
10  early 20s.
11    Q.  So it literally could be a ten-year span?
12    A.  Yes.
13    Q.  And so when you use the term "adolescence" in
14  this deposition, are you talking about the time periods
15  that you've identified for girls and boys through their
16  early 20s?
17    A.  Yes.
18    Q.  Of course, there's a difference between
19  adolescence from a medical psychiatric point of view
20  and minors and adults from a legal point of view.  Are
21  you aware of that?
22    MR. GANNAN:  Objection.  Vague.
23    A.  Yes.
24  BY MR. WILLIAMS:
25    Q.  I can't speak for Tennessee, but in Florida,

Page 22

1  if you are over the age of 18, you are no longer a
2  minor, you are an adult.  I suspect that's probably
3  true around the country.
4    What's been your experience on that?
5    A.  Where?
6    Q.  Wherever you've practiced.
7    A.  Okay.  In California, the legal age can depend
8  on what the patient is seeking.  So the standard legal
9  age for treatment of a 16-year-old, they can give
10  consent for psychiatric treatment.  A 12-year-old can
11  go into a clinic and have an abortion without parental
12  consent or parental knowledge.  So it depends on the
13  specific medical need that determines the age.
14    Q.  In California?
15    A.  In California.
16    Q.  How about Tennessee?
17    A.  Tennessee is 18, and a 16-year-old can consent
18  to psychiatric treatment.
19    Q.  Without parental consent?
20    A.  Yes.
21    Q.  Okay.  So I would assume, then, it's state
22  specific.  Is that your basic belief?
23    MR. GANNAN:  Objection.  Calls for legal
24  conclusion.  Speculation.
25    A.  I have only been in two states.  I can't

Page 23

1  address the other states, but I know that in California
2  12-year-olds can consent to certain procedures and
3  16-year-olds can consent to psychiatric treatment and
4  18-year-olds can consent to as an adult.
5  BY MR. WILLIAMS:
6    Q.  And in California, is that a matter of state
7  law, statute?
8    MR. GANNAN:  Objection.  Calls for legal
9  conclusion.
10    A.  I believe it's state law because I was in two
11  different counties and it was the same age, but that's
12  LA County and Ventura County.
13  BY MR. WILLIAMS:
14    Q.  Let me be clear.  Is it your belief that those
15  differing consent ages that you've described are
16  governed by a state statute statewide?
17    A.  I believe they are.
18    Q.  All right.  What's the -- have you ever had
19  experience with a human being who was not an
20  adolescent, using your definition, who experienced
21  gender dysphoria?
22    A.  Yes.
23    Q.  What is the youngest you've dealt with?
24    A.  Chronological age?
25    Q.  Yes.

Page 24

1    A.  Middle school.
2    Q.  Middle school?
3    A.  I think she was in the 6th grade.
4    Q.  I guess that's state -- middle school in
5  Florida is different than, I guess, it is elsewhere?
6    A.  In California middle school is 6th, 7th, and
7  8th grade.  And in Tennessee middle school is 6th, 7th,
8  and 8th grade, so middle school.
9    Q.  Same in Florida, by the way.  All right.  So
10  6th grade is the youngest that you can recall?
11    A.  Yes.
12    Q.  And that's generally about 12 years old.
13  Would you agree?
14    A.  No.
15    Q.  What age is it, in your experience?
16    A.  I've seen 11-year-olds in the 6th grade.
17    Q.  All right.  So whether it's 11 or 12, 6th
18  grade is the earliest grade that you can recall having
19  dealt with an adolescent who was experiencing gender
20  dysphoria.  Is that an accurate statement?
21    A.  If it's an adolescent, yes.  That would be the
22  youngest that I've seen as an adolescent.
23    Q.  Have you seen younger human beings than
24  adolescents that experience gender dysphoria?
25    A.  Yes.

6  (Pages 21 to 24)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 25

```
 1       Q.   And what is the youngest person you've seen,
 2   period, that experienced gender dysphoria?
 3       A.   Five.
 4       Q.   Really?
 5       A.   Yes.
 6       Q.   As much out of curiosity as anything, how did
 7   you come to see a five-year-old for gender dysphoria?
 8       A.   I love this story.
 9       Q.   I'm all ears.
10       A.   I only see two.  She lost all of her hair.
11   She was a triplet, three girls, identical girls with
12   booming hair.  And she lost it all over the course of
13   two or three weeks.  And so the parents went to their
14   primary care doctor.  They went through all the
15   procedures, and they couldn't discover a cause.  I
16   actually sent her to Stanford because I thought maybe,
17   maybe she had this illness or that illness or they
18   could do whatever, because her sisters were booming
19   hair.
20           And so they brought her to me to work with her
21   so that she could come to understand, accept, explore
22   the fact that she was bald, eyebrows, eyelashes, gone.
23   Alopecia universalis.  And she was a wonderful little
24   girl, and we would do play therapy, and I introduced --
25   there wasn't a Mrs. Potato Head back in the '80s.  So I
```

Page 26

```
 1   introduced Mr. Potato Head, and she said one time,
 2   because I was working to help her wear a wig.  And she
 3   looked at me, and she said, "Mr. Potato Head -- you're
 4   doing to me what I'm doing to Mr. Potato.  You are
 5   wanting me to wear a wig like I'm putting eyes on
 6   Mr. Potato Head."  It was just such a brilliant
 7   observation that she made.
 8           And she finally did wear a wig, but she went
 9   through this period of about a year and a half where
10   she claimed to be a boy because she had lost all her
11   hair, and so she was greatly distressed.  It bothered
12   her for a long period of time, and she talked about it,
13   and she was talking about it in school.  But back then
14   they didn't report it, and they didn't do anything
15   about it.
16           And she finally started wearing the wig, and
17   she actually started to play around with the wig.  She
18   would be at a bus stop with her parents and other
19   people would be there, and she'd suddenly go, "Oh, my
20   God, I've lost my hair," and she would hide the wig,
21   and then everybody would see she was bald.  So she
22   actually started playing games with it and had fun with
23   it.
24           So it lasted probably about three years, and
25   then it slowly went away, and she accepted the fact
```

Page 27

```
 1   that she was a girl and that she was bald and she wore
 2   a wig.
 3       Q.   Was there any nexus between the alopecia --
 4       A.   Universalis.
 5       Q.   -- universalis and the gender dysphoria from a
 6   biological point of view, to your knowledge?
 7       A.   No.  All her lab works, all her x-rays, all
 8   the consults at Stanford, at UC Davis, she was
 9   physically fine.  They could not find the etiology of
10   her alopecia universalis.
11       Q.   And did she -- did you follow this child for
12   very long?
13       A.   Yeah, for about four years.
14           In fact, I ended up seeing her mother, her
15   father, and her sibling, because it was -- well, just
16   one sibling -- they were triplets, but I saw the girl
17   that lost her hair and then one of the siblings.  It
18   was really devastating to the family.  I mean, just her
19   sisters had just booming hair.  I mean, it was like --
20   and she was completely bald.  And so the family had --
21   they were in mourning.  It was really sad.
22       Q.   You followed her from when, five to nine,
23   five years old to nine years old?
24       A.   Yeah, from '86 -- '86, most of '86, '87, '88,
25   '89.
```

Page 28

```
 1       Q.   And was she suffering or experiencing gender
 2   dysphoria when she was nine years old?
 3       A.   No.  It peaked -- it peaked for about a year
 4   and a half, and then it slowly went away over the
 5   course of therapy, which was not specific for that.
 6   The therapy I was doing was to help her accommodate to
 7   the fact that she had lost her hair and her sisters had
 8   booming hair.  And it wasn't called gender dysphoria at
 9   that time.
10       Q.   What was it called?
11       A.   I believe it was gender identity disorder.  I
12   think it was DSM-III.  I don't think it was DSM-III-R.
13   I'd have to check.  But it was an issue, and we would
14   talk about it, and I would point out to her that you're
15   an identical twin.  Your sisters are female, and she
16   would argue with me in her little way that she would
17   argue.  And sometimes she would get angry, and she'd
18   say, "You don't know what you're talking about.  She'd
19   throw the wig at the corner, and she'd walk out of the
20   office."  I love this little girl.
21       Q.   I can see why.  I can see why.
22       A.   Her parents grew up together, and they
23   married.  And then this catastrophic event happened, so
24   I worked with them a long time, individually and as a
25   family, and they were okay, and then they were gone.
```

7 (Pages 25 to 28)

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                        2b293f70-452a-4746-9273-f93183a2d9b3

Page 29

```
 1        Q.  And you don't know what -- how she's
 2   matriculated into adulthood, I take it?
 3        A.  No.  I ended up leaving Sacramento,
 4   California, and there was no follow-up, but the therapy
 5   had been completed.
 6          MR. WILLIAMS:  Let's take a break.
 7        (A brief recess was taken.)
 8   BY MR. WILLIAMS:
 9        Q.  We have to go back about 20 minutes or more
10   because I think I asked you a question earlier about
11   how you got involved in this case, and you talked to me
12   about the lawyer in Georgia that you met with with her
13   husband or friends --
14        A.  We had lunch, but then we met at our home.
15        Q.  Right.  So follow through to this case.  Did
16   that meeting have anything to do with this case that
17   we're here today on?
18        A.  She made several proposals, and she was in the
19   beginning of starting this.
20        Q.  Starting what?
21        A.  Starting this process of defending, I think,
22   parents who have -- are in danger of losing their
23   children because the children are claiming the opposite
24   sex and the school is demanding that something happen,
25   and Child Protective Services is removing the children.
```

Page 30

```
 1   So she's in the process of taking a -- not a detour,
 2   but another branch into law and so --
 3        Q.  Well, amplify what you just said, because it's
 4   a little perplexing to me, to be honest with you.
 5   Parents have a child, and the child is -- let's just
 6   say she's an adolescent, as you defined it, in middle
 7   school.  The middle school child is experiencing gender
 8   dysphoria, and it's manifested to others outside of the
 9   family, and the school system, I guess, is demanding
10   that the parents do something unless they're going to
11   take the kid away?  Is that what you're saying?
12          MR. GANNAN:  Objection.  Vague.  Assumes facts
13   not in evidence.
14        A.  My understanding is that when -- what she
15   presented -- what's happening was that the adolescent
16   would say something in the public school setting, and
17   the public school setting would let the parents know,
18   and then the public school setting would follow up and
19   want to know if she's getting treated for this.  And if
20   the parents said no, the school would contact Child
21   Protective Services.
22          CPS, Child Protective Services would then
23   contact the family and want to know if their daughter
24   or son is getting treatment, and if the family said no,
25   CPS would come out for a home visit, do an evaluation.
```

Page 31

```
 1   And if the parents said no, they weren't going to do
 2   it, then CPS would take the child and put them in
 3   foster care in emergency placement.
 4          So she was getting calls from parents saying
 5   that Child Protective Services had taken their son or
 6   daughter, and in some instances the parents were not
 7   allowed to see their son or daughter, not allowed to
 8   give consent, not allowed to be a parent, and so she
 9   had gotten -- because I think I had said that she had
10   worked for Child Protective Services in Georgia for a
11   lengthy period of time.  So she was very familiar with
12   that operation and how people did things.  So she was
13   increasingly concerned that this was happening and
14   was --
15        Q.  "She" being?
16        A.  Vernadette Broyles.
17        Q.  Yes.
18        A.  Vernadette Broyles' husband is an attorney,
19   and apparently they decided that she would branch off
20   into this kind of work exclusively, and so that's
21   apparently what she's doing.
22        Q.  From the conversations that you had with
23   Ms. Broyles, did you garner an understanding as to what
24   the, quote-unquote, treatment would be that the parents
25   were supposed to be providing to the child?
```

Page 32

```
 1        A.  What Vernadette Broyles said to me was that
 2   they were giving the children hormones and they were
 3   doing surgery.
 4        Q.  Who is they?
 5        A.  Have to be physicians.  She didn't state what
 6   physicians or what medical clinic.
 7        Q.  If a parent had a child that was going through
 8   gender dysphoria and Child Protective Services said,
 9   "Are you providing treatment for your child?" that's
10   the kind of treatment that they expected the child to
11   receive, surgery and hormones?
12        A.  That's what Vernadette Broyles presented to
13   me.
14        Q.  If the parents were not providing that form of
15   treatment, then the parents were?
16        A.  Negligent.
17        Q.  Well, they were -- whether negligent or not,
18   they were exposed to having their child taken away from
19   them by Child Protective Services and put into some
20   sort of home; right?
21        A.  Yes.
22        Q.  And if that happened, the child being taken
23   away, would the child then get treatment that the Child
24   Protective Services would mandate or something like
25   that?
```

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 33

1    A.  Yes.
2    Q.  Okay.  And this is in Georgia?
3    A.  I believe that the cases she was talking about
4    at the time in March of this year were in Georgia, but
5    I don't know for sure.
6    Q.  Okay.  In any event, Ms. Broyles apparently
7    determined that she would focus on this area of the
8    law, and that was part of the discussion that you had
9    with her.  So carry before me forward, Doctor, to how
10   we get you into this case as an expert witness.  What's
11   the chronology and the connection?
12   A.  What we agreed on is that --
13   Q.  "We" being?
14   A.  Vernadette Broyles and myself, agreed on that
15   I would send her articles, literature, newspaper things
16   about this issue.  And so I sent her these articles,
17   and at some point I believe -- I believe it was April
18   we had --
19   Q.  Of 2019?
20   A.  Of 2019.  There was a phone call involving
21   myself, Vernadette Broyles, and a person named Roger
22   Gannam.
23   Q.  And is that the same Roger Gannam that is
24   seated to your right?
25   A.  Yes.

Page 34

1    Q.  Did you know Mr. Gannam before you got the
2    phone call?
3    A.  No.
4    Q.  Tell me about the phone call, please.
5    A.  The phone call was a discussion about -- a
6    discovery discussion, what my expertise was, what kind
7    of doctor, what kind of practice, that kind of stuff.
8    It was a handshake over the phone.  And then it was
9    agreed on that there was a -- there was a specific case
10   that was in Florida and that materials would be sent
11   and discussions would ensue, and I became -- I don't
12   know that I can say expert witness, because I think the
13   judge has to decide that, but I became a person who is
14   in medicine and specializes in psychiatry and
15   subspecializes in child and adolescent psychiatry, and
16   have been working with Roger Gannam since, I believe
17   May, late April -- April, yeah.
18   Q.  Well, I think you are an expert witness.  The
19   judge just determines whether your testimony will be
20   admitted into evidence or not.
21   A.  Thank you.
22   Q.  I think that would be the proper nomenclature.
23   What did you tell Mr. Gannam in response to
24   this inquiry as to your area of professional expertise?
25   A.  What I have stated previously, that I am a

Page 35

1    physician, my specialty is psychiatry, my subspecialty
2    is child and adolescent psychiatry and that I have
3    worked in this discipline for about 40 years and that I
4    have a background that is involved in Tennessee, it's
5    involved in California, it's been academic, it's been
6    in the community, and it's been with juveniles in
7    confinement and that I had worked with the Department
8    of Justice and that I had been medical director of two
9    juvenile sex offender programs.  And so that discussion
10   was a look at whether or not I had the expertise
11   required to help them.
12   Q.  And did that expertise required to help them
13   include an expertise in the diagnosis of gender
14   dysphoria?
15   A.  Yes.
16   Q.  And did you discuss gender dysphoria in your
17   talk with Mr. Gannam back in April of this year?
18   A.  I don't think we specifically talked about
19   that.  Although, I -- I believe it came up.  I don't
20   generally talk about criteria for diagnosis.  Most
21   people are looking to see whether or not -- I believe
22   Roger was looking to see whether or not he could avail
23   himself of my expertise, and he was trying to assess
24   whether or not that I had that.
25   But I do believe that we did talk about gender

Page 36

1    dysphoria, but I think the conversation at that time or
2    a later conversation had to do with the ordinance --
3    not ordinance, that's -- that blows up, right.  The law
4    in Tampa.
5    MR. GANNAN:  It is called an ordinance.
6    BY MR. WILLIAMS:
7    Q.  Well, you hit the nail on the head.  It is an
8    ordinance.  And it was passed by the City Council here
9    in Tampa over two years ago.  And it is the law in
10   Tampa, at least within the city limits.
11   A.  Okay.
12   Q.  So I take it from that conversation with
13   Mr. Gannam he became -- he's not the witness, but is it
14   your perception that he became comfortable with your
15   area of expertise and the breath and depth of your
16   expertise as it relates to what he needed from an
17   expert witness?
18   A.  Yes.
19   Q.  Did Mr. Gannam during that first discussion
20   inform you as to what he wanted you to do as an expert?
21   A.  My memory of the discussion was he's
22   determining, through Vernadette and through talking
23   with me, whether or not I would be helpful for him on a
24   particular case.  I believe that he thought that I
25   would be, based on my experience, education, and other

9 (Pages 33 to 36)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 37

```
 1    things, and I believe that at that point the decision
 2    was made to start to help him because I believe in a
 3    short period of time, maybe that night, I was sent
 4    material to review, peruse, and evaluate, and we then
 5    began correspondence.
 6        Q.  What materials were you sent?
 7        A.  I was sent the Tampa ordinance.  I was sent a
 8    declaration by someone named Lawrence Mayer, I believe.
 9    I was sent several things on a particular site so that
10    I could access them and read them.
11        Q.  Who is Lawrence Mayer, do you know?
12        A.  He's a polymath.  He's a homo universalis.
13    He's a -- he knows everything.
14        Q.  Good for him.
15        A.  It is good for him.  People like that taught
16    me medicine, so that -- I think he is at Harvard.  I
17    just know that he's been at all the elite universities.
18    He's been at Stanford -- he's just been -- Michigan.
19        Q.  What is his last name again?
20        A.  Mayer, M-A-Y-E-R, Lawrence.  I believe it's
21    Lawrence Mayer.
22        Q.  Is he a doctor --
23        A.  Yes.
24        Q.  Medical doctor?
25        A.  Yes.
```

Page 38

```
 1        Q.  What's his specialty, if he has one?
 2        A.  It's everything.
 3        Q.  He specializes in everything he does.  Would
 4    you undergo brain surgery with Dr. Mayer, would you?
 5        A.  Yes.
 6            When I read what he wrote, I remember talking
 7    to Vernadette saying, "I can't do what this guy does.
 8    He's in biostatistics.  He's a psychiatrist.  He's --
 9    the list of things, the accomplishments that he has" --
10    so...
11        Q.  Well, let me follow up, if I may.
12            He is currently at Harvard Medical School?
13        A.  I'm not sure.  I got overwhelmed because I
14    normally -- my education was seeking out people that I
15    thought knew something that was valuable.  I went to
16    UC San Diego because there was someone there that I
17    thought knew something of value.  And someone like
18    that, you know, if he said you're wrong, then I'm
19    wrong.  I mean, it's just -- I don't know where he is.
20        Q.  Today?
21        A.  Yeah.
22        Q.  When Mr. Gannam contacted you, did you know
23    where Dr. Mayer was?
24        A.  No.
25        Q.  But in any event, Mr. Gannam sent you some
```

Page 39

```
 1    writings by Dr. Mayer to review that night?
 2        A.  I believe it's a declaration.
 3        Q.  Declaration.
 4            Do you still have that?
 5        A.  I don't have it.  It's on a site.
 6        Q.  What's the site?
 7        A.  It's the site that Roger Gannam sent me.
 8        Q.  Do you remember the name of that site?
 9        A.  I believe it starts with Vazzo.
10            MR. GANNAN:  Can we go off the record.
11            (A discussion was held off the record.)
12    BY MR. WILLIAMS:
13        Q.  All right.  So Mr. Gannam gave you access
14    to -- I call it a data room.
15        A.  Yeah.
16        Q.  Okay.  Back in the old days, we did that in
17    hard paper, in a room.  That is where we put all the
18    data.  Today it's all digital.
19            Mr. Gannam provided you with a way to have
20    access to the -- I'll call it the Vazzo data room where
21    you could access materials remotely from your home in
22    Franklin, Tennessee.  Is that a correct statement?
23        A.  Wherever I had the computer, I could access.
24        Q.  That's true.  Okay.  By computer wherever you
25    are, over the Internet; correct?
```

Page 40

```
 1        A.  Correct.
 2        Q.  And that's how you accessed the declaration
 3    from Dr. Mayer; correct?
 4        A.  Yes.
 5        Q.  Is that the only document that you accessed
 6    that was associated with Dr. Mayer?
 7        A.  There were other -- I guess you call them
 8    declarations.  There was one from Christopher that sat
 9    here yesterday.  There was one from --
10        Q.  Dr. Rosik?
11        A.  Yeah.  To me, he is Chris.
12        Q.  Okay.  To me, Dr. Rosik, so...
13        A.  And there was one from somebody named
14    Glassgold.
15        Q.  Glassgold?
16        A.  Yeah.  That's it.
17        Q.  So you had Rosik, Glassgold --
18        A.  And there was another -- then there was this --
19        Q.  All right.  We need to do this rather
20    methodically.
21        A.  Oh, I'm sorry.
22        Q.  Dr. Hudson is -- when he said the word "this,"
23    he was referring to Exhibit 6 to Dr. Rosik's
24    deposition, which is the American Psychological
25    Association's report, the American Psychological
```

10 (Pages 37 to 40)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

2b293f70-452a-4746-9273-f93183a2d9b3

Page 41

1    Association Task Force on Appropriate Therapeutic
2    Responses to Sexual Orientation.
3         So that was in the data room, the Vazzo data
4    room?
5         A.  Yes.
6         Q.  Okay.  Exhibit 6.  What else?
7         A.  And I believe Exhibit 3.
8         Q.  That's -- Exhibit 3 is the declaration of
9    Dr. Rosik, which is Exhibit 3 to his deposition, which
10   is dated May 6th, 2019?
11        A.  And I believe Exhibit 4.
12        Q.  Exhibit 4 is the rebuttal declaration of
13   Dr. Rosik and Exhibit 4 to his deposition.  And that is
14   dated July 17th, 2019.
15        A.  And Exhibit 5.
16        Q.  Exhibit 5 to Dr. Rosik's deposition is the
17   ordinance that is the subject matter of this
18   litigation, Tampa City Ordinance No. 2017-47.  All of
19   those items that you have identified were in the --
20   what I call the Vazzo data room?
21        A.  I believe they were, plus my declaration and
22   my rebuttal.  And Norman Spack, MD, his declaration and
23   his -- not his declaration -- his rebuttal.  His
24   rebuttal to my declaration.
25        Q.  Does that describe the universe of documents

Page 42

1    that were in the Vazzo data room that you've accessed
2    prior to today?
3         A.  I believe so, and I'm uncertain as to whether
4    there was something else in there.
5         Q.  In the data room?
6         A.  Yes.
7         Q.  Give me a guess as to what that might be.
8             MR. GANNAN:  Objection.  Calls for
9    speculation.
10   BY MR. WILLIAMS:
11        Q.  And I'm asking you to speculate because you're
12   uncertain.
13        A.  Yes.  And because I'm uncertain, I can't
14   speculate.
15        Q.  You can speculate.  The record reflects you
16   are speculating.
17        A.  No.  I don't see how I can speculate when I'm
18   uncertain.  I don't know what else is there, so I'm
19   unsure if something is in there, but I don't know what
20   it is, and there's a part of me that thinks there was
21   something there, but I don't know what it is.
22        Q.  You have no memory -- if there was, you don't
23   know what it is?
24        A.  Right now, I don't.
25        Q.  Okay.

Page 43

1         A.  I mean, if I saw it, bingo, I could tell you
2    right away.
3         Q.  You'll remember at 3:00 clock in the morning.
4    If so, call me.  I'll probably be up.
5             Now, I'm familiar with all of the items that
6    you delineated in my answer to my record because I have
7    those same documents, except for the declaration by
8    Dr. Lawrence Mayer.  I haven't been provided with that.
9             What did that declaration say, do you
10   remember?
11        A.  First of all, it's a CV, which that's a
12   weekend reading right there.
13        Q.  I'm sure.
14        A.  And I didn't get past that, because I ended up
15   calling Vernadette Broyles and saying, "Look, you know,
16   there's him, and then there's me, and I'm not a
17   researcher.  I'm a clinician."
18            And she said, "That's why you are valuable,
19   because you actually work with the people.  He is busy
20   going around at different elite universities teaching
21   people how to do what you do."
22            So I basically just read his CV and marveled.
23   I don't think I read anything else of it.
24        Q.  Well, when you used the term "declaration,"
25   that's a term we lawyers use in connection with sworn

Page 44

1    statements by witnesses, whether expert or otherwise,
2    that are submitted into a court record from time to
3    time.  You have a declaration.  Right?
4             And so apparently Dr. Mayer had a declaration
5    that was in the Vazzo data room.  Are you telling me
6    under oath that you didn't read the substantive part of
7    Dr. Mayer's declaration?
8         A.  I may have read snippets of it, but I was
9    really overwhelmed at his qualification.
10        Q.  I gleaned that from your testimony so far, and
11   that's wonderful.  Did you read snippets enough to give
12   me a general overview of what Dr. Mayer was saying in
13   his declaration?
14        A.  I can't say for sure.
15        Q.  How long was it?  Do you remember the
16   declaration part?  I realize the CV was horrendously
17   long.  But how long was the declaration?
18        A.  Not horrendous.  It was spectacular.
19        Q.  All right.  Spectacular.  I meant horrendous
20   in a positive way.
21        A.  I just believe I glanced and I -- I really
22   admired what he had -- what he had accomplished, and
23   so I -- I never actually read it in detail because it
24   seemed like nobody ever brought it up and nobody ever
25   asked me to read it.  So I concentrated on the

11 (Pages 41 to 44)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 45

1    declaration and the rebuttal.
2        Q.  On your declaration?
3        A.  Yes.
4        Q.  Doctor, whatever level of reading of the
5    substantive portions of Dr. Mayer's declaration, not
6    his CV, which was spectacular, whatever level of
7    review/reading that you did of those substantive
8    portions of his declaration, did anything that you read
9    have any effect on your declaration or your rebuttal
10   declaration in this litigation?
11       A.  No.
12       Q.  And I've gleaned from your testimony so far
13   that whatever you read substantively of his
14   declaration, not his CV, you have no memory of it?
15       A.  No.
16       Q.  Yes or no, you have no memory, or you do have
17   a memory?
18       A.  No, I have no memory of it.
19       Q.  So is it fair for me to conclude that whatever
20   Dr. Mayer said in his declaration is irrelevant to your
21   role in this litigation?
22       A.  Yes.
23       Q.  Do you even remember the subject matter of his
24   declaration?
25       A.  I believe it had to do with the issue that

Page 46

1    we're discussing today.
2        Q.  What issue is that, sir?
3        A.  The law that has been passed by Tampa.  I
4    believe that the reason he was on there is that he had
5    an opinion that was in congruence with what Roger
6    Gannam was attempting to do.
7        Q.  Congruent meaning basically aligned with what
8    Mr. Gannam was trying to do in this litigation --
9        A.  Yes.
10       Q.  -- his clients are?  He is the lawyer.  He is
11   just advocating his clients' cause; right?
12       A.  Well, I don't know that he is advocating.  He
13   is the attorney.
14       Q.  I'll withdraw the question.
15           Do you know whether or not Dr. Mayer is a
16   consulting expert with Mr. Gannam in this case?
17       A.  We've never talked about it.
18       Q.  Have you ever talked to Dr. Mayer?
19       A.  No.
20       Q.  Period?
21       A.  No.
22       Q.  Ever?
23       A.  No.  I would love to.
24       Q.  I'm sure you would.  Probably I would too.
25           But in any event, during your lifetime, you've

Page 47

1    never talked to Dr. Mayer about anything; is that
2    correct?
3        A.  Correct.
4        Q.  And if he has a role in this litigation, is it
5    accurate to state that you don't know what that role
6    is, sitting here today?
7        A.  No.
8        Q.  My statement is correct you don't know;
9    correct?
10       A.  Yes.
11       Q.  And I take you did not read Dr. Mayer's
12   declaration in preparing for this deposition today?
13       A.  No.
14       Q.  Is my statement correct?
15       A.  Yes.
16       Q.  Has Mr. Gannam ever told you what Dr. Mayer's
17   role, if any, is in this litigation?
18       A.  He may have mentioned it in one of our
19   conversations, but it wasn't pointed, and he may
20   have -- he may have sent me an e-mail stating that
21   Dr. Mayer's declaration and CV were in the data
22   sharing.
23       Q.  The Vazzo data room that I call it?
24       A.  Correct.
25       Q.  All right.  Have you exhausted your memory of

Page 48

1    materials that you accessed and reviewed in the Vazzo
2    data room in connection with preparing your declaration
3    and your rebuttal declaration in this case?
4            MR. GANNAN:  Objection.  Misstates testimony
5        or assumes facts not in evidence.
6    BY MR. WILLIAMS:
7        Q.  Go ahead.
8        A.  When you were saying that I remembered, there
9    is an American Psychological Association statement on
10   some policy statement about what psychologists should
11   do, they should affirm -- there's that -- I think it's
12   2015.  There's also -- there's also the 2009 Endocrine
13   Society statement.
14       Q.  That it's in the data room?
15       A.  Yes.
16       Q.  So those two documents you just recalled were
17   also in the Vazzo data room?
18       A.  Your question, boom, it popped up.
19       Q.  That's why I ask questions.
20       A.  Yeah.
21       Q.  That's how you get information.
22           Okay.  Has that exhausted your memory until I
23   ask you another question that triggers something in
24   your mind?
25       A.  I don't believe -- there's nothing from the

12 (Pages 45 to 48)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                          2b293f70-452a-4746-9273-f93183a2d9b3

Page 49

1    AMA.  There's nothing from the American Psychiatric
2    Association.  There's nothing from -- I don't -- I
3    think that's it.
4        Q.  All right.  Then let me go back to your
5    ongoing communications with Mr. Gannam, and I assume
6    you've just been dealing with Mr. Gannam in connection
7    with this litigation; is that correct?
8        A.  Yes.
9        Q.  Now, Mr. Mihet was here yesterday, but I
10   assume you've been dealing with Mr. Gannam solely?
11       A.  Yes.
12       Q.  What did Mr. Gannam tell you he wanted you to
13   do in connection with being an expert witness in this
14   case.  What instructions did he give you?
15       A.  He asked me if I would review the materials in
16   that data sharing Vazzo.
17       Q.  Data room I call it?
18       A.  Data room.  And then he asked me if I would
19   state my medical opinion about this issue.
20       Q.  Which issue?
21       A.  The issue of people claiming they're the
22   opposite sex and --
23       Q.  Opposite from their biological sex?
24       A.  Yes.  And, in actuality, if you're a male, the
25   opposite sex is not female.  Biologically that makes no

Page 50

1    sense.  There is no such thing as opposite sex.  But
2    it's used in the media.  It's used in the literature,
3    and it -- there's is no opposite sex.  You can't be
4    antimale.  You can't be antifemale.  But it's words
5    that are being used.
6        I just want to add that because I'm using that
7    word, but it's -- it's biologically impossible.  There
8    is no such thing as an opposite sex.  I think it's like
9    people say cats and dogs and somehow they're related,
10   but they're different species.  But with humans you
11   have male and female, but they're not opposite sex, but
12   that's how people talk about it.
13       Q.  Sure.
14       A.  So he wanted me to make a declaration based on
15   my experience and training and education with regards
16   to can someone be the opposite sex and do these people
17   need to be affirmed or do they need therapy or do
18   they -- what are their problems.  So he sent me an
19   outline -- so there was an -- on the data room, there
20   was an outline that guided me in terms of what I -- it
21   was an outline and it allowed me to put my opinion down
22   in outline form.
23       Q.  Did you follow the outline in preparing your
24   declaration?
25       A.  For the most part, I did.  I didn't follow it

Page 51

1    completely, but my experience with working with
2    attorneys is that I give them what they desire and then
3    they format it into a legal document that works for
4    them.
5        Q.  Is that what happened here?
6        A.  Yes.
7            MR. WILLIAMS:  Off the record.
8        (A discussion was held off the record.)
9    BY MR. WILLIAMS:
10       Q.  And this outline that Mr. Gannam provided to
11   you through the Vazzo data room is still in the data
12   room, is it?
13       A.  I believe so.
14       Q.  And is your declaration -- let me see here --
15   dated May 7, 2019.  I think you said you provide what
16   they're looking for, the lawyers are looking for, they
17   transmogrify it into their formatting, and then you
18   read it, and if it's okay with you, you sign it?  Is
19   that what happened here?
20       A.  Yes, because I was in agreement with what they
21   were saying.
22       Q.  I get that.
23       A.  Because I have -- in the past, I have turned
24   down forensic cases or cases with attorneys because
25   they were asking me to do something that I knew was not

Page 52

1    true.
2        Q.  Okay.
3        A.  So what I put down there, I haven't seen it,
4    but I assume that it's my signature because I signed
5    it.
6        (Exhibit No. 1 was marked for identification.)
7    BY MR. WILLIAMS:
8        Q.  I've had the court reporter mark as Exhibit 1
9    the "Declaration of Bernard O. Hudson MD."  It is dated
10   May 7th, 2019.  If you look at page 10, Doctor, is that
11   your electronic signature?
12       A.  Yes.
13       Q.  And did you actually affix your original
14   signature to the original document of this ilk?
15       A.  Yes.
16       Q.  And you provided this to Mr. Gannam who in
17   turn provided it to me?
18       A.  Via certified mail.
19       Q.  Terrific.  Okay.
20           All right.  So going back to my series of
21   questions.  You signed this document and provided it to
22   Mr. Gannam for his use in this litigation because your
23   declaration as formatted by Mr. Gannam was consistent
24   with the outline that he sent to you and was consistent
25   with what you believe to be your true opinions

13 (Pages 49 to 52)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 53

1    regarding the subject matter set forth in your
2    declaration.  Is that a fair statement?
3         MR. GANNAN:  You can answer.
4         A.  Yes.
5    BY MR. WILLIAMS:
6         Q.  I will confess, Doctor, that I was interested
7    in your statements under roman numeral III, capital A,
8    little i., Nos. 11 and 12.  And 12 on page 4, you talk
9    about the scientific method.  Do you not?  Take a
10   moment to read it to yourself?
11        A.  I know what it says, and I'm right here.
12        Q.  Okay.  So paragraph 12 talks in part about the
13   scientific method, does it not?
14        A.  Yes.
15        Q.  Define the "scientific method" as you
16   understand it.
17        A.  "The scientific method consists of an
18   instrumental injunction, an accepted apprehension, and
19   a common verity."
20        Q.  Translate that for us.
21        A.  Instrumental injunction is you ask the
22   question, "How does this happen?"  You form a way to
23   discover how it happens, and then you share it with
24   other people and see if they see it and understand it
25   the same way.  And I'll give you an example.

Page 54

1         There are two elderly women standing in this
2    room, looking out at night, and one of them says, "What
3    a beautiful moon."  The other one says, "Yes, they're
4    both beautiful."
5         Well, wait a minute, there's only one moon.
6    So the question is, how is this person seeing two
7    moons?  So other people come along and say there's only
8    one moon.  So that's the instrumental injunction.
9         But you have to know how to see something.
10   And you have to know that what you're using to see
11   something is precise.  And then you have to know that
12   other people using the same method that you used can
13   see the same thing or understand the same thing.
14        So the woman looks up and sees two moons.
15   Other people say, "There's only one moon."  You check
16   their vision, and you find that the other people's
17   vision is correct and they're able to focus and their
18   retina is fine and the optic nerve is fine and the
19   optic chiasm is fine and the visual center in the brain
20   is fine.
21        So the apprehension of the part of the
22   universe that you are looking at is correct.  But this
23   woman sees two moons.  So then you have to evaluate the
24   common verity.  You have to evaluate how she's
25   apprehending two moons.  And she's apprehending two

Page 55

1    moons because she has a distortion in her lens, so she
2    sees two moons.
3         So if you are using a microscope to look at a
4    cell, you have to make sure the microscope works and
5    that you are focusing on the correct cell.
6         So the scientific method looks at something,
7    asks a question, determines a way to apprehend and
8    understand what it is and then shares it, a common
9    verity, with other people to see if they can reproduce
10   that in the same way that you reproduce it.  That is
11   the essentials of a scientific method.
12        Q.  Is the scientific that you just described and
13   confined, is that universal throughout science?
14        A.  It's the scientific method.
15        Q.  Is your answer "yes"?
16        A.  Yes.
17        MR. WILLIAMS:  I have to make a quick phone
18   call at 11:00.  So can we take a five-minute break.
19        (A brief recess was taken.)
20   BY MR. WILLIAMS:
21        Q.  Doctor, your discussion of the scientific
22   method in your declaration and just on the record in
23   your testimony today triggered something in me, and was
24   pretty sure I had this book here, and I do.  The name
25   of the book is Scientific Method in Practice.  And let

Page 56

1    me read to you what the author --
2         MR. GANNAM:  Will you state for the record who
3    the author is.
4         MR. WILLIAMS:  Yeah, I'm going to.
5         MR. GANNAN:  Okay.
6    BY MR. WILLIAMS:
7         Q.  Are you --
8         A.  Gauch.
9         Q.  Huh?
10        A.  I'm sorry.  Gauch.
11        Q.  Gauch.  Are you familiar with Gauch?
12        A.  Yes.
13        Q.  Hugh G. Gauch, Jr., at Cornell University.  At
14   least that's where he was when he wrote this.  I have
15   other books on the scientific method, but they're at
16   home, unfortunately.  Here is what he says.  He
17   describes the elementary scientific method as follows
18   in bullet points:
19        One, hypothesis formulation.
20        Two, hypothesis testing.
21        Three, deductive and inductive logic.
22        Four, controlled experiments; replication and
23   repeatability.
24        Five, interactions between data and theory.
25        And then limits to science's domain.

14 (Pages 53 to 56)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

2b293f70-452a-4746-9273-f93183a2d9b3

Page 57

1    Is that consistent with your review of the
2  scientific method?
3    A.  No.  He makes a mistake, he leaves out the
4  first thing that you do in a scientific method.  You
5  have to have an observation.
6    Q.  Is that not implicit in the hypothesis
7  formulation?
8    A.  Science is not implicit; it's explicit.  And
9  therefore you have to make an observation in order to
10  form a hypothesis.
11    Q.  All right.  From your comment earlier, you
12  seem to be familiar with Gauch, the author of this
13  book.
14    A.  I read a lot over the years.  And names pop
15  up.
16    Q.  So you are familiar with him somewhat?
17    A.  I have a mental telephone book of names, and I
18  think he is in the G section.
19    Q.  All right.  So can we agree that you agree
20  with all of the items that I delineated from this book
21  starting with "hypothesis formulation," you agree with
22  all that with one exception, and that is the
23  observation component that he doesn't include
24  specifically expressly here, which you believe is the
25  first part, first element?

Page 58

1    A.  No.
2    Q.  All right.  Then tell me what you think of
3  what I just read into the record.
4    A.  What you read is what he wrote.
5    Q.  Correct.
6    A.  What I wrote are the principles of the
7  scientific method.  What he is describing to you,
8  lacking the observation part, he is describing to you
9  the instrumental components of the scientific method,
10  how you actually go about it.  I provided you the
11  principles of the scientific method.
12    Q.  What is the difference?  Distinguish between
13  how you go about it and the principles.
14    A.  The idea and then the action.  He is
15  describing the action.  I'm giving you the principle
16  ideas of the scientific method.
17    Q.  Do you agree with the action elements that he
18  delineated in this book?
19    A.  I would have to hear them again.
20    Q.  I'll read them to you.  Again, this is on
21  page 11 of Scientific Method in Practice by Hugh G.
22  Gauch, G-A-U-C-H, Jr.
23    Elementary Scientific Method.
24    One, hypothesis formulation.
25    Two, hypothesis testing.

Page 59

1    Three, deductive and inductive logic.
2    Four, controlled experiments; replication and
3  repeatability.
4    Five, interaction between data and theory.
5    Last, limits to science's domain.
6    Those are the elements that he delineates.  Do
7  you agree with those?
8    A.  I agree with those.  Although, without
9  observation, you can't do any of those.
10    Q.  So you would add observation at the top of the
11  list?
12    A.  You have to add observation.
13    Q.  I understand that your opinion is you have to,
14  but you would?
15    A.  My opinion is based on science.
16    Q.  But you would add observation to the top of
17  the list?
18    A.  That's why I put it in the declaration.
19    Q.  And you don't believe that observation is
20  integrally incorporated into the concept of hypothesis
21  formulation?
22    A.  I didn't hear the word "observe."
23    Q.  You did not because it's not there.  I'm
24  suggesting to you that maybe it's implicit or imbedded
25  into the concept of hypothesis formulation, but you

Page 60

1  don't agree with that, I take it?
2    MR. GANNAN:  Objection.  Asked and answered.
3    A.  I think if you're going to write something
4  like that, I think you need to make things very clear.
5  And throughout my career, I've studied science and I've
6  understood the scientific method, and you cannot have a
7  scientific method unless you have a way to observe what
8  you're trying to hypothesize and what you're trying to
9  test and what you're trying to share.
10  BY MR. WILLIAMS:
11    Q.  All right.  Thank you.  Let's move on to
12  another subject.
13    In reviewing your declaration and, frankly,
14  your rebuttal declaration, it occurred to me that -- at
15  least I concluded that, in your opinion, a person's sex
16  is really relevant to every medical diagnosis and
17  treatment.  Is that an accurate statement?
18    A.  Yes.
19    Q.  Why is that?
20    A.  Males and females have different genes.  They
21  have different DNA, different chromosomes.  Their
22  somatic cells are different.  Their physiology is
23  different.  The way they metabolize medications are
24  different.  Your treatment is different based on the
25  size of a person.  Males tend to be larger; females

15 (Pages 57 to 60)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                  2b293f70-452a-4746-9273-f93183a2d9b3

Page 61

1    tend to be smaller.
2        You have to know the sex.  You cannot give
3    someone a physical exam if they don't have breasts, if
4    they don't have male genitalia or female.  You have to
5    know the sex in order to know how to do the physical
6    exam, in order to know what questions to ask, in order
7    to know what diagnosis to give, and in order to know
8    what treatment to provide.
9        Q.  So in one sense, if I heard you correctly,
10   your understanding of medical science is that it's in
11   many ways bottomed on the division between men and
12   women, the sex of the patient?
13       MR. GANNAN:  Objection.  Vague.  Misstates
14   testimony.
15       A.  There are illnesses --
16   BY MR. WILLIAMS:
17       Q.  Is my statement correct?  Can you agree with
18   it or not?
19       A.  Say it again.
20       MR. WILLIAMS:  Read it back, please.
21   BY MR. WILLIAMS:
22       Q.  Just tell me if you agree with it.  If you
23   don't agree, just tell me why.
24       MR. WILLIAMS:  Read my question, please.
25       (The question was read back as follows:

Page 62

1        So in one sense, if I heard you correctly,
2    your understanding of medical science is that it's
3    in many ways bottomed on the division between men
4    and women, the sex of the patient.)
5        A.  I don't agree with the way you phrased the
6    statement.
7    BY MR. WILLIAMS:
8        Q.  How would you rephrase it so that you could
9    agree with it?
10       A.  The basis of any medical presentation is the
11   age and the sex.  This is an 18-year-old white male.
12   This a 27-year-old white female.  You have to know the
13   sex because illnesses are different between the sexes,
14   treatment is different between the sexes.
15       Q.  Okay.  And when you refer to treatment, you,
16   of course, are talking about treatment of a disease, I
17   take it?
18       A.  An illness.
19       Q.  Is a disease and an illness synonymous,
20   basically?
21       A.  "Disease" can refer to communicable diseases.
22   It can convey neurologic.  So when I use "illness,"
23   that's an umbrella term that provides another medical
24   provider the information necessary to know that this is
25   a bona fide illness.

Page 63

1        Q.  And disease would be a subset of illness, I
2    guess, if I understood you?
3        A.  I think it's a colloquial term that laypeople
4    use.
5        Q.  Illness?
6        A.  No disease.
7        Q.  Okay.  The reason I'm asking is paragraph 13
8    of your declaration, you say, quote -- and you've got
9    it in front of you there -- "Any abnormal change in the
10   causal biological development of a male or female human
11   being is considered a state of disease."  You didn't
12   say "state of illness," that's why I'm asking the
13   question.
14       A.  I tried to be specific there because it's
15   technically not an illness.  When doctors talk with
16   each other and they use the word "illness," you think
17   of acuity, you think of the here and now.  Development
18   that goes awry from the way it's supposed to is a state
19   of disease.
20       Q.  Development meaning what, sir?
21       A.  Well, this would be -- the way I'm using it is
22   that any abnormal change in the causal biological
23   development of a male or female human being is
24   considered a state of disease, because any development
25   that moves away from male or moves away from female is

Page 64

1    a state of disease, because there is just males and
2    females, there is no other.
3        Q.  Well, would you consider that disease to be a
4    mental disease or a physiological disease or a
5    biological disease?  How would you further amplify what
6    kind of disease you are talking about?
7        A.  Impairments in development can affect any
8    organ -- any organ system.  It can affect neurologic
9    systems.  It can affect cardiovascular systems.  It can
10   affect muscular systems, joint systems.  So any
11   impairment of that development results in a state of
12   disease.  And when the infant becomes a baby, after
13   it's born, it may become an illness, because they may
14   not be able to breathe, their heart may not work right,
15   et cetera, et cetera.
16       Q.  Is gender dysphoria a mental disease or mental
17   illness?
18       A.  Yes.
19       Q.  So amplify for me, if you would, Doctor, what
20   you mean by the word "abnormal" in the last sentence of
21   paragraph 13.
22       A.  In normal embryologic development, you end up
23   with a male or you end up with a female.  If there is
24   any change in that, then it's abnormal.
25       Q.  So gender dysphoria is an abnormal change in

16 (Pages 61 to 64)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 65

1  the causal biological development of either male or
2  female; is that correct?
3         MR. GANNAN: Objection. Vague. Misstates
4  testimony.
5  BY MR. WILLIAMS:
6     Q. That's not correct?
7     A. No.
8     Q. What's incorrect about it?
9     A. "Gender" refers to masculine and feminine or
10  qualities of either. Biological sex is determined by
11  the sex chromosomes. So when I refer to the
12  development of a homosapien, the development, if it's
13  normal, develops into a male or female.
14         Gender dysphoria, those people are already
15  developed into a male or female.
16     Q. And let me correlate that to causal biological
17  development. I'm trying to understand and correlate,
18  to use that term, gender dysphoria with causal
19  biological development. Maybe I'm just mistaken.
20         Do you correlate gender dysphoria with causal
21  biological development?
22     A. No.
23     Q. And so, therefore, gender dysphoria is just
24  unrelated to causal biological development whether
25  normal or abnormal. Is that a correct statement?

Page 66

1     A. Biological development is different from
2  phenomenological or experiential development, which is
3  the mind.
4     Q. And so experiential -- "causal experiential
5  development," would that be a term you would use?
6     A. No.
7     Q. Is gender dysphoria the product of
8  experiential development?
9     A. It is considered a psychological psychiatric
10  illness, which is an illness of the mind.
11     Q. Not an illness of the body?
12     A. The mind is part of the body.
13     Q. Okay. I get that. I'm trying to distinguish
14  between causal biological development -- what do you
15  mean by that, then? Does that include the mind?
16     A. I'm determining how to educate you without you
17  going to medical school.
18     Q. Thank you.
19     A. The essence of biology is structure and
20  function. Go anywhere and say that and anybody that
21  has studied medicine will understand what you mean.
22  Structure, function. Change the structure, you change
23  the function. Change the function, you sometimes can
24  change the structure.
25         Biological development is causal. It takes

Page 67

1  place. The mother doesn't have to say grow an extra
2  leg, grow 12 toes on this foot. It's causal. It's out
3  of the realm of the mind. But in the body, currently,
4  we believe that the only organ that has a structure and
5  a function and has another function is the brain. The
6  brain has a structure, and it has a function,
7  physiologic, biologic, but it also has a function
8  that's the mind.
9         And the mind is not causal. The mind is
10  whatever your mind is at the time. But your biology
11  remains the same. You breathe. You eat. You move.
12  Your heart beats. Your diaphragm allows you to
13  breathe. Those are causal relationships.
14         You cannot live without eating. You cannot
15  live without healing. You cannot live without oxygen.
16  Those are causal relationships. They have nothing to
17  do with what you wish. Okay. You can wish you have --
18  you can run like Gale Sayers, but you don't run like
19  Gale Sayers.
20         So the mind can come up with all kinds of
21  things that are not causal at all. They're
22  experiential, phenomenological, and so gender dysphoria
23  is a psychological psychiatric disorder.
24     Q. So you are in your testimony, if I understand
25  it, without having to go to medical school,

Page 68

1  experiential and phenomenological phenomenon, I guess,
2  is separate and apart from biological?
3     A. I gives rise to that. Dead people don't have
4  a mind, as far as we know. But we test, and we don't
5  discover a mind. So we know that causal relationships
6  in the brain can cause people to lose their memory,
7  cause people not to be able to speak well, cause people
8  not to be able to listen to words well.
9         We know that the structure of the brain gives
10  rise to the mind, and interference with that structure
11  will interfere with the mind. So it develops, and then
12  something changes develop or interfere with develop or
13  changes develop, and then that will change the
14  structure, and that will change the function.
15     Q. Correlate that back to gender dysphoria --
16         MR. GANNAN: Objection. Vague.
17         MR. WILLIAMS: I haven't finished my question
18  yet.
19         MR. GANNAN: Sorry. Withdrawn.
20         MR. WILLIAMS: Give me a second.
21         (A discussion was held off the record.)
22  BY MR. WILLIAMS:
23     Q. Can I state accurately that gender dysphoria
24  is the product of experiential or phenomenological
25  aspects, dynamics, whatever you want to call it, not

17 (Pages 65 to 68)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 69

1    biological -- biological development?
2         MR. GANNAN:  Objection.  Vague.
3    BY MR. WILLIAMS:
4         Q.  You can answer.
5         A.  I didn't know what he said.
6         MR. GANNAN:  I objected on vagueness.  You can
7    answer the question.
8         THE WITNESS:  Okay.
9         A.  The current state of the science is that it is
10   a psychiatric disorder that involves the mind.  But
11   there are psychiatric disorders that also involve the
12   mind and the brain.  There is no known evidence to
13   suggest that people with gender dysphoria have any
14   causal biological problems with their brain.
15   Although --
16   BY MR. WILLIAMS:
17        Q.  Brain the organ?
18        A.  Brain the organ.
19        Q.  Go ahead.
20        A.  There is no specific medical tests in terms of
21   laboratories, physical exam, x-ray, CT, MRI, functional
22   MRI, PET scan that will allow you to diagnose a medical
23   condition causing gender dysphoria.  It is a product of
24   the mind.
25        Now, there are cases in the literature that

Page 70

1    suggest that individuals with autism have higher rates
2    of gender dysphoria, but there, it's not clear.  So if
3    you think of the structure developing normally, the
4    mind can have all kinds of problems.
5         The mind can be depressed but not depressed to
6    the point that it affects the brain, but there are
7    depressions that affect the mind and affect the brain.
8    In fact, severe depression, melancholic depression will
9    affect the growth of your skin, affect the growth of
10   your hair, affect the heart rate.  So we know that
11   depression can go down deep into the biological causal
12   relationships that exist in the body.
13        Gender dysphoria there is no evidence in the
14   scientific literature to suggest that it is a
15   biological causal etiology.
16        Q.  You distinguished, I think, between mind and
17   brain, have you not, in your testimony?
18        A.  The structure of the brain gives rise to
19   physiologic control of the body and gives rise to the
20   mind.
21        Q.  Well, go with me, if you would.  The brain is
22   an organ of the human body, is it not?
23        A.  Yes.
24        Q.  And the brain as an organ allows the human
25   being to think, have emotions; correct?

Page 71

1         A.  Yes.
2         Q.  And so when you use the term "mind," I'm
3    telling you what I think so I can understand, without
4    going to medical school.  I correlate that to thinking
5    emotions, stuff like that, not biological phenomenon.
6    Is my thinking reasonably accurate?
7         A.  I lost track.  I -- can you repeat?
8         Q.  It's a statement I'm asking if you agree with
9    it.
10        A.  I want to hear it again.
11        Q.  Sure.
12        A.  Because Something happened and I lost track.
13   Am I allowed to ask her?
14        Q.  Sure.
15        MR. WILLIAMS:  Off the record.
16   (A discussion was held off the record.)
17   (The question was read back as follows:
18        And so when you use the term "mind," I'm
19   telling you what I think so I can understand,
20   without going to medical school.  I correlate that
21   to thinking emotions, stuff like that, not
22   biological phenomenon.  Is my thinking reasonably
23   accurate.)
24        A.  Yes.
25             ***

Page 72

1    BY MR. WILLIAMS:
2         Q.  In any event, going back to that dichotomy,
3    brain versus mind -- not versus but brain here, mind
4    there, gender dysphoria is more related to the mind;
5    correct?
6         A.  Yes.
7         Q.  The way I've characterized it; correct?
8         A.  Yes.
9         Q.  I'm going to confess to you, doctor, when I
10   read 14, I read it several times, paragraph 14.  And
11   I'm not sure I understand it, as I sit here today.
12   Would you please translate for me and for the court or
13   anybody else who reads this deposition in plain
14   English, simple terms, what you are intending to
15   communicate in paragraph 14 of your declaration.
16        A.  The only living human species on this planet
17   are homosapiens.  Homosapiens consist of males and
18   females.  In a female, the somatic cells, the cells
19   that are not involved in reproduction have two sex
20   chromosomes, and they look like an X under a
21   microscope.  And that's why they're called X.
22        In a male, the sex chromosomes have an X, but
23   they also have a chromosome that looks like a Y.
24        In a male who has an X chromosome and a Y
25   chromosome, all the information necessary to develop

18 (Pages 69 to 72)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 73

1    that human being is available on the X chromosome.  The
2    Y chromosome decides genetically whether it will be a
3    male and also hairy ears.
4        Q.  Also what?
5        A.  Hairy ears.  I didn't design it.
6        Q.  It happens.
7        A.  In a female, there's two Xs.  And it was
8    discovered by Winston Barr in 1946 that one of the Xs
9    shuts down.  There seems to be a redundancy of
10   information.  You don't need two Xs, so it shuts down.
11   That's the Lyon hypothesis that that Barr body will
12   stay a Barr body forever, and in consequence, the cell
13   only needs one X.  So in males you can't have a Barr
14   body if you have an X and a Y, because, if you shut
15   down the X, the cell can't live.
16       In a female, one the Xs shuts down, becomes a
17   littler dark spot on the edge of the nucleus, called a
18   Barr body.  He was a Canadian physician.  He discovered
19   it in 1950 -- 1946, and then Lyon, a physician,
20   proposed that this Barr body shuts down and never opens
21   up again because you have all the information you need
22   on the X chromosome.
23       So in someone who is born "normally," you have
24   a male or you have a female.  And in a male, you have
25   an X chromosome, you have a Y chromosome.  You have no

Page 74

1    Barr bodies because, if you shut down the X, the cell
2    will die.
3        In a female, you have an XX, and it's thought
4    under the Lyon hypothesis that one of the Xs shuts down
5    because you have a redundancy of information.  What
6    that means in practical terms is that in all women,
7    including the women in this room now, when one X shuts
8    down, it changes things.  So women, their sweat pattern
9    on their skin is different; whereas in men, it's
10   uniform, because the men can't shut down the X, but
11   because each X may have recessive genes or they may
12   have predominant genes, one of the Xs shuts down.
13   That's why cats with different hair color are almost
14   always female.
15       So what I'm saying in this sentence is that a
16   natal male, meaning a natural male, has an X and Y
17   chromosome in their somatic cells.  A natal female has
18   an XX in their -- a natal female has an X and X in
19   their somatic cells.  One of the Xs shuts down in the
20   nucleus, so you end up with one X, and that X is enough
21   to give a woman life.  But because there are genes that
22   are active or recessive or whatever, they may have
23   different sweat glands, they may have different nerve
24   distribution.  That's the ultimate diversity.  It
25   allows, through evolution, females to provide a

Page 75

1    different approach to common things that males cannot
2    do, because they only have one X chromosome.
3        So I go on to say that in men with Klinefelter
4    syndrome, they have two Xs and one Y.  What you find in
5    someone with Klinefelter's, when you do a karyotype,
6    when you look at the chromosomes, what you see, when
7    you look at the cell, you see a Barr body in a male.
8    Now, that shouldn't happen in a male, but they have
9    Klinefelter's.  They have two Xs.  So one of the Xs
10   shuts down and becomes a Barr body in the nucleus.  So
11   you end up with XY, which is a normal male, but because
12   the different cells shut down different Xs, you end up
13   with problems associated with Klinefelter's diagnosis.
14       Q.  Which is what?
15       A.  It's a -- Klinefelter's, they're very tall,
16   their arms sometimes will reach above their knees.
17   They tend to have elastic joints.  They tend to die on
18   the toilet because, when they push to have a bowel
19   movement, it collapses the valves in the heart.  So the
20   cartilage is very -- it's too elastic for the body to
21   withstand the rigors.
22       Nobody with Klinefelter's can play
23   professional sports like hockey, basketball, football,
24   because they'll damage themselves because the cartilage
25   isn't strong enough to hold the joints together, and

Page 76

1    the bones are elongated because those cells are giving
2    different information and causing a different
3    phenotype, a different expression of the genes.
4        So in Klinefelter's you have two Xs.  One X
5    shuts down.  You end with XY, which is a normal male,
6    but they're not normal because they have physical signs
7    and they have symptoms, and you can make the diagnosis
8    based on that.
9        So in a Klinefelter's patient, there is one
10   Barr body.  There shouldn't be a Barr body because it's
11   not a female, but because they have an extra X, they
12   have a Barr body.
13       In a female --
14       Q.  You are talking about a male that has a Barr
15   body?
16       A.  Yes.  Because they have two Xs.  In a normal
17   male, they just have one X.  So in a female with an XXX
18   karyotype, trisomy X, there are two Barr bodies because
19   there are an extra two X chromosomes, and so it shuts
20   it down in the nucleus.
21       In females with Turner syndrome with a
22   chromosomal karyotype of XO, they don't even have a Y
23   chromosome.  They don't even have an extra X
24   chromosome.  You can't have the X chromosome shut down.
25   The cell would die.  So they don't have a Barr body.

19 (Pages 73 to 76)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 77

1  As an inactivation the only X chromosome would render
2  the cell without DNA.
3       And although I don't mention it in this paper,
4  I'll mention it to you, because you seem interested.
5  In every cell of the body and every nucleus of the
6  body, there are between 5 and 10 million biochemical
7  reactions per second.  That's why, when you have
8  children and you're gone from seeing your children,
9  like maybe a week or two weeks, you have a sense that
10 they're somehow different.  And they are different,
11 because we're constantly changing, we're constantly
12 aging, we're constantly moving through time
13 biologically.
14      So Number 14, I'm trying to explain that
15 there's male and female, but in development, sometimes
16 you have a male that has an extra chromosome and they
17 have a disease or an illness called Klinefelter's, and
18 they end up having a Barr body where they shouldn't
19 have a Barr body.
20      And in females with trisomy X, where they have
21 three Xs instead of two, they have two Barr bodies.
22 And in Turner syndrome, where they have XO, they don't
23 have another chromosome.  They can't shut down the X
24 chromosome.  The cell will die.
25      So that is my explanation for Number 14.

Page 78

1       Q.  Have you ever heard of the term or phrase or
2  whatever called "intersex condition"?
3       A.  Uh-huh.
4       Q.  What is that?  What intersex condition?
5       A.  It's where they -- ambiguous genitalia, or
6  they have a combination of both genitalia.
7       Q.  At birth?
8       A.  Yes, at ultrasound.
9       Q.  At what?
10      A.  At ultrasound.
11      Q.  Do you know what causes that phenomenon?
12      A.  No.
13      Q.  Are you an expert at all in that phenomenon?
14      A.  No.
15      Q.  Does that phenomenon have any correlation to
16 gender dysphoria, in your opinion, or do you know
17 either way?
18      A.  I'll think out loud.  Intersex is a genetic
19 developmental disorder.
20      Q.  Biological?
21      A.  Biological causative, something -- something's
22 gone wrong, and it doesn't develop right, and it
23 develops both instead of --
24      Q.  Either/or?
25      A.  -- yeah.  I'm aware of no correlation between

Page 79

1  that and gender dysphoria.
2       Q.  And in any event, that is not part of your
3  expertise as a psychiatrist?
4       A.  If I was to do a physical exam on somebody,
5  which would -- it's usually identified at birth, so if
6  they got to me and no one has done a physical exam, I
7  would have to say, "What's going on?"
8       Q.  Sure.  Okay.  Turn to page 5.  And you have a
9  topic, little roman iv, "Evidence-Based Practice
10 Therapies," and you talk, at some length in the next
11 few paragraphs, about that subject.  I don't want to go
12 through all of your declaration on that, because it
13 would take a long time.
14      But my question to you is:  What is the
15 relevance of this subtopic to your expert opinions?
16 Can you summarize it for me?
17      A.  I would like to read it briefly.
18      Q.  Sure.  Absolutely.
19      MR. WILLIAMS:  Actually, if you want to take
20 an early lunch break, Roger, give you some time to
21 review it carefully.  That would be okay with me,
22 if that's what you would like to do.
23      MR. GANNAN:  Okay.
24 (A discussion was held off the record.)
25      MR. GANNAN:  I think we'll be fine, but

Page 80

1  Dr. Hudson has a 6:15 flight.
2       MR. WILLIAMS:  Oh, trust me.  We won't have a
3  problem.
4  (A luncheon recess was taken.)
5  BY MR. WILLIAMS:
6       Q.  Doctor, when we broke for lunch you were going
7  to take some time to read paragraphs 20 through 22 of
8  your declaration, pages 5 and 6.  Have you had an
9  opportunity to do that?
10      A.  Yes.
11      Q.  What is the significance of including your
12 discussion in paragraphs 20 through 22 about
13 evidence-based practice therapies?  Why did you include
14 that?
15      A.  I included it because therapy is important for
16 individuals who suffer from psychological or
17 psychiatric illness.  And I included it because I
18 wanted to show that there are therapies that are
19 available for parents, for children, adolescents, for
20 families, and there's different kinds of therapies, and
21 many of the therapies that are recommended by the
22 American Psychological Association, the American
23 Psychiatric Association are evidence-based therapies.
24 They are shown that, if you do the therapy in the way
25 that its proscribed, that you'll get better results.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

2b293f70-452a-4746-9273-f93183a2d9b3

Page 81

1    Q.  Prescribed.
2    A.  I'll go with that.
3    Q.  "Proscribed" is a totally different word.
4    A.  I was uncertain as to what to say.  And I also
5    did it because there is no evidence-based practice
6    therapy for people that "transgender."  So there are
7    evidence based therapies that are available to use with
8    people who have gender dysphoria, but the ban, like in
9    California and in other places, says you have to
10   affirm.
11         And what's happened in my experience is that
12   it's caused two things to happen.  It's caused patients
13   to fear going to therapy.  It's caused therapists,
14   whether they're LCSWs or marriage and family counseling
15   or psychiatrists, running afoul of the law if they
16   don't do this affirming.
17   Q.  Go ahead, please.
18   A.  I wanted to demonstrate that there are
19   therapies available for people who have gender
20   dysphoria if they have comorbidities; if they have
21   anxiety disorders, which many people with gender
22   dysphoria have; if they have depressive symptoms, which
23   many people with gender dysphoria have; if they have
24   substance abuse issues, which many gender dysphoric
25   people have; if they have histories of physical and/or

Page 82

1    sexual abuse, which many of these individuals have; if
2    they have experiences where they've been bullied or
3    accosted or assaulted in some way, which many of these
4    people have.
5          And so I wanted to demonstrate that there are
6    therapies available for these people if they have these
7    comorbidities.  But there is no therapy specifically
8    for gender dysphoria.  What you do is you treat the
9    outlying symptoms, and then you work with the patient
10   to the develop a therapeutic approach that aids them in
11   assisting how to see themselves, how to deal with the
12   "stigma" that's attached with that.
13         So those three sections it's -- Number 20 is
14   an introduction into their various kinds of therapy.
15   Number 21 is working with the patient so that you can
16   lessen their symptoms, and then 22 is pointing out that
17   there is no -- in the literature, a therapy for gender
18   dysphoria.  But if they have other symptoms, you can
19   use the evidence-based therapies with them.
20   Q.  You've used the word "therapy" quite a bit in
21   your answer and also in your declaration.  Give me a
22   working definition of the word "therapy" as you
23   understand it in connection with your testimony?
24   A.  It's the restoration of the self.  People --
25   the self is what, when you're asleep and you are

Page 83

1    dreaming, somebody is watching, and it's you.  And
2    that's the self.  And what people come in for therapy
3    for is difficulties with the self, difficulties in
4    relationships, difficulties with their own
5    relationships with themselves.
6          And so therapy is really restoring the person
7    to a civil relationship with themselves, and there's
8    various ways to approach a patient.  There's various
9    therapies that are evidence-based to use that with
10   patients, and some of the guidelines that claim to be
11   standards of care or evidence-based prevent you from
12   doing that.  And it's heartbreaking that you can't help
13   some of these people.
14         Like in California, I had to say to them, "The
15   law says I'm not allowed to do this."
16   Q.  What are you not allowed to do in California?
17   A.  You are supposed to affirm, and you are not
18   allowed to say that someone is not the opposite sex.
19   Q.  When you say "affirm," what does that mean?
20   Be specific.
21   A.  You're supposed to -- when somebody comes in
22   and claims that they're a "transgender," you are
23   supposed to say, "Yes, you are."  And then the
24   guidelines say you are supposed to educate them, you
25   are supposed to let them know about the stigma attached

Page 84

1    to this, and that they'll be -- people will be
2    aggressive, they won't accept you, they won't tolerate
3    you.  That's not therapy.  That's -- that's
4    instruction.  That's an instructional manual.
5          Therapy has to do with them bringing into the
6    session the problems they have and then you helping
7    them deal with those problems.  And one of the best
8    signs that therapy is over is the patient says to you,
9    "You know, if I wasn't coming here, I wouldn't have any
10   problems.  You're the problem now."
11         Well, that means that they brought the
12   problems into the therapy; they've restored themselves
13   to themselves; and they don't, any longer, need to see
14   you because they're doing well on the outside.  They're
15   no longer dysfunctional.
16   Q.  Doing well on the outside by themselves?
17   A.  In terms of activities of daily living, in
18   terms of work, in terms of relationships with friends
19   or family, in terms of living in the real world.  One
20   of the goals is -- in therapy, is to help people deal
21   with the fact that this world, that these people around
22   are not always going to get along.
23         And a lot of people come in -- everybody comes
24   in to therapy and says the same thing, basically:  "I
25   have a problem with that person.  I have a problem with

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 85

```
 1   that person, and it's their fault, and it's their
 2   fault."  It's not.  That's the way the world is.
 3         And so therapy really is helping someone deal
 4   with fact that the world doesn't negotiate, the world
 5   doesn't really care what you feel and how you think.
 6   And you have to live in the world in a civil way.  And
 7   if you have a psychiatric illness that's interfering
 8   with that, then that's what therapy attempts to
 9   address.  If they're really psychiatrically ill, you
10   may have to use psychopharmacology to help them.
11         So my experience in California was that you
12   had to affirm, you had to educate, you had to go
13   through this long list of things that you had to do.
14   That's not therapy.  What that is, it's just telling
15   the person what they already know.
16      Q.   Informational?
17      A.   Yeah.  They already know that the world
18   doesn't accept them.  They already know that they can
19   be bullied.  When I was at Vanderbilt, I had several
20   people that were homosexual, and one guy came in one
21   day, and he had a huge black eye.  He had a big cut on
22   his jaw.  He was downtown Nashville, and somebody
23   thought he was gay, and he was, and he got assaulted.
24         And he says, "I'm just not going to go
25   downtown anymore."
```

Page 86

```
 1         Well, you know, if you don't go downtown, you
 2   know, you don't go out with friends, you don't do
 3   things.  And the goal is for them to live in society.
 4   But society sometimes doesn't do what we want it to do.
 5   And he suffered greatly for it, and it took a while for
 6   him to finally go back downtown, but he went downtown
 7   with friends.  He didn't go alone anymore.  So we
 8   worked on does he have a friend?  Can he do downtown
 9   with that friend?  Can he have a good time with that
10   friend?  Will he feel protected with that friend?
11         So almost everyone that I've spoken to over
12   the years has no problem working with people that have
13   sexual instinct, sexual desire, sexual identities.
14   They don't have a problem with that.  That's fine.
15   Live your life.  Do what you want.  If you have this
16   illness, I'll help you with it and we'll plan some
17   therapy.
18         But these bans prevent you from doing that.
19   They cut you off before you're -- before you can do an
20   evaluation, before you can process what the person is
21   like.  Many people take a long time to open up.  I've
22   had people sometimes in therapy one to two months
23   before they finally are able to uncover what really is
24   bothering them, and I've had people that are -- have
25   been living their lives based on something that
```

Page 87

```
 1   happened when they were a teenager or when they were a
 2   child, and they are still doing the same thing.  It's a
 3   repetition-compulsion kind of lifestyle.
 4         And by sharing the observations that you seem
 5   to do this when this happens, you seem to say this when
 6   this happens, you share the observation.  And then they
 7   begin to incorporate that observation, and you begin to
 8   see them change.  And you begin to see what many people
 9   call an observing ego.  They're able to observe
10   themselves and say, "Okay.  I'm feeling this way, and
11   the reason I'm feeling this way is not because of the
12   person.  It's because I feel this way."  And they're
13   able to order their life.  They're able to -- they have
14   a direction.
15         Many people, as an example, come into therapy
16   with an old map, and they're trying to navigate streets
17   that longer exist or the streets are bigger or there's
18   building in the way.  And what you do is you update
19   their map.  You help them do that because it's
20   unconscious many times.  They don't know that they're
21   actually doing it.
22         You know, the famous thing about alcoholics is
23   they're in denial.  Well, denial is unconscious.  They
24   don't know they're in denial.  You have to help them
25   access that.  You have to help them dig it up so they
```

Page 88

```
 1   can see that they're in denial.
 2         Many times with individuals that, say, have a
 3   substance abuse problem, let's say alcohol, they'll
 4   say, "Well, I only drink six beers," and I'll say, "Why
 5   not nine?  Why not ten?  Why do you stop at six?  What
 6   is so magical about six?  Tell me about six.  What does
 7   that mean?"
 8         And, oftentimes, you can find out information
 9   because the six is a screen memory for other things
10   that took place in their life.  They've put everything
11   into the six beers.
12         I had a woman that was absolutely petrified by
13   spiders, and it took a while, it took a long while for
14   her to finally realize that on the day she was raped,
15   she was in a barn and she was looking up at a spider in
16   a spider web.  So she took the assault and the trauma,
17   and she projected it onto a spider.
18         That takes time.  And that takes
19   evidence-based therapy so that you can help them access
20   that, because it's highly defended.  It's a wall that
21   goes very high and goes very deep and goes very wide,
22   and you have to help them remove brick by brick by
23   brick so that they can see that the trauma still
24   exists, but it's been projected onto a spider or it's
25   been projected onto a man or it's been projected onto a
```

22 (Pages 85 to 88)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                        2b293f70-452a-4746-9273-f93183a2d9b3

Page 89

1   female.
2       So the steps there, 20, 21, and 22 is to point
3   out that there are available evidence-based therapies,
4   and there's a variety of evidence-based therapies based
5   on the scientific method and that there is no specific
6   evidence-based therapy for people that are claiming
7   they're transgender, but you can still help them by
8   alleviating their comorbid psychiatric problems, such
9   as depression, anxiety, panic attacks, sometimes
10  agoraphobia.  You can help them with substance abuse
11  problems.  You can help them.  But the ban cuts them
12  off.
13      Q.  Well, I realize that you don't live in the
14  city of Tampa, you don't practice psychiatry in the
15  city of Tampa.  You don't even live in Florida.  So
16  your experience with the ban, as you've talked about,
17  is primarily California's, is it not?
18      A.  It's California, and it's the reading of the
19  Tampa ordinance.
20      Q.  All right.  Let's stay with California because
21  that's where you practiced.  You haven't practiced in
22  Tampa, have you?
23      A.  No.
24      Q.  So going back to California, it's a statewide
25  statute.  I think we established that earlier that, to

Page 90

1   the best of your knowledge, that bans -- that is the
2   ban.  I don't have a copy of that statute, but what you
3   told me earlier, Doctor, is that if a client comes in,
4   all you can do is provide them with information or
5   instruction.  You can't provide them with therapy.  Did
6   I -- was that an accurate statement?
7       A.  You have to affirm, and then you have to
8   instruct.
9       Q.  "Affirm" meaning you are what you are?
10      A.  Yeah.
11      Q.  I want to make sure that term is clear on the
12  record.  So define "affirm" as you use it in the
13  context that we've been discussing.  "You have to
14  affirm," what does that mean?
15      A.  If somebody comes in and claims they're the
16  opposite sex, you have to agree with that.  You have to
17  affirm that they are the opposite sex.
18      Q.  A female human being comes in and says, "I'm a
19  male human being."  You, the psychiatrists, have to
20  say, "Yes, you are the male human being."  Is that what
21  you are saying?
22          MR. GANNAN:  Objection.  Vague.
23          You can answer.
24      A.  Yes.
25              ***

Page 91

1   BY MR. WILLIAMS:
2       Q.  You don't question what they've told you.  You
3   just affirm it -- confirm it, almost, is really what
4   you are saying?
5           MR. GANNAN:  Objection.  Vague.  Misstates
6       testimony.
7       A.  There are instances where the law interferes
8   with treatment, and I have tried in my career to abide
9   by the law.  But I will say to people, "Given the fact
10  that there's a law that does not allow me to question
11  you in that area, are there other things that you are
12  suffering from that I can help you with?"
13  BY MR. WILLIAMS:
14      Q.  All right.  Well, if the law wasn't as it is
15  in California and somebody came in to say -- who was
16  female and says, "I'm a man," what would you do
17  differently?  What therapy would you provide to them
18  potentially?
19      A.  Well, as I mentioned there is no
20  evidence-based therapy for people who claim that.  So
21  you look for any kind of comorbidity, and you then use
22  evidence-based therapy to treat that comorbidity.
23      Q.  "Comorbidity," define that, if you would.
24      A.  They come in and you diagnose gender
25  dysphoria.  Many of these individuals not only have

Page 92

1   gender dysphoria, they have depression, they have
2   anxiety, they have substance abuse problems, they have
3   self harm, they have suicidal thoughts, they have maybe
4   attempted suicide.  So you help them in those areas.
5       The goal is you may not be able to get to the
6   bull's-eye, but you can certainly circle around and
7   eliminate or attenuate the other symptoms that they're
8   suffering from.  You do help them.  You help them from
9   the outside towards the in.  And then if you are
10  able -- and I have been able to do this with people
11  that are claiming that they are the opposite sex, we go
12  through the science of biological sex.  We go through
13  how that can take place, and more often than not people
14  end up saying, "No, I guess I'm not the opposite sex."
15      I have had --
16      Q.  They reach that conclusion on their own?
17      A.  With help through the therapeutic process,
18  through the relationship that they establish,
19  asymmetric, they don't know anything about me, but they
20  know that I have a skill set, because every person I
21  ever meet I introduce myself.  I introduce the fact
22  that I'm Board-certified in psychiatry and child
23  adolescent psychiatry, that I've worked 40 years or
24  35 years, that I have been in an academic position, and
25  then I give them my card.

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 93

```
1        So there's an introduction, and then they
2   start to talk about what they're troubled with.  And if
3   they say that their primary problem is that they're the
4   opposite sex, I will say, "Are there other things that
5   are more troubling to you?"
6        If they say yes, then we address those things.
7   If they say no, then we address that.  And the way we
8   address that is we have to combine other evidence-based
9   therapies because there is no single, there is no
10  series of evidence-based treatments for someone
11  claiming gender dysphoria.  So what you do is you make
12  a complex evidence-based treatment based on the
13  principles of someone being able to talk, someone being
14  able to listen, someone being able to share
15  observations so that the person can see how they're
16  being experienced by somebody else.
17       So I'm a neutral, asymmetric person, and I'm
18  sharing observations in a nonthreatening way.  But
19  people will get upset.  People will get angry.  People
20  will cry.  People will get depressed.  But as you move
21  closer and closer to the self, the self is never
22  harmed, except in psychosis.  Okay.  But in gender
23  dysphoria, the self remains.  And what you do is you
24  slowly have them move towards themselves so that they
25  can understand what they're doing.
```

Page 94

```
1        And if I, and I have, had patients that
2   complete therapy by acknowledging I am not the opposite
3   sex, but I do want to be the opposite sex, but then at
4   that point the therapy is over.  They -- you took care
5   of their comorbidities.  They've been restored to
6   themselves.  They still have this idea, this whim, this
7   notion that they're the opposite sex, but they're
8   comfortable, they know how to be safe in the community,
9   they're sleeping well, they're eating well, they're
10  taking care of themselves, and their pharmacologic
11  treatment is over, and they're okay.
12       And the therapy then, the treatment then is
13  over.  And if they leave the office with less
14  comorbidities, with treated psychiatric illness and
15  they still believe this notion that they're the
16  opposite sex, but they're functioning, they're not
17  dysfunctional, then the therapy is over, and maybe they
18  call you back to see you again for a short period of
19  time or maybe they don't.  But they go on with their
20  life.
21       Q.  Is the therapy that you've been describing, in
22  your opinion, based on your understanding of the
23  California statute, banned in California?
24       A.  Yes.
25       Q.  So what you've just described, you could
```

Page 95

```
1   not -- legally that therapy is not a therapy that you
2   could legally provide to a client if you wanted to in
3   California?
4        MR. GANNAN:  Objection.  Asked and answered.
5   Calls for a legal conclusion.
6        A.  I don't see clients.
7   BY MR. WILLIAMS:
8        Q.  Patients.  I'm sorry.
9        A.  The reason they're called patients is because
10  it's patiens, and it's from Latin, and it means to
11  suffer.  And I see people that come in in pain and
12  suffering, and so that kind of treatment, my
13  understanding of the ban in California is that I'm not
14  able to do that kind of treatment.
15       Q.  I was just conflating yesterday with today
16  because psychologists refer to them as clients and not
17  as patients.
18       A.  Because psychologists are not physicians.
19       Q.  Right.
20       A.  And they do deal with pain and suffering, but
21  they don't have patients, any more than a pharmacist
22  has patients.
23       Q.  I agree.  Okay.
24       Have you compared the Tampa ordinance with the
25  California statute?
```

Page 96

```
1        A.  No.
2        Q.  So you don't know what's the same or what's
3   not the same, do you?
4        A.  No, I don't.
5        Q.  Are there physicians, psychiatrists or
6   otherwise, who specialize in treating transgender
7   patients, period?
8        A.  Ironically, it's at the LGBT clinics.  They're
9   allowed to do whatever they want.
10       Q.  I'm not following you.  I'm sorry.  Please
11  explain it.
12       A.  The ban only applies to people like me, but if
13  you are at a clinic that specializes in treating gays,
14  lesbians, bisexuals, transgenders, you are allowed to
15  do whatever you want.
16       Q.  In California?
17       A.  In California.  And I have referred -- many
18  people, I say -- you know, they get upset, they want to
19  know if I'm gay, and I don't answer, and I say, "What,
20  what if I am?  What if I'm not?  How would that" -- I
21  end up saying, "Okay, I get it.  You can go to West
22  Hollywood.  You can go to this clinic.  They -- you can
23  trust the person because they will be gay, they will be
24  lesbian, they will be bisexual, they may be a
25  transgender, and it seems like that is a priority for
```

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 97

1    you, so I will refer you there."
2        Q.  And these are clinics that hold themselves out
3    to be clinics for gay, lesbian, bisexual human beings?
4        A.  Yes.
5        Q.  Solely?
6        A.  Yeah.
7        Q.  Restricted, that's their population?
8        A.  Yeah.
9        Q.  And what you are testifying to, at least your
10   understanding, is that those gay, lesbian, bisexual
11   clinics can provide therapy that you can't provide
12   under the California statute?
13       MR. GANNAN:  Objection.  Calls for a legal
14   conclusion.
15       A.  I think what they do is they skirt the law.
16   They do provide treatment, but they don't acknowledge
17   the difficulties that are inherent in being
18   transgender.  They accept it, they affirm it, and they
19   chat and talk.  From what I've been told by people that
20   have been at those clinics, it's not really therapy.
21   It's just everybody high-fiving because they're gay,
22   they're lesbian, they're bisexual, or transgender.
23   BY MR. WILLIAMS:
24       Q.  As opposed to I will just use the word
25   "clinic" that is not focused on gay, lesbian,

Page 98

1    bisexuals?
2        A.  Yes.
3        Q.  That clinic wouldn't be doing that, what you
4    just described.  Would you agree?
5        A.  Right.
6        Q.  And therein lies the difference, if I
7    understand your testimony?
8        A.  Yes.
9        Q.  Have you ever assisted someone who is going
10   through gender transition?
11       MR. GANNAN:  Objection.  Vague.
12       A.  I'm not allowed to be involved in that
13   process.  I went to the children's hospital in Los
14   Angeles -- I'm sorry -- I went to the children's
15   hospital in Los Angeles where they do transgender, that
16   kind of stuff, and they weren't interested.  I had to
17   affirm.  I had to -- I just -- I could not be a doctor
18   to those people in that situation.
19   BY MR. WILLIAMS:
20       Q.  Because of the statute out there?
21       A.  Yes.
22       Q.  So your answer is really, no, you haven't, you
23   know, as a physician assisted a person in that process
24   that's undergoing gender transition?
25       A.  I've had referrals on people that are on

Page 99

1    puberty blockers, on cross-sex hormones and have
2    undergone surgery, not many, but I have had referrals
3    where the patient on their own decides that they're
4    still suffering from some particular psychiatric
5    problem and they've come to me while they've been in
6    that process because they're not getting the help that
7    they want from the other clinic.
8        I would also like to add that no one on this
9    earth has ever transitioned.
10       Q.  What does that mean?
11       A.  It's what your word is using, and I'm saying
12   that no one has transitioned.  There are no such things
13   as transsexuals.  No one can become the opposite sex.
14       Q.  I see.  So you are using the term "transition"
15   from one sex to the other sex?  Is that what you are
16   saying?
17       A.  That's what they say.
18       Q.  Yeah.  Okay.  That's what I understand.  So if
19   that's the case -- I'm trying to think how to
20   articulate this, Doctor.  Can you explain for us what
21   causes a male human being to identify as a female human
22   being?
23       MR. GANNAN:  Objection.
24       A.  No.
25       MR. GANNAN:  Object.  Vague.  Calls for

Page 100

1    speculation.
2        A.  No.
3    BY MR. WILLIAMS:
4        Q.  Why not?
5        A.  It's not known.  I have had patients that told
6    me with a straight face that they knew when they were
7    born that they were the opposite sex, before language.
8    It approaches a level of ridiculousness with some of
9    these people, and I find myself saying, "Calm down.
10   Answer the questions.  Provide the science.  Work with
11   them, but okay.  They knew when they were born that
12   they were the opposite sex."
13       Q.  Going back to one of your recent answers that
14   gender transition is just not possible, then -- and I
15   think you said that?
16       A.  Yeah.
17       Q.  Then --
18       A.  I said that no one can become the opposite
19   sex.  Gender is -- goes all over the place.  People can
20   be very masculine.  People can be very feminine.
21   People can be a combination of both, and I think I
22   stated in my declaration that I've never met anyone
23   that doesn't have masculine and feminine qualities.
24       Q.  Well, I think what you did say is you can't
25   transition from one to the other.  That's --

25 (Pages 97 to 100)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
2b293f70-452a-4746-9273-f93183a2d9b3

Page 101

```
 1        A.  Biologically, there's no way to reverse
 2   billions and billions of chemical reactions so that you
 3   have different genes, different chromosomes, different
 4   nucleus, different receptors, et cetera.
 5        Q.  And if that's the case -- and I accept your
 6   testimony at face value -- then it follows that, if
 7   gender transition is impossible for the reasons you
 8   just articulated --
 9        A.  No.  Biological sex cannot be transitioned.
10   Everybody's occasionally masculine, feminine.
11        Q.  Is there any -- ever a situation where some
12   effort to transition from one sex to the other is
13   medically necessary to save a life, to do anything of
14   that nature?
15        A.  No.
16        Q.  Have you been faced with a situation where --
17   I'll focus out in California -- where a patient
18   presents with gender dysphoria and, because of the
19   statute, you were unable to provide any therapeutic
20   modality -- I hope that's a word, a phrase -- at all?
21        MR. GANNAN:  Objection.  Vague.  Misstates
22   testimony.  Calls for legal conclusion.
23        A.  I have treated people in violation of the ban.
24   They will show up for an initial appointment, and they
25   will be at risk for suicide.  They will be intoxicated
```

Page 102

```
 1   because of substance use.  They will be floridly
 2   psychotic.  They will have extraordinary panic attacks.
 3   They will be massively depressed, and I believe that's
 4   an emergency, and I will initiate treatment.  I will
 5   initiate hospitalization.  I will call the team that
 6   comes out to evaluate whether someone needs to be
 7   hospitalized.  I believe that in certain situations
 8   affirmation is absolutely totally wrong because it's an
 9   emergency, and so I have treated people in that
10   situation.
11        Q.  And that situation would be defined as an
12   emergent situation?
13        A.  As I determine it, yes.
14        Q.  Your judgment that it is an emergent
15   situation?
16        A.  Yes.
17        Q.  And I guess that it follows that if you
18   determined that it was an emergent situation, you also
19   reached the conclusion that, if I do not take these
20   steps, this person could perhaps die?
21        A.  Yes.
22        Q.  Do you know whether the California statute
23   allowed for that in a carve-out for emergencies?
24        MR. GANNAN:  Objection.  Calls for legal
25   conclusion.
```

Page 103

```
 1        A.  I don't know specifically.  I just know that
 2   I'm not going to not treat.
 3   BY MR. WILLIAMS:
 4        Q.  I follow you.  I follow you.  You have used
 5   the term "affirm" a number of times during your
 6   deposition today.  Do you know what the American
 7   Medical Association's position on affirming a
 8   transgender person's gender identity is?
 9        A.  No.
10        Q.  Tell me whether or not you agree with the
11   following statement:  "Affirming a transgender person's
12   gender identity is an important means of improving
13   health that comes from the transgender population."
14        Do you agree with that?
15        A.  No.
16        Q.  Why not?
17        A.  It interferes with treatment.  It interferes
18   with diagnosis.  It prevents you from talking with the
19   person.
20        Q.  So if that's the case, is it your view or your
21   opinion, Doctor, that there are no real empirical
22   studies that have -- let me make sure I articulate this
23   correctly -- no empirical studies that have
24   demonstrated the efficacy of gender transition as a
25   therapeutic treatment for transgender people?
```

Page 104

```
 1        A.  Can you read it back to me?
 2        Q.  Sure.
 3        MR. WILLIAMS:  Please.
 4   (The question was read back.)
 5        A.  I'm not sure if you want a yes-or-no answer.
 6   BY MR. WILLIAMS:
 7        Q.  I just want the best answer you can provide to
 8   me.
 9        A.  All right.  We know from longitudinal studies
10   that individuals that undergo this kind of process
11   continue to suffer from enormous numbers of psychiatric
12   illnesses.  We have multiple instances of individuals
13   going through this kind of process and continuing to
14   suffer from depression, anxiety, substance abuse,
15   suicidal attempts, suicidal actions, self-harm.
16        What I understand from conferences and
17   colleagues over the years, that the wealthy do fairly
18   well when they have these kinds of hormone therapy and
19   treatments because it's extremely expensive and you
20   become a patient for life.  But the poor, for which
21   I've worked most of my life for, suffer enormously.
22   They're not able to access the kind of doctors that do
23   that kind of thing.  They're not able to access the
24   hormones, the cost.
25        But I know from my experience at Vanderbilt
```

26 (Pages 101 to 104)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 105

1  that there are people that have enormous amounts of
2  money and they can access, they can fly to different
3  states and get treatment.  But the individuals that
4  I've worked with, my experience says these people, they
5  suffer enormously because they'll start something but
6  they can't continue it or the insurance denies it or
7  their job changes and they get different insurance, and
8  it's a very complicated process for them.
9      And I know that there are clinics around the
10 country that select certain people for certain
11 procedures, and I know that there are -- there are
12 clinics, I don't know specifically which ones, but I
13 know that there are clinics, not only in this country
14 but in Canada and the UK, that 100 percent of the
15 people that show up are transitioned and are placed on
16 hormones.  There is no attempt to differentiate those
17 who may align with their biological sex eventually and
18 those who won't align.
19      So my answer is that in my experience in two
20 states, Tennessee and California, I have seen wealthy
21 people do pretty well, but I've not seen lower-income
22 people do as well.
23     Q.  All right.  Do you have an opinion as to
24 whether or not there's a transition-related care that
25 is necessary for the treatment of transgender persons,

Page 106

1  patients?
2     A.  You're asking me if someone that is in the
3  process of taking hormone therapy or cross-sex hormones
4  or having had surgery or all of the above, if they need
5  continued care?
6     Q.  That's certainly part of the question, yes.
7     A.  My answer would be yes.
8     Q.  What about transition-related care that does
9  not involve those components you just identified?
10    A.  If they're not undergoing hormone treatment
11 and they're not expecting surgery, we know that a large
12 percentage of those people will align with their
13 biological sex, and therefore they don't have to have
14 the cost, the expense, and all that for the treatments.
15 They don't become a patient for life.
16     And if they continue to have other psychiatric
17 problems like depression, anxiety, substance abuse, et
18 cetera, then they would need continued care and
19 treatment.
20    Q.  What evidence do you have that that larger,
21 apparently larger portion of the population you are
22 talking about will align with their biological sex?  I
23 think that's what you said.  Tell me if I'm wrong.
24    A.  Yeah, I've seen videos, I've seen at
25 conferences, and I've spoken with individuals who are

Page 107

1  in pediatrics and other psychiatrists, and I've been
2  told that somewhere between 75, 90 percent of these
3  people will, if given time, will align with their
4  biological sex.
5     Q.  Which means they're no longer in gender
6  transition, I guess?
7     A.  No.
8     Q.  Is my statement correct?
9     A.  I'm sorry.  Yes.
10    Q.  Are you a member of the American Medical
11 Association?
12    A.  No.
13    Q.  Have you ever been a member?
14    A.  No.
15    Q.  Why are you not a member?
16    A.  I don't believe in what they say.
17    Q.  Why do you not believe in what they say?
18    A.  I didn't go into medicine to kill people.
19    Q.  And does the American Medical Association
20 endorse killing people?
21    A.  You bet they do.
22    Q.  How so, sir?
23    A.  They high five it every God damn day.
24    Q.  How so?
25    A.  Abortion, assisted suicide, death row.

Page 108

1     Q.  Death row?
2     A.  Yeah.  I'm not part of that.  I took the
3  Hippocratic oath.  I went to Kos.  I walked where
4  Hippocrates walked.  I saw the Asclepeion.  I believe
5  in that.
6     Q.  Well, correlate what you just said with what
7  we're talking about here, because we're not talking
8  about abortion, we're not talking about suicide or
9  assisted suicide, we're not talking about the death
10 penalty.  We're talking about gender dysphoria, gender
11 identity, whatever label people want to use.
12     I think it's accurate to say that the AMA
13 endorses the necessity of transition-related care for
14 the treatment of transgender persons.  Are you aware of
15 that, sir?
16     MR. GANNAN:  Objection.  Vague.  Assumes
17 facts.  Go ahead.
18    A.  I'm aware that many organizations that claim
19 to be professional organizations rah, rah, rah around
20 this issue.  You asked me about the AMA.  You asked me
21 why I wasn't a member of the AMA.  I told you why I
22 wasn't a member of the AMA.
23 BY MR. WILLIAMS:
24    Q.  You did.  I'm asking the question that is
25 pending.

27 (Pages 105 to 108)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 109

```
 1        A.  I'm responding to the fact that you seem to
 2   not understand why I'm not a member of the AMA.  I
 3   don't know what the AMA policy is about that.  I may
 4   have read it at one time, but I can be certain that
 5   they're for it.  Even though it's experimental,
 6   investigatory, and there is no long-term studies,
 7   they're for it, because they're all for it.
 8        Q.  For it, "it" being what?  Define that.
 9        A.  Transgender, hormone treatment, surgery.
10   They're all -- all the professional organizations are
11   for it.
12        Q.  So I would assume that if the AMA's position
13   is that it endorses transition-related care as a
14   necessary part of treatment for transgender persons,
15   you would disagree with that?
16        A.  I would disagree with that.
17        Q.  Just for your benefit, I think I understand
18   why you are not a member of the AMA.  It didn't go by
19   head.  I understand that.  Whether I agree or not agree
20   is irrelevant, frankly.  My opinion doesn't matter.
21   It's your opinion, and that's all that matters.
22        What I want to try to do, Doctor -- and I'm
23   being very forthright with you -- is to determine and
24   understand your opinions as it relates to your
25   declaration and what your opinions may be if you ever
```

Page 110

```
 1   have to testify at a trial in the case that is before
 2   us right now, the Tampa case, so don't think I'm not
 3   listening carefully because I am.
 4        A.  And don't think I'm not honest.
 5        Q.  I don't think that at all.
 6        A.  Then don't repeat questions to me.
 7        Q.  What do you mean?
 8        A.  You asked me about the AMA.  You asked me why
 9   I wasn't a member of the AMA.  I told you why I wasn't
10   a member of the AMA, and then you followed that with a
11   question that sounded like you didn't understand why I
12   wasn't a member of the AMA.
13        Q.  You misunderstood my question then.
14        A.  80 percent of the physicians in this country
15   are not a member of the AMA, and there is a reason.
16        Q.  Okay.  That's fine.  Paragraph 23 and 24 of
17   your declaration, as I read them, that LGBT persons
18   have a higher rate of mental illness.  Did I read that
19   correctly in reading those two paragraphs?
20        A.  LGBT individuals continue to suffer from a
21   variety of mental illnesses.
22        Q.  Do they have higher rates of mental illness
23   than non-LGBT human beings?
24        A.  Yes.
25        Q.  And why is that?  What causes that higher
```

Page 111

```
 1   rate?  Do you know?
 2        A.  I can't specifically say what causes it.  I'm
 3   just aware that if I have somebody come into my office
 4   that's gay, lesbian, bisexual, transgender, I know that
 5   I have to ask them other questions.  I can't just take
 6   it on face value that they're gay, lesbian, bisexual,
 7   transgender.
 8        I know from conferences, from discussions with
 9   colleagues from grand rounds, from my own training and
10   education, that that group of people have significantly
11   more mental illness than the general population, the
12   cohort.  When you take people that are the same age and
13   in the same area and you compare them to the people
14   that are gay, lesbian, bisexual, and transgender,
15   they -- that group tends to have a prevalence of more
16   mental illness, and so it's not that it's not important
17   to me.  I want to know because, if I see that person, I
18   want to be able to ask them questions to determine
19   whether or not they have mental illness because I've
20   been told, I've been educated that they do, and my
21   experience is that they do.
22        And, oftentimes, I'm able to ask them and
23   they'll -- "yes, I do.  Yes.  I do."  So my evaluations
24   are tailored to the person, and I get demographic data
25   as best I can from the person, and what I've
```

Page 112

```
 1   discovered, what I have heard at conferences, what I
 2   have read in the literature is that they do have higher
 3   rates of mental illness.  And as a clinician hoping to
 4   treat, hoping to help, I need to be aware of that.
 5        Q.  You anecdotally told us about the gentleman in
 6   Nashville who went downtown and some guy attacked him
 7   because he was gay, I guess.  Is that your
 8   understanding of that?
 9        A.  Yeah, that's how it was described.
10        Q.  Would you reasonably conclude from that
11   anecdotal episode that whoever attacked him was a form
12   discrimination against gays?
13        MR. GANNAN:  Objection.  Vague.  Calls for
14   speculation.
15        A.  I don't know all the circumstances that are
16   involved in violence.  I can tell you from experience
17   that people that are gay, lesbians, bisexual,
18   transgender, they get attacked a lot, verbally,
19   physically, property, and I have -- when I've been able
20   to work with these kinds of patients, I have discovered
21   that there's a whole world out there that does not
22   accept, does not tolerate, and will not put up with
23   what they do and how they do it.
24   BY MR. WILLIAMS:
25        Q.  You mean, the gay and lesbian people?
```

28 (Pages 109 to 112)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

2b293f70-452a-4746-9273-f93183a2d9b3

Page 113

1    A.  Yeah.  Gay, lesbian, bisexual, transgender.
2  You know, 97 percent of the world is heterosexual, and
3  there are many parts of the world that it -- it's a
4  death sentence if you -- and I don't want these
5  individuals to have to go through that, but I can't
6  control the world.  But I can help them understand that
7  if certain phrases are said, if certain looks happen,
8  if certain actions take place, protect yourself, don't
9  go in by yourself, don't go to certain places.  And it
10  helps people.
11    Q.  Don't you think, Doctor, that the
12  discriminatory attitudes that a lot of people
13  apparently have towards gays and lesbians and
14  transgenders and bisexual human beings, as you
15  generally have described, that that more than likely
16  contributes to the higher level of mental illness among
17  the LGBT population in this country?
18    MR. GANNAN:  Objection.  Vague.  Calls for
19    speculation and misstates testimony.  Assumes facts
20    not in evidence.
21    A.  I think it contributes.  When you look at
22  nature, it's not only fixed, it's fluid.  We're
23  equipped with genes, DNA through evolution, through
24  time that allows us to adjust, adapt, and accommodate
25  to the changing world.  But when you are so far removed

Page 114

1  from everyone else, it's really difficult, I think, to
2  navigate.
3    Many times I've been told by people that are
4  gay, lesbian, bisexual, transgender, that sometimes
5  they just feel lost.  They don't know exactly what to
6  do.  They don't know how to protect themselves.  They
7  just -- they don't know what to do.
8    But the very act of being involved in that
9  kind of activity, I think lends itself to psychiatric
10  disorders, lends itself to substance abuse disorders.
11  I would agree --
12    Q.  That activity being what?  I'm sorry.
13    A.  The acts of being homosexual --
14    Q.  Okay.
15    A.  -- bisexual, transgender.  I think --
16    Q.  But you said but you would agree with what?  I
17  interrupt you a bit.
18    A.  I would agree that the stigma, that the going
19  out in social areas puts you at risk.  There have been
20  people killed because of this kind of thing.
21    Q.  Sure.
22    A.  For no other reason than the fact that that's
23  what they prefer.  And I believe that in a civil
24  society people have the right, as long as they're
25  lawful and remain civil, have the right to have the

Page 115

1  kind of life that they want.  But even -- even for us
2  that are not part of that group, it can be dangerous
3  anyway.
4    So my experience tells me that being gay,
5  lesbian, bisexual, transgender brings on psychiatric
6  problems, and the society, the people, their attitudes
7  makes it even worse.
8    Q.  It exacerbates the situation and that
9  exacerbation lends itself to a higher level of mental
10  illness within the LGBT community.  Is that what you
11  are saying?
12    A.  It not only exacerbates, but the very activity
13  itself lends itself to psychiatric problems.
14    Q.  Why?
15    A.  There's medical issues.  Many of these people
16  are involved in activities that result in substance
17  abuse, sexually transmitted diseases, depression,
18  anxiety.  When you add on the fact that society and
19  many societies will not accept them at all, that can
20  exacerbate already existing problems that they have
21  inherent in what they do.  And that's not even talking
22  about the medical problems that they have associated
23  with that kind of behavior.
24    Q.  Let me see if I can switch to another part of
25  your declaration.  Turn to page 7, and let me make sure

Page 116

1  I put this in context.  On page 6 under the topic
2  "There is No Scientific Justification for Banning
3  Evidenced-Based Practice Talk Therapies Who Present
4  with Gender Dysphoria."  And then under --
5    A.  Well, 6 is --
6    Q.  Paragraph 6 is B.
7    A.  Oh.
8    MR. GANNAN:  Page 6.
9    MS. ROBBINS:  Page 6.
10  BY MR. WILLIAMS:
11    Q.  Page 6, I'm sorry.  Page 6.
12    A.  Okay.
13    Q.  Little ii, the subtopic is "So-called
14  'Conversion Therapy' Bans Unscientifically Target and
15  Censor Sound, Evidence-Based Practice Therapies
16  Delivered Through Speech."  Top of page 7.
17    A.  Censor?
18    Q.  Well, that's why I'm going to ask you.  It
19  didn't make any sense to me, and that's why I'm asking
20  you the question.
21    A.  I missed that.  I don't -- I think it's
22  supposed to be "censors."
23    Q.  Should be "targets and censors"?
24    A.  "Bans Unscientifically" -- "Bans
25  Unscientifically" --

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 117

```
1        Q.  Syntactically it didn't make any sense to me.
2        A.  It doesn't make any sense to me.
3        Q.  So how would you correct, sir?
4        A.  I missed this.
5        Q.  Okay.  Well, it's your declaration, and you
6    are under oath, and as I said at the beginning, it's no
7    not gotcha game.  I said that to Dr. Rosik.  You were
8    here.
9            So tell me what you meant to say in that roman
10   numeral double little ii.
11       A.  Okay.
12       Q.  Take your time.
13       A.  Can he help me with this?
14       Q.  What do you mean?
15           MR. GANNAN:  I can't assist you with answering
16   the question.
17           THE WITNESS:  Oh, okay.  All right.  Okay.
18   BY MR. WILLIAMS:
19       Q.  Just do the best you can.
20       A.  All right.  I know what I want it to say.  It
21   doesn't say that.
22       Q.  I assumed that when I read it.
23       A.  Thank you.
24       Q.  You are a very smart guy, so...
25           (A discussion was held off the record.)
```

Page 118

```
1    BY MR. WILLIAMS:
2        Q.  Back on the record.  Doctor, I've
3    identified -- just to set the stage, I've identified a
4    subtitle that didn't make any sense to me.  And
5    that's ii at the top of page 7 which states, as it is
6    in your declaration, "So-Called 'Conversion Therapy'
7    Bans Unscientifically Target and Censor Sound,
8    Evidence-Based Practice Therapy Delivered Through
9    Speech."
10           When I read that to you, it didn't make any
11   sense to you, and you have now noodled on it.  Is that
12   a good word?
13       A.  Yeah.
14       Q.  And now have come up with what I think you
15   intended to say in the first place, but didn't, for
16   whatever reason, catch before you signed and submitted
17   your declaration?
18       A.  Yeah.
19       Q.  Did I say that correctly?
20       A.  Yes.  So what I have is "Conversion Therapy
21   Bans and Targets Scientific Evidence-Based Practice
22   Therapies Delivered Through Speech."
23       Q.  Okay.  You've eliminated the word "censor" and
24   "sound" altogether, I take it?
25       A.  Yes.
```

Page 119

```
1        Q.  All right.  Would you do me a favor.  I'm
2    going to hand you Exhibit 1 to your deposition, and
3    would you make those changes on the official exhibit to
4    your deposition, again, your declaration, Exhibit 1 so
5    that the official exhibit is --
6        A.  I have a red pen.  Is that okay?
7        Q.  Yes.  It's my red.  That's why I gave it to
8    you.
9        A.  All right.
10       Q.  It's easier to read.
11       A.  Do you want me to write it out or --
12       Q.  However you want to do it.
13       A.  I will write it out.  I don't print really
14   well.
15           (A discussion was held off the record.)
16   BY MR. WILLIAMS:
17       Q.  Would you read into the record the replacement
18   subtitle for little ii at the top of page 7 as you have
19   now rephrased it.
20       A.  "Conversion Therapy Bans and Targets
21   Scientific Evidence-Based Therapies Delivered Through
22   Speech."
23       Q.  All right.  Let's go ahead and take a break
24   now.
25           (A brief recess was taken.)
```

Page 120

```
1    BY MR. WILLIAMS:
2        Q.  In paragraph 25 -- did you want to add
3    something?
4        A.  I regret to inform that I've taken a look at
5    this, and I understand it differently now than I did
6    before, and I spoke with --
7        Q.  Before the break?
8        A.  Yes.  And as we ended and I started -- I
9    looked at what I had written, and I realized that
10   that's not what I want to say.
11       Q.  All right.
12       A.  And I appreciate you pointing this out and
13   allowing me to correct it, and I did speak with Roger
14   about this, and so I have changed it so that it says
15   finally what I actually want to say.
16       Q.  Let's do it this way, Doctor.  I think this is
17   the perfect time to correct mistakes.  Nobody is
18   perfect, of course.  If you would, at the bottom of
19   page 7, since we don't have much room at the top
20   anymore, write the subtopic that you now believe is the
21   correct subtopic.
22       A.  Leave the top the way it is?
23       Q.  Yes.  I'll make a speech on the record to
24   clarify.
25           (A discussion was held off the record.)
```

30 (Pages 117 to 120)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

2b293f70-452a-4746-9273-f93183a2d9b3

Page 121

```
 1   BY MR. WILLIAMS:
 2      Q.  I have in my hands Exhibit 1 to Dr. Hudson's
 3   deposition, which is, in fact, his previously filed
 4   declaration dated May 7, 2019.  Before the break I had
 5   a colloquy back and forth -- you remember what that
 6   word means, don't you? -- with Dr. Hudson about the
 7   typed subtitle, which did not make any sense to me and
 8   I don't think it made any sense to him.
 9          He then wanted to correct it, and he did so in
10   red ink at the top above the printed version.  Over the
11   break, he reflected further and decided that what he
12   really wanted to say is what I'm going to read into the
13   record right now, which he has printed at the bottom of
14   page 7, and it reads as follows:  "The Tampa ordinance
15   bans all scientific evidence-based practice therapies
16   provided through speech?"
17          Did I say that correctly, sir?
18      A.  Yes.
19      Q.  And what I just articulated is printed in blue
20   at the bottom of page 7 of your declaration, Exhibit 1,
21   and you have initialed it to the right, have you not,
22   sir?
23      A.  Yes.
24      Q.  So does that cover it?  I think it does.
25          Now, before the break, we had some discussions
```

Page 122

```
 1   about a number things, but it triggered something in my
 2   mind from my reading of paragraph 25 of your
 3   declaration.  If you would look at about two thirds of
 4   the way down, paragraph 25, you will see a sentence
 5   that says, "Distressed by thoughts that they cannot
 6   process, many resign to a distressed LGBT identity."
 7          Do you see that, sir?
 8      A.  Yes.
 9      Q.  That seemed, at least to me, to be
10   inconsistent with some of your testimony, and maybe I'm
11   wrong.  Tell me what you mean by that sentence.
12      A.  I'm referring farther up.  "Many of the youth
13   I have encountered who claim LGBT status are confused,
14   depressed, anxious, isolated, using substances,
15   experiencing poor sleep, complain of physical symptoms,
16   and can be self-harming and/or suicidal.  They ruminate
17   about peers and what parents will say and do.  Highly
18   distressed and uncertain, they seem relieved when I
19   state that they're free to discuss whatever comes into
20   their minds.  Some are so anxious they admit to panic
21   attacks when in public and with their peers in school.
22   They remark that there is no one to talk to privately
23   and brood about what to do.  Distressed by thoughts
24   that they cannot process, many resign to a distressed
25   LGBT identity."
```

Page 123

```
 1          The individuals that I see is in some ways a
 2   bias population.  I don't see LGBT people that do not
 3   have psychiatric illness and may have gender dysphoria
 4   but are functioning in the community.  The group that I
 5   see, usually I'm the tertiary provider.  The group that
 6   I see is not the typical cohort that you would find in
 7   the community.  I do understand that there are people
 8   who are part of the LGBT population that do not require
 9   psychiatric services.
10          And so the group that I see are so -- they
11   ruminate, they're stressed, they don't know what to do,
12   and they become this secret community of highly
13   stressed-out LGBT people, and they don't know what to
14   do because of a law, and many of these individuals
15   interpret the law that says they can't get therapy,
16   because they don't -- they're not attorneys, and even I
17   don't know exactly precisely what the law says.  I just
18   know that I've been told not to do this and the medical
19   board may get involved, and I don't know how it's going
20   to be enforced.
21          So that sentence refers to those individuals
22   that I talk about that come to me acknowledging that
23   there are individuals that are gay, lesbian, bisexual,
24   and transgender that may not need to see a psychiatrist
25   or have no desire to see a psychiatrist because they're
```

Page 124

```
 1   functioning.
 2      Q.  Just fine?
 3      A.  Just fine.
 4      Q.  Do you have any concept of, if you take the
 5   universe of LGBT population, what percentage are
 6   getting along just fine?
 7      A.  I don't know precisely.  But I know that there
 8   are people that identify with that group and are
 9   functioning well.  They work.  They have the right to
10   marry.  They have the right to adopt.  They seem to
11   have been placed in society and they are functioning in
12   a civil way.  So they have no reason to see me.  So
13   that comment refers to the people that come to me.
14      Q.  And I understand that.  My question really,
15   for my own benefit, is:  Do you have any idea -- well,
16   let me back up this way.
17          The people that see you is a subset of the
18   larger LGBT community?  Is that a good way to put it?
19      A.  Yes.
20      Q.  And those that come within the ambit of "many
21   resign to a distressed LGBT identity" is as a subset of
22   the subset?
23      A.  Yes.
24      Q.  So my question to you is:  Do you have any
25   idea from a proportional point of view how large this
```

31 (Pages 121 to 124)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                          2b293f70-452a-4746-9273-f93183a2d9b3

Page 125

1    sub-subset is of the entire LGBT community?
2        A.  I know that through my education and
3    conferences and grand rounds and discussions with other
4    providers that there is a higher rate of mental illness
5    among this group of people.
6        Q.  The subset -- sub-subset of distressed?
7        A.  No, just the LGBT group.
8        Q.  Okay.
9        A.  The subset of those individuals that don't
10   know what to do, are confused, ruminate, have poor
11   sleep, the ones that I have described, that's the
12   subset that I'm referring to.  And I don't know what
13   proportion are functioning fine.  I don't know what
14   proportion -- I know that there are studies that show
15   that there's higher rates of depression, substance
16   abuse, anxiety disorders, panic attacks, et cetera, but
17   I don't necessarily see those people.  I know that
18   they're out there, but I don't know the proportion.
19       Q.  And you use the term "distressed LGBT
20   identity."  Are you referring to those LGBT, that
21   portion of the population that is going through these
22   difficult whatever you want to call them?
23       A.  Yeah, what I outlined ahead of that, those are
24   the specific people I'm talking about.
25       Q.  Confusion, depression, anxiety, et cetera, et

Page 126

1    cetera; right?
2        A.  Yes, because I also see people that are part
3    of the LGBT group that have comorbidities, that have a
4    major psychiatric illness, but there's this other group
5    that, because of the ban, they don't know what to do,
6    and some of them interpret the ban against them.  They
7    think that they can't see someone, they're not allowed
8    to talk with someone to help their problems, and then
9    I'm thinking that I'm banned from helping people
10   because the ban is a law.
11       So it's twofold.  The possible patient is
12   thinking that they're banned from actually talking to
13   me or they'll get me trouble, and then I'm banned from
14   actually talking with someone and helping them when
15   they actually show up at my office.
16       Q.  Well, members of the LGBT community certainly
17   can have a -- I guess a self-awareness,
18   self-identification as being gay, do they not?
19       A.  Uh-huh.
20       Q.  Is that a "yes"?
21       A.  I'm sorry.  Yes.
22       Q.  Do you know what would cause a minor, since
23   that's what the ordinance addresses, to change that
24   self-awareness that self-identification as being gay?
25       MR. GANNAN:  Objection.  Vague.  Calls for

Page 127

1    speculation.
2        A.  I'm not sure I understand.  Can you --
3    BY MR. WILLIAMS:
4        Q.  If an adolescent -- I'll just call it an
5    adolescent --
6        A.  Okay.
7        Q.  -- is aware and self-identifies as being
8    gay --
9        A.  Right.
10       Q.  -- whether it's lesbian or gay whatever the
11   case may be, would you agree with me that it's possible
12   that -- well, let me rephrase the question.
13       Is it possible for that person to change to
14   something other than being gay?
15       MR. GANNAM:  Objection.  Vague.
16       You can answer.
17       A.  Yes, it's possible.
18   BY MR. WILLIAMS:
19       Q.  And how is it possible?  What would cause that
20   to take place?
21       A.  I don't know what would cause it to take
22   place, but I have heard reports of people choosing to
23   be part of that group, and I have heard reports of
24   people not being part of that group anymore.
25       Q.  People who have chosen not to be gay anymore

Page 128

1    and are now back to heterosexual?
2        A.  Yes.
3        Q.  Do you have any evidence-based proof of that
4    that you are aware of?
5        A.  No, it's just reports.
6        Q.  Anecdotal reports?
7        A.  Yes.
8        Q.  And you don't know the truth or falsity of
9    those reports, do you?
10       A.  Well, I've spoken with individuals who are
11   part -- who are homosexual, bisexual -- I don't
12   think -- I think it's just homosexual and bisexual who
13   have told me that they have had a friend that was part
14   of that group and they decided that they weren't, and
15   I've been told that people -- there's a curious thing
16   happening.  A lot of people in their 40s and 50s are
17   deciding that they are part of that group.
18       Q.  Part of the --
19       A.  The LGBT -- LGB group.  And I've been told not
20   many times, but I've been told that individuals that
21   are homosexual or bisexual decided, I don't know how,
22   that they were not part of that group and became
23   heterosexual.
24       Q.  But you don't know how that change-back, so to
25   speak, took place?

32 (Pages 125 to 128)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 129

1    A.  I don't.  I don't.  Because they don't come to
2  see me if they -- they just don't come to see me.  They
3  may see other people, but I just haven't come across
4  them.
5    Q.  If, in fact, the anecdotes that you've heard
6  that people have -- I'll just use the street
7  language -- changed back to heterosexual after
8  identifying, as you said with the gay community, if
9  that has happened, you don't know what the causal nexus
10  is for that process; is that true?
11    A.  No.
12      MR. GANNAN:  Objection.  Vague.  Assumes
13  facts.
14    A.  No, I don't.
15  BY MR. WILLIAMS:
16    Q.  Just for my edification, going back to your
17  comment earlier, can you even speculate as to what
18  would cause that?
19      MR. GANNAN:  I would object.  Calls for
20  speculation.
21      MR. WILLIAMS:  It does.
22      MR. GANNAN:  We're getting beyond the scope of
23  the subject matter that Dr. Hudson is presented
24  for.  His report deals primarily, and in terms of
25  any specifics, with minors who present with gender

Page 130

1  dysphoria or identify as transgender and speaking
2  about lesbian, gay, bisexual minors is getting
3  beyond the scope of what Dr. Hudson is here for.
4  BY MR. WILLIAMS:
5    Q.  That's a fair objection.  So let me modify my
6  question and restrict it to gender dysphoria.  They had
7  gender dysphoria and they no longer have gender
8  dysphoria.  Do you know what causes that?
9    A.  I can tell you based on some limited reports,
10  I have had patients and families of patients that have
11  restricted social media and the child or the adolescent
12  no longer is involved in that communication around that
13  issue of being transgender and they pull back from
14  that.  They no longer claim to be transgender.  That's
15  reports from people that I have seen.
16    Q.  Anecdotal reports?
17    A.  Yes.
18    Q.  You are not aware of any evidence-based
19  studies or reports on that, are you?
20    A.  No.
21    Q.  Take a moment, Doctor, to read paragraph 26 of
22  your declaration.
23    A.  I read it.
24    Q.  Ignoring the ordinance that is in force here
25  in Tampa, what do you think an appropriate treatment

Page 131

1  for gender dysphoria is?
2    A.  There currently is no evidence-based practice
3  therapy for this disorder.  I have treated other
4  psychiatric illnesses associated with gender dysphoria,
5  and I have at times been able to speak with people over
6  a period of time to help them function better.
7    Q.  In civil society?
8    A.  If someone comes in and they tell me that they
9  have a problem but they're doing fine in all areas,
10  then it's not really a problem.  They may actually have
11  a diagnosis, but they're functioning well and they're
12  getting along, and so I don't -- I don't feel that they
13  need to be in treatment because they're -- there's no
14  dysfunction.
15    Q.  You made the distinction a little earlier in
16  your testimony about psychologists versus
17  psychiatrists.  Psychiatrists obviously being medical
18  doctors, licensed physicians, and because of that they
19  can prescribe medications.  I think even in Florida
20  some psychologists can do that now at some levels.
21      Go ahead.
22    A.  There is no question.
23    Q.  No, there wasn't.  You were about to say
24  something.
25    A.  They're restricted.  They're able to use

Page 132

1  certain medications, and they oftentimes are heavily
2  supervised because they don't have medical training.
3    Q.  Right.
4    A.  I know that there is a movement around the
5  country to have advanced practice nurses take over.
6    Q.  Yes.
7    A.  They have about 4- to 5,000 clinical hours.  I
8  had in excess of 30,000 clinical hours, plus I was
9  motivated to do it.  And a lot of times other
10  disciplines are not as motivated as some people.  So
11  the psychologists, I know they can practice on Indian
12  reservations and in some manpower shortage areas, but
13  they're supervised and they're restricted in what -- in
14  terms of what they can do, because they cannot diagnose
15  medical problems, and I can.
16    Q.  Are there any drugs or medications that you
17  believe are appropriate to treat gender dysphoria?
18    A.  Only the comorbidities.
19    Q.  Not gender dysphoria itself.  Is that what
20  you're saying?
21    A.  No.
22    Q.  Is my statement correct?
23    A.  Yes.
24    Q.  That's a segue to paragraph 28.  Read that if
25  you would, please.  Starts at the bottom of 7, page 7.

33 (Pages 129 to 132)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 133

1    Goes to the top of page 8.
2       A.  I have read it.
3       Q.  At the end of that paragraph 28, you use the
4    term "pharmacologic treatment for a variety of
5    psychiatric illnesses."  What do you mean by
6    "pharmacological treatment"?
7       A.  Medications that have been FDA approved for
8    the use in treating a psychiatric illness.  That is the
9    definition of pharmacologic treatment for psychiatrists
10   or child and adolescent psychiatrists.
11      Q.  Now, read paragraph 32 on page 8.
12      A.  I read it.
13      Q.  My reason for directing your attention to this
14   paragraph, Doctor, I'm a little perplexed as to why you
15   even include it in your declaration.  Am I missing
16   something?  Is there some meaning that you intended
17   there that perhaps I'm not appreciating?
18         MR. GANNAN:  Objection.  Vague.  Calls for
19      speculation.
20      A.  Well, I think that 32 is a continuation of
21   what I'm discussing here, about this ordinance and the
22   California ban, is that there are individuals who take
23   it upon themselves to in some manner, publicly or even
24   privately, harm you because -- for whatever reason.  I
25   don't -- I don't know the reasons.

Page 134

1         I know that in the last, I think in the last
2    15, 20 years, a number of notable researchers who are
3    involved in the term "transsexuals," the term
4    "transgenders" have been attacked in various ways,
5    either through protests, either through losing their
6    contracts with the clinics that they were running, or
7    being talked about in negative profoundly disturbing
8    ways on social media platforms.  And I know that a
9    number -- well, I know at least one for sure that has
10   been banned from a social platform for simply stating
11   the science behind being a transgender.
12         And so what I'm presenting there is that I had
13   a personal experience.  I don't know if this person was
14   male or female.  I never got a chance to actually talk
15   with this person.
16      Q.  This is in California, I take it?
17      A.  Yes.  I was asked to see this person.  I went
18   out to the waiting room, and I privately said to this
19   person, "Are you so and so?"  And this person said,
20   "No."
21         And so I went back to the receptionist, and I
22   asked the receptionist, "Is that the person I'm
23   scheduled to see?"  And she said, "Yes."  And she says,
24   "No," and the long and the short of it was that, when I
25   finally went back and said, "The receptionist says that

Page 135

1    you're the person I'm supposed to see," this person
2    exploded with a string of profanities in front of the
3    entire waiting area, calling me a bigot and a
4    transphobe -- I got so many phobes, I can't carry them
5    around anymore, but she added a couple more, and then
6    stomped out in front of everybody.
7         And I know from contacts in California that
8    it's happening to some of the people that I have
9    associated with, not friends, but acquaintances at
10   different conferences that there's a movement to
11   humiliate or publicly defame or harm somebody because
12   they don't -- because they think that you're not going
13   to help them or that you are a bigot or you are all the
14   things that they say.
15         So I included this because this person filed a
16   complaint with the medical board.  It wasn't an
17   accusation; it was a complaint.  And in talking with
18   the medical board, I had no records to send because I
19   never actually saw the person.
20         And I talked to my malpractice company, and I
21   said, "Am I allowed to use the preferred name?"  And
22   they said, "No, you have to use a legal name.  You
23   cannot treat under a preferred name.  You have to treat
24   under a legal name.  You can't even write a
25   prescription, you can't order labs under a preferred

Page 136

1    name."
2         And at the clinic, people had to provide their
3    birth certificate.  So I know that there are some
4    states that are allowing people to change their birth
5    certificate to their gender, not their biological sex.
6    And I know that at the University of Colorado School of
7    Medicine, they've taken the policy is that, when you
8    come into the hospital, you give your gender, you don't
9    give your sex, and it's driving the doctors out of
10   their mind, because you have to know the biological sex
11   of the person because the treatment can be
12   dramatically -- the physical exam -- so I included that
13   as an example of that happening to me, when I had gone
14   out in good faith to try and have someone come back to
15   the office.
16      Q.  Sure.  When you say there's a, quote/unquote,
17   movement, are you describing an organized effort by a
18   group of people to intentionally accomplish an
19   objective, or is it just a generalized use of that
20   term?
21         MR. GANNAN:  Objection.  Vague.
22      A.  I know that several researchers with decades
23   of experience in this area have lost their position at
24   a university -- two universities -- three that I'm
25   aware of, have had to file lawsuits to get their

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 137

1   position back for simply sharing the science.
2        I'm sure you are aware that there are people
3   in this country that do not believe in vaccinations.
4   And there are teenagers that are secretly going to
5   clinics to get the vaccination so they don't get the
6   illness, because we've forgotten what these illnesses
7   used to do to people.
8        And I know that most -- I know that you are
9   probably aware that there's an increase in illnesses in
10  this country because people are not getting vaccinated.
11  So there's -- when I say "movement," there seems to be
12  press release science, and people follow that stuff,
13  and they'll go on talk shows and say that, you know,
14  you don't need to have this, you don't need to have
15  that.
16       And this happened to me, and I hadn't done
17  anything.  I went out to try and help, and I don't know
18  that there's any big conspiracy.  I just know that top
19  name, highly quality researchers have been attacked in
20  terms of job, in terms of clinic and have had to file
21  lawsuits to get their position back.
22       I know that recently a researcher at Brown
23  University published a paper and got so much flak that
24  the university changed the title of the paper and --
25       Q.   I'm with you.  Off the record.

Page 138

1        (A discussion was held off the record.)
2   BY MR. WILLIAMS:
3        Q.   We're getting close to the end here, Doctor.
4        In paragraph 33 at the bottom of 8, you also
5   make the comment, "there are many evidence-based
6   practice therapies that could be used to relieve the
7   stress of gender dysphoria."
8        Can you identify those evidence-based
9   therapies?
10       A.   Again, just saying to somebody, "You can talk
11  about it.  You can discuss it," in many instances, that
12  in itself is a relief.  I remember, during my
13  internship year, patients in severe pain would require
14  pain medication, and when you approached them and you
15  told them that the pain medication was coming, they
16  relaxed.  Just knowing that the pain medication was
17  going to be coming.
18       So a lot times when these patients come in and
19  meet with me and I tell them that "You can talk about
20  it.  You can talk with me.  I'm willing to listen, and
21  I'm willing to understand," that in itself will help
22  people.  The other aspect of it is that, because they
23  come in with higher rates of mental illness and you
24  start treating the mental illness, they do better, even
25  with their gender dysphoria, because they're not being

Page 139

1   pounded by anxiety disorders and depression and panic
2   attacks and anxiety states.
3        Q.   In paragraph 35 of your declaration, second
4   full sentence you state, "The American Psychological
5   Association (APA) published in 2015 its 'Guidelines for
6   Psychological Practice with Transgender and Gender
7   Nonconforming People,'" and you follow that with a
8   parenthetical, "(APA, 2015)."
9        Then in paragraph 36, you state -- first
10  sentence, "The APA, 2015 guidelines," which I just
11  alluded to -- "are an explicit attempt to dictate a
12  therapist's affirmation of a client's 'gender
13  identity,' irrespective of the science that reveals
14  that no one can become the opposite sex."
15       Did I read that correctly?
16       A.   Yes.
17       Q.   Is it your opinion that the APA 2015
18  guidelines, the purpose underlying those guidelines is
19  to compel a therapist to affirm a patient's gender
20  identity?
21       A.   It pretty much says that.
22       Q.   And I'm asking you, is that your position in
23  terms of what the purpose of that guideline is?
24       A.   I don't follow that particular guideline, but
25  my understanding in reading the guideline is that I am

Page 140

1   supposed to affirm.
2        Q.   That's the American Psychological Association,
3   so to the extent that you're a psychiatrist, how is
4   that relevant to your practice?
5        A.   It's relevant in the sense that it's one more
6   organization that is coming forth with what they call
7   guidelines, and in my four-decade career, I have seen
8   guidelines become mandated by insurance companies,
9   become standards of care with no evidence, and so it's
10  another reminder that this process is starting to
11  become press-release science.
12       Q.   Well, since you've used again the phrase
13  "evidence-based," if a patient comes to you, Doctor,
14  and you have a consultation and they tell you that they
15  have a gender identity that is different from their
16  birth sex, is there a response you can give that is
17  evidence-based practice therapy?
18       A.   Not for gender dysphoria.
19       Q.   Gender identity, do you distinguish between
20  the two in that question?
21       A.   Everybody has a gender identity.  Sometimes
22  it's feminine.  Sometimes it's masculine.  Sometimes
23  it's a combination of the two.  Sometimes -- I mean, I
24  think most people will recognize, even around the
25  world, that masculinity and femininity are -- that move

35 (Pages 137 to 140)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)

2b293f70-452a-4746-9273-f93183a2d9b3

Page 141

1    back and forth, shift and change.
2        So gender has for thousands of years referred
3    to biological sex.  It's been separated and -- but the
4    definition remains the same:  Masculine and feminine.
5        So if somebody comes in and says they're more
6    feminine and they're male and they more feminine,
7    that's not a psychiatric illness.  That's not a reason
8    to be in treatment, unless they start to tell me other
9    things related to that.
10       Q.  Paragraph 37 of your declaration you say,
11   among other things, "It is perverse to ban a possible
12   therapy that will for a majority of children help them
13   reharmonize with their biological sex."  Is that a
14   correct statement what I just said?
15       A.  I'm finding it.  37; right?
16       Q.  Yes, sir.  Six lines down.
17       A.  Okay.  I've read it.
18       Q.  How would you, as a clinical psychiatrist,
19   seek to help a child to reharmonize with his or her
20   biological sex?
21       A.  As I've mentioned in the declaration and as
22   we've talked about.  Children as opposed to
23   adolescents -- or if you want me to include children
24   and adolescents, I can do that -- but children that
25   come in oftentimes come in in very chaotic situations.

Page 142

1        There may be problems in the family.  There
2    may be problems at school.  There may be problems in
3    the community.  There may be domestic violence.  There
4    may be substance abuse among the parents.  I don't -- I
5    don't find -- and, remember, I see a select
6    population -- I don't find that when I -- when they
7    finally come to me that everything is beautiful and
8    light and all that kind of stuff.
9        I find that there is a lot of problems, not
10   only in the home environment, but they're having
11   problems in the school environment, and they're having
12   problems in the community.  And they have oftentimes
13   psychiatric illness as well.
14       And so as you work with them, as you alleviate
15   those problems, as you alleviate those problems, as you
16   talk with the parents and begin to help them solve
17   those problems, you attenuate the urgency, you
18   attenuate the symptoms, and that in itself will
19   alleviate -- for a lot of children, will alleviate the
20   problems that they're experiencing.
21       Q.  Is that a therapeutic procedure that you just
22   described?
23       A.  If they have an anxiety disorder, you can use
24   an evidence-based anxiety treatment.  If they have a
25   depressive disorder, you can use an evidence-based, and

Page 143

1    so the goal -- the goal is not -- there are some
2    illnesses that you just simply cannot cure.
3        My dad died last year from Parkinson's, and my
4    mom took care of him the last four, five years 7/24,
5    and she's fretting that she couldn't -- she could've
6    done more, and I keep telling her, "Mom, it's a fatal
7    illness.  You did as much as you could."
8        So what I do is try to alleviate the stuff
9    that's happening to them so that they can stand up.
10   Because a lot them come in and they're on the ground.
11   The weight of all this stuff is just pushing them down.
12       So if you can alleviate the anxiety disorder,
13   if you can get the parents to stop drinking and stop
14   smoking and that, if you can make things so that the
15   child can feel safe again and not threatened again,
16   what you find is that their symptoms attenuate and
17   they're not as bald and they're not as argumentative
18   and they're not as behaviorally disturbed.
19       Q.  Drinking and smoking aside, if, for example,
20   parents were telling their child, "Don't use a name
21   different from your biological sex," you know,
22   something of that ilk, would you ever advise them not
23   to do that or to do that?
24            MR. GANNAN:  Objection.  Vague.
25                       ***

Page 144

1    BY MR. WILLIAMS:
2        Q.  The parents.  To alleviate the dysphoria, I
3    guess.
4            MR. GANNAN:  Objection.  Vague.  Incomplete
5    hypothetical.
6        A.  My goal is to render relief where I can most
7    see relief.  And if they come in and they're saying
8    that the person has to say this name, I might ask,
9    "What does it say on the birth certificate.  What --
10   how was the decision made to name that child?  Is it a
11   family?  Is it a friend?  I explore the origins of
12   giving that child the name."  And that sometimes helps
13   families to understand what is going on.  It doesn't
14   cure.  It just relieves.
15   BY MR. WILLIAMS:
16       Q.  We've spent a better part of a day talking
17   about this, Doctor, and I appreciate you educating me
18   as much as anything else without sending me to medical
19   school.
20       I've gleaned from your testimony, though, that
21   the field of transgender or gender nonconforming is a
22   rapidly changing area of medicine.  Would that be an
23   accurate statement?
24       A.  No.
25       Q.  If I eliminate the word "rapidly," would it be

36 (Pages 141 to 144)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 145

1  an accurate statement?
2      A.  No.
3      Q.  Correct me, then.  What is wrong with my
4  statement?
5      A.  There is a apart of medicine that is moving
6  away from what medicine used to do and used to do
7  really well, and they are using medical treatments,
8  pure medical treatments on a psychiatric condition, and
9  they are springing up all over the country.  Academic
10  centers are finding that this is a financial industry.
11          They're charging thousands and thousands of
12  dollars to these people, and they're taking these
13  children and these adolescents, without any way of
14  knowing which ones will eventually align with their
15  biological sex, and they're treating them with hormones
16  and surgery and making a patient for life.
17          My understanding of medicine was to relieve
18  pain and suffering and at all costs to seek a cure so
19  that you didn't have the patient anymore.  But the
20  pharmaceutical companies are making a lot of money, and
21  a lot these clinics, it's a packaged deal.  You buy the
22  hormones from the package deal.
23          And I have sat in at the Los Angeles Children
24  Center and listened to a pediatrician talk about
25  puberty blockers and cross-sex hormones and surgery on

Page 146

1  young children, and I say to myself, "I've spent my
2  entire career working with juveniles in confinement who
3  the courts say cannot understand that they killed
4  somebody, cannot understand that they committed
5  robbery, cannot understand what they did and therefore
6  they cannot be given the death sentence and they cannot
7  be given a life sentence because they're cognitively
8  immature, and yet I am seeing children and adolescents
9  that are being put on treatments that are extremely
10  experimental, and being told that the kid knows that
11  this is okay and that the kid can give consent.  I
12  can't balance those two things out.
13          If you commit a crime, you're too immature to
14  understand that you committed a crime, but if you claim
15  that you are the opposite sex, which cannot happen, you
16  are mature enough to take puberty blockers, surgery,
17  and cross-sex hormones.  It doesn't make sense to me.
18          And given the fact that puberty is the
19  maturation of the human body into adulthood and it
20  takes anywhere from eight to ten years and can go into
21  the early 20s, what are they doing?  Maybe that's a
22  little too honest.  It just -- it scares me.
23      Q.  Have you in all your years of dealing with
24  gender dysphoria, gender identity matters and issues,
25  have you reached any conclusions as to, A, whether

Page 147

1  there is a pervasive discrimination against people who
2  are experiencing that and, B, what impact, if that
3  discrimination exists, it would have on that population
4  in terms of dealing with their gender dysphoria or
5  gender identity?
6          MR. GANNAN:  Objection.  Vague.  Calls for
7      speculation.
8      A.  There's two questions, and can she read back
9  the first question.
10  BY MR. WILLIAMS:
11      Q.  Sure.
12  (Part of the question was read back as follows:
13      Have you in all your years of dealing with
14      gender dysphoria, gender identity matters and
15      issues, have you reached any conclusions as to, A,
16      whether there is a pervasive discrimination against
17      people who are experiencing that --)
18      A.  Worldwide, people that have claimed to be
19  homosexual, bisexual, transgender, worldwide, people
20  don't get along with them.
21          When I was in elementary school, there was an
22  individual that we knew was not like us males.  He
23  always played with the girls.  He had nonmasculine --
24  we knew that something -- but we didn't harm him.  We
25  included him, but we knew that there was something

Page 148

1  different, and we didn't know -- I didn't know what it
2  was.  I just knew that he wasn't like me and he wasn't
3  like my friends and he wasn't -- he didn't play
4  baseball.  He didn't play sports.
5          You go out in the world, and almost everyone
6  is heterosexual, and you're not.  But you go out into
7  West Hollywood, and you are fine.  You go into parts of
8  San Francisco, and you're fine.  You go out into parts
9  of New York, and you're fine.  But you go outside those
10  areas and the world, you're not fine.
11          So I don't -- I don't think it's pervasive
12  discrimination.  I think it's just -- you're not like
13  they are, and that is unusual for people.
14          The other aspect of this is that -- in
15  Darwin's Origin of Species, in the last chapter, he
16  talks about evolutionary change and that genes are
17  designed to be all kinds of things.  Life will find a
18  way.  And over long periods of time people who practice
19  homosexuality will not propagate their genes, will not
20  mix their genes.  There's no way for them biologically
21  in nature to continue, but it's always been there.
22  It's always happened, because people love sex.  And
23  it's an enormous gift to us.
24          But most of the world is not like that, and
25  most of the world will not -- will not accept it.  And

ANTHEM REPORTING, LLC
www.anthemreporting.com   |   888.909.2720   |   anthem@anthemreporting.com

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

Page 149

1    many people will not tolerate it, and so you find that
2    you hook up with a certain few friends or you don't
3    become public.
4        Q.   And because --
5        A.   I haven't answered the second part.
6        Q.   Go ahead, please.
7        (The second part of the question was read back as
8        follows:  And, B, what impact, if that
9        discrimination exists, it would have on that
10       population in terms of dealing with their gender
11       dysphoria or gender identity?)
12       A.   Outside your peer group, outside your
13       neighborhood, outside that areas of the country that
14       are, for the most part, made up of people that are
15       similar or maybe are like you, I think there are
16       episodes of discrimination.  I think there are people
17       who don't like it.
18           In LA County, I had to take every year a
19       computer course called sexual harassment in the
20       workplace.  And it was nothing but how to interact with
21       homosexuals, bisexuals, and transgenders.  And I
22       remember sitting with the nursing staff, and one of the
23       nurses was saying, "I come here for work, and now I
24       have to use a pronoun, and now I have to work
25       differently than I normally work or I might get fired."

Page 150

1            On that sexual harassment, I had to answer
2    questions that I knew were wrong; otherwise, I would --
3    LA County would get rid of me.  "You're a bigot,
4    Hudson.  Get the hell out of here."
5            I help people deal with the world as it is.
6    And there are people that demand that the world change,
7    and I explain to them over time through evidence-based
8    therapies, if I can use them, that the world doesn't
9    negotiate.  It is what it is.  And it's harsh, and it's
10   rough, and it can get even harsher and rougher if
11   you're not careful.
12           So I don't think there's pervasive
13   discrimination.  I do think there's a stigma attached
14   to this, and a lot of people have a problem with it,
15   and there are people that will take it out either
16   through physical assault, property damage, or targeting
17   a baker in Colorado.
18       You had another question?
19       MR. WILLIAMS:  I have no further questions.
20       MR. GANNAN:  Dr. Hudson will read and sign.
21   (A discussion was held off the record.)
22       MR. WILLIAMS:  Before we conclude Dr. Hudson's
23   deposition, Dr. Hudson made hand-printed changes to
24   the subtitle at the top of page 7, and I went
25   through that on the record earlier this afternoon.

Page 151

1        And to make it clear, we have taken the document
2    that he made those handwritten changes and have
3    made it the official Exhibit 1 for his deposition.
4    And that is exemplified by the blue tab at the
5    right-hand bottom corner that has the number "1."
6    Okay.
7               STIPULATION
8        It was stated by counsel that the exercise of
9    reading and signing the transcript would not be waived.
10
11
12       (WHEREUPON, the taking of the deposition was
13   concluded at 3:20 p.m.)
14
15
16
17
18
19
20
21
22
23
24
25

Page 152

1            CERTIFICATE OF OATH
2
3
4    STATE OF FLORIDA          )
     COUNTY OF HILLSBOROUGH    )
5
     ***************************
6
7
8
9        I, ELSA HERNANDEZ, FPR, Notary Public, State
     of Florida, certify that the witness BERNARD HUDSON,
10   M.D., who produced a driver's license for
     identification, personally appeared before me and was
11   duly sworn.
         WITNESS my hand and official seal this date:
12   30th day of July, 2019.
13
14   ------------------------------
     ELSA HERNANDEZ, FPR
15   Notary Public, State of Florida
     Commission No. FF897203
16   Expires 9/30/2019
17
18
19
20
21
22
23
24
25

38 (Pages 149 to 152)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)
2b293f70-452a-4746-9273-f93183a2d9b3

---

Page 153

1        CERTIFICATE OF REPORTER
2
3    STATE OF FLORIDA          )
     COUNTY OF HILLSBOROUGH    )
4
5        I, ELSA HERNANDEZ, FPR, Court Reporter, and Notary
     Public, do hereby certify that I was authorized to and
6    did stenographically report the deposition of BERNARD
     HUDSON, M.D.; that a review of the transcript was
7    requested; and that the foregoing transcript, pages 1
     through 151, is a true record of my stenographic notes.
8
         I FURTHER CERTIFY that I am not a relative,
9    employee, or attorney, or counsel of any of the
     parties' attorneys or counsel connected with the
10   action, nor am I financially interested in the action.
11
         DATED this 10th day of August, 2019.
12
13
14                    _____
                      *Elsa Hernandez*
15                    ELSA HERNANDEZ, FPR
                      Notary Public
16
17
18
19
20
21
22
23
24
25

---

Page 154

1            ERRATA SHEET
2    IN RE:  ROBERT L. VAZZO v. CITY OF TAMPA, FLORIDA
     CASE NO:      8:17-cv-02896-WFJ-AAS
3    DATE TAKEN:      July 30, 2019
     DEPOSITION OF:    BERNARD HUDSON, M.D.
4
5    DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

     Please sign, date, and return this sheet to our office.
6    If additional lines are required for corrections,
     attach additional sheets.
7
     At the time of the reading and signing of the
8    deposition, the following changes were noted:
9    PAGE      LINE      CHANGE      REASON
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   Under penalties of perjury, I declare that I have read
     my deposition and that it is true and correct subject
23   to any changes in form or substance entered here.
24   SIGNATURE OF DEPONENT: _____
     DATE: _____
25

---

Page 155

1    August 12, 2019
2        ROGER K. GANNAM, ESQUIRE
         HORATIO G. MIHET, ESQUIRE
3        Liberty Counsel
         P.O. Box 540774
4        Orlando, Florida 32854
         rgannam@lc.org
5        hmihet@lc.org
6    In Re:  Vazzo v City of Tampa
7    Dear Mr. Gannam:
8    Enclosed please find the original errata page with your
     copy of the transcript so Dr. Hudson may read and sign.
9    Please have him make whatever changes are necessary on
     the errata page and sign it.  Please make a copy of the
10   errata page and place it in your copy of the
     transcript.  Please then forward the original errata
11   page back to our office at 101 South Franklin Street,
     Suite 101, Tampa, Florida 33602.
12
     If the errata page is not signed by the witness within
13   30 days after this letter has been furnished, we will
     then process the transcript without a signed errata
14   page.  If your client wishes to waive their right to
     read and sign, please have her sign on the signature
15   line at the bottom of this letter and send it back to
     our office.
16
     Your prompt attention to this matter is appreciated.
17
18   Sincerely,

     Elsa Hernandez, FPR
19   Anthem Reporting
20   I do hereby waive my signature
21   _____
     BERNARD HUDSON, M.D.
22
23
     Cc:  Robert V. Williams
24
25

---

39 (Pages 153 to 155)

Electronically signed by Elsa Hernandez (401-364-747-9923)
Electronically signed by Elsa Hernandez (401-364-747-9923)                    2b293f70-452a-4746-9273-f93183a2d9b3

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ROBERT L. VAZZO, LMFT, etc., et al.,    )
    )
    Plaintiffs,    )
v.    )   Case No. 8:17-cv-2896-T-02AAS
    )
CITY OF TAMPA, FLORIDA,    )
    )
    Defendant.    )
    )

## DECLARATION OF BERNARD O. HUDSON MD

I, Dr. Bernard O. Hudson, hereby declare as follows:

## TABLE OF CONTENTS

I.    ENGAGEMENT AND QUALIFICATIONS. ................................................................2

II.    SUMMARY OF OPINIONS. ...................................................................................3

III.    ANALYSIS AND OPINIONS. ...................................................................................4

    A.    Preliminary Scientific Considerations. ................................................................4

        i.    Science and the Scientific Method or Principles. ........................................4

        ii.    The Scientific Basis for Sex. ...................................................................4

        iii.    The Recent Division of Gender and 'Gender Identity' from Sex. ...............5

        iv.    Evidence-Based Practice Therapies. ..........................................................5

    B.    There Is No Scientific Justification for Banning Evidence-Based Practice
    Talk Therapies for Minors Who Present with Gender Dysphoria. ..........................6

        i.    Children and Adolescents Who Identify as LGBT Are at A
    Substantially Higher Risk of Mental Illness Requiring Treatment. .............6

        ii.    So-Called "Conversion Therapy" Bans Unscientifically Target and
    Censor Sound, Evidence-Based Practice Therapies Delivered Through
    Speech. ..............................................................................................7

        iii.    So-Called 'Affirming' Therapy Is Not an Evidence-Based Practice
    and Imposes an Outcome Predetermined by Therapists. .............................9



EXHIBIT 1
Deponent: Hudson
Depo Date: 7/26/19
Reporter: E. Hernandez
Anthem Reporting, LLC

## I.   ENGAGEMENT AND QUALIFICATIONS.

1.     I am over the age of 18 and am submitting this Declaration as expert testimony in support of Plaintiffs. I have been asked to offer my analysis and opinions regarding the claimed scientific justifications for City of Tampa Ordinance 2017-47, An Ordinance Of The City Of Tampa, Florida, Relating To Conversion Therapy On Patients Who Are Minors (hereinafter "Ordinance 2017-47"), specifically with respect to 'gender identity'. The facts in this Declaration are true and correct and if called upon to testify to them I would and could do so competently.

2.     I have studied and practiced medical science since 1979 as a physician who specializes in psychiatry and sub-specializes in child and adolescent psychiatry, with additional expertise in psychiatric illness and treatment of juveniles in confinement. I am board certified in General Psychiatry, 1989, and Child and Adolescent Psychiatry, 1993, by the American Board of Psychiatry and Neurology; and by the National Board of Physicians and Surgeons, 2017, in General Psychiatry and Child and Adolescent Psychiatry. I have recently retired my license with the California Medical Board, having been licensed since 1985; and I am currently licensed, since 1992, with the Tennessee Health Related Board, and with the United States Drug Enforcement Agency. At the end of 2017, I retired from Los Angeles County, Department of Mental Health, Juvenile Justice Division, after 15 years. I have practiced in Wisconsin, California, Kentucky, and Tennessee. While having practiced in academic settings, I am primarily a clinician and teacher.

3.     I attended the University of California, San Diego, graduating with a BS in Chemistry and serving as a teaching assistant in Biology, Chemistry, and English Literature.

4.     At the Cardinal Stritch School of Medicine, Loyola University, a three-year medical school, I entered the specialty of Psychiatry. I completed my internship and residency in Psychiatry at the Medical College of Wisconsin. I completed my fellowship in Child and Adolescent Psychiatry at the University of California, Davis, School of Medicine, where I worked with Robert Dorn MD, who had been psychoanalyzed by and worked with Anna Freud MD, in London.

5.     I have worked in my medical speciality, Psychiatry, and sub-speciality, Child and Adolescent Psychiatry, over the past four decades in a variety of community settings: private practice, two jails, five juvenile halls, and eight camps; two academic appointments, as a Clinical Instructor of Psychiatry, University Of California, Davis, and as an Assistant Professor of Psychiatry, Vanderbilt University School of Medicine; and with the United States Department of Justice, Civil Rights Division, Special Litigation Section, investigating juvenile detention centers in Louisiana and Georgia as an expert witness regarding local and regional community psychiatric standards of care.

6.     While working for Los Angeles County, Department of Mental Health, Juvenile Justice Division, I was the designated teacher/instructor for the Department of Justice from 2005 to 2015, teaching Health Services, Mental Health Services, and Probation Services. The instruction was regarding psychiatric illness and treatment and suicide prevention strategies for juveniles in confinement.

7.      Attached hereto as Exhibit A is a copy of my curriculum vitae. I have not authored any publications in the previous ten years, and I have not testified at trial or by deposition in any case during the previous four years.

8.      In preparing this report, I relied on the case filings and academic, scientific, and other reference materials identified in the table of References attached hereto as Exhibit B.

9.      My compensation for this engagement will be $450 per hour for deposition and trial testimony, $200 per hour for travel time, and actual expenses. I provide the remainder of my time for this engagement *pro bono*.

## II.      SUMMARY OF OPINIONS.

10.     **My opinions regarding the lack of scientific justification for** Ordinance 2017-47 may be summarized as follows:

**First**, biological sex is male and female, and gender is masculine and feminine.

**Second**, no one can change from a male to a female or a female to a male.

**Third**, a significant majority of people identifying as 'transgender' suffer from gender dysphoria, as well as significant mental illnesses such as depression, anxiety, substance-related disorders, self-harm, suicidal ideation and behaviors, and suicidal intent and attempts, etc.

**Fourth**, so-called 'conversion therapy' bans such as Tampa Ordinance 2017-47, target and censor scientifically sound, evidence-based practice therapies, consisting of speech, and ethically utilized by many medical professionals with minor patients.

**Fifth**, professional organizations are issuing 'affirming' therapy guidelines that disregard evidence-based practice therapies in favor of ideologically predetermined outcomes for patients suffering from gender dysphoria.

**Sixth**, because the vast majority of minors who experience gender dysphoria come to accept and psychologically align with their biological sex as they age into adulthood, 'affirming' every minor who identifies as 'transgender' is poor, unscientific practice, and condemns many minors who otherwise would not persist in a 'transgender' identity in adulthood to sterilization and a future of being life-long mental health patients with the attendant costs and risks of harm.

**Seventh**, there is an increasing number of ethical medical professionals who fear losing their licenses and careers by running afoul of so-called 'conversion therapy' bans and "affirming" therapy dictates.

3

III.   **ANALYSIS AND OPINIONS.**

A.   **Preliminary Scientific Considerations.**

i.   **Science and the Scientific Method or Principles.**

11.   Science is the systematic structuring of knowledge regarding the natural world that can be tested, explained, and predicted, assessing the interior and exterior universe. Empirical knowledge is based on that which is verified from experience, observation, and testing. Science does not answer the question "why?" but rather "how?"

12.   The scientific method—or scientific principles—consists of an instrumental injunction, an accepted apprehension, and a common verity. This method can be used to describe causal relations (e.g., biology), or phenomenological/experiential events or connections (e.g., psychology). While many methods are described, the ongoing, continuous observations of the natural world involve characterizations, conjecturing or hypothesis, measurements, inductive and deductive reasoned predictions, experiments, and peer review; and rigorous, assiduous, replicated retesting of all the steps are of necessity.

ii.   **The Scientific Basis for Sex.**

13.   In taxonomy, Homo sapiens is the only living human species. Homo sapiens are male and female; there is no other. All of medical science regarding the diagnosis and treatment of humans is based on this understanding. Any abnormal change in the causal biological development of a male or female human being is considered a state of disease.

14.   A natal male has sex chromosomes X and Y. A natal female has X and X, and given the redundancy of genetic information in a cell with two X's, in all somatic cells in a female one X is randomly inactivated, according to the Lyon hypothesis, becoming a Barr body. In men with Klinefelter's Syndrome, chromosomal XXY karyotype, there is one Barr body, and in females with chromosomal XXX karyotype, trisomy X, two Barr bodies are noted in the nucleus. Females with Turner Syndrome, chromosomal XO karyotype, do not have a Barr body, as inactivation of the only X chromosome would render the cell without DNA.

15.   Gene mutations do occur, biochemical reactions do go wrong, and substances may interfere with normal development, but there has never been a description in all of human medical science describing anyone changing into the opposite sex, changing his or her sex chromosomes, or being a natal male and having a Barr body in the nucleus of his somatic cells.

16.   In short, there is no **causal** science to the claim that a man can become a woman or a woman can become a man. Hence, from the genes in the DNA, to the nucleus in a cell, to the cell, to the tissue, to the organs throughout, to the organ system, and to the organism: a male is a male and cannot become a female, and a female is a female and cannot become a male.  No causal science exists in the medical literature to refute this fact.

17.   Males and females have a biological place that is not reversible. The propagation and mixing of genes to provide an organism with new living opportunities in its environment, is only possible in humans when a sperm, from a male, and an egg, from a female, combine to bring

4

together varied genotypes and ensuing phenotypes to produce a human being. During four decades of medical practice, no patient of mine has ever provided evidence that he or she had changed from one sex to the opposite sex. Some have identified as the opposite sex based on subjective thoughts and feelings, but none has ever provided objective or causal evidence that his or her DNA is now composed of genes of the opposite sex.

### iii. The Recent Division of Gender and 'Gender Identity' from Sex.

18.     The definition of gender has traditionally referred to the sex-related categories of masculinity or femininity. The history of the terminology of 'gender identity' has only varied over the last half century. The idea that gender is unrelated to biological sex came from John Money's concept of gender role, made public in the late 1950's. He conceived of a gender distinct from biological sex. He offered the idea, but with no evidence except in those rare individuals who suffered from abnormal development. (Money, 1955; Money, Hampson, & Hampson, 1957). Haig (2004) describes the evolution of the change in definition of gender in the article, "The Inexorable Rise in Gender and the Decline of Sex: Social Change in Academic Titles." As Haig describes, the loss of the definition of gender did not become a widespread issue until early feminist's began to use the term in the 1970's to differentiate themselves socially from males. (Lindsey, 2010).

19.     The World Health Organization (WHO) (2017) recently stated on its website that sex categories are male and female while gender refers to masculine and feminine. 'Gender identity' is related to characteristics that are more or less masculine or feminine, but sex is differentiated, for example, by males with testes and females with ovaries; males have heavier bones, and females can menstruate. Thus, 'gender identity' is considered variable in individuals, but sex is immutable in all individuals. (WHO, 2017).

### iv. Evidence-Based Practice Therapies.

20.     There are various types of therapy for parents and children/adolescents, including cognitive behavioral, dialectical behavioral, interpersonal, psychodynamic, psychoanalytic, mindfulness, family, play, marriage and family, and psychotherapy. Not all therapies, however, constitute evidence-based practice. Evidence-based practice therapies adhere to psychological techniques which are scientifically based. Both the American Psychiatric Association and the American Psychological Association consider evidence-based practice therapies to be preferred approaches for symptom relief. (Emmelkamp, et al., 2014; Cook, Schwartz, & Kaslow, 2017; McNair, Woodrow, & Hare 2017; Sackett, et al.,1996; Spring, 2007; Blow & Karam, 2017; Kraus, et al., 2016; Linehan, et al., 1999; Vigerland, et al., 2016).

21.     Since there are several kinds of evidence-based practice therapies, choosing the correct one is dependent on which one will best help the suffering patient. Patients with eating disorders, depression, intellectual disabilities, marital issues, etc. will require a combination of therapies as the symptoms lessen or worsen. As always, the two main goals of evidence-based practice therapy are the quality of the treatment to lessen the symptom load and the increasing accountability of the therapy by the patient to work to solve their dysfunction, aided by a qualified therapist using evidence-based practice.

22.     What is not present in any literature search are evidence-based practice therapies for someone identifying as 'transgender'. There is phenomenological/experiential science that identifies a psychiatric disorder called gender dysphoria in those claiming to be 'transgender'. The use of opposite-sex hormones in those individuals with gender dysphoria does not change DNA, chromosomes, steroid/sex receptors, or Barr bodies in natal females, or add Barr bodies to natal males; nor muscle strength, bone density, organs throughout the body, or biological sex. A male may believe he is a female and vice versa, but in Homo sapiens biological sex does not change. In reality, neither opposite sex hormones nor surgical alteration of healthy tissue changes anyone into the opposite sex.

**B.     There Is No Scientific Justification for Banning Evidence-Based Practice Talk Therapies for Minors Who Present with Gender Dysphoria.**

**i.     Children and Adolescents Who Identify as LGBT Are at A Substantially Higher Risk of Mental Illness Requiring Treatment.**

23.     Human sexuality is extraordinarily diverse. The LGBT acronym includes people who have expressed non-conventional sexual orientations or identities. Currently the state of knowledge regarding LGBT people is expected to be extended in the next few decades as society continues to become more accepting of this population. But despite this increasingly widespread social acceptance, LGBT individuals continue to suffer from a variety of mental illnesses. Many LGBT people are now 'coming out' during adolescence when developmental issues of identity, social acceptance, and strong peer-influence and opinion are most intense. Increasingly, children are claiming sexual identities at ever younger ages.

24.     A study in the United States indicates that over 95% of the US population is heterosexual. (Gates, 2011). World-wide estimates of heterosexuality are essentially the same, some slightly less and some slightly more. During this period, studies have shown that past-year mental health diagnosis among youth indicate that 10% have a mood disorder, 25% an anxiety disorder, and 8.3% a substance related disorder. (Kessler, et al., 2012; Kessler, 2007; CDC, 2013). Additionally, suicide is the third leading cause of death for youth ages 10-14 and the second leading cause of death for ages 15-24. (Bostwick, et al., 2010). When LGBT individuals are included, they are at significantly greater risk of poor mental health: elevated risk for depression and mood disorders, anxiety disorders, PTSD, alcohol related disorders, and suicide ideation/intent. (Cochran, Sullivan, & Mays, 2003; Cochran, et al., 2007; Gilman, et al., 2001; Hatzenbuehler, Nolen-Hoeksema, Dovidio, 2009; Burgard, Cochran, Mays, 2005; Needham, 2012). Many studies demonstrate that severe distress, symptoms of mental illness, and behaviors related to these disorders are to be found in the LGBT population well before adulthood. (Fish & Pasley, 2015; Ueno, 2005; Eskin, Kaynak-Demir, & Demir 2005). US and international studies reveal a population with high levels of emotional distress, symptoms related to mood and anxiety disorders, self-harm, suicidal ideation and suicidal behavior compared to heterosexual youth. (Fergusson, et al., 2005; Fleming, et al., 2007; Marshal, et al., 2011).

6

*CONVERSION THERAPY BANS AND TARGETS*
*SCIENTIFIC EVIDENCE-BASED THERAPIES ALLOWED*
*THROUGH SPEECH.*
*DH*

**ii.  So-Called "Conversion Therapy" Bans Unscientifically Target and Censor Sound, Evidence-Based Practice Therapies Delivered Through Speech.**

25.  In my experience as a psychiatrist who sub-specializes in child and adolescent psychiatry, the population identifying as LGBT is at significantly greater risk of psychiatric illness and requires treatment—not predetermined goals of "affirmation" or "conversion." Laws that keep patients away from treatment harm these individuals. Laws that purport to ban "conversion" therapies and impose "affirming" therapies are such laws. Many of the youth I have encountered who claim LGBT status are confused, depressed, anxious, isolated, using substances, experiencing poor sleep, complain of physical symptoms, and can be self-harming and/or suicidal. They ruminate about peers and what parents will say and do. Highly distressed and uncertain, they seem relieved when I state that they are free to discuss whatever comes into their minds. Some are so anxious they admit to panic attacks when in public and with their peers in school. They remark that there is no one to talk to privately and brood about what to do. Distressed by thoughts that they cannot process, many resign to a distressed LGBT identity. Conversely, I have encountered minors who appear comfortable with being part of the LGBT group and understand that their peer group may be a source of stress and aggression. In this situation, the discussion centers on how best to handle such instances of stress and bullying or aggression, who to talk with, and how best to organize the therapy to meet their needs as the therapeutic process unfolds.

26.  I have diagnosed and treated many individuals suffering from gender dysphoria and sexual instincts that disturb them and cause them significant discomfort. While diagnosing and treating a patient, I will offer educational observations based on my scientific understandings in psychiatry and child and adolescent psychiatry. As with all those who seek relief from pain and suffering, the type of therapy applied depends not on their sexual non-conformity or orientation, but rather on the needs of the patients to alleviate their pain and suffering. As a child and adolescent psychiatrist, I use no therapy that attempts to 'affirm' or 'convert', but rather I attempt to **restore** physical, mental, and civil functioning; a sense of gratitude; improved self-esteem; and an ability to observe oneself and make adjustments and adapt to varying situations. Evidence-based practice therapy for people suffering from gender dysphoria does not harm the patient but aims to help them explore root causes, alleviate their pain and suffering, and assist them with their dysphoria.

27.  I and others who ethically practice psychiatry and child and adolescent psychiatry **never engage in physically aversive or verbally coercive treatments, as this kind of treatment is reprehensible, and is lacking in any evidence-based science.** Practices that knowingly attempt to coerce or harm patients have been repudiated by myself and others in my profession for several decades. I have taken the Hippocratic Oath and I have stated publicly that "I will use treatment to help the sick according to my ability and judgement, but never with a view to injury and wrong-doing." My therapy is a combination of evidence-based practice, both in terms of therapy through speech and psychopharmacology; and the objective is to heal. I do not harm patients, although therapy can be painful and pharmacologic treatment may have distressing side effects. Apart from occasional court-ordered therapy sessions, therapy is voluntary.

28.  In my experience, children and adolescents suffering from gender dysphoria and identifying as 'transgender' presented with varying expectations for therapy. Some presented with a preconceived notion that I must identify as 'gay' in order to help them, and they preconditioned

*✗ THE TAMPA ORDINANCE BANS ALL SCIENTIFIC*
*EVIDENCE-BASED PRACTICE THERAPIES ALLOWED*
*THROUGH SPEECH.*
*BH*

therapy on my answering that inquiry. Some, though fewer, demanded full affirmation of their 'transgender' identity and/or expression as a precondition to my treating them. The minors I was most able to help, however, presented without preconditions, actively engaged in therapy, came to realize important issues about themselves, experienced a diminishment of their symptoms, admitted they had a better sense of how they became the persons they were, and were grateful for the therapy. In addition to speech-based therapy, this group usually also required pharmacologic treatment for a variety of psychiatric illnesses.

29.    Within the group I have tried to help, however, some indicated reticence or doubt about my being able to help them because of California's law against so-called "conversion therapy." I allowed the patients within this group to talk and wonder freely, and the therapy approaches I used, as with all patients, depended on the symptoms presented and the character of the person. Their initial reticence caused by such 'conversion' bans, however, impacted the duration and initial effectiveness of treatment. I also have been told by many patients that they have friends who are afraid to seek help for their distress due to "the law" that prevents any therapist or physician from attempting to "convert them."

30.    I am not aware of any evidence-based practice therapy that 'converts' someone from being 'transgender', and 'conversion' is never a therapeutic goal. But California's law, like Tampa's Ordinance 2017-47 banned any therapy approach that might lead to a person's changing from legal definitions of sexual orientation or from a 'transgender' identity. Thus, laws like Tampa's Ordinance 2017-47 negatively impact both practitioners and patients. Practitioners are afraid to provide, or have discontinued providing, psychiatric treatment for psychological pain and suffering related to gender dysphoria and identity because such treatment either violates or could be construed to violate the law against 'conversion therapy'. Patients are afraid to seek, or forego seeking, such therapy for the same reasons. While it was never clear to me how such a ban could ethically or fairly be enforced, or who would be qualified to enforce it, I apprehended that the California Medical Board would withdraw my license if I was found to be afoul of the law.

31.    'Conversion therapy' bans like Tampa's Ordinance 2017-47 impose de facto speech codes that subject practitioners to fear that they could be disciplined for saying the wrong thing. Although ethical practitioners in jurisdictions with such bans desire to provide psychiatric treatment to individuals suffering from gender dysphoria, they are increasingly concerned that treating such patients who identify as 'transgender' would jeopardize their careers.

32.    I had a personal experience justifying these fears when an individual who came to a community clinic for treatment became extremely and publicly upset that I used the individual's legal name—for legal and ethical reasons—instead of the individual's preferred name which apparently was attached to the individual's cross-gender identity. This person filed an accusation of misconduct against me with the medical board and, although the case was dismissed and the records destroyed, I sensed how quickly my career could be derailed by simply using someone's legal name in apparent violation of 'affirming' principles.

33.    Although the science of treating individuals who identify as 'transgender' is in the early stages of discovery, there are many evidence-based practice therapies that could be used to relieve the distress of gender dysphoria, whatever the direction of change that could occur for any particular patient. But practitioners are reluctant to treat such individuals, or have discontinued

treating such individuals, for fear of actually helping someone who may later a claim a violation of a 'conversion therapy' ban.

### iii. So-Called 'Affirming' Therapy Is Not an Evidence-Based Practice and Imposes an Outcome Predetermined by Therapists.

34.     So-called "affirmative" therapy, which is promoted by Ordinance 2017-47, is actually not therapy for the patient, but an instruction manual for the therapist to follow to declare and affirm, and how to understand those who identify as 'transgender' or among the gender nonconforming group. But simply affirming people are who they say they are is not diagnosing and not providing treatment or therapy but is instead 'reality nodding'. I have had countless patients inform me of their self-diagnoses, only to discover after further inquiry that their correct diagnoses are different from what they had believed. Hundreds of patients have told me what they believe to be causing their problems, and through therapy they discover that the etiology of their problems is distinctly different from what they had believed. Therapy is for the patient; and most patients drop out of therapy because therapy requires an inward-looking ability, and many will stop due to the difficulty with examining themselves. There is no evidence-based practice therapy specifically for LGBT people, only guidelines for the 'affirming' therapist to be informative, knowledgeable, understanding, sympathetic, and agreeable. But these guidelines are merely a baseline for how any psychiatrist or therapist should interact with anyone who seeks alleviation from pain and suffering. They do not, however, provide evidence-based practice therapy guidance that is needed by the patient to relieve their suffering.

35.     Many publications purport to provide guidelines or standards for the therapy of those identifying as 'transgender', but there is no evidence-based practice therapy described in those same publications. The American Psychological Association (APA) published in 2015 its "Guidelines for Psychological Practice with Transgender and Gender Nonconforming People" ("APA, 2015"). However, guidelines are not evidence-based practice therapy. The World Professional Association for Transgender Health (WPATH) in 2011 published its "Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Seventh Version" ("WPATH, 2011"). However, standards of care are not evidence-based practice therapy. What is discussed are social stressors, being culturally sensitive, stigma, psychiatric co-morbidities, suicidal ideations and/or suicidal intent, sexually transmitted diseases (STDs), and substance abuse. Busa & Lakshman (2018) authored the article, "A Review of Evidence Based Treatments for Transgender Youth Diagnosed with Social Anxiety Disorder." Contrary to its title, however, this article is not a review of evidence-based practice therapy for those identifying as 'transgender'; rather, it is a look into evidence-based practice for anxiety disorders. But the authors recommend that therapists "modify and adapt" their therapeutic approach with 'transgender' youth, which risks invalidating the evidence-based practice justification for the therapy. Another article characteristic of many of this type was authored by Hope, et al. (2016), "Culturally Competent Evidence-Based Behavioral Health Services for the Transgender Community: Progress and Challenges." This article title makes it appear that evidence-based practice therapy is taking place, but what the article actually describes is educating a therapist about how to understand the culture of being a 'transgender' and in "affirming" and "helping to transition."

36.     The APA, 2015 guidelines are an explicit attempt to dictate a therapist's affirmation of a client's 'gender identity', irrespective of the science that reveals no one can become the

opposite sex. The article describes sixteen guidelines, the express purpose of which is for a psychologist to become a "trans-affirmative" psychologist. While the article states that guidelines are different from standards, in my experience, guidelines can quickly become standards. And given the possibility that the goals and self-chosen identity of a person who is asking a therapist for help may change over time, and given that no one can yet determine if change will occur in any particular individual, following the guidelines places a client in a situation where the outcome is already determined by the psychologist. To the extent the goal of therapy is 'know thyself', the 'thyself' is already preconceived by the guideline-following psychologist. People come to a mental health provider for many reasons, known and unknown, and to foreclose the possibility that change can occur in a direction not of the provider's choosing limits the person's freedom and autonomy, stalls therapeutic progress, and interferes with the natural course of healing.

37.     Those in my profession know that many children will not retain a 'transgender' identity as adults, and that a significant majority will come to accept and psychologically align with their biological sex. (See Meyer-Bahlburg, 2002). Who can say with scientific certainty which child will become a 'transgender' adult and which will not? Banning evidence-based practice therapy is a harm to people seeking help with psychiatric illness; and it is perverse to ban a possible therapy that will for a majority of children help them reharmonize with their biological sex. (See, e.g., Meyer-Bahlburg, 2002, p. 360 (commending "treatment approach that speeds up the fading" of cross-gender behavior in children)). Additionally, there is no currently accepted evidence-based practice therapy for children who claim to be 'transgender'. I spend a significant amount of time working with parents to help them understand what is happening to their children; and this is important for the family to comprehend the diagnosis and the recommended treatment. Automatically affirming a child's claimed identity is not evidence-based practice, but rather a declaration of a future of being a life-long patient, cross-sex hormones, surgical destruction of healthy tissue and surgical side effects, life-long medical costs, and a life-long diagnosis of gender dysphoria with accompanying health problems such as sterility and loss of sexual pleasure. (Cretella, 2018). Any discussion of risk of harm resulting from therapy must include the mounting evidence of life-long potential harms from "affirming" therapy.

38.     To affirm patients in denying the realities of their sex and the substantial likelihood of later psychological alignment with that sex is to withhold effective and holistic psychiatric care. This is reality: The practice of psychology and psychiatry is the art of assisting clients/patients with being able to live in the real world, in harmony with the circumstances they find themselves in, and to enjoin with the world in a manner that will allow them to live freely, in a civil way, and to associate with others to the benefit of themselves and society. The guidelines that are put forth by many professional organizations, simply to affirm a patient's denial of reality, is to withhold effective evidence-based practice and individual holistic psychiatric care. But the practice of psychiatry and psychology, at its essence, is the art of assisting patients and clients to live in harmony with reality.

I declare under penalty of perjury under the laws of the United States that the foregoing statements are true and accurate.

Executed this May 7, 2019.                    *Bernard Hudson MD*
                                              Bernard O. Hudson, M.D.

10

# BERNARD O HUDSON MD

## CURRICULUM VITAE

| | |
|---|---|
| **OFFICE TELEPHONE:** | PRIVATE |
| **DATE AND PLACE OF BIRTH:** | MARCH 30, 1952<br>SACRAMENTO, CALIFORNIA |

**PERSONAL DATA: MARITAL STATUS** MARRIED 05-31-1980
**SPOUSE'S NAME** MARSHA R HUDSON BS RN
**CHILDREN'S DATA** KARRIS R HUDSON  10-27-1980
TORRY S HUDSON  02-22-1987
*BRANDON J HUDSON  05-13-1988
*Deceased  07-18-2015

**EDUCATION:**

**UNIVERSITY OF CALIFORNIA, SAN DIEGO**
LA JOLLA CALIFORNIA   1975-1979
BACHELOR OF SCIENCE CHEMISTRY

**LOYOLA UNIVERSITY**
CARDINAL STRITCH SCHOOL OF MEDICINE
CHICAGO ILLINOIS   1979-1982

**MEDICAL COLLEGE OF WISCONSIN**
MILWAUKEE WISCONSIN   1982-1985
INTERNSHIP/RESIDENCY PSYCHIATRY

**UNIVERSITY OF CALIFORNIA, DAVIS**
SCHOOL OF MEDICINE
SACRAMENTO CALIFORNIA   1985-1987
C/A PSYCHIATRY FELLOWSHIP

**CURRENT CME:**

**UNIVERSITY OF ARIZONA**
COLLEGE OF MEDICINE  09-17, 3 CME

**NEUROSCIENCE EDUCATION INSTITUTE**
DEPARTMENT OF CONTINUING EDUCATION
11-17, 36 CME

**TENNESSEE HEALTH RELATED BOARDS**
TRAUMATIC BRAIN INJURY  10-17, 6 CME

## EXHIBIT A

**PROFESSIONAL EXPERIENCE:**

**Yolo County Day Treatment Program**          April 1986-December 1988
Broderick, California
Outpatient program for 8-10 adolescents
 Provided psychiatric consultation to administration and clinical staff
          and diagnosis and treatment to adolescents.

**California Youth Authority**          April 1987-October 1990
DeWitt Nelson School
Stockton, California
    Provided psychiatric evaluations for Parole Board and emergency
          psychiatric evaluation.

**Omnibus Mental Health Group**          June 1897-September 1991
Davis and Sacramento, California
        Clinical practice involving diagnosis and treatment of children,
      adolescents, and adults. Provided supervision for Psychiatrists;
     Psychologists; Licensed Clinical Social Workers; Marriage, Family, And
          Child Counselors; and Master of Social Work Interns.

**California Youth Authority**          April 1987-October 1990
DeWitt Nelson School
Stockton, California
    Provided psychiatric evaluations for Parole Board and emergency
          psychiatric evaluation.

**St. Patrick's Home for Children**          June 1987-September 1991
Sacramento, California
Residential Treatment Facility, 44 Bed
 Provided clinical consultation to residential administration and clinical
          staff and diagnosis and treatment to residents.

**Sacramento Children's Home**          July 1987-July 1991
Sacramento, California
Residential Treatment Facility, 60 bed
    Provided psychiatric emergency call and emergency consultation to
          clinical staff.

**Regional Adolescent Treatment Program**          July 1988-July 1990
Stockton, California
Residential Treatment Facility, 42 bed
 Provided clinical consultation to residential administration and clinical
          staff and diagnosis and treatment to residents.

**Serendipity Diagnostic and Treatment Center**  March 1988-Aug 1988
Citrus Heights, California
Residential Treatment Facility, 38 bed
    Provided psychiatric consultation to administration and clinical staff
          and diagnosis and treatment to residents.

**Regional Adolescent Treatment Program**          July 1988-July 1990
Stockton, California
Residential Treatment Facility, 42 bed
 Provided clinical consultation to residential administration and clinical
        staff and diagnosis and treatment to residents.

**Sacramento County Juvenile Hall**          Sept 1988-Sept 1991
Sacramento, California
300 Bed Juvenile Detention Center
        Provided psychiatric consultation to juvenile detention center
    administration and clinical staff and diagnosis and treatment to
                                detainees.

**F.O.R.M. School**          December 1988-October 1990
Nevada City, California
Residential Treatment Facility, 48 bed
    Provided psychiatric consultation to residential administration and
        clinical staff and diagnosis and treatment to residents.

**Families First**          January 1989-October 1989
Davis, California
Residential Treatment Facility, 24 bed
    Provided psychiatric consultation to residential administration and
        clinical staff and diagnosis and treatment to residents.

**Pine Point, Center, Inc.**          October 1993-October 1995
Jackson, Tennessee
Juvenile Sexual Offender Program
Medical Director
Residential Treatment Facility, 32 bed
    Provided psychiatric consultation to residential administration and
        clinical staff and diagnosis and treatment to residents.

**Pine Point, Center, Inc.**          February 1994-October 1995
Jackson, Tennessee
Juvenile Sexual Offender Program
Medical Director
Residential Treatment Facility, 16 bed
    Provided medical oversight for nursing and clinical staff, quality
    assurance and improvement for medical services, and diagnosis and
                        treatment for residents.

**Hermitage Hall, Inc.**          October 1996-October 1999
Nashville, Tennessee
Juvenile Sexual Offenders Program
Medical Director
Residential Treatment Program, 95 bed
    Provided medical oversight for nursing and clinical staff, quality
    assurance and improvement for medical services, and diagnosis and
                        treatment for residents.

**Dede Wallace School**                                April 1998-January 1999
Nashville, Tennessee
Community Outpatient Clinic
Provided part-time psychiatric diagnosis and treatment to children and
adolescents.

**Jackson Academy**                              September 1998-March 1999
Dickson, Tennessee
Residential Treatment Facility, 75 bed
  Provided psychiatric consultation to administration and clinical staff
                    and diagnosis and treatment to residents.

**Camelot Care Centers, Inc.**                    May 1999-December 1999
Nashville, Tennessee
Consulting Corporate Medical Director
 Provided psychiatric consultation to administration regarding medical
                    and mental health standards of practice.

**Juvenile Justice Center**                        April 2000-October 2000
Nashville, Tennessee
95 Bed Juvenile Detention Facility
 Provided psychiatric consultation to administration, clinical training to
             probation staff and diagnosis and treatment to detainees.

**Los Angeles County**                                Nov 2000-Dec 2002
Department of Mental Health
Juvenile Justice Division
Locum Tenens – Staff Care, Inc.
Provided psychiatric diagnosis and treatment to juvenile hall and camp
                                detainees.

**Clinical Counseling Services**                        July 2002-Aug 2004
Los Angeles, California
Community Mental Health Clinic
        Provided psychiatric diagnosis and treatment to outpatients.

**Los Angeles County**            January 2003-December 2017 **(RETIRED)**
Department of Mental Health
Juvenile Justice Division
Staff Psychiatrist
Provided psychiatric diagnosis and treatment to juvenile hall and camp
                                detainees.

**Centerstone of Tennessee**              January 2018- December 2018
Frank Luton Center
Staff Psychiatrist
         Provided psychiatric diagnosis and treatment to outpatients.

**ADULT PSYCHIATRY:**

**Sacramento County Jail**                              April 1986-September 1988
Sacramento, California
    Provided psychiatric diagnosis and treatment to jail inmates on the
        Forensic Inpatient Unit, a 20 bed acute care setting.

**Criminal Justice Center**                              April 2000-December 2000
Nashville, Tennessee
Davidson County Jail
        Provided psychiatric diagnosis and treatment to jail inmates.


**NATIONAL HEALTH AND SERVICE CORPS:**

**Bluegrass Mental Health and Mental**                  Sept 1991-January 1992
**Retardation Board, Inc.**
Lexington, Kentucky
Child, Adolescent, and Adult Psychiatry
Temporary Placement
        Provided psychiatric consultation to mental health clinic
    administration and clinical staff and psychiatric diagnosis and
    treatment to outpatients covering four separate community mental
                health clinics.

**Carey Counseling Center, Inc.**                       November 1992-August 1995
Paris, Tennessee
Child, Adolescent, and Adult Psychiatry
Permanent Placement
        Provided psychiatric consultation to mental health clinic
    administration and clinical staff and psychiatric diagnosis and mental
        health clinics, a residential treatment facility of 16 beds, and a
                therapeutic preschool of 12 children.


**ACADEMIC APPOINTMENTS:**

**University of California, Davis**                      July 1987-September 1991
**School of Medicine**
Sacramento, California
Clinical Instructor of Psychiatry

**Vanderbilt University**                               August 1995-August 2000
**School of Medicine**
Department of Psychiatry
Division of Child and Adolescent Psychiatry
Nashville, Tennessee
Assistant Professor of Psychiatry

**Vanderbilt University**                                August 1995-September 1998
**School of Medicine**
Department of Psychiatry
Division of Child and Adolescent Psychiatry
Psychiatric Hospital at Vanderbilt
Nashville, Tennessee
Clinical Director, Partial Hospitalization Program for Adolescents

**Vanderbilt University**                               January 1998-July 2000
**School of Medicine**
Vanderbilt University Children's Hospital
Department of Psychiatry
Division of Child and Adolescent Psychiatry
Nashville, Tennessee
Director, Consultation/Liaison Service

**Vanderbilt University**                                      1997-1998
**School of Medicine**
Department of Psychiatry
Division of Child and Adolescent Psychiatry
Nashville, Tennessee
J. E. Dozier Award: Outstanding Teacher in Child and Adolescent
Psychiatry

**FORENSIC PSYHIATRIC CONSULTATION:**

**Mississippi Protection and Advocacy, Inc.**       July 1997-Jan 1998
Jack Bach, JD
      Investigation into psychiatric standards at East Mississippi State
                                Hospital.

**United States Department of Justice**        August 1997-Feb 1998
**Civil Rights Division**
**Special Litigation Section**
Kevin Russell, JD
 Investigation into medical/psychiatric conditions in Georgia's juvenile
                       detention facilities.

**United States Department of Justice**      April 1998-January 2000
**Civil Rights Division**
**Special Litigation Section**
Kevin Russell, JD
 Investigation into medical/psychiatric conditions in Louisiana juvenile
                       detention facilities.

**LICENSURE AND CERTIFICATION:**

**MEDICAL LICENSURE-**

| | | | |
|---|---|---|---|
| WISCONSIN | 25297 | 07-01-1983 | EXPIRED |
| CALIFORNIA | G55362 | 07-16-1985 | RETIRED 3/31/19 |
| KENTUCKY | TEMPORARY | | EXPIRED |
| TENNESSEE | MD25085 | | CURRENT |

**SPECIALTY BOARD CERTIFICATION**
GENERAL PSYCHIATRY (ADULT)
AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
CERTIFICATION NUMBER 31466
1989

CHILD AND ADOLESCENT PSYCHIATRY
AMERICAN BOARD OF PSYCHIATRY AND NEUROLOGY
CERTIFICATION NUMBER 3269
1993

NATIONAL BOARD OF PHYSCIANS AND SURGEONS
GENERAL PSYCHIATRY (ADULT)
2017

NATIONAL BOARD OF PHYSCIANS AND SURGEONS
CHILD/ADOLESCENT PSYCHIATRY
2017

## REFERENCES

American Psychological Association. (2015). Guidelines for Psychological Practice with Transgender and Gender Nonconforming People. *American Psychologist*, 70 (9), 832–864. doi: 10.1037/a0039906.

Blow, A.J., Karam, E.A. (2017). The Therapist's Role in Effective Marriage and Family Therapy Practice: The Case for Evidence Based Therapists. *Administration and Policy in Mental Health and Mental Health Services Research*, 44 (5), 716–723.

Bostwick, W.B., Boyd, C.J., Hughes, T.L., McCabe, S.E. (2010). Dimensions of Sexual Orientation and the Prevalence of Mood and Anxiety Disorders in the United States. *Am. J. Public Health*, 100, 468–475.

Burgard, S.A., Cochran, S.D., Mays, V.M. (2005). Alcohol and Tobacco Use Patterns Among Heterosexually and Homosexually Experienced California Women. *Drug Alcohol Depend.*, 77, 61–70.

Busa, S., Janssen, A., Lakshman, M. (2018). A Review of Evidence Based Treatments for Transgender Youth Diagnosed with Social Anxiety Disorder. *Transgender Health*, 3, 1, 27–33.

Centers for Disease Control and Prevention (CDC). (2013). 10 Leading Causes of Death by Age Group, United States—2013.

City of Tampa Ordinance 2017-47, An Ordinance Of The City Of Tampa, Florida, Relating To Conversion Therapy On Patients Who Are Minors (and all publications cited therein).

Cochran, S.D., Mays, V.M., Alegria, M., Ortega, A.N., Takeuchi, D. (2007). Mental Health and Substance Use Disorders Among Latino and Asian American Lesbian, Gay, and Bisexual Adults. *J. Consult. Clin. Psychol.*, 75, 785–794.

Cochran, S.D., Sullivan, J.G., Mays, V.M. (2003). Prevalence of Mental Disorders, Psychological Distress, and Mental Health Services Use Among Lesbian, Gay, and Bisexual Adults in the United States. *J. Consult. Clin. Psychol.*, 71, 53–61.

Cook, S.C., Schwartz, A.C., Kaslow, N.J. (2017). Evidence-Based Psychotherapy: Advantages and Challenges. *Neurotherapeutics*, 14 (3), 537–545. doi:10.1007/s13311-017-0549-4.

Cretella, M. (2018). Gender Dysphoria in Children. American College of Pediatricians. https://www.acpeds.org/the-college-speaks/position-statements/gender-dysphoria-in-children.

Emmelkamp, P.M.G., David, D., Beckers, T., Muris, P., Cuijpers, P., Lutz, W., Andersson, G., Araya, R., Rivera, R.M.B., Barkham, M., Berking, M., Berger, T., Botella, C., Carlbring, P., Colom, F., Essau, C., Hermans, D., Hofmann, S.G., Knappe, S., Ollendick, T.H., Raes, F., Rief, W., Riper, F., Van der Oord, S., Vervliet, B. (2014). Advancing psychotherapy

**EXHIBIT B**

1

and evidence-based psychological interventions. *International Journal of Methods in Psychiatric Research*, 23 (S1), 58–91.

Eskin, M., Kaynak-Demir, H., Demir, S. (2005). Same-Sex Sexual Orientation, Childhood Sexual Abuse, and Suicidal Behavior in University Students in Turkey. *Arch. Sex. Behav.*, 34, 185–195.

Fergusson, D.M., Horwood, L.J., Ridder, E.M., Beautrais, A.L. (2005). Sexual Orientation and Mental Health in a Birth Cohort of Young Adults. *Psychol. Med.*, 35, 971–981.

First Amended Verified Complaint for Declaratory, Preliminary and Permanent Injunctive Relief, and Damages (Doc. 78, June 12, 2018), *Vazzo, et al. v. City of Tampa, Fla.*, No. 8:17-cv-02896-CEH-AAS, U.S. Dist. Ct., M.D. Fla.

Fish, J.N., Pasley, K. (2015). Sexual (Minority) Trajectories, Mental Health, and Alcohol Use: A Longitudinal Study of Youth as They Transition to Adulthood. *J. Youth Adolesc.*, 44, 1508–1527.

Fleming, T.M., Merry, S.N., Robinson, E.M., Denny, S.J., Watson, P.D. (2007). Self-Reported Suicide Attempts and Associated Risk and Protective Factors Among Secondary School Students in New Zealand. *Aust. N Z J. Psychiatry*, 41, 213–21.

Gates, G.J. (2011). How Many People are Lesbian, Gay, Bisexual and Transgender? The Williams Institute. https://williamsinstitute.law.ucla.edu/wp-content/uploads/Gates-How-Many-People-LGBT-Apr-2011.pdf.

Gilman, S.E., Cochran, S.D., Mays, V.M., Hughes, M., Ostrow, D., Kessler, R.C. (2001). Risk of Psychiatric Disorders Among Individuals Reporting Same-Sex Sexual Partners in the National Comorbidity Survey. *Am. J. Public Health*, 91, 933–39.

Haig, D. (2004). The Inexorable Rise of Gender and the Decline of Sex: Social Change in Academic Titles, 1945–2001. *Archives of Sexual Behavior*, 33 (2): 87–96.

Hatzenbuehler, M.L., Nolen-Hoeksema, S., Dovidio, J. (2009). How Does Stigma "Get Under the Skin"? The Mediating Role of Emotion Regulation. *Psychol. Sci.*, 20, 1282–89.

Hope, D.A., Mocarski, R., Bautista, C.L., Holt, N.R. (2016). Culturally Competent Evidence-Based Behavioral Health Services for the Transgender Community: Progress and Challenges. *Am. J. Orthopsychiatry*, 86 (4), 361–65. doi: 10.1037/ort0000197.

Kessler, R.C., Amminger, G.P., Aguilar-Gaxiola, S., Alonso, J., Lee, S., Ustin, T.B. (2007). Age of onset of mental disorders: a review of recent literature. *Curr. Opin. Psychiatry*, 20, 359–364.

Kessler, R.C., Avenevoli, S., Costello, J., Georgiades, K., Green, J.G., et al. (2012). Prevalence, Persistence, and Sociodemographic Correlates of DSM-IV Disorders in the National Comorbidity Survey Replication Adolescent Supplement. *Arch. Gen. Psychiatry*, 69, 372–380.

**EXHIBIT B**

Kraus, D.R., Bentley, J.H., Alexander, P.C., Boswell, J.F., Constantino, M.J., Baxter, E.E., Castonguay, L.G. (2016). Predicting Therapist Effectiveness from Their Own Practice-Based Evidence. *Journal of Consulting and Clinical Psychology*, 84 (6), 473–483.

Lindsey, Linda L. (2010). Ch. 1. Sociology of Gender. Gender Roles: A Sociological Perspective. Pearson.

Linehan, M.M., Schmidt, H., Dimeff, L.A., Craft, J.C., Kanter, J., Comtois, K.A. (1999). Dialectical Behavior Therapy for Patients with Borderline Personality Disorder and Drug-Dependence. *American Journal on Addictions*, 8 (4), 279–292.

Marshal, M.P., Dietz, L.J., Friedman, M.S., Stall, R., Smith, H.A. (2011). Suicidality and Depression Disparities Between Sexual Minority and Heterosexual Youth: A Meta-Analytic Review. *J. Adolesc. Health*, 49, 115–23.

McNair, L., Woodrow, C., Hare, D. (2017). Dialectical Behaviour Therapy [DBT] with People with Intellectual Disabilities: A Systematic Review and Narrative Analysis. *Journal of Applied Research in Intellectual Disabilities*, 30 (5), 787–804.

Meyer-Bahlburg. H.F.L. (2002). Gender Identity Disorder in Young Boys: A Parent- and Peer-Based Treatment Protocol, *Clinical Psychol. and Psychiatry*, 7, 360.

Money, J. (1955). Hermaphroditism, Gender and Precocity in Hypera-Drenocorticism: Psychologic Findings. *Bulletin of the Johns Hopkins Hospital*, 96, 253–264.

Money, J., Hampson, J. G., & Hampson, J. L. (1957). Imprinting and the establishment of gender role. *Archives of Neurology and Psychiatry*, 77, 333–336.

Needham, B.L. (2012). Sexual Attraction and Trajectories of Mental Health and Substance Use During the Transition from Adolescence to Adulthood. *J. Youth Adolesc.*, 41, 179–190.

Sackett, D.L., Rosenberg, W.M.C., Gray, J.A.M., Haynes. R.B., Richardson, W.S. (1996). Evidence Based Medicine: What It Is and What It Isn't. *BMJ*, 312 (1), 71–72

Spring, B. (2007). Evidence-Based Practice in Clinical Psychology: What It Is, Why It Matters; What You Need to Know. *Journal of Clinical Psychology*, 63 (7), 611–631.

Ueno, K. (2005). Sexual Orientation and Psychological Distress in Adolescence: Examining Interpersonal Stressors and Social Support Processes. *Soc. Psychol. Q.*, 68, 258–277.

Vigerland, S., Lenhard, F., Bonnert, M., Lalouni, M., Hedman, E., Ahlen, J., Olen, O., Serlachius, E., Ljotsson, B. (2016). Internet-Delivered Cognitive Behavior Therapy for Children and Adolescents: A Systematic Review and Meta-Analysis. *Clinical Psychology Review*, 50 (1), 1–10.

World Health Organization (WHO). (2017). What do we mean by "sex" and "gender"?

World Professional Association for Transgender Health. (2011). Standards of Care for the Health of Transsexual, Transgender, and Gender Nonconforming People, Seventh Version.

**EXHIBIT B**