

Deposition of:
# Judith M. Glassgold , Psy.D

*July 25, 2019*

In the Matter of:

# Vazzo, Robert L, et al. v. City of Tampa, Florida

Veritext Legal Solutions
800.808.4958 | calendar-dmv@veritext.com |

Page 1

1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                     TAMPA DIVISION
3              CASE NO. 8:17-cv-2896-T-02AAS
4
     ROBERT L. VAZZO, LMFT, etc., et al.,
5
          Plaintiffs,
6
     vs.
7
     CITY OF TAMPA, FLORIDA
8
          Defendant.
9                                           /
10                           Suite 3200
                             Burr & Forman, LLP
11                           201 North Franklin Street
                             Tampa, Florida 33602
12                           10:06 a.m. to 4:58 p.m.
                             Thursday, July 25, 2019
13
14
15
16         DEPOSITION OF JUDITH M. GLASSGOLD, PSY.D.
17
18
19
20
21        Taken on behalf of the Plaintiff before Mary
22   Ann Smith, RPR, RMR, Notary Public in and for the
23   State of Florida at Large, pursuant to Plaintiffs'
24   Notice of Taking Depositions of Defendant's Expert
25   Witnesses in the above cause.

Page 2

1   APPEARANCES:
2
    ATTORNEY FOR PLAINTIFFS
3
        ROGER K. GANNAM, ESQUIRE
4       rgannam@LC.org
        HORATIO G. MIHET, ESQUIRE
5       hmihet@LC.org
        LIBERTY COUNSEL
6       P.O. Box 540774
        Orlando, Florida 32854
7
8   ATTORNEY FOR DEFENDANT
9       ROBERT V. WILLIAMS, ESQUIRE
        rwilliams@burr.com
10      DANA L. ROBBINS, ESQUIRE
        drobbins@burr.com
11      BURR & FORMAN LLP
        Suite 3200
12      201 North Franklin Street
        Tampa, Florida 33602
13
14  ALSO PRESENT
15      SHANNON MINTER, Esq., NCLR
        DR. CHRISTOPHER ROSIK (Via Skype)
16
17
18
19
20
21
22
23
24
25

Page 3

1                            INDEX

2    WITNESS                                       PAGE

3

     JUDITH M. GLASSGOLD, PSY.D.

4

           Direct Examination by Mr. Gannam........... 5

5

     Witness Signature page....................... 201

6    Errata Sheet................................. 202

     Certificate of Oath of Witness............... 203

7    Reporter's Deposition Certificate............ 204

     Letter to Witness Re:  Reading............... 205

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 4

1                        EXHIBITS
2
   NUMBER                  DESCRIPTION              PAGE
3
4    Exhibit 28    Declaration of Judith Glassgold... 33
                   Vazzo v. City of Tampa
5
     Exhibit 29    2010 study by Weiss, Morehouse... 135
6                  Yeager & Berry:  A Qualitative
                   Study of Ex-Gay and Ex-Ex-Gay
7                  experiences.
8    Exhibit 30    2014 article by Flentje, Heck.... 137
                   and Cochran:  Experiences of
9                  Ex-Ex-Gay Individuals in
                   Sexual Orientation Therapy.
10
     Exhibit 31    2015 article by Dehlin.......... 143
11                 Bradshaw, Hyde & Crowell:
                   Sexual Orientation Change
12                 Efforts Among Current Or Former
                   LDS Church Members.
13
     Exhibit 32    2018 report by Ryan, Toomey...... 151
14                 Diaz & Russell:  Parent-Initiated
                   Sexual Orientation Change Efforts
15                 with LGBT Adolescents
16   Exhibit 33    APA Guidelines for.............. 155
                   Psychological Practice with
17                 Transgender and Gender
                   Nonconforming People
18
     Exhibit 34    Declaration of Judith Glassgold.. 188
19                 Schwartz v. City of New York
20   Exhibit 35    Printout of the Born Perfect..... 190
                   home page
21
22
23
24        (Reporter's note:  Plaintiffs' Exhibits 1
     through 27 were not marked in this deposition.)
25

1           P R O C E E D I N G S

2           JUDITH M. GLASSGOLD, PSY.D., called as a

3    witness by the Plaintiffs, having been first duly

4    sworn, testified as follows:

5           THE WITNESS:  I do.

6                    DIRECT EXAMINATION

7    BY MR. GANNAM:

8       Q.   Good morning, Dr. Glassgold.  My name is

9    Roger Gannam, and I am an attorney for the plaintiffs

10   in the lawsuit of Vazzo v. City of Tampa, and we're

11   here today to take your deposition in the capacity as

12   an expert witness for the defendants, or the defendant

13   City of Tampa.  Is that also your understanding?

14      A.   That is.

15      Q.   Excellent.  I want to go over a few ground

16   rules.  First, let me ask have, you ever had your

17   deposition taken before?

18      A.   20 years ago.

19      Q.   Okay.  Well, maybe this will just be a little

20   refresher.  Your testimony today will be under oath

21   and transcribed by a court reporter.  Is that okay?

22      A.   Yes, it is.

23      Q.   It's important that because the testimony

24   will be taken down by the court reporter that all of

25   your answers be verbal, out loud, as opposed to head

Page 6

1  gestures or hand gestures like we would normally do in

2  a conversation.  Is that okay?

3       A.   Sure.  That's fine.

4       Q.   It's also important that we only speak one at

5  a time, so I will just ask that you wait until I'm

6  finished with my question before answering and I will

7  do my best to wait until you're done talking before I

8  start again.  Is that okay?

9       A.   Yes.

10      Q.   If I ask a question that you don't understand

11 for some reason, please let me know.  Is that okay?

12      A.   Yes.

13      Q.   And if I ask a question and you answer it, I

14 will assume that you heard it and understood it.  Is

15 that okay?

16      A.   Yes.

17      Q.   It is all right to take breaks today.  We're

18 not trying to make this an endurance contest.  I would

19 just ask that if I have a question pending, that you

20 complete your answer before taking a break.  Is that

21 okay?

22      A.   Sure.

23           MR. GANNAM:  Before we go further, I just

24      want to -- Rob, can you just say on the record

25      who is in the room with us?

1           MR. WILLIAMS:  Yes.  Well, including myself,

2       Rob Williams, Dana Robbins and Shannon Minter,

3       along with Dr. Glassgold.

4           MR. GANNAM:  And Shannon Minter is here in

5       what capacity?

6           MR. WILLIAMS:  He's a consultant assisting me

7       in this litigation.

8           MR. GANNAM:  And is Mr. Minter affiliated

9       with any organization?

10           MR. WILLIAMS:  I'm sure he is.

11           MR. GANNAM:  Can you tell me what it is?

12           MR. WILLIAMS:  I'm sure he's affiliated with

13       a lot of organizations.

14           MR. GANNAM:  Is he employed by a particular

15       organization?

16           MR. WILLIAMS:  He can tell you.

17           MR. MINTER:  National Center for Lesbian

18       Rights.

19           MR. GANNAM:  Also known as NCLR?

20           MR. MINTER:  Yeah.

21           MR. GANNAM:  Okay.  Thank you.  And,

22       Mr. Minter, are you an attorney as well?

23           MR. MINTER:  Yes.

24           MR. GANNAM:  Thank you.

25   BY MR. GANNAM:

Page 8

1      Q.   All right.  Dr. Glassgold, please state your

2    full name for the record.

3      A.   Judith Miriam Glassgold.

4      Q.   And your address, please?

5      A.   4 Wertsville Road, Hillsborough, New Jersey

6    08844.

7      Q.   And, as we proceed today, I want to ask, do

8    you currently having any condition or are you under

9    any disability that would affect your ability to

10   testify truthfully today?

11     A.   Not that I'm aware of.

12     Q.   And are you currently taking any medication

13   that could affect that capacity to testify?

14     A.   No.

15     Q.   And if this case should go to trial some time

16   in the next year or so, are you currently aware of any

17   reason why you might not be able to fully participate

18   if called as a witness for Tampa?

19     A.   I don't think so, no.

20     Q.   Please tell me your current employer.

21     A.   If I have multiple employers would you like

22   to hear all of them?

23     Q.   Yes.  Just start with one and we'll go from

24   there.

25     A.   The New Jersey Psychological Association.

```
                                                    Page 9
 1         Q.    What's your position there?
 2         A.    Director of professional affairs.
 3         Q.    How long have you been in that position?
 4         A.    I believe since June of 2017.  I believe --
 5   I'm trying to think.  Yeah.
 6         Q.    And, apart from that position, have you held
 7   any other positions with that organization?
 8         A.    Employment positions?
 9         Q.    Right.
10         A.    No.
11         Q.    So your employment began in June of 2017
12   approximately in the position of director of
13   professional affairs?
14         A.    Yes.
15         Q.    Okay.  Great.  You said you have more than
16   one employer?
17         A.    Yes, I do.
18         Q.    Who else?
19         A.    The College of Saint Elizabeth.
20         Q.    And where is that?
21         A.    That's in Morristown, New Jersey.
22         Q.    And what is your position there?
23         A.    Adjunct.
24         Q.    Is that a teaching position?
25         A.    Yes, it is.
```

Page 10

```
1        Q.    How long have you had that position?
2        A.    Actually it starts in three weeks, but I do
3   have an employment contract with them.
4        Q.    So three weeks you will start?
5        A.    Uh-hum.
6        Q.    Have you held any other employment positions
7   with the College of Saint Elizabeth?
8        A.    No.
9        Q.    By the way, where is the New Jersey
10  Psychological Association located?
11       A.    Oh, they just moved their office and I
12  telecommute, so I believe it's in -- near Hanover,
13  Parsippany area.  Northern New Jersey.
14       Q.    But you work from your home town --
15       A.    Yes, I do.
16       Q.    -- in that position?  Okay.
17             All right.  Any other employers?
18       A.    Rutgers University.
19       Q.    What's your position there?
20       A.    Lecturer.
21       Q.    How long have you had that position?
22       A.    A year.
23       Q.    And have you had any other positions at
24  Rutgers?
25       A.    Yes.
```

Page 11

1      Q.    What else?

2      A.    Visiting professor lecturer.  Adjunct

3   lecturer.

4      Q.    And have these positions been -- has this

5   been continuous employment by Rutgers or just periodic

6   employment by Rutgers?

7      A.    It was more or less continuous for 20 years

8   and then there was a break and I started up again last

9   year.

10     Q.    How long was the break?

11     A.    2009 to 20 -- what was last year, 2018.

12           MR. WILLIAMS:  Uh-hum.

13           THE WITNESS:  Yeah, I think those numbers are

14     right.

15   BY MR. GANNAM:

16     Q.    All right.  Do you have any other current

17   employers?

18     A.    No.

19     Q.    Were you employed between 2009 and 2018?

20     A.    I'm sorry.  2000 -- okay.  So --

21     Q.    Before you went back to Rutgers.

22     A.    Okay.  Which direction do you wish me to go,

23   backwards or forward?

24     Q.    Let's go backwards if that's okay.

25     A.    Okay.  So 2016 to 2018 I was employed by -- I

Page 12

1   had a position at Princeton University.

2       Q.    What was your position there?

3       A.    From 2016 to 2017 I was a research fellow at

4   the Center For Health and Wellbeing at the Woodrow

5   Wilson School of Public and International Policy.

6       Q.    And after that?

7       A.    I was a guest in the department.  Just a

8   guest researcher.

9       Q.    Same department?

10      A.    Same department, yes.

11      Q.    All right.  And then before that?

12      A.    Before that, from August of 2013 to August of

13  2016, I was employed by the American Psychological

14  Association as Associate Executive Director for

15  Government Relations in the Public Interest

16  Directorate.

17      Q.    And before that?

18      A.    I was employed by the Congressional Research

19  Service of the Library of Congress from, oh, late

20  20 -- summer of 2011 to 8/20/13.

21      Q.    And if we could go maybe just one or two more

22  steps earlier than that.

23      A.    Then I -- so I can give you two steps.  That

24  will take me to 2009.

25      Q.    Okay.

1      A.    So in 2010 I was employed as a senior -- what

2    was the title exactly.  Senior policy professional, by

3    Congressman Sander Levin of Michigan.

4      Q.    What was the congressman's name?

5      A.    Sander Levin.  Sandy Levin.

6      Q.    And that was 2010?

7      A.    Yeah.  2010 to the 2011 date of CRS.

8      Q.    Okay.

9      A.    And then before that from 2009, so now we

10   bring it back to 2009, I was employed by -- I was a

11   congressional fellow, which was a fellowship position

12   sponsored by the American Association For the

13   Advancement of Science and the American Psychological

14   Association, and I worked in the office of

15   Representative Xavier Becerra of California.

16     Q.    Now, did you work in Xavier Becerra's office

17   as a congressional fellow or in a different position

18   with his office?

19     A.    I worked as a congressional fellow, as a

20   health fellow.

21     Q.    And Xavier Becerra currently is the attorney

22   general of California; correct?

23     A.    Yes.

24     Q.    Was he attorney general at the time?

25     A.    No, he was a member of congress at the time.

Page 14

1      Q.   He's our opponent in other litigation.  I
2  didn't know what he did before --
3      A.   He only became an attorney general very
4  recently.
5      Q.   He took over for Kamala Harris.  Okay.
6           I also understand that you, correct me if I'm
7  wrong, chaired the APA Task Force that prepared the
8  2009 APA report on appropriate therapeutic response to
9  sexual orientation.  I may not have said that
10  accurately, but you know what I'm talking about?
11      A.   I understand and, yes, that is correct.
12      Q.   And in that position as Chair of the Task
13  Force, was that during the same time as your 2009
14  employment?
15      A.   No.
16      Q.   Tell me about -- the Task Force began when,
17  in 2007?
18      A.   Uh-hum.  That's correct.
19      Q.   And was that a paid position for you?
20      A.   No.
21      Q.   So where were you employed during your time
22  as Chair of the Task Force?
23      A.   I was self-employed and I had a professional
24  practice in clinical psychology in Highland Park,
25  New Jersey, and I was a visiting professor at Rutgers

Page 15

1    University.

2         Q.    And that gets into that earlier 20-year

3    stint?

4         A.    Yes, that was that earlier stint.

5         Q.    How long did you have your own practice as a

6    clinical psychologist?

7         A.    Close to 20 years.

8         Q.    Did that generally coincide with your

9    Rutgers, that first Rutgers stint?

10        A.    Yeah.  So I moved -- I started teaching at

11   Rutgers while I actually was a graduate student in

12   another department.  And then I just went into

13   practice.  Actually, I didn't.  That's not true.

14   Sorry.

15        Q.    Your teaching position that you're getting

16   ready to start, what is the -- is there a particular

17   subject matter or area that you will be lecturing in

18   or teaching in?

19        A.    Yes.  At the College of Saint Elizabeth I've

20   been employed to teach history and systems of

21   psychology.

22        Q.    And that's two different subjects, history

23   and --

24        A.    No, it's one combined.

25        Q.    Okay.  History and systems of psychology.

Page 16

1   Got it.

2       A.   It's an intellectual history course at the

3   college.

4       Q.   Anything else?

5       A.   No.

6       Q.   What about at Rutgers when you were a

7   lecturer during the one year?

8       A.   The course I taught last year and the course

9   I will teach this year is Policy in Mental Health.  Is

10  titled Policy in Mental Health.  It's a public policy

11  course on mental health policy.

12      Q.   What was the subject of your research at

13  Princeton when you were a research fellow there?

14      A.   Mental health policy and mental health

15  economics.

16      Q.   And what about during your first 20-year

17  stint at Rutgers, what areas did you teach in?

18      A.   I taught psychotherapy classes and topical

19  classes, and the courses included LGBT issues and

20  psychology, gender and psychology, psychoanalysis and

21  gender, community psychology.  I think that's it.

22      Q.   So is it correct that your last -- apart from

23  your -- to the extent any of your university positions

24  or college positions were with government or public

25  institutions, was the congressional research service

Page 17

1    position you had from 2011 to 2013 your last

2    government employment?

3        A.    Yes.

4        Q.    All right.  Do you currently hold any officer

5    or leadership positions in any nonprofit groups?

6        A.    I believe I am still a board member, but I'm

7    not a hundred percent certain, to be honest, because I

8    haven't heard from anyone in a very long time, of the

9    Born Perfect project at NCLR.  I think.  I don't know.

10       Q.    Okay.  Fair enough.  When did you become a

11   board member for that project?

12       A.    I am not exactly sure, to be honest.  Back in

13   2014 or 2015.

14       Q.    What is the nature or the purpose of that

15   project?

16       A.    It's to, I believe, enhance the wellbeing of

17   LGBT youth and combat negative stereotypes as well as

18   to provide positive therapies and treatments for them.

19       Q.    And what kinds of things have you done as a

20   board member for that project?  What kind of

21   activities?

22       A.    I answer telephone calls when I receive them

23   and provide information about psychotherapy and

24   psychology.

25       Q.    So would you look at your role as sort of

Page 18

1    informational or advisory to the project?

2         A.    Yes.   I'm considered, I believe, an advisor.

3    I'm not sure I'm actually a board member.   I think

4    they dismissed the board.   It's a very loosey-goosey

5    kind of thing, to be honest.   So I provide information

6    when asked, but I haven't been asked in a year, I

7    believe, for information.

8         Q.    Fair enough.   Any other organizations that

9    you hold a leadership position or an advisory position

10   with?

11        A.    No, I don't believe so.

12        Q.    Have you in the past?

13        A.    Yes, I have.

14        Q.    Let's go back to 2007 at the time that you

15   chaired the APA Task Force.   Did you hold any

16   leadership or advisory positions with other

17   organizations back then?   Non-employment positions.

18        A.    Okay.   So I was finishing up my term as

19   president of the New Jersey Psychological Association.

20        Q.    How long were you president?

21        A.    Just a year.   There's a three-year sequence

22   of elected president, president, and past president

23   type of sequence.

24        Q.    Okay.

25        A.    And you become a board member during that

Page 19

1   three-year term.

2       Q.   So in 2007 you were finishing your term as

3   president.  Then did you serve as past president for

4   another year after that?

5       A.   Yes, I did.

6       Q.   Okay.  And at that time were there any other

7   organizations were you held leadership or advisory

8   positions?

9       A.   I don't believe so, no.

10      Q.   How about in between then and your work with

11  the Born Perfect project, any other organizations?

12      A.   No, once I -- starting in 2009 I resigned.  I

13  didn't finish my term as past president of NJPA.  I

14  resigned all boards and my membership with NJPA.  I

15  moved to Washington sort of on a, more or less,

16  part-time basis, but I resigned when I became a

17  congressional fellow.  And I didn't hold any

18  leadership roles in professional organizations during

19  my time in Washington, D.C.

20      Q.   Apart from professional organizations, and

21  maybe you already covered this, but what about

22  advocacy organizations that you've been involved with?

23      A.   From 1995 to 2000 I was the head of an

24  organization or on the board of Friends of

25  Hillsborough, which was -- I'm not sure.  I guess it

Page 20

1    was advocacy.  We were a grass roots group concerned

2    about environmental and planning issues in central

3    New Jersey in our town.  I've never held any other

4    advocacy positions.  Non-paid advocacy positions.

5          Q.   And apart from the Born Perfect project, do

6    you have any other official affiliations or ties with

7    NCLR?

8          A.   No.

9          Q.   Do you have any affiliations or ties with the

10   Southern Poverty Law Center, or SPLC?

11         A.   No, not at this time.  No, I don't think I

12   ever have.

13         Q.   What about an organization called Equality

14   Florida?

15         A.   No.

16         Q.   We may come back to some of those topics.  I

17   think -- let me just check.

18              Let's talk about your preparation for your

19   testimony today.

20         A.   Uh-hum.

21         Q.   What did you do to prepare for giving

22   testimony today?

23         A.   I read my statement and I consulted and met

24   with my attorneys.  Or the attorneys for the City of

25   Tampa.

1     Q.   All right.  And did you consult any other

2  documents besides your declaration that you issued in

3  this case?

4     A.   I did review quickly Dr. Rosik's rebuttal and

5  I looked at the APA 2009 report.

6     Q.   Any other documents besides those?

7     A.   I think maybe some of the references in the

8  2009 report.  And documents -- perhaps a few documents

9  cited, it's hard to remember, in my statement.

10     Q.   Do you remember specifically any of those

11  that you looked at?

12     A.   No.  To be honest, I probably didn't review

13  very many of them at all.  To be honest.

14     Q.   As far as reviewing documents, about how long

15  would you say you spent in hours?

16     A.   Let's see.  Six.

17     Q.   All at one time or --

18     A.   Six reviewing documents.  No, probably --

19  yeah, split up over several days.

20     Q.   What about time spent meeting with attorneys

21  for the City of Tampa?

22     A.   I met with them yesterday.

23     Q.   Okay.  For how long?

24     A.   From about 9 to 3, but then we had a lunch

25  break.  Including a lunch break.

Page 22

1      Q.    And was that Mr. Williams in that meeting?

2      A.    Yes, he was.

3      Q.    Any other attorneys for the City of Tampa?

4      A.    Ms. Robinson and Mr. Minter.

5      Q.    Anyone else in the room?

6      A.    No.

7      Q.    Okay.  And, prior to yesterday's meeting, had

8  you had any other meetings in person with attorneys

9  for the city of Tampa?

10     A.    No.

11     Q.    How did you get involved with this case?  Who

12  first contacted you or approached you about being an

13  expert?

14     A.    I believe I received an e-mail from

15  Mr. Minter asking if I would speak to Mr. Williams.

16  Or if Mr. Williams could call me, if I was available

17  to speak to Mr. Williams.

18     Q.    And do you know why you were approached by

19  Mr. Minter about being an expert?

20     A.    I believe many people consider me an expert

21  in this area.

22     Q.    Have you given expert testimony in other

23  litigation?

24     A.    So in Schwartz v. New York, I believe, I

25  provided a statement.  And in, I believe, a case in

Page 23

1    New Jersey I provided just a brief declaration.

2        Q.    Do you remember the name of the case in

3    New Jersey?

4        A.    I believe it's in my vitae.

5        Q.    Okay.  Do you remember approximately how long

6    ago that was?

7        A.    That was a long time ago.  It was probably

8    2014.

9        Q.    And did you give any court or deposition

10   testimony in the New Jersey case?

11       A.    No.

12       Q.    You haven't given any in the New York case;

13   have you?

14       A.    No.

15       Q.    Are you scheduled to give any in the New York

16   case?

17       A.    Not that I'm aware of.

18       Q.    Do you know whether there have been any

19   rulings in the New York case since you submitted your

20   report in that case?

21       A.    No, I am not.

22       Q.    About how long ago did Mr. Minter approach

23   you about being an expert in this case?

24       A.    I'm not sure I recall.  Not very long ago.

25       Q.    Do you know if it was before or after the

Page 24

1    first Rosik and Hudson declarations were issued in

2    this case?

3         A.    I don't know.

4         Q.    So I take it you did get in touch with

5    Mr. Williams following that call or that e-mail?

6         A.    Or he, I believe, called me.

7         Q.    Okay.  And did you reach an agreement on

8    terms for serving as an expert in this case?

9         A.    Yes, we did.

10        Q.    And what are the terms of your arrangement

11   with the City of Tampa?

12        A.    I am being reimbursed for my costs to attend

13   this deposition and I receive a fee for this

14   deposition and a fee for yesterday's in-person

15   preparation, but I received no fee for the statement.

16        Q.    Okay.  So your travel costs, as in

17   out-of-pocket costs, are being reimbursed; is that

18   correct?

19        A.    Yes, all my travel costs.

20        Q.    Are you being paid for time spent traveling?

21        A.    No, I am not.

22        Q.    And what is your compensation arrangement for

23   time spent meeting with attorneys?

24        A.    $100 an hour.

25        Q.    And were you compensated for reading

Page 25

1    documents to prepare for today?

2        A.    No.

3        Q.    What about for your appearance today?

4        A.    $200 an hour.

5        Q.    And are there any other -- are you due any

6    other compensation or potentially due other

7    compensation for your work in this case?

8        A.    No.

9        Q.    Will you be paid for testimony at trial if

10   the case goes to trial?

11       A.    We haven't discussed that, but I assume so.

12       Q.    Is any aspect of your compensation

13   arrangement with the City of Tampa contingent on the

14   outcome of this case?

15       A.    No.

16       Q.    And I'm assuming it's the City of Tampa who

17   you have an arrangement with.  Is that in fact who

18   your arrangement is with?

19       A.    No.  I believe it's with this law firm.

20       Q.    Okay.

21       A.    I don't know.

22       Q.    Is there a written agreement?

23       A.    No.

24       Q.    Okay.  Who is responsible for payment of the

25   compensation that you agreed to?

Page 26

1      A.    Burr.  This firm.  I believe so.

2      Q.    And do you know ultimately if that cost is

3   being covered by the law firm or being covered by, for

4   example, the City of Tampa or the NCLR or some other

5   organization?

6      A.    I do not know specifically, but I assume it's

7   the City of Tampa.

8      Q.    But you don't know as you sit here?

9      A.    I'm not a hundred percent sure, so I don't

10  want to give you an inaccurate answer.

11     Q.    Fair enough.  So it really doesn't matter to

12  you, if you get what you've agreed to, who is actually

13  paying it?

14     A.    Well, I did provide a discount that was based

15  on my -- I provide a discount for government and

16  non-profits.  So they received the government discount

17  for my services.

18     Q.    Do you have any -- given that Mr. Minter at

19  NCLR who is the one who initially approached you, do

20  you have any agreement or arrangement with NCLR

21  regarding your work in this case?

22     A.    No.

23     Q.    Do you have any ongoing -- besides your --

24  and forgive me if I already asked.  Besides the Born

25  Perfect project, any other affiliations or

Page 27

1    arrangements with NCLR?

2        A.    No.

3        Q.    Do you have any other expert assignments or

4    potential expert employment coming up besides the ones

5    that we've talked about?

6        A.    No.

7        Q.    Now, where are you currently -- do you

8    currently hold professional licensure?

9        A.    My license is active in the State of

10   New Jersey and I have an inactive license in the State

11   of New York.

12       Q.    And what is the New Jersey license in

13   specifically?  What discipline or field?

14       A.    In psychology.

15       Q.    Okay.  And what about your inactive New York

16   license?

17       A.    Psychology.

18       Q.    And in terms of generally you would then --

19   in New Jersey, for example, you would be a licensed

20   psychologist; would that be the best description?

21       A.    That is the term that is used.

22       Q.    And the same in New York?

23       A.    I am not sure people with an inactive license

24   can refer to themselves as --

25       Q.    As licensed?

Page 28

1      A.   As licensed or even use the term "psychology"

2  in the state.

3      Q.   Okay.  Do you hold any other professional

4  licenses?

5      A.   No.

6      Q.   Have you ever held any others?

7      A.   No.

8      Q.   And do you have any -- within the field of

9  psychology in general, do you have any areas in which

10  you specialize?

11      A.   Yes.

12      Q.   And what areas would those be?

13      A.   Sexual orientation, gender, LGBT issues, and

14  public policy.

15      Q.   And apart from licensure as a psychologist,

16  do you hold any certificates or other designations,

17  you know, subsidiary to that to reflect the areas that

18  you focus on or specialize in?

19      A.   I'm a fellow of the American Psychological

20  Association.

21      Q.   And what does being a fellow of the APA

22  entail?

23      A.   It means that your credentials are reviewed

24  by a division or more, one or more divisions of the

25  APA.  They review your credentials and feel that you

Page 29

1   are outstanding expert in your field.  Then they

2   forward a nomination packet for you with endorsements.

3   You have to provide your background and vitae and

4   endorsements.  They forward that to the fellows

5   committee of the entire organization and then you are

6   voted on by that committee as an expert in the areas

7   that are so designated by the division.

8          I was designated an expert by the division

9   for -- I believe it's now called Sexual Orientation

10  and Gender Identity.  It was Sexual Orientation back

11  in 1990 -- back in 1992 or '93 when I was nominated.

12  No.  I'm sorry.  '97 I was nominated and elected a

13  fellow of APA.

14         I am also a fellow of The Psychology of

15  Women.  They also nominated and approved me as a

16  fellow of that division.

17     Q.   Psychology of women, is that a division

18  within the APA?

19     A.   Yes, that is.  They may be -- a lot of

20  divisions now for complicated issues, financial issues

21  I don't understand are incorporated separately, but I

22  couldn't tell you about them.  Psychology -- Division

23  35.  I think it's just the Psychology of Women.

24     Q.   That's also known as Division 35?

25     A.   Yes, it is.

Page 30

1      Q.   Any other divisions within the APA where you

2   have credentials?

3      A.   No.  You have to pay for each division you

4   belong to.

5      Q.   So if I were to ask you, generally speaking,

6   in what areas of psychology do you hold yourself out

7   as an expert, how would you answer that?

8      A.   As I did before, sexual orientation, LGBT

9   issues, gender, and public policy.

10      Q.   Has anyone ever challenged your status or

11   your credentials as an expert in any of those areas?

12      A.   No.

13      Q.   Are you required to complete any kind of

14   continuing education to maintain your licensure in

15   New Jersey?

16      A.   Yes, I am.

17      Q.   What were the last continuing ed. courses

18   that you completed?

19      A.   Psychology of Opioid Addiction, Adolescent

20   Mental Health are probably the last two.  I have to

21   think.  How many more would you like me to illuminate

22   on?

23      Q.   What is sort of your reporting period or your

24   cycle that you have to comply with for your continuing

25   ed.?

Page 31

1      A.   It's a two-year cycle in advance of your --
2 you have to provide an attestation to renew your
3 license.
4      Q.   So in those classes you just mentioned, are
5 those for your current cycle that we're in now or for
6 your prior or previously completed cycle?
7      A.   They're for my current cycle.  I just
8 completed them about a week or two ago.
9      Q.   What did you take to complete your -- to
10 satisfy your requirements for the last cycle?
11      A.   I took CE, as required by the State of
12 New Jersey, in domestic violence; telehealth; ethics;
13 LGBT issues.
14      Q.   What is telehealth?
15      A.   It's the provision of psychotherapy services
16 via two-way interactive video.
17      Q.   That's what I would have guessed it was, but
18 I didn't want to assume.
19      A.   It is not by telephone.
20      Q.   Okay.
21      A.   Those are -- I mean -- I'm sorry.  I do a lot
22 of -- did 40 credits of CE.  I don't recall all of
23 them.
24      Q.   So that's just some of them?
25      A.   That's just some.

Page 32

1      Q.    But you did 40?

2      A.    Yeah.  We were required to do 40 credits of

3   CE over two years.

4      Q.    What academic degrees do you hold?

5      A.    I hold a Doctor of Psychology from Rutgers

6   University and I have a bachelor's degree from Harvard

7   College.

8      Q.    What was that in?

9      A.    Government.  With honors.

10      Q.    In the areas that you've identified where you

11   would be considered an expert, sexual orientation,

12   gender, LGBT issues and public policy.  Did I say

13   those right?

14      A.    That's correct.

15      Q.    Has your expertise in those areas been

16   continuous throughout your career or did you add some

17   of them later than others?  Was there a period of time

18   where you were sort of less of an expert in those

19   areas?  I just want to kind of get a sense for the

20   continuity of your expertise or your status as an

21   expert in those areas.

22      A.    So my status in LGBT issues, sexual

23   orientation, gender, has been continuous and I started

24   working in those areas at the end of my graduate

25   career.  Public policy I developed an expertise in in

Page 33

1   2000 -- starting in 2009 began building up my interest

2   and expertise in those areas.

3       Q.   And when you say LGBT, does that subsume kind

4   of sexual orientation or gender as well?

5       A.   It's sexual orientation predominantly.

6           MR. GANNAM:  Let's get into your report.

7           If it's okay with you, I will mark as we go

8       along.

9           THE COURT REPORTER:  Sure.

10          MR. GANNAM:  For the record, I'm going to

11      start with Exhibit 28 just for continuity from

12      our last depositions exhibits.

13          (Plaintiffs' Exhibit No. 28 was marked for

14  identification.)

15  BY MR. GANNAM:

16      Q.   So, Dr. Glassgold, I'm handing you a document

17  I'm marking as Exhibit 28.

18          MR. GANNAM:  A copy for you, Rob.

19          MR. WILLIAMS:  I forgot to ask, and I

20      apologize, you, I think, contacted Dana yesterday

21      regarding having one or both of your experts

22      participate by Skype.

23          MR. GANNAM:  Uh-hum.

24          MR. WILLIAMS:  I don't know whether you're

25      doing or that or not.

Page 34

1        MR. GANNAM:  We are.  Christopher Rosik is

2    observing the deposition.  He's not going to do

3    anything but observe and he is -- we're doing

4    that via Google Hangouts.

5        MR. WILLIAMS:  Google Hangouts.

6        MR. GANNAM:  It's basically like Skype.

7        MR. MIHET:  Say hello.

8        MR. WILLIAMS:  Hello.  Where is he right now,

9    in California?

10        MR. MIHET:  I believe so.

11        MR. WILLIAMS:  All right.  Well, welcome,

12    Dr. Rosik, I hope you're enjoying it.

13        But Dr. Rosik is the only person that is?

14        MR. GANNAM:  That's correct.

15        MR. MIHET:  Correct.

16        MR. WILLIAMS:  Google, what is it again?

17        MR. GANNAM:  Hangouts.

18        MR. WILLIAMS:  Okay.  I leave all that stuff

19    up to my 13-year-old daughter.  She knows it very

20    well.

21        MR. GANNAM:  I'm sure we're out of date.  I'm

22    sure there's something new.

23        MR. WILLIAMS:  Trust me, you are.  I can

24    assure you that you are.

25  BY MR. GANNAM:

Page 35

```
 1      Q.   Dr. Glassgold, I've just handed you a
 2  document marked Exhibit 28 and the title is
 3  Declaration of Judith M. Glassgold.  Do you recognize
 4  this document?
 5      A.   Yes.
 6      Q.   And is this in fact the declaration that you
 7  issued or entered in this lawsuit?
 8      A.   I believe so.  I'm not reading the entire
 9  thing right now in front of me, but, yes, it looks
10  like it.
11      Q.   I will just orient you to what's there.  Your
12  declaration includes three exhibits, Exhibit A being
13  your CV; Exhibit B being the 2009 APA report; and
14  Exhibit C is the SAMHSA report from October 2015.  And
15  SAMHSA is S-A-M-H-S-A, all caps.
16      A.   Yes.
17      Q.   Do you see all that in front of you, without
18  reading every word of course?
19      A.   Right.
20           MR. WILLIAMS:  Would you put on the record,
21      if you would, Roger, representation that Exhibit
22      1 is in fact a genuine authentic copy of
23      Dr. Glassgold's declaration with all of the
24      exhibits?
25           MR. GANNAM:  From your mouth to the record.
```

Page 36

1     I'm satisfied with that.

2          MR. WILLIAMS:  There you go.

3    BY MR. GANNAM:

4     Q.   So, Dr. Glassgold, I kind of point you to the

5    last page of the declaration itself, which is page 38.

6    And is it double-sided just to save space.  Are you on

7    page 38?

8     A.   I believe so.

9     Q.   It reads "Executed this June 11, 2019."  Do

10   you see that?

11    A.   I see that.

12    Q.   And is that your signature at the bottom?

13    A.   Actually not.

14    Q.   Did you authorize someone to electronically

15   sign it on your behalf?

16    A.   I guess so.  I don't know.  I don't remember.

17   I signed a copy.

18    Q.   You signed with a pen signature?

19    A.   And forwarded it to the law firm.

20    Q.   Okay.  And is the pages 1 through 38 that

21   we're looking at now the same as the version that you

22   signed?

23    A.   I will assume so.

24    Q.   And I would accept Rob's representation that

25   it is.  I understand the logistics sometimes of

  
Page 37

```
 1    getting things signed.
 2            But, as signed, and I believe you said you
 3    did review your declaration before testifying today,
 4    is everything in this declaration still correct?
 5         A.    I believe so.
 6         Q.    Is there anything in this declaration that
 7    you desire to withdraw or change?
 8         A.    Not that I'm aware of, no.
 9         Q.    Have you done any additional research or work
10    on this case since providing this declaration other
11    than your time preparing for today's testimony?
12         A.    I'm not sure I totally understand the
13    question.
14         Q.    Fair enough.  Have you continued working on
15    any issues relating to this case or developing
16    opinions related to this case since you issued your
17    declaration?
18         A.    No.
19         Q.    Is this declaration complete in the sense
20    that it covers all of the opinions that you intend to
21    provide in this case?
22         A.    I'm not sure I totally understand that.
23         Q.    Well, what is the scope of your engagement
24    with the Burr Forman law firm to work on this case?
25    What subject matters were you asked to cover or what
```

Page 38

1   all have you been asked to do as an expert?

2       A.   I have been asked to do this, provide a

3   statement, and perhaps testify.

4       Q.   And when you say do this, you mean write the

5   declaration or today's deposition?

6       A.   Today's deposition and write the statement.

7   I think my -- I apologize.  But I continue to read in

8   this general area of sexual orientation and gender

9   because that's an area that I'm interested in, so I

10  don't believe that -- so that I will continue to read

11  articles that are published in this area.

12      Q.   Have you continued to do any work specific to

13  this lawsuit since preparing this declaration and

14  other than your time spent preparing for today's

15  deposition?

16          MR. WILLIAMS:  Roger, what do you mean by

17      work?  I want to make sure.

18      A.   Yeah, I don't understand what that means.

19  I'm sorry.

20      Q.   Let's back up.  What were the scope of your

21  engagement?  You said it was to issue this written

22  declaration --

23      A.   Uh-hum.

24      Q.   -- marked as Exhibit 28?

25      A.   Uh-hum.

Page 39

1    Q.    Testify at today's deposition?

2    A.    Uh-hum.

3    Q.    And then to testify at trial, if necessary?

4    A.    Right.

5          MR. WILLIAMS:  You have to say yes.

6          THE WITNESS:  Yes.  Sorry.

7          MR. WILLIAMS:  We all do it.

8  BY MR. GANNAM:

9    Q.    Are there any other -- is there any other

10  work or tasks you've been asked to do in connection

11  with the litigation?

12    A.    No.  No.

13    Q.    The answer is no.  Let's try not to talk over

14  each other.

15    A.    Sorry.  No.

16    Q.    That's okay.  I do it too.

17          So, apart from the continuing research or

18  scholarship that you do in this area anyway because

19  you are an expert in this area, have you done any

20  additional work for this case such as working on a

21  subsequent declaration or developing any opinions on

22  other subjects or anything like that?

23    A.    No.

24    Q.    And can you just state for me what were the

25  areas you were asked to provide an opinion on for

Page 40

1    purposes of this case?

2        A.    On the ordinance and related information to

3    conversion therapy.

4        Q.    And by "the ordinance" are you referring to

5    the City of Tampa ordinance that's the subject of this

6    lawsuit?

7        A.    Yes, I am.

8        Q.    And, for the record, that's Tampa ordinance

9    number 2017-47.  Is that also your understanding?

10       A.    That's my understanding.

11       Q.    Okay.  And I take it you've read the

12   ordinance?

13       A.    Yes, I have.

14       Q.    Were you ever consulted by anyone with the

15   City of Tampa prior to enactment of the ordinance?

16       A.    No.

17       Q.    Have you ever worked on any effort or

18   campaign to pass an ordinance like Tampa's or even a

19   state-wide law like Tampa's ordinance?

20       A.    No.

21       Q.    Have you worked on any advocacy projects or

22   campaigns related to banning conversion therapy or

23   SOCE or related therapies?

24       A.    Only providing information to the Born

25   Perfect group or the attorneys or the people there.

Page 41

1      Q.   And is one purpose of the Born Perfect

2   project to promote or seek enactment of bans like

3   Tampa's ordinance?

4      A.   I believe its frame is ending conversion

5   therapy, ending the provision.

6      Q.   Is that the primary purpose of the Born

7   Perfect project or a purpose of the Born Perfect

8   project?

9      A.   At the present time I'm not sure what the

10  purpose is because I haven't been consulted by them,

11  but it's to advise on effective public policies, I

12  believe.

13     Q.   And when you say a goal of the project was

14  ending conversion therapy, is that ending it through

15  legal prohibitions like Tampa's ordinance or through

16  some other means?

17     A.   I believe one may be through legislation like

18  you're submitting, as well as education and continuing

19  education about alternatives that could achieve client

20  goals in a safe and effective manner.

21     Q.   Are you aware of any other modes or

22  categories of therapy that have been legislatively

23  banned like conversion therapy has been in some

24  jurisdictions?

25           MR. WILLIAMS:  Object to the question as

Page 42

1      being vague.  At least to me.  I'm not sure what

2      you mean by that.

3           But, Dr. Glassgold, if you understand it,

4      feel free to answer.

5      A.   My understanding of those efforts is

6  incomplete.  The only one I am aware of is banning

7  rebirthing therapy.

8      Q.   And I think I've heard of that, but can you

9  just sort of explain what that is?

10     A.   To be honest, I couldn't explain it to you.

11 I'm sorry.

12     Q.   You're generally aware that something called

13 rebirthing therapy has been banned somewhere?

14     A.   Yes.

15     Q.   Did you work on any project related to that?

16     A.   No.

17     Q.   Does rebirthing therapy have any relationship

18 to what is sometimes called conversion therapy?

19     A.   I don't believe so, no.

20     Q.   Do you intend to give any opinions in this

21 lawsuit that are not reflected in your declaration?

22     A.   I don't believe so.

23     Q.   Are you the sole author of this declaration

24 marked as Exhibit 28?

25     A.   Yes.

Page 43

1    Q.   And does any of the content reflect the work

2    of others even though you may have drafted it?

3    A.   I don't believe so.

4    Q.   Did NCLR have any involvement in the

5    preparation of your declaration?

6    A.   Not that I'm aware of, no.

7    Q.   Did you exchange drafts or consult anyone at

8    NCLR before you prepared the final copy that you

9    signed?

10   A.   No.

11   Q.   What about with any other organizations other

12   than the Burr Forman law firm?

13   A.   No.

14   Q.   Have you communicated with the SPLC about the

15   preparation of your declaration?

16   A.   No.

17   Q.   What about Equality Florida?

18   A.   No.

19   Q.   And no other organizations?

20   A.   No.

21   Q.   How long did it take you to prepare your

22   declaration?

23        MR. WILLIAMS:  You mean actually write it or

24   the whole process?

25   Q.   I mean the whole project.

Page 44

1      A.   The whole project.   Wait.   So could you be

2   more specific by project?

3      Q.   Sure.   You were contacted at one point by

4   Mr. Minter, you spoke to Mr. Williams and made your

5   arrangements for your engagement.   How much time did

6   you spend working on your declaration from the

7   beginning up to when you signed it?

8      A.   Probably close to 40 hours total work.

9      Q.   And is any part of this declaration work that

10  you've done in another context that you converted into

11  the declaration or was it all new work?

12     A.   It probably contained material from articles

13  I have published and material I did prepare for other

14  declarations.

15     Q.   What other declarations?

16     A.   Schwartz.

17     Q.   That's the New York case?

18     A.   Yes.

19     Q.   Who is your engagement with in that case?

20     A.   A private law firm.

21     Q.   What is the name of the firm?

22     A.   I do not recall.   I would have to look it up.

23     Q.   Do you know whether that firm represents a

24  party in the New York lawsuit?

25     A.   The City of New York.

Page 45

```
 1        Q.   And in that engagement do you know who -- are
 2   you being compensated for that engagement?
 3        A.   No.
 4        Q.   Not at all?
 5        A.   Not at all.  Well, I just prepared a
 6   statement.  That's it.
 7        Q.   You prepared a declaration in that case?
 8        A.   Yes.  That's it.
 9        Q.   Are you going to testify in that case?
10        A.   Not that I'm aware of.
11        Q.   So there's no compensation arrangement for
12   what you've done so far?
13        A.   That's correct.
14        Q.   And apart from work that you may have done in
15   the New York case that you may have used for this
16   declaration, is there any other work that you've done
17   in another context that you've used to prepare this
18   declaration?
19        A.   Yes.  Testimony I provided in Maine.  Oh,
20   right actually.  I apologize.  I forgot.  I testified
21   on behalf of GLAD in the Maine law banning conversion
22   therapy, as an expert.
23        Q.   Testified where?
24        A.   In front of the legislature.  In front of the
25   legislative committee.
```

Page 46

1      Q.    Okay.  And that was testimony arranged by
2   GLAD?
3      A.    That's correct.
4      Q.    G-L-A-A-D; is that right?  Or G-L-A-D?
5      A.    Gay and lesbian -- Gay and Lesbian Advocates
6   and Defenders, I believe, is what it stands for.
7      Q.    We know it's called GLAD.  We're just not
8   sure exactly what all the letters stand for.
9            All right.  When was that testimony?
10     A.    April.
11     Q.    Of 2019?
12     A.    Yes.
13     Q.    And did Maine -- did the Maine legislature
14   pass a state-wide ban?
15     A.    Yes, it did.
16     Q.    What committee did you testify before?
17     A.    Health services and financing, I believe, or
18   something close to that.
19     Q.    How did you get involved in that project?
20     A.    I was contacted by an attorney with GLAD.
21     Q.    Do you remember who that was?
22     A.    Mary Bonauto.
23     Q.    And is that someone you knew before she
24   contacted you?
25     A.    Only by reputation.

Page 47

1      Q.   Did you prepare any written testimony for

2   that Maine legislative committee?

3      A.   Yes, I did.

4      Q.   Is that written testimony published anywhere

5   or available online, to your knowledge?

6      A.   It's in the record of the committee hearings

7   and it was provided to the committee.

8      Q.   Are there any other projects like that that

9   you've worked on?

10     A.   No.

11     Q.   Was the, for lack of a better word, the gist

12  of your written testimony to the Maine legislative

13  committee similar to what's in your declaration here?

14     A.   Similar and different probably.

15     Q.   In what ways was it similar?

16     A.   It focused on the general principal that

17  conversion therapy is ineffective and harmful and is

18  dangerous to young people.

19     Q.   In what ways was it different?

20     A.   I believe in this I talked much more --

21          MR. WILLIAMS:  This being your declaration?

22          THE WITNESS:  So I just wanted to --

23  generally, I believe that statement talked a

24  great deal more about adolescent health and child

25  development generally and adolescent suicide and

1    other mental health concerns.  But there are many

2    similarities.

3         MR. WILLIAMS:  Just a pause here, Roger.

4         The reason I said that, Doctor, is when you

5    read a dry transcript the word "this" is vague.

6         THE WITNESS:  Oh, sure.  Of course.  I

7    understand that.

8         MR. WILLIAMS:  So if you're referring to any

9    documents, it's always good to describe it with

10   some detail.  That way, the raw record will know

11   exactly what you're talking about.

12        THE WITNESS:  Good point.

13        MR. GANNAM:  All right.

14        MR. WILLIAMS:  Same thing with pronouns and

15   things like that.

16        THE WITNESS:  That's a good point.

17   BY MR. GANNAM:

18        Q.   Can I direct you to paragraph 9 of the

19   declaration.  It's on page 3.

20        A.   Okay.

21        Q.   It begins, "I served as the Chair of the

22   American Psychological Association, APA, Task Force on

23   Appropriate Therapeutic Responses to Sexual

24   Orientation, 2007 to 2009, and wrote sections and

25   edited the final report released in 2009."  Called

Page 49

```
 1   here the APA report and attached as Exhibit B to your
 2   declaration.
 3            Did I read that correctly?
 4       A.   Yes.
 5       Q.   Now, the remainder of that paragraph talks
 6   some about the process, but could you tell me, how did
 7   you get to that position of Chair of the APA Task
 8   Force?  And before we go on, going forward, if I say
 9   the APA Task Force, I'm referring to this 2007 Task
10   Force.  Do you understand that?
11       A.   Yes, I do.
12       Q.   And when I say --
13            MR. MIHET:  2009.
14            THE WITNESS:  Right.  Correct.  Thank you.
15   BY MR. GANNAM:
16       Q.   So the Task Force met from 2007 to 2009;
17   correct?
18       A.   That's correct.
19       Q.   And the report was issued in 2009.  So when I
20   say the APA report, I'm referring to the 2009 report.
21   Do you understand that?
22       A.   Yes.  Yes, I do.
23       Q.   Just so we're on the same page.
24            So now, tell me, how did you get to that
25   Chair of that Task Force?
```

Page 50

1      A.   So, from my understanding and I will explain

2  on the basis of my recollection, my best recollection

3  and understanding, an open call for nominations to

4  this Task Force was issued by APA, I believe within

5  the organization and maybe even more broadly to the

6  professional community.  I responded with an

7  application that I believed described my

8  qualifications.

9           In that nomination, the APA listed the charge

10 of the Task Force which is detailed in, I believe, the

11 preface material of the report.  I submitted this

12 application.  It may have included recommendations as

13 well to APA.  I believe I was self-nominated, but I

14 don't exactly recall.

15          Then my -- so I believe this process goes as

16 follows:  That my application was reviewed by a

17 standing committee of APA on sexual orientation and

18 LGBT issues.  Then my name, as well as other

19 prospective Task Force members as well as alternates

20 and all the nominations, were provided -- were

21 reviewed by this Task Force and they selected people

22 they felt could fulfill the charge.  And the charge

23 was very specific because it was a charge to recommend

24 to APA any policy updates to the 1997 APA resolution

25 on conversion therapy.  That was the only -- that was

Page 51

1    the existing resolution.

2           APA issued this charge because I believe they

3    had comments from outside organizations and the public

4    and from members within APA that the 1997 resolution

5    on conversion therapy no longer was suitable or fit

6    the circumstances or the research or the needs of the

7    public or professionals on guidance.  So APA, the

8    board of directors, I believe, or the council of

9    representatives voted to issue this charge and

10   constitute a Task Force because it was not budget

11   neutral, it did involve a cost to the organization,

12   you know, to bring in a panel of experts and have them

13   meet, so that they had to -- the Board had to approve

14   the task and the charge.

15          So we were -- the association, my

16   understanding, was responding to a request from

17   professionals and the public to update an internal APA

18   resolution that would reflect the policies of the

19   Association as well as the best scientific evidence.

20   So my application was my qualifications to accomplish

21   that purpose.

22          So the first screening was done by the

23   Committee on Sexual Orientation or the Committee on

24   LGBT issues.  The Committee changes its name

25   periodically.  I don't recall what it was at that

Page 52

1   time.

2           After they had a list of candidates and they

3   provided them to the Board, another standing

4   committee, and both the Committee and the Board, the

5   members were chosen for three-year terms and the

6   membership was constituted before the charge was

7   issued.  The board for psychology, for social --

8   psychology and the public interest oversees that

9   committee on sexual orientation and a number of other

10  committees in the public interest directorate.

11          I just want to add that both the Committee

12  and the Board are made up of psychologists who provide

13  guidance to the association on these issues among

14  others.  The Committee provides guidance on sexual

15  orientation issues and the Board provides guidance to

16  APA policies and staff on all issues relevant to

17  psychology and the public interest.

18          After the Board screened the list that the

19  Committee provided, it also had access to all the

20  applications that had come in, they then referred

21  their nominations up the ladder to -- and I'm not sure

22  if there were any other interim steps, whether APA

23  executive board, in terms of the administrative

24  executive officers, reviewed them.  I think that other

25  boards like the board for scientific affairs and the

Page 53

1    board on practice also reviewed the nominations.  Then

2    they were referred to the board of directors.  The

3    list of nominees alternates and all the applications

4    were given to the board of directors and they made the

5    final decision about the membership of the committee

6    as well as who would serve as the Chair.

7              So when I received, I believe, a letter from

8    APA, I was just informed that I was both member and

9    Chair.

10        Q.    Did you apply specifically for the Chair

11   position?

12        A.    No.

13        Q.    And why did you apply for membership on the

14   Task Force?

15        A.    I had become interested in these topics due

16   to my work in women's issues, sexual orientation and

17   psychoanalysis, as well as my interest and clinical

18   work with women and men, as well as an interest I had

19   and patients I had who had conflicts between their

20   religious beliefs and their sexual orientation.  So I

21   had addressed in two previous -- one previous book,

22   maybe a second book, and an article on issues in

23   psychoanalysis in lesbians.  So I was particularly

24   interested in this topic.

25              I had also served, from about 1999 to 2003 or

Page 54

1    '4, on the committee on LGBT issues for APA.  My term

2    had expired and I had become interested in some of

3    the, you know, current concerns about quality of

4    psychotherapy for this population.

5         Q.   And just so I understand, ultimately the

6    decision to appoint you as both a member and the Chair

7    of the Task Force was made by the board of directors

8    of the APA?

9         A.   That is my understanding.

10        Q.   And there were several interim reviews by

11   other committees and boards, to your understanding?

12        A.   Yes, that is correct.

13        Q.   And was that the same for everyone who became

14   a member of the Task Force?

15        A.   Definitely, yes.

16        Q.   Did you have any input on who was a member of

17   the Task Force?

18        A.   None at all.

19        Q.   How many members of the Task Force were

20   there?

21        A.   Oh, I believe we were a total of five.  The

22   list of members is in the report, in the covered

23   materials.

24        Q.   Now, did you have any involvement in the

25   issuance of the 1997 APA resolution on conversion

Page 55

1   therapy?

2        A.    No.

3        Q.    And was that the actual title, Resolution --

4        A.    Oh, no, nothing that simple.  It would be --

5        Q.    Something more like therapeutic response to,

6   kind of like the 2009 report?

7        A.    Right.  I believe the text of the original

8   resolution is somewhere in the materials of the report

9   in the appendix or you might find it on the APA

10  website.  I don't recall the title.  Something long

11  and technical.

12       Q.    Now, prior to your appointment as Chair of

13  the Task Force, had you done any scholarly writing or

14  give any testimony opposing the practice of conversion

15  therapy or SOCE?

16            MR. WILLIAMS:  Can we start with writing and

17       then go to testimony?

18            MR. GANNAM:  Sure.

19            MR. WILLIAMS:  So it's not a compound

20       question.

21       A.    So if you look at my 1995 edited book, I

22  believe at that point we talked more about inaccurate

23  and faulty constructions of lesbian identity.  I do

24  not recall that we actually discussed change therapy

25  in the way I think you're thinking about.  I think

Page 56

1    certainly we criticized and I don't know if my article

2    criticized, but the articles in the book and the

3    introduction I wrote with Dr. Susan Iasenza, talked

4    about how psychotherapy and generally.

5            So you must remember that until maybe even

6    the late 1990s most psychoanalytic therapies, some,

7    not many, so psychoanalytic therapies often still

8    included efforts to change or would represent

9    constructions and perceptions of lesbian sexual

10   orientation and bisexual orientation as faulty or

11   damaged.  So that's the topic we were focused on in

12   the book.  I don't think we ever dreamed of a

13   legislative ban or anything like that.  It was more

14   that psychotherapy should be an accurate

15   representation and not based on stereotypes and

16   stigma.

17       Q.   At the time that you became the Chair of the

18   Task Force, did you -- had you developed an opinion as

19   to the efficacy or harm of conversion therapy or SOCE?

20       A.   I focused predominantly -- actually,

21   somewhat.  I would say somewhat.

22       Q.   And what were your opinions at that time that

23   you took the Chair position?

24       A.   I believe that certain psychoanalytic

25   theories that some people based conversion therapy

Page 57

1    interventions were inaccurate and faulty and based on

2    stereotypes and were inaccurate and not based on

3    scientific facts.

4        Q.   And can you give me examples of those?

5        A.   The work of Nicolosi, Socarides, Segal,

6    Eisenbud.

7        Q.   Any others?

8        A.   No.

9        Q.   And what were your objections to their work,

10   if you can summarize those for me?

11       A.   They were fundamentally inaccurate.

12       Q.   In what ways?

13       A.   Pathologizing.  They were just fundamentally

14   inaccurate.  That they were based on outdated precepts

15   from 80 years ago that incorporated pathologizing and

16   dehumanizing versions that prescribed faulty mental

17   illness stereotypes.

18           They over-generalized from a clinical

19   population to a general population.  They were not

20   based on any actual scientific evidence and were just

21   generally opinion.

22       Q.   And can you give me more specific examples of

23   what outdated precepts we're talking about when you

24   say pathologizing?

25       A.   Penis envy, preoedipal, undifferentiation.  I

Page 58

1    think there was generally an overgeneralization from

2    clinical samples to the general population.  So

3    someone would see someone with a psychotic disorder

4    and then say that all lesbians are psychotic.  That

5    kind of types of issues.

6         Q.   Any others as far as objections that you had

7    to their work?

8         A.   I'm sure there are many, to be honest, but I

9    completed that book in 1995, so that it's been a while

10   since I reviewed those conclusions, to be honest.

11        Q.   Did you have any particular goals or

12   objectives in mind when you took the Chair position

13   for the Task Force?

14        A.   I hoped we could chart a course to providing

15   safe and effective therapies that were based on the

16   best scientific evidence for this population.

17        Q.   Do you believe the Task Force accomplished

18   that?

19        A.   Yes, I do.

20        Q.   Now, the APA report, the 2009 report that

21   your Task Force issued, generally uses the term

22   "sexual orientation change efforts" or S-O-C-E, or

23   SOCE.  We've also talked today and Tampa's ban refers

24   to conversion therapy.  What is the difference in

25   those terms, "SOCE" and "conversion therapy," as you

1    understand?

2        A.    The Task Force defined sexual orientation

3    change efforts in the report and so I refer you back

4    to that.  My sense is conversion therapy is a lay

5    term.

6        Q.    Are they synonymous or are there differences

7    in what the two terms cover?

8        A.    In the Tampa ordinance, conversion therapy

9    includes gender identity as well as sexual

10   orientation.  In the APA report, SOCE, the members,

11   some of them referred to it as that, just refers to

12   sexual orientation.

13            But I believe my understanding in the Task

14   Force report is that we refer to sexual orientation

15   change efforts as change efforts that have the a

16   priori goal, prior to even meeting the client, that

17   homosexuality should be changed or that sexual

18   orientation should be changed.  That when we refer to

19   sexual orientation change efforts we looked at and

20   we've really examined theories and practices that

21   assumed, against the scientific consensus, that

22   homosexuality is not a mental disorder or defect, that

23   it was a mental order or defect.  And so that they

24   attempted, a priori to seeing the client and listening

25   to the client's concerns, that the client needed to

Page 60

1   eliminate or eradicate those feelings.

2          MR. WILLIAMS:  Roger, before you ask another

3       question, it's 11:25.  I don't need a break, but

4       we do have lunch coming up.  We could order it

5       out to save time.  I'm offering it to you and

6       Harry or you can go your own way, as the song

7       goes.

8          MR. GANNAM:  Why don't we go off record, take

9       a break real quick, and we'll discuss it and make

10      a plan and we'll go from there.

11         MR. WILLIAMS:  Fine.

12         (Recess from 11:24 a.m. to 11:40 a.m.)

13  BY MR. GANNAM:

14      Q.   Continuing on, you told us about your

15  appointment as the Chair of the APA Task Force, and I

16  think you told us the board of directors made that

17  decision to appoint you and the other members; is that

18  correct?

19      A.   That's correct.

20      Q.   Is your application, is that a public

21  document or is that something held confidential by the

22  APA?

23      A.   I have no idea.  Sorry.

24      Q.   That's okay.  Some questions I ask I'm just

25  curious, I'm not expecting a particular answer.

Page 61

1          All right.  Can you tell me kind of just
2     about the process, what did the committee -- I'm
3     sorry -- the Task Force do from when it was empaneled
4     to when it issued its report?
5          A.   So we had five members.  So we had Roger
6     Worthington, Beverly Greene, Robin Miller, Jack
7     Drescher, Lee Beckstead, and myself.  So there were
8     six members, so that's a correction.
9               And there is a staff member with general
10    responsibility for that area who was our
11    administrative lead, sort of helpful person, that was
12    Clinton Anderson.  And then Charlene Hunter, I believe
13    that was her last name, was the administrative staff
14    person.  So those were the people who were in the room
15    at all times.
16              We met at least twice in 2007 because -- and
17    I believe that was the only meetings we held because
18    that was the only year funding for such a meeting was
19    allocated.
20         Q.   Where did you meet?
21         A.   We met at the American Psychological
22    Association late spring, early summer, and I think
23    again in the fall, but I could -- that's the base of a
24    12-year-old recollection that I have not consulted
25    my -- if I have an appointment book from that area.

Page 62

1    So I don't really know the dates.

2           The first year when we were appointed, which

3    was 2007, we didn't get appointed until April-ish

4    potentially.  Or maybe it was March.  I apologize.  Or

5    maybe earlier.

6           So I'm not even sure when the appointments

7    came through, but we couldn't meet because many of the

8    members are academics and they couldn't meet until the

9    semester was over.  So that was some time in May,

10   June.  And then we met again in the fall.  And we

11   proceeded with many conference calls and e-mails to

12   first create a reading list.

13          So, you know, Roger Worthington is an expert

14   in counseling psychology and sexual identity and has

15   published a number of articles.  At that time he was

16   most well known for his work on heterosexual identity

17   development.  Robin Miller is a statistician and

18   expert in statistical methodology and doing research.

19   Beverly Greene had experience in child and adolescent

20   therapies as well as ethnic minority or related in

21   diversity issues.

22          Lee Beckstead is a psychotherapist and had

23   expertise in concerns of religious individuals and had

24   published a couple of qualitative research papers on

25   the experiences of predominantly men from the LDS

Page 63

1    faith who had undergone conversion therapy.  And Jack

2    Drescher is a psychiatrist who is known for his work

3    predominantly on conversion therapy as well as

4    psychoanalysis.

5            So even though everybody had their area of

6    expertise, it was felt that we all had to have some

7    common background and understanding and people maybe

8    had to review areas that they were not as familiar

9    with because we all had our different areas.  So we

10   first compiled this bibliography and reading list for

11   people to review or at least to look at and figure out

12   where they needed to buff up their background,

13   especially maybe in some current concerns or some

14   current publications, so when we all met we could

15   really begin the process with the same background.

16   And we also created an agenda for our first meeting

17   via telephone calls.

18           Because we only had two meetings.  They were

19   both a day and-a-half, probably a long weekend.  So we

20   would arrive on a Friday, meet Saturday and Sunday,

21   and then leave Sunday night.  So you have two days,

22   four days total for the full year, but it was a pretty

23   intensive process so we wanted to create, especially

24   for the first meeting, a really tight agenda.  So

25   there was a lot of work involved in creating an

Page 64

1    agenda, trying to sort out what our priorities needed
2    to be.

3            And I think, in reviewing the bibliography, a
4    decision was made by the entire group that -- so we
5    had to adhere to the charge.  We really couldn't go
6    off and do other things.  But to complete the charge,
7    which is really to revise the APA resolution to decide
8    if the 1997 resolution was adequate, we weren't told
9    we had to revise the charge, we really were told we
10   had to look at it, think about if it really fit the
11   concerns of 2007 and whether it needed to be updated,
12   revised.  That we really needed to do a lot more work
13   and answer some fundamental questions about efficacy
14   and harms and the outcomes of the research on sexual
15   orientation change efforts.

16           And I will try to remember to come back to
17   why we chose SOCE, but I want to finish this train of
18   thought.

19           So a decision was made, and it may have been
20   made at the first meeting or just prior to the first
21   meeting, that we needed to do a really good systematic
22   research review, and Robin Lin Miller was going to
23   undertake that because she had the expertise.  She was
24   an editor at a well-regarded journal on those issues
25   and had undergone those kind of reviews.

Page 65

```
1          And a systematic review is the standard for
2     really evaluating effectiveness of treatments in most
3     scientific treatment types of things.  When you have
4     enough research to review.  So that's a common thing
5     that is done.  So Robin was going to undertake that.
6          We chose SOCE, I believe Dr. Beckstead, so we
7     had to decide what the scope was.  He preferred that
8     term.  We all chose that.  We didn't like the term
9     "conversion therapy" for a lot of reasons, but it is
10    the lay term.
11         And he wished to include therapies not only
12    done by licensed professionals, but where appropriate
13    and where important to also consider maybe efforts by
14    religious and spiritual leaders or professionals, we
15    chose the word "effort" to include that and maybe
16    because sometimes the treatments were diverse, but
17    that was something he felt was important from his work
18    with people with religious -- strong religious
19    beliefs, he consulted a wide variety of approaches.
20         MR. GANNAM:  Can I stop you right there.  And
21      can we go off for a second.
22              (Discussion off the record.)
23    BY MR. GANNAM:
24      Q.   So can you tell me what is a systematic
25    research review?
```

Page 66

1      A.   So, again, I defer to the text in the report

2   for a really complete version because I might leave

3   something out.  It basically looks at -- does a

4   literature review.

5           First you do a search in all medical -- all

6   relevant journals in your subject area of all studies

7   that evaluate a treatment or report a treatment, and

8   then the systematic review analyzes -- so this is only

9   peer review journals.  So after discussion we decided

10  that we had to limit it to peer review journals

11  because that is the best research that will show, in

12  the most robust way, whether there is any harms,

13  benefits, efficacy, effectiveness, change.  Because

14  the question was, does this approach work.  Does

15  SOCE -- do change efforts yield results.

16     Q.   And, when you say peer review journals, what

17  qualifies a journal to be a peer review journal?

18     A.   So, generally speaking, and the report may

19  have another more comprehensive definition, the

20  articles are submitted generally anonymously by the

21  authors and then reviewed by members of the editorial

22  board who are appointed by the editor for terms of

23  service, a few years, who are experts in the field.

24  So like the Journal of Educational Psychology will

25  have on its board educational psychologists or

Page 67

1    educational professionals who can evaluate, research

2    in education or educational psychology and decide

3    whether it meets the standards of the particular

4    journal.

5            In our -- in Chapter 3 of the report, which I

6    think gives a really good explanation of the review,

7    the systematic review process, but also what qualifies

8    as good scientific research.  So the systematic review

9    would look at a peer review journal, but then do

10   another evaluation about -- because a lot of articles

11   are published in a lot of, quote, peer review journals

12   and there are many, many journals out there.  Does it

13   meet the requirements for efficacy, to determine

14   efficacy.  Is it an experiment.

15           So Dr. Miller, who is the real expert, would

16   evaluate, along with us, we would -- I think we all

17   participated in some way to provide safeguards.  You

18   know, Robin and Roger, who were actually probably our

19   strongest researchers, you know, looked at the

20   articles, are they true experiments or are they quasi

21   experiments in terms of are they randomly selected or

22   is it a clinical population, do they measure an actual

23   treatment with controls or are they uncontrolled

24   experiments.  So they would evaluate them and

25   generally, to prove causality, you have to have some

Page 68

1   sort of treatment administered, some sort of

2   pre-assessment variables and some post-assessment

3   variables so you can assess change and anything else.

4          And you have to have some sort of goal.  Most

5   experiments have a specific goal in mind they want to

6   show.  X treatment does these things.

7       Q.   And when you said -- what's the difference

8   between a random sample and a clinical population?

9       A.   So a random sample is samples from the entire

10  population.  So like it's often most common in, like,

11  pharmaceutical research where you do that.  Or perhaps

12  you have a broad effort, you sort of can select from a

13  large group of people, and you randomly assign people

14  from the public who are either controlled to the

15  treatment design or sort of the neutral, no

16  intervention.

17         But sampling in this area is, you know, when

18  you're dealing with a special population, minority

19  population, stigmatized population, it's unusual to

20  have a random sample.  I'm not sure we know who LGBT

21  people are generally, so it would be hard to do that.

22      Q.   When the Task Force made a decision, for

23  example, to use the term S-O-C-E, or SOCE, was this

24  done by vote, did you require unanimity on decisions

25  or how did that work?

Page 69

1      A.    I think generally we aimed for a consensus.

2      Q.    Was there a list of articles or studies that

3  were specifically excluded from your systematic

4  research review?

5      A.    Yes, I believe.  I believe in the -- let me

6  try -- I'm trying to think.

7            So Robin did a literature review --

8            MR. WILLIAMS:  Why don't you do a last name

9      with Robin.

10           THE WITNESS:  Sorry.  I apologize.

11     A.    Robin, Dr. Miller, did the literature review

12  from 1960 on and then selected 56 or 57 studies that

13  qualified as peer reviewed research that appeared in

14  peer reviewed literature.  She then -- I believe that

15  list is in the appendix, but I'm not a hundred percent

16  sure.  And then she selected a number of articles to

17  examine in terms of their evidentiary conclusions

18  because they fit the qualities for quality research.

19           But, to be honest, I don't totally recall.

20  There was, you know, and I'm not sure -- not a hundred

21  percent sure of that.

22  BY MR. GANNAM:

23     Q.    And did she make the decision herself as to

24  which of those to include in your review or was that

25  something submitted to the whole committee for vote?

Page 70

1          A.    We didn't vote.   We looked at the list.   I

2     think she made her recommendations.   I believe Roger

3     Worthington probably participated in some way.   And

4     the committee did evaluate that.

5          Q.    Did the Task Force ever have votes or any

6     kind of parliamentary procedures on various things?

7          A.    I don't recall.   We were generally a very

8     collegial and professional group and I don't -- when

9     there was a disagreement or a difference in perception

10    we talked it through and came to, I think, a

11    conclusion that everybody felt good about.

12         Q.    Did that happen often?

13         A.    I don't recall, but I don't think so.   I just

14    remember it being a very productive experience and

15    very -- one of the highlights of my professional

16    career in terms of learning from others and having

17    interesting and worthwhile discussions of all sorts of

18    topics related to this.

19         Q.    Were any of the Task Force members themselves

20    practitioners of a therapy that could be called SOCE

21    or conversion therapy?

22         A.    No.   You must recall that the charge of the

23    Task Force was to revise an APA resolution and the

24    document that we produced and the product that was

25    going to be the resolution that was an internal APA

Page 71

1    product for APA purposes.  So, as such, the document

2    had to be consistent with APA policies and

3    resolutions, and in 1975 APA had adopted a resolution

4    that homosexuality was not a mental illness or

5    developmental defect and that the Association should

6    work to end the stigma toward homosexuality.

7            So many people who practiced such therapy

8    such as sexual orientation change therapies stated in

9    their publications that they perceive homosexuality as

10   a defect, so they would not be considered generally

11   able to participate.

12       Q.   You testified earlier that there were a lot

13   of reasons why you didn't like the term "conversion

14   therapy."  Can you explain what those are?

15       A.   I think it's -- for our purposes writing the

16   report, we wanted to have a term that was more

17   specific and didn't perhaps have any connotations one

18   way or the other that people could misinterpret and I

19   think we wanted something that reflected our charge.

20   So, you know, generally, again, this was an APA -- the

21   task we were doing was for the American Psychological

22   Association, so we really focused on what would meet

23   their requirements and, I think, you know, be

24   inclusive of the approaches we were going to think

25   about.

Page 72

1          Even if the approaches were not going to be

2     considered in the research review, you have to

3     remember that if you saw the final product -- I don't

4     know.  I assume, to be honest, that you haven't

5     read -- maybe you have read and enjoyed the report.

6     Or whatever.  Found it interesting.

7               MR. WILLIAMS:  Is that a yes or a no?

8          Q.   Read, yes.  I'll reserve judgment on whether

9     I enjoyed it.

10              MR. WILLIAMS:  All right.

11         A.   And that reminds me of something I left out

12    and I'm going to get back to.  That -- now I forgot my

13    train of thought.

14              So I think we wanted it to be comprehensive.

15    I think Lee felt that the word "therapy" was

16    problematic because some of the tech -- some of the

17    approaches he wanted to include, such as the religious

18    and spiritual approaches, weren't perhaps, per se,

19    therapy.  So because we are dealing with the provision

20    of efforts by nonprofessionals, we had to expand the

21    term and "efforts" was chosen.

22              MR. WILLIAMS:  Lee Beckstead; right?

23              THE WITNESS:  Dr. Beckstead, yes.

24              MR. WILLIAMS:  The use of first names, I

25        think, reflects the collegiality of your Task

Page 73

1      Force.

2            THE WITNESS:  I apologize for not being

3       specific on that.

4            MR. WILLIAMS:  That's all right.  I'm going

5       to be a pest on that.

6  BY MR. GANNAM:

7       Q.   So did your Task Force coin the term "sexual

8  orientation change efforts"?

9       A.   Yes, we did.  Yes.  We did coin that, for

10  better for worse.

11            I also want to say that, as an APA product,

12  you have to remember that the report was going to be

13  peer reviewed after it was done so that we knew that

14  we were going to write this report and perhaps propose

15  a new resolution.  And I think in the first meeting we

16  really determined that the resolution was very

17  outdated and didn't reflect any recent research so we

18  had to revise it and we wanted to, you know, come up

19  with a term that was accurate but that also would deal

20  with the fact that we were going to be peer reviewed

21  both by all the internal APA board and committees, but

22  we were going to submit the report to outside

23  reviewers, just like if it had gone through a peer

24  review journal.

25            So we wanted to pick a term that was

Page 74

1  appropriate, but we also wanted to do a product, you

2  know.  And then at the end the report was going to

3  have to be accepted by -- reviewed by all the boards

4  and committees, accepted by them, then it had to be

5  accepted by the council -- it had to be reviewed by

6  the board of directors and then accepted by the

7  council of representatives and any resolution we came

8  up with had to, of course, be peer reviewed, all those

9  things, and then voted on by the council of

10 representatives.

11      So there was just a lot of pressure or just

12 aware that our activities were going to be highly

13 scrutinized and the work product had to be really

14 quite excellent so we needed to be very, very thorough

15 and thoughtful.

16      Q.  At the time that you came up with the term,

17 and when I say you I mean the Task Force, did you

18 personally consider conversion therapy to be a term

19 that carried with it some connotation of approval or

20 disapproval of the practice?

21      A.  I think we thought that the term -- I didn't

22 think that per se because some people were positive

23 about the term who used it, some people were negative.

24 I think it had this -- conversion is a strange -- is a

25 word that's unique and didn't reflect the process, but

Page 75

1    it also, I believe, is the lay term and that's more

2    understandable.  S-O-C-E, SOCE, hasn't met with public

3    interest as a term particularly much.

4        Q.   Did you discuss or did you think at the time

5    that the term "conversion therapy" had a specifically

6    religious connotation?

7        A.   We did discuss that.  I'm not sure -- that

8    was certainly something we discussed.  I don't recall

9    what side I came up on.  I think there were pros and

10   cons to each.  I think that opinion was expressed by

11   some people.  I don't recall.

12       Q.   So in terms of the various practices carried

13   out by licensed professionals, at the time you came up

14   with the term SOCE, what were those licensed

15   professionals calling those practices?

16       A.   I'm not sure I recall totally.  I mean, I

17   think people like Socarides would just say he did

18   psychoanalysis.  I'm not sure.  I don't recall that.

19            Some of them may have used that term and I

20   believe that -- it was a professional term before it

21   became a lay term, I believe, but I can't recall who

22   might have used that term in the professional

23   literature, but I believe it was a professional term

24   before it was a lay term.

25            But, you know, I think, you know, we just --

Page 76

1    we spent a lot of time on that and I don't recall why.

2    I think, again, it was trying to find something that

3    was more -- that was more -- you know, sexual

4    orientation, we were focusing on that and we wanted to

5    really -- that was really the issue of looking at that

6    research and placing it within that context.

7         Q.   Before we go further, a moment ago you said

8    there were was something you left out that you wanted

9    to come back to?

10        A.   Oh, yeah.  I left out this whole notion or

11   this whole actually scrutiny in the peer review

12   process that you had asked me about the Task Force

13   meetings and how the Task Force did its business and I

14   stopped short of -- I stopped at the end of -- I

15   stopped in 2007 though we didn't publish the report

16   until 2009, and as I'm speaking to you I realize that

17   I left out a year and-a-half of the Task Force

18   activities.  So if you want to me to go back to that I

19   certainly could, or I don't know what your other

20   questions are at this point.

21        Q.   I will.  I'm going to ask a couple other

22   questions first.

23             Do you know who applied for membership on the

24   Task Force and was excluded?

25        A.   No.  I have no idea.

Page 77

1      Q.   Do you have knowledge of anyone who was

2    excluded?

3      A.   I believe that Dr. Nicolosi applied, but I

4    don't know why I would think I know that.  He wouldn't

5    have told me that personally, I may have just heard

6    that, but I don't know.  I think Dr. Yarhouse did,

7    Mark Yarhouse, but I am not sure.

8      Q.   Did you know Dr. Nicolosi?

9      A.   I have not -- I think I have only formally

10   met him since the report came out.  I do know, I was

11   aware -- I had read his books certainly and I knew who

12   he was by reputation.

13     Q.   Do you know whether any APA members in good

14   standing were excluded from the Task Force because of

15   their practice of SOCE or related --

16     A.   I do not know, no.  I was not involved at all

17   of the selection process.

18     Q.   Did the Task Force keep minutes or some other

19   written record of their proceedings or meetings?

20     A.   I don't believe so, but I am not a hundred

21   percent sure.  I don't recall.

22     Q.   What about audio recordings or video

23   recordings of meetings?

24     A.   I don't believe so.

25     Q.   To the extent you communicated by e-mail, for

Page 78

```
 1   example, are those saved or archived somewhere?
 2        A.   I doubt it.
 3        Q.   As the Task Force Chair, when you
 4   communicated by e-mail with other Task Force members,
 5   what e-mail did you use?  What account?
 6        A.   Either or both a Yahoo account or a Rutgers
 7   account.
 8        Q.   Do you still have both of those accounts?
 9        A.   I don't have the Rutgers account.  I may
10   have -- I think I still do, though it's somewhat
11   inactive, have the Yahoo account.
12        Q.   Do you remember what the address was?
13   Something at Yahoo.com?
14        A.   Drglassgold, d-r-g-l-a-s-s-g-o-l-d,
15   @Yahoocom.
16        Q.   And what would your Rutgers e-mail address
17   have been, the one you're not sure whether you still
18   have?
19        A.   I don't recall.  They change systems
20   periodically.  It's been a long time.  And then I had
21   a long gap in my Rutgers employment, so it deactivated
22   and I have no idea.
23        Q.   Do you ever recall seeing an official contact
24   list for the Task Force that you would refer to, this
25   is how we're supposed to talk to each other or get in
```

Page 79

1   touch with each other?

2         A.    We did have a contact list with e-mail

3   addresses that people provided.

4         Q.    And apart from those two in-person meetings

5   and e-mail, did you communicate in any other manner?

6         A.    Telephone.

7         Q.    Telephone conference?

8         A.    Telephone conference or perhaps individual

9   conference.

10          So, if you recall, so at one of the last --

11  the last meeting, in-person meeting, we distributed

12  work assignments in order to share the writing.  I

13  mean, we had these great discussions, we had an

14  outline of the report, we had some text, but we had to

15  write the report, so we assigned writing assignments.

16  So it was assumed that the people who were -- they

17  were different pairs.  Nobody was sort of left on

18  their own.  Well, Robin kind of was with Roger.

19          So we all had to work together, so they were

20  individual phone conversations that I assume happened

21  between people.  I know I called collaborators on a

22  chapter.  Like I would talk to Dr. Beckstead a great

23  deal on the two chapters we worked on, like discussing

24  what we were writing.

25        Q.    Did Task Force members consult persons who

Page 80

1    were not on the Task Force in the course of preparing

2    the report?

3        A.   Yes, I believe so.  I couldn't speak to who

4    those were.  Like I contacted Dr. Zucker at one point,

5    asked him about his research and some of his research

6    findings.  I'm sure other people talked to people.  I

7    may have talked to other people.  I'm not sure I can

8    recall at this moment.

9            Perhaps other people spoke to experts too

10   that were related, but I don't have a list of those.

11   I have no idea.

12       Q.   And would that contact with persons not on

13   the committee have been sort of part of the charge or

14   the work that you agreed to as Task Force members?

15       A.   I think it was in order to complete our --

16   when we wrote the report we wanted to make sure that

17   we had as much information as possible and we were

18   accurately interpreting things.  And quite a few of

19   these of the outside experts would have served as

20   reviewers, so I believe they were contacted to promote

21   the accuracy of the report.

22       Q.   Did the Task Force solicit public comment or

23   solicit particular people or organizations to ask for

24   comments on your work or your charge?

25       A.   Yes.  You will find in the -- I believe it's

1    the preface.  I could look at it now if you want me to

2    look at the particular.

3        Q.    Yeah, we will get to it eventually.

4        A.    We did solicit particular individuals.  So

5    some of the individuals who did not serve,

6    Dr. Yarhouse was asked to comment on the report,

7    Dr. Warren Throckmorton was asked.  So I believe some

8    of the individuals who were not included in the Task

9    Force membership, but who were interested in the

10   outcomes, were asked to comment and other people who

11   were considered experts in different areas.

12           So because it was such a long report, not

13   everybody could be an expert in all facets, so we

14   tried to gather some information or comments from

15   people from a broad spectrum.  I believe we sent out

16   the report to at least 40 unique individuals.  Then,

17   if you remember, so APA is a big organization with a

18   large -- and it's set up to solicit member input a

19   great deal.  And at the time we did the report it was

20   divided into directorates, so we sent the report to

21   the board of scientific affairs, the board of

22   professional practice, we sent it to divisions, all

23   the boards and committees of APA would review it.

24           And in March of 2009 -- so we met twice in

25   2007.  Then we spent 2008 writing the thing.  That was

Page 82

1    basically it.  And I think we really pushed to try to

2    finish it by early-ish January of 2009 so that we

3    could -- or maybe December of 2009 was more like it,

4    so we could get it out to all the boards and

5    committees.

6         So we're talking about 25 standing

7    committees, each with about five or six psychologists

8    from different backgrounds who were going to be asked

9    to review the report and provide us in-person feedback

10    at what's called the consolidated meetings, which is

11    when all the boards and committees come together.  And

12    that would be in March of 2009.

13         We also asked the ethics officer or ethics

14    specialist.  We asked a whole bunch of people.  And I

15    think people gave us ideas, Task Force members and

16    other people gave us ideas about who to ask for input.

17         So the process was going to be we finish the

18    report by the end of 2008, we send it out for review

19    to both outside experts and to members of APA

20    Leadership.  And the council members were going to get

21    this report.  There are 200 council members.

22         Then if people had comments, I and other Task

23    Force members, but predominantly me, and Clinton to

24    some degree, Clinton Anderson, were going to have to

25    respond to all the comments like you would do at a

Page 83

1    peer review process.

2           So let's say someone says change this, change

3    that, change this, we would have to evaluate what we

4    wanted to -- if their comments made sense.  We would

5    then make the changes or, if we didn't feel that was

6    appropriate, we would have to write an explanation of

7    why we didn't make the change.

8           So we wanted to -- our hope was that if we

9    got the report out by the end of 2008 and we got all

10   the comments back, including the in-person comments,

11   by March of 2009, that somehow or other, oh, God, we

12   were going to finish the work and get it to the

13   printer.  No, not to the printer.  At least get it to

14   the Board for their August meeting in Toronto.

15          So, you know, we had five months to

16   accomplish the goal of responding to the critiques,

17   finalizing the copy, proofreading it, you know, all

18   that stuff so it could be voted on, either accepted or

19   declined, and the resolution can be voted on by August

20   and then it would be printed and available on the

21   internet.

22   Q.   Did any of the persons outside the Task Force

23   who you specifically target to send the draft to for

24   review, were any of them non-APA members?

25   A.   They may have been, but I would have to look

Page 84

1    at the list of individuals in the preface.  I am not

2    sure I called --

3             We really considered this a scientific

4    document so we wanted -- and a professional document,

5    so we sent it to primarily professionals.  I don't

6    know if we sent it to people from the NASW, that's the

7    National Association of Social Workers, or other

8    people.  I don't recall.  I don't believe we sent it

9    to advocacy groups because we really did consider this

10   a professional document.

11       Q.   Did the Task Force or any individual member

12   of the Task Force receive unsolicited input or

13   lobbying even from advocacy groups or persons?

14       A.   I don't recall.  I don't recall my being

15   contacted.  Clinton Anderson may have been contacted.

16   I know some individuals who felt they were included

17   may have met with him.  I think he told me that.  I

18   was not involved in any of that.

19             I think certain administrators within APA,

20   Clinton's boss at that time, Gwendolyn Keita, who was

21   director of the public interest directorate, I think

22   they tried to protect us from all that and I believe

23   some letters went to the board of directors or to the

24   president of the APA, but we were really kind of in a

25   little cocoon, I believe.  But, you know, it's 12

Page 85

1   years, so it's been a while.

2        Q.   And you couldn't speak for other Task Force

3   members and who they spoke with?

4        A.   I have no idea.  I think, ethically, we did

5   talk about being open and honest with each other and I

6   think if they had felt that something was going on

7   they would have told Clinton and myself if they felt

8   like there was undue pressure or somebody was trying

9   to influence the outcome.  I believe they -- everybody

10  really bought into, no matter where they were coming

11  from, that this was a serious task and it was an

12  important task, and we knew that it was really

13  important and we wanted to do a good job.

14       Q.   Did every Task Force member read all of the

15  research that was selected for the systematic review?

16       A.   I cannot speak to what every Task Force

17  member did.  I know I tried to at least skim it

18  though, you know, I cannot speak to that.

19       Q.   Was it expected of each Task Force member to

20  have read all of the research selected for review?

21       A.   No, it was not.  I think some people felt

22  that their primary background was psychotherapy or

23  something like that and, as Dr. Miller had such

24  tremendous expertise, we did lean on her the same way

25  that the psychotherapy sections were primarily

Page 86

1    Dr. Beckstead, myself, and Dr. Greene.  The concerns

2    of religious individuals, which I think is really a

3    terrific chapter, that was primarily Dr. Beckstead,

4    Dr. Greene, myself.  So that people carved out certain

5    things and, as you know, I'm sure from serving on the

6    Task Force committees, I'm just assuming, some people

7    were part of others.

8            MR. WILLIAMS:  I'll take judicial notice of

9        that fact.

10       Q.   Now, in your declaration here you said that

11   you wrote sections and edited the final report at

12   least in 2009.  So let's start with what sections did

13   you personally write of the 2009 report?

14       A.   May I consult the report, please?

15       Q.   Yeah.  And, in fact, let's establish it is

16   what it is.

17            In Exhibit B of your declaration in front of

18   you is attached the report of the American

19   Psychological Association Task Force On Appropriate

20   Therapeutic Responses to Sexual Orientation.  Did I

21   say that correctly?

22       A.   Yes.

23       Q.   And this is attached to Exhibit 28, your

24   declaration in this case; right?

25       A.   Right.

Page 87

1      Q.   So this is the APA report we have been

2   talking about.  Which sections did you write?

3      A.   So I will say that I co-wrote the

4   introduction with Clinton Anderson.  And perhaps in

5   section 2, the psychology, religion and homosexuality,

6   Lee Beckstead probably reviewed that as well.

7          Then A Brief History of Sexual Orientation

8   Change Efforts I contributed sections to as did Jack

9   Drescher, Lee Beckstead, Roger Worthington all

10  contributed sections to that.

11         Section 3 is primarily the work of Robin

12  Miller.  Dr. Robin Miller.  Section 4 is primarily the

13  work of Dr. Miller.

14         Section 5, I believe that's primarily the

15  work of Dr. Beckstead, but I may have contributed some

16  to that and maybe Dr. Greene contributed more comments

17  by telephone and other things.  Chapter 6 is

18  Dr. Beckstead and myself.  Chapter 7 I took primary

19  ownership of.  Chapter 8, I wrote most of it, but in

20  close consultation with Dr. Greene.

21         Summary and conclusions, I probably took

22  primary responsibility for with some edits and

23  contribution by Clinton Anderson.  The executive

24  summary was probably me with the help of Dr. Anderson

25  in places, perhaps, and Lee may have -- Dr. Beckstead

Page 88

1    may have contributed too.  And the abstract, probably

2    myself and Clinton Anderson.

3        Q.   I missed Chapter 8.  Who did you say was

4    responsible for Chapter 8?

5        A.   Chapter 8 is I participated in that with the

6    participation via telephone and edits of Dr. Greene.

7        Q.   So Chapters 3 and 4, both titled A Systematic

8    Review of Research, were primarily Dr. Miller's work?

9        A.   Yes.

10       Q.   Did you have any involvement in those

11   sections?

12       A.   I and Dr. Miller worked -- discussed the

13   framework.  We talked a lot about the organization of

14   that chapter.  I had suggestions about the

15   organization, I edited it, but the content and format

16   and the conclusions are hers.

17       Q.   Was there a --

18       A.   But Doctor -- I just want to add -- sorry.

19   I'm sorry to interrupt you.  I apologize.

20       Q.   No, please.

21       A.   Dr. Worthington, who also has background in

22   research, I believe read through some of these things

23   and also probably talked to Robin on the phone and may

24   have contributed some bit, but I wasn't involved in

25   their conversations.  But I assume because he -- I

Page 89

1   think he did engage in that, but I can't really get

2   into specifics.

3       Q.   Was there any part of the report, the final

4   report, that was either objected to or not endorsed by

5   one or more members of the Task Force?

6       A.   No.

7       Q.   Was there any kind of minority report

8   prepared as to any section or any part of it?

9       A.   No.  I mean, everybody was expected to read

10  the whole thing once we put all the pieces together.

11  And there were changes and reorganization and a lot of

12  comments.

13          So when I say we wrote it for 2008, we had

14  deadlines for chapters.  And then we went through this

15  internal review process where people commented and I

16  swear at certain points we had to like start all over

17  again.  And, you know, it was a long writing process.

18  But, yeah, everybody read it and everybody, I think,

19  felt really good about it.  I think we felt very proud

20  of it.

21      Q.   What person or body within the APA ultimately

22  approved the final report for publication?

23      A.   The council of representatives.  So the APA

24  kind of has an interesting structure where it has a

25  legislative body that determines policies for the

Page 90

1    association and all the ultimate resolutions, and that

2    is a council of representatives.  The council of

3    representatives is made up of elected officials from

4    all the divisions of APA, including all the state

5    psychological associations that exist that participate

6    in APA.  For instance, the Florida Psychological

7    Association would have at least one member, I believe,

8    on the council of representatives.

9          Now, the actual numbers -- every division, I

10   believe, is represented and every state psych.

11   association is represented.  Some may have more

12   members based on size of membership.  So sort of like,

13   I guess, the house of representatives where the more

14   heavily populated you are you get more votes.

15         So let's say some of the biggest divisions in

16   the APA are psychoanalysis, private practice, general

17   psychotherapy.  So those people would all vote.  So

18   you have over 200, I believe.  I couldn't give you the

19   absolute number of people who would vote.  As well as

20   people who were elected from the board of directors,

21   they also vote.

22       Q.   Apart from those over 200, whatever that

23   number is, of the council of representatives, how many

24   other APA members have participated in the review and

25   comment process?

Page 91

1      A.   So I'm going to give you an estimate because

2  it would be all the committee members and all the

3  board members.  So the boards have -- so I'm going to

4  just count out loud.

5      Q.   Please.

6      A.   The boards have about 10 to 15 people and

7  there are four of them, so that's 40 to 60.  Then

8  they're all the committees of the public interest

9  directorate and I believe they're at least 10 if not

10 12, so that's 60 to 72.  Then we also added the ethics

11 committee, which is in a separate area.  So I'd say

12 about 150.

13     Q.   In addition to the council of

14 representatives?

15     A.   200.  Yes.  So we're talking a great many

16 people.  And the board of directors, which is a

17 separate body of, I believe, 20 people.

18          And then so many of the employees in the

19 highest level executive functions such as Dr. Keita,

20 who is the director of the public interest

21 directorate, the head of science directorate, the head

22 of the practice directorate, the head of the education

23 directorate, all those high-level administrators for

24 APA were expected to read it and give us comments.

25 And I know Dr. Keita certainly gave us her comments

Page 92

1  and the science directorate gave us comments.  So that

2  there was also -- so their members, about 500 members

3  gave us comments, and then APA administrators, who are

4  employees, also gave their comments and probably 10 to

5  15 of those in addition.

6      Q.   Is there a log or a record of all the

7  comments received and how they were answered or

8  responded to?

9      A.   I could not tell you.  I know we initially

10 had all of them.  I did not keep them.  Dr. Anderson

11 may have had them.  I have no idea if they are still

12 around.  I don't know.

13     Q.   Do you recall any conclusions reached in some

14 earlier draft of the report that were changed as a

15 result of comments received from others?

16     A.   Let me just think about that for a few

17 minutes.  No.  I think we added material sometimes.  I

18 think we did -- there may have been comments about

19 balance just in terms of how you present evidence

20 perhaps, but I don't recall specifically.

21          I do remember that the president -- so

22 because we took so long to get this done, it was a

23 such a lengthy process, APA presidents change every

24 year.  So we were appointed by one president and then

25 Dr. Alan Kazdin, who is an expert in child and

Page 93

1   adolescent psychology, I believe he's on the faculty

2   of Harvard Medical School or might be, he did change I

3   think -- he decided on the some of the wording of the

4   resolution.  And will you permit me to look up that?

5       Q.   Sure.

6       A.   Let's see.  I think the resolution may have

7   had more comments and more edits, but, to be honest,

8   the general gist remained the same.  It was, oh, how

9   you express -- scientists can be very detail-oriented

10  sometimes.  Some of them.  Let's see.  Where is the

11  resolution.

12      Q.   I think you will find it at page 120.

13      A.   Oh, thank you.

14      Q.   If we're talking about the same thing.

15      A.   Yes, we are.  This sentence, "there is

16  insufficient evidence," in page 121, two down, I

17  believe the board of directors, and I think Dr. Kazdin

18  in particular, preferred that wording.  I think there

19  was -- you know, they went back and forth too.  I

20  think they included us in -- you know, there was --

21  and I forget what the original wording is, was, but

22  that phrase, I think the board of -- some of the

23  scientists on the board of directors and the

24  scientists felt that that was important.

25      Q.   I'm going to read for the record the portion

Page 94

1    I think you're referring to.  It reads, "Be it further

2    resolved that the American Psychological Association

3    concludes that there is insufficient evidence to

4    support the use of psychological interventions to

5    change sexual orientation."

6        A.    Yes.

7        Q.    Did I read that correctly?

8        A.    Yes, you did.

9        Q.    And which part of that specifically do you

10   recall was changed at the request of the commenters?

11       A.    There is insufficient evidence.  I believe

12   the conclusion was the same that there is no evidence

13   to support the use.  Insufficient evidence, I think

14   that was generally the discussion of how to frame the

15   fact that there is a lack of evidence that sexual

16   orientation change efforts are effective.

17       Q.    Okay.  Any other conclusions or aspects of

18   the resolution?

19       A.    Not that I recall.  Not that I recall really,

20   to be honest.

21       Q.    Why did this Task Force not address gender

22   identity change efforts?

23       A.    We were not asked to.

24       Q.    Do you know why?

25       A.    That was not in the charge.  I couldn't tell

Page 95

1    you.  I believe at that time this was the issue that

2    was on people's minds.  Gender identity change efforts

3    were really not the focus.

4         Q.   So I am correct, this report does not address

5    gender identity?

6         A.   That is correct.  However, if you note in

7    Chapter 7 on children, that is somewhat touched on.

8    Because in children, some efforts reported in the

9    1960s in case studies do target gender nonconforming

10   behaviors and gender -- perhaps even gender identity

11   as a proxy for sexual orientation in children.

12        You have to recall that a six-year-old would

13   not say I am gay or lesbian, but they may act in ways

14   that are gender nonconforming that cause parents to

15   assume that they are or that there's something going

16   on and that then would become the focus of treatment.

17   So in that chapter we did discuss those issues and

18   that is why I spoke to Dr. Zucker.

19        But we reached no conclusions.  Well, we did

20   discuss that conclusion somewhat.

21        MR. GANNAM:  Can we go off for a moment.

22        (Lunch recess from 12:34 p.m. to 1:32 p.m.)

23   BY MR. GANNAM:

24        Q.   So we've been talking about the 2009 APA

25   report.  Is there any -- since this report came out in

Page 96

1  2009 I want to ask, is there any part of the report

2  that has been withdrawn or updated or changed by the

3  APA since it came out?

4       A.   No.  I believe, though, an announcement went

5  out earlier this year that they are reviewing the 2009

6  resolution, so they are interested in updating that

7  resolution on SOCE as well as issuing a resolution in

8  GICE, but those are both in the process.  They haven't

9  occurred yet.

10      Q.   Do you know where in the process those

11  projects are?

12      A.   No.  I'm not involved in those processes.

13 May I clarify?

14      Q.   Sure.

15      A.   So they are updating the resolutions, but

16 there has not been any -- to answer the first part of

17 your question, no part of the report has been

18 withdrawn or changed and there have been -- when it

19 came out the report was praised.  I modestly say that.

20 There have been no changes made.

21      Q.   And, as we sit here today, are there any

22 changes that -- or any part of the report that you

23 personally would want to back away from or no longer

24 endorse?

25      A.   No.

1      Q.   Well, let's look at some of the specifics, if

2  we could.  Let's go to page 2 of the report.  There's

3  a footnote designated by two asterisks that reads, "In

4  this report we use the term sexual orientation change

5  efforts, SOCE, to describe methods, for example,

6  behavioral techniques, psychoanalytic techniques,

7  medical approaches, religious and spiritual approaches

8  that aim to change a person's same-sex sexual

9  orientation to other sex regardless of whether mental

10  health professionals or lay individuals, including

11  religious professionals, religious leaders, social

12  groups and other lay networks such as self-help groups

13  are involved."

14          Did I read that correctly?

15      A.   Yes, you did.

16      Q.   And is that consistent with your earlier

17  testimony about what the Task Force intended to

18  include within the term SOCE?

19      A.   Yes.

20      Q.   Given that it includes methods and approaches

21  that are not performed by licensed mental health

22  providers, but rather are performed by religious and

23  spiritual leaders, for example, does that mean that

24  any conclusion in this report that uses that term

25  "SOCE" is not differentiating between practices

Page 98

1   carried out by licensed professionals and those

2   practices carried out by religious leaders and

3   non-licensed persons?

4       A.   Could you repeat that because, I'm sorry, I

5   lost the first part paying attention to the second

6   part.

7            MR. GANNAM:  Can you read that back for us.

8            (The question was read by the reporter.)

9       A.   So, in my understanding of that question, in

10  the report the conclusions we draw have to do, though

11  we defined SOCE in this way, the research, review, and

12  evaluation only pertains and the conclusion that there

13  is no, or is insufficient or there's no evidence of

14  efficacy is based on a review of the scientific

15  literature.  And if you look at actually the list of

16  studies that were examined, predominantly -- so I

17  would have to think about it, but predominantly the

18  behavioral treatment --

19           Actually, let me go back and just say I think

20  the answer is yes, as I review the literature that was

21  reviewed.  So we reviewed both literature, reviewing

22  therapies tried by licensed professionals as well as

23  some articles that may have pertained to practices by

24  support groups and by religious or spiritual leaders.

25  We reviewed everything and our conclusions do apply to

Page 99

1   both.

2   BY MR. GANNAM:

3       Q.   Now will you look at page 3.

4       A.   Uh-hum.

5       Q.   Now that we've defined what SOCE means, and

6   on the left side of the page about two-thirds of the

7   way down is the heading Individuals Who Seek SOCE And

8   Their Experiences.  Do you see that?

9       A.   Uh-hum.

10      Q.   I'll read the first sentence.  "Although the

11  recent SOCE research cannot provide conclusions

12  regarding efficacy or safety, it does provide some

13  information on those individuals who participate in

14  change efforts."

15           Did I read that correctly?

16      A.   Yes, you did.

17      Q.   And that conclusion, is that still valid that

18  the recent SOCE research cannot provide conclusions

19  regarding efficacy or safety?

20      A.   What do you mean by recent?  Recent -- the

21  research reviewed in the report?  I don't understand

22  your question.

23      Q.   Whatever the word "recent" means in the

24  report?

25      A.   Okay.  So let me explain.  And I apologize

Page 100

1    for any confusion in this report.

2            We divided the research on SOCE into two

3    periods, an early period from the 1960s and '70s,

4    maybe one study from 1983, '84 that was empirical

5    scientifically reviewed literature.  We called that

6    old SOCE.  I'm not sure we even used the word "old."

7    We just called that SOCE research.

8            Then when we did the review we discovered a

9    body of research that, in 2009, was more recent.  And

10   this was primarily, but not entirely, the research

11   provided by religiously-oriented professionals,

12   probably not psychologists or social workers.  We

13   called that recent research.  And when we reviewed the

14   recent research, most of it was not published in

15   scientific journals or some of it was, but it didn't

16   fit the criteria for a true experiment or a quasi

17   experimental design.

18           In other words, maybe it was qualitative like

19   Dr. Beckstead's work, or it was some other study.  It

20   was not an empirical study so it could not provide us

21   evidence of harms or benefits.  It could only provide

22   information on perceptions of participants.  So that's

23   why we said it cannot provide conclusions.  It's only

24   the recent research on SOCE that did not meet

25   experimental standards for causality that we said

Page 101

1    cannot provide conclusions regarding efficacy or

2    safety.

3         Q.   And what was the time period covered by which

4    you referred to as old or just plain SOCE?

5         A.   Probably -- old SOCE.  So if you go to the

6    back of the report, Appendix B, studies included, you

7    had asked for a list of all the studies that we

8    actually reviewed and looked at, even the ones that

9    maybe weren't commented on directly.  So we list the

10   experimental studies and in 1981 the quasi -- yeah, so

11   it's like early '80s I would say.  So non-experimental

12   studies also are there.

13        So it looks to be 1981 might be the last

14   study.  But -- yeah, it's the last experimental study.

15   Though Ponticelli is a qualitative psychological

16   study.  But let's say 1981 approximately.

17        Q.   And going back to page 2, in the right column

18   about two-thirds of the way down it reads, "None of

19   the recent research," and then it gives a range, 1999

20   to 2007?

21        A.   Right.  So, yeah, so it explains itself.

22   There you go.

23        Q.   So does that recent research there on page 2

24   correspond to that conclusion on page 3?

25        A.   Yes.  Thank you.  That would have been

Page 102

1    easier.  And it explains what I tried to just explain
2    to you.
3        Q.   So subject to that qualification of what
4    recent SOCE research is, this conclusion that's stated
5    here that it cannot provide conclusions regarding
6    efficacy or safety is still valid?
7        A.   Right.  So that conclusion on page 3 refers
8    to the data defined as recent 1999 to 2007.  The
9    earlier research, 1960 to -- most states conducted to
10   1981, in the paragraph above it, those were the
11   studies that were an adequate methodological adequacy
12   to provide conclusions on causality and those found
13   that SOCE was not effective.
14       Q.   Now will you turn to page 7, please.
15   Actually 6 and 7.  At the lower right-hand corner of
16   page 6 is the heading that reads "Research."  Do you
17   see that?
18       A.   Uh-hum.
19       Q.   And the first sentence says, "The Task Force
20   was asked to provide recommendations for future
21   research."
22            Did I read that correctly?
23       A.   Yes.
24       Q.   And then the next paragraph begins, "The
25   research on SOCE has not adequately assessed advocacy

Page 103

1   and safety."

2            Did I read that correctly?

3       A.   Right.

4       Q.   And this statement does not differentiate

5   between old research and recent research; does it?

6       A.   No.  I think it would apply to all research

7   because it's talking about future research, not past

8   studies.

9       Q.   And so the context for recommending future

10  research is that the current body of research has not

11  adequately assessed efficacy and safety; is that

12  correct?

13      A.   I mean, I would say that we know what the

14  current research has done or research to date.  We

15  would ask for improvements.  Adequately -- it has

16  tried to assess.  It may not have adequately assessed

17  it, but it has tried to assess it.

18      Q.   So, as written, the statement still stands

19  that it has not adequately assessed efficacy and

20  safety?

21      A.   Uh-hum.

22           MR. MIHET:  Is that a yes?

23      Q.   Please say yes or no and not uh-hum.

24      A.   Sorry.  The sentence is accurate.

25      Q.   Thank you.  Let's go to page 37.  In the

Page 104

1    lower right there's a heading that says "Recent

2    Studies"?

3         A.    Uh-hum.

4         Q.    In here are we talking about the same time

5    frame that was identified before, '99 to 2007?

6         A.    Yes.

7         Q.    So in this paragraph about recent studies,

8    the second full sentence after the citations begins

9    "These studies."  Do you see that?

10        A.    Yes, I do.

11        Q.    It reads, "These studies all use designs that

12   do not permit cause and effect attributions to be

13   made.  We conclude that although these studies may be

14   useful in describing people who pursue SOCE and their

15   experiences of SOCE, none of the recent studies can

16   address the efficacy of SOCE or its promise as an

17   intervention."

18             Did I read that correctly?

19        A.    Yes, you did.

20        Q.    So as describing the recent studies in that

21   time frame that's identified, does this statement

22   still stand, that the studies use designs that do not

23   permit cause and effect attributions to be made?

24        A.    That is correct.

25        Q.    Will you go to page 42.  Recent studies,

1   again, is the heading on page 42 and it begins,

2   "Although the recent studies do not provide valid

3   causal evidence of the efficacy of SOCE or of its

4   harm, some recent studies document that there are

5   people who perceive they have been harmed through

6   SOCE."  Followed by citations.  And then it reads,

7   "Just as other recent studies document that there are

8   people who perceive that they have benefited from it."

9        Did I read that correctly?

10   A.   Yes.

11   Q.   Now, again, we're talking about the same time

12   frame of studies; correct?

13   A.   Correct.

14   Q.   And so here does this statement stand, that

15   the recent studies do not provide valid causal

16   evidence of the efficacy of SOCE or of its harm?

17   A.   That's correct.  Well, do not provide -- so

18   do not provide valid causal efficacy.  And then

19   there's the rest of the sentence, some studies

20   document that some people perceive they have been

21   harmed or have benefited from it.

22   Q.   Okay.  So I want to look down towards the

23   bottom of that paragraph that begins "Among those

24   studies reporting on the perceptions of harm."  Do you

25   see that?

Page 106

1     A.    Right.

2     Q.    It continues, "The reported negative social

3    and emotional consequences include self reports of

4    anger, anxiety, confusion, depression, grief, guilt,

5    hopelessness, deteriorated relationships with family,

6    loss of social support, loss of faith, poor self

7    image, social isolation, intimacy difficulties,

8    intrusive imagery, suicidal ideation, self hatred, and

9    sexual dysfunction."

10           Did I read that correctly?

11     A.    Yes.

12     Q.    And it says, "These reports of perceptions of

13    harm are countered by accounts of perceptions of

14    relief, happiness, improved relationships with God,

15    and perceived improvement in mental health status

16    among other reported benefits."

17           Did I read that correctly?

18     A.    Right.   Yes.

19     Q.    So what I want to ask is did the Task Force

20    attempt to quantify the prevalence of the described

21    reported harms as compared to the described reported

22    benefits?

23     A.    I think in a gross way, yes, though the

24    different studies, there were different numbers of

25    studies, different number we -- I'm not sure the

Page 107

1    results were quantifiable, no.

2        Q.   Now, understanding that this particular

3    paragraph is taking about recent studies, but given

4    this list of reported harms, does the Task Force

5    report attempt to assign any number or percentage on

6    the increased likelihood of one of these enumerated

7    harms occurring from SOCE as compared to psychotherapy

8    in general?

9        A.   No.

10       Q.   And I'll give an example just so I'm clear.

11   The first reported harm in this list is anger.  So,

12   for example, did the Task Force attempt to quantify

13   how much more likely it is that a person who receives

14   SOCE will have increased anger as a result compared to

15   how many people would have increased anger as a result

16   of psychotherapy in general?

17       A.   You have to remember that these studies,

18   because of their quality, would not permit that kind

19   of comparison.

20       Q.   And so can -- asking not only about the

21   recent studies then, but about all of the research

22   that was reviewed, was the Task Force able to assign

23   any percentage of likelihood to these various reported

24   harms from SOCE as compared to the likelihood of those

25   reported harms from psychotherapy in general?

Page 108

1      A.   Dr. Miller did not complete that type of

2   analysis.  The later research did not lend itself to

3   any sort of ability to do that.  You have to remember,

4   the early research showed some serious harms, but we

5   did not do a quantitative analysis because also

6   that -- I'm not sure the harms research for general

7   studies, we did try to look what that might be, was

8   also not difficult to -- was difficult to obtain.

9           So there's so many psychological studies of

10  efficacy, different conditions, so I'm not sure we

11  were -- I'm not sure Robin -- Robin thought about

12  that, I think, maybe, but I'm not a hundred percent

13  sure.  So it's not quantifiable.

14           MR. WILLIAMS:  Robin who?

15           THE WITNESS:  Dr. Miller.  Sorry.

16  BY MR. GANNAM:

17      Q.   And so is the answer then the difference in

18  percentages or the likelihood of one of these negative

19  or harms resulting from SOCE compared to one of these

20  negatives resulting from psychotherapy in general is

21  not quantifiable?

22      A.   The research does not lend itself to that

23  type of quantification.

24      Q.   So the answer is yes?

25      A.   Could you repeat the question.  Sorry.

1          MR. GANNAM:  Could you repeat my last

2      question, please.

3          (The question was read by the reporter.)

4      A.   I'm just pausing to think that through.  I

5  believe it might be -- you know, might be quantifiable

6  for early research, but we -- I don't believe we did

7  that analysis.  It would not be possible with the

8  later research.

9  BY MR. GANNAM:

10     Q.   And are you aware of anyone who has done such

11  an analysis with the earlier research?

12     A.   I am not aware.

13     Q.   In the recent studies that are identified

14  here, was the prevalence of these various reported

15  harms resulting from SOCE by non-licensed persons

16  differentiated from the prevalence of these reported

17  harms from SOCE by licensed professionals?

18     A.   No, I do not believe so.

19     Q.   Did the Task Force make any attempt to

20  distinguish between those two categories, licensed

21  persons and unlicensed persons?

22     A.   We may have, but I am not sure.  I don't

23  recall.

24     Q.   And there's no result of such an analysis in

25  the report?

Page 110

1        A.    I don't believe so, no.

2        Q.    I want to go -- staying on page 42 in this

3    section titled Summary, which is the summary of

4    Chapter 4, the first sentence says, "We conclude that

5    there is a dearth of scientifically sound research on

6    the safety of SOCE."

7              Did I read that correctly?

8        A.    Uh-hum.  Yes.

9        Q.    And then it continues, "Early and recent

10   research studies provide no clear indication of the

11   prevalence of harmful outcomes among people who have

12   undergone efforts to change their sexual orientation

13   or the frequency of occurrence of harm because no

14   study to date of adequate scientific rigor has been

15   explicitly designed to do.  Thus, we cannot conclude

16   how likely it is that harm will occur from SOCE."

17             Did I read that correctly?

18       A.    Yes.

19       Q.    And does that conclusion still stand today?

20       A.    What, the conclusion in the report regarding

21   that research reviewed?

22       Q.    The final sentence, for example, we cannot

23   conclude how likely it is that harm will occur from

24   SOCE.

25       A.    Are you talking about only with regard to

Page 111

1    this research included in this report, not -- in other

2    words, I don't understand your question.

3         Q.   Okay.  The summary itself qualifies it by

4    saying early and recent research studies provide no

5    clear indication of the prevalence of harmful outcomes

6    among people who have undergone efforts to change

7    their sexual orientation or the frequency of

8    occurrence of harm because no study to date of

9    adequate scientific rigor has been explicitly designed

10   to do so.  So I think we're talking about only studies

11   available to date at the time of this report.

12        A.   Okay.

13        Q.   So, based on those studies, is it still a

14   correct conclusion that we cannot conclude how likely

15   it is that harm will occur from SOCE?

16        A.   So the conclusion on studies to date, so that

17   would be studies to 2007.  So it only -- that sentence

18   is accurate with studies to date to 2007.

19        Q.   Okay.  Now, if there happens to be one from

20   '08 that got in here, would it still apply?  I mean --

21        A.   Right.  If it's included in here, yes.

22        Q.   Okay.

23        A.   So the formal review was for -- yes, that's

24   correct.

25        Q.   Can we go to 72 now.  Page 72.  This is in

Page 112

1   the Chapter 8, Issues For Children and Adolescents and

2   Their Families.  On page 72 there's a section titled

3   Literature Review.  Do you see that?

4        A.   Yes, I do.

5        Q.   The first subheading is Literature on

6   Children and the first sentence reads, "There is a

7   lack of published research on SOCE among children."

8             Did I read that correctly?

9        A.   Yes.

10       Q.   And as of the time of this report, is that an

11   accurate statement?

12       A.   Yes.

13       Q.   And, going to page 73, the next subheading is

14   Literature On Adolescents.  Do you see that?

15       A.   Uh-hum.

16       Q.   And the first sentences says, "We found no

17   empirical research on adolescents to request SOCE."

18             Did I read that correctly?

19       A.   Yes.

20       Q.   And is that still an accurate statement as to

21   the state of the empirical record at the time of this

22   report?

23       A.   Yes.

24       Q.   Now I'm going to flip back a bit to page 22

25   just for a definition.

Page 113

1          MR. WILLIAMS:  Two two?

2          MR. GANNAM:  Two two, yes.

3   BY MR. GANNAM:

4      Q.   Page 22 near the bottom of the first column

5   begins the sentence "Behavior therapists tried."  Do

6   you see that?

7      A.   Yes.

8      Q.   It says, "Behavior therapists tried a variety

9   of aversion treatments such as inducing nausea,

10  vomiting, or paralysis, providing electric shocks, or

11  having the individual snap an elastic band around the

12  wrist when the individual became aroused to same-sex

13  erotic images or thoughts.  Other examples of aversive

14  behavioral treatments included covert desensitization,

15  shame aversion, systematic desensitization, orgasmic

16  reconditioning and satiation therapy."

17          Did I read that correctly?

18     A.   Yes.

19     Q.   Is that an adequate or an accurate summary of

20  what aversion treatments are in this realm of SOCE?

21     A.   I believe so.

22     Q.   Is there any other --

23     A.   Well --

24     Q.   Go ahead.

25     A.   In the United States, I believe that is an

Page 114

1    accurate statement.  There are, in international

2    settings, efforts to change sexual orientation that do

3    use, I believe, aversive treatments and mandatory

4    inpatient treatments, and I don't know the extent of

5    the aversive treatments.  Okay.

6        Q.   Just so I understand what you're saying, the

7    term "aversive treatments" could cover other things

8    besides what are listed here on page 22, but you

9    believe that what's listed on page 22 is a

10   representative list of things that have happened in

11   the United States?

12       A.   Since the 1960s on.  It might not cover -- I

13   think we left out the treatments from the 1920s, '30s,

14   and '40s such as hormone therapies, electric shock.

15   Did we include electric shock?

16       Q.   Yes.

17       A.   We didn't include hormone treatments and some

18   other treatments that occurred probably in the early

19   20th century.

20       Q.   To kind of have a working definition of what

21   an aversion treatment or aversive treatment is, would

22   it be fair to say aversive treatments involve some

23   kind of intentional pain or discomfort inflicted on

24   the patient?

25       A.   Not -- so it would be that plus any form of

Page 115

1    punishment.  Of punishing, punishment.  So, you know,

2    some treatments you provide rewards, you give someone

3    a piece of candy afterwards.  It's very simplistic.

4           And other treatments are aversive in that

5    it's a unpleasant sensation.  Some people would say

6    that the seatbelt noise you get when you don't plug in

7    your seatbelt is unpleasant.  There is some

8    subjectivity about aversion, but I think generally

9    it's unpleasant and perhaps a bit more than

10   unpleasant.

11      Q.   And if I ask you a question about aversive

12   treatment or aversion therapy that would go beyond

13   what you've just described, just let me know, but I

14   just wanted to come up with some kind of working

15   definition so we're both talking about the same thing.

16      A.   Right.  But I want to just say that, in

17   general, if you notice there's some references, in the

18   modern era and this current millennium it's highly

19   unusual to have any form of aversive treatments.  It's

20   highly, highly and may be, in this country, almost

21   nonexistent generally in psychotherapy.

22      Q.   Let me ask you, how many -- or which of

23   these, if you can look at the list on 22, which, if

24   any, of these treatments would be considered unethical

25   if practiced by licensed mental health providers in

Page 116

1   2019?

2        A.    Well, there's some general terms so that I

3   couldn't speak.  So covert sensitization, systematic

4   desensitization, satiation therapy may not be

5   aversive.

6        Q.    Okay.

7        A.    And some people still use the rubber band.

8   And then orgasmic recondition, yeah.  But let me just

9   say, I am not a specialist in behavior therapy so I --

10  you know.

11       Q.    Would inducing nausea, vomiting, or paralysis

12  in connection with SOCE be considered unethical, in

13  your opinion?

14       A.    Yes.  A human rights violation most likely.

15  And the electric shocks.  Well, in this context.

16       Q.    What about using the elastic band around the

17  wrist method in the context of SOCE, would that be

18  unethical?

19       A.    Yes, but you must remember -- lost my

20  thought.

21       Q.    Okay.  Now that we've talked about what

22  aversion treatments look like, let's go to page 41.

23  And on the right column the main heading is Reports of

24  Harm.  Do you see that?

25       A.    Right.

Page 117

1      Q.   And the first subheading is Early Studies.
2  Do you see that?
3      A.   Uh-hum.
4      Q.   It says, "Early research on efforts to change
5  sexual orientation focused heavily on interventions
6  that include aversion techniques."
7           Did I read that correctly?
8      A.   Yes.
9      Q.   The last sentence in that paragraph -- I'll
10  just read the whole thing.
11          The next sentence is, "Many of these studies
12  did not set out to investigate harm.  Nonetheless,
13  these studies provide some suggestion that harm can
14  occur from aversive efforts to change sexual
15  orientation?"
16          Did I read that correctly?
17     A.   Yes.
18     Q.   So would it be fair to say that these early
19  studies suggest that there may be a difference in the
20  quantity or prevalence of harm that can occur from
21  aversive SOCE as compared to non-aversive SOCE?
22     A.   I'm not sure that paragraph means that.
23     Q.   Okay.  Well, let me just ask you, in the
24  whole report or in the research that was examined,
25  would it be fair to say that there may be some

Page 118

1  difference in the harm that occurs from aversive SOCE

2  as compared to non-aversive SOCE?

3      A.   No.

4      Q.   And why is that the case?

5      A.   Because non-aversive SOCE, or SOCE, can cause

6  suicidal ideation and suicide attempts, and those are

7  very harmful outcomes.  They're life threatening.  And

8  that can come from non-aversive conversion therapy or

9  SOCE.

10     Q.   My question was is it possible there is a

11 difference in prevalence of harmful outcomes comparing

12 aversive SOCE to non-aversive SOCE?

13     A.   I don't think the evidence gives us any way

14 to draw that conclusion.

15     Q.   And is there -- does this early studies

16 paragraph on page 41 tell us that in the early studies

17 there were more that focused on aversion techniques as

18 compared to early studies that focused on non-aversive

19 techniques?

20     A.   So one of the challenges in your question is

21 that the studies that Dr. Miller reviewed in early

22 studies represent only studies that meet certain

23 methodological criteria for determining cause and

24 effect.  There were other reports from that era that

25 were not -- was not researched in terms of research

1   quality, you know, the work of Socarides or Bieber or

2   those individuals, so that we're considering a very

3   small sample of all the interventions that were

4   provided to individuals in the name -- into the rubric

5   of SOCE, so that we really can't compare, and I think

6   Dr. Miller would say we can't compare, early and late

7   research and draw these kind of conclusions that you

8   wish to make.  Or I can't.  I can't respond.  I'm

9   sorry.

10       Q.   In this category of the early studies, the

11  studies that preceded the recent studies as we've

12  already talked about, was there research in the early

13  studies showing that harm can occur from non-aversive

14  SOCE?

15       A.   I would say so.  Again, these early studies

16  are not the full spectrum of interventions offered, so

17  that interventions offered to individuals in that era

18  could have -- these are only behavioral treatments.

19  There were a variety of interventions offered to

20  people in that era that we couldn't use because they

21  really were not adequately designed.  And they were

22  non -- they might have been considered non-aversive.

23            But we didn't really do a review of those, so

24  we can't compare that.  I can't quantify or can't draw

25  a conclusion from that early era comparing

Page 120

1    non-aversive versus aversive.  I mean, Dr. Nicolosi or

2    Dr. Bieber or Dr. Socarides may have considered their

3    interventions non-aversive, but we didn't really look

4    at the outcomes and they didn't keep records that

5    would allow us to figure out outcomes.

6        Q.   So the Task Force, I assume, intentionally

7    made this statement about the aversive nature of the

8    early studies that were reviewed.  My question is were

9    there also early studies reviewed involving

10   non-aversive techniques where the same thing could be

11   said, that is, harm can occur from these non-aversive

12   therapies?

13       A.   Some of that material may be found in a

14   report in more qualitative retrospective studies that

15   we discuss in other chapters.  So --

16       Q.   And so --

17            MR. WILLIAMS:  Are you finished, Doctor?

18            THE WITNESS:  Yeah, I'm finished.

19   BY MR. GANNAM:

20       Q.   And so just to get back to the question I'm

21   asking, was any early research on efforts to change

22   sexual orientation that involved non-aversive

23   techniques reviewed for purposes of this Task Force

24   report?

25       A.   It may have been in the qualitative studies

Page 121

1   discussed in later chapters.  Most likely it did, but

2   I can't -- some of those qualitative studies involved

3   retrospective accounts that may have occurred during

4   that period.

5       Q.   And so in any of the research among the early

6   studies that involved non-aversive SOCE, did any of

7   those include reports of harm from that non-aversive

8   SOCE?

9       A.   I believe the answer is yes, but I don't

10  really want to give that as my response because I

11  would have to go back and look at those studies in

12  terms of the time period.

13      Q.   And so I'll ask a follow-up question.  Were

14  there any studies included in the early studies

15  involving non-aversive SOCE showing that non-aversive

16  SOCE causes harm?

17      A.   Let me just think.  I believe so.

18      Q.   And can you point me to where that would be

19  in this Task Force report?

20      A.   It would have to be in the list if you look

21  at -- we focused on aversive though let me be honest,

22  the degree aversiveness may depend.  Some of the

23  sensitization research may have included that, but, to

24  be honest, the studies are difficult -- it would be

25  difficult for me to draw any conclusions or answer

Page 122

1    your question in terms of that issue.  Though the

2    majority of early studies were aversive, some of the

3    sensitization or desensitization and there was one

4    study about fantasy that I can't -- I would not want

5    to say is necessarily aversive or not, but I just

6    don't remember the details that well.

7         Q.   And so to further differentiate between these

8    early studies involving aversive efforts that are

9    expressly mentioned here on page 41, can you identify

10   any specific early study that involved non-aversive

11   efforts that is shown to have reported harm or shows

12   that those efforts caused harm?

13        A.   I would have to review the studies again.  I

14   don't recall.

15        Q.   And so can you not identify any as you sit

16   here right now?

17        A.   I can't identify any as I sit here now based

18   on my memory.

19        Q.   Did you identify any such studies in your

20   declaration in this case?

21        A.   I didn't seek to go back to those studies.

22        Q.   So the answer is no?

23        A.   That is correct.

24        Q.   Can we go to, now, page -- let's go back to

25   page 4 towards the beginning of your report.  This is

Page 123

1  within the executive summary.  Will you look at page 4

2  on the top right.

3          The first full sentence in that right column

4  says, "The clinical literature."  Do you see that?

5      A.   Yes, I do.

6      Q.   It reads, "The clinical literature indicated

7  that adults perceive a benefit when they are provided

8  with client centered multicultural evidence based

9  approaches that provide."  And then there's a listing.

10  "A, acceptance and report."  Excuse me.  "Acceptance

11  and support.  B, a comprehensive assessment.  C,

12  active coping.  D, social support.  And E, identity

13  exploration and development."

14          Did I read that correctly?

15      A.   Yes.

16      Q.   And then it reads, "Acceptance and support

17  include unconditional acceptance of and support for

18  the various aspects of the client, respect for the

19  client's values, beliefs, and needs, and a reduction

20  in internalized sexual stigma."

21          Did I read that correctly?

22      A.   Yes.

23      Q.   And going down to about halfway down the page

24  there's a sentence that begins, "Identity

25  exploration."  Do you see that?

Page 124

1      A.    Yes, I do.

2      Q.    "Identity exploration and development include

3    offering permission and opportunity to explore a wide

4    range of options and reducing the conflicts caused by

5    dichotomous or conflicting conceptions of self and

6    identity without prioritizing a particular outcome."

7          Did I read that correctly?

8      A.    Yes.

9      Q.    Now, I want to elaborate on that.  On page 5

10   it begins -- in the left column about eight or so

11   lines down, the sentence begins "Given that there."

12   Do you see that?

13     A.    Okay.

14     Q.    "Given that there is diversity in how an

15   individual is defined and express their sexual

16   orientation identity, an affirmative approach is

17   supportive of clients identity development without an

18   a priori treatment goal concerning how clients

19   identify or live out their sexual orientation or

20   spiritual beliefs.  This type of therapy can provide a

21   safe space where the different aspects of the evolving

22   self can be acknowledged, explored, respected, and

23   potentially rewoven into a more coherent sense of self

24   that feels authentic to the client and it can be

25   helpful to those who accept, reject, or are ambivalent

Page 125

1    about their same-sex attractions.  The treatment does

2    not differ although the outcome of the client's

3    pathway to a sexual orientation identity does."

4         Did I read that correctly?

5    A.   Yes.

6    Q.   So these passages I have just read from, it's

7    in a heading that says "Recommendations and future

8    directions," does this describe a treatment approach

9    that the Task Force approved of or supported?

10   A.   Yes.

11   Q.   And to differentiate that from SOCE that the

12   Task Force does not support or approve of, and I will

13   ask you to correct me if I'm wrong, it seems like a

14   key ingredient is the lack of an a priori treatment

15   goal concerning how clients identify or live out their

16   sexual orientation or spiritual beliefs; is that

17   correct?

18   A.   Yes, that is one of the key aspects.

19   Q.   And I believe you mentioned another key

20   aspect of SOCE that the Task Force does not endorse or

21   approve of would be SOCE based on an assumption that

22   homosexuality is a disorder or is somehow a defect

23   that needs to be remedied; is that correct?

24   A.   Right.  And that is reflected in this issue

25   of sexual stigma, the negative impact of SOCE can be

1  that it increases sexual stigma and thus causes harm.

2     Q.  So I want to focus then on this sentence that

3  reads, "The treatment does not differ although the

4  outcome of the client's pathway to a sexual

5  orientation identity does."

6       First let me ask, is there a difference in

7  this report between the terms "sexual orientation" and

8  "sexual orientation identity"?

9     A.  Yes, there is.

10    Q.  And what is the difference?

11    A.  Sexual orientation, it's -- I mean, you may

12  want to just refer to the section of the report that

13  defines it but --

14    Q.  I could and I probably will.  Sometimes it's

15  better if you can explain it and that will help us

16  with a working conversation about it.

17    A.  So sexual orientation refers to attractions

18  and our patterns of arousal.  Identity is how a person

19  labels and identifies themselves.  So a simplistic

20  explanation would be someone who experiences arousal

21  to both men and women, but chooses to label

22  themselves -- that's their sexual orientation.  That's

23  who arouses them sexually and that's who they're

24  attracted to, but, for whatever reason, that person

25  decides to self-label as heterosexual and those are

Page 127

1    two different things.  So those are just two different

2    things.  That's an example.

3        Q.  So a person can -- based on what you just

4    explained, a person can, at the same time, maintain or

5    present a heterosexual identity while also

6    experiencing same-sex attraction or bisexual

7    attraction?

8        A.  That's correct.  And that's developed in that

9    section of the report and gone into in quite detail.

10       Q.  So, getting back then to the sentence I read

11   that says the treatment does not differ although the

12   outcome of the client's pathway to a sexual

13   orientation identity does, is this referring to the

14   fact that in one counseling session you may have a

15   therapist with no a priori treatment goal and no

16   assumption that homosexuality is a defect or a

17   disorder that needs to be solved, and another therapy

18   room or session we can have a therapist who does

19   assume that homosexuality is a defect and has as a

20   treatment goal to change the client from homosexual to

21   heterosexual.  Is this statement saying that coming at

22   the therapy from those two different directions could

23   still look the same as far as the treatment that they

24   deliver?

25       A.  No.  This paragraph in this section only

Page 128

1    referred to what we would term appropriate

2    intervention.  So this different pathway refers to

3    different client trajectories.

4          So let's say you were working with an

5    individual who is bisexual, okay, that's their arousal

6    pattern, and they are struggling with giving

7    themselves that name, bisexual, because they perceive

8    that the environment or their parents would reject

9    them.  So their pathway to perhaps self-acceptance as

10   a bisexual person would be one set of stages dealing

11   with biphobia, coping with the different valuations of

12   the same sex, which is the other sex attractions.

13   Then with a different client let's say we have a man

14   who experiences exclusively heterosexual attractions,

15   his pathway to feeling positive about his sexual

16   orientation may be rather effortless, so he would have

17   a different pathway.

18         So it really just refers to this process

19   that's described in depth, I believe, in Chapter 6 of

20   the appropriate intervention.  We're not talking about

21   SOCE here.  We're talking about identity development

22   issues and identity exploration issues that really

23   vary with clients based on where they start from, self

24   acceptance, self rejection, whether they -- and what

25   their actual struggles are in integrating into an

Page 129

1    identity.  Some people maybe never integrate anything
2    into an identity.  So that's what we're discussing
3    here.
4        Q.   And so, talking about, just for shorthand, an
5    affirmative approach as it's described here, it says
6    an affirmative approach is supportive of a client's
7    identity development without an a priori treatment
8    goal concerning how clients identify or live out their
9    sexual orientation or spiritual beliefs.  Did I say
10   that accurately?
11       A.   Yes, you did.
12       Q.   So is it possible then that applying this
13   affirmative approach with no a priori treatment goal
14   on the part of the therapist, you can still have
15   clients who come at their problems from a different
16   direction?  You may have one who submits to this
17   affirmative therapy who does desire to reduce same-sex
18   attraction or somehow align with a heterosexual
19   identity, whereas you may have another client who also
20   suffers from -- I don't mean to say suffer.  Who
21   experiences same-sex attraction who doesn't want to
22   change that and is satisfied to -- let me just stop
23   there.
24            If you have no a priori treatment goal on the
25   part of the therapist, they can apply this affirmative

Page 130

1   therapy whether the client's goal is to reduce

2   same-sex attraction or not to alter same-sex

3   attraction; is that accurate?

4        MR. WILLIAMS:  Roger, that's about a multiple

5        compound question.  I suspect that Dr. Glassgold

6        understands it, but if she doesn't, I don't and I

7        want the court reporter to read it back so I can

8        grasp what where you're going.

9        MR. GANNAM:  How about I will strike that and

10        let me just start over.

11   BY MR. GANNAM:

12        Q.   Is it true that a therapist can apply an

13   affirmative approach, as described here in the report,

14   that has no a priori treatment goal either to a client

15   who experiences same-sex attraction and wants to

16   reduce it or somehow align attractions with a

17   heterosexual identity and also to a client who

18   experiences same-sex attraction and does not want to

19   align with a heterosexual identity, the treatment

20   doesn't differ, but the pathway is the same?

21        A.   Yes.

22        Q.   Now, all of this, as you can see from just

23   the number of times I've had to try to ask the

24   question, it all seems very kind of nuance, for lack

25   of a better term.  You have -- on one hand you may

Page 131

1   have a therapist who has a particular treatment goal,

2   on the other hand you have a therapist who doesn't,

3   they might both meet with clients with same-sex

4   attraction who have their own goals for what they want

5   out of therapy.

6           Who is qualified to look at a counseling

7   session or what happens in the counseling session and

8   decide whether an affirmative approach has been

9   applied or whether a non-recommended SOCE has been

10  applied?

11      A.   I am not sure I agree with the first phrase

12  of your question which has to do with nuance.

13      Q.   Okay.  Let me take that out of it then.

14          Suppose there is a client who presents to a

15  licensed therapist, the client is experiencing

16  same-sex attraction and it is the client's goal to

17  reduce that attraction, but it's not the therapist's

18  goal.  The therapist is simply open and affirming of

19  whatever direction the client wants to go in.  And, on

20  the other hand, you may have a client who presents

21  with same-sex attraction and wants to change that

22  same-sex attraction and the therapist also has a

23  treatment goal of reducing that same-sex attraction.

24          So in the first case there's no a priori

25  treatment goal, in the second case there is.  Who

1  would be able to observe what happens in that

2  counseling session and decide whether SOCE has

3  occurred or whether the affirmative therapy that the

4  Task Force endorses has occurred?

5      A.   It would depend on who was present in that

6  counseling session or who reports it.  So the patient

7  may say, or their parent in the case of a minor may

8  report what the therapist said or did.  Or whatever if

9  there -- whoever was present in the room might be able

10  to report what was said and done.

11      Q.   And who would be qualified to decide, based

12  on that report, whether SOCE had occurred or an

13  appropriate affirmative therapy had occurred?

14      A.   I think it would depend on the individual

15  circumstances.

16      Q.   We talked earlier about practices that --

17  aversive practices that would be considered unethical

18  in 2019.  Do you recall that?

19      A.   Yes, I do.

20      Q.   And would it be fair to say that every state

21  has some kind of licensing board for the various

22  licensed mental health disciplines such as psychology

23  or marriage and family therapy or et cetera.  Would

24  that be a fair statement?

25      A.   I believe, though I have not reviewed every

Page 133

1  state because not all states license every type of

2  provider.  But most states do have licensing boards

3  that cover certain mental health professionals.

4      Q.    And would it be appropriate, if a client has

5  a complaint about potentially unethical practice, to

6  bring that complaint to the applicable state licensing

7  board for the licensee who that client was seeing or

8  received therapy from?

9      A.    Most states have a complaint process for

10  consumers to report violations, but these complaint

11  processes are geared towards adults reporting

12  complaints.

13      Q.    Now, can you say that based on knowledge of

14  all 50 states?

15      A.    No, I have not reviewed.

16      Q.    Okay.  What I'm asking is -- strike that.

17  Let me just move on for now.

18      A.    Yeah, that's a good idea.

19          MS. ROBBINS:  Can we take a five-minute

20      break?

21          MR. GANNAM:  Sure.

22          (Recess from 2:35 p.m. to 2:47 p.m.)

23  BY MR. GANNAM:

24      Q.    I'm going to move on from the APA report for

25  now.  I'm going to show you a document previously

Page 134

1    marked in this case as Exhibit 4 at the deposition of
2    Sal Ruggiero.
3         A.    Okay.
4         Q.    This is the document filed by the City in
5    this case as the Tampa ordinance 2017-47.  Do you
6    recognize this document?
7         A.    Yes, I do.
8         Q.    Have you read it before?
9         A.    Yes, I have.
10        Q.    I want to ask you, have you discussed with
11   any officials or employees of the City of Tampa how
12   the City intends to enforce this ordinance?
13        A.    No.
14        Q.    Okay.  And have you read anything or heard
15   anything from anyone about how the City intends to
16   enforce this ordinance?
17        A.    No, I don't believe so.  No.
18        Q.    In going back to your report on page 7 of
19   your declaration.
20        A.    Oh, sorry.  So now we're the declaration.
21             MR. WILLIAMS:  We're back there.
22        Q.    Yes, Exhibit 28.  So I want to look at, in
23   page 7, paragraph 17.  It says, "In fact, the
24   conclusions of the reports and policies reported in
25   the findings of the ordinance have been strengthened

Page 135

1    over time by, A, new studies from separate research

2    groups on individuals who participated in conversion

3    therapy efforts published from 2010, summarized in

4    sections 2 and 3."

5            Did I read that correctly?

6       A.   Yes.

7       Q.   And then there is a footnote there, number 7,

8    that lists out several studies subsequent to the dates

9    of the APA report; correct?

10      A.   Correct.

11      Q.   I'm going to talk about some of those with

12   you.

13           MR. WILLIAMS:  Some of the studies in

14      footnote 7?

15           MR. GANNAM:  Yes.

16           (Plaintiffs' Exhibit No. 29 was marked for

17   identification.)

18   BY MR. GANNAM:

19      Q.   So I will show you what I'm marking as

20   Exhibit 29.  This is a study by Weiss, Morehouse,

21   Yeager & Berry from 2010, titled A Qualitative Study

22   of Ex-Gay and Ex-Ex-Gay Experiences.

23           Did I read that correctly?

24      A.   Correct.

25      Q.   I'm going to go to -- and this is numbered

Page 136

1   according to the journal where it appeared so it

2   starts on page 291.  I'm going to turn to page 292.

3       A.   Okay.

4       Q.   So about halfway down on page 292 in the

5   second full paragraph in the middle it begins

6   "Scientific estimates."  Do you see that?

7       A.   Okay.  I think I see where that sentence

8   begins, yes.

9       Q.   And also, before I get there, this is in fact

10  a study that you cite in your declaration at footnote

11  7; correct?

12      A.   I believe so.  Yes.

13      Q.   Okay.  Sorry about that.  Going back to page

14  292 in the middle, the sentence, "Scientific Estimates

15  of the effectiveness of conversion therapy are

16  essentially nonexistent because of difficulties

17  obtaining samples following individuals after they

18  exit therapy, defining success, and obtaining

19  objective measurements of behavioral and psychological

20  change."

21          Did I read that correctly?

22      A.   Yes.

23      Q.   Do you have any reason to disagree with that

24  statement?

25      A.   I might not have worded the sentence the way

Page 137

1   they have, I don't like their writing style or

2   whatever, but I wouldn't use the word "estimates" and

3   I wouldn't use the word "effectiveness."  Efficacy.

4   But I think the general principal I agree with.

5        Q.   Okay.  Drop down to the bottom, the last

6   sentence on the page that begins "The combination."

7   Do you see that?

8        A.   Okay.

9        Q.   It reads, "The combination of the failure

10  rate of conversion therapies and the potential

11  negative effects of participating in conversion

12  therapy makes this an important area for research.

13  However, scientific research on the entire topic of

14  changing one's sexual orientation has been limited

15  and, in many cases, seriously methodologically

16  flawed."

17       Do you have any reason to disagree with that

18  statement?

19       A.   Yes, I generally agree.

20       Q.   Yes, you generally agree with it?

21       A.   Yes.

22       (Plaintiffs' Exhibit No. 30 was marked for

23  identification.)

24       Q.   I'm going to go on to Exhibit 30.  All right.

25  This exhibit is an article by -- you know, I can't

Page 138

1   pronounce this name.  It's F-l-e-n-t-j-e.  Do you know
2   how to pronounce that?
3       A.   I believe the J is pronounced like Y, but I
4   think we're okay.  I know what you're talking about.
5       Q.   I'll go with Flentje.  So it's by Flentje,
6   Heck & Cochran.  It is an article from 2014 titled
7   Experiences of Ex-Ex-Gay Individuals in Sexual
8   Reorientation Therapy:  Reasons For Seeking Treatment,
9   Perceived Helpfulness and Harmfulness of Treatment,
10  and Post-Treatment Identification.
11      A.   Uh-hum.
12      Q.   Did I say that correctly?
13      A.   Yes.
14      Q.   And is this another of the studies cited in
15  your declaration?
16      A.   Yes.
17      Q.   Will you turn to page 1245 of this article.
18           MR. WILLIAMS:  Exhibit 30; right?
19           MR. GANNAM:  Exhibit 30; that's correct.
20  BY MR. GANNAM:
21      Q.   Now, about halfway down the page it reads,
22  "Reorientation therapy."  Do you see that?
23      A.   Right.
24      Q.   Now, were they use term "reorientation
25  therapy" in this article, do you understand that to

Page 139

1    be, generally speaking, synonymous with SOCE or

2    conversion therapy as we have been discussing already?

3         A.    I believe so.

4         Q.    So it reads, "Reorientation therapy is a

5    political, emotional, and controversial topic and,

6    perhaps as a result of this, there is little

7    methodologically sound empirical research on this type

8    of therapy."

9              Did I read that correctly?

10        A.    Yes.

11        Q.    And do you have any reason to disagree with

12   that statement?

13        A.    I disagree somewhat with that statement.

14        Q.    What do you disagree with?

15        A.    I think that this statement was published --

16   I think there is some what we would call -- I would

17   disagree.  I think there is some better research at

18   this point.  It might not be perfect research, but

19   there is some research on these issues at this point

20   in time published since 2014.

21        Q.    So the statement reads, "There is little

22   methodologically sound empirical research on this type

23   of therapy."  Do you disagree with that statement

24   specifically?

25        A.    I'm not sure what they mean by

Page 140

1    methodologically sound.

2        Q.   Okay.  So how would you correct what they

3    said if you were to undertake to do that?

4        A.   I would use the word "RCTs."  Randomly

5    controlled design trials or rigorous experiments that

6    can provide cause and effect conclusions.

7        Q.   So, with that statement, would it be accurate

8    to say there is little research fitting the criteria

9    you just described on this type of therapy?

10       A.   Yes.  Actually -- oh, okay.  I think -- yeah,

11   that's okay.

12            The reason I bring this up is that she

13   discusses Beckstead and though some of his early

14   research was qualitative, it has its strengths too.

15   But we -- I think we are getting into the weeds a bit.

16       Q.   Okay.  Will you turn to page 1264.

17            MR. WILLIAMS:  Six four; correct?

18            MR. GANNAM:  Right.

19   BY MR. GANNAM:

20       Q.   About halfway down there's a heading that

21   reads, "Future Directions."  Do you see that?

22       A.   Right.

23       Q.   And the first sentence says, "This study also

24   points to the need for future research."  Do you agree

25   with that statement?

Page 141

1     A.    I'm not sure.  I would have to reread the

2  article.

3     Q.    As you sit here, do you know of a reason to

4  disagree with that statement?

5     A.    I think it would depend on the kind of

6  research and the population it was applied to and

7  whether it could be -- that's all.

8     Q.    So will you look at the -- skip the next

9  sentence and go down where it says, "Future research."

10  Do you see that?

11     A.    Right.

12     Q.    It says, "Future research could assess the

13  psychological health and wellbeing of individuals with

14  varying levels of motivation for seeking reorientation

15  therapy in an effort to approximate the prevalence of

16  psychological disorders and suicidality among

17  individuals who are highly motivated to seek this form

18  of treatment."

19          Did I read that correctly?

20     A.    Correct.

21     Q.    Do you agree this is one possible avenue for

22  future research?

23     A.    Yes.

24     Q.    And would the point of this research be to

25  determine whether a person who is highly motivated to

1    obtain what they call reorientation therapy may have

2    some predisposition or existing psychological disorder

3    that could lead to a feeling or a report of harm

4    following the therapy?

5        A.    No.   I think this would let us know a bit

6    more about the level of distress and the level of

7    complicating mental health issues in people who seek

8    to change their sexual orientation.

9        Q.    And would it be true that in determining

10   whether any therapy, but in this case SOCE or what

11   they call reorientation therapy, can be linked to or

12   can be said to cause harmful outcomes such as

13   suicidality, would it be necessary to know what level

14   of suicidality the individual was experiencing going

15   into the treatment in order to determine how it was

16   changed or exacerbated by the treatment?

17       A.    How about if we repeat the question.

18           MR. GANNAM:   Can you repeat the question.

19       I'm not sure I could.

20         (The question was read by the reporter.)

21           THE WITNESS:   Could you do that again,

22       please.   It's just a long sentence and I'm trying

23       to make sure I get all the phrases.   Can I borrow

24       a sheet of paper so I can keep track of the

25       sentence.   Thank you.

Page 143

1          (The question was read by the reporter.)

2      A.   I would say yes, with the proviso there's

3  also the issue -- yes, in certain instances and then

4  there are others potentially as well.

5  BY MR. GANNAM:

6      Q.   When you say others potentially as well, what

7  do you mean?

8      A.   Ineffective therapy.  You suggested that

9  either exacerbated or changed or not impacted.

10          (Plaintiffs' Exhibit No. 31 was marked for

11  identification.)

12      Q.   Okay.  Fair enough.

13          I'm showing you an article that I'm marking

14  Exhibit 31.  This is an article by Dehlin, Bradshaw,

15  Hyde & Crowell, titled Sexual Orientation Change

16  Efforts Among Current Or Formal LDS Church Members.

17  It's from a 2015 publication.  Do you recognize this

18  article?

19      A.   Yes.

20      Q.   And is this one that's cited in your

21  declaration?

22      A.   I believe so.

23      Q.   I want to look at the first page in the --

24  not in the abstract, but in the first main paragraph.

25  There's a sentence that begins, about the third

Page 144

1    sentence down, "Despite a recent increase."  Do you

2    see that?

3         A.   In the first paragraph?

4         Q.   The first paragraph begins, "Many 21st

5    century."  Do you see that?

6         A.   Right.  Okay.  Despite.  Okay.

7         Q.   So I'll read the sentence.  "Despite a recent

8    increase in public discourse regarding SSA, SOCE

9    studies have been limited in quantity, scope, and

10   methodology and ultimately have failed to demonstrate

11   either the effectiveness or benefit/harm of SOCE."

12   And it cites the 2009 APA report.

13             Did I read that correctly?

14        A.   Yes.

15        Q.   And then -- well, let me just ask you, do you

16   believe that's an accurate statement?

17        A.   Not necessarily.

18        Q.   What do you disagree with in that statement?

19        A.   The issue of harm.

20        Q.   Oh, okay.  What specifically do you disagree

21   with in the statement?

22        A.   I think the APA report concluded that there

23   was the possibility of harm.

24        Q.   Okay.  So would it be fair to say the APA

25   report concluded there is a possibility of harm from

Page 145

1    SOCE, but it did not -- it did not go so far as to

2    conclude that SOCE causes harm definitively?

3         A.   I think it said that patients' perceptions of

4    harm and that there is a risk of harm.  I would have

5    to read the report.  I would have to look -- we could

6    look at the sentence of the report again, but, yes,

7    there's a risk of harm.

8              I believe the report did conclude that

9    patients' perceptions -- patients did receive there to

10   be harms as well as benefits, but the patients did

11   perceive there to be harms.  And in some ways treated

12   those perceptions as credible and worthy of

13   significance.

14        Q.   Apart from that qualification, do you

15   otherwise agree with the statement that I just read in

16   this Exhibit 31?

17        A.   I agree with SOCE studies have been limited

18   in quantity, scope, and methodology, and ultimately

19   have failed to demonstrate the effectiveness of SOCE.

20             In fact, to go back to the report, I

21   apologize, as you -- as we discussed for a long time,

22   the methodologically adequate studies where there was

23   harm and you pointed out aversive studies, did

24   indicate harm and that was substantial harm.

25        Q.   When you say indicated harm, you mean

Page 146

1    indicated that the patients or clients reported harm;

2    correct?

3        A.   No, they, I believe, showed that there were

4    excessive dropout rates, loss of sexual feeling,

5    suicidality.  The actual reports documented the harm.

6    The actual studies found harm.

7            The aversive studies -- or the early studies,

8    the aversiveness of the -- the types of aversiveness

9    varied, there was a spectrum, and those did indicate

10   harms.  And then the more recent studies and some of

11   the qualitative studies like Dr. Beckstead and

12   Morrow's studies, members of the LDS church, discussed

13   perceived harms and benefits of SOCE.

14       Q.   But, as we've already discussed, as far as

15   the recent studies go, the Task Force report concluded

16   that the recent studies do not provide valid causal

17   evidence of the efficacy of SOCE or of its harm;

18   correct?

19       A.   Cause and effect, yes.

20       Q.   And is it also true that regarding all the

21   studies covered by the 2009 report you concluded or

22   stated, we conclude that there is a dearth of

23   scientifically sound research on the safety of SOCE

24   and also that we cannot conclude how likely it is that

25   harm will occur from SOCE?

Page 147

1        A.    Dearth -- Dearth, I'm sorry, I'm a

2   New Yorker, does not mean there is none, and there is

3   some.  It's hard to predict the extent and who will

4   either report harms or benefits.

5        Q.    So that statement still is true, that we

6   cannot conclude how likely it is that harm will occur

7   from SOCE?

8        A.    That is correct.  In some ways that makes it

9   even more risky.

10            MR. GANNAM:  I just want to move to strike

11       that last response after that is correct as

12       nonresponsive to the question.

13            MR. WILLIAMS:  Ignore that.

14            THE WITNESS:  Okay.

15   BY MR. GANNAM:

16       Q.    So will you look at page 96 of this Exhibit

17   31.

18            MR. WILLIAMS:  Nine six; right, Roger?

19            MR. GANNAM:  Yes, nine six.

20            MR. WILLIAMS:  Got it.

21   BY MR. GANNAM:

22       Q.    On the left column, the second full paragraph

23   begins "Finally."  Do you see that?

24       A.    Yes.

25       Q.    It says, "Finally, qualitative reports have

Page 148

1    suggested that individuals who engaged in SOCE

2    reported a variety of perceived benefits and harms."

3         Did I read that correctly?

4    A.   Yes.

5    Q.   The next sentence reads, "Based on a

6    comprehensive review of this work, the APA 2009 SOCE

7    Task Force concluded that no study to date has

8    demonstrated adequate scientific rigor to provide a

9    clear picture of the prevalence or frequency of either

10   beneficial or harmful outcomes."

11        Did I read that correctly?

12   A.   Yes.

13   Q.   And is that an accurate statement?

14   A.   Yes.

15   Q.   And then the next sentence reads, "More

16   recent studies claiming benefits and/or harm have done

17   little to ameliorate this concern."

18        Did I read that correctly?

19   A.   Yes.

20   Q.   And is that an accurate statement?

21   A.   I'm not sure I'm familiar with Karten & Wade,

22   but I believe that's accurate.  I'm just not familiar

23   with their -- with that article.

24   Q.   Okay.  Moving to the next column, first full

25   paragraph on the right where it says "The frequency."

Page 149

1    Do you see that?

2         A.    Right.

3         Q.    It says, "The frequency and rate of SOCE in

4    SSA populations remain unknown."

5              Did I read that correctly?

6         A.    Yes.

7         Q.    And, by SSA populations, are they referring

8    to same-sex attracted populations?

9         A.    I believe so, but I'm not sure where first

10   usage occurred so I would have -- you know.

11        Q.    Is that a normal or standard terminology in

12   the academic literature to refer to same-sex

13   attraction?

14        A.    I'm not sure.  I think in some, but not

15   others.  I think generally that isn't a term.  Some

16   people use that term.  I think most don't.  And I'm

17   not sure APA would, but whatever.

18        Q.    Fair enough.  The next sentence reads, "No

19   known study to date has drawn from a representative

20   sample of sufficient size to draw conclusions about

21   the experience of those who have attempted SOCE."

22             Did I read that correctly?

23        A.    Yes.

24        Q.    And is that an accurate statement as of the

25   date of this article?

Page 150

1      A.    Yes.

2      Q.    It continues, "Furthermore, no known study to

3  date has provided a comprehensive assessment of basic

4  demographic information, psychosocial wellbeing, and

5  religiosity, which would be required to understand the

6  effectiveness, benefits and/or harm caused by SOCE."

7          Did I read that correctly?

8      A.    Yes.

9      Q.    And is that an accurate statement?

10      A.    As of the date of this article?

11      Q.    Yes.

12      A.    Yes.

13      Q.    Skipping a sentence and getting to the word

14  "finally."  Do you see that?

15      A.    Okay.

16      Q.    It says, "Finally, in spite of the APA's 2009

17  report on SOCE, considerable debate continues about

18  the meaning of the report focusing specifically around

19  the lack of more conclusive SOCE related outcome

20  research."

21          Did I read that correctly?

22      A.    Yes.

23      Q.    And is it true that considerable debate

24  continues about the meaning of the report?

25      A.    I don't think so.

Page 151

1      Q.   And why do you disagree with that?

2      A.   I'm not sure how much -- I'm not sure what

3  they're referring to about considerable debate.  I'm

4  not sure what that really means in terms of I am

5  trying -- I think just two people, two groups arguing

6  may not be considerable debate.

7      Q.   Would you agree that there is some debate

8  that continues about the meaning of the report?

9      A.   I actually don't think there's very much

10 debate.

11     Q.   So there is some, but you wouldn't quantify

12 it as considerable?

13     A.   That's correct.

14          (Plaintiffs' Exhibit No. 32 was marked for

15 identification.)

16     Q.   All right.  I'm going to show you now Exhibit

17 32.  This is a report by Ryan, Toomey, Diaz & Russell

18 from 2018 titled --

19     A.   Yes.

20     Q.   -- Parent-Initiated Sexual Orientation Change

21 Efforts With LGBT Adolescents:  Implications For Young

22 Adult Mental Health and Adjustment."

23          Did I read that correctly?

24     A.   Yes.

25     Q.   Will you turn to the -- this one has, I

1    guess, a cover page from the service that provided it.
2    Would you turn to the first page of the article
3    itself.  It is one over from the cover there.  We'll
4    call this page 1.
5            At the bottom, the sentence that begins,
6    "Although."  Do you see that?
7        A.   Right.
8        Q.   "Although research on adult populations has
9    documented harmful effects of sexual orientation
10   change efforts, SOCE, no studies have examined SOCE
11   among adolescents, APA Task Force --
12           THE COURT REPORTER:  I'm sorry.  One more
13       time for me.
14       Q.   "APA Task Force on appropriate therapeutic
15   responses to sexual orientation 2009."
16           So did I read that correctly?
17       A.   Yes.
18       Q.   And you agree no studies have examined SOCE
19   among adolescents?
20       A.   I would have inserted the adjective "research
21   studies" or "scientific research studies."
22       Q.   Okay.
23       A.   Actually -- yeah, research, research studies
24   or experiments would be the appropriate word, to be
25   honest.

Page 153

1    Q.   So how about starting with the word "no,"

2    read it how it would be accurate.

3    A.   Although research in adult populations, blah,

4    blah, blah, SOCE, no empirically based research

5    studies.

6    Q.   Have examined SOCE among adolescents?

7    A.   I'm still thinking.  Have solely no

8    empirically based research studies have focused --

9    have examined or -- examined and focused on SOCE among

10   adolescents.

11   Q.   So I will read the clause as I believe you

12   have modified it just so we're clear.  No empirically

13   based research studies have examined and focused on

14   SOCE among adolescents?

15   A.   Yes.

16   Q.   So, as rewritten, that is accurate?

17   A.   Or reasonably accurate at the time of this

18   deposition.

19   Q.   Okay.  July 25, 2019?

20   A.   3:19.

21   Q.   And this is a study that you cited in your

22   declaration; correct?

23   A.   That is correct.

24   Q.   It's probably the newest study that you cited

25   in your declaration being from 2018?

Page 154

1     A.    Probably, yes.

2     Q.    I want to turn to page 11 of the study, the

3  bottom of page 11.  The paragraph begins "There are."

4  Do you see that?

5     A.    There are.

6     Q.    "There are several limitations of this

7  study."

8           Did I read that correctly?

9     A.    Yes.

10    Q.    I want to flip over now to page 12 among the

11 list of limitations.  About halfway down that first

12 paragraph appears the word "third."  Do you see that?

13    A.    Third.  Okay.

14    Q.    It says, "Third, the design is retrospective

15 and thus causal claims cannot be made."

16          Did I read that correctly?

17    A.    Yes.

18    Q.    And do you agree that that's the case with

19 this study?

20    A.    Yes.

21          MR. WILLIAMS:  Which study are you talking

22    about?  Let's make sure.

23          THE WITNESS:  Ryan.

24 BY MR. GANNAM:

25    Q.    The Ryan study.  What did I mark that, 32?

Page 155

1    A.    Uh-hum.

2    Q.    So that's a correct statement then?

3    A.    Uh-hum.

4          MR. WILLIAMS:  Yes?

5          THE WITNESS:  Yes.

6          MR. GANNAM:  Thank you.

7          MR. WILLIAMS:  It's getting late in the

8    afternoon.

9          THE WITNESS:  Have you had a chance to read

10   all these?

11         MR. WILLIAMS:  That's how I go to sleep every

12   night is reading these things.

13         THE WITNESS:  Some of them are more

14   interesting than others.

15         MR. WILLIAMS:  I told you I sleep very well.

16         THE WITNESS:  That's true.

17         MR. MIHET:  Is all of this on the record?

18         THE COURT REPORTER:  It is.

19         (Plaintiffs' Exhibit No. 33 was marked for

20   identification.)

21   BY MR. GANNAM:

22   Q.    I'm going to show you now what I'm marking as

23   Exhibit 33.  This is a document filed in this case at

24   document 135-1.  Its title is Guidelines For

25   Psychological Practice With Transgender and Gender

Page 156

1   Nonconforming People, published by the APA.  Do you

2   recognize this document?

3        A.   Yes.

4        Q.   Have you seen it before?

5        A.   I have.

6        Q.   Okay.  Will you turn then to page 841.  Are

7   you on page 841?

8        A.   Yes, I am.

9        Q.   Guideline 8 in the right column about halfway

10  down, do you see that?

11       A.   Correct.  Yes, I do.

12       Q.   It says, "Guideline 8.  Psychologists working

13  with gender-questioning and TGNC youth understand the

14  different developmental needs of children and

15  adolescents and that not all youth will persist in a

16  TGNC identity into adulthood."

17            Did I read that correctly?

18       A.   Yes.

19       Q.   And do you understand TGNC means transgender

20  or gender nonconforming in this article?

21       A.   Yes.

22       Q.   Now, in that section, the heading of which I

23  just read, over on page 842, about halfway down the

24  left column, the first full paragraph begins "A clear

25  distinction."  Do you see that?

1      A.    Yes.

2      Q.    The second sentence of that paragraph says,

3  "Due to the evidence that not all children persist in

4  a TGNC identity into adolescence or adulthood and

5  because no approach to working with TGNC children has

6  in been adequately empirically invalidated, consensus

7  does not exist regarding best practice with

8  prepubertal children."

9           Did I read that correctly?

10     A.    Yes.

11     Q.    Do you agree with that statement, at least as

12  of the date of this report, there is no approach to

13  working with TGNC children that has been adequately

14  empirically validated?

15     A.    I personally would disagree with that.

16     Q.    Why would you disagree?

17     A.    I prefer the approach in the SAMHSA report

18  that perhaps doesn't come down on one or two --

19  narrows the range and says would not use the word

20  "no," would probably say -- where is it.  I would add

21  another adjective.  I think in the SAMHSA report I

22  like the way that prepubertal treatment with this

23  population and this age was described better.  I would

24  say does not exist is somewhat strong.

25     Q.    So there's two different clauses or phrases

Page 158

1    here.  I just want to make sure we're talking about

2    the same thing.  After the word "and" it says,

3    "because no approach to working with TGNC children has

4    been adequately empirically validated."  So let's just

5    focus on that statement.  Is that an accurate

6    statement?

7         A.   No approach.  Not entirely, no.

8         Q.   How would you modify it to make it accurate

9    in your opinion?

10        A.   I would say because approaches, blah, blah,

11   blah, to working with TGNC children are still being

12   investigated and validated.

13        Q.   Okay.  And then the next clause reads,

14   "Consensus does not exist regarding best practice with

15   prepubertal children."

16        A.   I would say best practices are evolving or

17   are in development.  But I would refer you -- I really

18   refer you to the SAMHSA report.  I think, you know,

19   though there is, again, this way that professionals

20   qualify their work all over the place, as we always

21   do, I like some of the descriptions, more in-depth

22   descriptions of possible practices.  I think they're

23   concrete and helpful.

24        Q.   So are you saying that the SAMHSA report

25   stands against this APA guidelines that we're reading

Page 159

1    from?

2        A.   I'm not sure against.  I think they provide

3    some deeper understanding.  I think, again, of course

4    the organizations have different ways they like to

5    frame issues.  This makes sense for an APA document.

6    APA has its own internal ways it frames issues and

7    that makes sense for APA.

8        Q.   So is it objectively true to say a consensus

9    does not exist regarding best practice with

10   prepubertal TGNC and gender-questioning children?

11       A.   I'm not sure I can answer that, no.  I don't

12   believe it does, but I defer that.  I don't believe

13   it -- I'm not sure that's correct.

14       Q.   You're not sure that a consensus does not

15   exist or you're not sure that a consensus does exist?

16       A.   I'm not sure a consensus does not exist.  I

17   believe that there are trends towards a consensus.

18       Q.   Is that the same as saying that there is a

19   consensus?  What I'm trying to figure out is do you

20   disagree with it completely or would you qualify it?

21   For example, consensus does not exist, but a trend

22   towards consensus does exist?  Or would you say it

23   differently?

24       A.   I think that's a reasonable phrasing.

25       Q.   Okay.  Going down in the same section, the

Page 160

1  same paragraph actually, do you see where it says "Two

2  distinct"?

3      A.   The same paragraph?

4      Q.   Yes.  The word "two" followed by "distinct."

5  Do you see that?

6      A.   Right.

7      Q.   It says, "Two distinct approaches exist to

8  address gender identity concerns in children with some

9  authors subdividing one of the approaches to suggest

10  three."

11          Did I read that correctly?

12      A.   Yes.

13      Q.   Now, the next paragraph begins, "One approach

14  encourages an affirmation and acceptance of children's

15  expressed gender identity."

16          Did I read that correctly?

17      A.   Correct.

18      Q.   And do you agree that that is one approach

19  that exists regarding treating children with gender

20  identity concerns?

21      A.   Yes.

22      Q.   The next paragraph reads, "In the second

23  approach, children are encouraged to embrace their

24  given bodies and to align with their assigned gender

25  roles.  This includes endorsing and supporting

Page 161

1    behaviors and attitudes that align the child's sex

2    assigned at birth prior to the onset of puberty."

3         Did I read that correctly?

4    A.   Yes.

5    Q.   And do you agree that that is also an

6    approach to treating children with gender identity

7    concerns?

8    A.   I believe that is an approach though it has

9    been reduced in its -- I think fewer people endorse

10   that approach than in the past when this document was

11   published.

12   Q.   So since 2015, when this document was

13   published, December of 2015, you're saying that that

14   second approach is less common or less favored?

15   A.   Less favored.

16   Q.   Has it fallen out of practice or out of favor

17   all together or is it just diminished to some extent?

18   A.   I think it is diminished to a very great

19   extent.  I am not sure whether -- how many people

20   actually do provide that kind of treatment or how

21   often it's provided.

22   Q.   And what do you base that belief on?

23   A.   My conversations with colleagues unrelated to

24   this discussion in the case.

25   Q.   Are you familiar with any particular study or

1    group of studies that have reached the conclusion that

2    that approach is not favorable or should not be

3    applied by professionals?

4         A.    I am not aware of any studies.

5         Q.    Would it be fair to say that you personally

6    haven't undertaken any kind of full survey of the

7    landscape of professionals engaged in this kind of

8    therapy to determine how many are or are not engaging

9    in this second approach of encouraging a child to

10   align with their sex assigned at birth?

11        A.    A survey of all the possible professionals

12   who could be implementing a certain treatment in

13   confidential settings?

14        Q.    Let me rephrase that.  You said you're not

15   aware of any studies?

16        A.    Published.  But I am not aware personally.

17   Those studies may exist.

18        Q.    I understand.  What I'm trying to decide or

19   determine is, based on what you do know or believe as

20   to the diminishing of that particular approach, is

21   that based on some formal or thorough attempt you've

22   undertaken to answer that question or is that just

23   based on conversations you've had with people

24   professionally?

25        A.    There are some new publications out in book

Page 163

1   form that provide background and a summation or

2   summary and integration of trends in this aspect of

3   the field.  And I am thinking of a book recently

4   published by APA, but whose name escapes me.  So that

5   is one book I am familiar with that reviews the

6   issues.

7           The work of Laura Edwards-Leeper is the

8   research I'm most familiar with and she has a chapter

9   in that book and I have reviewed a manuscript she

10  wrote, or was provided with a manuscript she wrote on

11  these topics and that's -- and her work and then Marco

12  Hildalgo has also published in this area.  So those

13  are the studies I'm thinking about when I'm reflecting

14  on this topic and they are more recent than this.

15      Q.   And what have they concluded regarding this

16  approach?

17      A.   That they would probably subscribe to careful

18  assessment and then most likely tend towards the first

19  approach rather than the second approach, especially

20  if the second approach increases dysphoria and

21  distress in children.

22           MR. WILLIAMS:  Roger, you about through with

23      this exhibit because I would like to take a

24      break.

25           MR. GANNAM:  I will be done shortly.

Page 164

1            MR. WILLIAMS:  All right.

2    BY MR. GANNAM:

3        Q.   Did either of those authors you've mentioned

4    conclude that the second approach causes harm or

5    should be discontinued all together?

6        A.   Possibly.  I would have to review those

7    studies or those chapters.

8        Q.   So you don't know as you sit here right now?

9        A.   I can't recall.

10        Q.   Will you look at page 843.  On the right

11    column, second -- third full paragraph begins

12    "Psychologist may encourage."  Do you see that?

13        A.   Correct.  Yes, I do.

14        Q.   All right.  Maybe a third of the way down

15    that paragraph is the word "emphasizing."  Do you see

16    that?

17        A.   Uh-hum.

18        Q.   It reads, "Emphasizing to parents the

19    importance of allowing their child the freedom to

20    return to a gender identity that align with sex

21    assigned at birth or another gender identity at any

22    point cannot be overstated, particularly given the

23    research that suggests that not all young gender

24    nonconforming children will ultimately express a

25    gender identity different from that assigned at

Page 165

1    birth."

2            Did I read that correctly?

3        A.   Yes, you did.

4        Q.   And do you have any reason to disagree with

5    that statement?

6        A.   Yes.  In most circumstances the phrase

7    "cannot be overstated" I think is intense, but

8    whatever.

9        Q.   So you would agree with it in most

10   circumstances maybe without that intensification that

11   the author has included?

12       A.   I think the first phrase is the most

13   important up to the word "freedom."  The freedom to,

14   you know, develop their own gender identity.  I think

15   generally I'd say yes.

16       Q.   Okay.  So maybe can I try to give an example

17   then.  Suppose an adolescent who is biologically male

18   identifies as female for a period of time, adopts a

19   female gender identity, but after some period of time

20   decides on the child's own that the child wants to

21   return to a gender identity that matches the sex

22   assigned at birth.  Generally what the author's are

23   saying here.

24            Should, in most cases, a therapist be free to

25   help a child who requests therapy or counseling to

Page 166

1    assist with that de-transition or return to the gender
2    or the sex assigned at birth?
3         MR. WILLIAMS:  I will object to the form of
4      the question as being, frankly, vague and overly
5      generalized.
6         Q.   You can answer.
7         A.   To be honest, that's such a hypothetical I
8    think is impossible to answer because I don't think
9    there's enough clinical detail and assessment
10   information, that each case is unique and that, to be
11   honest, that there is research, I think, recently
12   published if I recall actually as I think about your
13   example, that returning is actually a very small
14   percent of individuals, probably 1 to 2 percent, and I
15   forget the exact age range where that occurs more.  So
16   that I think that -- I can't really -- I think that's
17   a difficult hypothetical provided to provide an answer
18   to.
19        Q.   Do you think that licensed professionals
20   should be precluded in all cases from helping a child
21   who requests help with that kind of return or
22   de-transition?
23        A.   I think you need to do a very careful
24   assessment of any course of action with children and
25   that any course of action either to assist in any

Page 167

1  direction needs to be assessed carefully.  And the

2  reasons and rationale need to be carefully examined in

3  all instances.  I think hypotheticals in clinical

4  cases are very difficult to answer.

5       Q.   So, from your answer, would it be fair to say

6  the licensed provider or professional in that case

7  should carefully assess the situation before deciding

8  whether or not to help?

9       A.   Right.

10      Q.   Is there any reason to legally prohibit that

11 licensed professional from making that determination

12 to assist or not assist the child who requests help in

13 that area?

14           MR. WILLIAMS:  Object to the form of the

15      question.  It calls for a legal conclusion and

16      assumes facts that really aren't in evidence

17      here.

18           THE WITNESS:  Do I still have to answer?

19           MR. WILLIAMS:  Yeah, you can answer it if you

20      think you can.

21      A.   I'm not sure I can answer that.  I think,

22 again, it's too vague.  I think it presumes competence

23 on the part of the professional that we haven't

24 established.  Or other issues too.  So I can't really

25 answer that question.

Page 168

1            I also can't draw a legal conclusion.  I
2      think -- I just find that a very difficult
3      hypothetical question.
4         Q.   Let's assume that the licensed professional
5      is competent to assess the situation and make an
6      appropriate determination of whether to help the child
7      or not.  My question is is there any reason that that
8      professional should be legally prohibited from ever
9      helping a child with that request?
10            MR. WILLIAMS:  I'm going to repeat the
11         objection made to the prior question.  Your
12         revision doesn't cure the problem with the
13         question posed.
14         A.   I don't think I -- I don't want to speculate
15      and I feel like you're asking me to really speculate
16      here and I feel like any speculation would include
17      such inaccuracies to not be helpful.  I mean, to not
18      be accurate.
19         Q.   So, going back to the passage from these APA
20      guidelines, where it says emphasizing to parents the
21      importance of allowing their child freedom to return
22      to a gender identity that aligns with sex assigned at
23      birth or another gender identity at any point cannot
24      be overstated.  Now, you've objected to that
25      intensifying language "cannot be overstated," but I

Page 169

1   believe you testified you agree with the general

2   proposition that a child ought to be allowed the

3   freedom to return if the child wants to?

4        A.   Yes, in most circumstances.  Yes, in general

5   circumstances.  Yeah, most circumstances or in certain

6   circumstances.

7        Q.   So, generally speaking, should that freedom

8   include the freedom to receive professional assistance

9   with that return or that change if the child wants it?

10       A.   I think when we're -- so I think --

11            MR. WILLIAMS:  I'm going to object to the

12       form of the question.  It just goes back to the

13       prior questions in the sense it assumes facts

14       that aren't in evidence and it calls for

15       speculation based on assumptions that are

16       embedded in the question itself.

17            I'm making an objection for the record,

18       Doctor.  If you think you can answer that

19       question, that's fine.  It's up to the court to

20       determine whether or not the question is proper.

21            MR. GANNAM:  And I just want to say for the

22       record in response to your objection that asking

23       this kind of hypothetical is perfectly acceptable

24       when we're talking with an expert witness, one

25       who has the qualification and training to discuss

Page 170

1      these matters.

2           MR. WILLIAMS:  Well, we disagree on that.

3      That's why judges exist to make rulings.

4      A.    I think this topic is complicated and

5      involves some degree of speculation and consideration

6      of issues of coercion and non-coercion so that I think

7      there's just a lot of important issues of how to

8      consider and vagueness and definitions.

9      BY MR. GANNAM:

10     Q.    Then let me ask this.  Should the freedom

11     that we've talked about for a child to return to a

12     gender identity that aligns with sex assigned at birth

13     include the freedom to consult a competent

14     professional, without coercion, to accomplish that

15     return?

16          MR. WILLIAMS:  You mean from a clinical point

17       of view as opposed to a legal point of view?

18          MR. GANNAM:  Yeah.

19     A.    There's another issue here about the issue of

20     minors and informed consent so, generally speaking,

21     the parents provide informed consent to all these

22     treatments and procedures.  So you're talking on a

23     minor consulting with a professional that the parent

24     provides, generally, informed consent to.  So freedom

25     is a complicated word here.

1    Q.   Well, there's always going to be an informed

2   consent issue any time a minor receives psychotherapy;

3   correct?

4    A.   That's correct.

5    Q.   So is there something about this situation

6   that is different from any other situation where a

7   minor receives psychotherapy or professional

8   counseling?

9    A.   I think it's a very complex situation.  I

10   think this is very complex topic.

11    Q.   So, to address your response, assume then

12   that this is a situation where the child wants to

13   return to a gender identity that aligns with the sex

14   assigned at birth, that there is a competent

15   professional able to help that child, that there is no

16   coercion, and that the parent appropriately exercises

17   their parental responsibility of informed consent.

18   Should that child, or that child and the parents, have

19   the freedom to get professional help with that return?

20        MR. WILLIAMS:  I'm going to repeat the same

21        objections I've been iterating now for the last

22        ten minutes.  Vague, overly broad, indefinite,

23        improper hypothetical.  You may try to answer the

24        question, Doctor.

25    A.   In a hypothetically perfect world where

Page 172

1    everyone is exquisitely trained and all that, that may

2    be an appropriate course of action.

3         Q.   You said that may be an appropriate?

4         A.   May be an appropriate.

5              MR. GANNAM:  Thank you.  Let's take that

6         break that Ron asked for.

7              MR. WILLIAMS:  Okay.  Great.

8              (Recess from 3:48 p.m. to 4:12 p.m.)

9              MR. WILLIAMS:  We've just finished a break

10        and during the break Dr. Glassgold told me what

11        was obvious to me, that she's really getting

12        tired and she was concerned about a particular

13        question that Mr. Gannam asked her, gosh, about

14        20, 30 minutes ago, I don't remember.  And she

15        wants to address that question and make sure that

16        her answer is clear and correct in her own mind.

17             So I'm going to ask the court reporter to

18        read that question if you can find it very

19        quickly, madam court reporter, so Dr. Glassgold

20        can address it.

21             MR. GANNAM:  I just want to object to your,

22        you know, taking this opportunity to ask a

23        question during my direct examination time.  You

24        have the opportunity to redirect after the

25        conclusion of my questions.

1          MR. WILLIAMS:  I'm going to go ahead and do
2     it anyway and I understand your objection, but
3     she's getting more tired.  I want to make sure.
4     It's only fair to this witness that she have that
5     opportunity.
6          THE WITNESS:  So do I need to speak to you
7     about which question it was?
8          MR. GANNAM:  Excuse me.
9          MR. WILLIAMS:  Do you remember the question?
10         THE WITNESS:  Yes, I do.  It's one I took
11    notes on.
12         MR. WILLIAMS:  All right.  Why don't you go
13    ahead and do whatever you need to do to make sure
14    the record is clear.
15         MR. GANNAM:  And I will just reiterate, we're
16    within our seven hours still of our time.
17         MR. WILLIAMS:  I understand.
18         MR. GANNAM:  So I would like to continue.
19         MR. WILLIAMS:  Let Dr. Glassgold clarify her
20    answer, if you would, and then we'll move on.
21         THE WITNESS:  It has to do with the question
22    about the Caitlin Ryan studies and a measure of
23    suicidality before -- would it be necessary to
24    have a measure of suicidality before assessing
25    suicide or something like that.

Page 174

1   BY MR. GANNAM:

2       Q.   Is there something you would like to change

3   about your answer that you gave previously?

4       A.   Yes.  I believe I said yes to that and I

5   meant to say no.  That was that question we read over

6   at least two times and I took some notes too and I

7   edited it, but then I think it was just I was

8   confused.  Tired and confused.

9           MR. GANNAM:  All right.  Just for the record

10          I want to say after a 22-minute break the witness

11          has given a new answer to a prior question that

12          was some time back.  I move to strike the attempt

13          to re-answer the question and I just want to go

14          back on the record.  I mean, I just want to

15          continue now with my questioning.

16  BY MR. GANNAM:

17      Q.   I guess before I go there, Dr. Glassgold, the

18  new answer that you just gave, did you discuss that

19  with anyone during the break?

20      A.   I discussed with Mr. Williams that I felt

21  that my answer had not been accurate and I had not --

22  I thought about it.  It was a multi-part question and

23  though the question was read back to me a few times, I

24  felt like that wasn't the answer that reflected my

25  views.

Page 175

1      Q.   And did you decide that your answer needed to

2   be changed or was it brought to your attention by

3   someone else?

4      A.   I decided my answer needed to be changed.

5      Q.   And I just want to remind you, Dr. Glassgold,

6   when we began the deposition I did ask that if I asked

7   a question that you didn't understand that you let me

8   know that, and I think you agreed that if you answered

9   the question that I could assume that you understood

10  it when I asked you.  Do you recall that?

11     A.   I do.

12     Q.   Before we continue, is there any other aspect

13  of your earlier testimony that you want to change?

14     A.   I don't think so.

15     Q.   Okay.  Let's look at the SAMHSA report that

16  you commuted to me earlier.  It's Exhibit C to your

17  expert declaration which was marked Exhibit 28.

18          MR. GANNAM:  For the record, SAMHSA is an

19      acronym for Substance Abuse and Mental Health

20      Services Administration, and this report is dated

21      October 2015.

22  BY MR. GANNAM:

23     Q.   What was your involvement with this report,

24  Dr. Glassgold?

25     A.   I helped support the work of a professional

Page 176

1    group of experts who came together within a -- we were

2    brought together by SAMHSA to discuss the issues

3    covered in the report, so I was a staff person at APA

4    at the time.

5         Q.   And SAMHSA is a governmental organization;

6    correct?

7         A.   That is correct.  It's an agency of the

8    Department of Health and Human Services.

9         Q.   Of the U.S. government?

10        A.   Yes.

11        Q.   And would it be fair to say this SAMHSA

12   report did not undergo the same layers of review as

13   the 2009 Task Force report that we talked about

14   earlier, at least within the APA?

15        A.   It is not an APA product, so it did not

16   undergo review at APA.

17        Q.   What review did it undergo or go through

18   before it was published, if you know?

19        A.   It went under review in the Department of

20   Health and Human Services, and my understanding is

21   that it was reviewed by different -- I believe it was

22   reviewed within that organization.

23        Q.   Will you look at page 13 of the SAMHSA

24   report, please.

25        A.   Uh-hum.

1        Q.    Earlier we were looking at the APA guidelines

2    on transgender and gender nonconforming children.  Do

3    you remember that?

4        A.    Yes.

5        Q.    And we had a discussion about whether there

6    was or was not a consensus on certain issues.  Do you

7    recall that?

8        A.    Yes.

9        Q.    On page 13 of the SAMHSA report at the top

10   within a section called consensus on efforts to change

11   gender identity.  Do you see that?

12       A.    Yes.

13       Q.    And it reads, "Number 3.  There is a lack of

14   published research on efforts to change gender

15   identity among children and adolescents."  We stop

16   there.  Do you agree with that statement?

17       A.    Yes.

18       Q.    And it's an accurate statement as of December

19   2015 when this report was published?

20       A.    I believe it was October 2015, yes.

21       Q.    Okay.  Thank you.  Will you go to page 25,

22   please.

23             While you're looking for that, did you edit

24   or contribute to the writing of this report?

25       A.    I assisted on the executive summary and then

Page 178

1    I sent in some materials written by Dr. Yarhouse to

2    the writer of this report, as well as I believe I

3    facilitated the connection of the writer to our ethics

4    specialist, or the ethics specialist.  This was -- so

5    there was a professional writer who was -- and

6    professional consultants hired by SAMHSA to pull

7    together this report.  So I facilitated the

8    communications of Dr. Yarhouse and another expert from

9    the Fordham Center to the person, and then I believe I

10   assisted and edited in the writing of the executive

11   summary.

12       Q.   And when you submitted the Yarhouse

13   materials, did the writer of the report receive and

14   consider those materials when you sent them?

15       A.   Yes, I believe so.

16       Q.   And did they make it into the report or

17   whatever aspect of them you brought to the writer's

18   attention?

19       A.   Some aspect of them.

20       Q.   So would it be fair to say you had access to

21   the writer of this report before it was published and

22   had an opportunity to give input to it?

23       A.   Yes.

24       Q.   Would you look at page 25 on the left column.

25       A.   Well, I just want to clarify, I was not sent

Page 179

1    the report, the entire report to edit at all.  I did

2    not see the report itself.  I had some access to the

3    writer of the report to submit material and I saw the

4    executive summary or I was asked to assist in order to

5    finish by the timeline.  I did not see the bulk of the

6    report before it was -- I did not edit the report or

7    see the majority of it until after it came out.

8         Q.   Did you receive and read it when it came out?

9         A.   I did receive and read it when it came out.

10        Q.   And did you -- at the time it came out did

11   you disagree with anything in it or object to anything

12   that had been published in it?

13        A.   Not that I recall.

14        Q.   As you sit here today, do you object to

15   anything in this report or think it is in any way

16   inaccurate?

17        A.   I don't believe so, but even though I've

18   looked at it, glanced at it since then, I haven't read

19   it with intensity or with an editorial frame of mind.

20        Q.   So, on page 25, the first paragraph there on

21   the left, the last sentence where it says "No new

22   studies," do you see that?

23        A.   Right.

24        Q.   Is says, "No new studies have been published

25   that would change the conclusions reached in the APA

Page 180

1   Task Force's 2009 review."

2          Did I read that correctly?

3      A.   Yes.

4      Q.   And that's referring to your APA Task Force

5   and its report; correct?

6      A.   Right.

7      Q.   And that's an accurate statement?

8      A.   I would say that it probably is, but part of

9   the problem I have with that sentence is it doesn't --

10  the two previous sentences, as I look at them now, it

11  separates research on adults and research on children.

12  And then the last sentence doesn't qualify whether

13  it's all, both adults and children's studies, or one

14  or the other.

15          And so I'm not sure that -- I'd have to think

16  about whether, as of October 2015, that probably is

17  correct for adults and children, but I think that -- I

18  think that's accurate, yes.  Sorry I had to try to

19  think things through.

20     Q.   No problem.  Will you look at page 26?

21     A.   Uh-hum.

22     Q.   About halfway down on the first full

23  paragraph is the word "although."  Do you see that?

24     A.   Yes.

25     Q.   It says, "Although no research demonstrating

                                              Page 181

1    the harms of conversion therapy with gender minority

2    youth has been published."  Let me stop there.

3           Do you agree with that statement, that no

4    research demonstrating the harms of conversion therapy

5    with gender minority youth has been published?

6         A.   As of October 2015, when that sentence was

7    written, I believe that sentence was accurate.

8         Q.   In your declaration that you filed in this

9    case, do you cite to any research that would disagree

10   with that statement from October of 2015 in the SAMHSA

11   report?

12        A.   Actually, the Ryan study did include

13   individuals who identify, in her study, as transgender

14   and they perceive and report concerns that would

15   indicate harm.

16        Q.   And we're talking about the Ryan 2018 study?

17        A.   Yes.

18        Q.   And I think we did already discuss that you

19   agreed with that statement in that report, that the

20   design is retrospective and thus causal claims cannot

21   be made from the Ryan report; correct?

22        A.   That's why I used patient perception.

23        Q.   Apart from that Ryan report, as we've just

24   discussed, do you cite in your declaration any other

25   research demonstrating harm from conversion therapy

Page 182

1    with gender minority youth?

2         A.    I don't believe so, though in the Bradshaw

3    study, one of the Bradshaw studies, they discuss the

4    experiences of individuals who do identify as gender

5    nonconforming who felt -- or felt that their gender

6    nonconforming behaviors were targeted, but I believe

7    those were individuals who experienced therapy as

8    adults, but they might have had therapy as young

9    adults or adolescents, but I am doubtful to that.  But

10   I believe it's only Ryan who identified that at this

11   point, but I'm pretty sure.  I would have to think

12   about this thing a little bit more.

13        Q.    Let me ask you this.  I'm sorry.  Are you

14   still thinking?

15        A.    I'm still thinking.

16        Q.    Please finish.  I mean, take your time.

17        A.    I believe that is -- my answer is correct.

18        Q.    Can you go back to your report.  Your

19   declaration, excuse me, Exhibit 28.  And I'm looking

20   at page 5.

21        A.    Uh-hum.

22              MR. WILLIAMS:  Give me a second here, Roger.

23   Let me catch up to you, if I may.  All right.

24   Thank you.

25        Q.    Specifically, paragraph 14.

Page 183

1      A.    Uh-hum.

2      Q.    It reads, "The ordinance is supported by the

3  best available scientific research relevant to

4  children and adolescents which is, again, cited in the

5  legislative findings of the ordinance."  Let me stop

6  there.

7          Will you look at, for the moment, Exhibit 4,

8  the ordinance itself.  In paragraph 14, where you

9  refer to the legislative findings of the ordinance,

10  are those the various whereas clauses appearing on

11  pages 1 through 5 of the ordinance?

12      A.    Yes.

13      Q.    Okay.  The next sentence, going back to

14  paragraph 14 on page 5 in your declaration says,

15  "Specifically, current scientific evidence, including

16  those cited in findings, confirm unequivocally that

17  conversion therapy, CT, in any form is ineffective and

18  harmful."

19          Did I read that correctly?

20      A.    Yes.

21      Q.    Now, we have looked at your APA report itself

22  that makes a statement, "We cannot include how likely

23  it is that harm will occur from SOCE."  And we've

24  looked at the SAMHSA report from 2015 that says, "No

25  studies have changed any of the conclusions in the

Page 184

1    2009 APA report."

2          My question is how do we get from those

3    studies to your statement that the current scientific

4    evidence confirms unequivocally that conversion

5    therapy in any form is both ineffective and harmful?

6      A.    There is no scientific evidence that

7    conversion therapy is effective and I believe patient

8    perception qualitative accounts of harm are valid to

9    be considered substantial enough evidence of harm that

10   the standards for harm are different than standards

11   for efficacy and patient perception of harm is

12   adequate reason to reconsider patient -- to consider a

13   therapeutic program.

14     Q.    So isn't it different to say that conversion

15   therapy poses a risk of harm on the one hand and

16   saying that it is harmful on the other hand,

17   scientifically speaking?

18     A.    Perhaps I think at some point we're

19   nitpicking, but there is a distinction.  I think --

20   so, to answer your question, I believe the totality of

21   the evidence supports my statement and I could go into

22   depth about that if you wish.

23     Q.    Well, I just would like to ask you to point

24   me to the study that or the research that was

25   completed or occurred from the 2015 SAMHSA report

Page 185

1    through the date of your declaration that goes from no

2    conclusions from the APA report in 2009 have been

3    changed by the research to now it's unequivocal that

4    conversion therapy is harmful and ineffective?

5         A.    I believe the Ryan report and the research

6    from 2015 on, including Bradshaw, point to strong

7    patient perceptions of harm.  And if you look at the

8    accounts in Bradshaw that compare the different types

9    of therapy, there is evidence of perceived harm and,

10   again, the evidence from harm do not have to be RCTs

11   in order for their treatment to be considered

12   extremely risky and seriously harmful.

13        Q.    And, apart from the Ryan study and the

14   Bradshaw study, are there any others that support that

15   statement since the 2015 SAMHSA report?

16        A.    I believe that the collective work of the

17   Bradshaw daily group, they're a group of studies by

18   that group, the Ryan work, which is most pertinent to

19   adolescents, is strong enough evidence for that

20   statement.

21        Q.    And, just so I'm clear, where the Ryan report

22   says causal connections cannot be made, you believe

23   that's strong enough to make a statement that research

24   confirms unequivocally that conversion therapy is

25   harmful?

1    A.    Yes, especially given that in the last 100

2    years there is no shred of evidence that is it

3    effective.  And providing ineffective treatment in

4    itself is harmful because you delay access to

5    effective care and that can increase the stress or

6    does not mitigate the stress in a timely fashion.  It

7    is the responsibility of the provider to provide

8    effective and safe care in a timely manner.  Pursuing

9    conversion therapy delays the provision of safe and

10   effective treatment and can worsen symptoms, and that

11   in itself is also harmful.

12        Q.    I want to make sure we're clear that since

13   the 2015 SAMHSA report you've identified the Ryan

14   report and the Bradshaw work, which are the LDS

15   studies.  I believe there are two of them, correct, in

16   that time frame?

17        A.    Two to three; right.

18        Q.    Apart from those, are there any others that

19   support that statement that the research confirms

20   unequivocally that conversion therapy is ineffective

21   and harmful?

22        A.    In the peer review journal, no, I don't

23   believe so.

24        Q.    You don't believe there's any others?

25        A.    I don't believe so.

                                        Page 187

1        Q.    You earlier spoke about a -- okay.  Let me

2    follow up.  Any anything apart from a peer review

3    journal that supports that statement?

4        A.    I only have reviewed the peer reviewed

5    statements.

6        Q.    So the answer is no, to your knowledge?

7        A.    Not to my knowledge.

8        Q.    Now, in your paragraph -- or in that

9    statement that the current scientific evidence

10   confirms unequivocally that conversion therapy is

11   ineffective and harmful, you added a footnote number 4

12   that cites to a Weiss, Morehouse, Yeager & Berry

13   study; correct?

14       A.    Uh-hum.

15       Q.    And we looked at -- and that was from 2010;

16   correct?

17       A.    Uh-hum.

18             MR. MIHET:  Just a reminder to use verbal

19        answers.  Yes or no, please.

20             THE WITNESS:  Okay.

21   BY MR. GANNAM:

22       Q.    And is there a particular reason why that was

23   the study you cite to support that particular

24   statement as opposed to something newer, for example,

25   or any of the other studies?

Page 188

1      A.   I don't recall, to be honest.  I really don't

2   recall.

3      Q.   You testified earlier that you gave a

4   declaration in the Schwartz case in New York?

5      A.   That is correct.

6           (Plaintiffs' Exhibit No. 34 was marked for

7   identification.)

8      Q.   Show you a copy that I will mark as Exhibit

9   34.

10          MR. WILLIAMS:   Thank you.

11     Q.   This document was filed at document 24-15 in

12  Schwartz v. The City of New York, case number 1:19

13  Civ. 00463.  The title is Declaration of Judith M.

14  Glassgold In Support of Defendant's Opposition to

15  Plaintiff's Motion For a Preliminary Injunction.

16          Did I read that title correctly?

17     A.   Yes, you did.

18     Q.   And I will represent that as I looked at this

19  on the docket it included 30, approximately, exhibits

20  that were attached to it in the original filing in the

21  New York court.  Is that also your recollection?

22     A.   I did not prepare the filing myself, so I

23  sent -- so I cannot say what it included.

24     Q.   As far as what you prepared yourself, is this

25  Exhibit 34 a copy of that document?

Page 189

1      A.    I believe so.

2      Q.    I want to refer you to -- you know what, I'm

3   just going to leave it alone as having you

4   authenticate it for the record.  I'm not going to ask

5   you any questions about it.

6           MR. WILLIAMS:  Authenticate what, Roger?

7           MR. GANNAM:  That that was her declaration in

8       the New York case.  I'm not going to ask any

9       further questions about it.

10          MR. WILLIAMS:  All right.

11  BY MR. GANNAM:

12     Q.    I would now like to -- I'm going to go back

13  to something that we talked about earlier and that was

14  your role with the Born Perfect project of NCLR.

15     A.    Uh-hum.

16     Q.    Since we talked and it earlier today, do you

17  have any more clarity on what your position is or the

18  title of your position with the organization?

19     A.    I believe I was part of an advisory body to

20  the Born Perfect.  I wasn't a board member.  I was on

21  a professional advisory body to provide them some

22  scientific and professional information.

23     Q.    And is part of joining that project and the

24  role in which you joined as an advisory -- in an

25  advisory capacity or an advisory board or committee,

Page 190

1    did you or were you asked to agree to or affirm any

2    kind of mission statement or goals of the project?

3        A.    I don't believe so.

4        Q.    In accepting that position with the project,

5    were you in fact committed to the goals of the project

6    when you joined it?

7        A.    My goals were to try to make sure that the

8    efforts were grounded as much as possible in the

9    professional literature.

10       Q.    And by efforts, what specifically are you

11   talking about?

12       A.    Whatever efforts they involved in.

13            (Plaintiffs' Exhibit No. 35 was marked for

14   identification.)

15       Q.    I'm going to show you a document that I've

16   marked as Exhibit 35.  This is a printout of the Born

17   Perfect home page on the internet.  At the top it says

18   Born Perfect:  The Campaign to End Conversion Therapy.

19   National Center For Lesbian Rights.  Do you see that

20   at the very top?

21       A.    Right.  Uh-huh.

22       Q.    And then, going to the center of the page

23   under the Born Perfect logo, it reads, "In June 2014

24   NCLR launched Born Perfect, the campaign to end

25   conversion therapy by passing laws across the country

Page 191

1    to protect LGBT children and young people, fighting in

2    courtrooms to ensure their safety and raising

3    awareness about the serious harms caused by these

4    dangerous practices."

5            Did I read that correctly?

6        A.   I believe so, yes.

7        Q.   And, having seen this, does that refresh your

8    recollection as to the purpose of the Born Perfect

9    campaign that you joined?

10           MR. WILLIAMS:  Whoa, whoa, whoa.  That

11       misstates her prior testimony.  She was a member

12       of the advisory committee.  That's what she said.

13       That's not the same as joining something.

14       A.   So, in 2014, I don't know what their website

15   was or the discussion we had.  I was asked by Caitlin

16   Ryan to join the advisory body to ensure that their

17   efforts were to the best reasonable professional

18   level.  I don't recall what their website was there or

19   what information I received at that time, to be

20   honest.

21       Q.   At the time did you understand the Born

22   Perfect project to have the specific role of ending

23   conversion therapy by passing laws across the country?

24       A.   I believe that was one of their goals, but I

25   also believe that not everybody.  I'm not sure whether

Page 192

1  everyone endorsed that or not.

2      Q.   Did you endorse that goal?

3      A.   In part.

4      Q.   And, Caitlin Ryan, is that the same Ryan who

5  authored the 2018 study that you cited in your

6  declaration?

7      A.   Right.

8      Q.   Are you friends with Ms. Ryan?

9      A.   Yes.  We've known each other maybe 40 years

10  now.

11      Q.   Is -- strike that.

12          On the second page in the middle among

13  that -- below the first graphic that appears on that

14  page it says, "We are committed to ending these

15  dangerous and stigmatizing practices across the

16  country once and for all."  Do you see that?

17      A.   Oh, okay.  Yes, I do.

18      Q.   Did you sign onto or share that commitment

19  when you agreed to serve in an advisory capacity to

20  the project?

21      A.   In part I'm not sure I -- my understanding

22  was I was to be an advisory person to help their

23  efforts, ensure that their efforts had some rational

24  and what they did had some basis in science and

25  professional practice.  I did not -- I was not

Page 193

1   consulted about any of their actions or lawsuits or

2   approve of or have to endorse any of their actions,

3   specific actions I may or may not agree with, but I

4   was not asked or not committed to endorsing any of

5   them.

6       Q.   So did your agreement to serve in an advisory

7   capacity go as far as agreeing to their goal of ending

8   conversion therapy?

9       A.   My goal was to improve the quality of care

10  that adolescents and children receive with regard to

11  sexual orientation and gender identity.  I did not

12  necessarily agree to all of their actions or all of

13  their strategies.

14      Q.   Do you currently support the project's goal

15  of ending conversion therapy?

16      A.   Yes.  In general.

17      Q.   And you testified earlier that it was an NCLR

18  representative who initiated your involvement in this

19  case; correct?

20      A.   That's correct.

21      Q.   And so was procuring your services as an

22  expert in this case in furtherance of the Born Perfect

23  project and its goals to end conversion therapy?

24          MR. WILLIAMS:  I didn't understand that

25      question.  Would you read it back.

Page 194

1        (The question was read by the reporter.)
2            MR. WILLIAMS:  Object to the form of the
3        question.  It's unintelligible to me, but if you
4        understand it.
5            THE WITNESS:  I don't understand it.
6            MR. GANNAM:  Rob, I appreciate just making
7        your objection and not suggesting --
8            MR. WILLIAMS:  That's what I just did.  It's
9        unintelligible.  What else can I say.
10       A.   I'm not sure I can make the causal leap that
11   that question requires.
12   BY MR. GANNAM:
13       Q.   Okay.  Do you understand that your
14   involvement in this case has to do with the Born
15   Perfect project of NCLR?
16       A.   I don't think -- I'm not sure -- is NCLR
17   involved in this case?
18       Q.   Well, NCLR called you to suggest that you
19   serve as an expert in this case; correct?
20       A.   So I was introduced -- so I guess if you want
21   to break down your question to did a professional from
22   NCLR introduce me to Mr. Williams, yes, that is
23   correct.
24       Q.   The NCLR lawyer who is sitting in the room
25   today; correct?

Page 195

1        A.    That's correct.

2        Q.    And did you ask the NCLR lawyer who called

3    you whether it was in connection with the Born Perfect

4    project?

5        A.    No, I did not.

6        Q.    Was the Born Perfect project discussed during

7    the course of that phone call?

8        A.    No.

9        Q.    And since you have been engaged to serve as

10   an expert in this case, have you discussed the Born

11   Perfect project with anyone at NCLR?

12       A.    No.

13       Q.    You said that you generally support the goal

14   of NCLR to end conversion therapy; is that correct?

15       A.    That is correct.

16       Q.    Is there anything specific about -- or any

17   specific goal of NCLR or any specific action of NCLR

18   in the Born Perfect project that you disagree with?

19       A.    To be honest with you, I do not follow

20   their -- what they do, to be honest, in great detail.

21   I generally respond to phone calls for them with

22   specific questions.  I don't keep up with what they

23   do.

24       Q.    So it'd be fair to say, as you sit here

25   today, you can't identify any goal or action of the

Page 196

1    project that you disagree with?

2         A.   Can't identify any goal or action of the

3    project that I agree or disagree with.  I'm not sure

4    what they're doing.  I'd have to look -- to answer

5    your question I'd have to review what they're doing,

6    to be honest.

7         Q.   But you did say you agree with their goal of

8    ending conversion therapy?

9         A.   That goal, but their particular strategy in

10   the goal that's what I'm not sure what they're doing

11   to achieve that goal.

12        Q.   So apart from agreeing generally with the

13   goal to end conversion therapy, you can't identify any

14   other goal or action of the Born Perfect project that

15   you agree or disagree with?

16        A.   Right, in terms of specific issues.

17             MR. GANNAM:  Okay.  I think I want to take a

18        break just to consult with my colleague here.

19             (Recess from 4:50 p.m. to 4:53 p.m.)

20   BY MR. GANNAM:

21        Q.   Wrap up a couple things.  First, I think you

22   testified earlier that you were not being compensated

23   for your expert witness engagement in New York; is

24   that correct?

25        A.   That's correct.

Page 197

1      Q.    You are being compensated for your engagement

2  here in Tampa; correct?

3      A.    For the physical presence, yes.

4      Q.    Any particular reason for the difference in

5  treatment of the two cases?

6      A.    I don't necessarily charge for the statement

7  preparation and in Schwartz all I did was prepare a

8  statement.  For the physical time when I have to be

9  aware from my other businesses or professional

10  engagements, I do ask to be compensated.

11      Q.    So in terms of compensation for the written

12  declaration, it's the same in both cases, you're not

13  being paid by either one?

14      A.    That's correct.  That's a good way of putting

15  it.  Thank you.

16      Q.    Thank you.  So if you testify in New York,

17  would you charge for your time in that situation?

18      A.    I would ask to be compensated for my time,

19  yes.

20          MR. GANNAM:  That ought to make you happy

21      that she's not treating Tampa differently from

22      New York.

23          MR. WILLIAMS:  I will finally get to sleep

24      tonight.

25  BY MR. GANNAM:

1    Q.   A lot of the questions about scientific

2    research and what it does and doesn't support today

3    have been limited by the timing of research in terms

4    of, for example, when I ask you about a particular

5    report you would say, yeah, as of the time of the

6    record that statement is accurate.  Do you follow me

7    in general?

8    A.   Yes.

9    Q.   So I want to ask you specifically about as we

10    sit here today, July 25, 2019, from any of the

11    scientific research that you are familiar with, can

12    you identify quantitatively the likelihood of harm

13    that could occur from SOCE as compared to other kinds

14    of psychotherapy?

15    A.   So I will try to be responsive to your

16    question.  Ideally, so if one could, and one could

17    identify people who could be harmed or benefited, that

18    would be a great boom to practitioners.  But because

19    we cannot predict who will be harmed and who may not

20    be harmed or what their -- may be harmed or not, it

21    makes it more risky because you can't predict the

22    treatment effect.  That was my answer.

23    Q.   So is the answer, no, you can't quantify the

24    likelihood of harm from SOCE as compared to other

25    therapies?

1     A.    That is correct.

2          MR. GANNAM:  And so just to give it -- strike

3     that.

4          No further questions.

5          MR. WILLIAMS:  My witness?

6          MR. MIHET:  Yes, sir.

7          MR. WILLIAMS:  Dr. Glassgold, I have no

8     questions.

9          THE WITNESS:  Thank you.

10         MR. WILLIAMS:  Now, I'm sure you will

11    transcribe this deposition.  And once that

12    transcription is completed, I will get a copy and

13    you will have an opportunity to review it and

14    make any corrections and so forth.

15         And how quickly are you going to get this --

16    have you talked to her yet about that?

17         MR. GANNAM:  We haven't.

18         MR. WILLIAMS:  Well, whenever it is --

19         MR. GANNAM:  Regular delivery.  I don't think

20    we have a need for rush.

21         MR. WILLIAMS:  We're not waiving is my point.

22    We're not going to waive.  She's not going to

23    waive.  So just put that on the record so

24    everybody can understand.

25         MR. MIHET:  Your obligation to read and sign

Page 200

1     happens whether or not we order a transcript.

2          MR. WILLIAMS:  How can I read and sign

3     something that's not transcribed?

4          MR. MIHET:  You do what you do, we do what we

5     do.

6          MR. WILLIAMS:  That's a new one on me, Harry.

7     I've never done that in 47 years.  I don't intend

8     to start now.

9          If it's transcribed, she will read it and she

10    will sign.  That's what the errata sheet is for.

11         THE COURT REPORTER:  And you're keeping the

12    exhibits?

13         MR. GANNAM:  Yes.  And I will scan them and

14    distribute them to everyone tomorrow.

15         THE COURT REPORTER:  Are you ordering now?

16         MR. GANNAM:  Yes, standard delivery.

17         MR. WILLIAMS:  We'll take a copy, obviously.

18         THE COURT REPORTER:  Anyone want paper or is

19    electronic fine?

20         MR. GANNAM:  Electronic.

21         MR. WILLIAMS:  Electronic is fine.

22         THE COURT REPORTER:  And we're off the record

23    now?

24         MR. GANNAM:  Yes.

25         (This deposition concluded at 4:58 p.m.)

Page 201

1   RE    :  Robert L. Vazzo v. City of Tampa
    DEPO OF:  Judith M. Glassgold, Psy.D.
2   TAKEN :  July 25, 2019
3
4                        EXCEPT FOR ANY CORRECTIONS
                         MADE ON THE ERRATA SHEET BY
5                        ME, I CERTIFY THIS IS A TRUE
                         AND ACCURATE TRANSCRIPT.
6                        FURTHER DEPONENT SAYETH NOT.
7
                          JUDITH M. GLASSGOLD
8
9   STATE OF FLORIDA        )
                            )  SS:
10  COUNTY OF HILLSBOROUGH  )
11
             Sworn and subscribed to before me this
12
    _____ day of _____, 2019.
13
    PERSONALLY KNOWN_____ OR I.D._____
14
                         _____
15                       Notary Public in and for
                         the State of Florida at
16                       Large.
17  My commission expires:
18
19
20
21
22
23
24
25

Page 202

1                        ERRATA SHEET
      RE     :  Robert L. Vazzo v. City of Tampa
2     DEPO OF:  Judith M. Glassgold, Psy.D.
      TAKEN  :  July 25, 2019
3
         DO NOT WRITE ON TRANSCRIPT, ENTER ANY CHANGES HERE
4
      Page      Line        Change              Reason
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    State of Florida)
      County of Hillsborough)
21
      Under penalties of perjury, I declare that I have read
22    the deposition transcript and it is true and correct
      subject to any changes in form or substance entered
23    here.
24

      _____       _____
25    Date                   Judith Glassgold

Page 203

1                 CERTIFICATE OF OATH OF WITNESS

2

3     STATE OF FLORIDA

4     COUNTY OF HILLSBOROUGH

5

6          I, MARY ANN SMITH, Registered Professional

7     Reporter, Registered Merit Reporter, Notary

8     Public, State of Florida, certify that the

9     witness, Judith Glassgold, Psy.D., personally

10    appeared before me on the 25th day of July, 2019,

11    and was duly sworn by me.

12

13         WITNESS my hand and official seal this 9th

14    day of August, 2019.

15

16

17

18

19                   Mary Ann Smith, RPR, RMR

                     Notary Public - State of Florida

20                   My Commission No. FF 977637

                     Expires:  May 17, 2020

21

22

23

24

25

Page 204

1                REPORTER'S DEPOSITION CERTIFICATE

2

3    STATE OF FLORIDA

4    COUNTY OF MANATEE

5

          I, MARY ANN SMITH, Registered Professional
6    Reporter, Registered Merit Reporter, certify that I
     was authorized to and did stenographically report the
7    deposition of Judith Glassgold, Psy.D., the witness
     herein, on July 25, 2019; that a review of the
8    transcript was requested; that the foregoing
     transcript, pages 1 through 206 inclusive is a true
9    and complete record of my stenographic notes of the
     deposition by said witness; and that this
10   computer-assisted transcript was prepared under my
     supervision.

11

          I further certify that I am not a relative,
12   employee, attorney or counsel of any of the parties,
     nor am I a relative or employee of any of the parties'
13   attorney or counsel connected with the action.

14        DATED this 9th day of August, 2019, at
     Lakewood Ranch, Manatee County, Florida.

15

16

17

18

19
                     Mary Ann Smith, RPR, RMR

20

21

22

23

24

25