

Deposition of:
## Norman Spack , M.D.

*August 1, 2019*

In the Matter of:

## Vazzo, Robert L, et al. v. City of Tampa, Florida

Veritext Legal Solutions
800.808.4958 | calendar-dmv@veritext.com |

Page 1

1                 UNITED STATES DISTRICT COURT
                  MIDDLE DISTRICT OF FLORIDA
2                       TAMPA DIVISION
3              Case No.:  8:17-cv-2896-T-02AAS
4    ROBERT L. VAZZO, LMFT, etc.,
     et al.
5         Plaintiffs
6    vs.
7    CITY OF TAMPA, FLORIDA
8         Defendant
     _____
9
10                    D E P O S I T I O N
11                          o f
12                   NORMAN SPACK, M.D.
13              taken on behalf of Plaintiffs
14
          DATE:           August 1, 2019
15
          TIME:           11:00 a.m. to 4:13 p.m.
16
          PLACE:          Burr & Forman, LLP
17                        201 N. Franklin Street, Suite 3200
                          Tampa, Florida  33602
18
          BEFORE:         Dawn A. Hillier, RMR, CRR, CLR
19                        Notary Public - State of
                          Florida, at Large
20
21
22
23
24
25

Page 2

1    APPEARANCES:
2
3    ATTORNEYS FOR PLAINTIFFS
4         ROGER K. GANNAM, ESQUIRE
          HORATIO G. MIHET, ESQUIRE
5         LIBERTY COUNSEL
          PO Box 540774
6         Orlando, Florida  32854
          407.875.1776
7         rgannam@lc.org
8
9    ATTORNEY FOR DEFENDANT
10        ROBERT V. WILLIAMS, ESQUIRE
          BURR & FORMAN, LLP
11        One Tampa City Center
          201 North Franklin Street, Suite 3200
12        Tampa, Florida  33602
          813.367.5751
13        rwilliams@burr.com
14
     ALSO PRESENT:
15
          Shannon Minter
16        Dr. Bernard Hudson (via telephone)
17
18
19
20
21
22
23
24
25

Page 3

1                          INDEX
2                                              PAGE
3    WITNESS - NORMAN SPACK, M.D.

     DIRECT EXAMINATION BY MR. GANNAM              5
4    CROSS EXAMINATION BY MR. WILLIAMS           136
     CERTIFICATE OF OATH                        145
5    REPORTER'S CERTIFICATE                      146
6
7
8                         EXHIBITS           MARKED
9    Exhibit 36   Declaration of Norman Spack,      46
          M.D.
10

11   Exhibit 37   Standards of care for the health   77
          of transsexual, transgender, and
          gender-nonconforming people
12

13   Exhibit 38   American Psychiatric Association   92
          document, a guide for working with
          transgender and gender-nonconforming
14        patients
15   Exhibit 39   Management of transgenderism     95
16   Exhibit 40   Serving transgender youth,        97
          challenges, dilemmas, and clinical
17        examples
18   Exhibit 41   Practice parameter on gay,       113
          lesbian, or bisexual sexual orientation,
19        gender nonconformity, and gender
          discordance in children and adolescence
20

     Premarked Exhibit 33                         115
21
22     (Exhibits retained by counsel.)
23
24
25

1

2            REPORTER'S KEY TO PUNCTUATION:

3     --   At end of question or answer references

4          interruption.

5     ...  References a trail-off by the speaker.

6            No testimony omitted.

7     "Uh-huh" "Um-hum" References affirmative sound.

8     "Huh-uh" "Um-um"  References negative sound.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    NORMAN SPACK, M.D.

2     was called as a witness and having first been duly

3     sworn, responding "I do," was examined and testified as

4     follows:

5                    COURT REPORTER:  Thank you.

6                    DIRECT EXAMINATION

7     BY MR. GANNAM:

8          Q    Good morning, Dr. Spack.  My name is Roger

9     Gannam and I'm an attorney for the plaintiffs in the

10    lawsuit against the City of Tampa regarding its ban on

11    conversion therapy as its local ordinance.  And we're

12    here to take your deposition today in the capacity as a

13    an expert witness for the City of Tampa.  Am I correct

14    so far?

15         A    Correct.

16         Q    Great.  I want to go through a few ground

17    rules and then we'll get into it.  Have you had your

18    deposition taken before?

19         A    Yes, actually.

20         Q    Okay.  Some of this may sound familiar, then.

21    But we're going to be taking down everything

22    stenographically today, every word.  So it's important

23    that all of your answers be out loud or verbal.  Is that

24    okay?

25         A    Sure.

1      Q    Great.  Our normal tendency in conversation is

2    to use, you know, head gestures or hand gestures.  But

3    none of that will show up on the transcript and that's

4    why we ask for verbal responses.

5           It's also important for the sake of the

6    transcript that we only speak one at a time.  So I will

7    do my best to wait until you're done talking before I

8    ask my next question.  And I would just ask that you

9    also wait until I'm done before answering.  Is that

10   okay?

11     A    Fine.

12          And where is the sound input so I know where

13   to look.

14     Q    Well, you have two.  The phone, I think, will

15   pick it up and from any direction.  And our court

16   reporter, are you using audio today as well?

17          COURT REPORTER:  Just me.

18   BY MR. GANNAM:

19     Q    Okay.  So the best thing to do is just respond

20   to me and if our court reporter has any trouble picking

21   you up, she'll let us know.

22          If I ask any question that you do not

23   understand, just please let me know what's wrong with

24   the question and I'll address it.  But if I ask a

25   question and you answer it, I will assume that you both

Page 7

1   heard me and understood me.  Is that okay?

2        A    Sure.

3        Q    We will try to be respectful of everyone's

4   time and get you out of here in time for your flight.

5   However, this is not an endurance contest.  And if you

6   need to take a break, that's certainly appropriate.

7   Just let me know.

8             I would ask that if there is a question

9   pending, that you answer the question before asking for

10  a break.  Is that okay?

11       A    Fine.

12       Q    All right.  Currently, are you under any

13  medical condition or disability that would affect your

14  capacity to testify truthfully today?

15       A    No.

16       Q    Are you currently taking any medication that

17  could affect your capacity to testify today?

18       A    No.

19       Q    And if this case should go to trial sometime

20  next year, are you aware of any situation or condition

21  that would prevent you from being able to testify at

22  trial?

23       A    No.

24       Q    Okay.  Great.

25            Any questions for me before we go further?

```
                                                Page 8

 1        A     No.

 2        Q     All right.  Please state your name for the

 3   record.

 4        A     Norman Spack.

 5        Q     And Dr. Spack, your address?

 6        A     474 Revere, R-e-v-e-r-e, Beach Boulevard,

 7   Apartment 1003, Revere, Mass, 02151.

 8        Q     All right.  Are you currently employed?

 9        A     No.

10        Q     All right.  Do you -- are you retired?

11        A     Yes.

12        Q     Okay.  As of when?

13        A     Two years ago.

14        Q     What was your last employment position?

15        A     I was a senior pediatric endocrinologist and

16   founding -- founder and director of the Gender

17   Management Service for the endocrine division at --

18        Q     Go ahead.

19        A     -- Boston Children's Hospital.

20        Q     Okay.  And that employment ended about two

21   years ago when you retired?

22        A     Yeah.

23        Q     And since you retired, have you done any kind

24   of consulting or other work for pay or remuneration of

25   any kind?
```

Page 9

1       A     Not directly from Children's Hospital.  But I

2    voluntarily go in to consult on problematic cases.

3       Q     And are you compensated for that?

4       A     No.

5       Q     All right.  So have you done any kind of

6    compensated work since your retirement two years ago?

7       A     A fair bit.

8       Q     Okay.  What kind of work?

9       A     It's all visiting professorships at pediatric

10   medical centers.

11      Q     Do you currently hold any professorships?

12      A     My professorship will never -- it stays with

13   me until I die.  So I'm an associate clinical professor

14   of pediatrics at Harvard Medical School.

15      Q     Anywhere else?  Other institutions?

16      A     No.

17      Q     What was the last course you taught?

18      A     The last course I taught was a major seminar

19   to the second-year Harvard medical students on gender

20   dysphoria in a young adolescent.

21      Q     And when was that?

22      A     That would have been about March -- they're

23   usually in March -- 2017.

24      Q     Was that before or after your retirement?

25      A     It was really just about as I was -- the

```
 1   academic year ends on July 30th, so by July 30th that
 2   year, I was retired.
 3        Q    Any other compensated work besides that
 4   March 2017 seminar -- or I should say since that
 5   March 2017 seminar?
 6        A    Well, if you consider the visiting
 7   professorships.
 8        Q    Okay.
 9        A    They're all compensated.  And I've probably
10   done about -- since I retired, probably done around
11   five.
12        Q    Can you just kind of tell me what that
13   consists of?  You said you've done five.
14        A    I can tell you a good one from proximity.
15   Last year, I did a two-day professorship right at All
16   Saints (sic) Children's Hospital in St. Petersburg.
17             That would usually -- it always consists of a
18   meeting the night before over dinner with members of the
19   pediatric endocrine department followed by giving a
20   major lecture on the subject of transgenderism in
21   children and adolescents; and following that, a more
22   informal case discussion, cases brought up by the
23   residents and interns that follows the major talk.
24        Q    So the five visiting professorships you've
25   engaged in since you retired typically follow that
```

Page 11

```
 1    similar pattern?

 2         A    I would say so.

 3         Q    Okay.  All right.  Anything else then besides

 4    the visiting professorship, as far as compensated work

 5    that you've performed?

 6         A    No.  I would say no because other work that

 7    I've done related to the field is co-authoring articles

 8    for publication and major journals.  And there was one

 9    non-compensated work, with probably a fairly big legacy.

10    I was able to win a $6 million grant from the National

11    Institute of Health for a four-institution collaborative

12    study of -- longitudinal study of transgender youth.

13    And that was a -- it included ourselves, the Children's

14    Hospital in Chicago, the Children's Hospital Los

15    Angeles, and the Children's Hospital at University of

16    California San Francisco.

17              And it was just beginning to take off and

18    enroll patients as I was retiring.

19              And none of us were -- of all the people

20    involved, the only ones who were likely to be partly

21    subsidized in their work were the research psychologists

22    and some of the other number-crunching researchers.

23         Q    So would it be fair to summarize your

24    involvement in that project as participating in

25    obtaining the grant, but not doing the work the grant is
```

Page 12

1   funding?

2       A    That's exactly right.

3       Q    And what is the subject -- or more specific

4   subject of that longitudinal study for which that grant

5   was given?

6       A    The patients who were enrolled in that study

7   were similar to the patients in age and qualitative

8   issues related to the gender identity as the patients

9   that the Dutch had used ten years before.

10          So the idea was to see if we had comparable

11  results to their -- I should have to say, phenomenal

12  results over the 22 years of age that they have followed

13  their patients.

14      Q    And generally speaking, what were the results

15  of the Dutch study that you were trying to analyze or

16  match or compare to?

17      A    They studied 55 males and 55 genetic females

18  who were living in the opposite gender.  They were

19  subjected to pubertal suppression and cross-gender

20  hormones at approximately age 15, any surgeries were

21  obtained -- that were done by age 18.  They had been

22  tested psychologically at the beginning of the study

23  with specific attention to gender identity.

24          They were studied, again, at the midpoint when

25  they were about to get the hormones of the opposite sex.

1   They were studied again before they would be considered

2   eligible for surgery.

3           But the critical thing that was done that was

4   published was they were studied at age 22 to 24, so four

5   to six years after the last formal treatment.  Obviously

6   they were continuing on hormonal treatment.

7           The stunning result that they showed -- and

8   Holland is a different place from us.  They showed

9   that -- and it was published in The Journal of

10  Pediatrics by de Vries, d-e, capital V, as in Victor,

11  r-i-e-s.  De Vries, et al.  They showed that at the end

12  of the game, the Dutch patients not only were

13  psychosocially normal but their results were better than

14  a cohort of age-match controlled patients.

15      Q    So that's the Dutch study?

16      A    Right.

17      Q    And did you complete the longitudinal study --

18  or was the longitudinal study for which the six million

19  NIH grant was given completed?

20      A    Hardly.

21      Q    Okay.  Tell me about the process of that

22  study.

23      A    Well, it meant that every -- the goal was for

24  every one of the four centers to enroll a hundred

25  patients.

Page 14

1          Q     Okay.

2          A     Okay?  And to enroll them over the course of a

3     year, maybe take two years to enroll them, and then

4     follow them for -- it would probably be -- they'd start

5     at the very beginning of puberty, and then -- so it

6     would be a six- to eight-year follow-up.

7               When the NIH does this, they do it with the

8     understanding -- and this is a great benefit to the

9     researchers -- that you can keep the patients who fund

10    you to do so.

11         Q     So the -- from the inception of the study

12    funded by the NIH grant to its completion, how long a

13    period of time are we talking?

14         A     Well, to do -- it could really be -- to get to

15    the same point that the Dutch were at -- remember, they

16    were at two to four years post 18.  So they were 20 to

17    22.  And our patients, to get to that point, would have

18    to be almost ten years from eight to 12.

19              You understand that a person who is

20    biologically female is more in a pubertal status of

21    starting on average between age ten to 12, whereas natal

22    or genetic males are more likely to be 12 to 14.

23         Q     So that particular study that the $6 million

24    NIH grant went to, we're years away from completing

25    that?

Page 15

1      A     Right.  And that amount of money is being

2     divided over four institutions.

3      Q     Okay.  Very good.

4            All right.  So apart from that -- the visiting

5     professorships you identified, your participation on the

6     project that won the $6 million NIH grant, what other

7     work have you done, even without compensation, since

8     your retirement two years ago?

9      A     Since I trained my -- since I trained many of

10    the people around the country who serve as directors of

11    programs like ours, I get a lot of phone calls.  And I

12    also get questions based on my experience from my

13    successors at Children's Hospital.

14     Q     And have you done any other writing besides

15    the -- for example, the grant application?

16     A     Yes.  But nowadays, I do it selectively.  So I

17    let my -- I let my trainees take the first officership

18    and I take the editing.

19            It suits their careers to be first office.

20     Q     Has anything been published that you are

21    author of or co-author of since you retired?

22     A     Yes.  There was just one review article on the

23    treatment of transgender youth.  And that was by Shumer,

24    S-h-u-m-e-r, and I.

25     Q     Do you know what publication that appeared in?

```
 1        A    I forgot.

 2        Q    And do you know the year or month and year?

 3        A    I believe that was published in this year.

 4        Q    In 2019?

 5        A    Yeah.  Earlier in the year.

 6        Q    Okay.  Do you currently do any work for any

 7   non-profit or charitable organizations, either in a

 8   formal relationship or in an informal relationship?

 9        A    Yes.

10        Q    Tell me about that.

11        A    In a sense, it's actually how I got my start

12   seeing the very first transgender patients that I ever

13   saw.

14             When I was training in adolescent medicines

15   from 1974, and then through my faculty status for at

16   least a decade, I used to -- I used to work for a

17   marvelous organization run by a wonderful nun named --

18   the organization is still thriving.  It's called Bridge

19   Over Troubled Waters.  And they ran a very elaborate van

20   set up to actually have a full medical treatment room.

21   And we would go travel around the city of Boston, not

22   far from where you were eating because the Boston Common

23   was one place we went.

24             We went to Harvard Square.  And we sometimes

25   went to what they call the Combat Zone.
```

Page 17

```
 1              But this is a organization that -- the van was

 2     a place to look at things medically.  But in point of

 3     fact, the major function of the van was to be a source

 4     of information to the street kids.

 5              The organization recognized that if they -- if

 6     a kid came off the -- a bus, came off the train, or

 7     whatever, and was looking for a place to stay, had no

 8     home or whatever, running away from home, we had X

 9     number of hours to latch on to that kid and be sure they

10     don't fall in more evil hands.

11              And so I've been on the board of the

12     organization.  They run a homeless shelter.  They run a

13     program for single mothers.  They recognize -- this is

14     interesting -- they recognized that a lot of kids

15     wouldn't go for jobs because they were too embarrassed

16     by their teeth or lack thereof.  And they set up an

17     entire dental clinic from Tufts dental school.

18              And they were doing every kind of dentistry.

19         Q    Are you still on that board of that

20     organization?

21         A    No.  I dropped off the board, but I maintain

22     my contacts.

23         Q    Do you volunteer for them or still provide any

24     assistance to them?

25         A    I provide medical advice to them, on the
```

Page 18

```
 1    larger picture.

 2         Q     And did this organization cater to or

 3    specialize in services to children who identified as

 4    LGBT or was this open to all kids that it encountered on

 5    the street?

 6         A     It was open to any kid who was on the streets.

 7    But I discovered, from talking to the people who do the

 8    demographics, that there was an overrepresentation of

 9    LGBT kids.  And they were, as they told me, not

10    run-aways, but they were throw-aways.

11         Q     Meaning?

12         A     That they were thrown out of their home

13    because of the sexual orientation.

14         Q     Any other organizations that you currently do

15    work -- or that you currently work with besides Bridge

16    Over Troubled Waters?

17         A     There's an organization -- actually

18    interesting, it's called Keshet, which is Hebrew for

19    rainbow.

20         Q     How do you spell Kesher?

21         A     Keshet is K-e-s-h-e-t.

22         Q     Oh, Keshet.

23         A     And it's interesting that the Jewish

24    federation in Boston has a division devoted specifically

25    for kids who are, in the rainbow sense, LGBT.  And I
```

Page 19

1    advise them.  I do a lot of local speaking gratis for
2    schools and religious organizations.
3         Q    Do you do any work either formally or
4    informally for the NCLR or National Center for Lesbian
5    Rights?
6         A    No.
7         Q    Have you ever?
8         A    No.  I have done -- in fact, I will soon, in a
9    couple months, do the second major talk for Parents and
10   Friends of Gays and Lesbians, which is a national
11   organization.  And I'll be doing a plenary address for
12   them in September in Asheville.
13        Q    In Asheville?
14        A    Yes.
15        Q    And have you spoken for that organization
16   before?
17        A    A long time ago.
18        Q    Okay.
19             What about, have you ever done any work with
20   or for an organization called Equality Florida?
21        A    No.
22        Q    What about The Trevor Project?
23        A    No.
24        Q    And Southern Poverty Law Center?
25        A    No.

Page 20

```
 1        Q    Have you ever testified as an expert witness
 2   before, either in written testimony or declaration or in
 3   a deposition or a trial or hearing?
 4        A    Yes.
 5        Q    How many times before?
 6        A    I think there was -- one particular case comes
 7   to mind.  An it was not in the realm of LGBT.
 8        Q    Okay.  And when was that case?
 9        A    I would say that it was probably 1970s.  And I
10   remember it vividly.
11        Q    Where was it geographically?
12        A    It was in Boston at the Boston family court.
13   And it was a case of a care and protection for a
14   12-year-old diabetic young man who family neglect was
15   causing him to be repeatedly admitted.
16        Q    And since then, have you done any kind of
17   expert testimony in court?
18        A    No.
19        Q    All right.  I want to talk about your
20   engagement as an expert in this case.  How did that come
21   about?
22        A    I'm trying to think of who contacted me first.
23   I think -- correct me if I'm wrong, but I think it
24   probably came from this office.
25        Q    Well, just testify to the best of your memory.
```

Page 21

1        A     Yeah.

2        Q     Unfortunately, Mr. Williams can't help you

3   answer.

4        A     Yeah.  I think it was through this office.

5   I'm not necessarily known in these parts.  And we don't

6   have a center in these parts.

7              It's possible that I was recommended by the

8   head of endocrinology at All Saints (sic) Children's in

9   St. Petersburg because we happen to be very good friends

10  and he's very senior.

11       Q     So at some point in time, you communicated

12  with someone here at this law firm?

13       A     Right.

14       Q     The Burr Forman law firm?

15       A     Right.

16       Q     Okay.  Who was the first person you spoke with

17  at this firm?

18       A     I believe it was Rob Williams.

19       Q     Mr. Williams that's sitting next to you there?

20       A     Yes.  I think, I'm virtually certain.

21  Although it's also possible that Shannon had

22  communicated with me about the situation.  Not a

23  specific case.  And it's possible that my answer to

24  Shannon was that I would be willing to be involved.

25       Q     And by Shannon, you mean Shannon Minter, the

```
                                               Page 22

 1    attorney for NCLR?

 2         A    Yes.

 3         Q    Who's also in the room with us today?

 4         A    Yes.

 5         Q    How did you know Shannon before, if you did?

 6         A    Well, I didn't know Shannon before, but I have

 7    subsequently found out that Shannon is very well known

 8    to attorneys in Boston -- do you know the organization

 9    GLAAD?

10         Q    I'm familiar with it.

11         A    Yes.  So the head of transgender services for

12    GLAAD is somebody I have had a close relationship to and

13    have advised and even -- well, I gave verbal testimony.

14    Not in a court.  It was actually in a -- it was actually

15    a joint committee of the main legislature.

16         Q    So is it possible that the first person you

17    spoke with about possibly being an expert in this case

18    was Shannon?

19         A    I'm not sure it would have been spoken.  It

20    would have been an email.

21         Q    Okay.  So is it possible the first

22    communication regarding your work in this case could

23    have been an email with Shannon?

24         A    Right.

25         Q    Okay.  And when was that?
```

Page 23

1          A     This is just a ballpark.  I would say

2     somewhere around four months ago, maybe.

3          Q     And do you still have any email communications

4     that you had with Shannon regarding the engagement?

5          A     I believe I do.  Not specifically about the

6     engagement but about -- I recall receiving a fascinating

7     email from one of my former trainees.  And it had to do

8     with new findings in transgender children, something you

9     should know about.  He said, this is hot off the press.

10    And I took Shannon's -- the email came to me and it had

11    a gigantic website.  And I forwarded it to Shannon.

12         Q     What email address do you use to communicate

13    with Shannon?  Or did you use to communicate with

14    Shannon?

15         A     I can't remember it.  But it was, I believe,

16    the name Shannon was in the email.

17         Q     Sorry.  Not Shannon.  Your email address --

18         A     Oh.

19         Q     -- that would get to you.  Sorry.

20         A     Okay.  So I have a typical Children's Hospital

21    address.  It's Norman.Spack@childrens.Harvard.edu.

22         Q     Is that your primary email address?

23         A     Yes.

24         Q     And even though you retired, would that be a

25    permanent email address that you're allowed to keep?

Page 24

```
1        A    You're allowed to.

2        Q    Do you communicate with any other email

3   accounts?

4        A    No.

5        Q    Okay.  All right.  As far as -- you said it

6   was about four months ago when you were engaged.  What

7   were you asked to do in this case?

8        A    Well, I'm not entirely sure that Shannon was

9   the one to be -- to tell me what was required.

10       Q    Okay.  Thank you for clarifying that.

11       A    It's quite possible that Shannon said they had

12  a case that was a municipal case.  And I think that

13  referred me to Rob.  And I think it was Rob who gave me

14  a more full picture of what's come out.

15       Q    And did Rob communicate that to you in

16  writing, through an email, or some kind of document?

17       A    No.  I think it was on the telephone.

18       Q    Okay.  And so going back to that assignment or

19  that request of you, what were you asked to do in

20  connection with this case?

21       A    Well, it was looking for -- he was looking for

22  an expert witness in an area that involved treatment of

23  youth, and particularly adolescents.  I guess my -- it's

24  possible that my CV is online, but one thing -- there

25  are two things that would make me an appropriate person,
```

Page 25

1    and that is -- there are very few people who have --

2    that were boarded in adolescent medicine and

3    endocrinology.

4        Q    By "boarded," you mean board certified?

5        A    Board certified.  Yep.

6             So it seemed that I would be an appropriate

7    person.  And on top of that, I had seen about 250

8    adolescents.  But early in the game, I volunteered to

9    take care of adults.  And I saw about an equal number of

10   adults.

11       Q    So understanding, generally speaking, you were

12   asked to be an expert witness.  Was there a specific

13   task or specific tasks you were asked to perform in

14   connection with the engagement?

15       A    You know, I think it was still somewhat vague.

16   I think it was -- there were some issues -- there were

17   some issues about who should take care of these

18   patients.  And I think I was asked for the approximate

19   date in which these things would come together.  And

20   that was more important to me than anything.

21            And then it was probable that in a subsequent

22   conversation it was clear that the issues had to do with

23   what we used to call reparative therapy or conversion

24   therapy.

25       Q    So understanding that the initial conversation

Page 26

1    or conversations may have been somewhat general, at some

2    point, did a specific, you know, list of items or

3    requests materialize so that you could, you know, then

4    proceed as the expert?

5         A    Well, I think that -- actually, all I had to

6    hear was that it was an issue of reparative or therapy.

7    Anything that related to aversive or reparative therapy,

8    I would be interested in.

9         Q    Let me back up a minute.  When you testified

10   before the main legislature --

11        A    Yeah.

12        Q    -- or maybe you said a committee of the

13   legislature.  Let me stop there.  Was it a committee of

14   the main legislature?

15        A    It was a committee of both sides.  So it was a

16   joint committee of the Senate and legislature.

17        Q    So both houses?

18        A    Both houses were represented.  But I would say

19   that the total number of sitting in that big horse shoe

20   must have been about 15 people.

21        Q    What was the subject matter of your testimony

22   there?

23        A    The subject matter of the testimony, it was a

24   question of bathroom use in a 12-year-old genetic male,

25   but an affirmed female, and an identical twin too, who

Page 27

```
 1    had been always accepted as a female at school, allowed

 2    to use the ladies room, et cetera.  And things changed

 3    when the child who transferred into the school had a

 4    grandfather -- told the grandfather the story and the

 5    grandfather started spying on the school.

 6            Anyhow, they changed -- they gave this girl a

 7    monitor to see that she wouldn't use the ladies room;

 8    only use the nurse's room.  I'll just get to the end, in

 9    that the head of GLAAD was testifying.  I was, the

10    father was.

11            Ultimately, the girl said we did as good a job

12    as we could have, but we failed.  And the only one who

13    could actually win the case would be her.

14       Q    So what specifically were you testifying about

15    before this committee?

16       A    We were testifying that it was appropriate for

17    her to use the bathroom.

18       Q    I see.

19       A    And they won the case.

20       Q    So let me now -- have you testified before any

21    other legislatures on GLBT (sic) issues?

22       A    Only once.  And it was before this.  There was

23    a bill before the Massachusetts legislature on the

24    rights of GLBT people (sic), and antidiscrimination law,

25    particularly with respect to housing, employment, and a
```

Page 28

1    number of other things.  It sat in committee for a long

2    time.  And then it ultimately passed.  I was one of the

3    panel that spoke to a joint committee of house and

4    senate.

5         Q    In favor of passage of the law?

6         A    In favor of passage, yeah.

7         Q    And have you ever testified before any

8    legislative body, either state, municipal, county,

9    regarding a therapy ban similar to Tampa's that we're

10   here about today?

11        A    No.

12        Q    And earlier, when you said -- you used the

13   term "reparative therapy."  Can you tell me what that

14   means to you when you use that word?

15        A    To me, it means the same as trying to get the

16   patient to return to living in their birth sex.

17        Q    And you also used the word "aversive" a moment

18   ago.  What does that mean?

19        A    Aversive means where the therapist actually

20   slaps the patient's hand.  It actually implies something

21   noxious.  Even at some point, these patients, years ago,

22   was subjected to electric convulsive shock.  So I would

23   define aversive as a painful and noxious treatment.

24        Q    And you, just now when you talk about

25   reparative therapy and aversive treatments, are you

Page 29

```
 1    speaking specifically in the context of children or
 2    persons who identify as transgender or identify as a
 3    gender other than their birth sex?
 4         A    Not really.
 5         Q    Okay.
 6         A    I mean, that's my interest.
 7         Q    Okay.
 8         A    And I don't claim to have this -- sure, I have
 9    experience with gay and lesbian kids.
10              But I also know that these therapies have been
11    applied to the gay and lesbian kids as well.
12         Q    Do you considered aversive therapies to be
13    unethical?
14         A    Yes.
15         Q    In all context or specifically in the context
16    of what you define as reparative therapy?
17         A    I can't think of anything that we could call
18    therapy that would be associated with painful -- painful
19    treatment.
20         Q    In what states are you licensed as a
21    physician?
22         A    Massachusetts.
23         Q    Any others?
24         A    No.
25         Q    And in the state of Massachusetts, is there a
```

Page 30

1   board or authority, governmental board or authority that

2   controls your licensure?

3        A    Yes.

4        Q    What is that board?

5        A    Massachusetts board of medicine.

6        Q    Do you know the makeup of that board in terms

7   of the credentials or qualifications of the board

8   members?

9        A    To be on the board?  I don't.  But I'm pretty

10  certain that some members of the board are not

11  themselves physicians.

12       Q    Is it your understanding that some or most of

13  the members would be physicians?

14       A    I would think so.

15       Q    Does that same board hear any complaints about

16  you or any other physician in the state of Massachusetts

17  for unethical practices?

18       A    Yeah.  That's -- it's my understanding that

19  they are the first to receive such complaints.

20       Q    And would it be your understanding that if a

21  complaint was made to that board about an aversive

22  treatment by a patient, that they would investigate that

23  and take that seriously?

24       A    They would, especially because -- and I just

25  found this out.  I would have -- that Massachusetts

Page 31

```
 1   would have been on the forefront of this.  But I just
 2   found out that prior to this year, in New England, all
 3   the states except Massachusetts and Maine had ordinances
 4   against reparative therapy or aversive therapy.  But
 5   this year, both Maine and Massachusetts have joined the
 6   other four.
 7        Q    Okay.  Prior to Massachusetts enacting some
 8   kind of statewide ban against reparative therapy, would
 9   it have been possible to submit a complaint to the
10   Massachusetts board of medicine regarding unethical
11   practices by a physician?
12        A    I would imagine so, and then they would have
13   had to run a case-any-case basis to decide.
14        Q    Getting back to your engagement in this case,
15   at some point were you given a specific list of tasks or
16   instructions for what was needed from you as an expert
17   witness?
18        A    Yes.  I have a notebook that's the size of
19   Robert Mueller's that contains numerous other people's
20   depositions and other comments.
21        Q    Was all that material provided to you?
22        A    Yes.
23        Q    By Mr. Williams' firm?
24        A    Yes.
25        Q    Okay.  Does it include a specific list of
```

Page 32

1    things for you to complete or services to provide?

2         A    No.  The only thing -- and it was quite

3    helpful because I had brought down from Boston, a huge

4    amount was directing what areas I would likely need to

5    focus on.

6         Q    And that directive, was that regarding

7    specifically your deposition today or the assignment in

8    general?

9         A    No.  I think my deposition today.

10        Q    I see.

11        A    And, yeah.

12        Q    Now, so far in this case, you have provided a

13   declaration.  Do you recall that?

14        A    Correct.

15        Q    And you're testifying here today.  Are there

16   other tasks yet to be completed in connection with your

17   engagement?

18        A    I don't think so.

19        Q    So --

20        A    There's one area that I think you should

21   know --

22        Q    Okay.  What's that?

23        A    -- because I think it will help you.  And that

24   is the issue of other physicians who have been

25   associated with, you might call reparative therapy.

Page 33

1            Are you aware of other physicians in Canada?

2       Q    What do you want me to know about physicians

3    in Canada?

4       A    Probably the most famous physician who has

5    been responsible for recommending a kind of coercive

6    therapy, i.e., telling parents to -- that if -- to limit

7    the child's toys and clothes, et cetera, to one room in

8    the house and not permit the child to take any of those

9    things outside the house.  In a way, I call this a kind

10   of coercive therapy.

11           And he's been head of the -- of the program at

12   the hospital of sick children -- adjacent to the

13   hospital of sick children in Toronto.  And he has -- I

14   just blocked on his name.  I just blocked on his name.

15      Q    You might remember it on a break or something

16   later.  That's fine.  Just...

17           MR. WILLIAMS:  I can't help you,

18       unfortunately, under the rules, so...

19           THE WITNESS:  It's blocked.

20           I've known him for 30 years.  There are some

21       things he's done that have been commendable with

22       treating adolescents.  But in treating children,

23       I've had several patients go to see him and come

24       back very depressed, very -- the child more dug in

25       than ever.

```
                                                     Page 34

 1   BY MR. GANNAM:

 2        Q    What condition are we talking about?

 3        A    We're talking about gender dysphoria --

 4        Q    Okay.

 5        A    -- in a child who is prepubertal, perhaps

 6   11 -- ten- or 11-year-old genetic male, affirming a

 7   female identity and having two other -- two brothers who

 8   initially were trying to do everything possible to get

 9   this child to act in a masculine way like they.

10             But they came -- the family came back from --

11   Ken Zucker is his name.  And the brothers went to the

12   parents and saw -- they said, he's totally depressed,

13   he's lying on the couch, he won't do anything.  And the

14   parents were about to do what Zucker had recommended

15   which was to give the child a birthday present, a

16   boy-type toy.  And the brothers suddenly changed their

17   mind.  They said, You can't do this, you've got to give

18   her a girl thing.  She'll just dissolve.

19             And then they went forward and treated her

20   like a girl, dressed as a girl.  Her progress has been

21   phenomenal.  And what happened was Zucker -- I think

22   what actually happened was there are so many parent

23   groups now of kids who have gender issues.  They talk to

24   each other.  And I believe it was the parents that

25   initially caused a review of his practices.  And he
```

Page 35

```
 1    actually lost his position.
 2        Q    Did you participate in any formal review of
 3    Dr. Zucker's practices?
 4        A    No.
 5        Q    Do you know why he lost his position, apart
 6    from what you've heard from others?
 7        A    I have.  It's interesting because I have a
 8    bill of particulars of what they -- what the reviewing
 9    committee in all of Canada had.  And it seemed that it
10    doesn't come to the conclusion of what should be done
11    with him, but it does indicate in what ways he needs to
12    improve the main standards.
13             And it appeared that one of the most
14    problematic area was that he seemed to be operating in a
15    vacuum, that he didn't bring in enough other specialists
16    like social workers and et cetera.  And it was quite
17    secretive what he was doing.
18             Now, it's important I tell you this because
19    I've been present at meetings where he speaks.  And
20    it's -- there's no -- he doesn't put any criticism or
21    typical debate.
22             And he is often -- if the you read the DSM5,
23    that Diagnosis and statistical manual of psychiatric
24    diseases, or the APA, American Psychological Association
25    standard of care, or the WPATH, the world professional
```

Page 36

1    association of transgender care, it's very likely that

2    what has been written as a standard of care of

3    transgender youth was written by him.  And so you better

4    be sure you're reading the most up-to-date thing because

5    a lot of the things that he wrote have been erased.  And

6    then nobody had the courage to say, we can't have his --

7    because he was basically codifying his approach.

8              Little kids don't necessarily know who they

9    are, so let's not allow them to live in a way they want

10   to.  The worst case scenario that maybe they'll turn out

11   gay and that's better than turning out trans.

12             That's how he would speak.

13        Q    Did the City of Tampa rely on any of

14   Dr. Zucker's work in connection with passing its

15   ordinance?

16        A    I think not.

17        Q    Do you know?

18        A    I don't know.

19        Q    Getting back to your engagement in this case,

20   let's start with your declaration, though.  What were

21   you asked to address in your declaration?

22        A    I was asked to address my opinion about a

23   therapy that convinces -- attempts to convince children

24   and adolescents to remain in or return to the sex and

25   behavior of the sex at birth.

Page 37

1        Q    And so apart from offering an opinion about

2   that, what else or other specific items were you asked

3   to address in your declaration?

4        A    I don't actually recall that I had -- that

5   there was another task.

6        Q    And is --

7        A    And, in fact, I don't think there was any

8   mention in that for gay and lesbian youth.

9        Q    Do you mean that your opinions are limited to

10  children who identify as transgender or gender --

11       A    Correct.

12       Q    And a note about terminology.  I see

13  transgender and the abbreviation TGNC for transgender,

14  gender nonconforming.

15            If I say TGNC, will you understand what I'm

16  talking about?

17       A    No.

18       Q    So that's not an abbreviation you use?

19       A    You know, all of these things can -- everybody

20  has -- I'll give you an example.  You might find some

21  literature, even the literature that I helped write the

22  standard of care from the endocrine society says

23  standard of care for treatment of transsexual.  Now, I

24  wouldn't write "transsexual" because that's the European

25  term, the broad-brush term for people who feel they're

Page 38

1   in the wrong body.

2           I remember when transgender meant you felt you

3   were in the wrong body.  But you didn't qualify as

4   transsexual unless you had surgery.  So I find

5   transgender to be sufficiently inclusive.

6       Q    And will you just define what you mean by the

7   word "transgender," then so, that we communicate clearly

8   the rest of the day?

9       A    Somebody who believes that their physical body

10  does not conform to this sense of self.

11      Q    And under that definition you just gave me, is

12  that an absolute?  Or are there degrees of those

13  feelings of not -- of physical body not being congruent

14  with how the person identifies themselves?

15      A    That's a good question.

16          MR. MIHET:  They're all good questions.

17          MR. GANNAM:  Stipulate.

18          THE WITNESS:  The point is, by the time they

19      get to me, I tend to see only those who are pretty

20      hardened in their feelings.  But I'm not with them

21      all the way.

22          Now, the one group that is not all the way who

23      I have seen, the very frustrating group, that's the

24      group that calls themselves gender queer, and I

25      call them gender fluid.

1           But either way, they don't want to see me.

2        It's the parents that want them to see me because

3        there is no medicinal treatment for them unless

4        they decide one way or the other.

5    BY MR. GANNAM:

6        Q    So can you tell me or maybe give me a

7    definition of the condition of a person who identifies

8    as gender queer or what you call gender fluid?

9        A    It's a person who doesn't commit to being

10   either male or female.  But that may take different --

11   manifest, for example, it could be someone who just sees

12   themselves somewhere in the spectrum and it changes from

13   day-to-day, and someone who sees themselves very much

14   male one day and very much female the next.

15       Q    Now, is gender queer or gender fluid itself a

16   gender identity?

17       A    It is, but it is as a term.

18       Q    What does that mean?

19       A    Well, because it gives you -- if you

20   describe -- otherwise you'd have a great difficulty

21   describing this person.

22           But if I say to you, this kid is gender fluid,

23   then you wouldn't have expectations of is the kid going

24   to strike you as a male or female.

25       Q    So suppose we were to categorize the different

Page 40

1    gender identities that at least are recognized in

2    medicine in your field, would it be accurate to say

3    there is male, there is female, and an in-between gender

4    fluid captures everything in between or does it only

5    capture some in between?

6         A    No.  If it's ill defined and especially

7    moving, a moving target, I would call it a form of

8    gender identity.

9         Q    Okay.

10        A    The thing I don't know, and I wouldn't be able

11   to tell you -- I don't know if I'll live long enough to

12   find out -- is how do these people end up?  Are they on

13   a path towards one or the other or not?

14        Q    Now, you said earlier that when a minor would

15   identify as gender fluid or gender queer presents to

16   you, there's not a medical treatment for them.  Can you

17   just explain what you mean by that?

18        A    Well, if they were certain they were to affirm

19   a male identity, then they would need to be testosterone

20   treated, unless they're making it by themselves.

21             If they affirm a female identity, they would

22   need to be estrogen treated, unless they already are

23   making estrogen themselves.

24             So many of the gender fluid kids take no

25   medications.

```
                                                    Page 41

 1          Q     Thank you.

 2                Now, getting back to your declaration that you

 3    prepared in this case, just so I'm clear, was there ever

 4    a document or set of instructions provided to you by

 5    Mr. Williams' firm that said, for example, make sure you

 6    address these five points or this one point in your

 7    declaration?

 8          A     I think the -- I think that is the case.

 9          Q     Okay.

10          A     Because I really didn't know what was going to

11    transpire here.

12          Q     And was that an email or some other kind of

13    document?

14          A     It may have been an email.  I think it

15    probably -- I mean, it would be too complicated for them

16    to telephone it.

17          Q     Certainly you needed something to tell you

18    what --

19          A     A template.

20          Q     -- you were writing; correct?

21          A     Right.

22          Q     And as you sit here, do you believe that your

23    declaration addressed what you were asked to write

24    about?

25          A     Yes.
```

Page 42

```
 1       Q    Was there anything you were asked to write
 2   about that you declined to write about for one reason or
 3   another?
 4       A    No.  But in fact, my first draft was really
 5   far too wordy.  And what it really was was a kind of
 6   autobiography of my life and the terms...
 7       Q    Is that the word Rob used, "too wordy"?  I'm
 8   kidding.
 9            Did anyone review earlier drafts of your
10   declaration besides this law firm?
11       A    No.
12       Q    Did you provide earlier drafts of your
13   declaration to anyone outside of this law firm?
14       A    No.
15       Q    Did you receive input regarding what should be
16   in your declaration from anyone besides this law firm?
17       A    No.
18            MR. WILLIAMS:  Off the record.
19            (Off the stenographic record.)
20   BY MR. GANNAM:
21       Q    So, back to your engagement here.  Apart from
22   preparing the declaration and testifying here today, has
23   your engagement involved any other work on your part?
24       A    Only reading Tommy Hart's --
25       Q    Let me ask you this, what did you do to
```

Page 43

```
 1   prepare for today specifically?  In other words, your
 2   declaration was written and submitted.  At some point,
 3   did you start preparing for your testimony today?
 4       A    Okay.  I'll make this brief.  And this was
 5   just yesterday, so this was a last-minute.  I read the
 6   ordinance.
 7       Q    The Tampa ordinance?
 8       A    Yes.
 9       Q    Okay.
10       A    I read my declaration.  I read -- I read
11   Dr. Hudson's narrative.  And I read -- because I thought
12   it was very well written, Dr. -- is it Glassman?
13       Q    Glassgold, maybe?
14            MR. WILLIAMS:  Glassgold.
15            THE WITNESS:  Glassgold.
16   BY MR. GANNAM:
17       Q    Anything else that you read?
18       A    No.
19       Q    And you said that this was yesterday that this
20   occurred?
21       A    Yep.
22       Q    And did you meet with anyone to prepare for
23   your testimony today?
24       A    Yes.  You gave us some extra time.  But
25   really, yesterday, we spent time.  But that was not so
```

Page 44

1      much a personal review.  It was more related to the

2      ordinance.  And I think that was really it.  That is --

3      yeah.

4           Q    Who did you meet with yesterday?

5           A    It's also possible that yesterday we read

6      the -- Kenneth Zucker, the -- the Kenneth Zucker review,

7      critical review.

8           Q    And who did you meet with yesterday?

9           A    With Rob, Shannon.

10          Q    Anyone else?

11          A    I don't think so.

12          Q    How long did you meet for?

13          A    I would say maybe three or four hours.  After

14     we went through the golf stories.

15          Q    Did you have any other in-person meetings

16     besides that meeting yesterday to prepare for your

17     deposition today?

18          A    No.

19          Q    Okay.  So we covered documents you reviewed

20     and who you met with.  All right.

21               Are you being compensated for your engagement

22     as an expert witness in this case?

23          A    I hope so.

24          Q    What is your understanding of the arrangement?

25          A    I understand that my expenses will be covered

Page 45

 1  coming down here, hotel, and that I would be compensated

 2  at what has been referred to as a municipal rate.

 3      Q    That makes me think lower than what you'd get

 4  anywhere else.  Does that sound about right?

 5      A    It is.

 6      Q    So you testified -- compensated for time spent

 7  doing what, exactly?

 8      A    Preparation, attendance at meeting -- the

 9  meeting unrelated to this one, and this deposition

10  meeting.

11      Q    And what is the rate that you're being

12  compensated at?  Do you know what that is?

13      A    I think I know what it is.  The non -- the

14  deposition rate I believe is $250 an hour.  And the

15  non-deposition work is half that.

16      Q    Are you offered any enhancement or additional

17  compensation based on the outcome of the case?

18      A    No.

19      Q    And to your understanding, who is paying your

20  compensation?

21      A    I assume this law firm is.

22      Q    Do you have any written agreement to that

23  effect?

24      A    No.

25      Q    All right.  Let's do this.  Should we take

Page 46

1   a -- let me just get something on the record first, make

2   the best use of our time here.  I'm handing you a

3   document that I'm marking as Exhibit 36, which for the

4   record is just a continuation of the numbering of

5   plaintiffs' exhibits.

6            (Exhibit 36 was marked.)

7   BY MR. GANNAM:

8        Q    Doctor, what I've handed you is titled

9   "Declaration of Norman Spack, MD," with a case style at

10  the top reading United States District Court for the

11  Middle District of Florida, Tampa Division, Robert L.

12  Vazzo, LMFT, versus City of Tampa, Case No.

13  8:17-cv-02896, et cetera.  Do you recognize this

14  document?

15       A    Yes.

16       Q    Is this the declaration that you prepared for

17  the City of Tampa as an expert witness in this case?

18       A    Yes.

19       Q    You had an opportunity to review this

20  yesterday; correct?

21       A    Yes.

22       Q    Is there -- is everything in this declaration

23  still accurate and truthful as we sit here today?

24       A    There's one slight error.

25       Q    Okay.  Please point that out.

Page 47

1      A     On my part.  Number nine, I've treated more

2   than 250 transgender children, not 140.

3      Q     You're talking about number nine on Roman

4   numeral one on page two?

5      A     Yes.  The very last line.

6      Q     Okay.  And that number that reads now says,

7   "I've treated more than 140 transgender children and

8   adolescents."  What should the number be?

9      A     250.

10      Q     Okay.  Do you know why you said 140 before?

11      A     I don't know.  I was -- I think my mind had

12   wandered to how many people the study had enrolled.

13      Q     Other than that change, are there any other

14   changes necessary to make the entire declaration

15   accurate?

16      A     Okay.

17      Q     Is that --

18      A     My CV.

19      Q     I'm not sure if my question and your answer

20   matched up.  So let me ask, just for the record.  Are

21   there any other changes that need to be made to the

22   declaration to make it entirely accurate?

23      A     I think not.

24      Q     Did anyone assist you in writing the

25   declaration, besides any assistance this law firm may

Page 48

1   have provided in formatting and things like that?

2        A    No.

3        Q    So is it fair to say all the content of the

4   written part came from you?

5        A    Yes.

6        Q    About how much time would you say it took you

7   to write the declaration?

8        A    Well, I talked with them after initial.  So

9   there was an initial, and then...

10            I would say that total together, I would say

11  it would probably have been about three hours.

12       Q    Have you done any additional research or

13  writing in connection with this expert engagement since

14  you submitted this declaration?

15       A    No.

16       Q    Do you intend to give any opinions in this

17  case that are not reflected in this declaration?

18       A    No.

19            MR. MIHET:  Good.

20            Just kidding.

21  BY MR. GANNAM:

22       Q    And I didn't -- it's probably just a

23  formality, but will you turn to page four of the

24  declaration?  The signature appears as Norman Spack.  Is

25  that your signature?

```
                                                    Page 49

  1        A    No.  I can't write that well.

  2        Q    Is that an electronic signature made on your

  3   behalf or that you effected yourself?

  4        A    No.  I believe it's electronic, and it was

  5   with my approval.

  6        Q    Okay.  Very good.

  7             All right.  Why don't we take a break now,

  8   maybe just a five-minute comfort break, and try to --

  9   are you okay with taking a little bit later lunch today,

 10   just so we can cover some --

 11             MR. WILLIAMS:  I'm okay, as long as Dr. Spack

 12        is.

 13             THE WITNESS:  I'm okay.

 14             MR. GANNAM:  All right.  We'll make this very

 15        quick, if that's all right with you.  And then

 16        we'll come back and get some more testimony.

 17             (A brief recess is had from 12:17 p.m. to

 18   12:44 p.m.)

 19   BY MR. GANNAM:

 20        Q    Dr. Spack, will you take a look again at your

 21   declaration that we marked as Exhibit 36.  And on the

 22   first page, I just want to look at numbered paragraph

 23   two.  You see that?

 24        A    Yep.

 25        Q    And first sentence says [as read]:  I have
```

Page 50

1    read the ordinance number 2017-47, an ordinance of the

2    City of Tampa, Florida, relating to conversion therapy

3    on patients who are minors.

4             Did I read that correctly?

5        A    Yep.

6        Q    And is that the ordinance that we've discussed

7    up to now in today's deposition?

8        A    Yes.

9        Q    And you go on to say, the next sentence -- I'm

10   sorry.  The continuation of the same sentence.  You read

11   [as read]:  And in my opinion, the ordinance is based

12   upon the evidence-based medical consensus regarding

13   appropriate treatment of transgender and

14   gender-nonconforming youth and the ordinance is

15   necessary to effectuate the City of Tampa's interest in

16   protecting vulnerable minors from the serious harms

17   caused by conversion therapy.

18             Did I read that correctly?

19       A    Yep.

20       Q    So just want to be clear for the record.  Your

21   opinion is offered only in connection with transgender

22   and gender-nonconforming youth and excludes

23   considerations specifically relating to gay and lesbian

24   and bisexual youth.  Would that be fair to say?

25       A    That was my understanding.

Page 51

1       Q    Okay.  Very good.

2            And when you use the term "conversion therapy"

3  in that sentence, what does that mean?

4       A    Some people would call it -- I'm trying to

5  think -- different names for this.  But in any case,

6  conversion therapy is a therapeutic approach to try to

7  induce and encourage patients who are minors, in this

8  case, to maintain or revert to their biologic sex, or

9  probably better to say a gender identity consistent with

10  the biologic sex.

11      Q    And in that sense, would that -- is that the

12  same definition, essentially, that you gave me earlier

13  for the term "reparative therapy"?

14      A    Yes.

15      Q    Okay.  Now, in the middle of that sentence,

16  appears the term "evidence-based medical consensus."

17  Can you explain what that term means?

18      A    Yes.  That there are medical writings that --

19  I'm trying to see how it's written.  Yeah.  There are

20  medical writings that state that the care of transgender

21  and gender-nonconforming youth is best accomplished in

22  methods consistent with the ordinance.

23      Q    Now, you've had an opportunity to read the

24  ordinance; correct?

25      A    Yeah.

Page 52

1        Q     And is it your belief that what the ordinance

2    prohibits is what you defined earlier as conversion

3    therapy?

4        A     I believe so.

5        Q     And do you have any understanding or belief as

6    to whether the ordinance prohibits more than what you

7    identified as conversion therapy?

8        A     It's possible that the ordinance deals with

9    gay and lesbian youth.  But it wasn't my purview.

10       Q     Okay.  Fair enough.

11             So specifically as it relates to transgender

12   and gender-nonconforming youth, do you have any belief

13   or understanding as to whether the ordinance prohibits

14   something in addition to or beyond what you earlier

15   defined as conversion therapy?

16       A     I don't think so.

17       Q     So this sentence where you said "the ordinance

18   is based upon the evidence-based medical consensus

19   regarding appropriate treatment of transgender and

20   gender-nonconforming youth," that is to the extent the

21   ordinance prohibits what you identified as conversion

22   therapy.  Would that be fair to say?

23       A     That's fair.

24       Q     Now, did you cite to any of the medical

25   writings that you said this evidence-based medical

Page 53

1    consensus is based on, in this declaration?

2        A    I believe there are a couple of -- it's hard

3    for me to remember which is in what reference.  But if

4    you look on page two, there are a number of references

5    in which I was a co-author.

6        Q    All right.  Are you referring to the footnote

7    denoted by the asterisk on page two?

8        A    Yeah.  Right.

9        Q    Okay.  And do all of the documents referenced

10   there have in common that you are an author or at least

11   co-author of the document?

12       A    I see that I am.

13       Q    Now, if I refer you to the numbered paragraph

14   five on page two where the asterisk appears about

15   halfway through the paragraph, following the sentence

16   [as read]:  I have published peer-reviewed articles on

17   the treatment of transgender people with a particular

18   emphasis on gender identity and youth.

19            Do you see that?

20       A    Yep.

21       Q    So does this footnote asterisk specifically

22   relate to that sentence?

23       A    They do.

24       Q    Okay.  Do these articles or documents

25   identified in that footnote, are those intended to be

Page 54

1    support for your statement in paragraph two that there

2    is an evidence-based medical consensus regarding

3    appropriate treatment of transgender and

4    gender-nonconforming youth?

5        A    Not all of these references.

6        Q    Okay.

7        A    But I believe that there is -- in at least

8    one, there is reference because when we write, we often

9    not only write about how to, but how not to.

10       Q    When you say "when we write," what are you

11   referring to?

12       A    When any of my colleagues -- these are all

13   people who are members of the Gender Management Service.

14   And it's interesting that especially around the time

15   that these were written, I just recall conversations

16   about, don't you think we should put something in about

17   what not to do.  And to some extent, that was a dart

18   pointed at Dr. Zucker.

19       Q    So of the references identified in footnote

20   asterisk, which of them would you offer as support for

21   the statement in paragraph two that the Tampa ordinance

22   is based upon evidence-based medical consensus regarding

23   appropriate treatment of transgender and

24   gender-nonconforming youth?

25       A    You know -- all right.  I'll give you an

Page 55

1    example.  The first one by Tishelman could well have it.

2             The second, by me, Clinical Crossroads.

3             Laura Edwards-Leeper and myself could have.

4        Q    Now, when you say "could," does that mean they

5    do support it or they might?

6        A    No.  I can't -- I can't recall which ones

7    because it would likely be a sentence or something that,

8    in fact, any of them could.

9        Q    So, as you sit here right now, can you

10   identify one of them that does?

11       A    I can't be sure.  They're several years old.

12   But if anything, that makes it more likely to be

13   included because this is when the gender clinic was --

14   this is reflecting our treatment in the gender clinic.

15   And we were very likely to put something in that

16   reflects -- reflects our feeling about reparative or

17   conversion therapy.

18       Q    So as I understand you, you're saying it might

19   or may even likely these articles may include -- strike

20   that question.

21            If I understand you correctly, you're saying

22   these references in the footnote asterisk may address

23   conversion and reparative therapy, but as you sit here

24   right now, you're not sure?

25       A    I'm not -- I'm pretty sure they include it.

Page 56

1    I'm not sure which one.

2         Q    And when you say -- do you have that same

3    level of confidence specifically regarding the statement

4    in paragraph two that the ordinance is based upon

5    evidence-based medical consensus regarding appropriate

6    treatment of transgender and gender-nonconforming youth?

7         A    I'm sorry.  Can you repeat that?

8              MR. GANNAM:  Can you read back my question?

9              (The Court Reporter is directed to read back

10   the previous question and/or answer.)

11             THE WITNESS:  Yes.

12   BY MR. GANNAM:

13        Q    Is there a reason why you didn't include a

14   citation to authorities in paragraph two?

15        A    I'm not sure that this -- I'm not sure that

16   it's fair to say that it doesn't include it.  It doesn't

17   include that any particular case.  But it takes into

18   account our opinion based on evidence-based consensus,

19   which means the articles would have some citation.

20        Q    Let me ask you this, do you agree with me that

21   paragraph two on the first page of your declaration

22   itself does not cite to a medical authority either in

23   the text or by footnote or some other reference?

24        A    All right.  I'm just...

25             MR. WILLIAMS:  You're referring to paragraph

Page 57

1          two on page one of his declaration?

2               MR. GANNAM:  Right.

3               THE WITNESS:  Well, I thought it would be -- I

4          think this is pretty straightforward.  It's one

5          thing for me to say I have read.  It's another

6          thing to say I have published.  And so the -- it

7          makes a stronger statement when you asterisk

8          something that leads to citations, all of which

9          include my name.  Number two doesn't -- would not

10         be considered a medical citation.

11    BY MR. GANNAM:

12         Q    Okay.  So I think you answered perhaps why

13    paragraph two doesn't include a reference.  My question

14    was actually that, do you agree with me that paragraph

15    two does not contain a reference to other medical

16    writings to support any of the propositions in that

17    paragraph?

18         A    Right.  That is correct.  However, when I did

19    not write anything in paragraph two, I knew that there

20    would be references coming in paragraph five.

21              And, in fact, in most medical journals, the

22    references don't even come to the very end of the

23    article.  I thought this would be more relevant to have

24    the references close on the same page as a relevant

25    point.

Page 58

1        Q    And just so I'm clear.  This declaration does

2    not include any kind of end notes or list of references

3    or bibliography or anything like that; correct?

4        A    Right.  Because otherwise, you wouldn't have

5    footnotes.

6        Q    Okay.  So apart from this footnote asterisk

7    that appears on page two referencing a sentence in

8    paragraph five, are there any other lists of references

9    provided in your declaration?

10       A    No.

11       Q    Numbered paragraph six on page two refers to a

12   clinical practice guideline attached as Exhibit B.

13            Do you see that?

14       A    Yes.  Okay.  There were three things, yeah.

15       Q    And if I flip to Exhibit B of your

16   declaration, which is approximately the last third,

17   maybe, of the packet that's in front of you, do I see

18   that guideline that you reference in paragraph six?

19       A    Exhibit B?

20            MR. WILLIAMS:  This one right here.  Let me

21        find it for you real quick.

22   BY MR. GANNAM:

23       Q    Yeah.  Rob can help you find it real quick.

24   That's not a problem.

25            MR. WILLIAMS:  Parenthetically, off the

Page 59

1          record.

2                    (Off the stenographic record.)

3     BY MR. GANNAM:

4          Q     All right.

5          A     Yes.

6          Q     So in Exhibit B, we see that [as read]:

7     Endocrine treatment of transsexual persons, an

8     independent society clinical practice guideline.

9                    Did I read that correctly?

10         A     Yes.

11         Q     And tell me your involvement in preparing this

12    document in Exhibit B.

13         A     As a member of the task force, I helped draft

14    and review drafts.  We had two full days of meeting in

15    New York.  And then the drafts were formulated.  We sent

16    our suggestions in.  You may not have seen an

17    evidence-based -- if you notice the -- first of all, if

18    you notice where the people came from, this was

19    international.

20                    Also, take a look at the circles next to many

21    of the statements.  It's interesting because it shows

22    how much we need to know.

23         Q     Can you give me a page reference where I can

24    see exactly where you're talking about?

25         A     I think a good page for it is 3133.  And look

Page 60

1    down at 4.0.

2        Q    All right.

3        A    So there are up to -- up to four circles and

4    have a cross inside.  And the degree to which -- the

5    degree to which the statement is borne -- meets the

6    title of -- meets the status of evidence basis.  Those

7    get the highest number.

8            And there was a person who -- certainly if

9    there's a -- two of them are crossed, and absolutely if

10   there are three or four, that's strong evidence basis.

11           When you see, for example, under 2.0, we

12   suggest deferring surgery until the individual is at

13   least 18 years old.  And that was only given one.  And

14   that's because we really aren't sure of what we should

15   recommend.

16       Q    Let me ask you, before getting into some of

17   those details.  You said that you participated in

18   drafting these guidelines; correct?

19       A    Right.

20       Q    And you participated in the process of

21   reviewing earlier drafts before this final guideline

22   came out?

23       A    Yes.

24       Q    And as the -- as this guideline exists, or

25   existed when it was published in its final form, were

Page 61

1   you in agreement with everything in it?

2        A    Yes.

3        Q    And okay.  And did you have an opportunity

4   during the drafting process to address any points that

5   you may not have agreed with or enter influence what was

6   in the final version?

7        A    Yes.  That's a good question.  There was --

8   God, it's been a while.

9             MR. WILLIAMS:  Finally, you stumbled into a

10        good question, Roger.

11             THE WITNESS:  No.  There was -- oh.  I

12        disagreed with them and I held back.  In 2.0, down

13        to 2.4, it says [as read]:  We suggest that

14        pubertal development of the desired opposite sex be

15        initiated at about age 16.

16             I won by having the term "at about age 16," in

17        part because I thought age 15 is often very

18        appropriate.

19             So that's my great contribution, is to get "at

20        about age 16".  There may be another something like

21        that.

22   BY MR. GANNAM:

23        Q    All right.  I can appreciate the distinction.

24             All right.  So now let me ask you to look at

25   page 3135.  And there's a section on the right column

Page 62

```
 1    that reads [as read]:  Method of development of

 2    evidence-based clinical practice guidelines.

 3              Do you see that?

 4    A    3135?

 5    Q    Yes.

 6    A    Yeah, okay.

 7    Q    And then about halfway down that column, maybe

 8    a little farther, there's a sentence that begins "in

 9    terms of the strength."

10              Do you see that?

11    A    Yep.

12    Q    All right.  I'm going to read a portion for

13    the record.  [as read]:  In terms of the strength of the

14    recommendation, strong recommendations use the phrase

15    "we recommend," and the number one, and weak

16    recommendations use the phrase "we suggest," and the

17    number two.  Cross-filled circles indicate the quality

18    of the evidence such that one cross denotes a very low

19    quality evidence, and that's a graphical one cross.  Two

20    crosses denotes low quality.  Three crosses denotes

21    moderate quality.  And four crosses denotes high

22    quality.

23              Have I read that correctly so far?

24    A    Yep.

25    Q    And then it continues [as read]:  The task
```

Page 63

1   force has confidence that persons who receive care

2   according to the strong recommendations will derive, on

3   average, more good than harm.

4           Did I read that correctly?

5       A   Yep.

6       Q   So does that sort of summarize what you

7   explained earlier about the significance of the cross

8   symbols and --

9       A   Yes.

10      Q   -- strength of the recommendations?

11      A   Yes.

12      Q   So for example now, turning back to on page

13  3133, for example, item 2.1.

14          Do you see that?

15      A   Yep.

16      Q   It says [as read]:  We recommend that

17  adolescents who fulfill eligibility and readiness

18  criteria for gender reassignment initially undergo

19  treatment to suppress pubertal development.

20          Did I read that correctly?

21      A   Um-hum.

22      Q   And it's assigned a one for strength of

23  recommendation, and one cross for quality of evidence;

24  correct?

25      A   Right.

Page 64

1      Q    And so to interpret that, I would say that 2.1

2    has a strong recommendation based on very low quality

3    evidence; correct?

4      A    Right.  And that's because no one had

5    carried -- carried it through yet.  You've got to look

6    at the date of this.

7      Q    And based on how that strong recommendation I

8    just read on 3135, that that means the task force had

9    confidence that persons who received care according to

10   that recommendation will derive, on average, more good

11   than harm; correct?

12     A    Yep.

13     Q    Now, that also means that there's a

14   possibility of some subset of the people who received

15   treatment, according to that recommendation, were

16   experiencing some degree of harm; correct?

17     A    It's hard for me to imagine -- are you talking

18   about harm during the course of treatment?

19     Q    Well, I'm referring to whatever the

20   explanation is on page 3135 that I read earlier where it

21   says [as read]:  The task force has confidence that

22   persons who receive care, according to the strong

23   recommendations, will derive, on average, more good than

24   harm.

25     A    Right.

Page 65

1     Q    So what does "harm" mean in that sentence?

2     A    I can give you one possible potential harm --

3     Q    Okay.

4     A    -- that we just didn't know the answer to, but

5  were concerned about.

6     Q    Okay.

7     A    We were concerned about the fact that if

8  you -- since most significant amount of your bone

9  density is acquired in puberty, that to shut puberty

10  down altogether might slow down bone density.  And the

11  potential harm would come later with perhaps more

12  reasonably fractured or end up with meeting a fall

13  causing a hip -- breaking a hip, et cetera.

14     Q    So at the time these guidelines came out in

15  2009, is it accurate to say that the -- there was a

16  perceived risk of harm of --

17          MR. WILLIAMS:  Lunch is here.

18  BY MR. GANNAM:

19     Q    -- the bone and density not developing because

20  you --

21     A    We stopped puberty.

22     Q    -- you stopped puberty.

23          Would it also be fair to say you couldn't

24  measure with a percentage, for example, how much more

25  likely that was to happen as a result of stopping

1  puberty?

2      A    No.  And one of the reasons for that is that

3  there was no way to be -- no one's ever done this

4  before.  So the issue was if they did have a slowing of

5  bone density, would they show catch-up as soon as they

6  started on estrogen?

7      Q    And so when I asked, were you able to assign a

8  percentage of the greater or increased likelihood of

9  this bone density not developing as a result of the

10 treatment, is your answer that, yes, you were able to

11 quantify that, or no, you were not able to quantify

12 that?

13     A    We were able to -- there is a method of

14 testing bone mineral density through a DEXA scanner.

15          And that was done all the time through this.

16     Q    I'm not sure that's the question I asked.  So

17 there is a method to test bone density?

18     A    Yes.

19     Q    And that has assigned some numerical value?

20     A    Yes.

21     Q    Okay.  My question is, At the commencement of

22 treatment, according to recommendation 2.1, were you

23 able to quantify the increased risk that the bone

24 density would be hindered or stopped as a result of the

25 treatment?

Page 67

1        A      We couldn't -- we couldn't predict.

2        Q      Okay.

3        A      We couldn't predict.

4               And I should say, it also fit into the

5    question of when to start.  Because if you started,

6    let's take a girl, a genetic female, if you started her

7    a little later on pubertal suppression, you might have

8    achieved a higher bone density at the time you start.

9    But there are other contravening issues with starting a

10   girl late because the average girl we see is -- we want

11   to see them at ten to 12, and they're coming in at 14,

12   which means how much can you -- how much womanhood can

13   you take away from them when they're already women.

14       Q      So there's a balancing of considerations when

15   you are setting out to stop or cease pubertal

16   development through --

17       A      Right.

18       Q      -- a medical intervention; correct?

19       A      Yes.  And I'll tell you one other thing.

20              One of the reasons we felt comfortable for

21   using -- and the Dutch felt comfortable of using this

22   pubertal suppression is because there is a -- we all in

23   endocrinology have dealt with usually girls, and usually

24   without tumors who are in this situation of precocious

25   puberty.  That is puberty that starts at three, four,

Page 68

1    five -- I mean, the whole nine yards.  And it used to be

2    an absolute mess because those girls end up looking

3    five, seven years older than they are.  And they

4    menstruate at kindergarten.  And because their growth

5    plates close early, they end up very short.

6            Now, the drug we use for pubertal suppression

7    has enabled them to go through a normal childhood.  The

8    drug is stopped at early puberty age.  They go into

9    normal menstrual cycles.  They become pregnant when

10   desired.  They become mothers.  It's one of the great

11   success stories.

12           But to extrapolate what happens to their

13   healthy bones, healthy because they had advancement in

14   their maturation process, has always been the question

15   of, yeah, but these girls we're starting are not

16   advanced bone age, bone to start with.

17       Q    Meaning the girls who had not experienced this

18   precautious puberty, as you called it?

19       A    Yep.

20       Q    Didn't start on the puberty blocking regime?

21       A    Right.

22       Q    Didn't have that benefit of the extra bone

23   development?

24       A    Right.  And nobody has ever done this before.

25       Q    I see.

```
                                               Page 69

 1           MR. WILLIAMS:  All right.  Lunch is here.  You

 2      guys call the shot on that, since you're asking the

 3      questions.

 4           MR. GANNAM:  Let me just see.

 5           (Off the stenographic record.)

 6  BY MR. GANNAM:

 7      Q    Let me get back to page one of the guideline,

 8  or it's actually 3132 is the journal page number.  At

 9  the summary of recommendations, 1.0, do you see that?

10  We're still on Exhibit B.  I'm sorry.  I didn't mean for

11  you to flip back to the...

12           The first page of the article itself.  There

13  you go.

14           Do you see the summary of recommendations at

15  the bottom?

16      A    Yep.

17      Q    All right.  Under diagnostic procedure, 1.1

18  [as read]:  We recommend that the diagnosis of gender

19  identity disorder, GID, be made by a mental health

20  professional, MHP.

21           Did I read that correctly?

22      A    Yep.

23      Q    Now, I think you alluded to this earlier, but

24  let me ask.  Is it accurate to say that these guidelines

25  apply to treatment that would occur after a child has
```

Page 70

1   already had some contact with a licensed mental health

2   provider and determined that there is gender identity

3   disorder or gender dysphoria or a condition that could

4   be helped by the treatment outlined in this guideline?

5   Is that an accurate statement?

6        A    I'm not sure.  I mean, the issue is that

7   the -- it could be the -- are you talking about there

8   has to be two people involved?

9        Q    Well, maybe you can just explain to me what

10  that means.

11       A    Because what I'm trying to say is that any,

12  any mental health professional who is experienced in

13  dealing with gender identity disorders needs to be the

14  person who assesses whether the kid is the real deal.

15       Q    Okay.  And so just for clarification, then,

16  you don't hold yourself out as a mental health

17  professional, do you?

18       A    No.  I wouldn't -- I wouldn't claim -- I'd put

19  my two cents in from talking to the kid.  But I would

20  make my -- our psychologists are the ones who do this

21  testing and make the -- a true judgment about these

22  kids.

23            But I don't -- it could be a social worker.

24  It could be a psychiatrist.  And somebody who's really

25  invested in this as an endeavor.

```
                                                    Page 71
 1       Q    So would it be fair to say you're an

 2   endocrinologist, generally speaking?

 3       A    Right.  Yes.

 4       Q    And so the treatments that are outlined in

 5   this guideline --

 6       A    Right.

 7       Q    -- are treatments that, generally speaking,

 8   would be administered after someone in the mental health

 9   field first sees the child?

10       A    Right.  Yes.

11       Q    Okay.  But that's not something -- you don't

12   make that initial determination.  The mental health

13   professional would make it; correct?

14       A    Right.

15       Q    And then one more statement.  And then we can

16   have some lunch.  Also on that same page, 1.2 -- I'm

17   sorry if you closed it up again.

18       A    Okay.

19       Q    1.2 reads [as read]:  Given the high rate of

20   remission of GID, after the onset of puberty, we

21   recommend against a complete social role change and

22   hormone treatment in prepubertal children with GID.

23            Did I read that correctly?

24       A    Yes.

25       Q    And that's a strong recommendation based on
```

Page 72

1   two crosses or low evidence; correct?

2       A    Right.  I think this has just come out in a

3   new form.

4       Q    Okay.  "This," meaning this guideline?

5       A    This guideline.  And I haven't seen it.  I was

6   not on the committee this time.  I think that it's

7   probably -- if you're looking for it, it's probably

8   still under Hembree.

9       Q    What's the year of the new guideline?

10      A    I think it would probably be either this year

11  or last year.

12      Q    Let me just ask you this, then, with that

13  clarification.  The assumption, given the high rate of

14  remission of GID after the onset of puberty, let me just

15  stop right there.  In 2019, is it still true that

16  there's a high rate of remission of GID after the onset

17  of puberty?

18      A    I'm sorry.  I want to be sure I...

19      Q    I'm on page 3132, item 1.2, bottom right of

20  the page.  Do you see where it says, "given the --

21      A    I do, yeah.

22      Q    So if I just stop with that assumption here

23  that given the high rate of remission of GID after the

24  onset of puberty, is it still a case in 2019 as we sit

25  here today, that there is a high rate of remission of

Page 73

1    GID after the onset of puberty?

2        A    The thing I'm having trouble with in the

3    statement is that you can read that statement as, you

4    know, after the onset of puberty, many of these kids

5    won't be transgender anymore.  Right?  That's not how I

6    read it, but I'm looking at the next section, do you...

7            Oh, okay.  I get it.  This is for untreated

8    people.

9        Q    Okay.  Explain that.  What do you mean by

10   that?

11       A    Okay.  So this is a description of kids who

12   may show cross-gender treatment, but that -- but unless

13   they really meet the treatment -- they're looking at

14   kids who have cross-gender behavior, but not so much as

15   to qualify as being transgender.

16       Q    I see.

17       A    Okay?  So they're saying -- it's saying,

18   therefore, hold the fort with prepubertal kids.

19       Q    So --

20       A    Because --

21       Q    Go ahead.

22       A    Because that some kids will act in a

23   prepubertal way, act in their birth sex later, but

24   they're not really the same.  And so what they're saying

25   here is don't encourage that kid to do a complete social

Page 74

```
 1   transition as a prepubertal kid because that kid may not
 2   turn out.  That's one of the -- one of the reasons for
 3   waiting until the beginning of puberty before making
 4   distinctions about how you present -- how your kid
 5   should present.
 6              But this may have changed in the
 7   recommendations because some of the people who have been
 8   involved in the recommendations are stronger believers
 9   in letting a kid present themselves whatever way they
10   want.
11        Q    And by social transition, do you mean, for
12   example, a biological boy, if he were to socially
13   transition, that means fully identifying as a girl --
14        A    Right.
15        Q    -- as a gender identity; correct?
16        A    Right.
17        Q    Okay.  And just so I read this correctly, in
18   1.2, we're talking about a group of children who have
19   experienced some gender dysphoria or have been diagnosed
20   as having gender identity disorder but have not
21   identified as the other gender.  Would that be a fair --
22        A    Well, they haven't -- their degree of
23   identification with the other gender is less.
24        Q    And but just reading this here, their degree
25   of identity with the other gender is less, but still
```

Page 75

1   enough for them to have been diagnosed with gender

2   identity disorder; correct?

3       A    Right.

4       Q    Okay.  So --

5       A    And if there's any reason why you have to have

6   incredibly skillful psychologists and testing

7   psychologists, it's over stuff like this.

8       Q    Meaning, you have to have an incredibly

9   skillful --

10      A    Someone who can follow this kid and see if the

11  kid conforms to those who really are going to change

12  their gender identity at post puberty and be treated

13  according to the protocol, or we're going to wait it out

14  and see what happens.

15      Q    Now, based on that statement, I want to ask a

16  follow-up.  Would a non-psychologist, let's say a person

17  with a high school diploma, for example, be able to make

18  that determination that you just described?

19      A    No.

20           MR. GANNAM:  Let's break for lunch.

21           (A luncheon recess is had from 1:30 p.m. to

22  2:04 p.m.)

23  BY MR. GANNAM:

24      Q    All right.  Are we back on?

25           All right, Dr. Spack.  Going back to your

Page 76

1    declaration, Exhibit 36, I want to ask you a few more

2    questions about it.  Can we look at page three and

3    numbered paragraph seven that begins "multiple

4    professional organizations."

5            Do you see that?

6    A    Yep.

7    Q    All right.  In that paragraph, it says [as

8    read]:  Multiple professional organizations have issued

9    evidence-based guidelines and standards of care for

10   treating transgender and nonconforming children and

11   adolescents.

12           Did I read that correctly?

13           Did I read that correctly, Dr. Spack?

14   A    Yes.

15   Q    Next, you write [as read]:  I am familiar with

16   these guidelines and standards which include the World

17   Professional Association for Transgender Health, the

18   American Psychological Association, the American

19   Psychiatric Associate, the American Medical Association,

20   and the Endocrine Society.

21           Did I read that correctly?

22   A    Yes.

23   Q    Now, these standards and guidelines of care

24   that you have identified in this paragraph, I want to

25   take them one by one.  Beginning with the last one, the

Page 77

1    Endocrine Society guidelines are the guidelines attached

2    to your declaration as Exhibit B; correct?

3         A    No.

4         Q    No.  What are the Endocrine Society

5    guidelines?

6         A    Well, it's ten years newer than that.

7         Q    What would be the date, then?

8         A    November -- it's actually 2018.

9         Q    Now, those guidelines are not attached to your

10   declaration; correct?

11        A    Right.  And I'm sorry about that.  I

12   thought -- I didn't realize that they had actually come

13   out.

14        Q    The World Professional Association for

15   Transgender Health, is that the same as WPATH?

16        A    Correct.

17        Q    And do you say WPATH to shorten that?  How do

18   you pronounce that?

19        A    That's what generally is said.

20        Q    WPATH.  Okay.  I'm going to show you a

21   document that I will mark as Exhibit 37.

22             (Exhibit 37 was marked.)

23   BY MR. GANNAM:

24        Q    This document has WPATH on the top left and on

25   the cover it says [as read]:  Standards of care for the

Page 78

1   health of transsexual, transgender, and

2   gender-nonconforming people.

3           Lower right along the edge, it reads "version

4   seven."  Did I say that correctly?

5       A    Um-hum.

6       Q    And when I open to the first page after that

7   cover, I see [as read]:  Copyright 2012, World

8   Professional Association for Transgender Health, WPATH.

9           Am I reading that correctly?

10      A    You are.  And I don't know what the frequency

11  of publication is to be able to -- do you know whether

12  this is most recent issue?

13      Q    Well, that was going to be my question for you

14  since you say in your declaration that you're familiar

15  with the guidelines and standards and you identified

16  World Professional Association for Transgender Health.

17  I wanted to ask you, are these the most current WPATH

18  standards of care?

19      A    Look, they don't usually come out that

20  frequently.

21      Q    Have you seen this version that I marked as

22  Exhibit 37?

23      A    I believe I have.

24          MR. MIHET:  Dr. Spack, would you be able to

25      speak up just a little bit?  I'm having a hard time

1     hearing you.

2          THE WITNESS:  All right.

3          MR. MIHET:  Thank you.

4          THE WITNESS:  All right.  Here we go.  Page

5     ten.

6   BY MR. GANNAM:

7     Q     Okay.  Is there something on page ten you

8   wanted me to look at?

9     A     Yeah.  I'm just looking at...

10    Q     Let me do this.  I can represent to you that

11  when I go to the WPATH website, this is the latest

12  version available to me, but it's not my testimony that

13  matters.  So I just -- my question is, Are you aware of

14  any later version than what is in front of you as

15  Exhibit 37?

16    A     I am not.

17    Q     What is the significance of WPATH in this

18  field that you practice in?

19          MR. WILLIAMS:  You mean the organization?

20  BY MR. GANNAM:

21    Q     The organization.

22    A     The organization is really mixed.  It does not

23  define itself by specialty or skill.  It is open to

24  people who are all manner of mental health professionals

25  and as well as endocrinologists, both pediatric and

Page 80

1    adult.  And even some surgeons.

2         Q    Is it a membership organization?

3         A    Yes.

4         Q    Are you a member?

5         A    Yes, actually.

6         Q    How long have you been a member?

7         A    I would say 15 years.

8         Q    As you sit here, can you tell me whether this

9    is the version you were referring to in paragraph seven

10   of your declaration?

11        A    Yes, I believe it is.

12        Q    Are you aware of anything -- strike that.

13             Will you look at page eight of this WPATH,

14   Doctor?  In the bottom paragraph, the fourth line down

15   is the word "often."

16             Do you see that?

17        A    [As read]:  Often with the help of

18   psychotherapy, some individuals integrate their trans-

19   or cross-gender feelings into the gender role they were

20   assigned at birth and do not feel the need to feminize

21   or masculinize.

22        Q    Those last three words were "masculinize their

23   body"; correct?

24        A    Correct.

25        Q    Is that still a true statement in 2019?

1      A    Well, knowing who these people are who wrote

2   it, I think that it's a mistake not to define the age

3   that they're talking about.

4      Q    All right.  What clarification would you add

5   to make that sentence true in your opinion?

6      A    Well, I would like it to say either -- and

7   this is the case in both adults and children.  See, I

8   read this and I look at this and I see the adults that

9   I've cared for.  Just a pure gut feeling, and a little

10  knowledge.

11         The two people who wrote -- the people who

12  wrote, who are in parentheses are all treaters of

13  adults.  Bockting...

14     Q    Meaning that the citation preceding this

15  sentence that reads [as read]:  Bockting & Goldberg,

16  Bockting and Lev?

17     A    Yes.

18     Q    Is that who you're referring to?

19     A    Yes.

20     Q    And you know their practices or that they are

21  practitioners?

22     A    Yeah.

23     Q    Okay.

24     A    And this distinguished practitioner.  But I

25  don't know that they've ever seen a kid.

Page 82

```
 1        Q    Now, you said, I believe a moment ago, that
 2    the statement would be true with respect to children and
 3    adults; correct?
 4        A    No, I didn't say that.
 5        Q    Okay.
 6        A    Or if I said it, I didn't mean it that way.
 7             What I think that -- I think that they should
 8    make clear who they're talking about.  And if they're
 9    talking about children and adults, say it.
10             MR. WILLIAMS:  "They," the authors of this
11        Exhibit 37?  Is that what you meant, Doctor?
12             THE WITNESS:  Yeah.
13    BY MR. GANNAM:
14        Q    Dr. Spack, who wrote these WPATH standards of
15    care?  Or do you know?
16        A    It'll say on front.
17        Q    So on page one --
18        A    Page one.
19        Q    -- has a listing beginning with the name Eli
20    Coleman; is that correct?
21        A    Right.
22        Q    Now, your name is not on this list?
23        A    No.
24        Q    Okay.  I see -- okay.  I'm not going to count,
25    but I see roughly 20 or so people --
```

Page 83

1      A     Right.

2      Q     -- maybe even 30?

3      A     Okay.  And I can --

4            MR. WILLIAMS:  It goes all the way from

5      Coleman down to Ken Zucker; right?  That whole list

6      of people?  Is that what you're talking about?

7            THE WITNESS:  Right.  And out of this, and I

8      know just about everybody here.  I see Peggy

9      Cohen-Kettenis.  These are following who I would

10     trust with this -- with comments about children or

11     adolescence, would be:  Peggy Cohen-Kettenis, Rob

12     Garofalo, Arlene Istar Lev, Heino Meyer-Bahlburg.

13     And I would delete Ken Zucker.

14   BY MR. GANNAM:

15     Q    Okay.  So understanding that this group of

16   people are listed as the authors here, going back to

17   page eight, the authors state -- let me read the whole

18   paragraph.  [As read]:  As the field matured, health

19   professionals recognized that while many individuals

20   need both hormone therapy and surgery to alleviate their

21   gender dysphoria, others need only one of these

22   treatment options and some need neither.

23          Did I read that correctly?

24     A    Yes.

25     Q    And then the next sentence reads [as read]:

Page 84

1    Often with the help of psychotherapy, some individuals

2    integrate their trans- or cross-gender feelings into the

3    gender role they were assigned at birth and do not feel

4    the need to feminize or masculinize their body.

5              Did I read that correctly?

6    A    Yes.

7    Q    My question is, Does that statement, beginning

8    with "often with the help of," apply to minors; that is,

9    persons under the age of 18?

10   A    I think -- well, depends what you call minors.

11   If I were talking about minors who have just reached

12   puberty, I would say that it does not.

13             It's certainly not with the kind of certitude

14   that is written here that was much more applicable to

15   adults.  And I'll tell you why.  And that is that the

16   about-to-be -- the early pubertal kid who has major

17   issues about gender identity, as puberty hits, they have

18   a profound panic.  My own philosophy about this is that

19   what happens is they've been told that when they got

20   through puberty, they wouldn't feel gender dysphoric

21   anymore.  And the fantasy that they're going to turn

22   into the other gender is not realized and they

23   decompensate.

24             But the adults, their bodies are essentially

25   finished.  And being finished, they feel they have more

Page 85

```
 1    choice.  Do you know what I mean?  My body's finished
 2    and, well, am I going to go through all this that's
 3    going to not do such a great job of having me look like
 4    a woman or like a man.  And I've seen it.  I mean, I've
 5    seen these -- they -- of course, they may be amendable,
 6    more amendable to psychotherapy because the
 7    psychotherapist is pointing out to them all the issues
 8    and problems and challenges and physical and maybe
 9    familial and everything else.
10              So I have trouble when I read somebody who
11    writes with this kind of certitude, knowing that the
12    kids I see are in terror.
13         Q    Well, let me ask you about --
14              MR. WILLIAMS:  What was that last word?
15         Terror?
16              THE WITNESS:  Yeah.
17              MR. WILLIAMS:  Oh.
18    BY MR. GANNAM:
19         Q    This statement on page eight, if it were
20    revised to leave off the first qualifier there "often,"
21    and I just began with the word "some," and I changed it
22    as follows:  Some prepubertal children integrate their
23    trans- or cross-gender feelings into the gender role
24    they were assigned at birth and do not feel the need to
25    feminize or masculinize their body.
```

Page 86

1          Would that be a true statement?

2          MR. WILLIAMS:  Object to the form of the

3      question as an improper hypothetical which assumes

4      speculative facts, frankly.

5          Go ahead and give an answer to the question,

6      if you can, Doctor.

7          THE WITNESS:  Well, "some," would apply to

8      anything.  But the way this is written is more like

9      "often."  And I would never write -- I could accept

10     it writing with "some."  But if they -- but I would

11     not accept it being included in "often."

12  BY MR. GANNAM:

13     Q    Understood.  Let me move on then and look at

14  something a little more specific.  Page 11 contains the

15  beginning of a section titled "differences between

16  children and adolescents with gender dysphoria."

17          Do you see that?

18     A    Yep.

19     Q    First sentence [as read]:  An important

20  difference between gender dysphoric children and

21  adolescents is in the proportion for whom dysphoria

22  persists into adulthood.  Gender dysphoria during

23  childhood does not inevitably continue into adulthood.

24          Let me stop there.  Have I read that

25  correctly?

Page 87

1         A    Yes.

2         Q    And do you agree with those two sentences so

3    far?

4         A    Yes.

5         Q    And just so we're clear, when this uses the

6    term "gender dysphoria," are we to understand that to

7    mean a disagreement or incongruency between the child's

8    biological sex and the child's gender identity or the

9    gender the child believes the child is closer to or

10   matches better?

11        A    I think it gets the statement across.

12        Q    So let me continue.  It says [as read]:

13   Rather, in follow-up studies of prepubertal children,

14   mainly boys, in parentheses, who were referred to

15   clinics for assessment of gender dysphoria, the

16   dysphoria persisted into adulthood for only six to

17   23 percent of children.

18             Did I read that correctly?

19        A    Yes.

20        Q    And then after the long citation -- or after

21   the citation -- actually, just go down to the sentence

22   begins "newer."  It says [as read]:  Newer studies, also

23   including girls, showed a 12 to 27 percent persistence

24   rate of gender dysphoria into adulthood.

25             Did I read that correctly?

Page 88

1        A      Yeah.

2        Q      Now, this document shows a date of 2012 on it.

3    Are you aware of any studies that alter these numbers

4    that are presented here as the range of boys and girls

5    whose gender dysphoria persists into adulthood?

6        A      No.  But I'm always -- and I don't disbelieve

7    the basic point here.  But I do want to point out that

8    sampling, in other words -- well, I trust

9    Cohen-Kettenis.

10              When I read Zucker, makes me wonder because

11   his patients are coming into a place that says

12   psychiatric clinic.

13              However, let's go -- let's go on because the

14   key thing is what they say about adolescents.

15       Q      Right.  Well let me read that, then, the next

16   paragraph begins [as read]:  In contrast, the

17   persistence of gender dysphoria into adulthood appears

18   to be much higher for adolescents.  No formal

19   prospective studies exist.

20              Did I read that correctly?

21       A      You did.  And I think that this -- pairing

22   these two makes perfect sense.

23       Q      "These two" meaning that first paragraph --

24       A      That first paragraph.

25       Q      -- and the two sentences I just read?

Page 89

1        A     Yes.  And it has some obligation.  Just the

2   fact that many of these kids won't persist doesn't mean

3   they don't need support or doesn't mean that if they are

4   very much compromised by, if not allowed to live in the

5   opposite role, even if it's temporary, it should be

6   allowed.

7        Q     So you're speaking of some ethic of client

8   determination or freedom here?

9        A     Right.

10       Q     Okay.

11       A     And what you see here, and this is really

12  important, why did the Dutch, why do we, why do all the

13  places around the world that are doing pubertal

14  suppression start with the first sign of puberty?  And

15  the reason for that is the data show that a kid who

16  holds on to the idea that he's in the wrong or she's in

17  the wrong body at puberty are almost definitely

18  transgender.

19       Q     Can I ask for your opinion on the second

20  sentence of that second paragraph that I just read "no

21  formal prospective studies exist."  Is that still the

22  case?

23       A     I would say that if anybody has that data, it

24  would be the group listed in the bottom.  And let me

25  just see.

Page 90

1      Q    The bottom of...

2      A    So you see, what they say is that -- now they

3    talk about -- see where it says [as read]:  However, in

4    follow-up study with 70 adolescents --

5      Q    Right.

6      A    -- who were diagnosed with gender dysphoria

7    and given pubertal suppression?  All continued with

8    actual sex reassignment.  In other words, they were

9    suppressed in puberty, but when they -- they all wanted

10    the hormones consistent with their new gender identity.

11      Q    And so there's a citation after that sentence

12    to de Vries, Steensma --

13      A    Right.

14      Q    -- Doreleijers.

15      A    This is the -- you're seeing the names of the

16    Dutch group, de Vries, the psychiatrist is head of the

17    group.  Steensma is a endocrinologist.  I don't know the

18    next one.  Cohen-Kettenis was the former leader of the

19    group.  She's now retired.

20      Q    So the statement in this 2012 document says

21    "no formal prospective studies exist."  And I believe

22    you're saying this Dutch group would be the people to

23    ask if that's still the case?

24      A    Right.

25      Q    But as you sit here, do you know the answer?

```
 1      A    And I kind of have a feeling, is that they got
 2   so involved in the pubertal suppression that they had no
 3   doubt that these kids -- these kids would not have been
 4   enrolled in their study if they didn't have the testing
 5   that showed they are -- they're transgender.  So I don't
 6   know why they put it this way.
 7      Q    But are you aware, personally, of any studies
 8   that exist or that came out after this statement that
 9   the authors of this document made, which is that no
10   formal prospective studies exist?
11      A    No.  And part of that is that it's really --
12   it's -- they could be such studies, but you have Zucker
13   who would be one of the authors.  And he was so eager to
14   treat that we don't really know what his patients were
15   like before treatment.
16      Q    So apart from speculating about Zucker, you're
17   not aware of any --
18      A    No.
19      Q    -- formal prospective studies; correct?
20      A    No.
21      Q    Am I correct?
22      A    I think so.
23      Q    Okay.  Thank you.
24           Let's -- the bottom of that page 11, it says
25   "as discussed in section four," do you see that?
```

```
                                                    Page 92

 1          A     Yep.

 2          Q     It says [as read]:  As discussed in section

 3     four and by Zucker and Lawrence, 2009, formal

 4     epidemiologic studies on gender dysphoria in children,

 5     adolescents, and adults are lacking.

 6               Do you agree with that statement?

 7          A     Yes.

 8          Q     And what does epidemiologic mean?

 9          A     Population studies.

10          Q     Great.  I'm going to show you a document I've

11     marked as Exhibit 38.

12               (Exhibit 38 was marked.)

13     BY MR. GANNAM:

14          Q     This document is from the American Psychiatric

15     Association.  The title is "a guide for working with

16     transgender and gender-nonconforming patients."

17               And what follows is sort of a table of

18     contents.  This is from a website.  I accessed it from

19     the American Psychiatric Association website.  And my

20     question for you is, Is this guide, at least as it's

21     laid out here, the American Psychiatric Association

22     guidelines to which you refer in paragraph seven of your

23     declaration?

24               MR. WILLIAMS:  Object to the form because

25          obviously Exhibit 38 is -- I don't know that he can
```

1      really answer your question, Roger, but...

2           THE WITNESS:  So the only question really that

3      you can ask with a document like this is, Does

4      this -- does this table of contents conform to what

5      you would expect of a document on the subject by

6      the American Psychiatric Association.

7  BY MR. GANNAM:

8      Q    Let me ask you this question:  You refer in

9  numbered paragraph seven on page three of your

10 declaration to various guidelines and standards of which

11 you specifically identified the American Psychiatric

12 Association; correct?

13     A    Right.

14     Q    So --

15     A    But I saw something a lot more than this.

16     Q    Okay.  And so is this a -- did the document

17 you saw, for example, have the same title as this

18 document, "a guide for working with transgender and

19 gender-nonconforming patients"?

20     A    Yes.  But you know when it says "view more"?

21     Q    Right.  Well, let me ask you next, then.  Does

22 this listing of contents, understanding this was printed

23 from a website where you could click on each of these

24 things and view more, does this listing of contents

25 correspond to the document that you were referring to in

Page 94

1    the -- in your declaration?

2         A     Yes.

3         Q     Okay.

4         A     If I were writing this for them, these are

5    the -- these are the headings I would --

6         Q     Let me ask you to look at the second to last

7    page of the document that I gave you where it says

8    "about the guide."

9         A     About the guide.

10        Q     Do you see that?

11              Under "disclaimer," the second paragraph, it

12   says [as read]:  Many experts have studied gender and

13   sexuality throughout their careers.  This toolkit

14   represents just one view of how to work with TGNC

15   patients, based largely on the WPATH standards of care.

16   Did I read that correctly?

17        A     Okay.  Yeah.

18        Q     Is that consistent with your understanding of

19   the American Psychiatric Association guideline you refer

20   to in your declaration?

21        A     It doesn't surprise me at all.

22        Q     Okay.  Understand, I haven't given you --

23        A     No, but...

24        Q     -- the entire document to work with.  But are

25   you aware of some other document besides what I've given

```
                                                        Page 95

 1    you the title and contents of in this Exhibit 38 by the

 2    American Psychiatric Association, that you're referring

 3    to in your declaration?

 4         A    No, I'm not.  And I was pleased to see the

 5    topics and less pleased to see the text.

 6         Q    Understood.

 7         A    It doesn't -- that doesn't surprise me with

 8    this organization.

 9         Q    Going to footnote asterisk in your

10    declaration, you identified in that footnote several

11    documents of which you are the author or co-author;

12    correct?

13         A    Yes.

14         Q    And you mentioned the first couple of them as

15    possibly containing some information relevant to your --

16    the contents of your declaration, generally speaking; is

17    that correct?  Actually, strike that.

18              I'm just going to show you the document.  This

19    is marked as Exhibit 39.

20              (Exhibit 39 was marked.)

21    BY MR. GANNAM:

22         Q    The title is "management of transgenderism" in

23    a publication from JAMAnetwork.com.  It says Norman P.

24    Spack, MD, discussant as the author.  Is this the same

25    document identified in footnote asterisk as Spack, NP,
```

Page 96

1   clinical crossroads, management of transgenderism, JAMA

2   2013-209?

3       A    Yes.

4       Q    Okay.  So this is a document you authored;

5   correct?

6       A    Yes.

7       Q    I wanted to ask you about the bold paragraph

8   at the top right appears to be some kind of abstract or

9   summary.  Would that be fair to say?

10      A    Yes.

11      Q    It talks about gender identity disorder, or in

12  parentheses, transgenderism to begin the paragraph.  Did

13  I read that correctly?

14      A    Yes.

15      Q    It says [as read]:  Gender identity disorder

16  (transgenderism) is poorly understood from both

17  mechanistic and clinical standpoints.  Awareness of the

18  condition appears to be increasing probably because of

19  greater societal acceptance and available hormonal

20  treatment.

21          Have I read that correctly so far?

22      A    Um-hum.

23      Q    Then it says [as read]:  Therapeutic options

24  include...

25          And it gives a listing of male to female and

Page 97

1    female to male therapeutic options; is that correct,

2    generally?

3        A    Right.

4        Q    I'm going to skip down towards the end, the

5    sentence begins "medical therapy."  Did I say that

6    correctly?  Or do you see that?

7        A    Yes.

8        Q    Now that sentence says [as read]:  Medical

9    therapy for both FTM, defined above as female to male,

10   and MTF, defined above as male to female, can be started

11   in early puberty, although long-term effects are not

12   known.

13            Did I read that correctly?

14       A    Yep.

15       Q    Now, where it says medical therapy, is that

16   referring generally to the listing of therapeutic

17   options that appeared before it?

18       A    Yes.

19       Q    And you wrote this -- or this was published in

20   2013.  Is the statement "although long-term effects are

21   not known" still a true statement?

22       A    Yes.

23       Q    All right.  I'm going to show you another

24   document now.  This, I will label Exhibit 40.

25            (Exhibit 40 was marked.)

Page 98

1    BY MR. GANNAM:

2         Q     Will you take a look at Exhibit 40 for me?

3    The title of this document is "serving transgender

4    youth, challenges, dilemmas, and clinical examples."

5              The main heading says "HHS public access,

6    author manuscript."

7              Below that, it says [as read]:  Published in

8    final edited form as professional psychology -- I guess

9    that would be research and practice, 2015.

10             Is this the document identified in your

11   declaration footnote, the first document there, as

12   Tishelman, A. C., Kaufman, R., Edwards-Leeper, L.,

13   Mandel F. H. --

14        A     Yes.

15        Q     -- Shumer, D. H., and Spack, N. P., 2015?

16        A     Yes.

17        Q     Yes.  Thank you.  So this is a document you

18   co-authored; correct?

19        A     Correct.

20        Q     Will you look at page four, please?  The first

21   paragraph, the last sentence begins members of the GeMS

22   team.

23             Do you see that?

24        A     Page four?

25        Q     Yes.

Page 99

1        A     First paragraph.

2        Q     Last sentence of the first paragraph.

3        A     Okay.

4        Q     First of all, what is GeMS?

5        A     Gender Management Service.   That is the name

6    of our clinic where we see kids in gender --

7        Q     In Boston?

8        A     Yeah.   Boston Children's.

9        Q     All right.   So members of -- do you say GeMS?

10   Is that how you pronounce it?

11       A     Yeah.

12       Q     Okay.   So members of the GeMS team have played

13   a role in the development of standards and guidelines,

14   including as a member of the active APA task force to

15   develop guidelines for psychological practice with

16   transgender and gender-nonconforming clients.   Did I

17   read that correctly?

18       A     Yes.

19       Q     Now, did you personally participate on that

20   APA task force?

21       A     No.

22       Q     Are you aware of that task force and the

23   document that it was bearing?

24       A     Yes.   And I'll tell you why.

25       Q     Okay.

1      A    We benefited from -- you can see the names of

2  the Dutch up above who gave us their testing materials

3  to determine gender -- gender identity and gender

4  dysphoria.  And we had it translated from the Dutch.

5  But we needed to be able to -- we got permission from

6  the Dutch that the task force was literally translating

7  and establishing something that we could pass around to

8  all these new 70 clinics.

9      Q    I see.  We'll come back to those APA

10 guidelines.  I want to ask you a few more questions

11 about this document.

12          Will you look at page seven?

13          MR. WILLIAMS:  Page seven.

14          THE WITNESS:  Yep.

15 BY MR. GANNAM:

16     Q    Under the heading "medical intervention," do

17 you see that?

18     A    Yes.

19     Q    The second paragraph under that heading, the

20 last sentence begins with the word "nevertheless."

21          Do you see that?

22     A    Okay.

23     Q    It says [as read]:  Nevertheless, an

24 adolescent who has initiated puberty blockers can decide

25 to terminate the intervention and allow physiological

Page 101

1    changes to occur as they would have had the medical

2    intervention never been initiated.

3              Did I read that correctly?

4       A    Yes.

5       Q    Now, just for the record, puberty blockers, is

6    that what we've already discussed as drugs that can be

7    administered to a child to stop the progression of

8    puberty?

9       A    Yes.

10      Q    And this statement seems to be claiming that

11   puberty blockers can be administered, but then stopped,

12   and then --

13      A     It's completely reversible.

14      Q     Meaning puberty will begin where it left off,

15   so to speak?

16      A     Exactly.

17      Q     Okay.  Now, is there any study or research

18   pointing to what harms may occur in a person who delays

19   puberty such that they take puberty blockers and then

20   stop puberty blockers and recommence puberty, but at an

21   older age than they otherwise would have or then their

22   peers went through puberty?

23      A     It would only be an issue if the -- if they

24   were on them all the way through puberty and stopped

25   them close to a time of desired fertility.  Because when

Page 102

1    you're on them, they're shutting down the whole system.

2         Q    What do you mean "the whole system"?

3         A    The whole system that leads to

4    spermatogenesis, leading to testosterone production.

5    And in the case -- in our usual case, that genetic male

6    who affirms a female identity, around age 17 and 18, is

7    going to want to have what I call a feminizing

8    genitoplasty.  In other words, female external genitals.

9              In the course of doing that, the testes are

10   removed.

11        Q    Which is an irreversible --

12        A    It's as irreversible as it gets.  But the

13   point is, it's -- so the issue for us in this regard is

14   usually moot because the patients are told well ahead of

15   time, if you go this far, they're going to have to do

16   a -- remove the testes.

17        Q    So would it be accurate to say the effects of

18   puberty blockers are reversible up to a point in time

19   after which they no longer would be reversible?

20        A    Well, they would be -- believe it or not,

21   they -- your ability to generate the hormone that you're

22   blocking will still be there.

23        Q    Okay.

24        A    Okay?  The point is that if someone besides,

25   well, I'm not sure I want to have feminizing

Page 103

1   genitoplasty, but please keep the blocker going so I

2   don't have to shave and I don't this or that, and then

3   decided at some point wanted to procreate, given a few

4   years, all spermatogenesis would reoccur.

5       Q    So in that sense, it's reversible in that

6   those biological processes will kick in again?

7       A    Right.

8       Q    Okay.  Next paragraph on the same page seven

9   reads [as read]:  Only with an older adolescent,

10  typically around age 16, are irreversible interventions

11  initiated, and only after psychotherapy and a careful

12  psychological evaluation has taken place.

13          Did I read that correctly?

14      A    Yes.

15      Q    Can you kind of summarize for me, what are the

16  irreversible interventions that could be initiated

17  around age 16?

18      A    So I'm trying to see if they're referring to

19  males or females; right?  It looks like they are.

20          So, they're talking about the institution of

21  the actual hormones of the affirmed gender.  Okay?  And

22  once you do that, you get breasts whether you want them

23  or not.  You get body hair, you get larynx.  You get

24  lower voice if you get testosterone.

25      Q    Did you just describe some examples from both

Page 104

1    sexes?

2         A    From both, yeah.

3         Q    Okay.

4         A    And so it's going to happen.  And that's why

5    we test them before we -- because this is the first time

6    that we, at around age 15, 16, the first time that we do

7    give irreversible treatment.

8         Q    So within the standards or guidelines of

9    practice that you operate under, there is a -- a range

10   of ages under 18, you say around 16 here, at which a

11   minor can elect to kind of cross that threshold of

12   irreversible treatment, beginning with cross-sex

13   hormones.  Is that --

14        A    Yeah.  I would say it's 15 to 16.

15        Q    Okay.

16        A    Would be the case.

17             And 18 is a timing of surgery, if desired.

18        Q    Now, is that a -- is 18 an absolute?  Or are

19   there situations where persons under the age of 18 may

20   elect and proceed with surgical interventions?

21        A    Yes.  You raise an interesting point.  We used

22   to say 18 because that was a legal age of consent.

23   However, the surgeons have told us that the worst

24   outcomes that they have in feminized genitoplasty where

25   the patients have to use dilation for four or five times

Page 105

1    a day for a year that we, in the past, were sending

2    girls to the surgeons during the summer before their

3    going off to college, if 18.

4             They tell us that the worst results they have

5    are with them because the first year requires strict

6    adherence to the dilation protocol.  They can't do it at

7    school and they don't.

8        Q    Can you, just for the record, explain what

9    you're talking about, about the dilation protocol for --

10       A    Well, they create a new vagina, and believe it

11   or not, using inverted scrotal tissue.

12       Q    This would be in a male to female --

13       A    A male to a female.

14       Q    -- surgery.

15       A    Right.

16       Q    Okay.

17       A    So that tissue needs to be expanded to be

18   functional, for them to be sexually functional.

19            And it works.  But unless the initial dilation

20   after the surgery is required to keep the patent.

21       Q    What does that dilation involve?  Is it

22   something that would have to be --

23       A    It looks a lot like a vibrator really.

24            They may have a series of gradations of size.

25   But they have to do it.  If they don't do it, what

Page 106

1    happens is they go back to the doctor, the spring after

2    their operation, and the doctor finds he can't get the

3    dilator in, in which case, he has to do another surgery

4    to cut a slit in the upper part of the vaginal wall.

5    And it's a mess.

6            So we've kind of shifted and said, Okay, a

7    girl has to be in her mother's territory for the first

8    year after surgery, because the mother can make sure

9    that the girl does the dilatation.  Otherwise, the girl

10   goes off to school, is so happy to be free, this or

11   that, and doesn't do it.

12       Q    And can you articulate a reason why the -- why

13   a child or adolescent, I guess, who has undergone this

14   surgery might not continue with the dilation?  Is it

15   laziness?  Is it painful?  What is that?

16       A    It's laziness.  It's the fact that you have to

17   be -- first of all, if you go to college, they have to

18   have a single room.  They have to dilate on their bed.

19   You can't share a room with someone doing that.

20           Secondly, their classes are so much farther

21   from their dorm to do four or five dilations a day.

22   It's just physically impossible.

23       Q    I see.  On page eight --

24           MR. WILLIAMS:  We're still on Exhibit 39?  40.

25           MR. GANNAM:  40, actually.

Page 107

1    BY MR. GANNAM:

2        Q    I'll just read the whole paragraph.  The

3    second -- or the first full paragraph --

4        A    What page?

5        Q    Page eight.  Begins "a common scenario."

6        A    Okay.

7        Q    [As read]:  A common scenario for GeMS to

8    recommend puberty blockers -- strike that.  Let me start

9    over.

10            [As read]:  A common scenario is for GeMS to

11    recommend puberty blockers when the youth and/or the

12    parent may feel that it would be best to start cross-sex

13    hormone therapy instead.  The delay of puberty, rather

14    than the immediate onset of the puberty of choice,

15    (utilizing cross-sex hormones) is sometimes difficult

16    for the youth or family to accept.  This is an area

17    where we currently have little research to guide us and

18    the decision of whether to block puberty or instead move

19    forward with an affirmed gender, i.e., cross-sex

20    hormones, must be weighed carefully.

21            Did I read that correctly?

22        A    Yeah.

23        Q    Is that still a true statement that this is an

24    area where we currently have little research to guide

25    us?

Page 108

1      A    Because very few people should, would, or

2  should do it this way.

3           And the reason is that, say, you're dealing

4  with a genetic female.  And they want to go right

5  forward into a male puberty -- into a male puberty.

6  Okay?  If you don't block them while you're doing it,

7  there's going to be menstruating.  They have to

8  understand that she's going to be menstruating like a

9  female, she's going to get progressively large breasts

10 that may require a more complex operation.  And it's why

11 my way of doing things and most of the people follow me

12 is that I run the blockade medicine all the way until

13 the gonads come out.  So therefore, the person who's

14 male to female has no masculinization, but at age 15 is

15 getting feminization.  So there's a person who comes out

16 looking perfectly female in the end because they don't

17 have any male characteristics while they're going

18 through a feminine puberty.

19          So, you know, if I had a situation like this,

20 I would say forget it.

21     Q    So the statement that "we currently have

22 little research to guide us" refers specifically to that

23 decision of whether to simply block puberty or move

24 ahead with cross-sex hormones?

25     A    Yeah.  I remember seeing this and I said,

```
                                                    Page 109
 1    well, I understand that you could put it in there

 2    because unfortunately, a lot of people can't afford the

 3    blocking hormones.  And we've got to do something.  So

 4    this is what we do, is to give them the hormones they

 5    desire.  They get some of those characteristics.  But

 6    it's not ideal.

 7         Q    Now, the last sentence reads [as read]:  Aside

 8    from the irreversible nature of cross-sex hormone

 9    initiation, this intervention has significant

10    ramifications for fertility while puberty blockers do

11    not.

12              Did I read that correctly?

13         A    Yes.  For example, you have a -- you give

14    excess or masculinizing testosterone levels to a genetic

15    female, you're going to end up making her what we call

16    polycystic ovary disease.  She's going to have big cysts

17    in the ovaries.  She's going to have trouble conceiving.

18              Ironically, the just shutting down puberty

19    just lift it up when you want to...

20         Q    Will you look at page 11, please?  The heading

21    reads "the service gaps and evolution of practice."

22              Did I read that correctly?

23         A    Yeah.

24         Q    Now, this reads [as read]:  Watching the

25    clinical services grow is rewarding, especially when
```

Page 110

1    they translate into more contented and peaceful lives

2    for youth and their families.  Nevertheless,

3    evidence-based practices are aspirational when a new

4    field emerges with no guiding clinical precedent.

5    Controversies among providers in the mental health and

6    medical fields are abundant.

7            Did I read that correctly?

8        A    Yes.

9        Q    Okay.  Now, the next sentence reads [as read]:

10   Drescher & Byne, 2012, and Stein, 2012, provide

11   excellent discussions of issues of consensus versus

12   continued controversies.  These include differing

13   assumptions regarding whether early intervention with

14   gender variant youth can encourage the assistance, and

15   whether that is an appropriate practice.

16           Did I read that correctly?

17       A    Yep.

18       Q    It continues [as read]:  Other areas of debate

19   include the age at which children or adolescents should

20   be encouraged or permitted to socially transition,

21   whether cross-sex hormones and surgery should be offered

22   to youth, and if so, at what age, whether parental

23   consent be required for these medical interventions, and

24   whether mental health involvement be required including

25   psychological evaluation prior to each stage of medical

Page 111

1    intervention.

2              Did I read that correctly?

3         A    Yes.

4         Q    [As read]:  These issues are complex and

5    providers in the field continue to be at odds in their

6    efforts to work in the best interest of the youth they

7    serve.

8              Did I read that correctly?

9         A    Yes.

10        Q    And this is a 2015 document.  Is it still the

11   case that these complex issues of disagreement continue?

12        A    Yes.  But, you know, I would like to make one

13   point.  This is why we're a team.  This is why every

14   patient is discussed before they're in the clinic

15   they're going to come in at, and everyone has a role

16   about how the patient feels about this and helps to make

17   these complex decisions.

18              There are also a reason why we're here today,

19   in part, because of alternative ways of going at this

20   issue, albeit it somewhat of an early issue.  Who knows.

21   This is what I -- I can worry about this because I think

22   in time we can get the right answers to it.

23              But I can't worry for my patients who's seeing

24   somebody who may have a theological basis for how

25   they're going to treat the patient, or where I worry

1    whether the person who is benefiting the most is the

2    patient or the clinician.  And these are tough-enough

3    issues, even when you have all the tools.

4            The people on my team can handle these

5    decisions with this stuff.

6        Q    The next paragraph begins "an important

7    priority."

8            Do you see that?

9        A    Yep.

10       Q    [As read]:  An important priority.  Going

11   forward is to develop research to enhance our

12   understanding of what typifies this population of

13   children and their developmental course and patterns and

14   to examine the long-term outcomes of treatment.

15           Did I read that correctly?

16       A    Yes.

17       Q    [As read]:  The field needs to better

18   comprehend which children are most likely to have a

19   lifelong and persistent identification with a different

20   gender than the one they were assigned versus those who

21   cease to self identify as transgender over the course of

22   time.

23           Did I read that correctly?

24       A    Yes.

25       Q    [As read]:  Although some information is

                                                    Page 113

 1    available -- there's a parenthetical with several

 2    sources listed -- much more research in this area is

 3    needed.

 4              Did I read that correctly?

 5         A    Yes.

 6         Q    Is that still a true statement, that much more

 7    research in this area is needed?

 8         A    Yes.  But what you're reading is the marching

 9    orders of why we would grant.

10         Q    Okay.  You're talking about the $6 million NIH

11    grant that was awarded?

12         A    Right.

13         Q    All right.  I'm going to show you a document

14    I've marked as Exhibit 41.

15              (Exhibit 41 was marked.)

16    BY MR. GANNAM:

17         Q    All right.  This document is titled "practice

18    parameter on gay, lesbian, or bisexual sexual

19    orientation, gender nonconformity, and gender

20    discordance in children and adolescence."

21              At the top is a filing header from this

22    lawsuit reading case 8:17-cv-02896, document 24-4, filed

23    January 12, 2018.

24              And I'll represent to you that this is a

25    document filed in this lawsuit by the City of Tampa as

Page 114

```
 1   one of the documents referenced in its ordinance.  Have
 2   you seen this document before?
 3        A    No.  Who is the author?
 4        Q    The American Academy of Child & Adolescent
 5   Psychiatry, AACAP.
 6        A    Without listing any --
 7        Q    I'm sorry?
 8        A    Without listing any particular individuals?
 9   This is like a -- this is a -- is this like a, say,
10   statement by...
11        Q    Well, if you look on page 971 towards -- 971
12   using the page numbering at the bottom of the pages.
13             MR. WILLIAMS:  Excuse me.  Just a second so I
14        can catch up.  Okay.
15   BY MR. GANNAM:
16        Q    You see where it says "parameter limitations"?
17        A    Okay.
18        Q    And then below that is a box, a gray box,
19   "this practice parameter was developed by"?
20        A    Okay.  It's like attachments.
21        Q    Correct.  So are you familiar with this
22   document?
23        A    No.
24        Q    You're not?  Okay.  Fair enough.  I'll move
25   on, then.  All right.  Now I'm going to show you a
```

Page 115

1    document previously marked as Exhibit 33 when we had the

2    deposition of Dr. Glassgold.  And it's an APA document,

3    "guidelines for psychological practice with transgender

4    and gender-nonconforming people."

5              (Off the stenographic record.)

6              MR. WILLIAMS:  I can't tell.  Is that the '09

7         document?

8              MR. GANNAM:  This is the 2015 APA document.

9              MR. WILLIAMS:  Oh, the 2015.  Okay.

10             MR. GANNAM:  For the record, it was filed in

11        this case at document 135-1.

12             (Exhibit 33 was marked in a previous

13   deposition.)

14   BY MR. GANNAM:

15        Q    Now, do you recall when I asked you about your

16   article that referred to GeMS team members participating

17   on the APA task force on the development of guidelines

18   for psychological practice with transgender and

19   gender-nonconforming people?

20        A    So you're looking at number 33?

21        Q    Yeah.  Let me ask you -- let me back up.

22             Will you look at document 40 again, which is

23   your article and the HHS public access page.  And go to

24   page four of Exhibit 40.  And on page four, the first

25   paragraph, last sentence --

```
                                                    Page 116

 1              MR. WILLIAMS:  Page four?

 2              MR. GANNAM:  -- of page four of document 40.

 3              MR. WILLIAMS:  Oh, this one.  Okay.

 4    BY MR. GANNAM:

 5        Q    I think you're on the right document.

 6              The last sentence of the first paragraph reads

 7    "members of the GeMS team."

 8              Do you see that?

 9        A    I'm sorry, what page?

10              MR. GANNAM:  May I point to it, Rob?

11              MR. WILLIAMS:  Sure.

12    BY MR. GANNAM:

13        Q    We're on page four.  And this, "members of the

14    GeMS team."

15              Do you see that?

16        A    Okay.

17        Q    It reads [as read]:  Members of the GeMS team

18    have played a role in the development of standards and

19    guidelines, including as a member of the active APA task

20    force to develop guidelines for psychological practice

21    with transgender and gender-nonconforming clients.

22              Did I read that correctly?

23              Dr. Spack, did I read that correctly?

24        A    Yep.

25        Q    Now, this document that I handed you just a
```

                                                        Page 117

1    moment ago marked Exhibit 33, is that the document being

2    referred to that your GeMS team played a part in?

3         A    Yes.

4         Q    I didn't hear if you answered or not.

5         A    Yes.

6         Q    Oh, okay.  Are you familiar with these APA

7    guidelines?

8         A    I have seen them, yes.

9         Q    Okay.  Have you had an opportunity to develop

10   any opinions as to their accuracy?

11             Let me stop there.

12        A    Well, if I looked at this, I looked at it

13   casually.  I'm not a great fan of the APA.

14        Q    Okay.  Fair enough.  Let me just ask you some

15   specific questions about it, then.

16             Will you look at, using the page numbering at

17   the bottom of the pages, page 842 of the document.

18             MR. WILLIAMS:  You're talking about that?

19   BY MR. GANNAM:

20        Q    Yeah.  Exhibit 33.

21        A    Okay.  Okay.

22        Q    On page 842, the first full paragraph begins

23   with "a clear distinction."

24             Do you see that?

25        A    Um-hum.

```
                                            Page 118

 1              MR. WILLIAMS:  Are you going to read that into

 2         the record, Roger, since I don't have a copy?  It

 3         might be helpful for me to follow that.

 4              MR. GANNAM:  Yeah.  I'll read the whole

 5         paragraph.

 6              MR. WILLIAMS:  Thank you.

 7    BY MR. GANNAM:

 8         Q    Are you with me on the page, Dr. Spack?

 9         A    (No verbal response.)

10         Q    Is that a yes?  Sorry.  Just for the record.

11              Did you say yes, Dr. Spack?

12         A    Yes.

13         Q    Okay.  Thank you.  [As read]:  A clear

14    distinction between care of TGNC and gender-questioning

15    children and adolescents exists in the literature.  Due

16    to the evidence that not all children persist in a TGNC

17    identity into adolescence or adulthood, and because no

18    approach to working with TGNC children has been

19    adequately, empirically validated, consensus does not

20    exist regarding best practice with prepubertal children.

21              Did I read that correctly?

22         A    Yep.

23         Q    Now, I'm going to break that down into a

24    couple of pieces and ask you about it.  First, where it

25    says TGNC, you understand that in this document, that
```

Page 119

1    means transgender and gender nonconforming?

2         A    Um-hum.

3         Q    Okay.  Great.

4              MR. WILLIAMS:  You have to say yes.

5              THE WITNESS:  Yeah.  Yeah.

6    BY MR. GANNAM:

7         Q    All right.  So that's a yes?

8         A    Yeah.

9              MR. WILLIAMS:  For her benefit.

10             THE WITNESS:  Yes.

11             MR. MIHET:  And try to keep your speech up, if

12        you can.  I'm still having a hard time hearing you

13        across the table.

14             MR. WILLIAMS:  What did you say?

15   BY MR. GANNAM:

16        Q    So it says [as read]:  Due to the evidence

17   that not all children persist in a TGNC identity into

18   adolescence or adulthood...

19             So first, do you agree with that premise that

20   not all children persist with a TGNC identity?  Do you

21   agree with that, Dr. Spack?

22        A    Yep.

23        Q    The next premise is [as read]:  And because no

24   approach to working with TGNC children has been

25   adequately, empirically validated...

Page 120

1          Do you agree with that premise, that no

2     approach to working with TGNC children has been

3     adequately, empirically validated?

4          A     Yes.

5          Q     Then the final statement is [as read]:

6     Consensus does not exist regarding best practice with

7     prepubertal children.

8          Do you agree with that conclusion that

9     consensus does not exist regarding best practice with

10    prepubertal children?

11         A     I think it's poorly written because I don't

12    think that they're indicating what kind of practice

13    they're referring to.  They should indicate -- we,

14    somebody, they, should indicate should we encourage

15    children to assume a social role, even if temperate.

16         Q     Sorry, could you say that again?

17         A     Well, it's not giving you a choice -- any idea

18    of what would be a potential way of dealing with

19    prepubertal children.

20         Q     Okay.  Well let me -- let me -- okay.  So

21    apart from that criticism of the statement, is it

22    nonetheless a true statement that there is not a

23    consensus regarding the best practice with prepubertal

24    children?

25         A     I would say the answer to that is yes.  And

Page 121

1   part of the reason our clinicians, like Zucker, who have

2   confused the physicians who would take care of these

3   children.

4        Q    So it identifies, then, two distinct

5   approaches.  If we skip down a sentence, it begins "two

6   distinct approaches."

7             Do you see that?

8        A    Um-hum.

9        Q    Is that a yes?

10       A    (No verbal response.)

11       Q    I'm sorry.  I need you to say --

12       A    Yeah.

13       Q    I know it can be cumbersome.

14            But [as read]:  Two distinct approaches exist

15   to address gender identity concerns in children.

16            Then after the citation it says [as read]:

17   With some authors subdividing one of the approaches to

18   suggest three.

19            Now, the next paragraph begins [as read]:  One

20   approach encourages an affirmation and acceptance of

21   children's expressed gender identity.

22            Did I read that correctly?

23       A    Yes.

24       Q    And, in fact, in the middle of that paragraph,

25   it even refers to one of your articles; correct?

                                                    Page 122

1        A    Yes.

2        Q    Okay.  Now, the next paragraph says [as read]:

3    In the second approach, children are encouraged to

4    embrace their given bodies and to align with their

5    assigned gender roles.  This includes endorsing and

6    supporting behaviors and attitudes that align with the

7    child's sex assigned at birth prior to the onset of

8    puberty.

9             Did I read that correctly?

10       A    Yes.

11       Q    Are you in agreement with the general

12   proposition that there are two approaches to prepubertal

13   children, one being to encourage and affirm the express

14   gender identity, and the other approach to encourage

15   children to embrace their given bodies that align with

16   their biological sex?

17       A    Absolutely.

18       Q    Okay.  I want to ask you to look at page 843,

19   using the page numbers at the bottom.  Have you found

20   page 843?

21       A    Yes.

22       Q    On the right column, in the last paragraph, it

23   begins "psychologists may encourage."

24            Do you see that?

25       A    Yes.

Page 123

1      Q    If I skip down one, two, three sentences to

2   the sentence that begins with the word "emphasizing"?

3      A    Yes.

4      Q    You see that.  Great.  I'll read it.  [As

5   read]:  Emphasizing to parents the importance of

6   allowing their child the freedom to return to a gender

7   identity that aligns with sex assigned at birth or

8   another gender identity at any point cannot be

9   overstated, particularly given the research that

10  suggests that not all young gender-nonconforming

11  children will ultimately express a gender identity

12  different from that assigned at birth.

13         Did I read that correctly?

14     A    Yes.

15     Q    Do you agree with this admonishment or this

16  advice in this document?

17     A    Yes.

18     Q    Okay.

19         MR. WILLIAMS:  Can we take a break real quick?

20         MR. GANNAM:  Yes, we may.

21         (A brief recess is had from 3:18 p.m. to 3:30

22  p.m.)

23  BY MR. GANNAM:

24     Q    Dr. Spack, can I ask you to go back to your

25  declaration, which is Exhibit 36?

Page 124

1      A      Okay.  Where abouts?

2      Q      And page three, which is the section Roman

3   numeral two, "analysis and opinions."  Are you there?

4      A      Yes.

5      Q      All right.  Will you look at numbered

6   paragraph one?  It reads -- are you at that paragraph?

7      A      Yeah.  "I have reviewed."

8      Q      It says [as read]:  I have reviewed the

9   declaration submitted by Dr. Bernard Hudson.  From that

10  review, it is my professional opinion that the

11  declaration significantly misstates current medical

12  knowledge and practice regarding the standard of care

13  and treatment for transgender and gender-nonconforming

14  children and adolescents.

15          Did I read that correctly?

16     A      Yes.

17     Q      Does this paragraph mean that you disagree

18  with everything Dr. Hudson said in his declaration?

19     A      No.

20     Q      In your declaration, apart from this paragraph

21  one, do you identify any specific part of Dr. Hudson's

22  declaration that you disagree with?

23     A      Do you have his declaration?

24     Q      I'm asking if, in your declaration, after this

25  paragraph one --

Page 125

1    A    Oh, oh, oh, okay.

2    Q    -- do you specifically identify any part of

3    his declaration that you disagree with?

4    A    There's no significant evidence that any type

5    of therapy or treatment can change a person's gender

6    identity.

7    Q    Where are you reading?  Are you reading --

8    A    Number four.

9    Q    Okay.  Number four reads [as read]:  There is

10   no scientific evidence that any type of therapy or

11   treatment can change a person's gender identity.  And

12   attempts to do so put patients at risk of serious harms,

13   including suicidality and depression.

14        Did I read that correctly?

15   A    Yes, you did.

16   Q    Now, are you telling me that that paragraph

17   disagrees with something in Dr. Hudson's declaration?

18   A    Yes.  He does not refer to the risks

19   associated with trying to shoehorn somebody into a

20   gender identity.

21   Q    Now, in paragraph four when you say there's no

22   scientific evidence that any type of therapy or

23   treatment -- let me stop there.

24        Are you referring to what you earlier defined

25   as conversion therapy?

1        A     Yes, but -- yes.

2        Q     Okay.  So when you talk here about -- well, it

3    says [as read]:  Attempts to do so put patients at risk

4    of serious harms, including suicidality and depression.

5              Did I read that correctly?

6        A     Yes.

7        Q     Now, you testified earlier that you're not a

8    mental health professional.  But I wanted to ask you if

9    you know, is there some risk of harm, including

10   suicidality and depression that can result from

11   psychotherapy in general?

12       A     That's true, but this is a particularly

13   vulnerable population.

14       Q     Okay.  So you do agree it's true that

15   psychotherapy in general can present some risk of harm

16   of suicidality and depression to patients?

17       A     Yes.

18             Yes.

19       Q     Now, can you quantify for me what increased

20   risk, if any, from what you defined as conversion

21   therapy for suicidality and depression exists?

22       A     Well, it may not be particularly scientific,

23   but the first -- the first association I had with

24   conversion therapy, and actually was the only one so

25   far -- I'll tell you what happened.

Page 127

1           This was a 18-year-old female who affirmed a

2    male identity.  The parents were very active in their

3    Catholic church and tended to go along with some of the

4    sign waving that the MassResistance organization was

5    holding up in front of -- the objection of that

6    organization to gay and lesbian teachers being allowed

7    to teach in the schools.

8           I actually found this kid to be a fairly

9    jovial person.  I actually didn't consider him at high

10   risk.  His parents felt that he should have a go of

11   therapy with a person who believed very much in

12   conversion therapy and was also tied very much to this

13   particularly right wing Catholic group that had made a

14   fair bit of noise in Massachusetts.

15        Q    That's MassResistance?

16        A    MassResistance.

17        Q    Okay.

18        A    Hadn't seen him in a while.  And I spoke to

19   his parents.  I said, How is he doing.  Mom said, Well,

20   I think he's developed a drug problem.  Are you getting

21   any help for that?  We're going to try.

22           The next thing I heard, that he had still seen

23   the therapist who was working on trying to convert him

24   back to female.  And the next thing I knew, I got a call

25   from the parents that he had overdosed on heroin and

Page 128

1    died.

2            Now, this is a complex situation, obviously.

3    Any heroin death can often be mis -- taking too much or

4    too strong a dose.  And I understood that.

5            But I met with the parents and they were

6    beside themselves.  And they particularly put blame on

7    themselves for forcing an issue and finding a person who

8    would be their agent in that.

9            So I have a particularly -- I really liked

10   this kid.  This kid was a great hockey player and played

11   with boys.  I was a hockey player.  And ironically, or

12   maybe perhaps expectedly, the parents abandoned the

13   MassResistance type -- abandoned that church altogether.

14   They came to every lecture I ever gave in Greater

15   Boston.  They became the most active people to meet with

16   new, newly diagnosed transgender kids.  It was just

17   quite amazing as to what happened.  But just, what can I

18   say?  It was something that's very, very hard to forget.

19   Q    As the parent of an 18 year old, I can't

20   imagine.  So obviously, that would be a situation that

21   is sad on many, many levels.  Can you say, as you sit

22   here, that the drug overdose was caused by what you call

23   the conversion therapy this young person received?

24   A    I can't.  I can't.  All I can say is this:

25   The initiation of drug treatment -- of drug taking --

Page 129

1    this kid wasn't taking anything before -- was coincident

2    with -- the actual overdose with heroin, I never ascribe

3    the overdose to a voluntary suicide.  Just can't.

4          Q    Right.

5          A    There's too many variables.

6          Q    And so scientifically speaking, of course,

7    coincident does not mean causal, obviously?

8          A    Of course.

9          Q    Now, do you know anything about this person

10   that the parents chose as therapist?  Was this person

11   licensed or a religious leader?  Or do you know anything

12   about the person?

13         A    I think the person came -- was recommended

14   through the church and through -- whether the person

15   was -- well, that's all I know.

16         Q    Okay.  Now, I understood -- you don't know

17   whether the person was a licensed therapist; is that

18   correct?

19         A    No.

20         Q    No, you do not know?

21         A    No, I do not know.

22         Q    Okay.  Now, I got the impression from the way

23   you explained what happened that this was also somewhat

24   to some extent coercive where the parents sort of sent

25   their son or -- you told me this was a --

Page 130

1          A     Female to male.

2          Q     Okay.  So the parents sent their child, who

3    was 18 to this person, whoever it was.

4          A     Right.

5          Q     Well, I mean, obviously I can see why that

6    account and their experience would put a bad taste in

7    your mouth.  But going back to the more scientific

8    question, which is, can you put a percentage or quantify

9    the increased risk to a person of suicidality or

10   depression, or any poor mental health outcome, from

11   conversion therapy as compared to psychotherapy, in

12   general?

13         A     The only thing is that he started using heroin

14   after he first met the therapist.  And he continued to

15   use heroin for weeks until he took the overdose.  And so

16   there was a part of me that was feeling -- he told that

17   therapist he was taking heroin -- why, you know, why

18   didn't -- why didn't he get the kind of referral that

19   you would expect.

20         Q     I can see why you would have those questions.

21              MR. GANNAM:  Can you read back my question to

22        him, please?

23              (The Court Reporter is directed to read back

24   the previous question and/or answer.)

25              THE WITNESS:  I can't say.

Page 131

1    BY MR. GANNAM:

2         Q    You can't say?

3         A    The only thing I can say is that whoever he

4    saw was seeing a kid who was relatively new to any --

5    any drug.  And this was heroin.  And this person made no

6    appropriate move.

7         Q    So apart from that particular situation, are

8    you telling me that you can't quantify or put a

9    percentage on the increased risk from conversion

10   therapy?

11        A    Correct.

12        Q    Now, what led me to that question was an

13   earlier question about what specifically your

14   declaration points to in Dr. Hudson's declaration that

15   you disagree with.

16             Is there anything else in your declaration

17   identifying a disagreement with Dr. Hudson's

18   declaration?

19        A    I will say one thing about -- or maybe I said

20   this before.  As I reread Hudson's declaration, I had

21   the feeling -- I had the feeling that Dr. Hudson might

22   be an appropriate therapist for some of my adult

23   patients.  That the way he came -- he comes across, a

24   sensitive person, that even though some of his approach,

25   perhaps, in conversion type would be totally

Page 132

1    inappropriate for children and adolescents, it might be

2    very useful in someone over 30 who literally needs to be

3    shaken up a bit but with a tenderness.

4        Q    Do you, in your declaration, identify anything

5    that -- any treatment that would be inappropriate for a

6    minor, based on Dr. Hudson's declaration?

7        A    Well, I do make the points that subjecting

8    minors to conversion therapy deviates from the standard

9    of care for treating transgender and

10   gender-nonconforming children in adolescence.

11            And I think that's the topic sentence for my

12   issues with Dr. Hudson and the age group that I talk

13   about.

14       Q    Is there anything else in your declaration

15   that points to a -- something specific in Dr. Hudson's

16   declaration that you disagree with or found

17   inappropriate?

18       A    No scientific evidence in any type of therapy

19   or treatment can change a person's gender identity.

20   Attempts to do so put patients at risk of serious harm,

21   including suicidality and depression.

22       Q    That was paragraph four; correct?

23       A    Right.  And number seven, I won't read them

24   all, but I listed the multiple professional

25   organizations that have issued evidence-based guidelines

Page 133

1    and standards of care for treating transgender and

2    gender-nonconforming children in adolescence.  By

3    inference, I say that these -- none of these guidelines

4    include conversion treatment.

5         Q    All right.  Have you now told me everything in

6    your declaration that addresses anything in Dr. Hudson's

7    declaration that you disagree with or found

8    inappropriate?

9              MR. WILLIAMS:  You're talking about the entire

10        declaration one through six of part A and seven

11        through eight of -- actually seven through nine of

12        part B?

13             MR. GANNAM:  I'm sorry?

14             MR. WILLIAMS:  I want to make sure that I

15        understand the question.

16             MR. GANNAM:  Will you read my question back?

17             (The Court Reporter is directed to read back

18        the previous question and/or answer.)

19             THE WITNESS:  Perhaps you'd read number nine?

20             MR. WILLIAMS:  Let her do this, Doctor.  And

21        let me ask.

22             MR. GANNAM:  All right.  Let me start with

23        that question.

24             MR. WILLIAMS:  Well, let me ask you a

25        question, because his reference to Dr. Hudson is

Page 134

1        specifically in paragraph Roman numeral 2A1.  And

2        my question is are you referring to just the six --

3        two through six thereafter or are you talking about

4        B as well or anything before that?  You said "in

5        your declaration."

6             MR. GANNAM:  All right.  I'll ask --

7             MR. WILLIAMS:  I want to make sure that I'm

8        understanding.

9             MR. GANNAM:  I'll ask the question.  And if

10       there's an objection, then make it.  And we'll see

11       if he can answer me.

12            MR. WILLIAMS:  Okay.  Fair enough.

13   BY MR. GANNAM:

14       Q    Dr. Spack.

15       A    Yes.

16       Q    Have you now told me everything in your

17   declaration that addresses a disagreement with

18   Dr. Hudson's declaration or something in his declaration

19   that you found inappropriate?

20       A    Well, this may be redundant, but it is my

21   concluding point, number nine.  [As read]:  There's no

22   evidence-based support for treatments that attempt to

23   change a young person's gender identity or gender

24   expression.  Conversion therapy deviates from the

25   standards of care and guidelines promulgated for the

Page 135

1    psychological and medical treatment of gender diverse

2    adolescence.

3            MR. WILLIAMS:  My objection, which I didn't

4        get a chance to lodge, is the declaration speaks

5        for itself.  And I think the court can make its own

6        conclusions as to what all this means.  So I think

7        it's unfair to the witness to ask him that kind of

8        a question.  He's answered the question.  And then

9        we'll go from there; okay?

10   BY MR. GANNAM:

11       Q    Your attorney said you've answered the

12   question.  I want to let you have the last word on that.

13   Have you now told me everything in your declaration that

14   addresses anything you disagree with in Dr. Hudson's

15   declaration or anything you found inappropriate in his

16   declaration?

17       A    I'm satisfied that my opinions have been

18   heard.

19       Q    All right.  Let me take a break with my

20   colleague for a moment and we will reconvene.

21            (A brief recess is had from 3:52 p.m. to 4:00

22   p.m.)

23   BY MR. GANNAM:

24       Q    Just to clean up our record a little bit, I'm

25   going to show you what was previously marked as

Page 136

1    Exhibit 4.  This is the Tampa ordinance 2017-47.

2              MR. WILLIAMS:  Do I have a copy of that?

3              MR. GANNAM:  We marked it as 4 during one of

4         the earliest depositions.

5              MR. WILLIAMS:  Right.  Right.  Give me a

6         second.

7    BY MR. GANNAM:

8         Q    Dr. Spack, is this in fact the ordinance that

9    we've been talking about --

10        A    Yes.

11        Q    -- in this case?

12             Great.  And have you had a chance to read this

13   ordinance before?

14        A    I did, yes.

15        Q    Okay.  And does your reading it include all

16   those various "whereas" clauses leading up the text of

17   the ordinance?

18        A    I never saw so many whereases in my life.

19        Q    Great.  All right.  I have no further

20   questions.

21                     CROSS EXAMINATION

22   BY MR. WILLIAMS:

23        Q    All right.  Dr. Spack, I just want to clarify

24   some things in my mind.  Mr. Gannam went over your

25   declaration, which is Exhibit 36 to your deposition that

Page 137

1    you signed on June 12th, 2019.  And you have that in

2    front of you there, don't you?

3        A    Yes.

4        Q    He also talked about the 2015 guidelines.  Do

5    you remember that part of his --

6        A    Yes.

7        Q    -- question?

8             2015 APA guidelines, I think.

9             MR. GANNAM:  You want to give the Exhibit

10        number, just for the record?

11             MR. WILLIAMS:  Yeah.  You're better at that

12        than I am.  I didn't have a copy of that.

13             MR. GANNAM:  33.

14             MR. WILLIAMS:  May I borrow your copy?

15             MR. GANNAM:  Why don't you borrow his copy

16        because all the pictures I drew of you in the

17        margin on this one.

18             MR. WILLIAMS:  I'm sure they're pretty

19        pictures.

20    BY MR. WILLIAMS:

21        Q    If you don't mind, I'll borrow that.

22             So Exhibit 33 is the American Psychological

23    Association 2015 guidelines.

24             Now, Doctor, with those -- with your

25    declaration in mind and the APA guidelines in mind,

Page 138

1    first of all, let me ask you, you've now been through

2    the better part of the day under Mr. Gannam's

3    grilling -- questioning.

4              MR. MIHET:  Skillful.

5              MR. WILLIAMS:  Skillful.  Yes.  Skillful and

6         adroit.

7    BY MR. WILLIAMS:

8         Q    But grilling, nevertheless.  Has anything that

9    Mr. Gannam has introduced to you today caused you to

10   change in your mind -- well, any of your statements in

11   your declaration?

12             MR. GANNAM:  Objection, leading.

13             You can answer.

14             THE WITNESS:  There was -- I'm not sure if

15        it's in here or -- there was a place where the two

16        options.

17   BY MR. WILLIAMS:

18        Q    Yeah.  I'm talking about -- I think you talked

19   about in connection with this.  But are the statements

20   that you made in your declaration signed in June still

21   valid statements, as far as you know?

22        A    Yes.

23             MR. GANNAM:  I just want to object, asked and

24        answered.

25   BY MR. WILLIAMS:

Page 139

```
 1        Q    Now, you just mentioned the two options.  And
 2   I remember that.  And Mr. Gannam asked you -- I think
 3   the question was, talked about two options.  What
 4   options did you understand him to be talking to you
 5   about -- asking you about?
 6        A    It relate -- I don't even remember which
 7   document it was.  But it --
 8        Q    I believe it was connected with 33.
 9             MR. GANNAM:  Objection, leading.
10             MR. WILLIAMS:  That's true.
11             THE WITNESS:  And the issue was whether or not
12        in response to the statement of two approaches to
13        the treatment of children who had gender dysphoria,
14        whether I had -- whether I had said they were equal
15        or not.
16             MR. GANNAM:  I didn't ask that question, so...
17   BY MR. WILLIAMS:
18        Q    Well, I'll ask it.  Are they equal?
19        A    Not necessarily.  And the reason is that --
20   well, could I just look at it again?
21        Q    Sure.  Here's the '15 -- or '15 guidelines.
22   Here's your declaration.
23             MR. GANNAM:  I just want to object to the
24        record of leading the witness to a document.
25             MR. MIHET:  For the record, Attorney Minter is
```

Page 140

1          now flipping through the exhibit and has opened it

2          to a particular paragraph and pointed the witness

3          to it.

4               MR. MINTER:  Yes.  The same paragraph that he

5          was questioned about earlier.

6               MR. WILLIAMS:  And to save time, I might add.

7          It's after 4:00.

8               THE WITNESS:  Okay.  I believe it was related

9          to guideline eight on page 841 of the American

10         Psychological Association.

11              And I'll read it.  This is longer than I

12         thought.  Can I ask a question?

13    BY MR. WILLIAMS:

14         Q    No, you can't.  You can take whatever time you

15    need to.

16         A    [As read]:  Many children develop stability in

17    the gender identity between ages three and four,

18    although gender consistency, which is recognition that

19    gender remains the same across situations, often does

20    not occur until ages four to seven.  Children who

21    demonstrate gender nonconformity in preschool and early

22    elementary school may not follow this trajectory.

23              This comes from Zucker.

24              [As read]:  Existing research suggests that 12

25    to 50 percent of all children diagnosed with gender

1 dysphoria may persist in their identification with a

2 gender different than sex assigned at birth into late

3 adolescence and young adulthood.

4          The point here is that what Zucker says

5 shouldn't be regarded as equivalent or shouldn't be

6 regarded as the Bible from Sinai.

7          And I say this because he not only says things

8 like this in 15 -- you know, like 15 personal references

9 in a paragraph, but what he has said has been regarded

10 as truth for a very long time, even in the pediatric

11 endocrine community and in the pediatric psychological

12 community.  And if his solution or recommendation is put

13 at equal weight with another, my only recommendation is

14 look very carefully at the other because it's very

15 likely to be more correct.  And it's also very likely

16 that when it was raised as a question or a -- or a

17 letter to the editor or whatever, criticizing Zucker, it

18 would have been shouted down.  It's really a classic

19 example of what -- of what happens when scientific -- a

20 scientific approach becomes political.

21     Q    Of the two choices, is one of them then the

22 Zucker approach?  Is that what you're saying?

23     A    There is one Zucker approach here.

24     Q    And is that the standard of care today, now?

25     A    No more.

Page 142

1      Q    What is the standard of care?  How would you

2  identify that?

3      A    Well --

4      Q    The other approach?

5      A    Yes.  There are two standards of care about

6  how to deal with the prepubertal kid who acts in a

7  cross-gender way.

8           Zucker's approach was to isolate the child,

9  limit the child to their own room, and not permit the

10  child to play with any toys or anything reflecting their

11  cross-gender feelings in another room in the house, as

12  if -- what Zucker was trying to do was accept the

13  possibility the kid may be gay, but try to keep the kid

14  from being transgender.

15           The other example is the best example by Diane

16  Ehrensaft of the University of California or San

17  Francisco, whose attitude is follow the child's lead,

18  you will have a happy child and you won't be making the

19  child transgender in so doing because many kids change

20  anyway.  But you can make yourself a really miserable

21  child if you follow Ken Zucker's approach.

22      Q    Which of those two is now the standard of

23  care?

24      A    I think Ehrensaft is.

25           MR. GANNAM:  Just I'm going to object to

Page 143

1    assumes facts not in evidence.

2         MR. WILLIAMS:  All right.  I think I've

3    covered those.  Okay.  Good enough.  That's all I

4    have.

5         MR. GANNAM:  All right.  Just for the record,

6    I'll move to strike the cross-examination as beyond

7    the scope of direct.  And we have no follow-up.

8         MR. WILLIAMS:  I move to strike your motion to

9    strike.

10         MR. MIHET:  And also as leading the witness,

11    coaching, and improperly getting the witness to

12    change their sworn testimony.

13         MR. WILLIAMS:  I take offense to all the above

14    objections because that's not what happened at all.

15    All right.  We're done?

16         Doctor, you have the right to read your

17    transcript.  I'm sure it will be transcribed.  And

18    I will -- if you want me to, I will send you, or

19    the court reporter will send you a copy of your

20    transcript.  You have the right to read it, make

21    any changes you want to, or whatever, or you can

22    waive that.  My advice is never waive that right.

23    That's what I tell everybody, so...

24         MR. MIHET:  We disagree that the witness has

25    the right to make any changes that he wants to.

Page 144

1           MR. WILLIAMS:  Good God, how can you disagree

2       with that.  Hold on, Harry.  I want to put you to a

3       real test here.

4           (Off the stenographic record.)

5           COURT REPORTER:  So Mr. Williams, you're

6       getting a copy of the transcript, then?

7           MR. WILLIAMS:  I'm sure they're going to order

8       it and I'll take a copy.  I'm assuming.  Maybe I

9       shouldn't assume.  You guys going to order it?

10          MR. MIHET:  Yes.

11          MR. WILLIAMS:  That's what I thought.

12          (The reading and signing of the deposition is

13   not waived.)

14          (At 4:13 p.m. the deposition was concluded.)

15

16

17

18

19

20

21

22

23

24

25

Page 145

1                    CERTIFICATE OF OATH

2

3    STATE OF FLORIDA   )

4    COUNTY OF HILLSBOROUGH )

5

6        I, the undersigned authority, certify that NORMAN

7    SPACK, M.D. personally appeared before me and was duly

8    sworn.

9        WITNESS my hand this 15th day of August, 2019.

10

11

12

13    _____

         DAWN A. HILLIER, RMR, CRR, CLR

14       Notary Public - State of Florida

         My Commission No.:  GG 259309

15       Expires:  12-15-2022

16

17

18

19

20

21

22

23

24

25

Page 146

1                          CERTIFICATE

2

3     STATE OF FLORIDA   )

4     COUNTY OF HILLSBOROUGH )

5          I, DAWN A. HILLIER, RMR, CRR, CLR certify that I

6     was authorized to and did stenographically report the

7     deposition of NORMAN SPACK, M.D.; that a review of the

8     transcript was requested; and that the transcript is a

9     true and complete record of my stenographic notes.

10

11         I further certify that I am not a relative,

12    employee, attorney, or counsel of any of the parties,

13    nor am I a relative or employee of any of the parties'

14    attorney or counsel connected with the action, nor am I

15    financially interested in the action.

16

17         DATED this 15th day of August, 2019.

18

19

20    _____

           DAWN A. HILLIER, RMR, CRR, CLR

21

22

23

24

25