UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

| | | |
|---|---|---|
| ROBERT L. VAZZO, LMFT, etc., et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 8:17-cv-2896-T-02AAS |
| v. | ) | |
| | ) | |
| CITY OF TAMPA, FLORIDA, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND
MOTION TO EXCLUDE CERTAIN OPINIONS OF DEFENDANT'S EXPERT
AND INCORPORATED MEMORANDUM OF LAW**

Plaintiffs ROBERT L. VAZZO, LMFT, individually and on behalf of his patients, and SOLI DEO GLORIA INTERNATIONAL, INC. d/b/a NEW HEARTS OUTREACH TAMPA BAY, individually and on behalf of its members, constituents, and clients,[1] pursuant to Local Rule 3.01 and the Court's Case Management and Scheduling Order (D.183), and on the grounds stated in the Memorandum of Law incorporated hereinbelow, move the Court as follows:

1.      For judgment as a matter of law under Rule 56, Fed. R. Civ. P., on all their claims against Defendant, the City of Tampa, Florida ("Tampa" or the "City"), in accordance with their prayer for relief in their First Amended Verified Complaint (Dkt. 78), there being no genuine dispute as to any material fact; and

2.      To exclude certain opinions of the City's expert Judith M. Glassgold, Psy.D under Rule 702, Fed. R. Evid. (*See infra* Mem. Law pt. I.B.1.c.)

---

[1]      Plaintiff DAVID H. PICKUP, LMFT does not take part in this filing. *See* Plaintiffs' Certification of Conference to Narrow Issues for Summary Judgment (Dkt. 188).

## MEMORANDUM OF LAW

## TABLE OF CONTENTS

TABLE OF CONTENTS...............................................................................................i

TABLE OF AUTHORITIES .....................................................................................iii

INTRODUCTION ....................................................................................................1

SUMMARY JUDGMENT STANDARD ...................................................................2

ARGUMENT ...........................................................................................................2

I.      PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON
        THEIR CONSTITUTIONAL CLAIMS...........................................................2

        A.      Binding Precedent Forecloses the City's Effort to Evade Strict Scrutiny by
                Relabeling Vazzo's Speech as 'Conduct' or 'Professional Speech.'......................2

                1.      Defendants' Relabeling Fails as a Matter of Law.......................................2

                2.      The 'Treatment' Label from *Otto v. Boca Raton* Also Fails as a Matter
                        of Law. .......................................................................................................6

                1.      The Undisputed Absence of Empirical Evidence of Harm from
                        "Conversion Therapy" Precludes Any Compelling Interest Justifying
                        the Ordinance. ............................................................................................7

                        a.      This Court Owes No Deference to the City's Unfounded
                                Legislative Judgments in the First Amendment Context................7

                        b.      The APA Report Stands Uncontradicted in Exposing the
                                Absence of Any Empirical Evidence of Harm from
                                "Conversion Therapy." .................................................................9

                        c.      Dr. Glassgold's 'Unequivocal' Opinion Contradicts All
                                Research and Should Be Excluded. ..............................................10

                2.      Even if the City Could Establish a Compelling Interest, the Ordinance
                        Is Not Narrowly Tailored Because It Is Not the Least Restrictive
                        Means to Address the Supposed Harms of "Conversion Therapy.".........12

                        a.      Defendants' Narrow Tailoring Burden Requires Concrete
                                Evidence Demonstrating Why Less Restrictive Alternatives
                                Would Be Unworkable. ...............................................................12

                        b.      The City Cannot Show Tampa Seriously Considered Any Less
                                Restrictive Alternative to Its Total Speech Ban............................13

3.      The Ordinance Cannot Pass Narrow Tailoring Because It Is Practically
        Unenforceable by City Code Officials.......................................................13

B.      Tampa Intended and Interprets the Ordinance to Prohibit Speech of a Particular
        Viewpoint..............................................................................................16

C.      PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW
        ON THEIR PRIOR RESTRAINT, VAGUENESS, AND OVERBREADTH
        CLAIMS. .................................................................................................21

II.     PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON
        THEIR IMPLIED PREEMPTION CLAIM........................................................21

III.    PLAINTIFFS SATISFY ALL FACTORS FOR PERMANENT INJUNCTIVE
        RELIEF. .................................................................................................25

CONCLUSION.................................................................................................25

CERTIFICATE OF SERVICE .............................................................................26

# **TABLE OF AUTHORITIES**

## **CASES**

*Adams v. Lab. Corp. of Am.*, 760 F.3d 1322 (11th Cir. 2014)........................................11

*Barrett v. Walker County Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017)...........................25

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016)...............................................12

*City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789 (1984) ...........................17

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ....................................................19,20

*Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788 (1985)..................17

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ..................................................20

*Gen. Elec. Co. v. Joiner*, 522 U.S. 136 (1997) .......................................................11,12

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ....................................4,5,6,7

*King v. Governor of New Jersey*, 767 F.3d 216 (3d Cir. 2014) .......................................3

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993)...........17

*Legal Servs. Corp. v. Valazquez*, 531 U.S. 533 (2001)..................................................19

*Libertarian Party of Va. v. Judd*, 718 F.3d 308 (4th Cir. 2013)...................................13

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ......................................................12,13,14

*Nat'l Inst. for Family & Life Advocates v. Becerra*,
        138 S. Ct. 2361 (2018) ("*NIFLA*").............................................................2,3,4,6

*Otto v. Boca Raton*, 353 F. Supp. 3d 1237 (S.D. Fla. 2019)........................................6,7

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014)............................................................3

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015)..........................................................2,3

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015)...................................................13

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)......................17

*Sarasota Alliance For Fair Elections, Inc. v. Browning*, 28 So.3d 880 (Fla. 2010) ....................21

*Searcy v. Harris*, 888 F.2d 1314 (11th Cir. 1989) ........................................................17

*Sorrell v. IMS Health*, 131 S. Ct. 2653 (2011) .......................................................17,19

*Wollschlaeger v. Florida*, 848 F.3d 1293 (11th Cir. 2017) ......................................................3,4,8

## **STATUTES**

Fla. Admin. Code subtitle 64B4 ...............................................................................................23

Fla. Admin. Code § 64B4-3.003 ...............................................................................................23

Fla. Admin. Code § 64B4-3.0035 .............................................................................................24

Fla. Admin. Code § 64B4-5.001 ...........................................................................................23,24

Fla. Stat. ch. 456 .......................................................................................................................21

Fla. Stat. ch. 491 .......................................................................................................................22

Fla. Stat. § 456.003 ...............................................................................................................21,22

Fla. Stat. § 491.003 ...................................................................................................................22

Fla. Stat. § 491.004 ...................................................................................................................22

Fla. Stat. § 491.005 ...............................................................................................................22,23

Fla. Stat. § 491.009 ...................................................................................................................23

## **OTHER AUTHORITIES**

Dictionary.com Unabridged ......................................................................................................18

Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413 ..............................................................17

Fed. R. Civ. P. 10 .......................................................................................................................1

Fed. R. Civ. P. 56 .......................................................................................................................2

## INTRODUCTION

Much factual and legal ground has been covered in the briefing and proceedings around Plaintiffs' Motion for Preliminary Injunction (Dkt. 85), which remains pending before the Court, including Plaintiffs' Consolidated Response in Opposition to Defendant, City of Tampa's Objections to Magistrate's Reports and Recommendations (Dkt. 160), and the Magistrate's Report and Recommendation (Dkt. 149) concluding Plaintiffs' preliminary injunction motion should be granted, in part. Rather than unnecessarily duplicate the substantial materials already before the Court, Plaintiffs herein focus primarily on certain interactions of their thoroughly briefed legal positions with the undisputed facts in the record, showing that Plaintiffs are entitled to judgment as a matter of law.

Plaintiffs' legal positions, as supplemented herein, are set forth in the following filings, which are incorporated herein by this reference pursuant to Rule 10(c), Fed. R. Civ. P.:

| Dkt. | Document |
|---|---|
| 85 | Plaintiffs' Motion for Preliminary Injunction with Incorporated Memorandum of Law (Plaintiffs' "**MPI**") |
| 114 | Plaintiffs' Response in Opposition to Defendants' Motions to Dismiss and Plaintiffs' Reply in Support of Their Renewed Motion for Preliminary Injunction (Plaintiffs' "**MTD Response/MPI Reply**") |
| 138 | Transcript of Preliminary Injunction Hearing ("**PI Hearing**") |
| 145 | Plaintiffs' Post-Hearing Memorandum of Law in Support of Motion for Preliminary Injunction (Plaintiffs' "**Post-Hearing MPI Memorandum**") |
| 147 | Plaintiffs' Objections to Amicus Curiae Equality Florida's Supplemental Amicus Brief (Plaintiffs' "**Objections to Supplemental Amicus Brief**") |
| 160 | Plaintiffs' Consolidated Response in Opposition to Defendant, City of Tampa's Objections to Magistrate's Reports and Recommendations (Plaintiffs' "**R&R Objection Response**") |

The following additional filings are also referenced herein:

| Dkt. | Document |
|------|----------|
| 149 | Report and Recommendation ("**MPI R&R**") |
| 155 | Defendant, City of Tampa's, Objections to Magistrate's Report and Recommendation on Motion to Dismiss ("**MTD Objections**") |
| 156 | Defendant, City of Tampa's, Objections to Magistrate's Report and Recommendation Regarding Plaintiff's Motion for Preliminary Injunction ("**MPI Objections**") |
| 193 | Plaintiffs' Statement of Undisputed Facts in Support of Motion for Summary Judgment  (Plaintiffs' "**SUF**") |

## SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.

## ARGUMENT

I. **PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR CONSTITUTIONAL CLAIMS.**

A. **Binding Precedent Forecloses the City's Effort to Evade Strict Scrutiny by Relabeling Vazzo's Speech as 'Conduct' or 'Professional Speech.'**

1. **Defendants' Relabeling Fails as a Matter of Law.**

As shown in Plaintiffs' prior briefing, the Supreme Court's *NIFLA* decision is only the latest of a line of cases prohibiting the government from simply relabeling the speech of professionals as a pretext to restrict their speech with less scrutiny. (*See, e.g.,* R&R Obj. Resp. 21–23 (citing, *inter alia*, *Nat'l Inst. for Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371–72 (2018) (hereinafter, "*NIFLA*"); MTD Resp./MTD Reply 2–9.) *NIFLA* affirmed the "stringent standard" of *Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015), mandating strict scrutiny for all

content-based restrictions on speech, and condemned the invidious discrimination inherent in bans on the speech of licensed professionals. 138 S. Ct. at 2371 ("As a general matter, such laws 'are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests.'").

The *NIFLA* Court expressly rejected the erroneous conclusion that content-based regulations of so-called "professional speech" do not receive strict scrutiny, **abrogating by name the two principal legal authorities upon which the Tampa ordinance was expressly based—** *King v. Governor of New Jersey*, 767 F.3d 216 (3d Cir. 2014), and *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014):

> Some Courts of Appeals have recognized "professional speech" as a separate category of speech that is subject to different rules. *See, e.g.*, [*King*; *Pickup*] . . . . So defined, these courts except professional speech from the rule that content-based regulations of speech are subject to strict scrutiny.
>
> **But this Court has not recognized "professional speech" as a separate category of speech. Speech is not unprotected merely because it is uttered by "professionals."**

*NIFLA*, 138 S. Ct. at 2371-72 (emphasis added). (*Cf.* SUF ¶ 8.) The *NIFLA* Court further admonished that allowing the government to lessen First Amendment protections for professionals by reclassifying their speech would eviscerate the protections afforded to doctors, lawyers, nurses, mental health professionals, and many others: "[T]hat gives the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement. **States cannot choose the protection that speech receives under the First Amendment**, as that would give them a powerful tool to impose invidious discrimination on disfavored subjects." 138 S. Ct. at 2372.

Even before *NIFLA*, the Eleventh Circuit's en banc decision in *Wollschlaeger v. Florida* rejected regulation of speech by relabeling because "**characterizing speech as conduct is a**

**dubious constitutional enterprise**." 848 F.3d 1293, 1309 (11th Cir. 2017) (emphasis added). "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Id.* at 1307 (citation and internal quotation marks omitted). Thus, whether the City tries to obtain rational basis review by labeling Vazzo's speech 'conduct" (*see, e.g.,* MTD Objs. 3–4; MPI Objs. 5–10), or tries to obtain some kind of intermediate scrutiny by labeling Vazzo's counseling 'professional speech' (*see, e.g.,* SUF ¶ 8), binding precedent requires this Court to reject the City's labeling game.

Still earlier, almost a decade before *NIFLA*, the Supreme Court solidified the fully protected status of professionals' speech in *Holder v. Humanitarian Law Project,* 561 U.S. 1 (2010). The *Holder* plaintiffs, including a former judge and a physician, brought a First Amendment challenge to a federal statute prohibiting the provision of "'material support or resources'" to foreign terrorist organizations. 561 U.S. at 7–8, 10. The plaintiffs wanted to provide support for the non-terroristic activities of two such organizations, "the PKK and LTTE, in the form of . . . legal training, and political advocacy . . . ." 561 U.S. at 10. The Court rejected the plaintiffs' claim that the statute banned pure political speech because plaintiffs remained free to speak and write about the PKK and LTTE, and to advocate for them. *Id.* at 25–26. The Court also rejected, however, the government's argument that the statute prohibited only "conduct, not speech," "and only incidentally burdens expression." 561 U.S. at 26. The Court reasoned,

> [the statute] regulates speech on the basis of its content. **Plaintiffs want to speak** to the PKK and LTTE, **and whether they may do so under [the statute] depends on what they say**. If plaintiffs' speech to those groups imparts a "specific skill" or communicates advice derived from "specialized knowledge" . . . then it is barred.

*Id.* at 27 (emphasis added).

The government in *Holder* (evocative of Tampa here) nevertheless argued that intermediate scrutiny should apply to the Court's First Amendment review of the statute "because it *generally*

functions as a regulation of conduct." *Id* at 27. The Supreme Court rejected that argument, too, because even though the statute "may be described as directed at conduct, . . . as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. In concluding that strict scrutiny applied, the Court reasoned,

> The First Amendment issue before us is more refined than either plaintiffs or the Government would have it. It is not whether the Government may prohibit pure political speech, or may prohibit material support in the form of conduct. It is instead **whether the Government may prohibit what plaintiffs want to do**—provide material support to the PKK and LTTE **in the form of speech**.

*Id.* at 28.

On the issue of whether strict scrutiny applies, the *Holder* Court's analysis is controlling because the facts are analogous.[2] First, the issue here can be framed nearly identically to the issue in *Holder*: whether Tampa may prohibit what Vazzo wants to do—provide sexual and gender identity counseling "in the form of speech." Second, as in *Holder*, Vazzo wants to use his speech to impart skills requested by his minor clients (reducing or eliminating unwanted same-sex attractions or gender conflicts) or communicate advice derived from his specialized knowledge. Third, as in *Holder*, the Tampa ordinance ostensibly allows Vazzo to write and speak about SOCE, and to advocate its benefits (*see, e.g.,* MTD Objs. 3–4; MPI Objs. 9, 11); but that is irrelevant, as in *Holder*, to the question before this Court (whether Tampa may prohibit what Doyle wants to do). As correctly observed by the Magistrate, the ordinance **prohibits Plaintiff counselors from**

---

[2]      On the issue of whether the content-based regulation **satisfied** strict scrutiny, the *Holder* analysis is not controlling here because, unlike Tampa, the government in *Holder* narrowly tailored its statute based on **empirical** consideration of the harms sought to be avoided by enacting the statute. *See* 561 U.S. at 29 ("Whether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question."). (*See infra* pt. I.B.1.)

**"using 'speech to help clients** understand and identify their anxiety or confusion regarding their attractions, or identity and then help the client formulate the method of counseling that will most benefit that particular client,'" and consequently, prohibits Plaintiff New Hearts Outreach from referring minor clients to the counselor Plaintiffs. (MTD R&R 3–4 (emphasis added) (quoting FAVC ¶ 65); MPI R&R 3 (same).) Thus, under the binding precedent of *Holder*, Tampa cannot avoid strict scrutiny by relabeling Vazzo's speech as 'conduct.'

### 2. The 'Treatment' Label from *Otto v. Boca Raton* Also Fails as a Matter of Law.

This Court should also reject the alternative labeling of speech as "treatment" in the Southern District of Florida's order in *Otto v. Boca Raton*, 353 F. Supp. 3d 1237 (S.D. Fla. 2019) (denying preliminary injunction against city and county "conversion therapy" bans). (*Cf.* MPI Objs. 5–10 (""[T]he only speech barred by the Ordinance is '*the manner of delivering the treatment*.'" (quoting *Otto*, 353 F. Supp. 3d at 1256).) In *Otto*, the district court disregarded *NIFLA*'s admonition against applying "different rules" to speech "uttered by 'professionals,'" 138 S. Ct. at 2371–72, and labored to recast the counselor-plaintiffs' speech as "treatment" speech (*i.e.*, not really speech) with diminished First Amendment protection. 353 F. Supp. 3d at 1255–58. Thus, the *Otto* court downgraded the counselors' speech based on the "function" of the speech:

> This case presents facts in which speech is not always expressive, and thus warrants less scrutiny. *Cf. [United States v.] O'Brien*, 391 U.S. 367 (1968). Plaintiffs' words serve a function; their words constitute an act of therapy with their minor clients, which makes Plaintiffs' speech different from the protected dialogues in *Wollschlaeger* and *NIFLA*, and from highly protected, political speech in the metaphoric or literal "public square."

353 F. Supp. 3d at 1257. In *Holder*, however, the Supreme Court rejected this very rationale, holding, "*O'Brien* does not provide the applicable standard for reviewing a content-based regulation of speech." 561 U.S. at 28.

Thus, the *Holder* analysis (*supra* pt. I.A.1) exposes the *Otto* court's error, and precludes any legitimate reliance on the *Otto* findings and conclusions. "The Government is wrong that the only thing actually at issue in this litigation is conduct . . . ." 561 U.S. at 27. "[Vazzo] wants to speak to [his minor clients], and whether [he] may do so under [the ordinance] depends on what [he] say[s]." *Id.* If Vazzo's speech "imparts a 'specific skill' or communicates advice derived from 'specialized knowledge'—for example, [strategies to reduce or eliminate unwanted same-sex attractions, or for gaining comfort with biological sex]—then it is barred." *See id.* "On the other hand, [Vazzo's] speech is not barred if it imparts only general or unspecialized knowledge"—for example, that another professional can communicate such strategies to the client and that the client should seek out that other professional. *See id.*

*Holder*, thus, eviscerates the City's rationalization that the ordinance does not regulate speech because it ostensibly allows Vazzo to talk **about** and **recommend** "conversion therapy." (MPI Objs. 5–10.) Under *Holder*, Tampa's seeming benevolence in tossing Vazzo the table scraps of "general or unspecialized" speech cannot excuse the City's censoring what Vazzo wants to say to help his clients.

The City Cannot Satisfy Its Strict Scrutiny Burden Because It Cannot Show Either a Compelling Interest Supporting the Ordinance or that the Ordinance Is the Least Restrictive Means.

> **1.    The Undisputed Absence of Empirical Evidence of Harm from "Conversion Therapy" Precludes Any Compelling Interest Justifying the Ordinance.**
>
> > **a.    This Court Owes No Deference to the City's Unfounded Legislative Judgments in the First Amendment Context.**

As shown in Plaintiffs' MPI and subsequent briefing, the City is not entitled to deference in making speech-restrictive determinations. (*See, e.g.,* MTD Resp./MPI Reply 16–21.) Rather,

under strict scrutiny, the government must support a content-based speech restriction with empirical or other concrete evidence of genuine, identifiable harm, not merely the anecdotes, conjecture, and supposition of proponents. (MTD Resp./MPI Reply 16–21.) The City has utterly failed to identify empirical or concrete evidence of genuine harm justifying the ordinance, and therefore cannot satisfy the compelling interest prong of strict scrutiny.

This absence of empirical evidence of harm, now beyond dispute, is an insurmountable obstacle to the City's narrow tailoring burdens. As shown in Plaintiffs' MPI briefing, it is not Plaintiffs' burden to prove the effectiveness Vazzo's talk therapy, or of "conversion therapy" or SOCE in general; rather, it is the City's burden to show empirical or concrete evidence of harm justifying Tampa's ordinance. (MTD Resp./MPI Reply 16; R&R Objs. Resp. 25–26.) Whatever **general** interest Tampa may rightfully proclaim in the health and safety of minors in the City, Tampa has no legitimate—let alone compelling—interest in protecting minors from the merely speculative narrative of harm crafted into position statements and uncritically adopted by the City Council. (MPI 13–17; MTD Resp./MPI Reply 16–21.)

In the binding *Wollschlaeger* decision, holding that provisions of a Florida statute prohibiting physicians' speech about gun ownership did not satisfy even intermediate scrutiny, the en banc Eleventh Circuit explained that purported governmental interests "[a]t an abstract level of generality" are not enough to justify "restrict[ing] the speech of doctors and medical professionals on a certain subject." 848 F.3d at 1316. Thus, Florida's undoubted "substantial interest" in "regulat[ing] the medical profession in order to protect the public" was nonetheless not specific enough to justify a speech restriction on professionals where there was no evidence of a harm to be remedied beyond "six anecdotes." 848 F.3d at 1316. The legislative record of Tampa's

ordinance is no better. (SUF ¶ 10–41.) Accordingly, Defendants cannot satisfy the interest prong of their narrow tailoring burden.

> **b.** **The APA Report Stands Uncontradicted in Exposing the Absence of Any Empirical Evidence of Harm from "Conversion Therapy."**

In Plaintiffs' SUF and prior briefing, they painstakingly expose the recurring, unequivocal admissions of the 2009 APA Report—ostensibly a principal authority supporting Tampa's ordinance—that there is no empirical evidence of harm from "conversion therapy." (SUF ¶¶ 11– 14; R&R Objs. Resp. 7–18.) Tampa has never rebutted this absence of empirical evidence of harm, perhaps best summarized in this single passage from the APA Report:

> **[T]here is a dearth of scientifically sound research on the safety of SOCE.** Early and recent research **studies provide no clear indication of the prevalence of harmful outcomes** among people who have undergone efforts to change their sexual orientation or the frequency of occurrence of harm because no study to date of adequate scientific rigor has been explicitly designed to do so. **Thus, we cannot conclude how likely it is that harm will occur from SOCE.**

(APA Rep. 42 (emphasis added).) Nor has the City rebutted any of the subsequent authorities affirming the APA Report's conclusions, and revealing the even greater evidence void on gender identity issues in minors. (SUF ¶ 11 (quoting SAMHSA Report PageID 568 ("**No new studies have been published that would change the conclusions reached in the APA Taskforce's 2009 review**." (emphasis added)), PageID 569 ("**[N]o research demonstrating the harms of conversion therapy with gender minority youth has been published . . . .**" (emphasis added))), SUF ¶ 19 (quoting AACAP Statement PageID 521 ("**There have been no randomized controlled trials of any treatment**. . . ." (emphasis added)), PageID 522 ("**Given the lack of empirical evidence** . . . **further research is needed** on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention . . . ." (emphasis

added))), SUF ¶ 21 (quoting APA TGNC Guidelines PageID 2759 ("[B]ecause **no approach to working with TGNC children has been adequately, empirically validated, consensus does not exist** . . . ." (emphasis added))).) To be sure, the City cannot rebut its own admission that Tampa had no way to quantify the purported risk of harm the ordinance claims to be posed by "conversion therapy." (SUF ¶ 14 (quoting ordinance sponsor, Councilman Guido Maniscalco, "No, **nobody knows**." (emphasis added)).)

Even the later research cited in the Declaration of the City's expert Dr. Glassgold fails to add any evidence to the empirical record that could rebut the above conclusions of the APA Report, SAMHSA Report, AACAP Statement, or APA TGNC Guidelines, up to and including the most recent study Dr. Glassgold cited, published in 2018 by Ryan, et al. (Dkt. 142-3 Page ID 3234 ("**[C]ausal claims cannot be made.**" (emphasis added)). (Glassgold 134:18–155:5, 175:15– 180:18; Ex. 28 (Dkt. 192-3) ¶ 17 at 7–8, 8 n.7, Ex. B; Exs. 29–32 (Dkts. 192-4 to 192-7).)

### c.    Dr.    Glassgold's    'Unequivocal'    Opinion Contradicts All Research and Should Be Excluded.

Given the unequivocally lacking empirical evidence to support any causal claims of harm from SOCE or "conversion therapy," as shown above, including from authorities co-authored by Dr. Glassgold, coordinated by Dr. Glassgold, and cited by Dr. Glassgold, Dr. Glassgold cannot justify her opinion that states the exact opposite: "[C]urrent scientific evidence, including those cited in the [ordinance] findings, confirm unequivocally that conversion therapy (CT) in any form is ineffective and harmful." (Glassgold Decl. (Dkt. 192-3) ¶ 14; *cf.* APA Rep. 90 ("**[R]esearch on SOCE . . . has not answered basic questions of whether it is safe or effective and for whom**" (emphasis added).) That is, Dr. Glassgold cannot explain, by any measure of reason or logic, why her opinion for the Court in this litigation is antithetical to the conclusions of the APA Report she co-authored, the SAMHSA report she coordinated, and the other studies she cited in her own

declaration. (Glassgold 182:18–188:2.) The same is true for all of Dr. Glassgold's opinions ascribing "significant" risk to SOCE or "conversion therapy" (e.g., Glassgold Decl. (Dkt. 192-3) ¶¶ 16, 36, 39, 42, 45, 47, 48, 50, 51, 76, 77) given that "**research studies provide no clear indication of the prevalence of harmful outcomes** . . . ." (APA Rep. 42; SUF ¶¶ 11–14, 19–21, 36–40.) To say Dr. Glassgold overplayed her hand is an understatement. This Court should exclude her unsupportable opinions.

The Eleventh Circuit explained the district court's gatekeeping rule under Federal Rule of Evidence 702:

> In *Daubert,* the Supreme Court explained that trial courts must act as **gatekeepers tasked with screening out speculative, unreliable expert testimony**. . . . Later, in *Kumho,* the Court explained that the gatekeeping function governs all expert testimony based on scientific technical, or other specialized knowledge, not just scientific testimony. The Court also stressed that the factors identified in *Daubert* do *not* constitute a definitive checklist or test. . . . Furthermore, *Kumho* emphasized that the goal of **gatekeeping is to ensure that an expert employs in the courtroom the same level of intellectual rigor** that characterizes the practice of an expert in the relevant field.

*Adams v. Lab. Corp. of Am.*, 760 F.3d 1322, 1327 (11th Cir. 2014) (emphasis added) (internal quotation marks and citations omitted).

The Supreme Court earlier held in *Gen. Elec. Co. v. Joiner*:

> "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data **only by the *ipse dixit* of the expert**. A court may conclude that **there is simply too great an analytical gap between the data and the opinion proffered**."

522 U.S. 136, 146 (1997) (emphasis added). At issue in *Joiner* was a district court's exclusion of the plaintiff's experts, having concluded that the studies cited by the experts did not support their opinions. *Id.* at 139–140. The Supreme Court concluded, "it was within the District Court's

discretion to conclude that the studies upon which the experts relied were not sufficient, whether individually or in combination, to support their conclusions . . . ." *Id.* at 146–47.

These binding precedents require this Court to reject all unreliable, intellectually unrigorous *ipse dixit* testimony of an expert witnesses which is not supported by the authorities cited by the witness. The identified opinions of Dr. Glassgold must be excluded under this standard. The analytical gap between all the authorities identified by the ordinance and Dr. Glassgold—that the empirical evidence supports no conclusions about SOCE efficacy or safety— and Dr. Glassgold's litigation opinion—that "current scientific evidence, including those cited in the [ordinance] findings, confirm unequivocally that conversion therapy (CT) in any form is ineffective and harmful"—is far too great for this Court to take the opinion seriously. *See Joiner*, 522 U.S. at 146.

> **2. Even if the City Could Establish a Compelling Interest, the Ordinance Is Not Narrowly Tailored Because It Is Not the Least Restrictive Means to Address the Supposed Harms of "Conversion Therapy."**
>
> > **a. Defendants' Narrow Tailoring Burden Requires Concrete Evidence Demonstrating Why Less Restrictive Alternatives Would Be Unworkable.**

As shown in Plaintiffs' MPI briefing (MPI 17–19; MTD Resp./MPI Reply 21–27), Tampa's content-based speech ban must be the least restrictive means to satisfy narrow tailoring, under the most exacting scrutiny. Thus, even if the City could establish a sufficiently compelling interest (it cannot), the City must also show Tampa "**seriously** undertook to address the problem with less intrusive tools readily available to it." *McCullen v. Coakley*, 134 S. Ct. 2518, 2539 (2014) (emphasis added). The City "would have to show either that **substantially less-restrictive alternatives were tried and failed**, or that the **alternatives were closely examined and ruled out for good reason**." *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2016); *see also*

*Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (requiring "government to present **actual evidence** supporting its assertion that a restriction on speech does not burden substantially more speech than necessary; **argument unsupported by the evidence will not suffice to carry the government's burden**"); *id.* at 231 ("As the Court explained in *McCullen* . . . **the burden of proving narrow tailoring requires the [government] to *prove* that it actually *tried* other methods to address the problem**."); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 318 (4th Cir. 2013) (holding government failed narrow tailoring under strict scrutiny where it "produced **no concrete evidence** of persuasive force explaining why the plaintiffs' proposed solution, manifestly less restrictive of their First Amendment rights, would be unworkable or impracticable.") (All bold emphases added.).

> **b.      The City Cannot Show Tampa Seriously Considered Any Less Restrictive Alternative to Its Total Speech Ban.**

The City fails narrow tailoring primarily because Tampa did not seriously (or at all) consider any less restrictive alternative to its total speech ban. The ordinance's legislative record contains no evidence that the City Council considered any alternative to the ordinance's speech restrictions. (SUF ¶ 41 (quoting ordinance sponsor, Maniscalco 100:14-102:9 ("We never debated anything else because we specifically wanted the complete ban."))). Thus, the City does not come close to proving Tampa seriously considered any less restrictive alternative to the ordinance, or rule out any alternative for good reason. *See Bruni*, 824 F.3d at 370.

> **3.      The Ordinance Cannot Pass Narrow Tailoring Because It Is Practically Unenforceable by City Code Officials.**

The City also fails narrow tailoring because the ordinance cannot, as a practical matter, be enforced to remedy any purported harms the City claims to have in view. As the Supreme Court taught in *McCullen*, the First Amendment "demand[s] a close fit between ends and means." 134

S. Ct. at 2534. The inability to enforce the ordinance through its code officials forecloses the required fit between the ordinance and the City's purported interest in enacting it.

Tampa's code officials are objectively ill-equipped to investigate and make determinations about appropriate mental health therapeutic practices. The City's code enforcement officials tasked with enforcing the ordinance need only a high school diploma or equivalent for the position, and receive no training in marriage and family therapy or mental health counseling. (SUF ¶ 42.) Code officials must know what the ordinance prohibits in order to enforce it, and to fulfill their responsibilities to issue notices of violation. (SUF ¶ 42.) But the officials are not trained to distinguish "conversion therapy" from other therapy, or qualified to tell the difference between "sexual orientation" and "gender identity," or how to know, for example, whether a child experiencing gender confusion has transitioned to a cross-gender identity or is still exploring the possibility. (SUF ¶ 42.) Tampa code officials do not enforce any other ordinances regulating the therapies offered by mental health professionals, and have no experience or expertise in enforcing such regulations. (SUF ¶ 43.)

Moreover, there is no evidence of any trained or qualified professional upstream from code enforcement personnel to preside over a final determination, such as a board of professional standards, or even a single reviewing professional with appropriate training or licensure. Tampa code officials are instructed to refer all potential "conversion therapy" cases to the City's legal department for handling. (SUF ¶ 44.) The City's lawyer responsible for overseeing "conversion therapy" enforcement, however, cannot define the term "gender identity" as used in the ordinance, and would look to the dictionary to interpret the ordinance. (SUF ¶ 44.) The ultimate trier of ordinance violations is a City-appointed special master, but the City does not know whether any special master on its roster is a licensed mental health practitioner, and the City has no plans to

14

appoint a special master with those credentials. (SUF ¶ 44.) Such a fatally flawed process could never satisfy the constitutional "fit" requirement of narrow tailoring.

To be sure, the testimony of the City's expert Dr. Spack illustrates the utter incompatibility of code enforcers with the regulation of mental health professionals. According to Dr. Spack, there is a "frustrating group" he sees "that calls themselves gender queer," and he calls them "gender fluid":

> **It's a person who doesn't commit to being either male or female. But that may take different -- manifest, for example, it could be someone who just sees themselves somewhere in the spectrum and it changes from day-to-day, and someone who sees themselves very much male one day and very much female the next**.
>
> . . . .
>
> **The thing I don't know, and I wouldn't be able to tell you** -- I don't know if I'll live long enough to find out -- is how do these people end up? **Are they on a path towards one or the other or not?**

(Spack 38:6–40:13 (emphasis added).) When asked whether "gender fluid" could be categorized as a gender identity, Dr. Spack answered, "If it's ill defined and especially moving, a moving target, I would call it a form of gender identity." (Spack 39:25–40:8.) If Dr. Spack could not easily determine the gender identity of a "gender fluid" person, or whether "they [are] on a path towards one or the other or not," then no Tampa code official is qualified to make that determination for purposes of determining whether a change of gender identity is being attempted.

As another illustration, the guidelines on gender identity issues lauded by Dr. Spack recommend against transition for prepubertal children who exhibit "cross-gender behavior, but not so much as to qualify as being transgender," and Dr. Spack testified that the determination of whether the child qualifies as being transgender must be made by "incredibly skillful psychologists" and not non-psychologists without education beyond high school:

> Q       . . . . Would a non-psychologist, let's say a person with a high school diploma, for example, be able to make that determination that you described?
>
> A       **No.**

(Spack 75:15–19 (emphasis added); SUF ¶ 37, 38.)

The ordinance, however, allows unlimited affirmation of this contra-indicated transition, while prohibiting counseling to help the child embrace or align with his or her biological sex if such alignment is construed as a change or attempted change of gender identity. The glaringly obvious problem, then, is that no Tampa code official or upstream adjudicator is qualified to make that determination. Moreover, the ordinance endorses affirmation of contra-indicated transition in the direction of cross-gender identity, but prohibits affirmation in the other direction—towards biological gender identity—even though that is a recognized approach to alleviating gender dysphoria. (Spack 116:25–123:17, Ex. 33 (Dkt. 192-8).)

### B.     Tampa Intended and Interprets the Ordinance to Prohibit Speech of a Particular Viewpoint.

Not only does the ordinance text betray the City's intent to censor speech, it also betrays the City's intent to censor a particular viewpoint. As found by the Magistrate,

> the City adopted Ordinance 2017-47 because the City disagreed with the viewpoint mental health counselors express during SOCE counseling. (See also Doc. 24-1, p. 6) (prohibiting counseling aimed at "chang[ing] . . . gender identity, or gender expression" while allowing counseling "that provides support and assistance to a person undergoing gender transition") . . . .

(MPI R&R 30 (citing ordinance text); *see also* MPI 7–11; MTD Resp./MPI Reply 11–13; R&R Objs. Resp. 32–38.) The City's enforcement attorney confirmed the ordinance punishes a counselor's viewpoint that affirms a client's goal to change sexual orientation or gender identity. (SUF ¶ 9.) The Magistrate correctly discerned that, given the ordinance's expressly allowing the affirmation of a client's "transition" (change) from the client's biological gender, the City's

interpretation otherwise disallowing the affirmation of a client's change of gender identity means that the counseling viewpoint affirming transition-change (away from biological gender) is allowed, while the counseling viewpoint affirming return-change (to biological gender) is prohibited.

A viewpoint-based restriction on private speech has never been upheld by the Supreme Court or any court. Indeed, a finding of viewpoint discrimination is dispositive. *See Sorrell v. IMS Health*, 131 S. Ct. 2653, 2667 (2011). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* at 829. In fact, **viewpoint-based regulations are always unconstitutional**. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others'") (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)); *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985) ("the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses"); *see also Searcy v. Harris*, 888 F.2d 1314, 1324 (11th Cir. 1989) (the government "may not discriminate between speakers who will speak on the topic merely because it disagrees with their views"), *id.* at 1325 ("**The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis**." (emphasis added)); Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 444 ("the Court almost always rigorously reviews and then invalidates regulations based on viewpoint").

17

The ordinance is a textbook example of viewpoint discrimination. On its face, the ordinance purports to allow licensed therapists to discuss the subject of sexual orientation, but explicitly prohibits a particular viewpoint on that subject, namely that unwanted same-sex attraction can be reduced or eliminated to the benefit of the client, if the client so desires. The ordinance defines "conversion therapy" in such a way that it is clear that the City is targeting only one viewpoint, *i.e.*, SOCE that seeks to "eliminate or reduce sexual or romantic attractions or feelings **toward individuals of the same gender or sex**." (Ordinance PageID 348 (emphasis added).) Similarly, the ordinance encourages counselors to affirm and facilitate same-sex attractions when minor clients are questioning such feelings, but prohibits counselors from affirming minor clients' desires and goals to change unwanted same-sex attractions, even when the minor clients themselves request and seek that outcome. (*Id.*)

The ordinance also purports to prohibit licensed counselors from engaging in any practice that seeks to change behaviors, gender identity, or gender expression. (*Id.*) But the plain text of the ordinance demonstrates that it only prohibits such counseling for minor clients who wish to reduce or eliminate behaviors, identity, or expressions that differ from their biological sex. (*Id.*) That this is true cannot be questioned because the ordinance specifically exempts counseling that "provides support and assistance to a person undergoing gender transition." (*Id.*). To undergo "gender transition," one has to be—at minimum—seeking to change from one gender to the other. **Change is the definition of transition**. *See* Dictionary.com Unabridged, https://www.dictionary.com/browse/transition?s=t (last visited Aug. 26, 2019) ("movement, passage, or **change** from one position, state, stage, subject, concept, etc., to another; **change**" (emphasis added).) So, under the ordinance, if a minor client wants to undergo irreversible hormone therapy or surgery to alter his appearance or genitalia, the City has no problem with a counselor providing counseling to assist

in **that** change. (*See, e.g.,* SAMHSA Rep. PageID 557.) But, if a minor client merely wants to speak with a counselor about unwanted feelings concerning her gender identity or expression, the counselor is absolutely prohibited from engaging in such counseling if it aids the minor in reducing unwanted cross-gender identity, behaviors, or expressions. There can be no question that this is viewpoint discrimination.

The Supreme Court and several other courts have invalidated regulations of professional speech as unconstitutional viewpoint discrimination. *See Sorrell*, 131 S. Ct. 2653 (2011); *Legal Servs. Corp. v. Valazquez*, 531 U.S. 533 (2001); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002). In these cases, the courts recognized the axiomatic truth that the government is not permitted to impose its viewpoint on speakers, even professional speakers subject to licensing requirements and regulation.

In *Velazquez*, the Court addressed a federal funding limitation on legal aid attorneys that operated in the same viewpoint-based manner as the Ordinances. *Velazquez*, 531 U.S. at 537–38. The law provided that attorneys could not receive funds if they challenged welfare laws. The Court invalidated the law as viewpoint discriminatory, because it had the effect of prohibiting "advice or argumentation that existing welfare laws are unconstitutional or unlawful," and thereby excluded certain "vital theories and ideas" from the lawyers' representation. *Id.* at 547–49.

In *Conant*, the Ninth Circuit invalidated a federal policy that punished physicians for communicating with their patients about the benefits or options of marijuana as a potential treatment. *Conant*, 309 F.3d at 633. The Ninth Circuit noted that the doctor-patient relationship is entitled to robust First Amendment protection:

> An integral component of the practice of medicine is the communication between a doctor and a patient. **Physicians must be able to speak frankly and openly to patients**. That need has been

> recognized by courts through the application of the common law
> doctor-patient privilege.

*Id.* at 636 (emphasis added). Far from being a First Amendment orphan, such professional speech "may be entitled to the strongest protection our Constitution has to offer." *Id.* at 637 (quoting *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)). The ban impermissibly regulated physician speech based on viewpoint:

> The government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications. Only doctor-patient conversations that include discussions of the medical use of marijuana trigger the policy. Moreover, the **policy does not merely prohibit the** discussion **of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient**. Such condemnation of particular views is especially troubling in the First Amendment context.

*Id.* at 637–38 (emphasis added). The court rejected as inadequate the government's justification that the policy prevented clients from engaging in harmful behavior, and permanently enjoined enforcement of the policy. *Id.* at 638–39.

The ordinance here operates almost identically to the federal policy enjoined in *Conant*. Just as the policy in *Conant* prohibited physicians from speaking about the benefits of marijuana to a suffering patient, so does the ordinance prohibit counselors from speaking about the potential for reduction or elimination of unwanted same-sex attractions, or desires to "transition to another gender" (or de-transition to biological sex) that might benefit a client distressed by the unwanted desires. In both cases, the laws express a preference for the message the government approves and disdain attached to punishment for the viewpoint the government abhors. As was true of the law in *Conant*, the ordinance here should be invalidated as unconstitutional viewpoint discrimination.

It is not enough that the ordinance purports to protect a therapist's right to recommend or refer clients out for SOCE. (Ordinance PageID 347.) In reality, as soon as a therapist informs a

client that the talk therapy recommended by the therapist as beneficial and good is nonetheless illegal, the credibility of the therapist's viewpoint is immediately undermined, to the injury of the therapist's reputation and, more importantly, the therapeutic alliance. To be sure, this undermining of the therapist's viewpoint is intended, and intentionally discriminatory.

### C.   PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR PRIOR RESTRAINT, VAGUENESS, AND OVERBREADTH CLAIMS.

Plaintiffs are entitled to judgment as a matter of law on their vagueness, overbreadth, and prior restraint claims on the legal grounds presented in their MPI at 20–22 and R&R Objs. Resp. at 38, and as concluded by the Magistrate in the MPI R&R at 30–32.

## II.   PLAINTIFFS ARE ENTITLED TO JUDGMENT AS A MATTER OF LAW ON THEIR IMPLIED PREEMPTION CLAIM.

As shown in Plaintiffs' MPI briefing, the Tampa ordinance is *ultra vires* and void *ab initio* as legislation on a subject matter impliedly preempted to the State of Florida. (MPI 22–24; MTD Resp./MPI Reply 40–43.) The proper inquiry is whether the State has "preempted **a particular subject area**," not one individual form of counseling. *Sarasota Alliance For Fair Elections, Inc. v. Browning*, 28 So.3d 880, 886 (Fla. 2010) (emphasis added)). Here, the State of Florida's regulatory scheme, which covers all licensed medical and mental health professionals in the State, is pervasive and evidences an intent to be the sole regulator of these licensed professionals in the State. Tampa's ordinance unlawfully invades Florida's pervasive regulatory scheme.

Florida Statutes Chapter 456 sets forth the general provisions related to the regulation and licensure of health professions and occupations. Specifically, in Fla. Stat. § 456.003(2)(b) the Legislature identified the absence of local regulation as a justification for the State to authorize the **State** Department of Health to establish boards and regulatory bodies to ensure that such professions are regulated to protect the health, safety and welfare of the public:

> (2) The Legislature further believes that such **professions shall be regulated** only for the preservation of the health, safety, and welfare of the public **under the police powers of the state**. Such professions shall be regulated when:
>
> . . . .
>
> (b) **The public is not effectively protected by other means, including, but not limited to**, other state statutes, **local ordinances**, or federal legislation.

Fla. Stat. § 456.003. This statement of legislative intent justifies the state's entry into, and occupation of, the field of health professional regulation, because no preexisting local ordinances were there to protect the public. It does not invite Florida cities to subsequently enter the field with their own regulations.

**Chapter 491** more specifically regulates professionals in clinical social work, marriage and family therapy, and mental health counseling. For example, **§ 491.003 defines** the "'practice of marriage and family therapy,'" **identifies** who "[m]arriage and family therapy may be rendered to," and **restricts** the "use of specific methods, techniques, or modalities within the practice of marriage and family therapy . . . to marriage and family therapists appropriately trained in the use of such methods, techniques, or modalities." Fla. Stat. § 491.003(8). The section similarly regulates the practices of clinical social work and mental health counseling.

**Section 491.004** creates within the State Department of Health the **Board of Clinical Social Work, Marriage and Family Therapy, and Mental Health Counseling** (the "State Board") composed of nine members, **six of which must be licensed professionals in the three practice fields**. Fla. Stat. § 491.004(1), (2). The section also grants rulemaking authority to the Board to implement Chapter 491. Fla. Stat. § 491.004(5).

**Section 491.005** imposes **licensure requirements** for clinical social work, marriage and family therapy, and mental health counseling professionals, **including requirements for**

education, experience, passage of a **"theory and practice examination," and "knowledge of the laws and rules governing the practice** of clinical social work, marriage and family therapy, and mental health counseling." Fla. Stat. § 491.005(1), (3), (4).

**Section 491.009** specifies **grounds for discipline** of licensed clinical social work, marriage and family therapy, and mental health counseling professionals, including **"False, deceptive, or misleading advertising or obtaining a fee or other thing of value on the representation that beneficial results from any treatment will be guaranteed,"** and **"Failing to meet the minimum standards of performance in professional activities when measured against generally prevailing peer performance**, including the undertaking of activities for which the licensee, registered intern, or certificateholder is not qualified by training or experience." Fla. Stat. § 491.009(1)(d), (r).

**Florida Administrative Code Subtitle 64B4** contains the rules implemented by the State Board to implement Fla. Stat. Ch. 491. For example, **§ 64B4-3.003** specifies the respective **"theory and practice"** licensure examinations to be administered to social work, marriage and family therapy, and mental health counseling professionals, such as the **"examination developed by the Examination Advisory Committee of the Association of Marital and Family Therapy Regulatory Board (AMFTRB)"** for marriage and family therapists. F.A.C. § 64B4-3.003(2)(c).

**Section 64B4-5.001** provides for the **determination of violations and imposition of discipline** on the grounds provided by Fla. Stat. § 491.009, such as "False, deceptive, or misleading advertising or obtaining a fee or other thing of value on the representation that beneficial results from any treatment will be guaranteed," and "Failing to meet the MINIMUM standards of performance in professional activities when measured against generally prevailing peer performance, including the undertaking of activities for which the licensee is not qualified by

training or experience." F.A.C. § 64B4-5.001(1)(d), (s). Such **determinations of violations and imposition of discipline** against licensed social work, marriage and family therapy, and mental health counseling professionals are made **by the State Board, six members of which are licensed professionals** in the respective fields.

Section **64B4-3.0035** additionally specifies how the three types of professionals "shall demonstrate knowledge of the laws and rules for licensure:"

> (1) An applicant shall complete an approved course consisting of a minimum of eight (8) hours which shall include the following subject areas:
>
> > (a) **Chapter 456, Part II, F.S.**, (Regulation of Professions and Occupations, General Provisions)
> >
> > (b) **Chapter 90.503**, F.S., (Psychotherapist-Patient Privilege)
> >
> > (c) **Chapter 394**, F.S., (Part I Florida Mental Health Act)
> >
> > (d) **Chapter 397**, F.S.
> >
> > (e) **Chapters 415 and 39**, F.S., (Protection from Abuse, Neglect and Exploitation)
> >
> > (f) **Chapter 491**, F.S., (Clinical, Counseling and Psychotherapy Services)
> >
> > (g) **Chapter 64B4, F.A.C.**, (Rules of the Board of Clinical Social Work, Marriage and Family Therapy and Mental Health Counseling)
>
> (2) **The laws and rules course must provide integration of the above subject areas into the competencies required for clinical practice and must include interactive discussion of clinical case examples applying the laws and rules that govern the appropriate clinical practice**.

No local ordinances are mentioned in the extensive requirements for knowledge of the laws and rules, because there is no room for local ordinances in the state statutory scheme.

24

The foregoing regulation of licensed health providers in general, and licensed mental health providers specifically, including education, experience, licensure, practice, and discipline, administered by a state board of licensed professionals, is pervasive, and implies an intent by the Florida Legislature to occupy the field to the exclusion of local regulation.

**III.   PLAINTIFFS SATISFY ALL FACTORS FOR PERMANENT INJUNCTIVE RELIEF.**

In the Eleventh Circuit, "to obtain a permanent injunction, a plaintiff must show (1) that he has suffered an irreparable injury; (2) that his remedies at law are inadequate; (3) that the balance of hardships weighs in his favor; and (4) that a permanent injunction would not disserve the public interest." *Barrett v. Walker County Sch. Dist.*, 872 F.3d 1209, 1229 (11th Cir. 2017). As shown in Plaintiffs' MPI briefing, Plaintiffs satisfy these factors. (MPI 24–25; MTD Resp./MPI Reply 27–30; R&R Objs. Resp. 41–43.)

**<u>CONCLUSION</u>**

For all of the foregoing reasons, the Court should grant Plaintiffs' Motion for Summary Judgment.

Respectfully submitted,

/s/ Roger K. Gannam
Mathew D. Staver
Horatio G. Mihet
Roger K. Gannam
Daniel J. Schmid
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Fax: (407) 875-0770
E-mail: rgannam@LC.org
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on this August 26, 2019, I caused a true and correct copy of the foregoing to be filed electronically with the Court's CM/ECF system. Service upon all counsel of record will be effectuated by the Court's electronic notification system.

/s/ Roger K. Gannam
Roger K. Gannam
*Attorney for Plaintiffs*

26