## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

ROBERT L VAZZO and SOLI DEO
GLORIA INTERNATONAL, INC.
d/b/a NEW HEARTS OUTREACH
TAMPA BAY,

       Plaintiffs,

v.                                                      No. 8:17-cv-2896-T-02AAS

CITY OF TAMPA,

       Defendant.

_____/

## ORDER GRANTING
## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

This matter comes to the Court on Motions for Summary Judgment filed by

Plaintiffs Robert Vazzo and New Hearts Outreach Tampa Bay, Dkt. 194, and

Defendant, City of Tampa, Dkt. 189. With the benefit of full briefing and able

argument by both sides at a hearing, the Court grants Plaintiffs' motion for

summary judgment as to Count VI of the Amended Complaint, Dkt. 78, pursuant

to Fed. R. Civ. P. 56.

### INTRODUCTION

This case involves a challenge to the City of Tampa's municipal ordinance

prohibiting sexual orientation change efforts ("SOCE") on minors during licensed

psychotherapy and counseling.  The Eleventh Circuit follows "the longstanding principle that federal courts should avoid reaching constitutional questions if there are other grounds upon which a case can be decided." *BellSouth Telecomms., Inc. v. Town of Palm Beach*, 252 F.3d 1169, 1176 (11th Cir. 2001).  The Supreme Court has long endorsed this "sound general policy." *District of Columbia v. Little,* 339 U.S. 1, 3–4 (1950).  Following this policy, the Court turns first to Count VI, a preemption Count based upon Florida law.  According to the City, the Ordinance regulates medical professionals and "part of the practice of medicine" within the City limits.  Dkt. 189 at 17.  The City is unaware of any child ever receiving proscribed SOCE in the City.[1]  The City has never before substantively regulated and disciplined the practice of medicine, psychotherapy, or mental health treatment within City limits.  Nor does the City possess charter or home rule authority to do so.  The City Ordinance is preempted by the comprehensive Florida regulatory scheme for healthcare regulation and discipline.  Accordingly, the Court strikes the Ordinance under the implied preemption doctrine and grants the Plaintiffs' motion for summary judgment on Count VI. Dkt. 194.

## PROCEDURAL BACKGROUND

**The Ordinance:**  The City of Tampa passed Ordinance 2017-47 (attached here as an appendix) on April 6, 2017. It was signed into law by Mayor Bob

---

[1] Dkt. 134-18 at 8 & 9; Dkt. 133-3 at 109.

Buckhorn four days later.[2]  Broadly stated, the Ordinance bars therapy within the City by medical doctors and mental health professionals that seeks to assist a minor patient in a goal to change gender expression or to change sexual orientation/attraction.  These two subjects are separate and distinct, but related.  The cases have generically referred to these two subjects as "SOCE" or sexual orientation change efforts.  The Ordinance uses the term "conversion therapy."  Neither term is entirely accurate, but the Court will use the term "SOCE" for these two subjects as that seems more prevalent in the case law and literature and that term was preferred by the City's expert.[3]  The Tampa Ordinance prohibiting SOCE on minors is very similar to one present in other lawsuits now pending.[4]

Specifically, the Ordinance contains a lengthy preamble, citing a number of psychological and medical studies offering criticism of SOCE.  Tampa, Fla., Ordinance 2017-47 (April 10, 2017).  The preamble, which serves as legislative factfinding by the City Council, cites as legal authority "two federal circuit courts of appeal [that] have upheld bans on conversion therapy."[5]  These two cases, from

---

[2]  Tampa, Fla., Ordinance 2017-47 at 4 (April 10, 2017) (codified at Tampa, Fla., Code of Ordinances §§ 14-310 to -313 (2019)); see also Dkt. 1 at 41–47.

[3] *E.g. Pickup v. Brown,* 740 F.3d 1208, 1221 (9th Cir. 2014); *King v. New Jersey,* 767 F.3d 216, 221 (3d Cir. 2014); *Otto v. City of Boca Raton,* 353 F. Supp. 3d 1257, 1241 (S.D. Fla. 2019); Dkt. 192-1 at 58–59, 64–65; Dkt. 133-3 at 52–53.

[4] *Otto,* 353 F. Supp. 3d at 1243–44; Dkt. 133-3 at 60; *see also* City of West Palm Beach, Ordinance 4666-16 (2016).

[5] *See* Tampa, Fla., Ordinance 2017-47 at 4 (April 10, 2017) (citing *King v. New Jersey,* 767 F.3d 216 (3d Cir. 2014); *Pickup v. Brown,* 740 F.3d 1208 (9th Cir. 2014)).

the U.S. Ninth and Third Circuit Courts of Appeals, were criticized by name and

possibly abrogated on First Amendment grounds by the U.S. Supreme Court in

2018 in *Nat'l Institute of Family and Life Advocates v. Becerra,* 138 S. Ct. 2361,

2371–72 (2018).

The Ordinance states that the City Council found "overwhelming research

demonstrating that sexual orientation and gender identity change efforts can pose

critical health risks to lesbian, gay, bisexual, transgender or questioning persons,

and that being lesbian, gay, bisexual, transgender or questioning is not a mental

disease, mental disorder, mental illness, deficiency, or shortcoming." Tampa, Fla.,

Ordinance 2017-47 at 4 (April 10, 2017). Relevant text is as follows:

**Sec. 14-310.–Intent**.

The Intent of this Ordinance is to protect the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and/or questioning youth, from exposure to the serious harms and risks caused by conversion therapy or reparative therapy by licensed providers, including but not limited to licensed therapists. These provisions are exercises of police power of the City for the public safety, health, and welfare; and its provisions shall be liberally construed to accomplish that purpose.

**Sec. 14-311.–Definitions**.

*Conversion therapy or reparative therapy* means, interchangeably, any counseling, practice or treatment performed with the goal of changing an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behaviors, gender identity, or gender expression, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex. Conversion therapy does not include counseling

4

that provides support and assistance to a person undergoing gender transition or counseling that provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as such counseling does not seek to change sexual orientation or gender identity.

> *Minor* means any person less than 18 years of age.

> *Provider* means any person who is licensed by the State of Florida to provide professional counseling, or who performs counseling as part of his or her professional training under chapters 456, 458, 459, 490 or 491 of the Florida Statutes, as such chapters may be amended, including but not limited to, medical practitioners, osteopathic practitioners, psychologists, psychotherapists, social workers, marriage and family therapists, and licensed counselors. A Provider does not include members of the clergy who are acting in their roles as clergy or pastoral counselors and providing religious counseling to congregants, as long as they do not hold themselves out as operating pursuant to any of the aforementioned Florida Statutes licenses.

**Sec. 14-312.–Conversion Therapy Prohibited**.

> It shall be unlawful for any Provider to practice conversion therapy efforts on any individual who is a minor regardless of whether the Provider receives monetary compensation in exchange for such services.

Tampa, Fla., Code of Ordinances §§ 14-310 to -312 (2019).

The Ordinance provides for a $1000 fine for the first offense and a $5000 fine for subsequent offenses. *Id.* § 14-313. The City's Department of Neighborhood Enhancement (formerly Code Enforcement) enforces the Ordinance. *Id.* Although this is the City Department that usually enforces code violations like overgrown weeds and unpermitted contracting, the City's

Neighborhood Enhancement director testified that he would take any suspected violation of the SOCE Ordinance to the City Attorney before issuing a notice of violation.  Dkt. 133-1 at 23–25, 29.  The Assistant City Attorney tasked as representative on this matter has been a lawyer for four years but has no training in counseling, therapy, or medicine; and stated that the City would consult Webster's Dictionary to understand the terms in the Ordinance.  Dkt. 133-3 at 23, 25, 67–68.

If contested, the City would employ a "special magistrate" to adjudicate the alleged violation as a code enforcement proceeding.  Dkt. 134-3 at 8; Dkt. 133-3 at 102–03.  The City's special magistrates are unpaid volunteers appointed by the mayor.  *Id.*  The City has no plan in connection with the Ordinance to appoint someone who is a licensed mental health provider.  *Id.* at 104.

The Ordinance does not preclude providers from speaking about SOCE to any persons including patients and in any setting, other than as part of therapy with minor patients.  The Ordinance applies only to licensed practitioners while giving mental health therapy to minors within City limits, and applies to no other persons such as ministers, lay providers, parents, unlicensed persons, etc. Tampa, Fla., Ordinance 2017-47 at 4 (April 10, 2017).  The Ordinance does not differentiate between coercive or aversive therapy, and simple "talk therapy."

**The Plaintiffs:**  Plaintiff Vazzo is a marriage and family therapist licensed in Florida and other states.  Dkt. 78 ¶ 14.  His practice includes providing SOCE

counsel to minors.  *Id.* ¶ 102.  According to Vazzo, SOCE counseling may help clients including minors "reduce or eliminate same-sex sexual attractions, behaviors, or identity."  *Id.* ¶¶ 60, 88, 116.  Vazzo employs no coercive or aversive techniques.  *Id.* ¶ 61.  During SOCE counseling, Vazzo uses speech to help clients "understand and identify their anxiety or confusion regarding their attractions, or identity and then help the client formulate the method of counseling that will most benefit that particular client."  *Id.* ¶ 65.

Vazzo states that clients initiate SOCE counseling by giving informed consent.  *Id.* ¶ 8.  Some clients request SOCE counseling to "address the conflicts between their sincerely held religious beliefs and goals to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity."  *Id.* ¶ 9.

Plaintiff New Hearts Outreach is a Christian ministry in Tampa.  *Id.* ¶¶ 16, 126.  Part of its ministry is to refer individuals, including minors, "struggling with unwanted same-sex attractions, behaviors, and identity" to mental health professionals to receive SOCE counseling.  *Id.* ¶¶ 132–34.

Vazzo cannot provide SOCE counseling to minors in Tampa under Ordinance 2017-47.  *Id.* ¶ 112.  Nor can New Hearts Outreach refer minors to Vazzo for SOCE counseling in Tampa.  *Id.* ¶ 135.

Plaintiffs sue the City and allege Ordinance 2017-47 violates their federal and state constitutional rights.  Dkt. 78.  The Plaintiffs allege Ordinance 2017-47

violates their right to freedom of speech under the First Amendment (Count I), a claim to which the parties have devoted great attention. *Id.* ¶¶ 177–96; *see* Dkt. 189 at 5–17; Dkt. 194 at 2–20.

Among their other claims, Plaintiffs allege in Count VI that the Florida legislature preempted the field of regulating mental health professionals. *Id.* ¶¶ 262–75. Because this Court grants summary judgment on the preemption claim in Count VI, the other counts in the Amended Complaint are not discussed.[6]

## SUMMARY JUDGMENT STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that a summary judgment "shall [be granted] if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Jeffrey v. Sarasota White Sox*, 64 F.3d 590, 593 (11th Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). The Court must view the evidence in the light most favorable to the non-movant and resolve all doubts in the non-movant's favor. *Id.* at 594.

---

[6] In addition to the "free speech" First Amendment claim in Count I, Plaintiffs assert in Count II a First Amendment claim based on their clients' rights to receive information. Dkt. 78 at 197–205. In the other remaining counts, Count IV asserts a claim under the Florida Constitution's Article I § 4 free speech clause. *Id.* at 224–43. Count VII asserts a claim under Florida Statute § 381.026(04), the Florida Patient's Bill of Rights. *Id.* at 276–91.

However, when "the party seeking summary judgment meets the initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to come forward with sufficient evidence to rebut this showing with affidavits or other relevant and admissible evidence." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991) (citing *Celotex*, 477 U.S. at 324).  To satisfy its burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

Furthermore, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed.'"  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) (quoting *Schuylkill and Dauphin Imp. Co. v. Munson*, 81 U.S. 442, 448 (U.S. 1871)).

## FLORIDA'S LAW OF IMPLIED PREEMPTION

The Supreme Court of Florida most recently addressed the implied preemption doctrine in *D'Agastino v. City of Miami*, 220 So. 3d 410 (2017) (finding portion of Miami ordinance impliedly preempted).  The Court noted that, "in Florida, the power of a municipal government to legislate is derived from both constitutional provisions and statute.  Generally speaking, the Florida Constitution authorizes and empowers municipalities to exist and conduct municipal powers except as otherwise provided by law."  *Id.* at 420.  Concerning municipal powers, the Florida Constitution states:

> (b)  POWERS.  Municipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law.  Each municipal legislative body shall be elective.

Fla. Const. art. VIII, § 2(b); *see also D'Agastino*, 220 So. 3d at 420.

Acting on its constitutional authority to address municipal powers, the Legislature clarified the powers of municipal government by enacting the Municipal Home Rule Powers Act, which is now codified in section 166.021 of the Florida Statutes.  *D'Agastino*, 220 So. 3d at 420.  Specifically, section 166.021(1) provides in full:

> 166.021 Powers.–

> (1)   As provided in s. 2(b), Art. VIII of the State Constitution, municipalities shall have the governmental, corporate, and proprietary

> powers to enable them to conduct municipal government, perform
> municipal functions, and render municipal services, and may exercise
> any power for municipal purposes, except when expressly prohibited
> by law.

Fla. Stat. § 166.021(1) (2008); *see also D'Agastino*, 220 So. 3d at 420.  *D'Agastino*

noted that:

> However, these powers are subject to limitations; among others,
> municipalities may not enact legislation concerning subjects expressly
> preempted to the state by general law:
>
> > "(3)   The Legislature recognizes that pursuant to the grant of
> > power set forth in s. 2(b), Art. VIII of the State Constitution, the
> > legislative body of each municipality has the power to enact
> > legislation concerning any subject matter upon which the state
> > Legislature may act, except:
> > > (a) The subjects of annexation, merger, and exercise of
> > > extraterritorial power, which require general or special law
> > > pursuant to s. 2(c), Art. VIII of the State Constitution;
> > > (b)  Any subject expressly prohibited by the constitution;
> > > (c)  Any subject expressly preempted to state or county
> > > government by the constitution or by general law; and
> > > (d)  Any subject preempted to a county pursuant to a county
> > > charter adopted under the authority of ss. 1(g), 3, and 6(e),
> > > Art. VIII of the State Constitution."

220 So. 3d at 420 (quoting Fla. Stat. § 166.021(3) (2008)) (emphasis omitted).

Against this backdrop, the *D'Agastino* court observed that "a local

government enactment may be inconsistent with state law where the Legislature

has preempted a particular subject area." *Id*. at 420–21 (quoting *Sarasota All. for*

*Fair Elections, Inc. v. Browning*, 28 So. 3d 880, 886 (Fla. 2010)).  The Florida

Supreme Court noted that Florida law recognizes both express preemption and

implied preemption.  *Id*. at 421.

11

Unlike the explicit nature of express preemption, "implied preemption occurs when the state legislative scheme is pervasive and the local legislation would present a danger of conflict with that pervasive scheme." *Id*. Put another way, "preemption is implied when the legislative scheme is so pervasive as to virtually evidence an intent to preempt the particular area or field of operation, and where strong public policy reasons exist for finding such an area or field to be preempted by the Legislature." *Id*. Thus, explicit words are not required for preemption "so long as it is clear from the language utilized that the Legislature has clearly preempted local regulation of the subject." *Id.* (citing to *Barragan v. City of Miami*, 545 So. 2d 252, 254 (Fla. 1989)). The *D'Agastino* Court held that the test for implied preemption requires that the courts look "to the provisions of the whole law, and to its object and policy." *Id.* (citing *Browning*, 28 So. 3d at 886); *see also State v. Harden*, 938 So. 2d 480, 486 (Fla. 2006). Additionally, "[t]he nature of the power exerted by the Legislature, the object sought to be attained by the statute at issue, and the character of the obligations imposed by the statute" are all vital in this analysis. *Id*.

*D'Agastino* cautioned judges to "be careful and mindful in attempting to impute intent to the Legislature to preclude a local elected governing body from exercising its home rule powers." *Id.* (citing *Tallahassee Mem'l Reg'l Med. Ctr.,*

*Inc. v. Tallahassee Med. Ctr., Inc.*, 681 So. 2d 826, 831 (Fla. 1st DCA 1996)).

Despite this caveat the Florida Supreme Court went on to explain:

> Nevertheless, as we reemphasized in *City of Palm Bay*, because the Legislature is ultimately superior to local government under the Florida Constitution, preemption can arise even where there is no specifically preclusive language. 114 So. 3d at 928 ("But we have never interpreted either the constitutional or statutory provisions relating to the legislative preemption of municipal home rule powers to require that the Legislature specifically state that the exercise of municipal power on a particular subject is precluded."). We further reaffirmed in *City of Palm Bay* that the language "except as otherwise provided by law" contained in the constitutional provision "establishes the constitutional superiority of the Legislature's power over municipal power."

*Id.*

"Although implied preemption involving a municipality's home rule powers may be disfavored, [courts] must carefully consider the intent of the Legislature with regard to the preemptive operation even though it may not be expressly stated." *D'Agastino*, 220 So. 3d at 423. The *D'Agastino* court found that a portion of municipal disciplinary proceedings for local police officers was impliedly preempted by an extensive state statutory and regulatory scheme set up for police disciplinary matters. *Id.* at 423–24. The Court found it readily apparent that the field of police disciplinary investigations was regulated by multiple Florida statutes. *Id.* at 424. The municipal creation of a local subpoena power over police officers, as part of police discipline and police conduct investigations, was impliedly preempted. *Id.* at 427.

The test is simple: "implied preemption is found when the state legislative scheme of regulation is pervasive and the local legislation would present the danger of conflict with that pervasive regulatory scheme." *Classy Cycles, Inc. v. Bay Cty. Fla.*, 201 So. 3d 779, 788 (Fla. 1st DCA 2016) (citing to *Browning*, 28 So. 3d at 886). The state legislative scheme should be "so pervasive as to evidence an intent to preempt the particular area, and [] strong public policy reasons exist for finding such an area to be preempted by the Legislature." *Phantom of Clearwater, Inc. v. Pinellas Cty.*, 894 So. 2d 1011, 1019 (Fla. 2d DCA 2005) (citing *Tallahassee Mem'l*, 681 So. 2d at 831). "[T]he preempted field is usually a narrowly defined field, 'limited to the specific area where the Legislature has expressed their will to be the sole regulator.'" *Id*. (citing *St. Johns Cty. v. N.E. Fla. Builders Ass'n*, 583 So. 2d 635, 642 (Fla. 1991)).

Examples of these principles in action can be seen in *D'Agastino* where a survey of the relevant state statutes relating to police disciplinary investigations showed a legislative intent to cover the entire spectrum of subpoenaed police testimony. 220 So. 3d at 420–26. There was no room for municipal intrusion into subpoenaing police officers concerning discipline. That the city's police subpoenas conflicted somewhat with the State's showed that the State occupied the field exclusively. Likewise, in *Classy Cycles*, the municipality imposed insurance

requirements for motor vehicle usage (tourist-style scooters).  201 So. 3d at 782–

83.  In finding implied preemption, the appellate court stated:

> [T]he Legislature has created a pervasive scheme of regulation,
> coverage requirements, and limitation of liability, including specific
> requirements for coverage necessary to operate various motor vehicles
> in Florida.  *Thus, the ordinances are an attempt to regulate in an area
> well-covered by existing statutes.  The local governments' ordinances
> attempting to mandate insurance are therefore impliedly preempted.*

*Id.* at 788 (emphasis added).

Some courts have found no implied preemption when the state regulatory

scheme was brief, or only a few pages in the law books.  *See, e.g.*, *Phantom of*

*Clearwater, Inc.*, 894 So. 2d at 1019 (noting the state statute at issue was only 3

pages long); *Bloom v. Miami-Dade Cty.*, No. 09-51205 CA 13, 2009 Fla. Cir.

LEXIS 4303 at *4–6 (Fla. Cir. Ct. Sept. 6, 2009), *aff'd sub nom. Exile v. Miami-*

*Dade Cty.*, 35 So. 3d 118 (Fla. 3d DCA 2010).  As discussed below, this is

manifestly not the case here with Florida health regulations.

Other courts have found no implied preemption when the municipal

ordinance is local in nature, or tied to a situation unique to the locale.  For

example, in *Exile v. Miami-Dade Cty.*, 35 So. 3d 118 (Fla. 3d DCA 2010), the

District Court of Appeal found that an ordinance prohibiting convicted sex

offenders from living within 2500 feet of a school was not preempted by a state

statute with a 1000 feet prohibition.  In the trial court opinion, which the Third

District Court of Appeal appeared to rely upon, the court noted there was no need

for statewide uniformity because the most effective buffer zone would depend upon local conditions and local property boundaries, varying across municipalities. *Bloom*, 2009 Fla. Cir. LEXIS 4303 at *8–10.

But in *Classy Cycles*, the county argued its local conditions, involving untrained and unruly tourists driving scooters and motorcycles in the beach area, showed a need for its local insurance requirements and local safety regulations for motor vehicle traffic.  201 So. 3d at 789.  The court rejected this, noting that 1) no grant from the Legislature to localities existed regarding vehicle insurance; and 2) rowdy tourists are not a local phenomena in Florida to permit differing laws in Bay County, when the Legislature's broad program of regulation occupied the field.  *Id.* at 788–89.

*Classy Cycles* is apt here.  There is no grant of authority by the Florida Legislature to municipalities to substantively regulate healthcare treatment and discipline.  The State, not localities, occupies this field.  Just as in *Classy Cycles*, here there is nothing local or unique to Tampa about SOCE that would suggest the statewide, uniform medical regulation regime should vary because of Tampa's peculiarities, and should vary across the State, from town to town and from county to county.  The matter legislated against—SOCE—is statewide, not Tampa-specific.  And, a uniform and statewide system of healthcare treatment and practitioner discipline already exists, for sound reasons.  Implied preemption is a

16

disfavored remedy because cities have broad powers to address municipal concerns. But substantive regulation of psychotherapy is a State, not a municipal concern.

Additional cases considering implied preemption have considered whether the Florida Legislature via statute has delegated some enforcement or regulation to local government. Thus, in *Sarasota Alliance for Fair Elections, Inc. v. Browning*, 28 So. 3d 880, 887–88 (Fla. 2010) the court found implied preemption to be improper, in part because Florida election law specifically delegated certain responsibilities and powers to local authorities concerning voting systems. Similar cases finding delegation to local authorities include *Phantom of Clearwater*, 894 So. 2d at 1011 (finding no implied preemption on local fireworks legislation; the State statutory scheme expressly delegated enforcement to local government, with municipalities to regulate displays and set and require bonds for firework sales) and *Hillsborough County v. Florida Restaurant Ass'n, Inc.*, 603 So. 2d 587 (Fla. 2d DCA 1992) (finding Florida alcohol statute expressly reserved local authority on issue for municipalities). In stark contrast to these cases, the State statutory scheme for healthcare regulation leaves nothing substantive at all for municipalities to do; there is no grant or delegation at all to localities.

## FLORIDA'S BROAD AND EXCLUSIVE
## REGULATION OF HEALTHCARE MODALITIES AND DISCIPLINE

The City of Tampa's Ordinance instructs medical doctors, osteopathic doctors, psychologists, and licensed mental health counselors as to what they may and may not say within patient therapy.  Tampa has never regulated healthcare substantively in any other way before Ordinance 2017-47. [7]  Nor does Tampa substantively regulate services similar in nature to healthcare such as massage therapy, acupuncture, optometry, tattoos, piercings, hearing aids, medical labs, or funeral services.

This contrasts with the State of Florida's pervasive and all-encompassing regulation in this field.  To say that the State of Florida's regime of healthcare regulations is vast is an understatement.  There seems nothing more regulated and addressed by the Florida legislative and administrative body than healthcare, and a material part of this is mental health related.  In addition to its breadth and depth, this Florida regulatory scheme is uniform across each of the 400 plus municipalities in the State.  In contrast, the Tampa Ordinance covers only the 114 square miles of city limits, leaving the substantive mental health therapy rules to

_____

[7] Dkt. 133-3 at 111. During the proliferation of "pill mills" in the City, Tampa passed a permitting ordinance on pain management clinics. Tampa, Fla., Code of Ordinances § 6-253 to -262 (2019).  It says nothing substantively about treatment, practice of pain management, or medicine.

vary depending which of the 400 plus Florida municipalities one is in, or even
where one is within Hillsborough County.[8]

## A.  Five State-Mandated Areas the Ordinance Encroaches Upon:

Before the Court surveys specific Florida regulations concerning the practice
types Tampa wishes to regulate, it is important to note five areas of Florida
healthcare law that the Tampa Ordinance seeks to occupy or partly alter.  Because
State law and policy already reside in these areas broadly, there is "danger of
conflict with that pervasive regulatory scheme."  *Classy Cycles*, 201 So. 3d at 788
(citing *Sarasota Alliance*, 28 So. 3d at 886.).

### 1. Florida's Broad Right of Privacy:

Nothing is more intimate, more private, and more sensitive, than a growing
young man or woman talking to a mental health therapist about sex, gender,
preferences, and conflicting feelings.  The Ordinance inserts the City's code
enforcers into the middle of this sensitive, intense and private moment.  But this
moment is already governed by Florida's very broad rights of privacy, something
the Ordinance ignores.

Article I, Section 23 of the Florida Constitution states in pertinent part:
"Right of Privacy.– Every natural person has the right to be let alone and free from

---

[8] Tampa's land area is 114 square miles while Hillsborough County is 1021 square miles in land
area. *See* Community Facts, factfinder.census.gov (last accessed Oct. 2, 2019).

governmental intrusion into the person's private life except as otherwise provided herein." Fla. Const. art. I, § 23.  This provision applies to minors.  *See generally In Re. T.W.*, 551 So. 2d 1186, 1193 (Fla. 1989).  Further, this Florida constitutional right of privacy "embraces more privacy interests, and extends more protection to the individuals in those interests, than does the federal Constitution."  *Id.* at 1191–92; s*ee also Von Eiff v. Azicri*, 720 So. 2d 510, 513 (Fla. 1998).  In a more recent amendment, the Florida Constitution affirmed that "[t]he Legislature shall not limit or deny the privacy right guaranteed to a minor under the United States constitution as interpreted by the Supreme Court."  Fla. Const. art. X, § 22 (enabling parental abortion notification).

The Florida Constitution's privacy right has been implicated in a wide variety of cases.[9]  "The drafters of the amendment rejected the use of the words 'unreasonable' or 'unwarranted' before the phrase 'governmental intrusion' in order to make the privacy right as strong as possible."  *Winfield v. Div. of Pari-Mutual Wagering*, 477 So. 2d 544, 548 (Fla. 1985).  The Florida Constitution's privacy amendment suggests that government should stay out of the therapy room. The Tampa Ordinance does not address this constitutional issue, and in doing so

---

[9] *See, e.g.*, *N. Fla. Women's Health Servs., Inc. v. State*, 866 So. 2d 612, 619 n.6 (Fla. 2003) (citing to fourteen additional examples) (court's holding superseded by constitutional amendment).

the City attempts to occupy a very private space, contrary to a strong statewide policy.

### 2. Parental Choice in Healthcare:

The law in Florida is that, with very few exceptions,[10] parents are responsible for selecting the manner of medical treatment received by their children, and this continues until age 18.  *See* Fla. Stat. § 743.07 (2019); *DeCosta v. N. Broward Hosp. Dist.*, 497 So. 2d 1282, 1283–84 (Fla. 4th DCA 1986) (parents "educate, protect, and provide reasonable and necessary medical attention for child").  The Ordinance eliminates this longstanding parental right without discussion or exception—Florida already occupied this ground.  Parental rights, which the Florida Supreme Court has noted are fundamental and protected by the state constitution,[11] are reduced or increased within Hillsborough County, Florida, depending on whether one steps across the Tampa city line or not.

---

[10] *E.g.*, *J.V. v. State*, 516 So. 2d 1133 (Fla. 1st DCA 1987) (court ordered blood transfusion to child of Jehovah's Witnesses who refused the transfer); Fla. Stat. § 390.01114(4)(a) (judicial override of parental notification for minor's abortion); Fla. Stat. § 394.4784 (adolescent crisis intervention).

[11] *E.g.,*  *D.M.T. v. T.M.H.*, 129 So. 3d 320, 334–35 (Fla. 2013) ("The interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized in American law[;] . . . parents' fundamental right to raise their children is protected by Florida's state constitutional right of privacy[.]") (internal citations and quotations omitted).

### 3. Florida Patient's Bill of Rights:

Besides impacting Florida privacy rights and rights to parental choice in healthcare, the Ordinance alters within the City a patient's rights under the Florida Patient's Bill of Rights and Responsibilities.  This section of the Public Health Chapter, Chapter 381 of the Florida Statutes, states in part:

> A patient has the right to access any mode of treatment that is, in his or her own judgment and the judgment of his or her health care practitioner, in the best interests of the patient, including complementary or alternative health care treatments, in accordance with the provisions of s. 456.41.

Fla. Stat. § 381.026(4)(d)(3).  Because Florida has already staked out this regulatory territory, the Tampa Ordinance enters this area at odds with this portion of the Florida statutory scheme.  Nor did the City appear to consider this Legislative enactment when it was considering the Ordinance.  The Ordinance would appear to substitute the City's judgment for the judgment of the patient and practitioner, an express contradiction of what the Legislature requires in section 381.026(4)(d)(3).

### 4. Florida's Endorsement of Alternative Healthcare Options:

The Ordinance also encroaches upon, without mention or consideration, a provision in Chapter 456 of the Florida Statutes, which is titled "Health Professions and Occupations: General Provisions."  In this chapter, the Legislature stated its intent for health professions:

22

> **Legislative Intent**.–It is the intent of the Legislature that citizens be able to make informed choices *for any type* of health care they deem to be an effective option for treating human disease, pain, injury, deformity, or other physical or mental condition.  It is the intent of the Legislature that citizens be able to choose from all health care options, including the prevailing or conventional treatment methods as well as other treatments designed to complement or substitute for the prevailing or conventional treatment methods.  It is the intent of the Legislature that health care practitioners be able to offer complementary or alternative health care treatments, with the same requirements, provisions, and liabilities as those associated with the prevailing or conventional treatment methods.

Fla. Stat. § 456.41(1) (2019) (emphasis added).

> Although the City outlaws the practice, the Florida statute goes on to read:

> (c) The health care practitioner may, in his or her discretion and *without restriction*, recommend any mode or treatment that is, in his or her judgment, in the best interest of the patient . . . in accordance with the provisions of his or her license.
>
> . . . .
>
> (5) EFFECT.–This section does not modify or change the scope of practice of any licensees of the department, nor does it alter in any way the provisions of the individual practice acts for those licensees, which require the licensees to practice within their respective standards of care and which prohibit fraud or exploitation of patients.

Fla. Stat. § 456.41(3)(c) & (5) (emphasis added).  This statute gives practitioners great leeway to recommend "any mode" of treatment "without restriction."  The only constraint is the applicable standard of care and proper treatment of patients, both of which are set and are policed in great detail by the Department of Health and the professional disciplinary boards organized pursuant to the all-encompassing legislative scheme.

23

This very plain statement of legislative intent in section 456.41 ordains that the patients choose their treatment modality through an informed choice, including alternative or nonconventional choices, with the practitioner free to recommend any modality without restriction.  Fla. Stat. § 456.41(1).  Although the State occupies this field by statute, the City Ordinance seeks to override this legislative intent: there will be no patient choice or unrestricted practitioner discretion for SOCE in Tampa, notwithstanding what the Board of Medicine, the disciplinary bodies, or the relevant standard of care says.

### 5.  Florida's Well-Established Doctrine of Informed Consent:

The Ordinance appears to impact the well-traveled Florida statutory doctrine of informed consent.  For SOCE there will be no informed consent in Tampa although the Florida Legislature has set up a complete and developed scheme of informed consent.  *E.g.*, Fla. Stat. § 766.103 (2019).

This informed consent concept notes that some medical procedures have "substantial risks and hazards inherent in the proposed treatment or procedures[.]"  *Id.* § 766.103(3)(a)(2).  Under Florida law, in the face of those substantial risks and hazards, the healthcare provider may perform the healing function sought so long as fully informed consent by the patient is given "in accordance with an accepted standard of medical practice among members of the medical profession with similar training and experience in the same or similar medical community."  *Id.* §

766.103(3)(a)(1).  In such a case, if the maladies or risks occur about which

informed consent was given, no tort recovery may occur.  *Id.* § 766.103(3).  The

purpose of this law is to permit patients to receive the healthcare they desire and

their caregivers feel they need, so long as the substantial risks and hazards are fully

disclosed and accepted.  Healthcare treatment is risky.  There is a risk in all

healthcare treatments, and this provision permits a patient to assume that risk as

long as it is an informed fashion, guided by the statute.

Informed consent is a bedrock principle of healthcare in a free society.  The

concept vindicates the individual's right to make his or her own informed decision

as to what health treatment he or she will undergo.  When the patient is denied the

ability to exercise or even consider informed consent, the patient's personal liberty

suffers.

According to the Florida Supreme Court, in Florida "[t]he doctrine of

informed consent is well recognized, has a long history, and is grounded in the

common law and based in the concepts of bodily integrity and patient autonomy."

*State v. Presidential Women's Ctr.*, 937 So. 2d 114, 116 (Fla. 2006).  The Florida

Supreme Court adopted the "general rule on this subject as follows: The patient

must be the final arbiter as to whether he will take his chances with the operation,

or take his chances living without it."  *Id.* at 117.  The court further noted, "[N]o

right is held more sacred, or is more carefully guarded, by the common law, than

the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Id.* (citing *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 269 (1990)).

The Tampa Ordinance simply ignores this well-known and broad Florida concept of informed consent.  The City Council has determined that SOCE is too dangerous for even a patient fully informed of all risks, who desires to proceed.

All of these topics such as constitutional privacy rights, parental choice, patient choice as to treatment, and the availability of non-conventional or alternative treatments show that the Legislature has occupied entirely the very wide healthcare swath, whether it is called "informed consent" or "patient's rights."  No room exists in this pervasive and uniform statewide program for the more than four-hundred Florida municipalities to regulate where legislative intent resides so broadly.

**B.  Legislative Regulation of the Practice Areas:**

The Ordinance outlaws some therapeutic speech in the fields of medicine, osteopathic medicine, psychology, and all types of licensed clinical counseling.  In order to determine if the Florida regulatory apparatus shows the State intends to be the sole regulator of these fields, the Court must survey this Florida regulatory program.

26

The Legislature created the Department of Health by Florida Statute § 20.43. One of its duties is to "[r]egulate health practitioners for the preservation of the health, safety, and welfare of the public."  Fla. Stat. § 20.43(2)(g).  Section 20.43 enables the practitioner governing boards discussed below.

The first source to consult in assessing Florida's regulation in this area is Florida Statutes Chapter 456, entitled "Health Professions and Occupations: General Provisions."  Spanning 50 pages of the statute book, this Chapter sets forth the elaborate administrative governing rules for healthcare practice in Florida, placing the State Department of Health as overseer.  All relevant persons practicing healthcare and healing arts in Florida are included under this Department's supervision.  All practice types regulated by Tampa's Ordinance are included in Chapter 456's program of regulation.  Chapter 456 states that "The Legislature . . . believes that such professions shall be regulated only for the preservation of health, safety, and welfare of the public under the police powers of the state.  Such professions shall be regulated when . . . [t]he public is not effectively protected by other means, including, but not limited to, other state statutes, local ordinance, or federal legislation."  Fla. Stat. §§ 456.003(2) & (2)(b).[12]  While Chapter 456 left

---

[12] Florida courts have looked to whether the statutes provide a specific grant of authority to local governing bodies when evaluating whether there is implied preemption. *Classy Cycles*, 201 So. 3d at 788.  This provision is the Legislature explaining why it occupies the field: cities have never regulated medicine before, and do not do so now.  When asked by this Court to supply examples of its similar ordinances, the City could not provide any.  This language is the same text as when the current iteration of the Department of Health was initially established in 1996,

27

open the possibility that the State could set aside areas for local regulation, no such local regulation exists historically and the State has provided no grants to localities prospectively.  Neither Chapter 456 nor other statutes or State regulations provide any opening or suggestion that municipal regulation should supplement the State's comprehensive healthcare coverage.

In fact, the healthcare regulatory scheme created in Chapter 456 provides for an exhaustive disciplinary regime, leaving no set-aside areas for localities to regulate.  Chapter 456 enables the establishment of regulatory boards, based in Tallahassee, for governance and discipline of the various medical professions.  *Id.* §§ 456.004 & 456.006.[13]  This enabling statement of legislative intent omits any reference to municipal powers.  The enabling statement also limits the power of the Department of Health and any state board by barring unreasonable regulations; no similar limitation is mentioned for a municipality, suggesting municipalities have no role.  *Id.* § 456.003(4)(a).  The statute notes "[t]he Legislature shall evaluate proposals to increase the regulation of regulated professions . . . ."  *Id.* §

---

S. 38, ch. 97-261; Fla. Stat. § 455.517(2)(b) (1997), and is pulled directly from the language of the Department of Business and Professional Regulation, Fla. Stat. § 455.201(2)(b) (1997), which, in 1997, both were under Chapter 455: "Regulation of Professions and Occupations: General Provisions."  Since then, the Department of Health general provisions have expanded to be their own section of the code and gone from being 30 pages to 50 pages, in addition to the hundreds of practice specific statutes and administrative regulations.  The statutory reference to the absence of local ordinances explains the pervasive legislative scheme created by the Legislature which clearly occupies the field.

[13] The individual boards are established in Florida Statute § 20.43(2)(g).

28

456.003(4)(c).  Chapter 456 sets up an elaborate scheme to qualify, test, license, regulate, adjudicate, and discipline Florida professionals in each of the healthcare fields.

Section 456.072 is entitled "Grounds for discipline; penalties; enforcement." The final provision of that section states: "The purpose of this section is to facilitate uniform discipline for those actions made punishable under this section and, to this end, a reference to this section constitutes a general reference under the doctrine of incorporation by reference." *Id.* § 456.072(8).  It appears clear from reading this chapter that the Legislature intended a uniform system of discipline to run throughout the State.  The section mandates, statewide, that how one investigates and disciplines healthcare professionals should be uniform.

The text makes clear the Legislature intended for uniform discipline to apply throughout the State when it comes to healthcare providers.  But Tampa's Ordinance creates a different and encroaching process in this area.

For disciplinary proceedings brought pursuant to Florida statute, the State must prove the allegations against a medical professional by "clear and convincing" evidence, subject to investigation at several levels and final review by a peer-review board, trained in the field.[14]  *Id.* § 456.073. Yet Tampa's Ordinance

---

[14] Sanctions for the violation of a statute must be proven by "clear and convincing" evidence. *See Dep't of Banking & Fin. v. Osborne Stern & Co.*, 670 So. 2d 932, 933 (Fla. 1996); *Ferris v. Turlington,* 510 So. 2d 292, 294–95 (Fla. 1987).

29

only requires that a violation be proven by "the greater weight of the evidence" before a code enforcement magistrate.  Tampa, Fla., Code of Ordinances § 9-108(1).  The Florida Administrative Procedure Act prohibits this lesser "greater weight of the evidence standard" in licensure disciplinary proceedings.  Fla. Stat. § 120.57(1)(j).  So, the Tampa Ordinance creates two standards for therapy subject to discipline (whether inside or outside the City limits) and also has a different and less complete adjudicator, who uses a different and less rigorous burden of proof.

The practitioners' appellate remedies are also greatly lessened by Tampa.  A practitioner disciplined under the Tampa Ordinance would have an appeal right to the Circuit Court and review would be limited to the record below, not *de novo*.  Fla. Stat. § 162.11. A practitioner disciplined under the statewide Department of Health statute is entitled to more robust rights—direct review in the District Courts of Appeal, with a *de novo* review of statutory interpretation and a factual review upon "competent, substantial evidence." Fla. Stat. § 120.68; *Safirstein v. Dep't of Health, Bd. of Med.*, 271 So. 3d 1178, 1180 (Fla. 3d DCA 2019).

As to professional discipline, the Ordinance occupies the same field as the Legislature but differs greatly from the statewide model adopted by the Legislature.  The reason for this difference is clear.  Under Florida law,

"professional disciplinary statutes are penal in nature."[15]  The Ordinance alters

Florida law and makes professional disciplinary action not penal, but civil in

nature.

Tampa's divergent standard for punishing errant mental health therapy is

relevant in the preemption analysis because it creates a danger of conflict with an

area pervasively regulated, for which the Legislature has stated a policy of

statewide uniformity.  For this same reason the Florida Supreme Court in

*D'Agastino* found state law impliedly preempted a local ordinance permitting

police subpoenas in local police misconduct investigations.  220 So. 3d at 423–24.

In *D'Agastino* the local ordinance reduced protections present in the statewide

mechanism for investigating and disciplining police officers.  *Id.* at 426.  In

Tampa, the local ordinance reduces protections present in the statewide mechanism

for investigating and disciplining healthcare providers.  Tampa does not

complement protections the State gives to healthcare providers; it reduces them.

The Legislative requirement for "uniform discipline" exists because health

care modalities are highly complex and dynamic, but they do not vary across the

state.  With due respect for the citizen legislators on the Tampa City Council, none

---

[15] *Cone v. State Dep't of Health*, 886 So. 2d 1007, 1011 (Fla. 1st DCA 2004); *Fleischman v. Dep't of Prof'l Regulation,* 441 So. 2d 1121, 1123 (Fla. 3d DCA 1983).

are skilled in mental health issues,[16] nor are any of the City's code enforcement

personnel.  In contrast the Florida Department of Health, with its skilled

adjudicatory bodies, is equipped to address this dynamic area of psychotherapy.

And dynamic it is, indeed.  Although the City expresses confident certitude,

the City's experts, one or both, expressly agreed with the following points:

- Minors can be gender fluid and may change or revert gender identity.  Dkt. 192-2 at 38–40.
- Gender dysphoria during childhood does not inevitably continue into adulthood.  Dkt. 192-2 at 85–87.
- Formal epidemiologic studies on gender dysphoria in children, adolescents, and adults are lacking.  Dkt. 192-2 at 92.
- One Tampa expert testified there is not a consensus regarding the best practices with prepubertal gender nonconforming children.  Dkt. 192-2 at 120–21.
- A second Tampa expert testified consensus does not exist regarding best practices with prepubertal gender nonconforming children, but a trend toward a consensus exists.  Dkt. 192-1 at 159.
- Emphasizing to parents the importance of allowing their child the freedom to return to a gender identity that aligns with sex assigned at birth or another gender identity at any point cannot be overstated.  Dkt. 192-2 at 123.
- One cannot quantify or put a percentage on the increased risk from conversion therapy, as compared to other therapy.  Dkts. 192-2 at 131; 192-1 at 198–99.
- Scientific estimates of the efficacy of conversion therapy are essentially nonexistent because of the difficulties of obtaining samples following individuals after they exit therapy, defining success, and obtaining objective reassessment.  Dkt. 192-1 at 136–37.
- Based on a comprehensive review of this work, the American Psychological Association 2009 SOCE Task Force concluded that no study to date has demonstrated adequate scientific rigor to provide a clear picture of the prevalence or frequency of either beneficial or harmful SOCE outcomes.

---

[16]  Dkt. 190-2 at 93; Dkt. 133-3 at 25.  At oral argument the City's lawyer conceded no council member had skilled knowledge in the field.  The main sponsor of the Ordinance on the council was unaware of the difference between talk therapy and aversive practices, and testified that council and participating staff are untrained in the mental health field.  Dkt. 190-2 at 36, 93.

More recent studies claiming benefits and/or harm have done little to ameliorate this concern.  Dkt. 192-1 at 148.

- No known study to date [looking at 2014 article Dkt. 192-6 at 2] has drawn from a representative sample of sufficient size to draw conclusions about the experience of those who have attempted SOCE.  Dkt. 192-1 at 149.

- No known study [looking at same 2014 article] has provided a comprehensive assessment of basic demographic information, psychosocial wellbeing, and religiosity, which would be required to understand the effectiveness, benefits and/or harm caused by SOCE.  Dkt. 192-1 at 150.

- Although research on adult populations has documented harmful effects of SOCE, no scientific research studies have examined SOCE among adolescents.  Dkt. 192-1 at 153.

- With extraordinarily well-trained counseling "in a hypothetically perfect world" it may be an appropriate course of action for a counselor to aid a gender-dysphoric child who wants to return to biological gender of birth.  Dkt. 192-1 at 171–72.

- There is a lack of published research on efforts to change gender identity among childhood and adolescents.  Dkt. 192-1 at 177.

- As of October 2015 no research demonstrating the harms of conversion therapy with gender minority youth has been published.  Dkt. 192-1 at 180–81.  In 2018 an article was published on youth but causal claims could not be made from that 2018 report. Dkt. 192-1 at 181.

As the citations above show, the City's highly-credentialed experts, one or both, expressly agreed with the above bullet points.  This illustrates the complex and dynamic subject matter of human gender and sexual preference.  This shows the wisdom of the Legislature's program of uniform statewide governance and defining and disciplining the field statewide by medical experts.  The field of gender expression is especially complex.  Tampa's lay attempt at psychotherapy regulation crowds into this very complex, evolving area.

### 1. Specific Regulations for Medical Doctors (M.Ds.):

After the lengthy set-up of the Florida Department of Health in Chapters 20

and 456, the Legislature then set forth practitioner-specific statutes.  M.Ds. are

more specifically regulated by Chapter 458—spanning 37 pages in the statute

book.  Fla. Stat. § 458.  Expanding upon Chapter 456, this Chapter is entitled

"Medical Practice."  Chapter 458 creates the Florida Board of Medicine to license

and discipline M.Ds.  This Board is comprised of 15 members appointed by the

Governor subject to Florida Senate approval.  *Id.* § 458.307(1).

Chapter 458 restricts certain dangerous psychiatric procedures such as

electroconvulsive and psychosurgical procedures, *id.* § 458.325, but omits any

reference to SOCE psychological treatment.  It appears that the Florida legislature

has considered SOCE regulation in the recent past,[17] but has not acted upon it.

Committing medical (psychiatric) malpractice (defined as "failure to practice

medicine in accordance with the level of care, skill, and treatment recognized in

general law related to health care licensure") is grounds for discipline. *Id.* §

458.331(1)(t)(1) (citing Fla. Stat. § 456.50(1)(g)).

This far into the Court's survey of Florida law it is apparent that the Florida

statutes *already* provide the City with its desired protection against SOCE.  The

City and its experts adamantly assert that even non-aversive SOCE violates the

---

[17] H.B. 137, 2016 Leg. (Fla. 2016); S.B. 258 2016 Leg. (Fla. 2016).

prevailing treatment standard of care, and constitutes psychiatric, psychological, and counseling malpractice.[18]  This is the essence of the Ordinance.  The present Florida legislative scheme already outlaws such professional behavior, and it is subject to statewide discipline.

All the City, the City's Neighborhood Enhancement director, or the Assistant City Attorney need do if the SOCE they describe is detected within Tampa limits is file a complaint with the Department of Health.  As the Board of Medicine notes, "Who can file a complaint? Anyone can file a complaint." Board of Medicine, Complaints Process FAQs, https://flboardofmedicine.gov/complaints-process-faqs/ (last accessed Oct. 3, 2019).

The Florida regulatory scheme punishes and bars all mental health therapy that is beneath the prevailing standard of care.  *See* Fla. Stat. §§ 458.331(1)(t)(1) & 456.50(1)(e) (adopting the tort "standard of care" from Fla Stat. § 766.102 for discipline).  And, it obviously bars all unreasonably dangerous treatment.  In this vein, the reason why the City has never reported SOCE to Florida disciplinary boards may be because the City has yet to find any in Tampa.  Likewise, in the similar *Otto* case from Palm Beach County, the court noted that "[t]he Florida

---

[18] Dkt. 192-11, Spack Declaration at 3–4; Dkt. 192-2 at 131–33; Dkt. 192-3, Glassgold Declaration at ¶¶ 23, 41, 47, 51; Dkt. 189 at 21.

Department of Health had no records regarding complaints against medical providers regarding SOCE." *Otto*, 353 F. Supp. 3d at 1264.

To complete the Court's review of Chapter 458, it is noteworthy that Section 458.331 lists "grounds for disciplinary action" of M.Ds. Like Chapter 456, the Legislature in the final subsection notes "The purpose of this section is to facilitate uniform discipline . . . ." Fla. Stat. § 458.331(tt)(11). This legislative scheme does not contemplate divergent professional disciplinary standards among and between the Florida cities and towns.

The Florida regulatory scheme for medical doctors then goes beyond the statute book, to the Florida Administrative Code. Starting at Chapter 64B8-1.001, the administrative code stretches some 143 pages of regulations concerning how medical doctors must run their practices, their assistants, and how they must treat patients. The administrative code supplements and expands the disciplinary functions set forth in the statute book. Fla. Admin. Code 64B8-8.001. Practicing below the general standard of care is punishable by fines and sanctions ranging from one year probation and a $1000 fine to a $10,000 fine and permanent license revocation. *Id.* at 64B8-8.001(2)(t).

## 2. Specific Regulations for Osteopaths (D.Os.)

The Tampa Ordinance applies to Osteopathic Medicine. The Florida Legislature regulates D.Os. through Chapter 459, Florida Statutes, entitled

36

"Osteopathic Medicine."  The 29 pages of this Chapter set forth the regulatory framework for osteopaths.  The Chapter creates a gubernatorial appointed and senate-approved 7-member "Board of Osteopathic Medicine" to screen, license, and provide disciplinary framework for those practicing osteopathic medicine.  Fla. Stat. § 459.004.

Discipline for osteopathic physicians is set forth in section 459.015 and that section repeats the legislative mantra: "The purpose of this section is to facilitate uniform discipline for those acts made punishable under this section . . . ."  *Id.* § 459.015(11).  Grounds for discipline include practice beyond the standard of care, and "[t]he board may establish by rule standards of practice and standard of care for particular practice settings . . . ."  *Id.* § 459.015(1)(z).  This statutory provision about the Board of Osteopathy's ability to establish standards of practice by rule did not include any reference to Florida municipalities establishing osteopathic practice standards.

Florida's regulation of osteopathic medicine is supplemented by the Florida Administrative Code, with separate and lengthy administrative code provisions albeit along the same lines as those administrative regulations appertaining to medical doctors.  *See* Fla. Admin. Code 64B15.  The administrative regulations for osteopathic physicians say nothing about local ordinances supplementing or contradicting the State rules.

### 3.  Specific Regulations for Psychologists

The Tampa's Ordinance also seeks to regulate licensed psychologists.

Psychologists are subject to 21 pages of statutory regulation by Florida Statutes

Chapter 490, entitled "Psychological Services."  Fla. Stat. § 490.  As with the other

disciplines, this Chapter invokes a  "Board of Psychology" appointed by the

Governor and approved by the Florida Senate, that regulates the field from pre-

license education to testing, professional behavior and practice standards, and

discipline.  *Id.* § 490.004.  The statute includes the familiar requirement that the

practitioner perform within "the minimum standards of performance in

professional activities when measured against generally prevailing peer

performance," or face discipline.  *Id.* § 490.009(1)(r).

As with the other practitioners, Florida goes beyond the statute book and

provides 31 pages of regulations in the Florida Administrative Code for

psychologists.  Fla. Admin. Code 64B19.  The regulations cover licensure, limited

licensure, discipline, consent for treatment for minors, special rules for treating

juvenile sex offenders, etc.  The regulations do not refer to local rules.

### 4.  Specific Regulations for Licensed Counselors:

Plaintiff Vazzo is a Florida-licensed marriage and family therapy counselor,

and the Ordinance applies to him.  Vazzo and his fellow practitioners are regulated

under Chapter 491, Florida Statutes, entitled "Clinical, Counseling, and

Psychotherapy Services." Fla. Stat. § 491. This 13-page statute sets up a

disciplinary and regulatory 6-member appointed board known as the "Board of

Clinical Social Work, Marriage and Family Therapy, and Mental Health

Counseling." Fla. Stat § 491.004. The Chapter regulates the conduct of Vazzo

and licensed therapists in this state, including discipline. *Id.* § 491.009. The

Legislature specifically defines "mental health counseling" as "the use of scientific

and applied behavioral science theories, methods, and techniques for the purpose

of describing, preventing and treating undesired behavior and enhancing mental

health . . . ." *Id.* § 491.003(9). This practice includes "behavior modification" to

address "dysfunctions," related to "behavioral disorders" and "sexual

dysfunction[.]" *Id.* Gender dysphoria is listed in the American Psychological

Associations Diagnostic and Statistic Manual of Mental Disorders (5th ed. 2013)

("DSM"), [19] and licensed counseling on that subject is clearly included in this

statutory definition.

   The disciplinary provisions of Chapter 491 make sanctionable any

counseling practice that fails to meet the minimum standard of care "when

measured against generally prevailing peer performance[.]" Fla. Stat §

491.009(1)(r). As with the other professions, the mental health counselor statute is

accompanied by regulations in the Florida Administrative Code. Fla. Admin. Code

---

[19] *See* DSM at 451–59 for a discussion of this sensitive topic.

64B4.  These 45 pages of administrative regulations control the qualifications, licensing, practice, and discipline in the entire licensed counselor area.  No delegation to cities can be found.

Among the disciplinary sanctions for counseling beneath the prevailing standard of care are a $5000 fine and permanent license revocation.  *Id.* at 64B4-5.010(s).  The rules contain a continuing professional education requirement for licensed counselors.  Ongoing training courses are required but only from an approved list of courses and providers, as set forth in the regulations.  *Id.* at 64B4-6.002.

The regulations add additional license requirements for Vazzo's specialty of marriage and family therapy.  *Id.* at 64B4-22.110. That license requires additional course content in, among other subjects:  i) psychopathology, defined as "the evaluation and classification of abnormal human behavior and psychiatric disorders in individuals according to current diagnostic standards (DSM IVTR and ICD9 or ICD10);" and ii) human sexuality theory and counseling techniques, defined as "a broad understanding of human sexual development, both normal and abnormal sexual functioning and appropriate counseling techniques for sexual dysfunctions;" and iii) psychosocial theories, defined as: "the interrelationship of psychology and sociology in understanding the growth and development of living human systems within their larger, social systems context.  Courses in family

40

sociology, gender, anthropology or culture and ethnicity in counseling offer psychosocial awareness." *Id.* at 64B4-22.110(5), (6), (8).

For the reasons noted above, the Court concludes that Florida's substantive regulation of healthcare practices, modalities, and discipline is so pervasive that it occupies the entire field.  The City's Ordinance creates a danger of conflict with the Legislature's broad program for the healing arts in Florida.  The strong policy reasons for a statewide, uniform system of substantive healthcare regulation and discipline are clear, as is the Legislature's intent for same.

## CONCLUSION

Accordingly, the Court grants Plaintiffs' motion for summary judgment, Dkt. 194, on Count VI.  Tampa Ordinance 2017-47 is stricken under the doctrine of implied preemption.  The Defendant is permanently enjoined from enforcing it. The Clerk is instructed to enter judgment for Plaintiffs and to close this case.

DONE AND ORDERED, at Tampa, Florida, on October 4, 2019.


*/s/ William F. Jung*
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


**COPIES FURNISHED TO:**
Counsel of Record

# **Appendix**



S T A T E   O F   F L O R I D A )
                               ) CITY OF TAMPA
COUNTY OF HILLSBOROUGH)


### CLERK'S CERTIFICATE

I, Shirley Foxx-Knowles, the duly appointed and qualified City Clerk of the City of Tampa, Florida,

do hereby certify to the best of my knowledge, that the attached document is a true and correct copy

of Ordinance No. 2017-47 adopted by the City Council of the City of Tampa, on April 6, 2017 and

approved by the Mayor on April 10, 2017 relating to conversion therapy on patients who are minor,

making revisions to City of Tampa Code of Ordinances, Chapter 14 (Offenses); creating Article X,

Sections 14-310 – 14-313; amending Chapter 19 (Property Maintenance and Structural Standards);

amending Section 19-4(a)(2), Department of Code Enforcement; duties and scope of authority of

the Director; on file in the Office of the City Clerk.


WITNESS, My hand and the Official Seal of the City of Tampa, Florida on this the 15th day of
December, 2017.




                                             *Shirley Foxx-Knowles*
                                             Shirley Foxx-Knowles
                                             City Clerk



(SEAL OF THE CITY OF TAMPA)



PLAINTIFF'S
EXHIBIT
4
Ruggiero
10/30/18

*Code change*

ORDINANCE NO. 2017- *47*

AN ORDINANCE OF THE CITY OF TAMPA, FLORIDA,
RELATING TO CONVERSION THERAPY ON PATIENTS
WHO ARE MINORS, MAKING REVISIONS TO CITY OF
TAMPA CODE OF ORDINANCES, CHAPTER 14
(OFFENSES); CREATING ARTICLE X, SECTIONS 14-310 –
14-313; AMENDING CHAPTER 19 (PROPERTY
MAINTENANCE AND STRUCTURAL STANDARDS);
AMENDING SECTION 19-4(a)(2), DEPARTMENT OF CODE
ENFORCEMENT; DUTIES AND SCOPE OF AUTHORITY OF
THE DIRECTOR; REPEALING ALL ORDINANCES OR
PARTS OF ORDINANCES IN CONFLICT THEREWITH;
PROVIDING FOR SEVERABILITY; PROVIDING AN
EFFECTIVE DATE.

WHEREAS, as recognized by major professional associations of mental
health practitioners and researchers in the United States and elsewhere for nearly 40
years, being lesbian, gay, bisexual, transgender or gender nonconforming, or
questioning (LGBT or LGBTQ) is not a mental disease, disorder or illness,
deficiency or shortcoming; and

WHEREAS, the American Academy of Pediatrics in 1993 published an
article in its Journal, stating: "Therapy directed at specifically changing sexual
orientation is contraindicated, since it can provoke guilt and anxiety while having
little or no potential for achieving changes in orientation;"[1] and

WHEREAS, the American Psychiatric Association in December 1998
published its opposition to any psychiatric treatment, including reparative or
conversion therapy, which therapy regime is based upon the assumption that
homosexuality is a mental disorder *per se* or that a patient should change his or her
homosexual orientation;[2] and

WHEREAS, the American Psychological Association's Task Force on
Appropriate Therapeutic Responses to Sexual Orientation ("APA Task Force")
conducted a systematic review of peer-reviewed journal literature on Sexual
Orientation Change Efforts ("SOCE"), and issued its report in 2009, citing research
that sexual orientation change efforts can pose critical health risks to lesbian, gay, and
bisexual people, including confusion, depression, guilt, helplessness, hopelessness,
shame, social withdrawal, suicidality, substance abuse, stress, disappointment, self-
blame, decreased self-esteem and authenticity to others, increased self-hatred,
hostility and blame toward parents, feelings of anger and betrayal, loss of friends and
potential romantic partners, problems in sexual and emotional intimacy, sexual

---

[1] http://pediatrics.aappublications.org/content/pediatrics/92/4/631.full.pdf
[2] https://www.camft.org/ias/images/PDFs/SOCE/APA_Position_Statement.pdf

-1-

*E2017-48*
*E2017-8 CH14*
*E2017-8 CH19*

dysfunction, high-risk sexual behaviors, a feeling of being dehumanized and untrue to self, a loss of faith, and a sense of having wasted time and resources;[3] and

WHEREAS, following the report issued by the APA Task Force, the American Psychological Association in 2009 issued a resolution on Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts, advising parents, guardians, young people, and their families to avoid sexual orientation change efforts that portray homosexuality as a mental illness or developmental disorder and to seek psychotherapy, social support, and educational services that provide accurate information on sexual orientation and sexuality, increase family and school support, and reduce rejection of sexual minority youth;[4] and

WHEREAS, the American Psychoanalytic Association in June 2012 issued a position statement on conversion therapy efforts, articulating that "As with any societal prejudice, bias against individuals based on actual or perceived sexual orientation, gender identity or gender expression negatively affects mental health, contributing to an enduring sense of stigma and pervasive self-criticism through the internalization of such prejudice" and that psychoanalytic technique "does not encompass purposeful attempts to 'convert,' 'repair,' change or shift an individual's sexual orientation, gender identity or gender expression," such efforts being inapposite to "fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by reinforcing damaging internalized attitudes;"[5] and

WHEREAS, the American Academy of Child & Adolescent Psychiatry in 2012 published an article in its Journal stating that clinicians should be aware that there is "no evidence that sexual orientation can be altered through therapy and that attempts to do so may be harmful;" that there is "no medically valid basis for attempting to prevent homosexuality, which is not an illness;" and that such efforts may encourage family rejection and undermine self-esteem, connectedness and caring, important protective factors against suicidal ideation and attempts; and that, for similar reasons cumulatively stated above, carrying the risk of significant harm, SOCE is contraindicated[6]; and

WHEREAS, the Pan American Health Organization, a regional office of the World Health Organization, issued a statement in 2012 stating: "'These supposed conversion therapies constitute a violation of the ethical principles of health care and violate human rights that are protected by international and regional agreements.'" The organization also noted that conversion therapies "lack medical justification and represent a serious threat to the health and well-being of affected people;"[7] and

---

[3] https://www.apa.org/pi/lgbt/resources/therapeutic-response.pdf
[4] http://www.apa.org/about/policy/sexual-orientation.pdf
[5] http://www.apsa.org/content/2012-position-statement-attempts-change-sexual-orientation-gender-identity-or-gender
[6] http://www.jaacap.com/article/S0890-8567(12)00500-X/pdf
[7] http://www.paho.org/hq/index.php?option=com_content&view=article&id=6803%3A2012-therapies-changesexual-orientation-lack-medical-justification-threaten health&catid=740%3Apress-releases&Itemid=1926&lang=en

WHEREAS, in 2014 the American School Counselor Association issued a position statement that states: "It is not the role of the professional school counselor to attempt to change a student's sexual orientation or gender identity. Professional school counselors do not support efforts by licensed mental health professionals to change a student's sexual orientation or gender as these practices have been proven ineffective and harmful;"[8] and

WHEREAS, a 2015 report of the Substance Abuse and Mental Health Services Administration, a division of the U.S. Department of Health and Human Services, "Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth" further reiterates based on scientific literature that conversion therapy efforts to change an individual's sexual orientation, gender identity, or gender expression is a practice not supported by credible evidence and has been disavowed by behavioral health experts and associations, perpetuates outdated views of gender roles and identities, negative stereotypes, stating, importantly, that such therapy may put young people at risk of serious harm, and recognizing that, same-gender sexual orientation (including identity, behavior, and attraction) is part of the normal spectrum of human diversity and does not constitute a mental disorder;[9] and

WHEREAS, the American College of Physicians wrote a position paper in 2015 opposing the use of "conversion," "reorientation," or "reparative" therapy for the treatment of LGBT persons, stating that "[a]vailable research does not support the use of reparative therapy as an effective method in the treatment of LGBT persons. Evidence shows that the practice may actually cause emotional or physical harm to LGBT individuals, particularly adolescents or young persons;"[10] and

WHEREAS, In 2016, the American Medical Association issued policy statement H-160.991, which expressly opposed the use of "reparative" or "conversion" therapy for sexual orientation or gender identity;[11] and

WHEREAS, The World Psychiatric Association issued a policy statement in March, 2016 on Gender Identity and Same-Sex Orientation, which stated, "There is no sound scientific evidence that innate sexual orientation can be changed. Furthermore, so-called treatments of homosexuality can create a setting in which prejudice and discrimination flourish, and they can be potentially harmful. The provision of any intervention purporting to 'treat' something that is not a disorder is wholly unethical;"[12] and

WHEREAS, The National Association of Social Workers ("NASW") issued a policy statement stating that "No data demonstrates that reparative or conversion therapies are effective, and in fact they may be harmful." The NASW went further and stated that "conversion and reparative therapies are an infringement to the guiding principles inherent to social worker ethics and values;"[13] and

---

[8] https://www.schoolcounselor.org/asca/media/asca/PositionStatements/PS_LGBTQ.pdf
[9] http://store.samhsa.gov/shin/content/SMA15-4928/SMA15-4928.pdf
[10] http://annals.org/article.aspx?articleid=2292051
[11] https://www.ama-assn.org/delivering-care/policies-lesbian-gay-bisexual-transgender-queer-lgbtq-issues
[12] http://www.wpanet.org/WPA_in_News.php
[13] http://www.naswdc.org/diversity/lgb/reparative.asp

-3-

WHEREAS, The Agency for Healthcare Research and Quality issued a clinician's guideline for practitioners who work with children and adolescents based on research provided by the American Academy of Child and Adolescent Psychiatry. It stated that "There is no empirical evidence that adult homosexuality can be prevented if gender nonconforming children are influenced to be more gender conforming. Indeed, there is no medically valid basis for attempting to prevent homosexuality, which is not an illness. On the contrary, such efforts may encourage family rejection and undermine self-esteem, connectedness, and caring, which are important protective factors against suicidal ideation and attempts;"[14] and

WHEREAS, At least two federal circuit courts of appeal have upheld bans on conversion therapy.[15]  Both courts found that bans on conversion therapy did not violate free speech rights; nor did such bans run afoul of the Free Exercise Clause; nor were such bans vague or impermissibly overbroad.  Further the courts found that counseling is professional speech, subject to a lower level of judicial scrutiny because the government has a substantial interest in protecting citizens from ineffective or harmful professional practices; and

WHEREAS, the City does not intend to prevent mental health providers from speaking to the public about SOCE; expressing their views to patients; recommending SOCE to patients; administering SOCE to any person who is 18 years of age or older; or referring minors to unlicensed counselors, such as religious leaders. This ordinance does not prevent unlicensed providers, such as religious leaders, from administering SOCE to children or adults; nor does it prevent minors from seeking SOCE from mental health providers in other political subdivisions or states outside of the City of Tampa, Florida; and

WHEREAS, City of Tampa has a compelling interest in protecting the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and questioning youth, and in protecting its minors against exposure to serious harms caused by sexual orientation and gender identity change efforts; and

WHEREAS, the City Council hereby finds the overwhelming research demonstrating that sexual orientation and gender identity change efforts can pose critical health risks to lesbian, gay, bisexual, transgender or questioning persons, and that being lesbian, gay, bisexual, transgender or questioning is not a mental disease, mental disorder, mental illness, deficiency, or shortcoming; and

WHEREAS, the City Council finds minors receiving treatment from licensed therapists in the City of Tampa, Florida who may be subject to conversion or reparative therapy are not effectively protected by other means, including, but not limited to, other state statutes, local ordinances, or federal legislation; and

---

[14] https://www.guideline.gov/summaries/summary/38417
[15] King v. Governor of the State of New Jersey, 767 F.3d 216 (3rd Cir. 2014) and Pickup v. Brown, 740 F.3d 1208 (9th Cir. 2013)

-4-

WHEREAS, the City Council desires to prohibit, within the geographic boundaries of the City, the practice of sexual orientation or gender identity change efforts on minors by licensed therapists only, including reparative and/or conversion therapy, which have been demonstrated to be harmful to the physical and psychological well-being of lesbian, gay, bisexual, transgender and questioning persons.

## NOW, THEREFORE,

**BE IT ORDAINED BY THE CITY COUNCIL**
**OF THE CITY OF TAMPA, FLORIDA,**

**Section 1.** That the Whereas Clauses are adopted as if set forth fully herein.

**Section 2.** That "Chapter 14, Article X" is created as follows:

### "CHAPTER 14, ARTICLE X, CONVERSION THERAPY"

**Section 3.** That "Sec. 14.310. – Intent." is hereby created by adding the underlined language as follows:

**"Sec. 14-310. – Intent.**

The Intent of this Ordinance is to protect the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and/or questioning youth, from exposure to the serious harms and risks caused by conversion therapy or reparative therapy by licensed providers, including but not limited to licensed therapists. These provisions are exercises of police power of the City for the public safety, health, and welfare; and its provisions shall be liberally construed to accomplish that purpose."

**Section 4.** That "Sec. 14-311. – Definitions." is hereby created by adding the underlined language as follows:

**"Sec. 14-311. – Definitions.**

(a) *Conversion therapy* or *reparative therapy* means, interchangeably, any counseling, practice or treatment performed with the goal of changing an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behaviors, gender identity, or gender expression, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex. Conversion therapy does not include counseling that provides support and assistance to a person undergoing gender transition or counseling that provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as such counseling does not seek to change sexual orientation or gender identity.

(b)    *Minor* means any person less than 18 years of age.

(c)    *Provider* means any person who is licensed by the State of Florida to provide professional counseling, or who performs counseling as part of his or her professional training under chapters 456, 458, 459, 490 or 491 of the Florida Statutes, as such chapters may be amended, including but not limited to, medical practitioners, osteopathic practitioners, psychologists, psychotherapists, social workers, marriage and family therapists, and licensed counselors. A Provider does not include members of the clergy who are acting in their roles as clergy or pastoral counselors and providing religious counseling to congregants, as long as they do not hold themselves out as operating pursuant to any of the aforementioned Florida Statutes licenses."

Section 5.    That "Sec. 14-312. – Conversion Therapy Prohibited." is hereby created by adding the underlined language as follows:

"Sec. 14-312. – Conversion Therapy Prohibited.

It shall be unlawful for any Provider to practice conversion therapy efforts on any individual who is a minor regardless of whether the Provider receives monetary compensation in exchange for such services."

Section 6.    That "Sec. 14-313. – Enforcement and Civil Penalties." is hereby created by adding the underlined language as follows:

"Sec. 14-313. – Enforcement and Civil Penalties.

(a)    This article may be enforced pursuant to Chapter 9, Article II of this Code.

(b)    The violation of Sec. 14-312 of this Division is deemed an irreparable or irreversible violation.

(c)    Each separate incident of a violation of Sec. 14-312 shall constitute a separate violation for enforcement purposes.

(d)    The fine for a first violation of Sec. 14-312 is $1000.00. The fine for a second and subsequent violation(s) of Sec. 14-312 is $5000.00

(e)    These penalties shall not preclude any other remedies available at law or in equity, including, injunctive relief in the circuit court."

Section 7.    That "Sec. 19-4(a)(2). – Department of Code Enforcement; duties and scope of authority of the director" is hereby amended by adding the underline language as follows:

"Sec. 19-4(a)(2). – Department of Code Enforcement; duties and scope of authority of the director

(a)The director shall have all powers, duties and responsibilities to administer and enforce the following City Code chapters or sections: The director shall be deemed to be an officer for the purpose of enforcing the provisions of this chapter under authority provided in section 1-14 of this Code.

(1)Section 5-105;

-6-

(2)Chapter 14, articles III, IV, and X;
(3)Chapter 19;
(4)Chapter 21, articles I, II, III and V;
(5)Chapter 22, articles I and III;
(6)Chapter 25, article I;
(7)Chapter 27."

**Section 8.**     All ordinances or parts of ordinances in conflict herewith are hereby repealed.

**Section 9.**     Should any section or provision of this Ordinance or any portion, paragraph, sentence, or word be declared invalid by a court of competent jurisdiction, such decision shall not affect the validity of the remainder of this Ordinance.

**Section 10.**     Authority is hereby granted to codify the text amendment set forth in Section 1 of this Ordinance.

**Section 11.**     That this Ordinance shall take effect immediately upon its adoption.

PASSED AND ORDAINED BY THE CITY COUNCIL OF THE CITY OF TAMPA, FLORIDA, ON _____ APR 0 6 2017 _____.

CHAIRMAN/CHAIRMAN PRO-TEM,
CITY COUNCIL

ATTEST:

SHIRLEY FOXX-KNOWLES, CITY CLERK

APPROVED BY ME ON   APR 1 0 2017

BOB BUCKHORN, MAYOR

Approved As to Legal Sufficiency:

        E/S
Ernest Mueller, Senior Assistant City Attorney

-7-